# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ALLAN TEH,<br><br>        Plaintiff,<br><br>                v.<br><br>LEE MELCHIONNI, individually,<br>SYLVIA BENITO, individually,<br>JUSTICE PARTNERS MANAGEMENT, a<br>Delaware Limited Liability Company,<br>JUSTICE PARTNERS LAW GROUP, a District of<br>Columbia Limited Partnership, PERSIST<br>COMMUNICATIONS, INC., a Florida Corporation,<br>THE LAKE LAW FIRM, a New York Limited Liability<br>Company, and EDWARD LAKE,<br><br>        Defendants, | Case No.:<br><br>**NOTICE OF REMOVAL** |

## DOCKET INDEX

| |
|---|
| State Court Docket Sheet |
| 001 - 2024-10-25 Civil Cover Sheet |
| 002 - 2024-10-25 Complaint |
| 005 - 2024-12-09 Defendant's Answer to the Complaint |
| 009 - 2025-01-21 Defendant's Persist Comm Inc, Lake Law Firm, and Edwards Lakes Notice of Appearance and Designation Email Address |
| 010 - 2025-01-22 Defendant's Persist Comm Inc, Lake Law Firm, and Edward Lakes Motion for Extension of Time to Respond to Complaint |
| 011 - 2025-01-23 Agreed Order on Defendant's Persist Com Inc, Lake Law Firm's Motion for Extension of Time to Respond to Plaintiff's Complaint |
| 019 - 2025-02-11 Defendant's Persist Com, Lake Law Firm, and Edward Lakes Motion to Dismiss Plaintiff's Complaint |
| 020 - 2025-02-21 Plaintiff's Response in Opposition to Defendant's Motion to Dismiss |
| 023 - 2025-05-07 Plaintiff's Agreed Motion to Transfer |
| 024 - 2025-05-06 Agreed Order Granting Agreed Motion to Transfer |

| |
|---|
| 026 - 2025-05-24 Order Setting Initial Case Management Conference and to Prepare a Mandatory Case Status Report |
| 029 - 2025-08-01 Plaintiff's Notice of Filing Joint Case Management Report |
| 030 - 2025-09-01 Uniform Pre-Trial Preparation Order |
| 031 - 2025-09-01 Order Setting Jury Trial and Final Pretrial Conference and Calendar Call |
| 032 - 2025-09-11 Notice of Filing Supplemental Authority in Further Support of Plaintiff's Response to Defendants' Motion to Dismiss |
| 033 - 2025-09-27 Order Granting Defendants Motion to Dismiss Plaintiff's Complaint [DE.19] |
| 036 - 2025-10-17 Plaintiff's First Amended Complaint |
| 039 - 2025-10-22 Mediation Disposition Report |
| 042 - 2025-10-27 Defendant Sylvia Benito's Answer and Counter Claim |
| 044 - 2025-10-28 Defendant's LLF, Persist and Edward Lake's Motion to Dismiss Plaintiff's First Amended Complaint |
| 045 - 2025-10-29 JP Management & JP Law Group's Answer and Affirmative Defenses |
| 046 - 2025-10-29 Melchionni's Answer and Affirmative Defenses |
| 047 - 2025-11-07 Plaintiff's Response in Opposition to LLF, Persist & Lake's Motion to Dismiss |
| 048 - 2025-11-07 Plaintiff's Notice of Filing - Suffolk Complaints |

# Case Information

| | | |
|---|---|---|
| **Local Case Number:** 2024-020751-CA-01 | **State Case Number:** 132024CA02075101GE01 | **Case Style:** Allan Teh vs PERSIST COMMUNICATIONS, INC. et al |
| **Filing Date:** 10/25/2024 | **Judicial Section:** CA44 - Downtown Miami - Judge Walsh, Lisa S | **Case Status:** OPEN |
| **Case Type:** Business Torts | **Consolidated Case No.:** | |

# Related Cases

| Case Number: | Filing Date: | Case Type: |
|---|---|---|
| 2023-004474-CA-01 | 03/15/2023 | Business Transactions |
| 2023-015702-CA-01 | 04/25/2023 | Shareholder Derivative |
| 2023-018039-CA-01 | 06/09/2023 | Shareholder Derivative |

# Hearing Details

| | | |
|---|---|---|
| **Hearing Date:** 04/17/2025 | **Hearing Time:** 8:15AM | **Hearing Code:** SPECSETS |
| **Description:** Special Sets | **Hearing Location:** | |
| **Hearing Date:** 04/17/2025 | **Hearing Time:** 8:15AM | **Hearing Code:** SPECSETS |
| **Description:** Special Sets | **Hearing Location:** | |

# Parties

| Party Description | Party Name | Attorney Information | Other Attorney(s) |
|---|---|---|---|
| Plaintiff | Teh, Allan | **B#:** 909335 Jones, Matthew L. | |
| Defendant | PERSIST COMMUNICATIONS, INC. | **B#:** 115465 Gelber, Matthew R., ESQ | |
| Defendant | Melchionni, Lee | **B#:** 124041 Bitran, Daniel S. | |
| Defendant | Benito, Sylvia | **B#:** 124041 Bitran, Daniel S. | **B#:** 887056 Montalvo, Hector James |
| Defendant | Justice Partners Management LLC | **B#:** 124041 Bitran, Daniel S. | |
| Defendant | Justice Partners Law Group, LP | **B#:** 124041 Bitran, Daniel S. | |
| Defendant | Lake, Edward | **B#:** 115465 Gelber, Matthew R., ESQ | |

| Party Description | Party Name | Attorney Information | Other Attorney(s) |
|---|---|---|---|
| Defendant | The Lake Law Firm, LLC | B#: 115465<br>Gelber, Matthew R., ESQ | |

# Dockets

| DIN | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|
| 49 | 11/07/2025 | | Response to Motion | Event | |
| 48 | 11/07/2025 | | Notice of Filing: | Event | Complaint: Benito v. Lake et. al., Index No: 628021/2025, Supreme Court of the State of New York County of Suffolk; Complaint: Law Office of Edward J. Lake v. Melchionni, Benito, Solit, et. al, Supreme Court of the State of New York County of Suffolk; Complaint: Blakemore Investments, LLC v. Law Offices of Edward J. Lake, P.C. d/b/a The Lake Law Firm and Edward J. Lake, Index No. 629003/2025, Supreme Court of the State of New York County of Suffolk |
| 47 | 11/07/2025 | | Amended Notice of Hearing | Event | November 26th, 2025 |
| 46 | 10/29/2025 | | Answer to Amended Complaint | Event | |
| 45 | 10/29/2025 | | Answer to Amended Complaint | Event | |
| 43 | 10/29/2025 | | Receipt: | Event | Receipt#:3190078 Amt Paid:$395.00 Name:MONTALVO, HECTOR JAMES 848 BRICKELL AVENUE, SUITE 310 MIAMI, FLORIDA 3313 Comment: Allocation Code Quantity Unit Amount 3103-Circuit Cross Clai 1 $395.00 $395.00 Tender Type:eFilings Tender Amt:$395.00 Receipt Date:10/29/2025 Register#:319 Cashier:EFilingUser EFiling #:234563642 |
| 44 | 10/28/2025 | | Motion to Dismiss | Event | |
| 42 | 10/27/2025 | | Answer and Counter Claim | Event | |
| 41 | 10/27/2025 | | Order: | Event | Granting Motion For Admission To Appear Pro Hac Vice Of Nafiz Cekirge |
| 40 | 10/24/2025 | | Receipt: | Event | Receipt#:3220127 Amt Paid:$100.00 Name:MONTALVO, HECTOR JAMES 848 BRICKELL AVENUE, SUITE 310 MIAMI, FLORIDA 3313 Comment: Allocation Code Quantity Unit Amount 3176-Non-Fla Attorney F 1 $100.00 $100.00 Tender Type:eFilings Tender Amt:$100.00 Receipt Date:10/24/2025 Register#:322 Cashier:EFilingUser EFiling #:234261810 |
| 39 | 10/22/2025 | | Mediators Report | Event | |
| 38 | 10/22/2025 | | Motion for Pro Hac Vice | Event | |
| 37 | 10/20/2025 | | Notice of Appearance | Event | |
| 36 | 10/17/2025 | | Notice of Filing: | Event | AMENDED COMPLAINT |
| 35 | 10/17/2025 | | Amended Notice | Event | Mediation |
| 34 | 10/14/2025 | | Notice of Mediation Conference | Event | |
| 33 | 09/27/2025 | 34962/2202 | Order Granting Motion to Dismiss | Event | Plaintiff's Complaint/Granted, With Leave For Plaintiff To Amend The Complaint, Etc. (DE 19) |
| 32 | 09/11/2025 | | Notice of Filing: | Event | SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| 31 | 09/01/2025 | | Order Setting CM Deadline | Event | |

| DIN | Date | Book/Page | Docket Entry | Event Type | Comments |
|-----|------|-----------|--------------|------------|----------|
| 30 | 09/01/2025 | | Order Setting CM Deadline | Event | |
| 29 | 08/01/2025 | | Case Management Report | Event | Joint |
| 28 | 07/22/2025 | | Notice of Hrg Special Appt | Event | September 17th, 2025 at 8:30 am via ZOOM |
| 27 | 05/24/2025 | | Order Setting CM Deadline | Event | |
| 26 | 05/24/2025 | | Order Setting CM Deadline | Event | |
| 24 | 05/08/2025 | | Order of Transfer (jud Sect Chg) Section: | Event | |
| 23 | 05/07/2025 | | Motion to Transfer | Event | |
| | 04/17/2025 | | Special Sets | Hearing | DEFENDANTS, PERSIST COMMUNICATIONS, INC., THE LAKE LAW FIRM, AND EDWARD LAKES, MOTION TO DISMISS PLAINTIFFS COMPLAINT |
| | 04/17/2025 | | Special Sets | Hearing | DEFENDANTS, PERSIST COMMUNICATIONS, INC., THE LAKE LAW FIRM, AND EDWARD LAKES, MOTION TO DISMISS PLAINTIFFS COMPLAINT |
| 22 | 04/15/2025 | | Notice of Cancellation of Hearing | Event | |
| 21 | 03/18/2025 | | Motion to Transfer | Event | |
| 20 | 02/21/2025 | | Response to Motion | Event | TO DISMISS |
| 19 | 02/11/2025 | | Motion to Dismiss | Event | |
| 18 | 02/05/2025 | | Receipt: | Event | Receipt#:3260006 Amt Paid:$200.00 Comment: Allocation Code Quantity Unit Amount 3176-Non-Fla Attorney F 1 $100.00 $100.00 3176-Non-Fla Attorney F 1 $100.00 $100.00 Tender Type:eFilings Tender Amt:$200.00 Receipt Date:02/05/2025 Register#:326 Cashier:EFilingUser EFiling #:215759467 |
| 14 | 02/02/2025 | | Order: | Event | ON VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510 |
| 13 | 02/02/2025 | | Order: | Event | ON VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510 |
| 17 | 01/31/2025 | | Motion for Pro Hac Vice | Event | |
| 16 | 01/31/2025 | | Motion for Pro Hac Vice | Event | |
| 15 | 01/30/2025 | | Notice of Taking Video Deposition | Event | |
| 12 | 01/24/2025 | | Notice of Taking Video Deposition | Event | |
| 11 | 01/23/2025 | | Order Extending Time for | Event | TO RESPOND TO PLAINTIFF'S COMPLAINT IS GRANTED |
| 10 | 01/22/2025 | | Motion for Extension of Time | Event | |
| 9 | 01/21/2025 | | Notice of Appearance | Event | |

| DIN | Date | Book/Page | Docket Entry | Event Type | Comments |
|-----|------|-----------|--------------|------------|----------|
| 8 | 01/17/2025 | | Notice of Taking Video Deposition | Event | |
| 7 | 01/17/2025 | | Notice of Taking Video Deposition | Event | |
| 6 | 01/17/2025 | | Notice of Taking Video Deposition | Event | |
| 5 | 12/09/2024 | | Answer and Affirmative Defense | Event | |
| 4 | 10/31/2024 | | Receipt: | Event | Receipt#:3150004 Amt Paid:$406.00 Name:JONES, MATTHEW L. 999 PONCE DE LEON BLVD., SUITE 925 CORAL GABLES FL 33134 Comment: Allocation Code Quantity Unit Amount 3100-Circuit Filing Fee 1 $401.00 $401.00 3102-Multiple Defendant 1 $5.00 $5.00 Tender Type:eFilings Tender Amt:$406.00 Receipt Date:10/31/2024 Register#:315 Cashier:EFilingUser |
| 2 | 10/25/2024 | | Complaint | Event | |
| 1 | 10/25/2024 | | Civil Cover Sheet - Claim Amount | Event | |

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 7 of 978

Filing # 209627444 E-Filed 10/25/2024 03:44:22 PM

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I.      CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

<u>Allan Teh</u>
Plaintiff                                                                Case # _____
                                                                         Judge    _____

vs.

<u>PERSIST COMMUNICATIONS, INC., Lee Melchionni, Sylvia Benito, Justice Partners</u>
<u>Management LLC, Justice Partners Law Group, LP, Edward Lake, The Lake Law Firm, LLC</u>
Defendant

**II.     AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

**III.    TYPE OF CASE**     (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

- 2 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☒ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☒ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

- 2 -

☐ Replevins
☐ Evictions
 ☐ Residential Evictions
 ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

**IV. REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V. NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

 9

**VI. IS THIS CASE A CLASS ACTION LAWSUIT?**
 ☐ yes
 ☒ no

**VII. HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
 ☐ no
 ☒ yes If "yes," list all related cases by name, case number, and court.
 2022-022470-CA-01

**VIII. IS JURY TRIAL DEMANDED IN COMPLAINT?**
 ☒ yes
 ☐ no

**IX. DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
 ☐ yes
 ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Eric Santiago Rojo-Dotel   Fla. Bar # 1031871
   Attorney or party       (Bar # if attorney)

Eric Santiago Rojo-Dotel     10/28/2024
 (type or print name)     Date

- 3 -

Filing # 209627444 E-Filed 10/25/2024 03:44:22 PM

IN THE CIRCUIT COURT OF THE 11<sup>TH</sup> JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.:

ALLAN TEH,

     Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida Corporation,
THE LAKE LAW FIRM, a New York Limited Liability Company, and EDWARD LAKE,

     Defendants

_____/

## COMPLAINT

Plaintiff, ALLAN TEH ("Teh"), files this Direct Action against Defendants, LEE MELCHIONNI ("Melchionni"), SYLVIA BENITO ("Benito"), JUSTICE PARTNERS MANAGEMENT, LLC ("Management"), JUSTICE PARTNERS LAW GROUP, LP, ("Law Group") PERSIST COMMUNICATIONS, INC ("Persist"), THE LAKE LAW FIRM, LLC ("Lake Law") (collectively referred to as "Defendants"), and EDWARD LAKE ("Lake") and in support thereof alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. This direct action is for damages, declaratory relief and equitable relief in excess of the minimum jurisdictional limits of this Court.

2. The Plaintiff, Allan Teh, is a citizen and resident of the State of Florida.

3.      Defendant, Melchionni, is the Chief Operating Officer of Justice Partners and is a citizen and resident of the State of Florida. His current residential address is located in Miami-Dade County Florida. His apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

4.      Defendant, Benito, is the Chief Executive Officer of Justice Partners and is a citizen and resident of the State of Florida. Her current residential address is located in Miami-Dade County Florida. Her apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

5.      Defendant, Management, is the Manager of LLC and is a Delaware Limited Liability Company doing business in Miami-Dade County, Florida.

6.      Defendant, Law Group, is a District of Columbia Limited Partnership doing business in Miami-Dade County, Florida.

7.      Defendant Persist is a Florida Corporation formed in the State of Florida and doing business in the state of Florida. Persist's current office and the place of operation is located in Broward County, Florida - specifically, 1815 Cordova Road, Fort Lauderdale, FL 33316.

8.      Persist's President and Registered Agent is Edward Lake ("Mr. Lake").  Mr. Lake's address as President and Registered Agent of Persist is the same principal address as Persist and The Lake Law Firm - 1815 Cordova Road, Fort Lauderdale, FL 33316. *See attached Persist Annual Report filed on January 20, 2023 as **Exhibit 1** and Lake Law invoices dated 4/15/2021 and 10/11/2021 as **Composite Exhibit 2.***

9.      Lake Law, upon information and belief, is a New York law firm with operations in the State of Florida. Lake Law Firm has an office located in Broward County

Florida and issues invoices regarding alleged services offered and rendered in the State of Florida and utilizes the 1815 Cordova Road, Fort Lauderdale, FL 33316 office address on its invoices. *See **Composite Exhibit 2**.*

10.     As more fully set forth herein, Lake Law has purposefully availed itself of the privilege of conducting activities within Florida and is therefore under the jurisdiction of this Court. As set out herein and pursuant to Fla. Stat. §48.193 et seq., Lake Law is subject to specific personal jurisdiction because Lake Law committed multiple acts and breaches enumerated in Fla. Stat. §48.193(1) including, but not limited to: operating, conducting, engaging in, and carrying on a business or business venture in Florida, Lake Law has an office in Florida, has committed various and multiple tortious acts within the State of Florida and has breached and is continuing to breach agreements in Florida by failing to perform acts required by the agreements to be performed in Florida.

11.     This venue and forum are appropriate based upon Fla. Stat. § 47.011 and Fla. Stat. § 47.051, and also because virtually every act, breach and transaction set out in this Derivative Complaint occurred in Miami-Dade County, Florida. To the extent other acts, breaches and transactions are stated within this complaint, those occurred in Broward County, Florida. Moreover, the overwhelming majority of fact witnesses are located in Miami-Dade County, Florida.

12.     Defendant, Edward Lake is a citizen and resident of the State of Florida.

13.     Pursuant to Section 9.3 of the Offering Circular attached hereto as **Exhibit 3** the parties to the Agreement irrevocably agree that all actions or proceedings arising out of or related to the Subscription Agreement will be litigated solely in the venue and jurisdiction of any court located within the State of Florida.

14.     Pursuant to Section 13.8 of the LLC's Operating Agreement, this action can only be brought in courts located in Florida, "County of Dade" [sic].

## GENERAL ALLEGATIONS

15.     The Manager of LLC is Defendant, Justice Partners Management, LLC, ("Management") a Delaware Limited Liability Company formed on February 15th, 2021.

16.     Pursuant to the Offering Circular, Melchionni is an "Authorized Member" of JP Management. *See Pg. 67 of Offering Circular attached as **Exhibit 3.***

17.     On April 6, 2021, Plaintiff acquired a sizable equity interest in Justice Partners through the purchase of 4,000 Units of Series A Preferred Units, at a purchase price of $4,000,000. *See Offering Circular attached as **Exhibit 3.***

18.     As more fully set out herein, the Plaintiff's acquisition of this equity interest was the result of a variety of misrepresentations by the Defendants herein.

19.     Defendants, Melchionni, Benito, Management, jointly and individually, fraudulently induced multiple individuals and entities, including the Plaintiff, to invest a total of $11,725,000 in the LLC.

20.     The represented purpose of the formation of LLC as stated in the marketing documents and Offering Circular provided by the Defendants was to take the entirety of the invested proceeds and provide those funds as a "Loan" to Defendant, Law Group. *See Page 3 of Marketing Deck attached as **Exhibit 4.***

21.     The LLC Operating Agreement and incorporated documents and agreements – presented to the Plaintiff prior to his investment and as a specific inducement to undertake such investment, used the terms "Loan" and "Investment" interchangeably, defining "Investment" as "investments and loans made, directly, or

indirectly, by the Company [LLC] in accordance with this Agreement to Justice Partners Law Group, LP." *See Pg. 28 of Offering Circular attached as* **Exhibit 3.**

22.    The Defendants, Melchionni and Benito both collectively and individually, represented that the "Loan" was to be utilized by the Law Group "as to facilitate the financing of mass tort litigation expenses, which include, but are not limited to: research, client acquisition; marketing; expert fees; general working capital purposes for the Firm [Law Group], and any other businesses ancillary or complementary thereto." *See Page 17 of Offering Circular attached as* **Exhibit 3.**

23.    As discovery has revealed in other related litigation, the only method or basis that could result in the return of the Plaintiff's or other investors' principal investment, and possible profits, is: (1) Law Group's acquisition of mass tort litigation cases; (2) the settlement or successful trial of those mass tort litigation cases; (3) via legitimate retainer agreements, contingency fee agreements, and/or referral/co-counsel agreements, that would ultimately yield attorneys' fees revenue which would then result in funds that would then flow up to the LLC for purposes of distribution and/or repayment to the investors and members of the LLC.

24.    Defendant Melchionni, the COO of the LLC, the Managing Partner of Defendant Law Group, as well as an "Authorized Member" of Management, admitted under oath in a separate legal proceeding that the Law Group is inextricably linked with Justice Partners.

25.    Specifically, Melchionni confirmed these allegations by testifying: "Justice Partners Law Group is involved in the . . .litigation, which would then - - the funds

produced from that would flow through to Justice Partners LLC." *See Pg. 75 Lns. 12-15 of Deposition Transcript of Melchionni attached as* **Exhibit 5**.

26.     As set out more fully below, the "Loan" of $11,725,000 to Law Group **was never effectuated**, and **JP Law Group has not acquired any mass tort litigation cases or clients**.

27.     Instead, Defendants Melchionni, Benito, Management, and Law Group, jointly and individually, conspired with Defendants, Lake Law and Persist jointly and individually, to defraud the LLC's investors and members.

28.     Prior to Mr. Teh's investment and after that investment, Melchionni, Benito, and Management, jointly and individually, misrepresented the nature of the LLC's members' investment and loan to Law Group, and instead effectuated the fraudulently transfer of $11,250,000 to Defendants, Lake Law and Persist. *See Lake Law Invoices attached as* **Exhibit 2**.

29.     In furtherance of that scheme, Melchionni, Benito, Management, and Law Group, jointly and individually, misrepresented the capacity, authority, ability and status of the Law Group's acquisition of mass tort litigation cases. These misrepresentations were made before and after the Plaintiff's investment.

30.     Following Plaintiff's April 6th, 2021 acquisition of 4,000 Units of Series A Preferred Units of the LLC, at a purchase price of $4,000,000 he did not receive any substantive correspondence, information or documentation to allow him to assess the value, status, and quality of $4,000,000 equity interest.

31.     In response, and following the LLC's failure to comply with Plaintiff's November 5th, 2022, Demand for Books and Records, Plaintiff, on November 25th, 2022,

initiated a Books and Records Action in the Circuit Court for the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, *Teh v. Justice Partners, LLC, et al.*, Case No. 2022-022470-CA-1 (the "Books and Records Action").

32.     During those legal proceedings the LLC at the direction of Melchionni, Benito, and Management, turned over a small set of documents, albeit insufficient, that directly revealed: 1) Melchionni's, Benito's, and Management's obvious breach and disregard as to the terms of Justice Partners Operating Agreement; 2) the lack of evidence to support that any "Loan" was ever provided to Law Group; and 3) the fraudulent and unauthorized transfer of $11,250,000 to Defendant's Lake Law and Persist.

33.     Section 10.1 of the Justice Partners Operating Agreement provides:

> The Company will maintain true, **complete and correct books of account of the Company, all in accordance with generally accepted accounting principles** applied on a consistent basis and shall keep minutes of the proceedings of, or maintain written consents executed by, the Members and the Manager. The books of account **shall contain particulars of all monies, goods or effects belonging to or owing to or by the Company**, or paid, received, sold or purchased in the course of the business, and all such other transactions, **matters and things relating to the business of the Company as are usually entered in books of accounts kept by Persons engaged in a business of a like kind and character**. In addition, the Company shall keep all records required to be kept pursuant to the Act. Any Member shall, upon prior written notice and during normal business hours, have access to the information described in the Act, for the purpose of inspecting or, at the expense of such Member, copying the same. Any Member reviewing the books and records of the Company pursuant to the preceding sentence shall do so in a manner which does not unduly interfere with the conduct of the business of the Company. The Company will provide an unaudited financial at the end of each fiscal year to its Members.

*Section 10.1(a): Books and Records*

34.     Section 10.3 of the Justice Partners Operating Agreement provides:

The Manager **may not commingle the Company's funds with the funds of any** Member, Director, officer or other Person.

*Section 10.3: Company Funds*

35.     The term "Person" is identified in the LLC Operating Agreement as "a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity."

36.     Prior to the plaintiff's investment , the Defendants specifically stated that the plaintiff's invested funds would be segregated and safeguarded into a discrete operating account for the subject operating LLC. This representation was material and essential regarding the Plaintiff's decision to undertake this investment.

37.     However, the Defendants, Melchionni and Benito, have admitted on multiple occasions that, in direct breach of Section 10.3, Justice Partners funds have been extensively co-mingled with other entities via their unauthorized and undisclosed use of a "third-party fund administrator" Industry Fintech Inc.

38.     As evidence of these misrepresentations, and in direct breach of Section 10.1(a) of the Operating Agreement, and despite being the COO of Justice Partners, Melchionni has repeatedly contended that it is Industry Fintech, not the LLC that generates and handles the financial records of LLC.

39.     Melchionni went as far as to represent under oath that *only* Industry Fintech maintains and has custody of document which would evidence and outline the status of the "Loan" to Law Group. *See Pg. 43-4 Lns. 19-13 of Deposition Transcript of Melchionni attached as **Exhibit 5**.*

40.     No such documents or records in that regard have ever been produced to the Plaintiff.

41.     The LLC's funds were so extensively co-mingled that the heavily redacted bank statements provided during the Books and Records Action were unusable to forensically determine the flow of the subject funds.

42.     As additional evidence of these misrepresentations, during the Books and Records Action, Melchionni and Benito produced two "Invoices" generated by Defendants, Lake Law and Persist. *See Invoices attached as Composite **Exhibit 2.***

43.     The first "Invoice" was apparently generated by Lake Law and Persist on April 15th, 2021, **only two days** following Plaintiff's initial transfer of $2 million into Justice Partners' bank account, and states that **$6,125,000** was transferred into Persist's TD Bank Account ending in #2721.

44.     The second "Invoice" was generated by Lake Law and Persist on October 11th, 2021, and states that an additional **$5,125,000** was transferred into Persist's TD Bank Account ending in #2721.

45.     Interestingly, both "Invoices" contain the language "BILL TO: Justice Partners Law Group."

46.     However, Justice Partners (2021-2022) General Ledger, provided by Melchionni and Benito, establishes that it was in fact the LLC, **not the** Law Group, which transferred the funds to Persist and Lake Law. *See General Ledger as **Exhibit 6** which will be filed Under Seal.*

47.     The misrepresentations and fraudulent payments and transfers referenced above, totaling **$11,250,000**, were effectuated and undertaken at the direction of

Melchionni, Benito, Management, Lake Law, Lake and Persist, jointly and individually. Such transfers were made and effectuated without any cognizable consideration, contract or agreement in place.

48.     The fact that the funds transferred to Lake Law and Persist came from the LLC and not JP Law's bank accounts is and express admission and concession that the misrepresented "Loan" to Law Group was never actually made or realized.

49.     However, such well documented fraudulent misrepresentations and acts did not get in the way of the Defendants attempting a ham-handed cover up regarding such a breaches.  Specifically, on February 16th, 2022, **103 days** following Plaintiff's original records request, Melchionni and Benito, ostensibly on behalf of the LLC, provided Plaintiff with an **unexecuted** "Senior Secured Promissory Note" supposedly evidencing the memorialization of the "Loan" from the LLC to JP Law Group. *See Unexecuted Loan Agreements attached as* **Composite Exhibit 7.**

50.     Interestingly, and according to the terms of the unexecuted "Senior Security Instrument", the LLC "shall maintain an account on its books and records which shall evidence the outstanding principal balance of all Advances, Interest due and owing thereon and any fees and expenses due from time to time under this Note." *See* **Exhibit 7.**

51.     Only after this Court entered a verdict against the LLC in a separate action did the Defendants bother to generate and then send to the Plaintiff a quanta of these documents.  Even that production is grossly deficient.

52.     More interestingly, on August 18th, 2023, counsel for Justice Partners in the Books and Records Action produced an **executed version** of the "Senior Security Instrument." *See Executed Loan Agreements attached as **Exhibit 8**.*

53.     On August 22nd, 2023, when Melchionni, under oath, was asked why the executed version of the "Senior Security Instrument" was not originally provided back in February 16th, 2023 in response to the records requests, he simply answered "[i]t had not been executed when it was sent to you." *See Page 42, Lns. 11-14 of Melchionni Deposition Transcript attached as **Exhibit 5**.*

54.     The Senior Security Instrument was executed **by Melchionni**, on behalf of Law Group, on **June 23rd, 2023**, **808 days following Plaintiff's acquisition of his $4,000,000 equity interest**. *See **Exhibit 8**.*

55.     However, although the Instrument was apparently executed on June 23rd, 2023, Melchionni, on behalf of both the LLC and the Law Group, simply announced that the "effective date" of the agreement would be **April 14th, 2021**.

56.     Coincidentally, the "effective date" of April 14th, 2021, is **a day before the first "Invoice" was generated by Lake Law and Persist on April 15th, 2021**.

57.     Rather than following through on the representations made to the Plaintiff regarding the actual use of the invested funds or adhering to the LLC's Operating Agreement and properly providing a "Loan" to the Law Group, Defendants, Melchionni, Benito, and Management instead fraudulently paid and transferred essentially the entirety of the LLC's cash, assets and invested funds directly to Defendants, Lake Law, Lake and Persist.

58.     The Defendants made these misrepresentations and conducted this fraudulent scheme in order to obtain and then retain complete control over the use of the LLC's cash, assets, and investors' funds as well as siphon "good cases" away from the LLC's members and investors for Defendants' own pecuniary gain.

59.     Specifically, Defendants Melchionni and Benito have significant material interests and positions in other similarly configured law firms.  As a result of those Defendants' inter-firm relationships, those Defendants are able to assign, re-assign or otherwise designate "good cases" to one or more firms ("cherry-picking") but also assign or re-assign "bad cases" to other firms at which those Defendants have significant interests and positions.

60.     The Defendants, Melchionni and Benito, conspicuously failed to advise the Plaintiff of these positions and relationships before he his investment.

61.     An example of this conduct comes in the form of the various nonsensical "updates" provided by the Defendants to the LLC's members and investors regarding the status of these supposed mass tort litigation cases "acquired" by the Law Group.

62.     One such "update" (i.e., a "representation") occurred on October 20, 2021, when Melchionni and Benito emailed Plaintiff explicitly stating that the LLC had "spent $11,250,000 to **acquire** 200 Firefighter Foam Cases, 208 Talc Cases, 380 Hernia Mesh Cases, 350 3M Cases, 150 RoundUp Cases, and 200 Zantac Cases." *See October 20th, 2021 Email attached **as Exhibit 9.***

63.     Melchionni and Benito stated in that same October 20, 2021 email that Justice Partners would be "entitled to 72% of the attorney fee" obtained through these mass tort litigations.

64. Melchionni assured Plaintiff on several occasions that there would be no case drop-off in the cases acquired by Justice Partners stating "I prenegotiate exactly what we are paying for cases so I do not have to worry about drop off or price increases mid campaign." *See Email attached as **Exhibit 9.***

65. However, those representations made are incongruent, and hold no relationship with the cases "acquired" by the Law Group, as set forth in the two "Invoices" generated by Lake Law and Persist.

66. Specifically, the April 15th, 2022, and October 11th, 2021, "Invoices" state that for the same $11,250,000 figure, the Law Group "acquired":

   a. 1,200 3M Mass Tort Cases;

   b. 200 Fire Foam Mass Tort Cases;

   c. 1,986 Hernia Mesh Mass Tort Cases;

   d. 250 Round Up Mass Tort Cases;

   e. 1,544 Talcum Powder Mass Tort Cases; and

   f. 200 Zantac Mass Tort Cases.

*See attached **Exhibit 2.***

67. As is crystal clear, those "Invoices" bear no relationship to the other representations or verifiable reality.

68. The Defendants' misrepresentations and nonsensical "updates" continued.

69. Specifically, Melchionni, Benito, and Management provided "investor report" in April of 2023. *See April 2023 Investor Report attached as **Exhibit 10.***

70. In that "report", the mass tort "cases" previously represented to be "acquired" by the Law Group and by Agreement the LLC as a lender/investor of the Law

Group, those case were now referred to as mere "leads," while maintaining the same acquisition cost of "$11,250,000."

71.     Specifically, the April 2023 Report now states that the LLC and the Law Group have:

   a. 216 Total "Leads" of 3M Ear Plug Mass Tort Cases with 60 pending leads and 141 filed/retained leads;

   b. 21 Total "Leads" of Camp Lejune Mass Tort Cases with 20 pending leads and 0 filed/retained leads;

   c. 149 Total Leads of Fire Foam Mass Tort Cases with 33 pending leads and 114 filed/retained leads;

   d. 195 Total Leads of Hernia Mesh Mass Tort Cases with 138 pending leads and 49 filed/retained leads;

   e. 30 Total Leads of Talcum Powder Mass Tort Cases with 14 pending leads and 16 filed/retained leads;

   f. 29 Total Leads of Zantac Mass Tort Cases with 14 pending leads and 16 filed/retained leads; and

   g. 73 Total Leads of B2B/ERC Mass Tort Cases with 0 pending leads and 0 filed/retained leads. *See Exhibit 10.*

72.     Not only do the represented values not make logical sense, but now other undisclosed categories of cases are referenced and the phrase "Leads" was never disclosed to the Plaintiff prior to his investment.

73.     The Defendants' misrepresentations continued.

74.     On July 11th, 2023, Plaintiff received a document labeled "All cases presently open and assigned to JPLG Law Group [Law Group]" *See List of cases attached as **Exhibit 11.***

75.     This list of "cases presently open and assigned to JPLG Law Group" was not provided, or generated by the LLC Melchionni, Benito, or Management, but rather Defendant Edward J. Lake, the 100% owner of both Lake Law and Persist.

76.     This previously undisclosed list now provides a wholly new set of values for the mass tort cases supposedly "acquired" by the Law Group, and now provides that the Law Group has:

     a.  152 Hernia Mesh Mass Tort Cases;

     b.  30 Talcum Powder Mass Tort Cases;

     c.  200 3M Earplug Mass Tort Cases;

     d.  18 Camp Lejune Mass Tort Cases;

     e.  150 Fire Foam Mass Tort Cases;

     f.  28 Zantac Mass Tort Cases; and

     g.  52 B2B/ERC Mass Tort Cases.

*See attached **Exhibit 11.***

77.     Not content with the misrepresentations thus far, they continued.

78.     On December 1st, 2023, Plaintiff received a purported LLC September 2023 "Investor Report" generated by Melchionni, Benito, and Management, containing once again a wholly new data set representing the cases "acquired" by JP Law Group.  *See September Investor Report attached as **Exhibit 12.***

79.    In that "report" the Defendants now claim that the cases "acquired" by the Law Group and by Agreement, the LLC, include:

    a.  137 Hernia Mesh Mass Tort Cases;

    b.  24 Talcum Powder Mass Tort Cases;

    c.  152 Fire Foam Mass Tort Cases;

    d.  16 Camp Lejune Mass Tort Cases;

    e.  163 3M Earplug Mass Tort Cases; and

    f.  13 Zantac Mass Tort Cases. *See **Exhibit 13.***

80.    Not only are the number of "acquired" cases materially different than prior representations but the September 2023 Investor Report is wholly devoid of any reference to the 52 B2B/ERC Mass Tort Cases represented in Edward J. Lake's prior correspondence dated July 11th, 2023, and attached as **Exhibit 11.**

81.    Defendants' misrepresentations reached new heights of absurdity when on January 25th, 2024, Plaintiff received the LLC's January 2024 "Investor Update" ("January Report"). *See January 2024 Investor Update attached as **Exhibit 13.***

82.    The opening paragraph of the January Report states:

In an effort to shore up and protect our investments in cases being handled by the Lake Law Firm ("LLF"), on **January 17, 2024, Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term Funding and Security Agreement (the "Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF.** The purpose of the loan is to allow LLF to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business. We are informed that LLF is currently in discussions with two potential longer-term lenders. The loan accrues interest at the rate of five percent per annum and matures April 1, 2024.

83.     The January Report sets forth that Melchionni and Benito in their individual capacity provided Defendant Lake Law with an additional **$400,000**.

84.     Melchionni and Benito went as far to state that the funds will be used by Lake Law "to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business."

85.     The absurdity and obvious nature of Melchionni and Benito's misrepresentations continued on February 29th, 2024, when Plaintiff received and update **for an entirely separate and distinct investment** he entered into with Melchionni and Benito, **which was identical to the LLC's January Report**. *See February 29th ,2024 KS Law Update attached as **Exhibit 14.***

86.     The investment involves a District of Columbia law firm, KS Law Group, LLP ("KS Law"), which was formed by Melchionni, Benito, and the Plaintiff, on August 24th, 2021.

87.     KS Law was to operate in the same capacity as the Justice Partners Law Group but with the Plaintiff being the sole investor/capital partner.

88.     Plaintiff has initiated several different lawsuits and arbitration proceedings in regard to the KS Law investment.

89.     As evidence of the fraudulent conduct set out herein, the February 29th, 2024, KS Law update was **verbatim** to the January Justice Partners LLC Report.

90.     The first paragraph of the KS Law update read as follow:

In an effort to shore up and protect our investments in cases being handled by the Lake Law Firm ("LLF"), **on January 17, 2024, Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term Funding and Security Agreement (the "Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF.** The purpose of the loan is

to allow LLF to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business. We are informed that LLF is currently in discussions with two potential longer-term lenders. The loan accrues interest at the rate of five percent per annum and matures April 1, 2024.

91.    For Melchionni and Benito to represent identical "updates" in two entirely separate and distinct entities and investments strains the limits of credibility and further demonstrates their disregard for their legal obligations as well as any semblance of transparency or integrity.

92.    To this day, the Plaintiff still has not been able to accurately assess the value, status, and quality of his investment.

93.    As if to highlight to serious nature of these claims, the misrepresentations made to the Plaintiff regarding Talcum Powder Cases are especially troubling in light of Johnson & Johnson's April 13th, 2023, press release announcing an **8.9 Billion Dollar** settlement offer to claimants in Talcum Powder cases. *See Press Release attached as Exhibit 15.*

94.    Additionally, it is important to note that the Justice Partners Law Group is **law firm** formed in the District of Columbia and is required to comply with the D.C. Rules of Professional Conduct.

95.    Rules 1.5(c) and 1.5(e) of the D.C. Rules of Professional Conduct explicitly state:

1.5(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. **A contingent fee agreement shall be in writing** and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation, other expenses to be deducted from the recovery, whether such expenses are to be deducted before or after the contingent fee is calculated, and whether

the client will be liable for expenses regardless of the outcome of the matter. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and if there is a recovery, showing the remittance to the client and the method of its determination.

1.5(e) A division of a fee between lawyers who are not in the same firm may be made only if:

    (1) The division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.

    (2) **The client is advised, in writing**, of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged;

    (3) The client gives informed consent to the arrangement; and

    (4) The total fee is reasonable.

80. As previously stated, and upon information and belief, Law Group is apparently not a party to any known fee agreement and no "client" has ever been informed of Law Group's involvement in their case.

81. Defendants, Melchionni, Benito, and JP Management, acting in concert with Defendants, the Law Group, Lake Law, Lake and Persist as described herein, have defrauded the Plaintiff and caused substantial damage in that regard. These damages are separate and distinct from any damages incurred by Justice Partners LLC.

**COUNT 1**
**DIRECT CLAIM FOR CIVIL CONSPIRACY TO COMMIT FRAUD**
**(AS TO ALL DEFENDANTS)**

82. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

83.     Defendants, acting in concert and agreement, conspired to defraud the Plaintiff.

84.     Defendants jointly, and unlawfully, defrauded the Plaintiff by misrepresenting the use and deployment of the Plaintff's invested funds as set out herein.

85.     Defendants effectuated this civil conspiracy by initiating a deliberate and repeated campaign of misinformation and misrepresentations, as set out herein.

86.     In addition to that which is set out above, one such example is the fact that all LLC funds were represented to be used as "Loan" to the Law Group.

87.     Instead, no such "Loan" was ever effectuated and instead the entirety of Plaintiff's invested funds were fraudulently transferred to Defendants Lake Law, Lake and Persist.

88.     The unlawful misappropriation of the Plaintiff's funds based upon such misrepresentations and conduct has materially damaged the Plaintiff.

**WHEREFORE**, Plaintiff, requests this Honorable Court enter judgment against all Defendants for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

## COUNT 2
## DIRECT CLAIM FOR FRAUD
### (AS TO LEE MELCHIONNI)

89.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

90.     At all times material hereto, there has been a relationship of trust and confidence between this Defendant on one hand and the Plaintiff. The genesis of this trust

and confidence is consequent to this Defendant's solicitation and multiple representations to the Plaintiff in an effort to induce him to make the investment set out herein.

91. In addition to that which alleged herein, Melchionni has committed fraud by, among other things, participating in self-dealing and fraudulent transactions whereby transferring essentially all of the Plaintiff's funds to Defendants, Persist and Lake Law, without any consideration or known agreement in place.

92. Further, Melchionni, has co-mingled the Plaintiff's funds in an effort to utilize said funds for his own pecuniary gain.

93. By virtue of Melchionni's fiduciary relationship, Melchionni had the continuing duty of care, honesty, and loyalty to the Plaintiff which he has blatantly ignored and breached.

94. Melchionni knew or should have known that his conduct and inaction would necessarily damage the Plaintiff.

95. Melchionni's material breaches of his duties have proximately caused serious damage to the Plaintiff. All such damages proximately result from Melchionni's breaches of his duties.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

## COUNT 3
## <u>DIRECT CLAIM FOR FRAUD</u>
## (AS TO SYLVIA BENTIO)

96. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

97.     At all times material hereto, there has been a relationship of trust and confidence between this Defendant on one hand and the Plaintiff. The genesis of this trust and confidence is consequent to this Defendant's solicitation and multiple representations to the Plaintiff in an effort to induce him to make the investment set out herein.

98.     As alleged above and herein, Benito has committed fraud by, among other things, participating in self-dealing and fraudulent transactions whereby transferring essentially all of Plaintiff's funds to Defendants, Persist and Lake Law, without any known consideration or agreement in place.

99.     Further, Benito, has co-mingled the plaintiff's funds in an effort to utilize said funds for her own pecuniary gain.

100.    By virtue of Benito's fiduciary relationship, Benito had the continuing duty of care, honesty, and loyalty to the plaintiff which she has blatantly ignored and breached.

101.    Benito knew or should have known that his conduct and inaction would necessarily damage the plaintiff.

102.    Benito's material breaches of her duties have proximately caused serious damage to the plaintiff. All such damages proximately result from Benito's breaches of her duties.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper..

## COUNT 4
## DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY
### (AS TO LEE MELCHIONNI)

103.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

104.   At all times material hereto, there has been a relationship of trust and confidence between this Defendant on one hand and the Plaintiff. The genesis of this trust and confidence is consequent to this Defendant's solicitation and multiple representations to the Plaintiff in an effort to induce him to make the investment set out herein.

105.   As alleged herein, Melchionni has committed fraud and breached its fiduciary duties by misdirecting and misappropriating the Plaintiff's funds, wasting assets, and fraudulently concealing and failing to disclose the same, for his own personal pecuniary gain and to the detriment of the Plaintiff.

106.   For example, Plaintiff has discovered that Melchionni without any safeguards, benchmarks, or monitoring agreements in place, fraudulently transferred essentially all of the Plaintiff's funds to Defendants, Persist and Lake Law.

107.   Melchionni has also failed to properly account for Plaintiff's funds by improperly co-mingling those funds with several other entities under his power and control for his own pecuniary gain.

108.   As further evidence of his breaches in this regard, Melchionni has failed to maintain proper bookkeeping in regard to any "loans" paid or provided to Justice Partners Law Group.

109.   The misconduct of Melchionni has materially harmed the plaintiff.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

**COUNT 6**
**DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY**
**(AS TO SYLVIA BENTIO)**

110. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

111. At all times material hereto, there has been a relationship of trust and confidence between this Defendant on one hand and the Plaintiff. The genesis of this trust and confidence is consequent to this Defendant's solicitation and multiple representations to the Plaintiff in an effort to induce him to make the investment set out herein.

112. As alleged herein, Benito has committed fraud and breached her fiduciary duties by misdirecting and misappropriating the Plaintiff's funds, wasting assets, and fraudulently concealing and failing to disclose the same, for his own personal pecuniary gain and to the detriment of the Plaintiff.

113. For example, Plaintiff has discovered that Benito without any safeguards, benchmarks, or monitoring agreements in place, fraudulently transferred and participated in a scheme to transfer essentially all of the Plaintiff's funds to Defendants, Persist and Lake Law.

114. Benito has also failed to properly account for Plaintiff's funds by improperly co-mingling those funds with several other entities under her power and control for her own pecuniary gain.

115. As further evidence of her breaches in this regard, Benito has failed to maintain proper bookkeeping in regard to any "loans" paid or provided to Justice Partners Law Group.

116. The misconduct of Benito has materially harmed the plaintiff.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

## COUNT 7

### CLAIM FOR AIDING AND ABETTING FRAUD
### (AS TO THE LAKE LAW FIRM, LLC)

117.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

118.    As is clear from the allegations set out herein, Lake Law, knowingly and substantially assisted Defendants, Melchionni, Benito, and Lake in a scheme to defraud the Plaintiff.

119.    As more fully set forth herein, Lake Law substantially assisted in the misrepresentations set out herein and as well as the fraudulent transfer of Plaintiff's funds to fellow Defendant, Persist.

120.    In addition, Lake Law knew or should have known that the representations made to the Plaintiff before his investment and on the "invoices" generated were false as it never provided any mass tort litigation cases to Justice Partners Law Group.

121.    As evidence of the misrepresentations set out herein and as evidenced by the fact that at the time of filing the Books and Records action, Lake Law had not provided a single co-counsel, trial counsel, or referring counsel agreement which would entitle Law Group to any fees procured by the settlement of these represented mass tort cases.

122.   As set forth herein, the Law Group would have been the only investment vehicle or mechanism that the Plaintiff could have recovered his investment and any profits generated by these mass tort litigation cases.

123.   The representations present on the "invoices" generated by Lake Law regarding the number of cases acquired by Justice Partners Law Group were similarly provided to the plaintiff prior to his investment and were used as a material inducement to undertake that $4 million dollar investment.

124.   Lake Law's actions have proximately caused damage to the Plaintiff.  All such damages proximately result from Lake Law's substantial and material assistance in perpetrating the fraudulent scheme upon the plaintiff.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

## COUNT 8

### <u>CLAIM FOR AIDING AND ABETTING FRAUD</u>
### (AS TO PERSIST COMMUNICATIONS INC.)

125.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

126.   As is clear from the allegations set out herein, Persist, knowingly and substantially assisted Defendants, Melchionni, Benito, Lake Law and Lake in a scheme to defraud the Plaintiff.

127.   As more fully set forth herein, Persist substantially assisted in the misrepresentations set out herein and as well as the fraudulent transfer of Plaintiff's funds to itself.

128.   In addition, Persist knew or should have known that the representations made to the Plaintiff before his investment and on the "invoices" generated were false as neither it or any other Defendant provided any mass tort litigation cases to Justice Partners Law Group.

129.   As evidence of the misrepresentations set out herein and as evidenced by the fact that at the time of filing the Books and Records action, neither Persist or Lake or Lake Law had provided a single co-counsel, trial counsel, or referring counsel agreement which would entitle Law Group to any fees procured by the settlement of these represented mass tort cases.

130.   As set forth herein, the Law Group would have been the only investment vehicle or mechanism that the Plaintiff could have recovered his investment and any profits generated by these mass tort litigation cases.

131.   The representations present on the "invoices" generated by Persist and Lake Law regarding the number of cases acquired by Justice Partners Law Group were similarly provided to the plaintiff prior to his investment and were used as a material inducement to undertake that $4 million dollar investment.

132.   Persist's actions have proximately caused damage to the Plaintiff. All such damages proximately result from Persist's substantial and material assistance in perpetrating the fraudulent scheme upon the plaintiff.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

## COUNT 9

### CLAIM FOR AIDING AND ABETTING FRAUD
### (AS TO EDWARD LAKE)

133.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

134.     As is clear from the allegations set out herein, Lake, knowingly and substantially assisted Defendants, Melchionni, Benito, Lake Law and Persist in a scheme to defraud the Plaintiff.

135.     As more fully set forth herein, Lake substantially assisted in the misrepresentations set out herein and as well as the fraudulent transfer of Plaintiff's funds to himself and Persist.

136.     In addition, Lake knew or should have known that the representations made to the Plaintiff before his investment and on the "invoices" generated were false as neither it or any other Defendant provided any mass tort litigation cases to Justice Partners Law Group.

137.     As evidence of the misrepresentations set out herein and as evidenced by the fact that at the time of filing the Books and Records action, neither Persist or Lake or Lake Law had provided a single co-counsel, trial counsel, or referring counsel agreement which would entitle Law Group to any fees procured by the settlement of these represented mass tort cases.

138.     As set forth herein, the Law Group would have been the only investment vehicle or mechanism that the Plaintiff could have recovered his investment and any profits generated by these mass tort litigation cases.

139.    The representations present on the "invoices" generated by Persist, Lake and Lake Law regarding the number of cases acquired by Justice Partners Law Group were similarly provided to the plaintiff prior to his investment and were used as a material inducement to undertake that $4 million dollar investment.

140.    Lake's actions have proximately caused damage to the Plaintiff.  All such damages proximately result from Lake's substantial and material assistance in perpetrating the fraudulent scheme upon the plaintiff.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

### _JURY TRIAL DEMAND_

The Plaintiff demand a trial by jury on all issues so triable as of right.

Dated: _____ , 2024

Respectfully submitted,

**JONES & ADAMS, P.A.**
_Attorney for Plaintiff_
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

By:

/s/ Matthew Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335
matthew@jones-adams.com

# 2023 FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P15000085963

**Entity Name:** PERSIST COMMUNICATIONS, CORPORATION

**Current Principal  Place of Business:**

1815 CORDOVA RD
FT. LAUDERDALE,  FL  33316

**Current Mailing Address:**

1815 CORDOVA RD
FT. LAUDERDALE,  FL  33316  US

**FEI Number: 81-0851001**

**Name and Address of Current Registered Agent:**

LAKE, EDWARD J
1815 CORDOVA RD
FT. LAUDERDALE, FL  33316  US

**FILED**
**Jan 20, 2023**
**Secretary of State**
**7254299730CC**

# Exhibit 1

**Certificate of Status Desired:**  No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   EDWARD LAKE                                                                 01/20/2023

Electronic Signature of Registered Agent                                          Date

**Officer/Director Detail :**

Title              PRESIDENT

Name             LAKE, EDWARD J

Address          1815 CORDOVA RD

City-State-Zip:    FT. LAUDERDALE  FL  33316

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: EDWARD J LAKE                           PRESIDENT                  01/20/2023

Electronic Signature of Signing Officer/Director Detail                          Date

**Composite Exhibit 2**



## Invoice

| BILL TO: Justice Partners Law Group | | CAMPAIGN: HM/TALC/RU/3M/FF/Zantac |
|---|---|---|
| | | DATE: 4/15/2021 |
| | | DUE DATE: |
| Phone: | | TERMS: See Below |

| Quantity | Description | Unit Price | Line Total |
|---|---|---|---|
| 380 | **Hernia Mesh** | **$5,000** | **$1,900,000** |
| 208 | **Talc** | **$5,700** | **$1,185,600** |
| 150 | **Round Up** | **$5,000** | **$750,000** |
| 350 | **3M** | **$2,000** | **$700,000** |
| 200 | **Fire Foam** | **$5,447** | **$1,089,400** |
| 200 | **Zantac** | **$2,500** | **$500,000** |
| | | Total | **$6,125,000.00** |

**Hernia Mesh:** Cases provided with the following criteria below & guaranteed by medical records:

- Records showing revision, removal, or replacement surgery, or scheduled within 90 days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery 2011+

**Talc:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer)
- 75 years old or younger
- 4 years plus of exposure
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer w/ chemo or treatment
- Death w/in 18 months and original diagnosis within four (4) years of death

**Round Up:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with NHL or subtype within the last 10 years, unless medical records access then 2007 forward.
- Direct exposure ONLY to RoundUp for more than one year
- No existing attorney

**REMITTANCE BY WIRE:** *Beneficiary Name: Persist | *Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316 | *Bank Account No.: 4326532721 | *Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

**Zantac:** Cases provided with the following criteria below & guaranteed by medical records:

- OTC or Prescribed Zantac
- Intermittent use for a minimum of 1 year.
- Diagnosed after using injury(s) of:
- § Cancers: stomach (gastric), bladder, esophageal, kidney, pancreatic, liver, testicular, colon, prostate, breast (tier 2 ductal carcinoma)
- Death certificate must indicate qualifying cancer as cause of death
- Death within SOL

- No previous or existing attorney representation.

**3M:** Cases provided with the following criteria below & guaranteed by medical records:
- Used 3M Combat Arms CAEv2 Earplugs between 2003-2015
- Diagnosed with tinnitus or documented loss of hearing 10% or more in at least one ear
- No existing attorney

**Fire Foam:** Cases provided with the following criteria below:
- Used or was exposed to fire foam
- Diagnosed with one of the following cancers:
  - Kidney Cancer
  - Testicular Cancer
  - Prostate Cancer
  - Bladder Cancer
  - Pancreatic Cancer
  - Neuroendocrine Tumors
  - Leukemia
  - Lymphoma
  - Thyroid Cancer
- Diagnosed 2012+
- No previous or existing attorney

**Edward J. Lake, Esq. (EL) agrees to the following:**

1. Market, intake, and sign-up potential clients.
2. Gather medical records, a medical summary, a plaintiff fact sheet and/or court complaint, as necessary.
3. EL will act as liaison between the undesigned and trial firms.
4. The Lake Law Offices will handle any client inquiries.
5. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.
6. Joint venture fee splits will be as follows: 20 % The Lake Law Offices; 60% Client firm; 20% Trial firm.

Forty-five (45) days' notice required prior stopping campaign.

Due to the nature of how the retainers are generated, there may be a 5-10% over delivery which will be billable to the client once the campaign allocation has been reached, and payable within 15 days.

Print Name: _____

Signature: _____ Date: _____

## REMITTANCE BY WIRE:

*Beneficiary Name: Persist

*Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316

*Bank Account No.: 4326532721

*Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*



## Invoice

| BILL TO: Justice Partners Law Group | CAMPAIGN: HM/TALC/RU/3M/FF/Zantac |
|---|---|
| | DATE: 10/11/2021 |
| | DUE DATE: |
| Phone: | TERMS: Additional 12% split fee amendment |

| Quantity | Description | Total | |
|---|---|---|---|
| 1,606 | Hernia Mesh | Total | **$5,125,000.00** |
| 1,336 | Talc | | |
| 100 | Round Up | | |
| 850 | 3M | | |

**Hernia Mesh:** Cases provided with the following criteria below & guaranteed by medical records:

- Records showing revision, removal, or replacement surgery, or scheduled within 90 days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery 2011+

**Talc:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer)
- 75 years old or younger
- 4 years plus of exposure
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer w/ chemo or treatment
- Death w/in 18 months and original diagnosis within four (4) years of death

**Round Up:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with NHL or subtype within the last 10 years, unless medical records access then 2007 forward.
- Direct exposure ONLY to RoundUp for more than one year
- No existing attorney

**3M:** Cases provided with the following criteria below & guaranteed by medical records:

- Used 3M Combat Arms CAEv2 Earplugs between 2003-2015
- Diagnosed with tinnitus or documented loss of hearing 10% or more in at least one ear
- No existing attorney

**REMITTANCE BY WIRE:** *Beneficiary Name: Persist | *Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316 | *Bank Account No.: 4326532721 | *Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

**Edward J. Lake, Esq. (EL) agrees to the following:**

1. Market, intake, and sign-up potential clients.
2. Gather medical records, a medical summary, a plaintiff fact sheet and/or court complaint, as necessary.
3. EL will act as liaison between the undesigned and trial firms.
4. The Lake Law Offices will handle any client inquiries.
5. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.
6. Joint venture fee splits will be as follows: 13 % The Lake Law Offices; 60% Client firm; 15% Trial firm.
7. Additional 12% backend on for a total of 72% backend on the cases above

Forty-five (45) days' notice required prior stopping campaign.
Due to the nature of how the retainers are generated, there may be a 5-10% over delivery which will be billable to the client once the campaign allocation has been reached, and payable within 15 days.

Print Name: _Lee Melchionni_

Signature: _____  Date: _10/12/21_

## REMITTANCE BY WIRE:

*Beneficiary Name: Persist
*Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316
*Bank Account No.: 4326532721
*Bank Routing Info: 067014822

1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com

CONFIDENTIAL

# Exhibit 3

Name of Offeree: <u>Allan Teh</u>

Copy No.: <u> </u>

---

**OFFERING CIRCULAR**

**SERIES A PREFERRED UNITS**

**OF**

**JUSTICE PARTNERS, LLC**

**December 15, 2020**

---

## TABLE OF CONTENTS

| DOCUMENTS | | TAB NO. |
|---|---|---|
| Subscription Agreement | | 1 |
| Exhibits to Subscription Agreement: | | |
| Exhibit A | Term Sheet | 2 |
| Exhibit B | Operating Agreement | 3 |
| Exhibit C | Risk Factors | 4 |
| Exhibit D | Definition of Accredited Investor | 5 |
| Exhibit E | Definition of Bad Actor Disqualifying Event | 6 |
| Exhibit F | Accredited Investor Questionnaire | 7 |
| Exhibit G | Bad Actor Questionnaire | 8 |
| Exhibit H | Investor Presentation | 9 |

*ACTIVE 53694223v2*

04-06-2021 @ 11:48:08 AM EST

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY APPLICABLE STATE OR FOREIGN SECURITIES LAWS, NOR HAS THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") OR ANY STATE OR FOREIGN REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS AGREEMENT OR ENDORSED THE MERITS OF THIS AGREEMENT, AND ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THE SECURITIES ARE OFFERED PURSUANT TO EXEMPTIONS PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER, CERTAIN STATE SECURITIES LAWS AND CERTAIN RULES AND REGULATIONS PROMULGATED PURSUANT THERETO.  THE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE OR FOREIGN SECURITIES LAWS OR AN OPINION OF COUNSEL ACCEPTABLE TO US AND OUR COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED.

## SUBSCRIPTION AGREEMENT

This **SUBSCRIPTION AGREEMENT** (this "**Agreement**"), dated as of the date set forth on the signature page hereto, is by and between Justice Partners, LLC, a Delaware limited liability company (the "**Company**"), and the subscriber identified on the signature page hereto (the "**Subscriber**").

**WHEREAS**, the Company and the Subscriber are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission under the Securities Act of 1933, as amended (the "**Securities Act**");

**WHEREAS**, the Company is offering its non-voting Series A Preferred Units up to 45,000 Preferred Units (the "**Series A Preferred Units**") in an aggregate amount of up to $45,000,000 (the "**Offering Amount**") to investors (each, an "**Investor**" and together, the "**Investors**" or the "**Series A Preferred Units Holders**"), to be sold on a "best efforts" basis in a private placement offering (the "**Offering**") as more particularly described in the form of non-binding term sheet attached as Exhibit A hereto (as may be amended or modified from time to time, the "**Term Sheet**") and below; *provided* that the Company may, in its sole discretion increase the Offering Amount without notice to the Subscriber; and

**WHEREAS**, terms of the Series A Preferred Units, including preferences, ranking and other provisions, are as outlined in the Term Sheet and set forth in detail in the Company's Operating Agreement, dated as of December 15, 2020, attached as Exhibit B hereto (the "**Limited Partnership Agreement Agreement**").

**NOW, THEREFORE**, in consideration of the mutual covenants and other agreements contained in this Agreement, the Company and the Subscriber hereby agree as follows:

2

04-06-2021 @ 11:48:08 AM EST

1.    **Subscription For Series A Preferred Units; Purchase Price.**

1.1    Purchase.  The Subscriber, intending to be legally bound, hereby irrevocably agrees to subscribe for and agrees to purchase up to that number of Series A Preferred Units set forth on the signature page hereto at a purchase price of One Thousand Dollars and 00/100 ($1,000.00) per Series A Preferred Unit ("**Per Unit Price**"). This subscription is submitted to the Company in accordance with and subject to the terms and conditions described in this Agreement.

1.2    Purchase Price.  The aggregate purchase price for the Series A Preferred Units subscribed for is equal to the number of Series A Preferred Units subscribed for multiplied by the Per Interest Price and is set forth on the signature page hereto (the "**Purchase Price**").

1.3    Subscription Proceeds.  All subscription proceeds received and accepted will be deposited directly into the Company's Limited Partnership Agreement account and following acceptance by the Company hereunder and payment by the Company of its costs and expenses, including organization and Offering expenses and commissions, if any, such funds will be used by the Company for expansion of current operations and development and launch of new products and general corporate purposes, including salaries. The Company may use proceeds of the Offering immediately upon each Closing.

1.4    Payment. Payment of the Purchase Price shall be due and payable upon execution and delivery of this Agreement by the Subscriber to the Company, unless otherwise agreed to by the Company.  The Subscriber shall be required to deliver to the Company the Purchase Price in cash by delivery of a certified check payable to the Company or by wire transfer of immediately available funds to the following account of the Company:

Bank: JP Morgan

Acct #: ███████8466

Routing Transit #: ██████████

Acct: Justice Partners, LLC

1.5    Acknowledgements.  By executing this Agreement, the Subscriber acknowledges that (i) the Subscriber has been informed of various matters relating to the Company, including but not limited to, this Agreement, the Term Sheet attached as Exhibit A,  the Risk Factors attached as Exhibit C hereto (the "**Risk Factors**") the Company Limited Partnership Agreement attached as Exhibit B and the Investor Presentation attached as Exhibit H (together, the "**Offering Documents**"); (ii) that the Subscriber is an "accredited investor" as such term is defined in Rule 501 of Regulation D, which definition is attached as Exhibit D attached hereto; and (iii) that the Subscriber is not and has not been the subject of any "bad actor disqualifying event," as described in the excerpt of Rule 506(d) attached hereto as Exhibit E (a "**Bad Actor Disqualifying Event**").

3

*ACTIVE 53694223v2*

1.6     Closing; Conditions to Closing.  Closing on the purchase and sale of the Series A Preferred Units shall be consummated on such date as the Company accepts the Subscriber's offer to purchase the Series A Preferred Units as evidenced by the Company's counter-execution of the signature page to this Agreement, the Company's execution of the Series A Preferred Units issued to the Subscriber and the issuance of a fully executed Series A Preferred Units certificate to the Subscriber ("**Closing**"). On or prior to the date of each Closing, the following shall have occurred:

(a)     The Subscriber shall have thoroughly reviewed the Offering Documents;

(b)     The Subscriber shall have delivered to the Company a dated and executed signature page to this Agreement, with all blanks properly completed;

(c)     The Subscriber shall have delivered to the Company a dated completed and signed Accredited Investor Questionnaire attached as Exhibit F hereto and Bad Actor Questionnaire attached as Exhibit G hereto, each with all blanks properly completed;

(d)     The Company shall have received the Purchase Price from the Subscriber; and

(e)     Any other conditions to Closing set forth in this Agreement shall have been satisfied or waived.

2.     **Subscriber Representations and Warranties as to Suitability Standards.**

The Subscriber hereby represents and warrants that:

2.1     Investment Decision. The Subscriber and the Subscriber's advisors (which advisors do not include the Company or its principals, representatives or counsel) have such knowledge and experience in legal, financial and business matters as to be capable of evaluating the merits and risks of the prospective investment in the Company, of protecting the Subscriber's interests in connection therewith and making an informed investment decision.

2.2     Information Furnished.  The Subscriber has been furnished with or has had access to any and all material documents and information regarding the Company and its intended business as it, he or she desires, including but not limited to the Offering Documents, as well as the opportunity to ask questions of the Company's management.  The Subscriber hereby acknowledges that the Company has made available to the Subscriber prior to any investment in the Company all information requested by the Subscriber and deemed by the Subscriber to be reasonably necessary to enable the Subscriber to evaluate the risks and merits of an investment in the Company.  The Subscriber, after a review of this information and other information obtained, is aware of the speculative nature of any investment in the Company.

2.3     Financial Information.  The Subscriber is not relying on any financial information, including without limitation financial projections or oral representations in making the decision to purchase the Series A Preferred Units.

4

*ACTIVE 53694223v2*

Proof Stamping
04-06-2021 @ 11:48:08 AM EST

2.4     Own Account.  The Subscriber is acquiring the Series A Preferred Units for the Subscriber's own account, not on behalf of other persons, and for investment purposes only and not with a view to resale or distribution, transfer, assignment, resale or subdivision of Series A Preferred Units.  The Subscriber understands that, due to the restrictions referred to in Section 5 below, and the lack of any market existing or to exist for Series A Preferred Units, the Subscriber's investment in the Company will be highly illiquid and will have to be held indefinitely.

2.5     Economic Risk.  The Subscriber can bear the economic risk of the investment in the Company without impairing the Subscriber's ability to provide for itself, himself or herself and/or his or her family (as applicable) in the same manner that the Subscriber would have been able to provide prior to making an investment in the Company.  The Subscriber understands that he, she or it may continue to bear the economic risk of the investment in the Company for an indefinite period of time.

2.6     Subscriber's Commitments.  The Subscriber's overall commitment to investments which are not readily marketable is not disproportionate to the Subscriber's net worth, the Subscriber's investment in the Series A Preferred Units will not cause such overall commitment to become excessive, and the investment is suitable for the Subscriber when viewed in light of the Subscriber's other securities holdings and the Subscriber's financial situation and needs.

2.7     Adequate Means. The Subscriber has adequate means of providing for the Subscriber's current needs and personal contingencies.

2.8     Risk Factors.  The Subscriber recognizes that the Company is a development stage company with limited sales and that any investment in the Company involves substantial risk, and the Subscriber has evaluated and fully understands all risks in the Subscriber's decision to purchase Series A Preferred Units hereunder, including, but not limited to, the Risk Factors.

2.9     No Review. The Subscriber understands that the offer and sale of the Series A Preferred Units have not been submitted to, reviewed by, nor have the merits of this investment been endorsed or approved by any state or federal agency, commission, authority or self-regulatory organization.

2.10    Company's Businesses.  The Subscriber understands the businesses in which the Company is engaged or proposes to be engaged in and the risks associated therewith.

2.11    Individual Subscriber.  If the Subscriber is an individual, the Subscriber is at least eighteen (18) years of age and a bona fide resident and domiciliary (not a temporary or transient resident) of the state or country indicated on the signature page hereof and the Subscriber has no present intention of becoming a resident of any other state or jurisdiction.

2.12    Non-Individual Subscriber.  If the Subscriber is not an individual, the Subscriber is domiciled in the state or country indicated on the signature page hereof, has no present intention of becoming domiciled in any other state or jurisdiction and is an "Accredited Investor" or an

5

*ACTIVE 53694223v2*

"Institutional Investor" as defined under the "Blue Sky" or securities laws or regulations of the state in which it is domiciled, as applicable.

2.13    Local Standards. The Subscriber otherwise meets any special suitability standards applicable in the Subscriber's state or country of residence or domicile.

2.14    Accredited Investor.  The Subscriber is an "accredited investor" as that term is defined and used under Regulation D and which definition is set forth on Exhibit C attached hereto and represents that the information provided in the Accredited Investor Questionnaire, attached as Exhibit E hereto, and any exhibits attached thereto, are true and correct.

2.15    Bad Actor Disqualifying Event.  The Subscriber represents and warrants that as of the date hereof, the Subscriber is not and has not been the subject of any Bad Actor Disqualifying Event that would require disclosure in the Company's offering documents, and represents that the information provided in the Bad Actor Questionnaire, attached hereto as Exhibit F hereto, and any exhibits attached thereto are true and correct, and hereby agrees to promptly notify the Company if the undersigned becomes aware of a Bad Actor Disqualifying Event after the date of this Agreement and through the termination date of the Offering.

2.16    True and Correct.  All of the written information pertaining to the Subscriber which the Subscriber has heretofore furnished to the Company, and all information pertaining to the Subscriber which is set forth in this Agreement, including all representations and warranties made by the Subscriber, is correct and complete as of the date hereof and, if there should be any material change in such information hereafter, the Subscriber shall promptly furnish such revised or corrected information to the Company. The Subscriber otherwise meets any special suitability standards applicable to the Subscriber's state of residence.

2.17    No Inconsistent Oral Statements or Written Materials. The Subscriber has not been furnished with any oral representation or oral information or written materials in connection with the Offering that is in any way contrary to or inconsistent with, statements made in this Agreement and the attachments hereto.

2.18    Communication of Offer. The Subscriber is not purchasing the Series A Preferred Units as a result of any advertisement, article, notice or other communication regarding the Series A Preferred Units published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

**3.    Representations, Warranties and Agreements of the Subscriber.**

The Subscriber hereby represents, warrants and agrees as follows:

3.1    Organization and Standing of the Subscriber.  If the Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly

6

*ACTIVE 53694223v2*

existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has the requisite corporate power to own its assets and to carry on its business.

3.2     Authority; Enforceability.  The Subscriber has the requisite power and authority to enter into and perform this Agreement and to purchase the Series A Preferred Units being sold to it hereunder. The execution, delivery and performance of this Agreement by the Subscriber and the consummation by it of the transaction contemplated hereby has been duly authorized by all necessary corporate or partnership action, and no further consent or authorization of the Subscriber or its board of directors, stockholders, partners, members, as the case may be, is required.  This Agreement and other agreements delivered together with this Agreement or in connection herewith have been duly authorized, executed and delivered by the Subscriber and constitutes, or shall constitute when executed and delivered, valid and binding agreements enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity; and the Subscriber has full corporate power and authority necessary to enter into this Agreement and such other agreements and to perform its obligations hereunder and under all other agreements entered into by the Subscriber relating hereto.

3.3     No Conflicts.  The execution, delivery and performance of this Agreement and the consummation by the Subscriber of the transactions contemplated hereby or relating hereto do not and will not (i) result in a violation of the Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which the Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to the Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on the Subscriber).  The Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement or to purchase the Series A Preferred  Stock in accordance with the terms hereof, provided that for purposes of the representation made in this sentence, the Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

3.4     No Governmental Review.  The Subscriber understands that no United States federal or state agency or any other governmental or state agency has passed on or made recommendations or endorsement of the Securities or the suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

3.5     Securities Registration.  The Subscriber understands that the Series A Preferred Units have not been registered under the Securities Act or related laws and regulations or any other applicable securities laws of any other jurisdiction (collectively, the "**Securities Laws**").  The

7

*ACTIVE 53694223v2*

04-06-2021 @ 11:48:08 AM EST

Subscriber understands that it, he or she has no rights whatsoever to request, and that the Company is under no obligation whatsoever to furnish, a registration of the Series A Preferred Units under the Securities Laws.

3.6     Confidentiality.  The Subscriber understands and hereby acknowledges and agrees that all of the information appearing herein and otherwise provided to the Subscriber in connection with the purchase of the Series A Preferred Units made hereby is confidential and that the Subscriber and the Subscriber's representatives and agents may not disclose such information to any person that is not a party to the transactions contemplated hereby.

3.7     Investment Company Act.  The Subscriber understands that the Company has not been registered as an investment company under the Investment Company Act in reliance upon an exemption from registration provided by Section 3(c)(1) thereunder (which exemption is generally available only to an issuer, the securities of which are beneficially owned by not more than 100 persons as defined in the Investment Company Act).  The Subscriber hereby further represents and warrants that it is not a participant-directed defined contribution plan.

3.8     Additional Information.  The Subscriber understands that that he, she or it may, at the Company's discretion, and in compliance with the Jumpstart Our Business Startups Act legislation enacted by the President of the United States on April 5, 2012, be required to provide current financial and other information to the Company to enable it to determine whether he, she or it is qualified to purchase the Series A Preferred Units.

4.     **Representations, Warranties and Agreements of the Company.**

The Company hereby represents, warrants and agrees as follows:

4.1     Organization and Standing.  The Company was organized under the laws of the State of Delaware on December 15, 2020.  The Company's business address on the date hereof is 20900 NE 30th Avenue, Suite 510, Miami, FL 33180. The Company has the requisite corporation power to own its properties and to carry on its business as now being conducted and as presently proposed to be conducted.

4.2     Authorization and Power.  The Company has the requisite corporation power and authority to execute and perform this Agreement.  This Agreement has been duly executed and delivered by the Company and constitutes its valid and binding obligation, enforceable against it in accordance with its terms, except to the extent that its enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally or by general equitable principles.

5.     **Transfer Restrictions.**

5.1     General.  The Subscriber represents that he/she/it understands that the sale or transfer of the Series A Preferred Units is restricted and that:

8

*ACTIVE 53694223v2*

04-06-2021 @ 11:48:08 AM EST

(a) <u>No Registration</u>. The Series A Preferred Units has not been registered under the Securities Act or the laws of any other jurisdiction by reason of a specific exemption or exemptions from registration under the Securities Act and applicable state securities laws, and that the Company's reliance on such exemptions is predicated on the accuracy and completeness of the Subscriber's representations, warranties, acknowledgments and agreements herein.  The Series A Preferred Units cannot be sold or transferred by the Subscriber unless subsequently registered under applicable law or an exemption from registration is available.  The Company is not required to register the Series A Preferred Units or to make any exemption from registration available.

(b) <u>Opinion</u>. The right to sell or transfer any of the Series A Preferred Units will be restricted as described in this Agreement which include restrictions against sale or transfer in violation of applicable securities laws, the requirement that an opinion of counsel be furnished that any proposed sale or transfer will not violate such laws and other restrictions and requirements.

(c) <u>No Public Market</u>.  There will be no public market for the Series A Preferred Units and the Subscriber may not be able to sell the Series A Preferred Units.  Accordingly, the Subscriber must bear the economic risk of the Subscriber's investment in the Series A Preferred Units for an indefinite period of time.

5.2 <u>Legend</u>.  The Subscriber acknowledges that the certificates representing the Series A Preferred Units, if issued by the Company, will bear a legend substantially in the form of the following:

**"THIS SERIES A PREFERRED  UNITS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND NEITHER THIS SERIES A PREFERRED  UNITS, SUCH SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR SUCH LAWS OR AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS WHICH, IN THE OPINION OF COUNSEL FOR THE LENDER, WHICH COUNSEL AND OPINION ARE REASONABLY SATISFACTORY TO COUNSEL FOR THE BORROWER, IS AVAILABLE."**

5.3 <u>Sale Requirements</u>. The Subscriber agrees that he/she/it will not offer to sell, sell or transfer the Series A Preferred Units or any part thereof or interest therein without registration under the Securities Act and applicable state securities laws or without providing to the Company an opinion of counsel acceptable to the Company that such offer, sale or transfer is exempt from registration under the Securities Act and under applicable state securities laws or otherwise in violation of this Agreement, the Articles of Organization or any of the Company's other governing documents.

**6.      <u>Representations and Warranties Regarding Verification of Subscription Funds.</u>**

9

**Before making the following representations and warranties, the Subscriber should check the Office of Foreign Assets Control ("OFAC") website at <http://www.treas.gov/ofac> with respect to federal regulations and executive orders administered by OFAC which prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals which are listed on the OFAC website.  In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[1] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.  Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth below.  The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations.**

The Subscriber represents and warrants that:

6.1     <u>OFAC List Countries</u>.  The amounts invested by the Subscriber in the Company in the Offering were not and are not directly or indirectly derived from activities that contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations. Federal regulations and Executive Orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals.  The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at <http://www.treas.gov/ofac>.   In addition, the OFAC Programs prohibit dealing with individuals[2] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists;

6.2     <u>OFAC List Entity</u>.  To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs;

6.3     <u>Account Freeze</u>.  The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations;

6.4     <u>Suspension of Redemption Right</u>.  The Subscriber acknowledges that the Company may, by written notice to the Subscriber, suspend the redemption rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering

---

[1] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

[2] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

*ACTIVE 53694223v2*

regulations applicable to the Company or any of the Company's service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs;

6.5     Senior Foreign Political Figure. To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a senior foreign political figure[3], or any immediate family member[4] or close associate[5] of a senior foreign political figure, as such terms are defined in their respective footnotes;

6.6     Foreign Banks. If the Subscriber is affiliated with a non-U.S. banking institution (a "**Foreign Bank**"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains Limited Partnership Agreement records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate; and

6.7     Notification of Changes. The Subscriber understands, acknowledges and agrees that if the Subscriber becomes aware of any change in the information set forth in these representations that the Subscriber shall promptly notify the Company of such changes.

## 7.     **Subscription Irrevocable by Subscriber but Subject to Rejection by the Company.**

7.1     Irrevocable by Subscriber. This Agreement is not, and shall not be, revocable by the Subscriber.

7.2     Company Termination or Withdrawal. The Company, in its sole discretion, has the right to terminate or withdraw the Offering at any time, to accept or reject subscriptions in other than the order in which they were received, to reject any subscription in whole or in part, to allot

---

[3] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[4] An "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[5] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

*ACTIVE 53694223v2*

04-06-2021 @ 11:48:08 AM EST

to the Subscriber less than the value of Series A Preferred Units subscribed for, and to return without interest the amount paid by the Subscriber.

7.3    Not Binding. The Subscriber understands and agrees that this Agreement is not binding upon the Company until the Company accepts it, which acceptance is at the sole discretion of the Company and is to be evidenced by the Company's completion, execution and delivery of this Agreement, fully executed, to the relevant Subscriber.

7.4    Company Rejection. In the event of rejection of this subscription in whole (but not in part), or if the sale of the Series A Preferred Units subscribed for by the Subscriber is not consummated by the Company for any reason (in which event this Agreement shall be deemed to be rejected), this Agreement and any other agreement entered into between the Subscriber and the Company relating to this subscription shall thereafter have no force or effect and the Company shall promptly cause to be returned to the Subscriber the Purchase Price remitted by the Subscriber, without interest thereon or deduction therefrom.  If this subscription is accepted in part, the Company shall promptly cause to be returned to the Subscriber that portion of the Purchase Price remitted by the Subscriber which represents payment for the Series A Preferred Units for which this subscription was not accepted, without interest thereon or deduction therefrom.

## 8.    Indemnification.

The Subscriber hereby indemnifies and holds harmless the Company, its members, managers, officers, directors, agents, employees, advisors, affiliates and successors from and against all liability, damage, claims, losses, costs and expenses (including reasonable attorneys' fees) which it may incur by reason of the failure of the Subscriber to fulfill any of the terms and conditions of this Agreement, or by reason of any breach of the representations and warranties made by the Subscriber herein or in any document provided by the Subscriber to the Company or any of its affiliates.

## 9.    Miscellaneous.

9.1    Notices.   All notices, demands, requests, consents, approvals and other communications that may or are required to be given by either party to the other party hereunder shall be deemed to be sufficient if in writing and (i) delivered in person, (ii) delivered and received by facsimile, if a confirmatory mailing in accordance herewith is also made, (iii) duly sent by registered mail return receipt requested and postage prepaid, or (iv) duly sent by overnight delivery service, in each case as addressed to such party at the address set forth below:

If to the Company, to:

> Justice Partners, LLC
> 20900 NE 30th Ave, Suite 510
> Miami, FL 33180
> Attn: Lee Melchionni

With a copy to:

<center>12</center>

04-06-2021 @ 11:48:08 AM EST

Bruce C. Rosetto, Esq.
Greenberg Traurig, P.A.
777 S. Flagler Drive, Suite 300 East
West Palm Beach, FL  33401
Facsimile #: 561-367-6225

If to the Subscriber:

To the address listed on the Signature Page

All notices, demands, requests, consents, approvals and other communications shall be deemed to have been received (i) at the same time it was personally delivered, (ii) on the receipt of delivery by facsimile if accompanied by a confirmatory mailing, (iii) five (5) days after mailing via registered mail return receipt requested whether signed for or not, to the foregoing persons at the addresses set forth above or (iv) the next day when sent by overnight delivery service. The above shall constitute service despite rejection or other refusal to accept or inability to deliver because of changed address for which no notice has been received.

9.2    Construction; Governing Law.    All issues and questions concerning the construction, validity and interpretation of this Agreement and all matters pertaining hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

9.3    Consent to Jurisdiction.    THE PARTIES HERETO IRREVOCABLY AGREE THAT ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT WILL BE LITIGATED SOLELY IN THE VENUE AND JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF FLORIDA.  THE PARTIES HEREBY CONSENT AND SUBMIT TO THE JURISDICTION OF ANY COURT LOCATED WITHIN THE STATE OF FLORIDA, WAIVE PERSONAL SERVICE OF PROCESS AND AGREE THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE PARTIES AT THE ADDRESS STATED IN THE NOTICE PROVISIONS OF THIS AGREEMENT, AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.  THE PREVAILING PARTY(IES) IN ANY SUCH ACTION OR PROCEEDING SHALL BE ENTITLED TO RECOVER ITS REASONABLE ATTORNEYS' FEES AND COSTS FROM THE OTHER PARTY(IES).

9.4    Waiver of Jury Trial.    THE PARTIES HERETO, HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT OR INSTITUTED BY EITHER PARTY OR ANY SUCCESSOR OR ASSIGN OF EITHER PARTY (a) UNDER THIS AGREEMENT OR ANY

13

RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (b) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH PARTY AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE OTHER PARTY ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

9.5     Construction.  In construing this Agreement, the singular shall be held to include the plural, the plural shall include the singular, the use of any gender shall include every other and all genders, and captions and paragraph headings shall be disregarded.

9.6     Severability.  The invalidity of any one or more of the words, phrases, sentences, clauses, sections or subsections contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part hereof, all of which are inserted conditionally on their being valid in law, and, in the event that any one or more of the words, phrases, sentences, clauses, sections or subsections contained in this Agreement shall be declared invalid, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, section or sections, or subsection or subsections had not been inserted.

9.7     Section Headings.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of any provisions of this Agreement.

9.8     Counterparts.  This Agreement may be executed in any number of counterparts (including by facsimile transmission) and by the several parties hereto in separate counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

9.9     Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes all prior agreements, understandings, negotiations and discussions, both written and oral, between the parties hereto with respect to the subject matter hereof.  This Agreement may not be amended or modified in any way except by a written instrument executed by each of the parties.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

14

*ACTIVE 53694223v2*

04-06-2021 @ 11:48:08 AM EST

The undersigned Subscriber hereby agrees to purchase __4,000__ Units of the Series A Preferred Units, at an aggregate Purchase Price of US$__$4,000,000.00__ and is tendering such amount pursuant to the provisions of Section 1.3 hereof.

Date: __4/6/2021__ __, 2021

_Allan Teh_

**Signature of Subscriber**

Allan Teh

**Print Name of Subscriber**

Residence/Domicile:        50 S Pointe DR. PH#2  Miami Beach, Florida 33139

Number and Street

City/State/Zip

USA

Country

Social Security/Taxpayer
Identification Number(s):        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

The Company hereby accepts the foregoing subscription for __4,000__ Units of Series A Preferred Units as of __4/6/2021__ __, 2021.

Justice Partners, LLC, a Delaware limited liability company

_Lee Melch_

By: _____
Name:  Lee Melchionni
Title:  Manager

*ACTIVE 54225632v1*

04-06-2021 @ 11:48:08 AM EST

**EXHIBIT A**
**TERM SHEET**

**SUMMARY OF PRINCIPAL TERMS**
**FOR**
**PRIVATE PLACEMENT**
**OF UP TO**
**$45,000,000 OF CLASS A PREFERRED UNITS**

**JUSTICE PARTNERS, LLC**
a Delaware limited liability company

*The terms and conditions set forth herein are subject to change and this non-binding term sheet (the "**Term Sheet**") does not constitute an offer to purchase securities. The terms and conditions set forth herein are indicative only and subject to change based on market conditions. Moreover, the terms and conditions set forth are subject to customary legal review and due diligence review. Neither this Term Sheet nor any discussion or negotiation of the proposed transaction constitutes an agreement or obligation on the part of any person to purchase or sell securities of Justice Partners, LLC or enter into any agreement to purchase securities of the company.*

## I.     Terms of Justice Partners, LLC Offering

**ISSUER:**      Justice Partners, LLC, a Delaware limited liability company (the "**Company**").

**TYPE OF SECURITY:**      The Company intends to offer its non-voting Class A Preferred Units up to 45,000 Units (the "**Class A Preferred Units**") in an aggregate amount of up to $45,000,000 (the "**Class A Preferred Offering**") to investors (each, an "**Investor**" and together, the "**Investors**" or the "**Class A Preferred Units Holders**"), pursuant to the terms and conditions of a subscription agreement to be entered into by each Investor and the Company (each, a "**Subscription Agreement**" and collectively, the "**Subscription Agreements**"). The Company reserves the right to raise more than $45,000,000 in the Offering in its sole discretion without notice to Investors.

Capitalized terms used but not otherwise defined in this Term Sheet shall have the meaning set forth in the Operating Agreement.

**USE OF PROCEEDS**      The Company intends to use all the proceeds from this Offering to loan (the "**Loan**") to the Justice Partners Law Group, LP (the "**Firm**" or the "**Borrower**").

*BOC 37522681v3*

*ACTIVE 54225632v1*

04-06-2021 @ 11:48:09 AM EST

| | |
|---|---|
| **PURPOSE:** | The purpose of the Company (the "**Purpose**") is to make the Loan to the Firm, so as to facilitate the financing of mass tort litigation expenses, which include, but are not limited to: research; client acquisition; marketing; expert fees; general working capital purposes for the Firm, and any other businesses ancillary or complementary thereto. |
| **MANAGER:** | The Company will be managed by Justice Partners Management, LLC, a Delaware limited liability company (the "**Managers**"). |
| **PURCHASE PRICE; MINIMUM/MAXIMUM INVESTMENT AMOUNTS:** | The purchase price shall be One Thousand Dollars and 00/100 ($1,000) per Unit ("**Per Unit Price**"). The minimum individual investment amount in the Offering is $500,000 for 500 Units. |
| **THE OFFERING:** | The Class A Preferred Offering will be an exempt private placement under federal and state securities laws and regulations. The Company may accept funds in this Offering in one or more Closings (defined below). |
| **CLOSINGS:** | Each closing of a purchase and sale of the Class A Preferred Units shall be consummated on such date(s) as the Company accepts an Investor's offer to purchase the Class A Preferred Units as evidenced by the Company's counter-execution of the signature page to the Subscription Agreement for each such Investor and the return of a fully executed Subscription Agreement to the relevant Investor (each, a "**Closing**" and collectively, the "**Closings**"). |
| **CONDITIONS PRECEDENT TO CLOSE:** | On or prior to the date of each Closing, the following shall have occurred: (i) the Investor shall have paid to the Company the Purchase Price by a bank cashier's check or by wire transfer of immediately available U.S. funds; (ii) the Investor shall have delivered to the Company a dated and executed signature page to the Subscription Agreement, with all blanks properly completed; (iii) the Investor shall have delivered to the Company a dated completed and signed Accredited Investor Questionnaire, with all blanks properly completed; and (iv) the Purchaser shall have thoroughly reviewed the Subscription Agreement and the Risk Factors, the Term Sheet, and the Operating Agreement, each as attached to the Subscription Agreement. |

BOC 37522681v3

ACTIVE 54225632v1

| | |
|---|---|
| **RANKING:** | The Class A Preferred Units shall be senior to any other class of units. As long as any Class A Preferred Units remain outstanding shall not without obtaining the prior approval of the Class A Preferred Members owning at least a majority of the Class A Preferred Units then outstanding, create, authorize or issue any other class of Units, the terms of which provide that such class of Units shall rank prior to the Class A Preferred Units in respect of rights upon dissolution, liquidation or winding up of the Company; *provided, however*, the Company may, at any time, create, authorize or issue, without the consent of any of the Class A Preferred Members, other classes of Units or series thereof which rank junior to, or on parity with, the Class A Preferred Units in respect to dissolution, liquidation or winding up of the Company. |
| **PREFERRED RETURN:** | Fifteen percent (15%) per annum simple multiplied by the Class A Preferred Holder's respective Capital Account (the "**Preferred Return**"), which shall accrue from the date of the Company's acceptance of the Investor's Capital Contribution, until the Firm receives its first mass tort settlement proceeds via a Master Qualified Settlement Fund. |
| **MATURITY:** | The Class A Preferred Units shall have no maturity date and will remain outstanding unless the Units are repurchased or redeemed as set forth herein. |
| **FINANCIAL REPORT:** | The Company will provide an audited financial report in accordance with GAAP at the end of each fiscal year to its Members. |

*BOC 37522681v3*

*ACTIVE 54225632v1*

04-06-2021 @ 11:48:09 AM EST

**DISTRIBUTIONS:** The Company may make distributions of distributable cash (net of expenses, reserves, etc.), or declare a distribution to be held in suspense to meet tax law requirements, each, a "**Distribution**" as follows:

1. Return of Capital: First, one hundred percent (100%) to Class A Preferred Members until Distributions to such Class A Preferred Members of Distributable Cash on a cumulative basis pursuant to this clause (a) equal such Class A Preferred Member's Capital Contributions.

2. Preferred Return: Second, one hundred percent (100%) to Class A Preferred Members until Distributions to such Class A Preferred Members of Distributable Cash on a cumulative basis pursuant to this clause (b) equal the Preferred Return.

3. Catch Up: Third, one hundred percent (100%) to the Manager until Distributions to the Manager of Distributable Cash on a cumulative basis as carried interest Distributions equal fifteen percent (15%) of all Distributions of Distributable Cash made pursuant to Section 5.2(a) and Section 5.2(b) of the Company's Operating Agreement;

4. Split: Any balance, (i) eighty-five percent (85%) to Class A Preferred Members and (ii) fifteen percent (15%) to the Manager; and

5. Performance Milestone:  Notwithstanding the foregoing, upon each Class A Preferred Member receiving Distributions equal to three times (3x) such Class A Preferred Member's Capital Contributions (the "**Performance Milestone**"), (i) one hundred percent (100%) of Distributable Cash after the Performance Milestone to the Manager until Distributions to the Manager of such Distributable Cash on a cumulative basis as carried interest Distributions equal 20% of all Distributions of Distributable Cash made pursuant to Section 5.2(a), Section 5.2(b) and Section 5.2(c) of the Company's Operating Agreement, and (ii) any balance, (x) eighty percent (80%) to Class A Preferred Members and (y) twenty percent (20%) to the Manager.

*BOC 37522681v3*

*ACTIVE 54225632v1*

Proof Stamp.org
04-06-2021 @ 11:48:09 AM EST

| | |
|---|---|
| **LIQUIDATION PREFERENCE:** | In the event of any liquidation, dissolution or winding up of the affairs of the Company, whether voluntary or otherwise, after payment or provision for payment of the debts and other liabilities of the Company, the Class A Preferred Members shall be entitled to receive, before the Common Members or other classes of preferred units of the Company ranking junior thereto, out of the remaining net assets of the Company, the amount each Class A Preferred Member Capital Account in the Class A Preferred Units plus 15%. After such payment shall have been made in full to the Class A Preferred Members, or funds or assets necessary for such payment shall have been set aside in trust for the account of the Class A Preferred Members, so as to be and continue to be available therefor, the Class A Preferred Members shall be entitled to no further participation in such distribution of the assets of the Company. |
| **SELLING COMPENSATION:** | The Company may utilize broker dealers or a placement agent to assist in raising the capital in connection with this Offering and in such event the Company would be paying standard compensation fees and expenses of any such broker dealer or placement agent. |
| **TRANSFER RIGHTS:** | Except as set forth in the Operating Agreement of the Company, no Class A Preferred Unit Holder may transfer its Units or any rights or interests therein without the prior consent of the Company, which consent may be withheld in the Company's sole discretion. |
| **INVESTORS:** | Each Investor is required to be "accredited" as such term is defined under Securities and Exchange Commission Rule 501 of Regulation D. Each Class A Preferred Unit Holder will be required to execute a Subscription Agreement and an Accredited Investor Questionnaire and provide any other documentation which may be required for the Company to comply with the Jumpstart our Business Startups Act or the JOBS Act.  In addition, Investors should have funds other than those invested in the Company adequate to meet their personal needs and contingencies and must be knowledgeable and experienced in financial and business matters generally.  The manager of the Company may, in his sole discretion, decline to admit any prospective investor regardless of whether such person meets the foregoing suitability requirements. |
| **NON-BINDING TERM SHEET; CONFIDENTIALITY:** | This Term Sheet merely constitutes a statement of the intentions with respect to the transactions described herein and is not a legally binding document and the terms of the proposed transaction and information produced by the Company (whether written or verbal) shall remain confidential. |
| **EXPENSES:** | The Company and the Investors will each bear their own legal and other expenses with respect to the transactions contemplated herein. |

*BOC 37522681v3*

*ACTIVE 54225632v1*

**RESTRICTIONS ON TRANSFER**

The Units will be restricted as to transferability under state and federal laws regulating securities. The issuance of the Units will not be registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or any other similar state statutes, in reliance upon exemptions from the registration requirements contained therein. Accordingly, the Units will be "restricted securities" as defined in Rule 144 of the Securities Act. As "restricted securities," an Investor must hold them indefinitely and may not dispose or otherwise sell them without registration under the Securities Act and any applicable state securities laws unless exemptions form registrations are available. Moreover, in the event an Investor desires to sell or otherwise dispose of any of the Units, the Investor will be required to furnish the Company with an opinion of counsel acceptable to us that the transfer would not violate the registration requirements of the Securities Act or applicable state securities laws. Any certificate or other document evidencing the Securities will be imprinted with a conspicuous legend stating that the Securities have not been registered under the Securities Act and state securities laws, and referring to the restrictions on transferability and sale of the Units. In addition, the Company's records concerning the Units will include "stop transfer notations" with respect to such Units.

04-06-2021 @ 11:48:09 AM EST

# EXHIBIT B
# OPERATING AGREEMENT

## JUSTICE PARTNERS LLC

## A DELAWARE LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT

## EFFECTIVE AS OF DECEMBER 15, 2020

THE LIMITED LIABILITY COMPANY INTERESTS (AND THE UNITS INTO WHICH THEY ARE DIVIDED) ISSUED IN ACCORDANCE WITH AND DESCRIBED IN THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THEIR INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME.

*BOC 37522681v3*

*ACTIVE 54225632v1*

04-06-2021 @ 11:48:09 AM EST

## TABLE OF CONTENTS

**Page No.**

ARTICLE I DEFINITIONS ...........................................................................................................1

    1.1     Definitions ...............................................................................1
    1.2     Further Definitions ................................................................7

ARTICLE II ORGANIZATION .....................................................................................................7

    2.1     Formation.................................................................................7
    2.2     Name.........................................................................................7
    2.3     Purpose ....................................................................................7
    2.4     Powers ......................................................................................8
    2.5     Term..........................................................................................8
    2.6     Registered Office; Registered Agent; Principal Office; Other Offices ...............................8
    2.7     Company Property ..................................................................8
    2.8     Expenses ..................................................................................8

ARTICLE III UNITS AND CAPITALIZATION ...........................................................................8

    3.1     Units..........................................................................................8
    3.2     Certificates..............................................................................9
    3.3     Capital Contributions............................................................9
    3.4     Default in Payment. ...............................................................10
    3.5     Additional Capital – Other ...................................................11
    3.6     Reserved ..................................................................................11
    3.7     Securities Laws.......................................................................11

ARTICLE IV CAPITAL ACCOUNTS ..........................................................................................12

    4.1     Establishment and Determination of Capital Accounts.......................................................12
    4.2     Computation of Amounts .....................................................12
    4.3     Negative Capital Accounts...................................................12
    4.4     Company Capital ....................................................................12
    4.5     No Withdrawal .......................................................................13
    4.6     Loans from Members.............................................................13
    4.7     Adjustments to Book Value ..................................................13

ARTICLE V DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES............................13

    5.1     Generally ................................................................................13
    5.2     Distributions ..........................................................................13
    5.3     Allocation of Profits and Losses..........................................14
    5.4     Special Allocations ...............................................................14
    5.5     Tax Allocations; Code Section 704(c).................................15
    5.6     Amounts Withheld.................................................................16

*ACTIVE 54225632v1*

04-06-2021 @ 11:48:09 AM EST

**ARTICLE VI MANAGEMENT** .......................................................................................................**16**

6.1 Manager..................................................................................................................16
6.2 Authority of the Manager. ....................................................................................16
6.3 Power of Attorney .................................................................................................18
6.4 Devotion of Time; No Exclusive Duty to Company..............................................18
6.5 Manager's Compensation; Reimbursement ..........................................................19
6.6 Delegation of Duties..............................................................................................19
6.7 Officers ..................................................................................................................19
6.8 Reliance by Third Parties ......................................................................................19
6.9 Resignation and Replacement of Manager............................................................20
6.10 Removal of Manager .............................................................................................20
6.11 Successor Funds; Presentation of Opportunities to the Company.........................20
6.12 Standards of Conduct and Modification of Duties. ...............................................20

**ARTICLE VII MEMBERS** ...........................................................................................................**22**

7.1 Participation in Management..................................................................................22
7.2 Right of Members to Bring Action........................................................................23
7.3 No Exclusive Duty to Company ............................................................................23
7.4 A Member's Duty of Loyalty ................................................................................23
7.5 No Authority of Individual Member ......................................................................23
7.6 Related Party Transactions ....................................................................................23

**ARTICLE VIII LIMITED LIABILITY, EXCULPATION AND INDEMNIFICATION** .................**23**

8.1 Limited Liability of Members. ..............................................................................23
8.2 Exculpation of Covered Persons............................................................................24
8.3 Right to Indemnification for Covered Persons.......................................................24
8.4 Contract with Company.........................................................................................25
8.5 Advance Payment ..................................................................................................25
8.6 Indemnification of Employees and Agents ...........................................................25
8.7 Appearance as a Witness.......................................................................................25
8.8 Nonexclusivity of Rights ......................................................................................25
8.9 Insurance................................................................................................................25
8.10 Savings Clause.......................................................................................................26
8.11 Transactions with the Company ............................................................................26

**ARTICLE IX TAX MATTERS** ....................................................................................................**26**

9.1 Tax Returns............................................................................................................26
9.2 Tax Matters Representative....................................................................................26
9.3 Indemnification and Reimbursement for Payments on Behalf of a Member.........26

**ARTICLE X BOOKS AND RECORDS; REPORTS AND CONFIDENTIALITY**............................**27**

10.1 Maintenance of Books...........................................................................................27
10.2 Reports...................................................................................................................28
10.3 Company Funds......................................................................................................28
10.4 Confidentiality.......................................................................................................28

- ii -

**ARTICLE XI TRANSFERS; ADMISSION OF MEMBERS** ..................................................**29**

| | | |
|---|---|---|
| 11.1 | Transfer Restrictions. | 29 |
| 11.2 | Permitted Transfers. | 29 |
| 11.3 | Void Transfer. | 30 |
| 11.4 | Effect of Valid Transfer. | 30 |
| 11.5 | Admission of Substitute Member. | 31 |
| 11.6 | Admission of Additional Members. | 32 |
| 11.7 | Death, Incapacity or Bankruptcy of a Member. | 32 |

**ARTICLE XII DISSOLUTION, LIQUIDATION AND TERMINATION** ..........................................**33**

| | | |
|---|---|---|
| 12.1 | Dissolution | 33 |
| 12.2 | Authority to Wind Up | 33 |
| 12.3 | Accounting | 33 |
| 12.4 | Distribution of Assets | 34 |
| 12.5 | Liquidating Distribution | 34 |
| 12.6 | Distributions in Kind | 34 |
| 12.7 | Liquidating Trustee | 34 |
| 12.8 | Winding Up | 35 |
| 12.9 | Termination | 35 |
| 12.10 | Return of Capital | 35 |

**ARTICLE XIII GENERAL PROVISIONS** ..........................................................................**35**

| | | |
|---|---|---|
| 13.1 | Offset | 35 |
| 13.2 | Notices | 35 |
| 13.3 | Entire Agreement | 36 |
| 13.4 | Effect of Waiver or Consent | 36 |
| 13.5 | Amendments | 36 |
| 13.6 | Binding Effect | 37 |
| 13.7 | Governing Law; Severability | 37 |
| 13.8 | Jurisdiction; Venue | 38 |
| 13.9 | Waiver of Jury Trial; Expedited Arbitration | 38 |
| 13.10 | Further Assurances | 39 |
| 13.11 | Waiver of Certain Rights | 39 |
| 13.12 | Notice to Members of Provisions | 39 |
| 13.13 | Remedies | 39 |
| 13.14 | Severability | 39 |
| 13.15 | Descriptive Headings; Interpretations | 40 |
| 13.16 | UCC Article 8 Election | 40 |
| 13.17 | Creditors | 40 |
| 13.18 | Survival | 40 |
| 13.19 | Counterparts | 40 |
| 13.20 | Compliance with Anti-Money Laundering Requirements | 40 |

*[Remainder of Page Intentionally Left Blank]*

ACTIVE 54225632v1

04-06-2021 @ 11:48:09 AM EST

**OPERATING AGREEMENT**
**OF**
**JUSTICE PARTNERS LLC**
**A DELAWARE LIMITED LIABILITY COMPANY**

This Operating Agreement (this "**Agreement**") is entered into and effective as of December 15, 2020 (the "**Effective Date**"), by and among **JUSTICE PARTNERS LLC**, a Delaware limited liability company (the "**Company**") the initial members set forth on Exhibit A hereto (the "**Members**"), and those Persons who subsequently become Members by executing a joinder to this Agreement.

**WHEREAS**, Certificate of Formation (the "**Certificate**") was filed with the Department of State of the State of Delaware on October 8, 2020 in order to form the Company as a Delaware limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act;

**WHEREAS**, the Members now enter into this Agreement in order to set forth the terms and conditions that will regulate and govern the operation and management of the Company and regulate and govern the respective rights and obligations of the Members with respect to the Company.

**NOW, THEREFORE**, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1      **Definitions**.  For purposes of this Agreement, the following terms have the meanings set forth below with respect thereto:

"**Act**" means the Delaware Limited Liability Company Act, 6 *Del. C*., Sections 18-101 *et seq*., as amended from time to time.as it may be amended from time to time, and any successor to such statute.

"**Affiliate**" shall mean, with respect to any Person, (a) any other Person directly or indirectly controlling, controlled by, or under common control with, such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise, and (bi) any officer, director, partner or member thereof.

"**Bankrupt Member**" means any Member (a) that (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to or acquiesces in the appointment of a trustee, receive or liquidator of the Member or of all or any substantial part of the Member's properties; or (b) against which a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law has been commenced and sixty (60) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and sixty (60) days have expired without the appointments having been vacated or

04-06-2021 @ 11:48:09 AM EST

stayed, or sixty (60) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"**Base Rate**" means, on any date, a variable rate per annum equal to the rate of interest most recently published by *The Wall Street Journal* as the "prime rate" at large U.S. money center banks.

"**Book Value**" means, with respect to any Company property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treas. Reg. §1.704-1(b)(2)(iv)(d)-(g).

"**Business Day**" means any day other than a Saturday, a Sunday or a holiday on which national banking associations in the State of Delaware are closed.

"**Capital Base**" means all Capital Contributions made to the Company by an applicable Contributing Common Member pursuant to Section **Error! Reference source not found.**, including any additional Capital Contribution in question.

"**Capital Commitment**" means, with respect to each Member, the amount set forth opposite such Member's name on Schedule A to be contributed by such Member to the Company pursuant to and in accordance with Section 3, as such amount may be amended from time to time pursuant to the terms of this Agreement.

"**Capital Contribution**" means the amount of cash or cash equivalents, or the fair market value (as determined by the Manager) of any other property, that is contributed by a Member to the capital of the Company in respect of any Unit.

"**Class A Common Unit**" means a Class A Common Unit or fraction thereof of the Company representing the interest of the Manager in Profits, Losses and Distributions and having the rights and obligations specified with respect thereto as set forth in this Agreement.

"**Class A Preferred Members**" shall mean those Members holding Class A Preferred Units in the Company, their permitted successors and assigns and any other Person who may be admitted to the Company as a Class A Preferred Member in accordance with the terms of this Agreement.

"**Class A Preferred Members Membership Percentage**" means, with respect to each Class A Preferred Member as of any particular time, such Class A Preferred Member's percentage ownership of the total outstanding Class A Preferred Units of the Company set forth on the Schedule of Members.

"**Class A Preferred Units**" means a Class A Preferred Unit or fraction thereof of the Company representing the interest of a Class A Preferred Member in Profits, Losses and Distributions and having the rights and obligations specified with respect thereto as set forth in this Agreement.

"**Code**" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"**Common Members**" shall mean those Members holding Common Units in the Company, their permitted successors and assigns and any other Person who may be admitted to the Company as a Common Member in accordance with the terms of this Agreement.

- 2 -

04-06-2021 @ 11:48:09 AM EST

"**Common Unit**" means a Common Unit or fraction thereof of the Company representing the interest of a Common Member in Profits, Losses and Distributions and having the rights and obligations specified with respect thereto as set forth in this Agreement.

"**Company**" means Justice Partners LLC, a Delaware limited liability company.

"**Company Business**" means to engage in any business activities as determined by the Members.

"**Company Minimum Gain**" has the meaning set forth for "partnership minimum gain" in Treasury Regulations Section 1.704-2(d).

"**Covered Person**" means any and all of the following: (a) the Directors and any departing or former Directors and the Affiliates of any of them; (b) any Person who is or was a Manager, managing partner, general partner, director, officer, employee, agent, fiduciary or trustee of the Board, or of any of the Affiliates of any of them; (c) any Person who is or was serving as a Manager, managing member, general partner, director, officer, employee, agent, fiduciary or trustee of another Person owing a fiduciary duty to the Company or its Affiliates; (d) any director, officer, manager, partner or other principal of the Company; or (e) any other Person designated by the Manager.

"**Distributable Cash**" means all cash received by the Company relating to the Investments other than Capital Contributions, including, without limitation, income, dividends, distributions, interest and proceeds from an Investment and any other miscellaneous receipts or revenues of the Company related directly to Investments held by the Company.

"**Distribution**" means any distribution made by the Company to a Member, whether in cash (including Distributable Cash), property or securities of the Company and whether by liquidating distribution or otherwise; *provided that* none of the following shall be a Distribution: (a) any redemption or repurchase by the Company of any securities of the Company (including Units); (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by Unit split, pro rata Unit distribution or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as an employee, officer, consultant or other provider of services to the Company; provided, further that the Manager will be entitled to withhold from any Distribution, at its discretion, appropriate reserves for expenses and liabilities of the Company, as well as for any required tax withholdings and that amounts withheld for taxes will be treated as Distributions for purposes of the calculations described in this Agreement.

"**Fair Value**" means, in respect of any class of Units, as of the date of determination, the fair market value of such Units as determined by (i) an independent appraisal firm with experience in the valuing companies in a business similar to the Company Business or (ii) the unanimous approval of all Members.

"**Fiscal Year**" of the Company means the calendar year, or such other annual accounting period as established by the Manager.

"**Incapacitated**" means, with respect to a natural person, his or her incompetency or insanity, as determined by the Manager in its sole discretion.

"**Investment Expenses**" means, collectively, the (a) Management Expenses, (b) Organizational Expenses and (c) Operating Expenses.

"**Investments**" means investments and loans made, directly or indirectly, by the Company in accordance with this Agreement to Justice Partners Law Group, LP.

- 3 -

04-06-2021 @ 11:48:09 AM EST

"**Liquidation Event**" means (a) the voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Company; (b) the commencement by the Company of a voluntary case under the federal bankruptcy laws or any other applicable federal, state or international bankruptcy, insolvency or similar law, the consent to the entry of an order for relief in an involuntary case under such law or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Company or of any substantial part of its property, the making of an assignment by the Company for the benefit of its creditors, the admission in writing by the Company of its inability to pay its debts generally as they become due, the entry of a decree or order for relief in respect of the Company by a court having jurisdiction in the premises in an involuntary case under the federal bankruptcy laws or any other applicable federal, state or international bankruptcy, insolvency or similar law, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Company or of any substantial part of its property; (c) the sale, lease, Transfer, conveyance or other disposition, in one transaction or a series of related or unrelated transactions, of all or substantially all of the assets of the Company and its wholly-owned subsidiaries, taken as a whole; (d) a transaction or series of related or unrelated transactions, including by way of merger, consolidation, recapitalization, reorganization or sale or issuance of shares, the result of which is that the Common Members immediately prior to such transaction are, after giving effect to such transaction, no longer (or their respective Affiliates or Permitted Transferees are no longer), in the aggregate, the "beneficial owners" (as such term is defined in Rule 13d-3 and Rule 13d-5 promulgated under the Securities Exchange Act of 1934, as amended) directly or indirectly, through one or more intermediaries, of more than fifty percent (50.0%) of the voting power of the outstanding voting securities of the Company or any successor thereto resulting from any such transaction(s); or (e) any other transaction or series of related transactions in which substantially all control of the Company or its property is Transferred to a third party.

"**Liquidating Trustee**" means such Person as is selected at the time of dissolution by the Manager, which Person may include a Director or an Affiliate of any Member, who shall be empowered to give and receive notices, reports and payments in connection with the dissolution, liquidation and/or winding up of the Company and shall hold and exercise such other rights and powers as are necessary or required to permit all parties to deal with the Liquidating Trustee in connection with the dissolution, liquidation, and/or winding up of the Company.

"**Losses**" for any period means all items of Company loss, deduction and expense for such period determined according to Section 4.2.

"**Majority in Interest of the Members**" means a Member or Members, voting together as a single class, collectively holding in excess of fifty percent (50.0%) Membership Percentage of the Company.

"**Manager**" has the meaning set forth in Section 6.1.

"**Member Minimum Gain**" has the meaning set forth for "partner nonrecourse debt minimum gain" in Treasury Regulations Section 1.704-2(i).

"**Member Nonrecourse Deductions**" has the meaning set forth for "partner nonrecourse deductions" in Treasury Regulations Section 1.704-2(i).

"**Members**" means the Persons listed as the holders of Units as set forth on the Schedule of Members to include any other Person that both acquires a Unit and is admitted to the Company as a Substitute Member or additional Member in accordance with the terms of this Agreement, but only so long as such Person is shown on the Company's books and records as the owner of one or more Units. The term "**Member**" means any one of the Members. The Members shall constitute the "members" (as that term is

04-06-2021 @ 11:48:09 AM EST

defined in the Act) of the Company.  For the avoidance of doubt, unless otherwise noted in this Agreement, any reference to "Member" or "Members" in this Agreement will include the Manager.

"**Membership Percentage**" means, with respect to each Member as of any particular time, such Member's percentage ownership of the total outstanding Units of the Company set forth on the Schedule of Members.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

"**Operating Expenses**" means, except as otherwise specifically provided in this Agreement, the Company's pro rata share of all third-party costs and expenses of maintaining the operations of the Company and appraising and valuing, acquiring, maintaining, financing, hedging and disposing of Investments, including, without limitation, taxes, fees and other governmental charges levied against the Company; insurance; administrative and research fees; expenses of custodians, outside advisors, counsel accountants, auditors, administrators and other consultants and professionals; technological expenses; interest on and fees, costs and expenses arising out of all financings entered into by the Company (including, without limitation, those of lenders, investment banks, and other financing sources); travel expenses; brokerage commissions; custodial expenses; litigation expenses (including the amount of any judgments or settlements paid in connection therewith); winding up and liquidation expenses; expenses incurred in connection with any tax audit, investigation, settlement or review; expenses associated with the preparation and distribution of reports, financial statements, tax returns and K-1s to the Members; indemnification and other unreimbursed expenses; and any extraordinary expenses to the extent not reimbursed or paid by insurance, but specifically excluding the Organizational Expenses.

"**Organizational Expenses**" means the Company's pro rata share of all out-of-pocket expenses incurred in connection with the organization and formation of the Manager, the Company and any related investment vehicle, and other related entities organized by the Manager or its Affiliates and the offering of the interests therein, including, without limitation, legal and accounting fees and expenses; printing costs; filing fees; and the transportation, meal, and lodging expenses of the personnel of the Manager.

"**Person**" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"**Preferred Return**" means a fifteen percent (15%) per annum cumulative preferred return (non-compounding) on the amount of each Capital Contribution made by a Class A Preferred Member; *provided*, that  the Preferred Return is computed for the period that (i) begins on the date such Capital Contribution is paid to the Company and (ii) ends on the earlier of (A) the date such Preferred Return is paid to any Member pursuant to the provisions of Section 5.2 or (B) the QSF Preferred Return End Date.

"**Preferred Unit**" means a series of preferred units of interest in the Company having the rights, including the votes per Unit, if any, as set forth in this Agreement governing such series of Preferred Units.

"**Profits**" for any period means all items of Company income and gain for such period determined according to Section 4.2.

"**QSF Event**" means the date upon which capital is deposited into a Qualified Settlement Fund or similar fund, account, or trust established under applicable law for the benefit of the members or Justice Partners Law Group, LP.

- 5 -

04-06-2021 @ 11:48:09 AM EST

"**QSF Preferred Return End Date**" means the date any Member elects to defer Distributions to be made to such Member under Section 5.2, due to and upon a QSF Event.

"**Remaining Capital Commitment**" means, with respect to any Member at any given time, such Member's Capital Commitment adjusted as follows: (a) reduced by such Member's Capital Contributions and (b) increased by (i) any unused Capital Contributions of such Member returned, and (ii) any refunds of Capital Contributions of such Member, in each case in accordance with this Agreement.

"**Schedule of Members**" shall mean the Schedule of Members attached hereto as Exhibit A, setting forth as of a certain date specified thereon, with respect to each Member, the name, address, respective number and class of Units owned by such Member and the amount of Capital Contributions made by such Member with respect thereto, as may be amended, adjusted or updated from time to time, by the Manager without the need for any further action, consent or approval by any of the Members.

"**Securities Act**" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.  Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

"**Substitute Member**" means a Person that is admitted as a Member to the Company pursuant to Section 11.5(a).

"**Super Majority in Interest of the Members**" means a Member or Members , voting together as a single class, collectively holding in excess of seventy percent (70.0%) of the votes associated with the outstanding Class A Common Units and authorized to vote outstanding Preferred Units, not including Units of a defaulted Member(s).

"**Taxable Year**" means the Company's taxable year ending December 31 (or part thereof, in the case of the Company's last taxable year), or such other year as is determined by the Manager in compliance with Section 706 of the Code.

"**Total Capital Base**" means, as of any date in question, all Capital Contributions theretofore made to the Company by all Members, including the additional Capital Contributions made by the Contributing Class A Preferred Members for which an adjustment to the Class A Preferred Membership Percentages is made pursuant to Section **Error! Reference source not found.**.

"**Transfer**" means any sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other disposition or encumbrance of an interest (whether with or without consideration, whether voluntarily or involuntarily or by operation of Law) or the acts thereof with correlative meanings to the terms "**Transferee**," "**Transferor**," "**Transferred**."

"**Treasury Regulations**" means, unless the context clearly indicates otherwise, the regulations in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Units**" means units in the Company held by a Member representing such Member's membership interests in the Company, which shall be paid for in cash or such other form of consideration as the Manager may determine in its reasonable discretion, whether held in the form of Common Units, Preferred Units or other type of units or other interests in the Company as may be issued by the Company; *provided,* that any class, group or series of Units issued shall have the relative rights, powers and duties set forth in this Agreement.  A Unit shall entitle the Member to (a) an interest in the Profits, Losses, Distributions, and net

- 6 -

proceeds of liquidation of the Company, as set forth herein; (b) any right to vote as set forth herein or as required under the Act; and (c) any right to participate in the management of the Company as set forth herein or as required under the Act.  A Unit is personal property and a Member shall have no interest in the specific assets or property of the Company.

1.2     **Further Definitions**.  The following terms, as used in this Agreement, have the meanings given to them in the Section or place indicated below:

| Term | Section |
|---|---|
| Additional Funds | Section 3.5 |
| Agreement | Preamble |
| Certificate | Recitals |
| Capital Account | Section 4.1 |
| Capital Call | Section 3.3(b) |
| Confidential Information | Section 10.4 |
| Designated Member | Section 11.7(a) |
| Funding Date | Section 3.3(b) |
| Indemnifying Member | Section 9.3(a) |
| Liquidating Distribution | Section 12.4 |
| Permitted Transfer | Section 11.2(a) |
| Permitted Transferee | Section 11.2(a) |
| Proceeding | Section 8.3 |
| Purchase Date | Section 11.7(b) |
| Purchase Price | Section 11.7(b) |
| Subscription Agreement | Section 4.1 |
| Tax Matters Representative | Section 10.2 |

## ARTICLE II
## ORGANIZATION

2.1     **Formation**.  The Company was formed as a Delaware limited liability company by the filing of Certificate of Formation (the "**Certificate**") for the Company with the Secretary of State of the State of Delaware under and pursuant to the Act.

2.2     **Name**.  The name of the Company is "JUSTICE PARTNERS LLC", and all Company Business shall be conducted in that name or such other names that comply with applicable law as the Manager may select from time to time.

2.3     **Purpose**.  The purpose of the Company is to carry on any and all lawful businesses and activities permitted from time to time under the Act and other applicable law, including without limitation, making (directly or indirectly), holding, managing, selling, exchanging or otherwise dealing in Investments and to engage in any other acts or activities necessary, advisable, related or incidental thereto and in any other acts or activities permitted by law.  Notwithstanding the foregoing, without the consent of the Manager and a vote of the Members holding a Majority in Interest of the Members, the Company shall not engage in any business other than (a) the Company Business; and (b) such other activities as may be necessary, advisable or appropriate to the accomplishment of the Company Business as determined by the Manager.  Subject to the terms and conditions of this Agreement, the Company is specifically authorized to enter into, make and perform all contracts and other undertakings, and engage in all other activities and transactions, as the Manager may deem necessary, advisable or convenient for carrying out the purposes of the Company.

04-06-2021 @ 11:48:09 AM EST

2.4     **Powers**. The Company shall possess and may exercise all powers and privileges granted by the Act, all other applicable laws or by this Agreement, together with any powers incidental thereto, insofar as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

2.5     **Term**. The term of the Company commenced on the date the Certificate were filed with the office of the Secretary of State of Delaware and shall continue until dissolution and liquidation thereof as determined under Article XII.

2.6     **Registered Office; Registered Agent; Principal Office; Other Offices**. The Company shall maintain a registered office in the State of Delaware. The Manager may, from time to time, change the Company's registered office and/or registered agent. The principal office of the Company shall be at such place as the Manager may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain records there. The Company may have such other offices as the Manager may designate from time to time.

2.7     **Company Property**. Company assets shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company assets or any portion thereof. Legal title to any or all Company assets may be held in the name of the Company or one or more nominees, as the Manager may determine. The Manager hereby declares and warrants that any Company assets for which legal title is held in the name of any nominee shall be held in trust by such nominee for the use and benefit of the Company in accordance with the provisions of this Agreement. All Company assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company assets is held. The Units of each Member shall constitute personal property.

2.8     **Expenses**. Except as otherwise provided, and subject to any limits in this Agreement, the Company and the Manager acting on behalf of the Company, will pay all Operating Expenses.

<div align="center">

**ARTICLE III**
**UNITS AND CAPITALIZATION**

</div>

3.1     **Units**.

(a)     General. Each Member's interest in the Company, including such Member's interest, if any, in the capital, income, gains, losses, deductions and expenses of the Company and the right to vote, if any, on certain Company matters as provided in this Agreement, shall be represented by the Units which may be issued in one (1) or more classes or series of classes, as approved by the Manager.

(b)     Election for Profits Interests. By executing this Agreement, each Member authorizes and directs the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "**IRS Notice**") apply to any interest in the Company transferred to a service provider by the Company on or after the effective date of such Revenue Procedure in connection with services provided to the Company. For purposes of making such Safe Harbor election, the Tax Matters Representative is hereby designated as the "partner who has responsibility for U.S. federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by the Tax Matters Representative constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS Notice. The Company and each Member hereby agree to comply with all requirements of the Safe Harbor described in the IRS Notice, including, without limitation, the requirement that each Member shall prepare and file any U.S. federal income tax returns such Member

<div align="center">

- 8 -

</div>

is required to file reporting the income tax effects of each "Safe Harbor Partnership Interest" issued by the Company in a manner consistent with the requirements of the IRS Notice.  A Member's obligations to comply with the requirements of this Section shall survive such Member's ceasing to be a Member of the Company and/or the termination, dissolution, liquidation and winding up of the Company, and, for purposes of this Section, the Company shall be treated as continuing in existence.  Each Member authorizes the Tax Matters Representative to amend this Section to the extent necessary to achieve similar tax treatment with respect to any interest in the Company transferred to a service provider by the Company in connection with services provided to the Company as set forth in Section 4 of the IRS Notice (e.g., to reflect changes from the rules set forth in the IRS Notice in subsequent U.S. Department of Treasury or Internal Revenue Service guidance).

3.2     **Certificates**.

(a)     General.  The Units owned by the Members will be recorded on the Schedule of Members and will not be required to be represented by physical certificates.  The Manager may in its discretion issue certificates to the Members representing the Units held by each Member, containing such legends as the Manager deems appropriate or required by applicable securities laws in the Manager's discretion, including as set forth in Section 3.2(b).  If certificates represent the Units, the certificates shall be signed by, or in the name of the Company by any one (1) Director and shall represent the number of Units held by a Member registered in certificate form.  Any signature on such certificate may be a facsimile. If any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Company with the same effect as if such individual was an officer, transfer agent or registrar at the date of issue.

(b)     Legends.  Each certificate shall be stamped or otherwise imprinted with a legend in substantially the following form:

ANY ASSIGNMENT OR TRANSFER OF AN INTEREST IN THIS LIMITED LIABILITY COMPANY IS SUBJECT TO THE RESTRICTIONS IMPOSED ON TRANSFER BY THE OPERATING AGREEMENT OF THE COMPANY DATED DECEMBER 15, 2020.

A certificate representing Units that are subject to further restrictions on Transfer or to other restrictions may have a notation of such additional restriction(s) imprinted thereon.

(c)     Lost, Stolen or Destroyed Certificates; Issuance of New Certificates.   The Company may issue a new certificate in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Company may require the owner of the lost, stolen or destroyed certificate, or his, her or its legal representative, to give the Company a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

3.3     **Capital Contributions**.

(a)     Each Member has made, or concurrently with the execution of this Agreement is making, a Capital Contribution to the Company in the amount set forth in the records of the Company.  No Member shall be entitled to any interest or compensation with respect to such Member's Capital Contribution or share of the capital of the Company, except as expressly provided herein.  No Member shall have any liability for the repayment of the Capital Contribution of any other Member and each Member shall look only to the assets of the Company for return of such Member's Capital Contributions to the extent permitted herein.

04-06-2021 @ 11:48:09 AM EST

(b)      Except as specifically set forth in this Agreement, the Manager may, in its sole discretion, from time to time determine that the reasonable business needs of the Company require that Capital Contributions be contributed to the Company in such amounts and at such times as the Manager determines is needed and approves and may request the Class A Members to make such contributions (each, a "**Capital Call**"); *provided*, that the Manager shall not make Capital Calls from any Class A Preferred Member for amounts in excess of the aggregate Remaining Capital Commitments of such Class A Preferred Member and no such Class A Preferred Member shall be obligated to contribute Capital Contributions in amounts in excess of its Remaining Capital Commitment.  The Manager shall provide written notice of the Capital Call to the Class A Preferred Members and each of the Class A Preferred Members shall be required to fund to the Company its pro rata share (based upon such Class A Preferred Members respective Class A Preferred Members Membership Percentage) of the amount of the Capital Call which amount shall be due, in cash, on the date determined by the Manager (the "**Funding Date**"), which shall be specified in the notice of the Capital Call provided by the Manager.

3.4      **Default in Payment.**

(a)      The Company shall be entitled to enforce the obligations of each Member to make the Capital Contributions set forth in Section 3.4, and the Company shall have all remedies available at law or in equity in the event any Capital Contribution is not so made.

(b)      If a Member (a "Defaulting Member") fails to pay any installment of its Capital Commitment (or any other amount required to be paid by it pursuant to a Capital Call, under any other provision of this Agreement or the Subscription Agreement) within five (5) days after the due date therefor, the Manager may send a notice of default (a "Default Notice") to such Member.  If the installment is not received by the Company within ten (10) days after the receipt by the Defaulting Member of a Default Notice (i) such failure shall constitute a breach of this Agreement and (ii) in the Manager's sole discretion, such amount shall constitute a demand loan ("Default Loan") to such Member that shall bear interest payable to the Company at a rate of eighteen percent (18%) per annum, compounded monthly, or, if lower, the highest rate of interest permitted under applicable law, from and after the original due date of such installment (the "Default Date") until the earliest of either (A) the payment of such installment, including any interest accruing under this Section 3.4(b), (B) the purchase of such Defaulting Member's Defaulted Interest (as defined below) under Section 3.4(c), or (C) the conclusion of foreclosure proceedings under Section 3.4(e).  Any interest paid by a Defaulting Member pursuant to this Section 3.4(b) shall not be treated as a Capital Contribution but shall be treated as income of the Company.

(c)      In addition to, and not in limitation of, the foregoing, the Manager may designate (in its sole discretion) in the Default Notice provided to a Defaulting Member, one or more parties, which parties may be the Company, the other Members, the Manager, Affiliates of the Manager **or third parties**, that will be permitted to acquire (by redemption in the case of the Company or by purchase in the case of any other Person) all or any portion of the Interest of the Defaulting Member in the Company (the "Defaulted Interest"); provided that such default has not been cured by the Defaulting Member within ten (10) days after receipt by the Defaulting Member of the Default Notice.  If a Defaulting Member shall pay any overdue installment of its Capital Commitment, plus interest in accordance with Section 3.4(b), prior to the expiration of the above referenced ten (10) day period, (i) such Member shall cease to be a Defaulting Member, (ii) such Member shall cease to be in breach of this Agreement and (iii) the remedies provided in this Section 3.4(c) and in Section 3.4(e) shall not be available with respect thereto.  If a Defaulting Member shall fail to cure its default within the above referenced ten (10) day period, such failure shall constitute a breach of this Agreement and such Defaulting Member shall forfeit its Interest and thereby cease to be a Member for all purposes as of the date of the issuance of the Default Notice.

- 10 -

04-06-2021 @ 11:48:09 AM EST

(d)  With respect to any redemption or purchase made pursuant to Section 3.4(c), the aggregate consideration payable to the Defaulting Member shall be a cash payment in an amount equal to fifty percent (50%) of the lesser of such Defaulting Member's (i) Estimated Value Capital Account or (ii) Capital Account, as of the Default Date, less the attorneys' fees and costs of enforcing payment and the transfer and removal of the Defaulting Member as a Member.  The provisions of Section 3.4, including the discount set forth in the immediately preceding sentence shall constitute a penalty for breach of this Agreement as permitted by the Delaware Act that has been fully negotiated and discussed and each Member completely understands and comprehends the intent, effect and potential ramifications thereof.  The Members agree that the provisions of Section 3.4, including this Section 3.4(d) are a reasonable remedy for the monetary damage that would result from any Member's failing to make its required Capital Contributions as and when from time to time required pursuant to the provisions of this Agreement.

(e)  In addition to or in lieu of, and not in limitation of, any of the foregoing, upon termination of the ten (10) day period provided in Section 3.4(c) if a breach of this Agreement by the Defaulting Member has occurred, the Manager, in its sole discretion, may (i) commence proceedings to collect any due and unpaid installment of the Defaulting Member's Capital Commitment (plus interest in accordance with Section 3.4(b)) and the expenses of collection, including arbitration or court costs and attorneys' fees and disbursements, and (ii) elect (effective upon giving notice to the Defaulting Member) that the Defaulting Member have no further co-investment opportunities to the extent that the Defaulting Member otherwise would qualify for such opportunities.

(f)  Any actions taken by the Manager or the Company pursuant to this Section 3.4 shall be in addition to and not in limitation of any other rights or remedies that the Company may have against the Defaulting Member, including, but not limited to, the right to hold the Defaulting Member responsible for any damages or liabilities (including attorneys' fees, arbitration or court costs and other expenses of collection) to which the Company may be subjected (in whole or in part) under applicable law as a result of the default by the Defaulting Member.

3.5  **Additional Capital – Other**.  Notwithstanding anything in this Agreement to the contrary, the Manager may, at any time and from time to time, determine that the Company requires additional funds ("**Additional Funds**").  Accordingly, in the discretion of the Manager, the Company may raise Additional Funds in any manner provided in, and including in accordance with, the following:

(a)  Third Party Loans.  At the discretion of the Manager, the Company may raise all or any portion of the Additional Funds by incurring or assuming debt, or by entering into credit, guaranty, financing or refinancing arrangements, upon such terms as the Manager determines appropriate; and

(b)  Affiliate Loans.  If the Manager determines at any time (or from time to time) that the Company needs Additional Funds from the Members, the Manager or its designees may, in the Manager's sole and absolute discretion, loan such funds to the Company.  Any such loan will be unsecured and accrue interest at a rate of ten percent (10%) per annum, compounded annually and based on a calendar year of three hundred sixty-five (365) days.

3.6  **Reserved**.

3.7  **Securities Laws**.  To accomplish the purpose of this Article, the Manager is hereby authorized to do all things necessary to admit Members, including, but not limited to, qualifying the Units for sale with state securities regulatory authorities or perfecting exemptions from qualification, and entering into such underwriting or agency arrangements for the offering and sale of Units upon such terms and conditions as the Manager may deem advisable.

**ARTICLE IV**
**CAPITAL ACCOUNTS**

4.1      **Establishment and Determination of Capital Accounts**.  A capital account ("**Capital Account**") shall be established for each Member.  The Capital Account of each Member shall consist of its initial Capital Contribution and shall be (a) increased by (i) any additional Capital Contributions made by such Member pursuant to the terms of this Agreement and (ii) such Member's share of items of income and gain allocated to such Member pursuant to Article V (Distributions; Allocations of Profits and Losses), (b) decreased by (i) such Member's share of items of loss, deduction and expense allocated to such Member pursuant to Article V and (ii) any Distributions to such Member of cash or the fair market value of any other property (net of liabilities assumed by such Member and liabilities to which such property is subject) distributed to such Member, and (c) adjusted as otherwise required by the Code and the regulations thereunder, including, but not limited to, the rules of Treasury Regulations Section 1.704-1(b)(2)(iv).  Any references in this Agreement to the Capital Account of a Member shall be deemed to refer to such Capital Account as the same may be increased or decreased from time to time as set forth above.

4.2      **Computation of Amounts**.  For purposes of computing the amount of any item of income, gain, loss, deduction or expense to be reflected in Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes; *provided, that*:

(a)      any income that is exempt from Federal income tax shall be added to such taxable income or losses;

(b)      any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)*(i)*, shall be subtracted from such taxable income or losses;

(c)      if the Book Value of any Company property is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)*(e)* (in connection with a distribution of such property) or *(f)* (in connection with a revaluation of Capital Accounts), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property;

(d)      if property that is reflected on the books of the Company has a Book Value that differs from the adjusted tax basis of such property, depreciation, amortization and gain or loss with respect to such property shall be determined by reference to such Book Value; and

(e)      the computation of all items of income, gain, loss, deduction and expense shall be made without regard to any election pursuant to Section 754 of the Code that may be made by the Company, unless the adjustment to basis of Company property pursuant to such election is reflected in Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)*(m)*.

4.3      **Negative Capital Accounts**.  No Member shall be required to pay to the Company or any other Member any deficit or negative balance that may exist from time to time in such Member's Capital Account.  Notwithstanding anything expressed or implied to the contrary in this Agreement, upon liquidation, dissolution or winding up of the Company, no Member shall be required to make any Capital Contribution to the Company in respect of any deficit in such Member's Capital Account.

4.4      **Company Capital**.  Except as expressly provided in this Agreement, no Member shall be paid interest on any Capital Contribution to the Company or on such Member's Capital Account, and no Member shall have any right (a) to demand the return of such Member's Capital Contribution or any other

04-06-2021 @ 11:48:09 AM EST

Distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon dissolution of the Company pursuant to Article XII; (b) to seek or obtain a partition of any Company assets; or (c) to own or use any particular or individual assets of the Company.

4.5    **No Withdrawal**.  Except as expressly provided in this Agreement, no Member shall be entitled to withdraw any part of such Member's Capital Contribution or Capital Account or to receive any Distribution from the Company.

4.6    **Loans from Members**.  Loans by Members to the Company shall not be considered Capital Contributions.  If any Member shall loan funds to the Company in excess of the amounts required hereunder to be contributed by such Member to the capital of the Company, the making of such loans shall not result in any increase in the amount of the Capital Account of such Member.  The amount of any such loans shall be a debt of the Company to such Member and shall be payable or collectible in accordance with the terms and conditions of Section 3.5(b) (Affiliate Loans), or on such other terms and conditions upon which such loans are made and which are approved by Members holding a Majority in Interest of the Members and the Member making the loan.

4.7    **Adjustments to Book Value**.  The Company shall adjust the Book Value of its assets to fair market value in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*f*) as of the following times:  (a) at the Manager's discretion in connection with the issuance of Units in the Company; (b) at the Manager's discretion in connection with the Distribution by the Company to a Member of more than a *de minimis* amount of Company assets, including cash, if as a result of such Distribution, such Member's interest in the Company is reduced; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(*g*).  Any such increase or decrease in Book Value of an asset shall be allocated as a Profit or Loss to the Capital Accounts of the Members under Section 5.2 (determined immediately prior to the issuance of the new Units or the distribution of assets in an ownership reduction transaction).

## ARTICLE V
## DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES

5.1    **Generally**.  Subject to the provisions of the Act, the Manager shall have discretion regarding the amounts and timing of Distributions to Members, in each case subject to the retention of, or payment to third parties of, such funds as the Manager deems necessary with respect to the reasonable business needs of the Company, which shall include (but not by way of limitation) the payment or the making of provision for the payment when due of Company obligations, including establishing reserves and the payment of any Investment Expenses, including without limitation management or administrative fees and expenses or any other obligations.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Members on account of their Units in the Company if such distribution would violate the Act or any other applicable law or any of the Company's covenants respecting its financings, leases or other contractual commitments.

5.2    **Distributions**.  The Company may make Distributions, the frequency and amount of which shall be determined by the Manager, in its sole discretion, to the Members as follows:

(a)    Return of Capital: First, one hundred percent (100%) to Class A Preferred Members until Distributions to such Class A Preferred Members of Distributable Cash on a cumulative basis pursuant to this clause (a) equal such Class A Preferred Member's Capital Contributions.

(b)    Preferred Return: Second, one hundred percent (100%) to Class A Preferred

- 13 -

04-06-2021 @ 11:48:09 AM EST

Members until Distributions to such Class A Preferred Members of Distributable Cash on a cumulative basis pursuant to this clause (b) equal the Preferred Return.

(c)     Catch Up: Third, one hundred percent (100%) to the Manager until Distributions to the Manager of Distributable Cash on a cumulative basis as carried interest Distributions equal fifteen percent (15%) of all Distributions of Distributable Cash made pursuant to Section 5.2(a) and Section 5.2(b);

(d)     Split: Any balance, (i) eighty-five percent (85%) to Class A Preferred Members and (ii) fifteen percent (15%) to the Manager; and

(e)     Performance Milestone:  Notwithstanding the foregoing, upon each Class A Preferred Member receiving Distributions equal to three times (3x) such Class A Preferred Member's Capital Contributions (the "**Performance Milestone**"), (i) one hundred percent (100%) of Distributable Cash after the Performance Milestone to the Manager until Distributions to the Manager of such Distributable Cash on a cumulative basis as carried interest Distributions equal 20% of all Distributions of Distributable Cash made pursuant to Section 5.2(a), Section 5.2(b) and Section 5.2(c) and (ii) any balance, (x) eighty percent (80%) to Class A Preferred Members and (y) twenty percent (20%) to the Manager.

5.3     **Allocation of Profits and Losses**.  For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and Distributions during such Fiscal Year and all special allocations pursuant to Section 5.4 with respect to such Fiscal Year, all Profits and Losses (other than Profits and Losses specially allocated pursuant to Section 5.4) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (a) the amount which would be distributed to such Member, determined as if the Company were to liquidate all of its assets for the Book Value thereof and distribute the proceeds thereof (after payment of all Company debts, liabilities and obligations) pursuant to Section 5.2(a) hereof, *minus* (b) the sum of (i) such Member's share of Company Minimum Gain (as determined according to Treasury Regulations Section 1.704-2(d) and (g)(3)) and Member Minimum Gain (as determined according to Treasury Regulations Section 1.704-2(i)) and (ii) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Year.

5.4     **Special Allocations**.  Notwithstanding the provisions of Section 5.2:

(a)     Nonrecourse Deductions.  Nonrecourse Deductions shall be allocated to the Members pro rata in proportion to the total number of such Units held by each such Member.  If there is a net decrease in Company Minimum Gain during any Taxable Year, each Member shall be specially allocated items of taxable income or gain for such Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f)(6) and 1.704-2(j)(2).  This paragraph is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Deductions.  Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Minimum Gain during any Taxable Year, each Member that has a share of such Member Minimum Gain shall be specially allocated items of taxable income or gain for such Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to that Member's share of the net decrease in Member Minimum Gain.  Items to

04-06-2021 @ 11:48:09 AM EST

be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This paragraph is intended to comply with the minimum gain chargeback requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)        Unexpected Adjustments.  If any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-l(b)(2)(ii)(d)(4), (5) or (6), items of taxable income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate the adjusted capital account deficit (determined according to Treasury Regulations Section 1.704-1 (b)(2)(ii)(d)) created by such adjustments, allocations or Distributions as quickly as possible.  This paragraph is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1 (b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)        Curative Allocations.  The allocations set forth in paragraphs (a), (b) and (c) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this Article (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Profits and Losses among Members so that, to the extent possible, the net amount of such allocations of Profits and Losses and other items and the Regulatory Allocations (including Regulatory Allocations that, although not yet made, are expected to be made in the future) to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

(e)        Transactions between Members and the Company.  If, and to the extent that, any Member is deemed to recognize any item of income, gain, loss, deduction or credit as a result of any transaction between such Member and the Company pursuant to Code Sections 1272-1274, 7872, 483, 482, 83 or any similar provision now or hereafter in effect, and the Manager determines that any corresponding Profit or Loss of the Company should be allocated to the Member who recognized such item in order to reflect the Member's economic interests in the Company, then the Manager may so allocate such Profit or Loss.

(f)        Excess Nonrecourse Liabilities.  For purposes of calculating a Member's share of "excess nonrecourse liabilities" of the Company (within the meaning of Treasury Regulations Section 1.752-3(a)(3)), the Members intend that they be considered as sharing profits of the Company in proportion to their respective Membership Percentages.

(g)        Company Nonrecourse Liability.  Deductions attributable to any "nonrecourse liability" of the Company, as defined in accordance with Section 1.704-2(b)(3) of the Treasury Regulations, shall be allocated among the Members in proportion to their respective Membership Percentages.

5.5        **Tax Allocations; Code Section 704(c)**.

(a)        General.  The income, gains, losses, deductions and expenses of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, deductions and expenses among the Members for computing their Capital Accounts, *except that* if any such allocation is not permitted by the Code or other applicable law, the Company's subsequent income, gains, losses, deductions and expenses shall be allocated among the Members so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)        Section 704(c).  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, deduction and expense with respect to any property contributed

04-06-2021 @ 11:48:09 AM EST

to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution.

(c)     Adjustment of Book Value.  If the Book Value of any Company asset is adjusted pursuant to this Section, subsequent allocations of items of taxable income, gain, loss, deduction and expense with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)     Manager's Authority.  Any elections or other decisions relating to allocations for federal, state and local income tax purposes shall be made by the Manager in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations pursuant to this Section 5.5 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or Distributions pursuant to any provisions of this Agreement.  The Members are aware of the income tax consequences of the allocations made by this Article and hereby agree to be bound by the provisions of this Article in reporting their shares of Company income and loss for income tax purposes.

5.6     **Amounts Withheld**.  All amounts withheld from or offset against any Distribution to a Member pursuant to Section 9.3 shall be treated as amounts distributed to such Member pursuant to this Article V for all purposes under this Agreement.

## ARTICLE VI
## MANAGEMENT

6.1     **Manager**.  The business and affairs of the Company shall be managed by the Manager. Unless removed, resigned or the provisions of Section 6.11 are applicable, the initial hereunder shall be Justice Partners Management, LLC, a Delaware limited liability company at all times during the term of this Agreement (the "**Manager**").

6.2     **Authority of the Manager.**

(a)     General.  Except for situations in which the approval of the Members is required by this Agreement, including Section 7.1 (Participation in Management) and Section 7.2 (Voting), or by the non-waivable provisions of applicable law, and subject at all times to Section 6.1 (Manager), the Manager shall have exclusive, full and complete authority, power and discretion to make all decisions and take all actions for the Company, its business, affairs and properties not otherwise provided for in this Agreement, and to perform any and all other acts or activities customary or incident to the management of Company Business , including, but not limited to:

(i)     Acquire, own, hold, construct, operate, maintain and improve real or personal property in the Company's name;

(ii)     Borrow money in the Company's name from financial institutions, the Manager, the Members or their Affiliates, on such terms as the Manager deems appropriate, and in connection therewith, to hypothecate, mortgage, encumber and grant security interests in Company assets to secure repayment of the borrowed sums, and to execute for and on the Company's behalf any Financing Instruments as may be reasonably required to accomplish the same, including, but not limited to, causing the Company to enter into one or more borrowings that are secured in whole or in part by the Company's funded or unfunded Capital Contributions, and in connection with such borrowings, each Member agrees to execute the requisite documentation required for the Company to obtain such financing;

- 16 -

Proof Stamping
04-06-2021 @ 11:48:09 AM EST

(iii)  Pay or prepay, in whole or in part, refinance, amend, modify or extend any Financing Instruments affecting Company assets and in connection therewith to execute for and on the Company's behalf any extensions, renewals or modifications of such Financing Instruments;

(iv)  Purchase liability and other insurance to, among other things, protect the Company's property and any Person who is or was serving as a Covered Person;

(v)  Invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments, including but not limited to temporary or interim investments of any capital of the Company or the making of bridge loans to other investments as determined in the sole discretion of Manager;

(vi)  Purchase or sell any real estate in any class or sector, non-real estate assets or securities (whether preferred or common equity, convertible security or other security) in any company;

(vii)  Make and execute any loans and other debt financings which may or may not be collateralized or other assets including mortgages, senior secured loans, subordinated and mezzanine loans and other structured financing transactions;

(viii)  Pledge any of the Company assets, including the Capital Accounts of the Members;

(ix)  Make and implement all investment policies and procedures;

(x)  Conduct all functions of any kind related to the day to day management;

(xi)  Sell, exchange or otherwise dispose of Company assets in the ordinary course of business as part of a single transaction or plan, so long as such transaction is not a sale of all or substantially all of the Company's property and does not violate or cause a default under any agreement to which the Company may be bound;

(xii)  Execute on the Company's behalf all instruments and documents, including, without limitation, checks; drafts; Financing Instruments; documents providing for the acquisition or disposition of Company property; assignments and bills of sale; leases; and any other instruments or documents necessary or desirable to conduct the Company's business;

(xiii)  Select, employ, hire, fire, and determine compensation for employees, accountants, legal counsel, managing Agents, tradesmen, contractors, subcontractors or other Persons to perform services for the Company;

(xiv)  Enter into any and all other agreements on the Company's behalf in reasonable furtherance of the Company's purpose and business, in such forms as the Manager may approve; and

(xv)  Perform all other acts necessary or appropriate to the conduct the Company's business and to the extent not specifically included above or not expressly excluded in the Agreement, the Manager is deemed to have full authority.

(b)  <u>Major Decisions</u>.  Notwithstanding anything to the contrary herein, the following Major Decisions shall require the approval of the Super Majority in Interest of the Members:

- 17 -

(i)       approving, amending or abandoning a plan of conversion or merger of the Company wherein the Company is not the surviving entity, including in connection with a Liquidation Event;

(ii)      sale or disposing of all or substantially all of the Company's assets or property outside the ordinary course of business, including in connection with a Liquidation Event;

(iii)     Incurring any borrowings, loan financings, and/or debt facility in excess of $250,000, other than any Investment, trade payables or equipment financings in the ordinary course of business, whether in a single transaction or a series of transactions;

(iv)      Any acquisitions, whether by asset purchase, stock or membership purchase, or merger;

(v)       Admission of any new Member, other than through a Permitted Transfer;

(vi)      Conducting a public or private offering or sale of any Company equity securities or convertible into equity securities (such as but not limited to options, warrants or notes) of the Company or other rights (contingent or otherwise) to acquire any equity securities;

(vii)     Entering into any contract, commitment, agreement, joint venture, or other contractual understanding (whether written or verbal) outside of the ordinary course of business in excess of $250,000 whether in a single transaction or a series of transactions;

(viii)    Changing the nature of the Company Business;

(ix)      dissolving and winding up the Company;

(x)       filing a petition under the federal bankruptcy laws or under any other receivership, insolvency or reorganization laws; the making of any of the above or analogous decisions with respect to the Company, and

(xi)      The making of any of the above or analogous decisions with respect to the Company.

6.3      **Power of Attorney**.  Each Member hereby constitutes and appoints the Manager and the Liquidating Trustee if not the Manager with full power to act without the others as such Member's true and lawful representative and attorney in-fact, in such Member's name, place and stead, to make, execute, sign, acknowledge and deliver or file in such form and substance as is approved by the Manager (a) all instruments, documents and certificates which may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Company, or to qualify or continue the qualification of the Company in all jurisdictions in which the Company may conduct business or own property, and any amendment to, modification to, restatement of or cancellation of any such instrument, document or certificate and (b) all conveyances and other instruments, documents and certificates which may be required to effectuate the dissolution and termination of the Company approved in accordance with the terms of this Agreement.  The powers of attorney granted herein shall be deemed to be coupled with an interest, shall be irrevocable and shall survive the death, disability, incompetency, bankruptcy, insolvency or termination of any Member and the Transfer of all or any portion of the Units held by such Member, and shall extend to such Member's heirs, successors, assigns and personal representatives.

6.4      **Devotion of Time; No Exclusive Duty to Company**.  The Manager shall devote such time

- 18 -

Brant Steinberg
04-06-2021 @ 11:48:09 AM EST

and attention to the business of the Company as the Manager shall determine, in the exercise of his reasonable judgment, to be necessary for the conduct of Company Business.  The Manager shall not be required to manage the Company as his sole and exclusive function and he will have other business interests and will engage in other activities in addition to those relating to the Company.

6.5 **Manager's Compensation; Reimbursement**. The Manager, in its sole discretion, shall set forth all compensation and other remuneration for itself, any employees, consultants, contractors, professionals or others that perform services on behalf of the Company.  In addition, to the extent that the Manager or its Affiliates incur expenses or advance funds on behalf of the Company, the Manager or Affiliate, as the case may be, shall be entitled to reimbursement of such funds, without interest, separate from and in addition to the rights to the income, gain, Losses, credits, deductions and Distributions of the Company as set forth in Article V (collectively, the "**Management Expenses**").  The Manager will determine in good faith the reimbursable expenses that are allocable to the Company.

6.6 **Delegation of Duties**.  The Manager may, from time to time, delegate to one or more Persons (including any officer as set forth in Section 6.7 (Officers)) such authority and duties as the Manager may deem advisable.  The Manager also may assign titles to any Member or other individual and may delegate to such Member or other individual certain authority and duties.  Any number of titles may be held by the same Member or other individual.  Any delegation pursuant to this Section may be revoked at any time by the Manager.

6.7 **Officers.**

(a) Designation and Appointment.  The Manager may (but need not), from time to time, designate and appoint one or more persons as an officer of the Company.  An officer need not be a Member.  Any officers so designated shall have such authority and perform such duties as the Manager may, from time to time, delegate to them.  The Manager may assign titles (including chairperson, chief executive officer, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer) to particular officers.  Unless the Manager otherwise decide, if the title is one commonly used for officers of a business corporation formed, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to (i) any specific delegation of authority and duties made to such officer by the Manager pursuant to the third sentence of this Section 6.7(a) and (ii) any delegation of authority and duties made to one or more officers pursuant to the terms of Section 6.6 (Delegation of Duties).  Each officer shall hold office until such officer's successor shall be duly designated and shall qualify or until such officer's death or until such officer shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same individual.  The salaries or other compensation, if any, of the officers and agents (and the Manager) of the Company shall be fixed from time to time by the Manager in its sole discretion.

(b) Resignation and Removal.  Any officer (subject to any contract rights available to the Company, if applicable) may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Manager.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any officer may be removed as such, either with or without cause, by the Manager in its sole discretion at any time; *provided, however*, that such removal shall be without prejudice to the contract rights, if any, of the individual so removed.  Designation of an officer shall not of itself create contract rights.  Any vacancy occurring in any office of the Company may be filled by the Manager.

6.8 **Reliance by Third Parties**. Any Person dealing with the Company, other than a Member, may rely on the authority of the Manager (or any officer authorized by the Manager) in taking any action

- 19 -

in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement. Every agreement, instrument or document executed by the Manager (or any officer authorized by the Manager) in the name of the Company with respect to any business or property of the Company shall be conclusive evidence in favor of any Person relying thereon or claiming thereunder that (a) at the time of the execution or delivery thereof, this Agreement was in full force and effect; (b) such agreement, instrument or document was duly executed according to this Agreement and is binding upon the Company; and (c) the Manager or such officer was duly authorized and empowered to execute and deliver such agreement, instrument or document for and on behalf of the Company.

6.9     **Resignation and Replacement of Manager**.  The Manager may resign at any time. Upon a resignation of the initial Manager, a new Manager shall be designated by the resigning initial Manager (each, a "**Substitute Manager**"). In the event of the resignation of a Substitute Manager, the initial Manager who named the Substitute Manager shall name the new Substitute Manager to replace the resigning Substitute Manager.  In the event of a resignation of a Manager who was appointed by a Super Majority in Interest of the Members, a Super Majority in Interest of the Members shall name the new Manager to replace the resigning Manager.  If any Manager that is also a Member resigns, such resignation shall not affect the Manager's rights as a Member or constitute a withdrawal of a Member.

6.10     **Removal of Manager**. The Manager may be removed only with cause by the Super Majority in Interest of the Members and upon such removal, a new Manager shall be designated and appointed by the Super Majority in Interest of the Members.

6.11     **Successor Funds; Presentation of Opportunities to the Company**.

(a)     Without consent of the Class A Members at least equal to 70% of the Membership Percentage of the Company, (not counting Capital Commitments of Defaulting Members), until the earlier of (i) the termination of the Commitment Period and (ii) the date on which 75% of the Aggregate Commitments of the Class A Preferred Members have been invested, committed and/or reserved for investment and/or have been drawn or reserved to fund Investment Expenses, the Manager shall not, and shall cause each of its Affiliates not to, hold a closing with third party investors on behalf of another pooled investment fund, for which the Manager or its Affiliate acts as a manager or the primary source of transactions, with objectives substantially similar to those of the Company (a "**Successor Fund**").

(b)     Until the date on which the Manager may sponsor a Successor Fund in accordance with Section 6.11(a), the Manager and its Affiliates shall offer to the Company any investment opportunities presented to them that the Manager determines in good faith to be suitable and appropriate for the Company and consistent with the investment objectives set forth in Section 2.3. Notwithstanding the foregoing, (i) the Company may share investment opportunities and invest side-by-side with any Person (other than an Affiliate of the Manager) in instances where such Person provides investment opportunities, operating capabilities, or other strategic or competitive opportunities or advantages to the Company, (ii) the Manager or any Affiliate thereof may make (as principal or on behalf of other investment vehicles) any investment which the Manager has not made or pursued, in whole or in part, on behalf of the Company after making the assessment set forth in this Section 6.11(b) and (iii) the Company may co-invest with a prior fund or a Successor Fund in any investment opportunity offered to the Company, and the Manager may allocate such portion of such investment opportunity to such prior fund or Successor Fund as the Manager determines, in its sole discretion, to be appropriate.

6.12     **Standards of Conduct and Modification of Duties.**

- 20 -

04-06-2021 @ 11:48:09 AM EST

(a)    General.  In the performance of his duties, the Manager shall not be deemed to be held to any higher standards than those set forth in the Act.

(b)    Good Faith.  Whenever the Manager make a determination or takes or declines to take any other action in his capacity as Manager of the Company as opposed to in his individual capacity, whether under this Agreement or any other agreement contemplated hereby or otherwise, then, unless another express standard is provided for in this Agreement, the Manager shall make such determination or take or decline to take such other action in good faith and shall not be subject to any higher standard contemplated hereby or under the Act or any other law, rule or regulation or at equity.  A determination, other action or failure to act by the Manager will be deemed to be in good faith unless the Manager acted in a manner that was in wanton and willful disregard for the interests of the Company.  The standard shall be deemed to have been met if the Manager took into consideration the interests of the Company in making any decision or taking or declining to take any action, regardless of the actual decision made or action taken or not taken.  In any proceeding brought by the Company, any Member, or any Person who acquires an interest in a Unit or any other Person who is bound by this Agreement challenging such action, determination or failure to act, the Person bringing or prosecuting such proceeding shall have the burden of proving that such determination, action or failure to act was not in good faith.

(c)    Individual Capacity. Whenever the Manager makes a determination or takes or declines to take any other action in his individual capacity as opposed to in his capacity as Manager of the Company, whether under this Agreement or any other agreement contemplated hereby or otherwise, then the Manager is entitled, to the fullest extent permitted by law, to make such determination or to take or decline to take such other action free of any fiduciary duty or other duty existing at law, in equity or otherwise or obligation whatsoever to the Company, any Member, any other Person who acquires an interest in a Unit or any other Person who otherwise is bound by this Agreement, and the Manager  shall not, to the fullest extent permitted by law, be required to act in good faith or pursuant to any other standard imposed by this Agreement or any other agreement contemplated hereby or under the Act or any other law, rule or regulation or at equity.  By way of illustration and not of limitation, whenever the phrases, "at the option of the Manager," "in its sole discretion" or some variation of those phrases, are used in this Agreement, it indicates that the Manager is acting in his individual capacity.  For the avoidance of doubt, whenever the Manager votes or transfers Units it may own, or refrain from voting or transferring Units he may own, he shall be acting in his individual capacity.

(d)    Duty of Loyalty.  Whenever the Manager makes a determination or takes or declines to take any other action in his capacity as Manager of the Company as opposed to in his individual capacity, whether under this Agreement or any other agreement contemplated hereby or otherwise, then the Manager shall make such determination or take or decline to take such action in a manner that is consistent with his duty of loyalty to the Company.  It is hereby understood, acknowledged and agreed that the Manager' duty of loyalty shall not be violated by the Manager taking any of the following or similar actions:

(i)    the ownership, either directly or through Affiliates, of other entities of the same business type and within the same business sector as the Company;

(ii)    the ownership, either directly or through Affiliates, of companies that do business with the Company; and/or

(iii)    the ownership of assets, including land, that may be purchased by or leased to the Company.

- 21 -

04-06-2021 @ 11:48:09 AM EST

(e)      Conflict of Interest. Whenever a potential conflict of interest exists or arises between the Manager or any Affiliates, on the one hand, and the Company, any Member or any Person who acquires an interest in a Unit or any other Person who is bound by this Agreement on the other hand, the Manager is entitled to make such decision or take or decline to take such action in his discretion without obtaining approval from the Members.  In such cases, it will be presumed that in making his decisions or taking or declining to take such actions, the Manager upheld his duty of loyalty, his duty of care and his duty to act in good faith, each as clarified herein.  In any proceeding brought by the Company, any Member who acquires an interest in a Unit or any other Person who is bound by this Agreement, challenging such action, determination or failure to act, the Person bringing or prosecuting such proceeding shall have the burden of proving that such determination, action or failure to act was not made in a manner consistent with the Manager' duty of loyalty, duty of care and duty to act in good faith, each as may be clarified herein.

(f)      No Obligation.  Notwithstanding anything to the contrary in this Agreement, the Manager and his Affiliates or any other Covered Person shall have no duty or obligation, express or implied, to (i) sell or otherwise dispose of any asset of the Company other than in the ordinary course of business or (ii) permit any Member to use any facilities or assets of any of the Affiliates of the Manager, except as may be provided in contracts entered into from time to time specifically dealing with such use. Any determination by the Manager or any of his Affiliates to enter into such contracts shall be in his or such Affiliates sole discretion.

(g)      Manager's Determination. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any other agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement the Manager is permitted or required to make a decision (a) in his "consent," "approval," "determination," "sole discretion" or "discretion" or under a grant of similar authority or latitude, or any variation thereof, the Manager shall be entitled to act in his sole discretion and absolute discretion and to consider only such interests and factors as he desires, including his own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in his "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard.  If any questions should arise with respect to the operation of the Company that are not specifically provided for in this Agreement or the Act, or with respect to the interpretation of this Agreement, the Manager is hereby authorized to make a final determination with respect to any such question and to interpret this Agreement in good faith, and his determination and interpretation so made shall be final and binding on all parties.  Notwithstanding any other provision of this Agreement, including the preceding provisions of this Section, the Manager shall comply with the implied contractual covenant of good faith and fair dealing.

## ARTICLE VII
## MEMBERS

7.1      **Participation in Management**.  No Member (in his, her or its capacity as such) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditures on behalf of the Company, unless (a) such specific authority has been expressly granted to and not revoked from such Person by the Manager or (b) such specific authority has been expressly granted to such Person pursuant to this Agreement.  Each Member shall take part in the management of the Company by exercising the voting and consent rights granted to such Member under this Agreement; provided however that any Member that does not have voting rights will have no ability to participate in an action or decision of the Company except to the extent specifically provided in this Agreement or pursuant to applicable law.

- 22 -

04-06-2021 @ 11:48:09 AM EST

7.2    **Right of Members to Bring Action**.  No Member in the Member's capacity as a Member may bring a suit or action against the Company or against any other Member in the other Member's capacity as a member in any court for any reason except to obtain urgent judicial relief.  No Member may bring a suit or action against any Person in the name of or on behalf of the Company except with the affirmative vote of Members collectively holding in excess of seventy-five percent (75.0%) of the outstanding Units, not including Units of a defaulted Member(s).

7.3    **No Exclusive Duty to Company**.  No Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of any other Member or the Directors or any of their Affiliates or to the income or proceeds derived therefrom.

7.4    **A Member's Duty of Loyalty**.  Each Member agrees:  (a) to account to the Company and hold as trustee for the Company any property, profit or benefit derived by such Member in the conduct and winding up of the Company business or derived from the use by the Member of Company property, including the appropriation of a Company opportunity, and (b) to refrain from dealing with the Company in the conduct or winding up of the Company business on behalf of a party having an interest adverse to the Company.

7.5    **No Authority of Individual Member**.  Except as set forth in this Agreement, no Member, acting individually, or any of their respective Affiliates, has the power or authority to bind any other Member or to authorize any action to be taken by the Company, or to act as agent for the Company or any other Member, unless that power or authority has been specifically delegated or authorized by the Manager.

7.6    **Related Party Transactions**.  The Company may transact business with a Director or Member or officer or any Affiliate thereof *provided,* that (i) the Members are made aware of the material facts as to the relationship of the party to the Company and (ii) a determination by the Manager that the contract or transaction made is fair as to the Company as of the time it is executed and delivered.

### ARTICLE VIII
### LIMITED LIABILITY, EXCULPATION AND INDEMNIFICATION

8.1    **Limited Liability of Members**.

(a)    Limitation of Liability.  Except as otherwise required by applicable law and as explicitly set forth in this Agreement, the debts, liabilities, commitments and other obligations of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall have any personal liability whatsoever in its capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company or to any other Person, for the debts, liabilities, commitments or any other obligations of the Company or for any Losses of the Company. Notwithstanding anything contained herein to the contrary, there shall be no limitations on liability or right of indemnification under this Agreement for the conduct or actions of any Member that are outside of the scope of such Member's authority or permitted actions with respect to this Agreement, the Act or other applicable law.

(b)    Observance of Formalities.  Notwithstanding anything contained herein to the contrary, the failure of the Company, the Directors or any Member, to observe any formalities or procedural or other requirements relating to the exercise of its powers or management of Company Business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on any of the Members.

04-06-2021 @ 11:48:09 AM EST

        (c)      Return of Distributions.  In accordance with the Act and the laws of the State of Delaware, a Member may, under certain circumstances, be required to return amounts previously distributed to such Member.

        8.2      **Exculpation of Covered Persons**.  Covered Persons shall not be liable for errors in judgment.  Additionally, to the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company, the Members and any Person who acquires an interest in a Unit or is otherwise bound by this Agreement, the Directors and any other Covered Person acting in connection with Company Business or affairs shall not be liable, to the fullest extent permitted by law, to the Company, the Members and any Person who acquires an interest in a Unit or is otherwise bound by this Agreement, for its reliance on the provisions of this Agreement.  Any Covered Person may consult with counsel and accountants, any Member, officer, employee or committee of the Company and other professional expert in respect of Company affairs, and provided such Covered Person acts in good faith reliance upon the advice or opinion of such counsel or accountants or other persons, such Covered Person shall not be liable for any loss suffered by the Company in reliance thereon.  Additionally, the Manager may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents, and the Manager shall not be responsible for any misconduct or negligence on the part of any such agent appointed by the Manager in good faith.  If the Act is hereafter amended or interpreted to permit further limitation of the personal liability of Covered Persons beyond the foregoing, then this paragraph shall be interpreted to limit the personal liability of Covered Persons to the fullest extent permitted by the Act, as amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to limit the personal liability of Covered Persons to a greater extent than that permitted by said law prior to such amendment).  In furtherance of, and without limiting the generality of the foregoing, no Covered Person shall be (a) personally liable for the debts, obligations or liabilities of the Company, including any such debts, obligations or liabilities arising under a judgment, decree or order of a court; (b) obligated to cure any deficit in any Capital Account; (c) required to return all or any portion of any Capital Contribution; or (d) required to lend any funds to the Company.

        8.3      **Right to Indemnification for Covered Persons**.  Subject to the limitations and conditions as provided in this Article, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative (hereinafter a "**Proceeding**"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he, she or it, or a Person of whom he, she or it is the legal representative, is or was a Covered Person or while a Covered Person is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, shall be indemnified by the Company to the fullest extent permitted by the Act, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article shall continue as to a Person who has ceased to serve in the capacity that initially entitled such Person to indemnity hereunder; *provided*, that no such Person shall be indemnified for any judgments, penalties, fines, settlements or expenses (i) to the extent attributable to conduct for which indemnification would not be permitted under the Act or other applicable law, (ii) for any present or future breaches of any representations, warranties or covenants by such Person contained in this Agreement or in any other agreement with the Company; or (iii) in any action (except an action to enforce indemnification rights set

- 24 -

04-06-2021 @ 11:48:09 AM EST

forth in this Section) brought by such Person.  It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

8.4 **Contract with Company**.  The rights granted pursuant to this Article shall be deemed contract rights, and no amendment, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any amendment, modification or repeal.

8.5 **Advance Payment**.  The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 8.3 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; *provided*, *however*, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article or otherwise.

8.6 **Indemnification of Employees and Agents**.  The Company, by adoption of a resolution of the Manager, may indemnify and advance expenses to any employees or agents of the Company who are not or were not Covered Persons but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against liabilities and expenses asserted against such Person and incurred by such Person in such a capacity or arising out of their status as such a Person, to the same extent that it may indemnify and advance expenses to Covered Persons under this Article.

8.7 **Appearance as a Witness**.  Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Covered Person in connection with the appearance as a witness or other participation in a Proceeding at a time when the Covered Person is not a named defendant or respondent in the Proceeding.

8.8 **Nonexclusivity of Rights**.  The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right that a Covered Person or other Person indemnified pursuant to Section 8.3 or Section 8.6 may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement, any agreement, vote of Members or otherwise.  The provisions of this Article are for the benefit of the Covered Persons and their heirs, successors, assigns, executors and administrators and shall not be deemed to create any rights for the benefit of any other Persons.

8.9 **Insurance**.  The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as a Covered Person or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article.

8.10    **Savings Clause**.  If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless the Directors or any other Person indemnified pursuant to this Article as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

8.11    **Transactions with the Company**.  A Covered Person shall not be denied indemnification in whole or in part under Section 8.3 because the Covered Person had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

## ARTICLE IX
## TAX MATTERS

9.1    **Tax Returns**.  The Manager shall cause to be prepared and filed all necessary federal and state income tax and other tax returns for the Company, including making any elections the Manager may deem appropriate and in the best interests of the Members.  Each Member shall furnish to the Manager all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax and other tax returns to be prepared and filed.

9.2    **Tax Matters Representative**.  Unless and until the Members shall unanimously agree otherwise, Sylvia Benito shall be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code (the "**Tax Matters Representative**"). If for any reason the position of "tax matters partner" becomes vacant, such position shall be filled by the majority vote of the Manager.

(a)    Authority of Tax Matters Representative.  The Tax Matters Representative is authorized to represent the Company before the Internal Revenue Service and any other governmental agency with jurisdiction, and to sign such consents and to enter into settlements and other agreements with such agencies as the Tax Matters Representative deems necessary or advisable.

(b)    Tax Elections.  The Tax Matters Representative may, in its sole discretion, make or revoke any election under the Code or the Treasury Regulations issued thereunder (including for this purpose any new or amended Treasury Regulations issued after the date of formation of the Company), including an election to be taxed as a corporation for U.S. federal income tax purposes pursuant to Treasury Regulations Section 301.7701-3.

(c)    Reimbursement of Expenses.  Promptly following the written request of the Tax Matters Representative, the Company shall, to the fullest extent permitted by law, reimburse and indemnify the Tax Matters Representative for all reasonable expenses, including reasonable legal and accounting fees, claims, liabilities, losses and damages incurred by the Tax Matters Representative in connection with any administrative or judicial proceeding (i) with respect to the tax liability of the Company and/or (ii) with respect to the tax liability of the Members in connection with the operations of the Company.

(d)    Survival of Provisions.  The provisions of this Section shall survive the termination of the Company or the termination of any Member's interest in the Company and shall remain binding on the Members for as long a period of time as is necessary to resolve with the Internal Revenue Service any and all matters regarding the Federal income taxation or other taxes of the Company or the Members.

9.3    **Indemnification and Reimbursement for Payments on Behalf of a Member**.

- 26 -

04-06-2021 @ 11:48:09 AM EST

(a)     If the Company is obligated to pay any amount to a governmental agency (or otherwise makes a payment) because of a Member's status or otherwise specifically attributable to a Member (including, without limitation, federal withholding taxes with respect to foreign Persons, state personal property taxes, state withholding taxes, state unincorporated business taxes, etc.), then such Member (the "**Indemnifying Member**") shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payments).  The amount to be indemnified shall be charged against the Capital Account of the Indemnifying Member, and, at the option of the Manager, either:

(i)     promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company equal to the full amount to be indemnified (and the amount paid shall be added to the Indemnifying Member's Capital Account but shall not be treated as a Capital Contribution); or

(ii)     the Company shall reduce Distributions which would otherwise be made to the Indemnifying Member, until the Company has recovered the amount to be indemnified (and, notwithstanding Section 4.1, the amount withheld shall not be treated as a Capital Contribution).

(b)     A Member's obligation to make contributions to the Company under this Section shall survive the termination, dissolution, liquidation and winding up of the Company, and for purposes of this Section, the Company shall be treated as continuing in existence.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section, including instituting a lawsuit to collect such contribution with interest calculated at a rate equal to the Base Rate plus three (3) percentage points per annum (but not in excess of the highest rate per annum permitted by law).

## ARTICLE X
## BOOKS AND RECORDS; REPORTS AND CONFIDENTIALITY

10.1     **Maintenance of Books**.

(a)     <u>Books and Records</u>.  The Company will maintain true, complete and correct books of account of the Company, all in accordance with generally accepted accounting principles applied on a consistent basis and shall keep minutes of the proceedings of, or maintain written consents executed by, the Members and the Manager.  The books of account shall contain particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the business, and all such other transactions, matters and things relating to the business of the Company as are usually entered in books of accounts kept by Persons engaged in a business of a like kind and character.  In addition, the Company shall keep all records required to be kept pursuant to the Act.  Any Member shall, upon prior written notice and during normal business hours, have access to the information described in the Act, for the purpose of inspecting or, at the expense of such Member, copying the same.  Any Member reviewing the books and records of the Company pursuant to the preceding sentence shall do so in a manner which does not unduly interfere with the conduct of the business of the Company.  The Company will provide an unaudited financial at the end of each fiscal year to its Members.

(b)     <u>Schedule of Members</u>.  The Company will maintain, and as required update, the Schedule of Members without the need for any further action, consent or approval by any of the Members. Unless otherwise determined by the Manager, the Schedule of Members will be and remain confidential, and each Member hereby accepts, acknowledges and agrees that, notwithstanding anything herein to the contrary, to the maximum extent permitted by law, such Member will have no right to view or obtain the Schedule of Members or otherwise obtain any such information relating to any Member other than himself

Proof Claims.org
04-06-2021 @ 11:48:09 AM EST

or herself.

(c)     Form of Records.  Any records maintained by the Company in the regular course of its business, including the Schedule of Members, books of account, and records of Company proceedings may be kept on, or be in the form of, computer disks, memory chips or any other information storage device; *provided,* that the records so kept can be converted into clearly legible written form within a reasonable period of time.

10.2     **Reports**.

(a)     Tax Information.  The Company shall prepare and deliver (via mail, electronically, fax or other means of communication) to each Member and, to the extent necessary, to each former Member (or such Member's legal representatives), a report setting forth in sufficient detail such information as shall enable such Member or former Member (or such Member's legal representatives) to prepare its respective federal, state and local income tax returns in accordance with the laws, rules and regulations then prevailing. The Company shall also provide Form K-1s to each of the Members as soon as reasonably practicable after the end of each Taxable Year.

(b)     Cost of Reports; No Additional Information.

(i)     The Company shall bear the costs of all reports and other information provided pursuant to this Section.

(ii)     To the fullest extent possible under the law, the Manager may keep confidential from the Members, for such period of time as the Manager determines, (A) any information that the Manager determines to be in the nature of trade secrets, (B) other information the disclosure of which the Manager believes (1) is not in the best interests of the Company or any of its Affiliates, (2) could damage the Company or its Affiliates or their businesses or (3) that the Manager or the Company are required by law or by agreement with any third party to keep confidential (other than agreements with Affiliates of the Company the primary purpose of which is to circumvent the obligations set forth in this Section).

(iii)     Notwithstanding any other provision of this Agreement or the Act, each of the Members, each other Person who acquires an interest in a Unit and each other Person bound by this Agreement hereby agrees to the fullest extent permitted by law that they do not have rights to receive information from the Company or any Covered Person for the purpose of determining whether to pursue litigation or assist in pending litigation against the Company or any Covered Person relating to the affairs of the Company except pursuant to the applicable rules of discovery relating to litigation commenced by such Person.

10.3     **Company Funds**.  The Manager may not commingle the Company's funds with the funds of any Member, Director, officer or other Person.

10.4     **Confidentiality**.  Each Member recognizes and acknowledges that it may receive certain confidential and proprietary information and trade secrets of the Company, including but not limited to confidential information of the Company regarding identifiable, specific and discrete business opportunities being pursued by the Company (the "**Confidential Information**").  Each Member (on behalf of itself and, to the extent that such Member would be responsible for the acts of the following Persons under principles of agency law, its directors, officers, shareholders, partners, employees, agents and members) agrees that it will not, during or after the term of this Agreement, whether through an Affiliate or otherwise, take commercial or proprietary advantage of or profit from any Confidential Information or disclose

- 28 -

04-06-2021 @ 11:48:09 AM EST

Confidential Information to any Person for any reason or purpose whatsoever, except (i) to authorized representatives and employees of the Company and as otherwise may be proper in the course of performing such Member's obligations, or enforcing such Member's rights, under this Agreement; (ii) as part of such Member's normal reporting or review procedure, or in connection with such Member's or such Member's Affiliates' normal fund raising, marketing, informational or reporting activities, or to such Member's (or any of its Affiliates') Affiliates, employees, auditors, attorneys or other agents; (iii) to any bona fide prospective purchaser of the equity or assets of such Member or its Affiliates or the Units held by such Member, or prospective merger partner of such Member or its Affiliates, *provided,* that such purchaser or merger partner agrees to be bound by the provisions of this Section 10.4; or (iv) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation; *provided,* that the Member required to make such disclosure shall provide to the Manager prompt prior notice of such requirement.  For purposes of this Section, Confidential Information shall not include any information of which (x) such Person became aware prior to its affiliation with the Company, or (y) such Person learns from sources other than the Company (*provided* that such Person does not know or have reason to know, at the time of such Person's disclosure of such information, that such information was acquired by such source through violation of law, or breach of contractual confidentiality obligations or breach of fiduciary duties).  Nothing in this Section shall in any way limit or otherwise modify any confidentiality covenants entered into by the Company's employees with the Company.

## ARTICLE XI
## TRANSFERS; ADMISSION OF MEMBERS

11.1    **Transfer Restrictions**.  Except as otherwise set forth in this Article, no Member shall Transfer all or any portion of any interest in any Units (including to any other Member, or by gift, or by operation of law or otherwise) without first obtaining the prior written consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.  Notwithstanding anything herein to the contrary, all Transfers will be in compliance with the Securities Act and applicable state securities laws as determined by the Company and its securities counsel.

11.2    **Permitted Transfers**.

(a)    General.  The restrictions on Transfer provided in this Article shall not be applicable to the following (each, a "**Permitted Transfer**" and the transferee of each, a "**Permitted Transferee**"):

(i)    any Transfer by a Member to a spouse, parent, sibling or other descendant of a Member or to a trust primarily for the benefit of any such individual;

(ii)    any Transfer by a Member to an Affiliate of such Member;

(iii)    any gift Transfer from a Member to a member of that Member's immediate family or for estate planning purposes; or

(iv)    any Transfer upon the death of any Member to such Member's executors, administrators or testamentary trustees;

*provided,* that the transferee in each case is otherwise qualified to be a Member pursuant to the terms of this Agreement and complies with the provisions for membership set forth in this Agreement and/or required by the Manager from time to time.

Proof Stamping
04-06-2021 @ 11:48:09 AM EST

(b)      Transferring Member Ceases to be Member.  Upon a Transfer of all a Member's Units in connection with a Permitted Transfer in compliance with the provisions of this Agreement and the admission of the Transferee thereof as a Substitute Member, the Transferring Member shall cease to be a Member hereunder.

11.3      **Void Transfer**.  Any purported Transfer, no matter how effected, by any Member of any Units in the Company in contravention of this Agreement or which does not comply with the terms, conditions and procedures of this Agreement shall be void and ineffectual and shall not bind or be recognized by the Company or any other party and shall not result in a Transfer of any interest in the Company.  No such purported assignee shall have any voting rights or any right to any Profits, Losses or Distributions of the Company.

11.4      **Effect of Valid Transfer**.

(a)      Assignment.  A Transfer of Units permitted hereunder shall be effective as of the date of assignment and compliance with the conditions to such Transfer.  Profits, Losses and other Company items shall be allocated between the assignor and the assignee according to Code Section 706, using the "interim closing of the books" or the "daily proration" method selected by the Manager.  Distributions made before the effective date of such Transfer shall be paid to the assignor, and Distributions made after such date shall be paid to the assignee.

(b)      Record Owner.  Notwithstanding the foregoing, the Company and the Manager shall be entitled to treat the record owner of any Units or other interest in the Company as the absolute owner thereof and shall incur no liability for Distributions of cash or other property made in good faith to such owner until such time as a written assignment of such Units or other interest in the Company, which assignment is permitted pursuant to the terms and conditions of this Article, has been received and accepted by the Manager and recorded on the books of the Company.

(c)      Rights and Obligations of Assignee.  Unless and until an assignee becomes a Substitute Member pursuant to Section 11.5, the assignee shall not be entitled to any of the rights granted to a Member hereunder or under applicable law, other than the rights granted specifically to assignees pursuant to this Agreement or pursuant to the Act; *provided,* that without relieving the assigning Member from any such limitations or obligations, as more fully described in Section 11.4(e) hereof, such assignee shall be bound by any limitations and obligations of a Member contained herein by which a Member would be bound on account of the assignee's interest in the Company (including the obligation to make required Capital Contributions with respect to any Transferred Units).

(d)      Acceptance of Benefits.  Any Person who acquires in any manner whatsoever any Units or other interest in the Company, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all the terms and conditions of this Agreement that any predecessor in such Units or other interest in the Company of such Person was subject to or by which such predecessor was bound.

(e)      Rights and Obligations of Assignor.  Any Member who shall assign any Units or other interest in the Company shall cease to be a Member of the Company with respect to such Units or other interest and shall no longer have any rights or privileges of a Member with respect to such Units or other interest, except that the applicable provisions of Article IX (Tax Matters) shall continue to inure to the benefit of such Member in accordance with the terms thereof.  Unless and until such an assignee is admitted as a Substitute Member in accordance with the provisions of Section 11.5 hereof, (i) such

- 30 -

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

assigning Member shall retain all the duties, liabilities and obligations of a Member with respect to such Units or other interest, including, without limitation, the obligation (together with its assignee, pursuant to Section 11.4(c) hereof) to make and return Capital Contributions on account of such Units or other interest pursuant to the terms of this Agreement and (ii) the Manager may, in its discretion, reinstate all or any portion of the rights and privileges of such Member with respect to such Units or other interest for any period of time prior to the date such assignee becomes a Substitute Member. Nothing contained herein shall relieve any Member who Transfers any Units or other interest in the Company from any liability of such Member to the Company or the other Members with respect to such Units or other interest that may exist on the date such assignee becomes a Substitute Member or that is otherwise specified in the Act and incorporated into this Agreement or for any liability to the Company or any other Person for any present or future breaches of any representations, warranties or covenants by such Member (in its capacity as such) contained herein or in the other agreements with the Company.

11.5    **Admission of Substitute Member**.

(a)    <u>Admission</u>. An authorized assignee of any Units or other interests in the Company of a Member, or any portion thereof, shall become a Substitute Member entitled to all the rights of a Member if and only if (i) the assignor gives the assignee such right; (ii) the Manager has granted its prior written consent to such assignment and substitution, if required, which consent may be withheld in the discretion of the Manager; (iii) such assignee shall execute and deliver a joinder agreement or counterpart signature page to this Agreement agreeing to be bound by all the terms and conditions of this Agreement; and (iv) such assignee shall execute such other documents and instruments as may be necessary or appropriate to effect such Person's admission as a Substitute Member, in a form satisfactory to the Manager. In the event of the admission of an assignee as a Substitute Member, all references herein to the assignor shall be deemed to apply to such Substitute Member, and such Substitute Member shall succeed to all the rights and obligations of the assignor hereunder; *provided,* that the assignor shall continue to remain subject to Section 10.4 (Confidentiality) and Section 11.4(e). Each Member agrees that, notwithstanding the Transfer of all or any portion of its interest in the Company, as between the Member as assignor and the Company, the Member as assignor shall remain liable to return any Distributions previously made to such Member if return of any such Distributions is required by any provision of this Agreement or the Act.

(b)    <u>Timing</u>. Any such assignee will become a Substitute Member on the later of (i) the effective date of Transfer and (ii) the date on which all the conditions set forth in Section 11.5(a) have been satisfied. No further action or consent by the Members shall be required in connection with the admission of Substitute Members to the Company pursuant to Section 11.5(a).

(c)    <u>Failure</u>. In the event a Transferee of a Unit is not admitted as a Substitute Member, such Transferee shall be deemed a mere assignee of Profits only without any voting rights or right, power or authority of a Member hereunder and shall bear Losses in the same manner as its predecessor in interest, and the Transferor of such interest shall thereafter be considered to have no further rights or interest in the Company with respect to the interest Transferred, but shall nonetheless be subject to its obligations under this Agreement with respect to such interest. Additionally, the Transferor shall be deemed to be a defaulted Member. Upon admission of a Transferee as a Substitute Member, the Transferor shall automatically be withdrawn from the Company and be relieved of any corresponding obligations, to the extent of its Transferred Units.

(d)    <u>Costs</u>. All reasonable costs and expenses incurred by the Company in connection with any Transfer, and, if applicable, the admission of a Person as a Substitute Member, shall be paid by the transferor.

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

(e)     Update Schedule of Members.  Upon the admission of a Substitute Member, the Manager shall update the Schedule of Members to reflect the changes in ownership of Units and Membership Percentages, including the name, address, number and class of Units and amount of Capital Contributions of such Substitute Member and to eliminate the name and address of and other information relating to the assigning Member with regard to the assigned Units and other interests in the Company.

11.6     **Admission of Additional Members**.

(a)     Admission.  A Person may be admitted to the Company as an additional Member only as contemplated under Section 3.5 (Additional Capital – Other) or Section **Error! Reference source not found.** (Additional Units) hereof and only if such additional Member shall execute and deliver a counterpart of this Agreement agreeing to be bound by all the terms and conditions of this Agreement, and such other documents and instruments as may be necessary or appropriate to effect such Person's admission as an additional Member, in a form satisfactory to the Manager.  Such admission shall become effective on the date on which the Manager determines in its discretion that such conditions have been satisfied and when any such admission is shown on the books and records of the Company.  No action or consent by Members shall be required in connection with the admission of new Members to the Company.

(b)     Update Schedule of Members.  Upon the admission of an additional Member, the Manager shall update the Schedule of Members to reflect the changes in ownership of Units and Membership Percentages resulting from the issuance of Units, including the name, address, number and class of Units and amount of Capital Contributions of such additional Member.

11.7     **Death, Incapacity or Bankruptcy of a Member.**

(a)     General.  If a Member dies, becomes Incapacitated or a Bankrupt Member (the "**Designated Member**"), the remaining Member or Members (the "**Remaining Members**") shall forthwith become vested with the exclusive obligation, in proportion to their relative Membership Percentages, to purchase the entire right, title and interest of the Designated Member at a purchase price equal to the Fair Value of such interest; *provided*, *however*, that such calculation of Membership Percentages shall be made assuming that all Units owned by the Designated Member were distributed to all the Remaining Members pro rata in proportion to their then current Membership Percentages.

(b)     Fair Value.  The Remaining Members succeeding to the entire right, title and interest of the Designated Member shall pay to such Designated Member (or his/her/its legal representative) the Fair Value thereof within ninety (90) days of the death of the Designated Member or the Designated Member's becoming Incapacitated or a Bankrupt Member (such date, the "**Purchase Date**"); *provided*, that the Fair Value shall be determined as of a date that is at least thirty (30) days prior to the Purchase Date.  In the event the Fair Value is determined by independent appraisal, the cost of each appraiser shall be paid by the party choosing such appraiser; *provided*, *further* that payment of Fair Value may be made, in the discretion of the Remaining Members, in cash or an unsecured, 8% interest rate per annum twelve (12) month promissory note.

(c)     Designated Member's Obligations.  A Designated Member (or his/her/its legal representative) whose entire right, title and interest is to be purchased and succeeded to by the Remaining Members pursuant to this Section shall, on or before the Purchase Date, execute and deliver such deeds, bills of sale and other instruments as shall reasonably be requested by such Remaining Members to effect the conveyance and Transfer of the entire right, title and interest of such Designated Member in the Company and shall, to the extent requested by the Remaining Members, cooperate to effect a smooth and efficient continuation of the Company affairs.

- 32 -

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

(d) <u>Bankrupt Member</u>. If a Bankrupt Member (or his/her/its legal representative) disputes the right of the Remaining Members to purchase and succeed to the Bankrupt Member's entire right, title and interest in the Company, such Bankrupt Member (and his/her/its legal representative) shall nevertheless execute instruments and cooperate with the Remaining Members pursuant to the immediately preceding sentence, without, however, being deemed to have waived his/her/its rights to damages if the Remaining Members shall have purchased and succeeded to the interest of the Bankrupt Member under this Section without having the right to do so.

## ARTICLE XII
## DISSOLUTION, LIQUIDATION AND TERMINATION

12.1 **Dissolution**.

(a) <u>General</u>. The Company shall be dissolved, its assets disposed of and its affairs wound up upon the first to occur of the following:

(i) approval of the Manager and of Members holding a Majority in Interest of the Members;

(ii) the entry of a decree of judicial dissolution of the Company under the Act or such other event requiring dissolution under the Act; and

(iii) a determination by the Manager to dissolve the Company because it has determined that there is a substantial likelihood that due to a change in the text, application or interpretation of the provisions of the U.S. federal securities laws (including the Securities Act), or any other applicable statute, regulation, case law, administrative ruling or other similar authority (including changes that result in the Company being taxable as a corporation or association under U.S. federal income tax law), the Company cannot operate effectively in the manner contemplated herein.

(b) <u>Specific Occurrences</u>. The Company shall not be dissolved by the admission of additional or Substitute Members. The death, retirement, resignation, bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company.

(c) <u>Perpetual Existence</u>. Except as otherwise set forth in this Article, the Company is intended to have perpetual existence.

12.2 **Authority to Wind Up**. Upon the dissolution of the Company as set forth in <u>Section 12.1</u>, the Manager shall have all necessary power and authority required to marshal the assets of the Company, to pay the Company's creditors, to distribute assets and otherwise wind up the business and affairs of the Company. In particular, the Manager shall have the authority to continue to conduct the business and affairs of the Company insofar as such continued operation remains consistent, in the judgment of the Manager, with the orderly winding up of the Company.

12.3 **Accounting**. Upon the dissolution of the Company, an accounting shall be made of the assets and liabilities of the Company and the Capital Account of each Member as of the date of dissolution and of the items of Profits and Losses from the date of the last previous accounting to the date of dissolution. The Liquidating Trustee shall cause Financial Statements presenting such accounting to be prepared and certified.

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

12.4 **Distribution of Assets**.  Upon a Liquidation Event, the assets of the Company shall be distributed as follows in accordance with the Act (the "**Liquidating Distribution**"):

(a) *first*, to creditors of the Company in satisfaction of the liabilities of the Company, including Members who are creditors (other than in respect of Distributions owing to them hereunder);

(b) *second*, to the payment of the expenses of the Liquidation Event;

(c) *third*, to establish any necessary reserves, in amounts established by the Manager or the Liquidating Trustee, as the case may be, to provide for other liabilities, including contingent liabilities, if any;

(d) *fourth*, if applicable, to the holders of each series of Class A Preferred Units, in such amount and with such allocation as set forth in Section 5.2(d) and

(e) *thereafter*, to the Common Members in accordance with Section 5.2(a);

*provided*, that the distribution of cash, securities and other property to a Member in accordance with the provisions of this Section shall constitute a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Interest and all the Company's property, and shall constitute a compromise to which all Members have consented within the meaning of the Act.  If such cash, securities and other property are insufficient to return such Member's Capital Contributions or returns thereon, the Member shall have no recourse against the Manager, any of the other Members or Officers of the Company.

12.5 **Liquidating Distribution**.  The Liquidating Distribution shall be made on or before the later to occur of (i) the last day of the Taxable Year of the Company in which the Liquidation Event occurs and (ii) ninety (90) days thereafter (the "**Final Liquidation Date**").  If the Liquidating Trustee, in its discretion, determines that the Liquidating Distributions will not be timely made, it may distribute all the assets and liabilities of the Company in trust with the Liquidating Trustee, or such other Person as may be selected by the Liquidating Trustee acting as trustee; the purpose of the trust is to allow the Company to comply with the timing requirements under Regulation Section 1.704-1(b).  The Liquidating Trustee, acting as trustee of said trust, shall distribute the former Company assets (however constituted, enhanced or otherwise) as promptly as such trustee deems proper and in the same manner as directed in this Section (without regard to this sentence or the preceding two sentences) and otherwise as required hereunder.  The trust shall be terminated as soon as possible after the trust property is distributed to the beneficiaries thereof.

12.6 **Distributions in Kind**.  Any Company property distributed in kind shall be transferred and conveyed to the distributees as tenants in common subject to any liabilities attached thereto so as to vest in them undivided interests in the whole of such property in proportion to their respective rights to share in the proceeds of the sale of such property in accordance with this Article.

12.7 **Liquidating Trustee**.

(a) General.  Upon the dissolution of the Company, the affairs of the Company shall be wound up and terminated and the Members shall continue to share Profits, Losses, Distributions and other items of the Company during the winding up period in accordance with the provisions of this Agreement.  The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Liquidating Trustee, who is hereby authorized to do all acts authorized by law for these purposes.  The Liquidating Trustee, in carrying out such winding up and distribution, shall have full power and authority to sell, assign, Transfer and encumber all or any of the Company assets.  On dissolution of the Company, the Manager shall act as liquidator or may appoint one or more Members as

- 34 -

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

liquidator(s). The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense.

(b) <u>Indemnification</u>. The Liquidating Trustee shall be indemnified and held harmless by the Company from and against any and all claims, liabilities, costs, damages and causes of action of any nature whatsoever arising out of or incidental to the Liquidating Trustee's taking of or failure to take any action authorized under, or within the scope of, this Agreement; *provided*, *however*, that the Liquidating Trustee shall not be entitled to indemnification for:

(i) matters entirely unrelated to the Liquidating Trustee's actions under the provisions of this Agreement; or

(ii) the fraud, willful misconduct, self-dealing or criminal activity of the Liquidating Trustee.

12.8 **<u>Winding Up</u>**. The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all the remaining property and assets of the Company have been distributed to the Members.

12.9 **<u>Termination</u>**. Upon the completion of the winding up of the Company and the distribution of all Company assets as provided herein, the Company shall terminate and the Liquidating Trustee shall have the authority to execute and record any and all other documents required to effectuate the termination of the Company.

12.10 **<u>Return of Capital</u>**. The Liquidating Trustee shall not be personally liable for the return of Capital Contributions or any portion thereof to the Members (it being understood that any such return shall be made solely from Company assets).

## ARTICLE XIII
## GENERAL PROVISIONS

13.1 **<u>Offset</u>**. Whenever the Company is to pay any sum to any Member under this Agreement or pursuant to any other agreement or right, any amounts that such Member owes to the Company under this Agreement or pursuant to any other agreement or right may be offset against and deducted from that sum before payment.

13.2 **<u>Notices</u>**. Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and shall be deemed to have been received, given or made when (a) delivered personally to the recipient; (b) telecopied or delivered by electronic mail to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied or e-mailed before 5:00 p.m. Miami, Florida time on a Business Day, and otherwise on the next Business Day; (c) one (1) Business Day after being sent by reputable overnight courier service (charges prepaid); or (d) five (5) Business Days after being deposited in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested. All notices, requests and consents to be sent to a Member must be sent to or made at the address given for that Member on the Schedule of Members on the books and records of the Company, or such other address as that Member may specify by notice to the Company and the other Members. Any notice, request or consent to the Company or the Manager must be given to the Manager at the following address:

- 35 -

04-06-2021 @ 11:48:09 AM EST

To the Company          20900 NE 30th Ave
or the Manager:         Suite 510
                        Miami, FL 33180

Whenever any notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

13.3    **Entire Agreement**.  This Agreement and the Subscription Agreements (including all exhibits and schedules thereto) contain the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all prior agreements, arrangements, understandings, proposals, representations and warranties with respect thereto.

13.4    **Effect of Waiver or Consent**.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run.

13.5    **Amendments**.

(a)    General.  This Agreement may be amended or modified from time to time only by a written instrument adopted by the Manager and executed and agreed to by Members holding the required number of Units set forth herein; *provided, however*, that (i) an amendment or modification reducing disproportionately a Member's Units or other interest in Profits, Losses or Distributions or increasing a Member's Capital Contribution shall be effective only with that Member's consent and (ii) an amendment or modification reducing the vote required for any consent or vote in this Agreement shall be effective only with the consent or vote of Members having the Units theretofore required.

(b)    No Member Approval.  The Manager may without prior notice or consent of any Member generally make amendments to reflect or effect any of the following:

(i)    to correct any mistake, clerical, technical or other errors, cure any ambiguity or omission in this Agreement, make an inconsequential revision, provide clarity or to correct or supplement any provision herein that may be defective or inconsistent with any other provisions of this Agreement or to effect the intent of the provisions of this Agreement or that is otherwise contemplated by this Agreement;

(ii)    any increase or decrease in the Units or any class or series thereof;

(iii)    the creation, authorization and/or issuance of additional Units or other limited liability company interests in the Company;

(iv)    the admission of new members and Substitute Members of the Company in accordance with the provisions of this Agreement;

(v)    the cancellation or repurchase of Units or other interests in the Company which have been issued subject to vesting or similar arrangements;

- 36 -

(vi)　　that the Units shall be certificated upon determination by the Manager;

(vii)　　update the Schedule of Members, including in connection with any of subclauses (ii) through (vi) above;

(viii)　　an election for the Company to be bound by any successor statute governing limited liability companies governed by and under the laws of Delaware;

(ix)　　changes to this Agreement to conform to changes in the Act or interpretations thereof which the Manager believes appropriate, necessary or desirable, *provided,* that in its opinion such amendment does not have a materially adverse effect upon the Members or the Company;

(x)　　the exercise of any power granted to the Manager under this Agreement;

(xi)　　changes which, in the discretion of the Manager, are advisable to qualify or to continue the qualification of the Company as a limited liability company in which the Members and the Manager has limited liability under the laws of any state or that are necessary or advisable, in the discretion of the Manager, to ensure that the Company will not be treated as an association taxable as a corporation for federal income tax purposes;

(xii)　　to amend the provisions of <u>Article V</u> (Distributions; Allocations of Profits and Losses) if the Company is advised at any time by legal counsel that the allocations provided therein are unlikely to be respected for federal income tax purposes, in which case the Manager is empowered to amend such provisions to the extent necessary in accordance with the advice of counsel to effect the plans of allocations and Distributions provided in this Agreement (new allocations made by the Manager in reliance upon the advice of counsel described above shall not give rise to any claim or cause of action by any Member), or otherwise to achieve the tax treatment contemplated by this Agreement;

(xiii)　　as necessary to reflect the respective allocations, Distributions, voting, liquidation and other rights, preferences, privileges and restrictions with respect to new Units or interests issued by the Company, or to effectuate Distributions, splits and combinations of Units as contemplated by the Agreement, or to effectuate a modification to the manner in which capital accounts of the Members, or any debits or credits thereto, as contemplated by the Agreement; or

(xiv)　　to effect any other amendment that does not have a materially adverse effect on the Members.

13.6　　**Binding Effect**.  Subject to the restrictions on Transfer set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members, and their respective heirs, legal representatives, successors and assigns.

13.7　　**Governing Law; Severability**. THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.  In the event of a direct conflict between the provisions of this Agreement and any provision of the Certificate or any mandatory provision of the Act, the applicable provision of the Certificate or the Act shall control.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by law.

- 37 -

04-06-2021 @ 11:48:09 AM EST

13.8      **Jurisdiction; Venue**.  Except as provided in Section 13.9, any action or proceeding against the parties relating in any way to this Agreement may be brought and enforced only in the courts of the State of Florida, and the parties irrevocably submit to the jurisdiction of such courts in respect of any such action or proceeding.  The parties irrevocably waive, to the fullest extent permitted by law, any objection that they may now or hereafter have to the laying of venue of any such action or proceeding in the state or federal courts of the State of Florida, County of Dade and any claim that any such action or proceeding brought in any such court has been brought in any inconvenient forum.  To the fullest extent permitted by law, the parties hereby irrevocably consent to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to it at its address as set forth herein.  Nothing herein shall affect the right of the parties to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction.

13.9      **Waiver of Jury Trial; Expedited Arbitration**.  BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES UNDER THIS AGREEMENT OR ANY DOCUMENTS RELATED HERETO.

Any dispute between or among the Manager and the Members or any interpretation of this Agreement shall be submitted to expedited arbitration as provided below (but any damages must be resolved in a court described in Section 13.8).  The prevailing party in any arbitration or litigation shall be reimbursed for its arbitration costs (including attorneys' fees) by the non-prevailing party.

If any dispute arises concerning the interpretation, validity, or performance of this Agreement or any of its terms and provisions, including but not limited to the issue of whether or not a dispute is arbitrable, then the parties shall submit such dispute for binding determination before a retired judge selected from *JAMS/ENDISPUTE* or any similar organization mutually acceptable to the parties.  The parties shall mutually agree on one arbitrator from the list provided by the arbitrating organization; *provided,* that if the parties cannot agree, then each party shall select one arbitrator from the list, and the two arbitrators so selected shall agree upon a third arbitrator chosen from the same list, which third arbitrator shall determine the dispute.  The arbitration shall take place in Palm Beach County, Florida, and shall be conducted in accordance with the then prevailing rules of the arbitrating organization, except as set forth in this Section 13.9.  The parties shall have all the same rights of discovery as if the arbitration proceeding were a lawsuit in a court of Delaware.  The arbitrator shall apply Delaware substantive law to the proceeding.  The arbitrator shall, to the fullest extent permitted by law, have the power to grant all legal and equitable remedies, including provisional remedies, and award compensatory damages provided by law; however, the arbitrator may not order relief in excess of what a court could order.  The arbitrator shall not have authority to award punitive or exemplary damages.  The arbitrator shall prepare and provide the parties with a written award including factual findings and the legal reasoning upon which the award is based.  The arbitrator shall not have the power to commit errors of law or legal reasoning or to make findings of fact except upon sufficiency of the evidence.  Any award that contains errors of law or legal reasoning or makes findings of fact except upon the sufficiency of the evidence exceeds the power of the arbitrator, and may be corrected or vacated as provided by applicable law in the courts described in Section 13.8.  The arbitrator shall award costs and attorneys' fees in accordance with the terms and conditions of this Agreement.  Any

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

court having jurisdiction may enter judgment on the award rendered by the arbitrator, or correct or vacate such award as provided by applicable law.  The parties understand that by agreement to binding arbitration they are giving up the rights they may otherwise have to trial by a court or a jury and all rights of appeal, and to an award of punitive or exemplary damages.  Pending resolution of any arbitration proceeding, either party may apply to any court of competent jurisdiction for any provisional remedy, including but not limited to a temporary restraining order or a preliminary injunction, excluding however, any dispute relating to discovery matters, and for enforcement of any such order.  The application for or enforcement of any provisional remedy by a party shall not operate as a waiver of the within agreement to submit a dispute to binding arbitration. Notwithstanding any provision of this <u>Section 13.9</u> to the contrary, the failure of any Member or any member of the Manager to enter into, or answer a demand for, arbitration in accordance with this <u>Section 13.9</u> shall grant the counterparty the right to a default judgment with respect to such dispute, which default judgment may be entered by any court having jurisdiction.

Notwithstanding any provision of this Agreement to the contrary, this Section shall be construed to the maximum extent possible to comply with the laws of the State of Delaware, including the Delaware General Arbitration Act (the "**Delaware Arbitration Act**").  If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this Section, including any rules of the American Arbitration Association, shall be invalid or unenforceable under the Delaware Arbitration Act, or other applicable law, such invalidity shall not invalidate all of this Section.  In that case, this Section shall be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of the Delaware Arbitration Act or other applicable law and, in the event such term or provision cannot be so limited, this Section shall be construed to omit such invalid or unenforceable provision.

13.10    **<u>Further Assurances</u>**.   In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

13.11    **<u>Waiver of Certain Rights</u>**.  Each Member irrevocably waives any (i) right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company, to the extent permitted to be waived under the Act, and (ii) rights of appraisal it may have under the Act.

13.12    **<u>Notice to Members of Provisions</u>**.   By executing this Agreement, each Member acknowledges that it has actual notice of (i) all the provisions hereof (including, without limitation, the restrictions on Transfer set forth in <u>Article XI</u>), and (ii) all the provisions of the Certificate.

13.13    **<u>Remedies</u>**.  Each Member shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all the rights which such Person has under any law.  Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

13.14    **<u>Severability</u>**.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

been contained herein.  If the Act is subsequently amended or interpreted in such a way as to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

13.15    **Descriptive Headings; Interpretations**.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.  All references to Certificate and Sections refer to articles and sections of this Agreement, and all references to Schedules are to schedules attached hereto, each of which is incorporated herein and made a part hereof for all purposes. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.  The use of the word "including" in this Agreement shall be by way of example rather than by limitation.  The use of the words "and," "or" and "either" shall not be exclusive.  Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. Wherever required by the context, references to a Fiscal Year shall refer to a portion thereof.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

13.16    **UCC Article 8 Election**.  Each Unit of the Company  shall constitute a "security" within the meaning of, and be governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 and the Company hereby "opts-in" to such provisions for the purpose of the Uniform Commercial Code.

13.17    **Creditors**.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any of its Affiliates, and no creditor who makes a loan to the Company or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Company Profits, Losses, Distributions, capital or property other than as a secured creditor.

13.18    **Survival**.   All indemnities and reimbursement obligations made pursuant to this Agreement shall survive dissolution and liquidation of the Company until the expiration of the longest applicable statute of limitations (including extensions and waivers) with respect to the matter for which a party would be entitled to be indemnified or reimbursed, as the case may be.

13.19    **Counterparts**.  This Agreement may be executed in multiple counterparts with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

13.20    **Compliance with Anti-Money Laundering Requirements**.  Notwithstanding any other provision of this Agreement to the contrary, the Manager, in its own name and on behalf of the Company, shall be authorized without the consent of any Person, including any other Member, to take such action as they determine in its discretion to be necessary or advisable to comply with any anti-money laundering or

- 40 -

anti-terrorist laws, rules, regulations, directives or special measures, including the actions contemplated by the Subscription Agreements.

*[Signature Page Follows]*

**SIGNATURE PAGE TO OPERATING AGREEMENT**
**OF**
**JUSTICE PARTNERS LLC**

The undersigned hereby execute the Operating Agreement of JUSTICE PARTNERS LLC, a Delaware limited liability company, with effect from the date first above written.

**COMPANY:**
**JUSTICE PARTNERS LLC**

By: _____
Name:  Lee Melchionni
Title:  Authorized Member

**MANAGER:**
**JUSTICE PARTNERS MANAGEMENT, LLC**

By: _____
Name:  Lee Melchionni
Title:  Authorized Member

*ACTIVE 47915850v1*

04-06-2021 @ 11:48:09 AM EST

## JOINDER AGREEMENT

This Joinder Agreement ("Joinder") is executed by the undersigned pursuant to the terms of the Operating Agreement of JUSTICE PARTNERS LLC (the "Company"), dated as of December 15, 2020, a copy of which has been provided to the undersigned and is incorporated herein by reference (the "Agreement"). By execution of this Joinder, the undersigned agrees as follows:

Acknowledgement. The undersigned acknowledges that undersigned is acquiring Units that are subject to the terms and conditions of the Agreement. Capitalized terms used herein without definition are defined in the Agreement and are used herein with the same meanings set forth herein.

Agreement. The undersigned (a) consents and agrees to all the provisions of the Agreement; (b) agrees that all Units now owned or hereafter acquired by the undersigned are bound by and subject to the terms of the Agreement; (c) adopts the Agreement with the same force and effect as if the undersigned were originally a party thereto; provided that joinder in the Agreement will not constitute admission as a Member unless and until he, she or it is duly admitted in accordance with the terms of the Agreement; and (d) acknowledges that for purposes of the Agreement, the undersigned is a holder of Class A Preferred Units / Class A Common Units as applicable as set forth below.

Notice. Any notice required or permitted by the Agreement will be given to the undersigned at the address listed besides the undersigned's signature below.

EXECUTED AND DATED on this 6 day of April, 20 2021

_____

Address for Notices:   50 S Pointe DR. PH#2  Miami Beach, Florida 33139

Number and Type of Units:   4,000
_____

ACTIVE 47915850v1

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

**EXHIBIT A**

SCHEDULE OF MEMBERS
OF
**JUSTICE PARTNERS LLC**
*(current as of December 15, 2020)*

| Name and address | Number of Class A Common Units | Class A Common Membership Percentage | Number of Class A Preferred Units | Class A Preferred Membership Percentage | Aggregate Membership Percentage |
|---|---|---|---|---|---|
| True Vision Ventures LLC | 30,000 | 100% | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **TOTAL** | | | 100% | | 100% |

*ACTIVE 47915850v1*

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

**EXHIBIT C**
**RISK FACTORS**

THERE ARE CERTAIN RISKS INHERENT IN AN INVESTMENT IN THE SERIES A PREFERRED UNITS (THE "**SECURITIES**" OR THE "**SERIES A PREFERRED UNITS**"). THE FOLLOWING DOES NOT PURPORT TO BE EXCLUSIVE OR TO SUMMARIZE ALL RISKS THAT MAY BE ASSOCIATED WITH PURCHASING OR OWNING THE SECURITIES. EACH POTENTIAL INVESTOR IS ADVISED AND EXPECTED TO CONDUCT ITS OWN INVESTIGATION INTO THE COMPANY AND THE RISKS AND SPECULATIVE FACTORS INHERENT IN AN INVESTMENT IN THE SECURITIES AND TO ARRIVE AT AN INDEPENDENT EVALUATION OF AN INVESTMENT IN THE SECURITIES. THE AGREEMENT TO WHICH THESE RISK FACTORS ARE ATTACHED IS PROVIDED FOR ASSISTANCE ONLY AND SHOULD BE READ IN ITS ENTIRETY AND IT IS NOT INTENDED TO BE, AND MUST NOT ALONE BE TAKEN AS, A RECOMMENDATION TO PURCHASE ANY SECURITIES OR AS THE BASIS FOR AN INVESTMENT DECISION. EACH INVESTOR SHOULD CONSULT HIS OWN TAX, INVESTMENT AND LEGAL ADVISORS CONCERNING THE MERITS OF THIS OFFERING. ALL REFERENCES TO "WE", "OUR", "US" AND "THE COMPANY" REFER TO JUSTICE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY.

**RISKS RELATED TO THE COMPANY**

***We are a recently formed developmental stage entities with no operating history and we have not yet generated any revenues or achieved profitability.***

We are a developmental stage operation with no operating history upon which investors may base an evaluation of our potential future performance.  As a result, there can be no assurance that we will be able to develop consistent revenue sources, or that our operations will become profitable even if we are able to invest the funds raised in this Offering in accordance with our business plans. Our prospects must be considered in light of the risks, expenses and difficulties frequently encountered by entities in the early stages of development. Such risks include, but are not limited to, an evolving business model, developing the business plan, developing the business infrastructure and the management of growth. We must, among other things, in connection with the use of all proceeds of the Offering to make the proposed loan (the "**Loan**") to the Justice Partners Law Group, LP, a partnership organized under the laws of the District of Columbia ("**Justice Partners Law Group**"), respond to legal, economic and market variables outside our control, conduct adequate due diligence, respond to competitive developments.  There can be no assurance that we will be successful in meeting these challenges and addressing such risks and the failure to do so could have a materially adverse effect on our business, results of operations and financial condition.

As a development stage company, we are also subject to risks and or levels of risk that are often greater than those encountered by companies with established operations and relationships. There can be no assurance that we will be successful in meeting these challenges and addressing such risks and the failure to do so could have a materially adverse effect on our business, results of operations and financial condition.

*ACTIVE 47915850v1*

04-06-2021 @ 11:48:09 AM EST

***Investors will have no rights in the day-to-day decision making of the Company.***

The Company is a managed by its Manager, Justice Partners Management, LLC, (the "**Manager**") under the direction of Sylvia Benito (the "**Principal**"). Day-to-day managerial control of the Company is vested in the Manager, and the Manager has very broad management authority. The investors will not have the ability to participate in the management of the Company. Therefore, purchasers of the Series A Preferred Interests ability to participate in decisions made by the Company will be restricted and holders of the Series A Preferred Interests may not agree with all decisions of its management.

***The Company does not have operations.***

The Company has no direct operations of its own. Its only significant asset is or will be the Loan. The Justice Partners Law Group's ability to distribute profits to its Qualified Settlement Fund, will depend exclusively on its ability to source clients, as well as its success in litigating and/or settling mass tort claims, which is not within the control of either Justice Partners Law Group or the Company, and is instead largely determined by outside factors. Thus, there can be no assurance that the Justice Partners Law Group will be profitable or have any earnings or cash flow available for-profit distribution to the Company, and thus to the Series A Preferred Members.

***The Company's success is dependent exclusively on the success of the Justice Partners Law Group.***

The Justice Partners Law Group was only recently formed and has no operational history to date. The Company is dependent entirely on the efforts of Justice Partners Law Group to engage clients and successfully litigate and/or settle class action claims. Justice Partners Law Group anticipates entering into co-counsel relationships with litigation counsel in exchange for a portion of the legal fees, and thus, the success of the Company and Justice Partners Law Group is largely dependent upon the success of co-counsel. The inability to enter into and maintain co-counsel relationships will have a material adverse effect on the Company. Furthermore, no assurances can be given that Justice Partners Law Group will be successful in engaging clients, entering into and maintaining co-counsel relationships, and/or successfully disposing either via settlement or litigation award, any litigation matter. Therefore, to the extent that the Justice Partners Law Group is not successful in any of these endeavors, Investors in the Company may lose their entire investment.

***The Loan to Justice Law Partners may violate the Rules of Professional Conduct.***

There are limited circumstances in which a law firm or an attorney may share legal fees with non-lawyers in the District of Columbia. Here, the Loan features a "success fee" equal to up to 100% of the principal amount of the Loan. In the event of an equitable subordination claim, a court could find that Company has assumed a degree of control over the Justice Partners Law Group, thereby having a non-attorney share fees and control the law firm in violation of the Rules of Professional Conduct. Likewise, a court could find that the success fee is an improper sharing of attorney fees violative of the Rules of Professional Conducts. In such situation, the Investors may be entitled to seek rescission of the purchase of their Series A Preferred Units. If a number of Investors were

*ACTIVE 47915850v1*

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

successful in seeking rescission, the Company would face significant financial demands, which could adversely affect us as a whole.

### No Opinion of Counsel Regarding the Loan.

Neither the Company nor the Justice Partners Law Group received an opinion of counsel or a ruling from the District of Columbia Bar that this structure is acceptable under the Rules of Professional Conduct.

### The Company may be exposed to lender liability risks including equitable subordination.

In recent years, a number of judicial decisions in the United States have upheld the right of borrowers to sue lending institutions on the basis of various evolving legal theories (collectively termed "**lender liability**").  Generally, lender liability is founded upon the premise that an institutional lender has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the borrower or has assumed a degree of control over the borrower resulting in creation of a fiduciary duty owed to the borrower or its other creditors or shareholders.  Because of the nature of the Loan, the Company could be subject to allegations of lender liability.

In addition, under common law principles that in some cases form the basis for lender liability claims, if a lending institution (a) intentionally takes an action that results in the undercapitalization of a borrower to the detriment of other creditors of such borrower, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors of (d) uses its influence as an equity holder, if applicable, to dominate or control a borrower to the detriment of the other creditors of such borrower, a court may elect to subordinate the claim of the offending lending institution to the claims of the disadvantaged creditor or creditors, a remedy called "equitable subordination." Because of the nature of the Loan, the Company  be subject to claims from creditors of the Justice Partners Law Group that the Loan should be equitably subordinated.

### Payments under the Loan may constitute an avoidable preference in the event of insolvency.

If certain bankruptcy or insolvency proceedings are initiated by or against the Justice Partners Law Group within 90 calendar days after any payment is made by the Justice Partners Law Group to the Company under the Loan, or within one year after any payment is made by the Justice Partners Law Group to the Company, then to the extent the Company is deemed to be an "insider" as defined in the Bankruptcy Law, all or a portion of such payment may be avoided as a preferential transfer under the Bankruptcy Law and the Company may be required to return such payment. There can be no assurance that in the event of any bankruptcy case and related litigation that payments on the Loan will be made in full, on time or at all.

### The Company will be exposed to potential litigation if it attempts to foreclose on the collateral or otherwise enforce its rights.

It is possible that the Company may find it necessary or desirable to foreclose on the collateral securing the Loan.  The foreclosure process may be lengthy and expensive.  The Justice Partners Law Group may resist an action for foreclosure by asserting numerous claims, counterclaims and defenses against the Company including, without limitation, numerous lender liability claims and

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

defenses, even when such assertions may have no basis in fact, in an effort to prolong the foreclosure action and force the Company into a modification of the Loan. A foreclosure action can sometimes take several years or more to litigate. At any time prior to or during the foreclosure proceedings, the Justice Partners Law Group may file for bankruptcy, which would have the effect of staying the foreclosure action and further delaying the foreclosure process. Additionally, proposed legislation would, if enacted, empower bankruptcy courts to reduce the principal balance of the Loan. Any such reductions would adversely affect the value of Loan and the Company's ability to repay an investor's capital contribution to the Company and the Preferred Return.

*The Series A Preferred Members will not be an owner of the Justice Partners Law Group and will not enjoy the rights, privileges and benefits of a direct investment in the Justice Partners Law Group.*

Although the Company will use the proceeds from the Series A Preferred Members to make the Loan to the Justice Partners Law Group, you will not become an owner or a direct creditor of the Justice Partners Law Group as a result of the Loan. By investing in the Company, you will become an equity holder of only the Company as a Series A Preferred Member, and you will only be entitled to exercise the rights, privileges and benefits afforded the Series A Preferred Members, as set forth in the Operating Agreement. Accordingly, you will not have the right to vote or direct the voting of any equity interests in the Justice Partners Law Group.

*No person or entity is obligated to make additional capital contributions or loans to the Justice Partners Law Group.*

No person or entity has any obligation or commitment whatsoever to make any capital contributions or loans to the Justice Partners Law Group. Accordingly, if the Justice Partners Law Group does not receive sufficient funds from the its operations to make distributions to the Qualified Settlement Fund, and repay the Loan, the Series A Preferred Members may not receive their Preferred Returns or any return of their investment. Justice Partners Law Group may not rely on capital contributions or loans from any person or entity and, therefore, may not be able to satisfy its obligations under the terms of the Loan.

*The is limited security for the Loan and no guarantee for any profits of the Justice Partners Law Group.*

The Loan is a Loan to the Justice Partners Law Group, secured by the assets of the Justice Partners Law Group, which are negligible. It is currently contemplated that the Principal will serve as a co-trustee of a Qualified Settlement Fund administered by Justice Partners Law Group. The Justice Partners Law Group is a newly formed entity that is anticipated to have *de minimis* revenue and limited underlying assets. In the event of a liquidation, the value the Justice Partners Law Group will completely dependent upon market and economic conditions, the availability of buyers and similar factors at the time of liquidation. There also can be no assurance that the Justice Partners Law Group will be saleable and, even if saleable, the timing of its liquidation is uncertain. To the extent that liens or other rights granted to third parties encumber the Justice Partners Law Group's assets, including the rights granted under the any Qualified Settlement Fund to the clients of the Justice Partners Law Group, such third parties have or may exercise rights and remedies with respect to the assets of the Justice Partners Law Group.

*ACTIVE 47915850v1*

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

***The Company's ability to exercise its rights under the Loan Documents is effectively limited by the provisions of the District of Columbia's rules regarding law firm ownership.***

The Company's security interest in the Justice Partners Law Group is possibly unenforceable, as pursuant to Rule 5.4 of the District of Columbia's Rules of Professional Responsibility, sharing of legal fees with non-lawyers is not permitted, except under limited circumstances.   As a result, the Company's ability to exercise any rights under the Loan Documents is limited.

***No Series A Preferred Member may exercise or otherwise enforce the Company's rights under the Loan Documents.***

If an event of default occurs under the Loan Documents, only the Principal, and neither the Company nor any Series A Preferred Member of the Company may seek to enforce any rights under the Loan Documents.   There can be no assurance that the Justice Partners Law Group will have sufficient assets, or will be able to obtain other funds, to pay the principal and unpaid interest on the Loan, and as a result, the Company may be unable to pay the Preferred Return or make any distribution to the Series A Preferred Members.

***There is no guarantee or assurance that the Company will make distributions to the Series A Preferred Members.***

The Company intends to make cash distributions to the Series A Preferred Members only after the Loan has been repaid, as the Company has no other business activities except for the Loan.   Justice Partner's upon disposition of a class action law suit and after the payment of expenses of both the Company and Justice Partners Law Group.   There can be no assurance that cash will be available, or that distributions will be made.

***Control of the Company is vested in the Manager, and the Manager is entitled to receive fees.***

Full day-to-day management control over the Company rests with the Manager, and the Series A Preferred Interest Holders lack any managerial control over the Company or investments.   Therefore, our success is largely dependent on the Manager for the day-to-day management of the business and investments.   In addition, the Manager, and consequently the Company, is currently dependent on the continued service of Sylvia Benito, the Principal.   The loss of the Manager's services, including if any services of the Principal were to cease or lapse for any reason, may cause the Company to be adversely affected.   In addition, the Manager, or its designated affiliate, is entitled to receive, after payment of the Preferred Return, 15% of any distributions until the Series A Preferred Unit Holders receive a return of 3x their respective Capital Contributions, and 20% thereafter.   While the Manager intends that such services be provided at competitive market rates, such compensation was not determined through arm's-length negotiation.

***The Operating Agreement places limitations on liability.***

The Operating Agreement contains provisions providing for the indemnification of our members, managers, officers, employees and other agents. As a result of the inclusion of such provisions, neither the Common Unit nor Preferred Unit holders may be able to recover monetary damages against our members, managers, officers, employees or other agents for actions taken by them,

although it may be possible to obtain injunctive or other equitable relief with respect to certain actions. If equitable remedies are found not to be available to Common Unit or Preferred Unit holders in any particular case, our members may not have an effective remedy against the challenged conduct.

## RISKS RELATED TO THE OFFERING AND YOUR INVESTMENT

***Your investment in the Series A Preferred Units is a long-term investment.***

Investors should be aware of the long-term nature of their investment in the Company. Prospective investors will be required to represent in writing that they are purchasing the Series A Preferred Units for their own account for long-term investment and not with a view towards resale or distribution. Accordingly, purchasers of the Series A Preferred Units must be willing and able to bear the economic risk of their investment for an indefinite period of time.

***The Purchase Price for the Series A Preferred Units was determined arbitrarily may not bear a reasonable relationship to the value of the Common Units.***

The Purchase Price for the Series A Preferred Units has been determined solely by us. The determination of the Purchase Price was arbitrary and is not an indication of the value of the Series A Preferred Units, the underlying Common Units or the assets or our earnings and it bears no inherent relationship to our assets, book value, net income or any other recognized measure of value.

***The Investors will not have any voice in either the Company or in the Justice Partners Law Group.***

The holders of Series A Preferred Units are not entitled to vote for any matter with regard to the Company or with regard to Justice Partners Law Group, including with regard to the Loan to Justice Partners Law Group.   Such purchasers, either individually or as a collective group, will not have the ability to control our actions in major decisions.

***The Securities are not registered with the Securities and Exchange Commission.***

The Securities will not be registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or any state's blue-sky laws in reliance upon exemptions contained in the Securities Act and in such laws. The Securities may not be resold unless they are registered thereunder or an exemption from registration is available. Holders of Securities have no right to require the registration of the Series A Preferred Units or underlying Common Units. The exemption from registration of the Securities in accordance with applicable provisions of the securities laws of the United States and state law cannot be guaranteed. Neither the SEC, any state nor any of their agencies have reviewed or passed upon the merits of the Series A Preferred Units or Common Units or the accuracy of this Agreement.

***The Offering is not registered with the SEC or state securities authorities and there will be no regulatory review or approval of the sale of the Series A Preferred Units.***

The Offering of will not be registered with the SEC under the Securities Act or the securities

*ACTIVE 47915850v1*

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

agency of any state and no such agency will review or pass upon the sale of the Series A Preferred Units. The Series A Preferred Units are being offered in reliance on certain exemptions from the registration provisions of the Securities Act and state securities laws applicable only to offers and sales to investors meeting the suitability requirements set forth in the Subscription Agreement to which these Risk Factors are attached. No governmental regulatory agency has or will review or pass upon the sale of the Series A Preferred Units. As such, prospective investors will not have the benefit of review by the SEC or any state securities regulatory authority. Therefore, you are assuming the task and the risks of assessing the adequacy of disclosure and the fairness of the terms of this Offering on your own, or in conjunction with your personal advisors.

*(a)     If we fail to comply with state, federal and international securities laws we may be subject to a rescission action.*

The Securities are being offered, and will be sold, to investors in reliance upon certain exemptions from the registration requirements provided in the Securities Act and state securities laws, or "Blue-Sky" laws. If we fail to comply with the requirements of these exemptions, it is possible that Investors may be entitled to seek rescission of their purchase of the Securities, if they so desire. It is possible that one or more Investors seeking rescission would succeed. This might also occur under the applicable "Blue-Sky" laws and regulations in states where the Securities will be offered without registration or qualification pursuant to a private offering or other exemption. If a number of Investors were successful in seeking rescission, we would face significant financial demands, which could adversely affect us as a whole.

*Our failure to comply with federal, state and relevant international securities law and regulations in connection with this Offering could subject us to enforcement actions and impair our ability to raise capital in the future.*

We are relying upon exemptions from the registration provisions of federal, state and relevant international securities laws in this Offering. In relying upon such exemptions we have the burden of compliance with such laws for this Offering. If for any reason we fail to comply, we may, among other things, be subjected to both investigations and administrative actions by federal, state or foreign agencies or actions for rescission or for damages. Such actions, if commenced, could have a material adverse effect on our ability to raise necessary capital in the future. While we endeavor to fully comply with all such laws, there is no assurance that any non-compliance will not have material adverse effect on us.

*To satisfy the requirements of applicable securities laws there is limited transferability and liquidity in the Securities.*

To satisfy the requirements of certain exemptions from registration under the Securities Act, and to conform to applicable state securities laws, each Investor must acquire the Securities for investment purposes only and not with a view towards distribution. Consequently, certain conditions of the Securities Act may need to be satisfied prior to any sale, transfer, or other disposition of the Securities. Some of these conditions may include a minimum holding period, availability of certain reports, including financial statements from us, limitations on the percentage of securities sold, and the manner in which they are sold.

*ACTIVE 47915850v1*

**No assignment, transfer or disposition of any Securities may be made unless we receive an opinion of counsel provided at the holder's expense, in a form satisfactory to us stating that the proposed sale, transfer or other disposition will not result in a violation of applicable federal, state or foreign securities laws and regulations.**

*Our Securities have no public market and no assurance can be given that any public market will ever develop, or if developed that any such market will be sustained.*

The Securities have not been registered under the Securities Act, and are being offered in reliance upon exemptions from the registration requirements thereunder in a manner that is intended to comply with the requirements of Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder, and are only being offered hereunder to "accredited investors" as defined in the Securities Act. The Securities cannot be sold, transferred, pledged, hypothecated, assigned or otherwise disposed of, and unless they are registered under the Securities Act, or if in the opinion of counsel, satisfactory to us, such sale, transfer, pledge, hypothecation, assignment or disposition is exempt from such registration requirements. We have no current intent to file a registration statement with respect to the Securities and we have not made any representations with respect to the future filing of any registration statement or with respect to effectuating any public offering for the Securities. There is currently no trading market for the Securities and it is not anticipated that a trading market will ever develop. Accordingly, even in the absence of the foregoing restrictions on transfer, it is unlikely that an Investor will be able to readily dispose of the Securities or pledge them as collateral for a loan. Consequently, the Securities are suitable only for long-term investment by persons with no need for liquidity and who can absorb the loss of their entire investment.

*The Securities offered by the Company lack liquidity and transferability.*

There is no active secondary market for security holders to either purchase or sell their Series A Preferred Units or Common Units. We are not responsible for supporting or maintaining a market for the Securities. As a result, Investors may be unable to sell or transfer their Securities indefinitely and thus may be unable to realize any profit on their investment. Investors who need to be able to liquidate their investment with certainty should not invest their funds in the Securities.

*There is currently no public or private trading market for the Securities and as a result the Securities lack liquidity and transferability.*

Because there is no public or private trading market for the Securities and no such market is expected to develop, the liquidity and transferability of the Securities will be adversely affected. The Securities cannot be sold unless they are registered under the Securities Act or are exempt therefrom. There can be no assurances that we will ever register the Securities for resale under federal, state or foreign securities laws. Consequently, you may not be able to liquidate your Securities in the event of an emergency or for any other reason. Accordingly, this investment is designed for investors with no need for liquidity and who can afford to bear the risk of losing their entire investment.

*The value of the Securities will fluctuate.*

The value of the Series A Preferred Units and the underlying Common Units will fluctuate

*ACTIVE 47915850v1*

depending upon numerous factors, including without limitation, the success of our business, customer expansion, competitive developments, our ability to adapt to changing conditions and technology, changes in laws, the cost of keeping current with new technology and methods, inflation, recession, labor matters, including the departure or addition of key personnel to our management team, acts of god and other factors.

***You are not entitled to rely on other information.***

In making the decision to purchase the Securities, an Investor may consider information and materials not included this Agreement. **We have not authorized the use of such information nor do we make any representation or warranty as to any such information or material, and no assurances can be given as to its accuracy or completeness.** In addition, no assurances can be given to any subsequent purchaser of any of our securities that such information or material, if any, will be available, accurate, current or complete.

***Investments in the Securities may have adverse tax consequences.***

Investors are encouraged to contact their financial and tax advisors to determine the consequences, if any, of (i) their purchase of the Series A Preferred Units, and (ii) if the Series A Preferred Units are converted, their acquisition of Common Units.

***The members are subject to restrictions on transferability and there is a lack of public market for the Series A Preferred Units.***

The Series A Preferred Units are subject to significant restrictions on resale and the Common Units issuable upon conversion thereof are subject to significant restrictions on transferability and resale and may not be transferred or resold except as permitted under the Operating Agreement, the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. Additionally, neither the Series A Preferred Units nor the Common Units are registered under the Securities Act or qualified under the "Blue-Sky" laws of any state or jurisdiction, nor do we have any current intention to seek registration. Currently there is no trading market for the Series A Preferred Units or the Common Units and as a result, all Investors should assume the Series A Preferred Units and the Common Units issuable upon conversion thereof are illiquid.

***The purchase of the Series A Preferred Units is a speculative investment.***

Our goals are highly speculative and there is no assurance that we will be able to meet any of them. Our ability to achieve our objectives may be determined by factors beyond our control and that cannot be predicted at this time. Consequently, there can be no assurance that our efforts to start and expand our business operations will prove to be sufficient to enable us to generate the funds require to operate our business. Investors who purchase the Series A Preferred Units should be aware that they may not earn a substantial return on their investment and may, in fact lose their investment entirely.

***There can be no assurance that you will realize a return on your investment.***

No assurance can be given that you will realize a return on your investment or that you will not

*ACTIVE 47915850v1*

lose your entire investment. For this reason, you should read the Subscription Agreement to which these Risk Factors are attached and all other exhibits attached thereto carefully. Additionally, you should consult with your own personal legal and financial advisors prior to making any investment decision.

***We can provide no assurances or certainty as to an investment in the Company being profitable.***

There is no assurance that cash flow or profits will be generated by our investments. The lack of cash flow or profits will negatively affect our ability to meet our goals. Neither the Company nor any of its members or affiliates are obligated to provide the Investors with a guarantee against a loss on their investment or negative cash flows, and neither the Company nor any of its members or affiliates have or intend to provide such a guarantee.

***The Company and investors may be required to meet certain anti-money laundering regulations.***

The Uniting and Strengthening America by Fulfilling Rights and Ending Eavesdropping, Dragnet-collection and Online Monitoring Act of 2015 (the "**USA FREEDOM Act**") requires that financial institutions establish and maintain compliance programs to guard against money laundering activities. The USA FREEDOM Act requires the Secretary of the U.S. Treasury to prescribe regulations in connection with anti-money laundering policies of financial institutions. The Financial Crimes Enforcement Network ("**FinCEN**"), an agency of the U.S. Treasury, has announced that it is likely that such regulations would subject certain pooled investment vehicles to enact anti-money laundering policies. It is possible that legislation or regulations could be promulgated that would require the Manager or other service providers to the Company, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to the Series A Preferred Members. The Manager reserves the right to request such information as is necessary to verify the identity of a Series A Preferred Member and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by FinCEN and/or the SEC. In the event of delay or failure by a Series A Preferred Member to produce any information required for verification purposes, the subscription monies relating thereto may be refused.

***A Series A Preferred Member's investment return may be reduced if the Company is required to register as an investment company under the Investment Company Act; if the Company becomes an unregistered investment company, the Company could not continue its business.***

The Company does not intend to register as an investment company under the Investment Company Act of 1940, as amended (the "**Investment Company Act**"), and instead intends to rely on an exemption provided under Section 3(c)(1) of the Investment Company Act for companies with not more than 100 beneficial owners, but may also rely on other exceptions or exemptions to registration under the Investment Company Act. If the Company is unable to qualify for an exception or exemption under the Investment Company Act, including Section 3(c)(1), or otherwise was obligated to register as an investment company, the Company would have to comply with a variety of substantive requirements under the Investment Company Act that impose, among other things:

- limitations on capital structure;

*ACTIVE 47915850v1*

- restrictions on specified investments;

- prohibitions on transactions with affiliates; and

- compliance with reporting, record keeping, voting, proxy disclosure and other rules and regulations that would significantly increase the Company's operating expenses.

Further, if the Company were required to register as an investment company but failed to do so, the Company would be prohibited from engaging in the Company's business and criminal and civil actions could be brought against the Company, the Manager and their respective management personnel. In addition, the Company's contracts, including the Preferred Loan Documents, would be unenforceable unless a court required enforcement, and a court could appoint a receiver to take control of the Company and liquidate the Company's business. The Manager will seek to minimize the degree of governmental regulation and oversight to which it and the Company are subject, but no assurance can be made that the Company will not be subject to additional government regulation.

***The Manager is not subject to regulatory oversight.***

The Manager does not believe it is required to register, and does not intend to register, as an investment advisor under the Investment Advisers Act of 1940 (the "**Advisers Act**"), or under any comparable state investment law, and instead intends to rely upon an available exemption from registration. In consequence, the Manager generally is not subject to the restrictions contained in the Advisers Act, although the Manager may become subject to such restrictions in the future. The Manager will seek to minimize the degree of governmental regulation and oversight to which it and the Company are subject. While it is anticipated that this approach will reduce compliance and other costs, this approach will also eliminate a variety of investor protections (including certain protections arising under the Securities Act, the Investment Company Act and the Advisers Act) that would be available if the Manager and the Company were subject to greater regulatory and oversight burdens.

***The Company has no assets.***

The Company will technically not have any assets, but for the Loan. The performance of the Company is therefore directly dependent upon the performance of the Justice Partners Law Group, and its ability to repay the Loan, and will not be offset or improved by the value of any other assets. Any adverse financial, operational or business circumstances of the Justice Partners Law Group, will therefore, directly and adversely impact the Company's performance and returns to its investors.

***If any securities offering of the Company fails to comply with state or federal securities laws, the Company may be required to refund to its investors their investment capital, plus interest, which may result in the Company's and/or Justice Partners Law Group's liquidation and potential economic loss .***

The Company is currently undertaking an offering of securities that is not registered with the SEC based on certain exemptions from state and federal registration requirements. If the SEC or

*ACTIVE 47915850v1*

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

applicable state regulatory agency later determines that any of these securities offerings did not fully comply with federal or state law, as applicable, the Company may be required to refund to certain investors their investment capital, plus interest.  If the Company is required to return any such capital or make any such interest payment, both the capital and assets of the Company and/or the Justice Partners Law Group could be adversely affected, thus jeopardizing the ability of the Company to operate successfully.  In addition, if suits for rescission are brought under the Securities Act and successfully concluded for failure to register any of the Company's or Justice Partners Law Group's securities offerings, or for acts or omissions constituting offenses under the Securities Act, the Securities Exchange Act of 1934, as amended, or applicable state securities laws, the capital and assets of the Company could be adversely affected, jeopardizing the Company's ability to operate successfully.  Further, the Company may be required to expend time and capital to defend an action by investigators of the SEC or state securities agencies of a particular state, even where the Company is ultimately exonerated.  In addition, the structure of the Loan in the Justice Partners Group may be violative of the rules relating to attorney ethics and professional responsibility, as the Principal is merely a nominee for the Company's Series A Preferred Investors.

## RISKS ASSOCIATED WITH RETIREMENT PLANS

***An investment in the Company may not qualify as an appropriate investment for retirement plans.***

There are special considerations that apply to pension or profit sharing trusts or IRA's investing in our securities and thus you should consult with your financial and retirement plan advisors prior to investing any money from your retirement plan. If you are investing the assets of a Pension, Profit Sharing, 401(k), Keogh, or other qualified Retirement Plan, or the assets of an IRA in our Securities, you could incur liability or subject the plan to taxation if:

- your investment is not consistent with your fiduciary obligations under ERISA under the Internal Revenue Code;

- your investment is not made in accordance with the documents and instruments governing your plan or IRA, including your plans investment policy;

- your investment does not satisfy the prudence and diversification requirements of Section 40 (a) (1)(B) and 404 (A) (1)(C) of ERISA;

- your investment impairs the liquidity of the plan;

- your investment produces "unrelated business taxable income" for the plan or IRA;

- you will not be able to value the assets of the plan annually in accordance with ERISA requirements; or

*ACTIVE 47915850v1*

- your investment creates a prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code.

***Our assets may be Plan Assets for ERISA purposes, which could subject us to additional restrictions on our ability to operate our business.***

ERISA and the Internal Revenue Code may apply what is known as the look-through rule to this investment. Under the look-through rule, the assets of an entity in which a qualified plan or IRA has made an Loan may constitute assets of the qualified plan or IRA. A fiduciary of a qualified plan or IRA should consult with its advisors and carefully consider the effect of that treatment if that were to occur. We may only accept less than 25% of the gross proceeds of the Offering from Qualified Plans and IRAs.

*ACTIVE 47915850v1*

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

**EXHIBIT D**
**DEFINITION OF ACCREDITED INVESTOR**

Accredited investor means any person who comes within any of the following categories:

(1)     Either (a) a bank as defined in Section 3(a)(2) of the Securities Act of 1933, as amended (the "**Act**"), or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; (b) any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended; (c) an insurance company as defined in Section 2(13) of the Act; (d) an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that act; (e) a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or 301(d) of the Small Business Investment Act of 1958; (f) an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which plan fiduciary is either a bank, savings and loan association, insurance company or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000 or if a self-directed plan, with investment decisions made solely by persons that are accredited investors; or (g) a plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if the plan has total assets in excess of $5,000,000;

(2)     A private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940;

(3)     Any organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, corporation, trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)     Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of the issuer;

(5)     A natural person whose individual net worth, or joint net worth with spouse, exceeds $1,000,000 at the time of purchase (exclusive of the investor's primary residence)[6];

(6)     A natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each

---

[6] The calculation of "net worth" for purposes of the determining accredited investor status was amended by the federal statute The Dodd–Frank Wall Street Reform and Consumer Protection Act and rules promulgated by the Securities and Exchange Commission thereunder.  The term "net worth" means the excess of total assets at fair market value, including cash, stock, securities, personal property and real estate (other than your primary residence), over total liabilities (other than a mortgage or other debt secured by your primary residence).  In the event that the amount of any mortgage or other indebtedness secured by your primary residence exceeds the fair market value of the residence, that excess liability should also be deducted from your net worth.  Any mortgage or indebtedness secured by your primary residence incurred within 60 days before the time of the sale of the securities offered hereunder, other than as a result of the acquisition of the primary residence, shall also be deducted from your net worth.

*ACTIVE 47915850v1*

of those years and who reasonably expects reaching the same income level in the current year;[7]

(7)     Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506 (b)(2)(ii) under the Act; or

(8)     Any entity in which each of the equity owners of such entity certifies that he meets the qualifications set forth in either (1), (2), (3), (4), (5), (6) or (7) above.

*[Remainder of Page Intentionally Left Blank]*

---

[7] The term "income" means annual adjusted gross income, as reported for federal income tax purposes, plus (i) the amount of any tax-exempt interest income received; (ii) the amount of losses claimed as a limited partner in a limited partnership; (iii) any deduction claimed for depletion; (iv) amounts contributed to an IRA or Keogh retirement plan; (v) alimony paid; and (vi) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code of 1986, as amended.

*ACTIVE 47915850v1*

04-06-2021 @ 11:48:09 AM EST

## EXHIBIT E

## <u>Definition of Bad Actor Disqualifying Event</u>

**§ 230.506   Exemption for limited offers and sales without regard to dollar amount of offering.**

(d) *"Bad Actor" disqualification.* (1) No exemption under this section shall be available for a sale of securities if the issuer; any predecessor of the issuer; any affiliated issuer; any director, executive officer, other officer participating in the offering, general partner or managing member of the issuer; any beneficial owner of 20% or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power; any promoter connected with the issuer in any capacity at the time of such sale; any investment manager of an issuer that is a pooled investment fund; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of Purchasers in connection with such sale of securities; any general partner or managing member of any such investment manager or solicitor; or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor:

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of Purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of Purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

(*1*) Association with an entity regulated by such commission, authority, agency, or officer;

(*2*) Engaging in the business of securities, insurance or banking; or

(*3*) Engaging in savings association or credit union activities; or

(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(b) or 78*o*–4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–3(e) or (f)) that, at the time of such sale:

(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B) Places limitations on the activities, functions or operations of such person; or

(C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b–5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations

04-06-2021 @ 11:48:09 AM EST

**EXHIBIT F**
**ACCREDITED INVESTOR QUESTIONNAIRE**

Dear Investor:

The information contained in this questionnaire is being furnished to Justice Partners, LLP, a Delaware limited liability company (the "**Company**"), in order that the Company may determine whether acquisition of the Company's securities (the "**Securities**") may be made by you, as an investor, in light of the requirements of Regulation D promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"), and certain exemptions contained in state securities laws. You understand that the information is needed for the Company to determine whether it has reasonable grounds to believe that you are an "accredited investor" as that term is defined in Regulation D and that you have such knowledge and experience in financial, investment and business matters and that you are capable of evaluating the merits and risks of the proposed investment in the Securities.  You understand that (a) the Company will rely on the information contained herein for purposes of such determination, (b) the Securities may not be registered under the Securities Act, (c) the Securities may not be registered under the securities laws of any state, and (d) this questionnaire is not an offer to acquire the Securities or any other securities in any case where such offer would not be legally permitted.

Information contained in this questionnaire will be kept confidential by the Company and its agents, employees and representatives.  You understand, however, that the Company may have the need to present it to such parties as it deems advisable in order to establish the applicability under any federal or state securities laws of an exemption from registration.

In accordance with the foregoing, the following representations and information are hereby made and furnished by the investor:

Please answer all questions. If the answer is "none" or "not applicable," please so state.

INFORMATION REQUIRED OF EACH PROSPECTIVE INVESTOR:

1.   A.   **If Investor is an Individual:**

Name: Allan Teh          Age: 56

Social Security Number: 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          No. of Dependents: 1

Marital Status: Divorced          Citizenship: USA

*If interests are to be jointly held:*

Name:          Age:

Social Security Number:          No. of Dependents:

Marital Status:          Citizenship:

B.   **If Investor is an Entity:**

Name          State of Organization:

EIN:          Date of Formation:

2.   A.   **If Investor is an Individual:**

Residence Address: 50 S Pointe DR. PH#2  Miami Beach, Florida 33139

*ACTIVE 53688302v1*

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

Mailing Address (if different): _____

Telephone Number: __9174056164_____

Facsimile Number: _____

Email Address: __Operations@kstreetcap.com_____

**B.**     **If Investor is an Entity:**

Business Address: _____

Mailing Address (if different): _____

Telephone Number: _____

Facsimile Number: _____

Email Address: _____

**3.**     **A.**     **If Investor is an Individual:**

State in which the investor:

   is licensed to drive: _____

   is registered to vote: _____

**B.**     **If Investor is an Entity:**

State in which the investor:

   files income tax returns: _____

   has principal place of business: _____

**4.**     **If Investor is an Individual:**

Please describe your current employment, including the name of the business and any entity by which you are employed and its principal business:

_____

_____

Please describe any college or graduate degrees held by you: _____

_____

_____

**5.**     **If Investor is an Entity:**

Provide the total assets of the entity as of a recent date:*

   Assets: $_____          Date: _____

*\* In the event the entity has less than $5,000,000 in assets, each shareholder, partner, member, or beneficiary (in the case of a trust), as applicable, must be an accredited investor and complete this questionnaire.*

*ACTIVE 53688302v1*

04-06-2021 @ 11:48:09 AM EST

6. **If Investor is an Individual:**

Please initial on the line applicable to you under "Individual" and to you and your spouse under "Joint":

(a)   Gross Income During Last Two Years

| Individual | | Joint (with spouse) | | |
|---|---|---|---|---|
| 2020 | 2019 | 2020 | 2019 | |
| _____ | _____ | _____ | _____ | Less than $200,000 |
| _____ | _____ | _____ | _____ | $200,000 - 299,000 |
| _____ | _____ | _____ | _____ | $300,000 - 1,000,000 |
| _____ | _____ | _____ | _____ | More than $1,000,000 |

(b)   Anticipated Gross Income During 2021

| Individual | Joint (with spouse) | |
|---|---|---|
| _____ | _____ | Less than $200,000 |
| _____ | _____ | $200,000 - $299,000 |
| _____ | _____ | $300,000 - $1,000,000 |
| _____ | _____ | More than $1,000,000 |

(c)   Current "Net Worth" (Exclusive of Primary Residence)[8]

| | |
|---|---|
| _____ | Less than $1,000,000 |
| _____ | $1,000,000 - $5,000,000 |
| _____ | More than $5,000,000 |

7.   Is the investor involved in any litigation, which, if an adverse decision occurred, would materially affect the investor's financial condition?

Yes _____ No _____

If yes, please provide details: _____

_____

8.   The investor is an experienced and sophisticated investor or is advised by a qualified investment advisor, all as required under the securities laws and regulations.

Yes _____   No _____

9.   The investor understands the full nature and risk of an investment in the Securities and can afford the complete loss of the entire investment in the Securities.

Yes _____   No _____

---

[8] "Net Worth" means the excess of total assets at fair market value, including cash, stock, securities, personal property and real estate (*other than* your primary residence), over total liabilities (*other than* a mortgage or other debt secured by your primary residence). In the event that the amount of any mortgage or other indebtedness secured by your primary residence exceeds the fair market value of the residence, that excess liability must also be deducted from your net worth.  Any mortgage or indebtedness secured by your primary residence incurred within 60 days before the time of the sale of the securities offered hereunder, other than as a result of the acquisition of the primary residence, shall also be deducted from your net worth.

ACTIVE 53688302v1

10. The investor is able to bear the economic risk of an investment in the Securities for an indefinite period of time and understands that an investment in the Securities may be illiquid.

Yes _____   No _____

11. Does the investor have any other investments or contingent liabilities that the investor reasonably anticipates could cause the need for sudden cash requirements in excess of cash readily available to the investor?

Yes _____   No _____

If yes, please explain: _____

_____

12. Please describe the investor's experience as an investor (including amounts invested) in securities, particularly investments in non-marketable and tax incentive securities.

_____

_____

13. Has the investor participated in other private placements of securities?

Yes _____ No _____

If yes, please provide detail: _____

_____

14. In evaluating the merits and risks of this investment, does the investor intend to rely upon the advice of the investor's attorney, accountant or other advisor?

Yes _____   No _____

15. If the investor is an entity, was it formed for the specific purpose of acquiring the Securities offered?

Yes _____   No _____

16. Manner in which title to Securities is to be held: (circle one)

(a)   Individual Ownership
(b)   Community Property
(c)   Joint Tenant with Right of Survivorship (both parties must sign)
(d)   Partnership
(e)   Tenants in Common
(f)   Company
(g)   Trust
(h)   Other: _____

17. **Further Representations**.

The investor understands that the Company will be relying on the accuracy and completeness of the investor's responses to the foregoing questions and the investor represents and warrants to the Company as follows:

(i)   The answers to the above questions are complete and correct and may be relied upon by the Company whether or not the offering in which the investor proposes to participate is exempt from registration under the Securities Act and the securities laws of certain states;

*ACTIVE 53688302v1*

(ii)    The investor will notify t e ompany mme ate y o any mater a change in any statement made herein occurring prior to the closing of any purchase by the investor of the Securities; and

(iii)   The investor or its management, in case of an entity, has sufficient knowledge and experience in financial, investment and business matters to evaluate the merits and risks of the prospective investment; and the investor is able to bear the economic risk of the investment in the Securities and currently could afford a complete loss of such investment.

[*Signature Page Follows*]

**Justice Partners, LLC**

*ACCREDITED INVESTOR QUESTIONNAIRE SIGNATURE PAGE*

IN WITNESS WHEREOF, the undersigned has executed this Accredited Investor Questionnaire as of the date set forth below and declares under oath that it is truthful and correct to the best of the undersigned's knowledge.

*Signature of the Investor or Authorized Signatory of Investor*: _____

Name of Investor:   Allan Teh _____

Name of Authorized Signatory:  _____

Title of Authorized Signatory:  _____

Date:   4/6/2021 _____

**If jointly held:**

*Signature of the Investor or Authorized Signatory of Investor*: _____

Name of Investor:  _____

Name of Authorized Signatory:  _____

Title of Authorized Signatory:  _____

Date: _____

*ACTIVE 53688302v1*

**EXHIBIT G**
**BAD ACTOR QUESTIONNAIRE**
**Justice Partners, LLC (the "Issuer")**

**Bad Actor Questionnaire for Entities**

Legal Name of Entity: _____

Relationship to Issuer: _____

Please complete the following questions on behalf of the foregoing entity.  Please feel free to contact the Issuer for clarification on any of the foregoing questions.

1.   Please list each of the Executive Officers, Directors, Managers and Officers of the Entity named above participating in the offering of the Issuer's securities: _____

_____

_____

_____

_____

*If you are a General Partner, Managing Member, Investment Manager, Placement Agent or other entity receiving payment in connection with the Offering, please have each of the foregoing individuals complete a separate Bad Actor Questionnaire for Individuals in the form attached hereto. If you are a beneficial owner of more than 20% of the Issuer's securities, a separate Bad Actor Questionnaire for Individuals will not be required for each of the foregoing individuals.*

2.   Have you been convicted, within the last 10 years, of a felony or misdemeanor: (A) in connection with the purchase or sale of any security; (B) involving the making of any false filing with the SEC; or (C) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

☐ Yes                 ☐ No

3.   Are you subject to any order, judgment or decree of any court of competent jurisdiction, entered within the last five years that currently restrains or enjoins you from engaging or continuing to engage in any conduct or practice: (A) in connection with the purchase or sale of any security; (B) involving the making of any false filing with the SEC; or (C) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

☐ Yes                 ☐ No

4.   Are you subject to a final order of a state securities commission (or an agency or office of a state performing similar functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that: (A) presently, bars you from: (1) association with an entity regulated by such commission, authority, agency, or officer; (2) engaging in the business of securities, insurance or banking; or (3) engaging in savings association or credit union activities; or (B) constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before the date hereof?

☐ Yes                 ☐ No

5.   Are you presently subject to an order of the SEC entered pursuant to section 15(b)  or 15B(c) of the Securities Exchange Act of 1934 or section 203(e) or (f) of the Investment Advisers Act of 1940 that: (A) suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser; (B) places limitations on your activities, functions or operations; or (C) bars you from being associated with any entity or from participating in the offering of any penny stock?

☐ Yes                 ☐ No

*ACTIVE 53688302v1*

Print Seit..........
04-06-2021 @ 11:48:09 AM EST

6.   Are you subject to any order of the SEC en ere￾ w￾ ￾n ˜ve years ￾e˜ore t￾ ￾a￾e hereof that currently orders you to cease and desist from committing or causing a violation or future violation of: (A) any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933, section 10(b) of the Securities Exchange Act of 1934 and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 and section 206(1) of the Investment Advisers Act of 1940, or any other rule or regulation thereunder; or (B) Section 5 of the Securities Act of 1933?

☐ Yes          ☐ No

7.   Are you currently suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?

☐ Yes          ☐ No

8.   Have you filed (as a registrant or issuer), or been named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within the last five years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or are you currently the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued?

☐ Yes          ☐ No

9.   Are you subject to a United States Postal Service false representation order entered within the last five years, or are you subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations?

☐ Yes          ☐ No

If you answer "Yes" to any of questions 2-9 above, please describe the event(s), including the date of the event and, if applicable, the court or agency involved in such conviction, order, judgment or decree.  Please attach additional pages if necessary. _____

_____
_____
_____
_____
_____
_____
_____

The undersigned hereby certifies under penalty of perjury that (a) the undersigned is an officer of the above named entity, (b) the undersigned is duly authorized to complete this questionnaire on behalf of the above named entity, and (c) to the best of the undersigned's knowledge, after reasonable due inquiry, the foregoing information is true and correct in all respects.  The undersigned understands that this questionnaire will be used by the Issuer in order to comply with applicable securities laws and that the failure to disclose applicable information could restrict the Issuer's ability to conduct a private placement of securities in compliance with the Securities Act of 1933, as amended.  The undersigned further acknowledges that the Issuer may be required by Rule 506(e) of Regulation D promulgated under the Securities Act of 1933 to disclose the information contained in this questionnaire to potential purchasers of the Issuer's securities and hereby consents, on behalf of the above named entity, in the undersigned's capacity as an officer of the above named entity, to the disclosure of such information.  In the event that any of the information in the foregoing questionnaire becomes untrue at any time, the undersigned hereby agrees to promptly provide the Issuer with an update to this questionnaire and a description of such event(s) which make the answers to this questionnaire untrue.

Name of Entity: _____

Signature of Authorized Person: _____

Printed Name: _____

Title: _____

Date: _____

ACTIVE 53688302v1

04-06-2021 @ 11:48:09 AM EST

EXHIBIT G
Part 2 of 2

## Justice Partners, LLC (the "Issuer")
## Bad Actor Questionnaire for Individuals

Name:  **Allan Teh**                                        Title:  **Individual**

Relationship to Issuer: _____

Please complete the following questions.  Please feel free to contact the Issuer for clarification on any of the foregoing questions.

1.  Have you been convicted, within the last 10 years, of a felony or misdemeanor: (A) in connection with the purchase or sale of any security; (B) involving the making of any false filing with the SEC; or (C) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

    ☐ Yes          ☑ No

2.  Are you subject to any order, judgment or decree of any court of competent jurisdiction, entered within the last five years that currently restrains or enjoins you from engaging or continuing to engage in any conduct or practice: (A) in connection with the purchase or sale of any security; (B) involving the making of any false filing with the SEC; or (C) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

    ☐ Yes          ☑ No

3.  Are you subject to a final order of a state securities commission (or an agency or office of a state performing similar functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that: (A) presently, bars you from: (1) association with an entity regulated by such commission, authority, agency, or officer; (2) engaging in the business of securities, insurance or banking; or (3) engaging in savings association or credit union activities; or (B) constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before the date hereof?

    ☐ Yes          ☑ No

4.  Are you presently subject to an order of the SEC entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 or section 203(e) or (f) of the Investment Advisers Act of 1940 that: (A) suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser; (B) places limitations on your activities, functions or operations; or (C) bars you from being associated with any entity or from participating in the offering of any penny stock?

    ☐ Yes          ☑ No

5.  Are you subject to any order of the SEC entered within five years before the date hereof that currently orders you to cease and desist from committing or causing a violation or future violation of: (A) any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933, section 10(b) of the Securities Exchange Act of 1934 and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 and section 206(1) of the Investment Advisers Act of 1940, or any other rule or regulation thereunder; or (B) Section 5 of the Securities Act of 1933?

    ☐ Yes          ☑ No

*ACTIVE 53694223v2*

04-06-2021 @ 11:48:09 AM EST

6.  Are you currently suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?

☐ Yes          ☑ No

7.  Have you filed (as a registrant or issuer), or been named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within the last five years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or are you currently the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued?

☐ Yes          ☑ No

8.  Are you subject to a United States Postal Service false representation order entered within the last five years, or are you subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations?

☐ Yes          ☑ No

If you answer "Yes" to any of the foregoing questions, please describe the event(s), including the date of the event and, if applicable, the court or agency involved in such conviction, order, judgment or decree. Please attach additional pages                                        if                                        necessary.

_____
_____
_____
_____
_____
_____
_____
_____

I hereby certify under penalty of perjury that the foregoing information is true and correct in all respects. I understand that this questionnaire will be used by the Issuer in order to comply with applicable securities laws and that the failure to disclose applicable information could restrict the Issuer's ability to conduct a private placement of securities in compliance with the Securities Act of 1933, as amended. I further acknowledge that the Issuer may be required by Rule 506(e) of Regulation D promulgated under the Securities Act of 1933 to disclose the information contained in this questionnaire to potential purchasers of the Issuer's securities and hereby consent to the disclosure of such information. In the event that any of the information in the foregoing questionnaire becomes untrue at any time, I hereby agree to promptly provide the Issuer with an update to this questionnaire and a description of such event(s) which make the answers to this questionnaire untrue.

*Allan Teh*

Signature: _____

Printed Name: __Allan Teh_____

Date: __4/6/2021_____

*ACTIVE 53694223v2*



| Signer | Signature | Timestamp |
|---|---|---|
| Brent Steinberg<br>steinberg.brent@gmail.com | *Allan Teh*<br>Using IP Address 138.207.157.50 | Viewed: 04-06-2021 11:19:00 AM EST<br>Signed: 04-06-2021 11:48:09 AM EST |

Geo IP address location for 138.207.157.50

| Region/State | City | Zip/Postal Code | Country |
|---|---|---|---|
| Florida | Flagami | | United States |



**Exhibit 4**

# Invest in the Power of Making Wrongs Right

*Seed Capital for Mass Tort Actions*

**JUSTICE PARTNERS**

Confidential — Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 142 of 978

# Disclaimer

» This presentation is the property of Justice Partners Investments LLC ("Justice Partners") and is strictly confidential. It contains information intended only for the person to whom it is transmitted. With receipt of this information, recipient acknowledges and agrees that: (i) this document which is not intended to be distributed, and if distributed inadvertently, will be returned to Justice Partners upon request as soon as possible; (ii) the recipient will not copy, fax, reproduce, divulge, or distribute this confidential information, in whole or in part, without the express written consent of Justice Partners ; (iii) all of the information herein will be treated as confidential material with no less care than that afforded to its own confidential material.

» This presentation is for informational purposes only and is not intended for any other use. This presentation is not an offering memorandum or prospectus and should not be treated as offering material of any sort. The information contained in this presentation shall not constitute an offer to sell or the solicitation of an offer to buy securities. This presentation is intended to be of general interest only and does not constitute or set forth professional opinions or advice. The information in this document is speculative and may or may not be accurate. Actual information and results may differ materially from those stated in this document.

» Justice Partners makes no representations or warranties which respect to the accuracy of the whole or any part of this Justice Partners presentation and disclaims all such representations and warranties. Neither Justice Partners nor its principals, employees, or agents shall be liable to any user of this document or to any other person or entity for the truthfulness or accuracy of information contained in this presentation or for any errors or omissions in its content, regardless of the cause of such inaccuracy, error, or omission. Furthermore, Justice Partners, its principals, employees, or agents accept no liability and disclaim all responsibility for the consequences of any user of this document or anyone else acting, or refraining to act, in reliance on the information contained in this document or for any decision based on it, or for any actual, consequential, special, incidental, or punitive damages to any person or entity for any matter relating to this document even if advised of the possibility of such damages. Any and all projections that may be contained this document have been estimated based on unknown variables which may or may not occur in the future.

» This presentation contains forward-looking statements within the meaning of the federal securities laws. Forward-looking statements express Justice Partners' expectations or predictions of future events or results. They are not guaranties and are subject to many risks and uncertainties. There are a number of factors beyond Justice Partners' control that could cause actual events or results to be significantly different from those described in the forward-looking statements. Any or all of the forward-looking statements in this document or in any other statements Justice Partners makes may turn out to be wrong. Except as required by applicable law, Justice Partners does not intend to publicly update or revise any forward-looking statements, whether as a result of new information, future developments or otherwise. In light of the significant uncertainties inherent in the forward-looking statements made in this document, the inclusion of this information should not be regarded as a representation by Justice Partners or any other person that its objectives, future results, levels of activity, performance or plans will be achieved.

» The financial information contained herein has not been audited or reviewed by our independent certified public accountants and accordingly they express no opinion or other form of assurance as to this financial information. No representation or warranty of any kind is or can be made with respect to the accuracy or completeness of, and no representation or warranty should be inferred from, Justice Partners 's financial information (the "Financials") or the assumptions underlying them. No representation or warranty can be made as to Justice Partners' future operations or the amount of any future income or loss. Some assumptions on which the Financials are based may inevitably not materialize, and unanticipated events and circumstances will occur. Further, the Financials are not prepared nor are they presented in accordance with generally accepted accounting principles. Therefore, the actual results achieved during the period presented may vary from the Financials, and the variations may be material. Prospective investors are cautioned not to rely on the Financials contained in the presentation. Justice Partners does not intend to update or otherwise revise the Financials to reflect circumstances existing after the date hereof or to reflect the occurrence of unanticipated events even if some or all of the underlying assumptions do not come to fruition.

2

## Confidential – Subject to Confidentiality Order

# Executive Summary

» Justice Partners

- **Justice Partners, LLC** ("**Justice Partners**" or the "**Fund**"), is a new Fund which is offering up to $30,000,000 of its Series A Preferred Units to invest in law firms in order to finance mass tort litigation expenses, thereby encouraging access to justice and increase operational efficiencies.

- The Justice Partners team consists of seasoned attorneys and investment professionals. It was founded by Lee Melchionni, an attorney with close to a decade of experience, primarily in Mass Torts, and Sylvia Benito, a CFA charter holder with over 20 years of experience and $1 billion AUA.

- The Firm has access to a multitude of law firms that have leadership positions in multiple ongoing mass tort litigations, with the ability to direct capital to those firms.

- The Firm's ability to co-counsel with the top mass tort litigation firms in leadership positions, increases the chances of successful outcomes, through access to information and standing of our co-counsel partners in positions of power.

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 144 of 978

**JUSTICE PARTNERS**

# Features and Benefits

» Access to direct investments in Mass Tort Litigations → Zero correlated asset class with high potential returns

» Agreements with steering committee attorneys → Visibility into case data for increased precision of investment decisions

» LLC structure, not a fund → Allows for option to defer taxation upon settlement, after consulting your tax specialist

» Cutting edge case acquisition → Ability to acquire up to 4x the number of claimants versus a traditional Mass Tort firm

» Seasoned team → Long term attorney relationships to provide opportunities to garner favorable results.

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 145 of 978

# Realistic Opportunities Through Due Diligence and Case Selection

» Focus will be on litigations that have been ongoing for 12 to 24 months, allowing Justice Partners to better gauge the probability of success

» The Firm will seek cases that have already generated a recognized liability, often through bell weather case hearings, where a court rules on the claims of a small subset of claimants with the strongest cases

» Our attorneys will analyze case documents and outside research to evaluate the strength of a claim, evaluating evidence of harm, number of likely claimants, and our probability of success

» We will also perform financial analysis to determine likely settlement amounts, focusing on claims with the highest potential for monetary success

» We intend to focus on 3-5 high potential cases at a time. This allows us to devote the diligence necessary for success to each individual claim, without making the Firm reliant on the success or failure of one single litigation

» Investors can make additional direct co-investments, up to their original investment in Justice Partners, where additional capacity exists, for specific individual litigations

Confidential – Subject to Confidentiality Order

JUSTICE PARTNERS

# Mass Tort Actions Are a Powerful Tool for Social Justice and an Extraordinary Investment Opportunity

| Tax Deferral | Positive Social Impact | Non-Correlation | Outsized Returns |
|---|---|---|---|
| Investors should check with their tax advisor to explore whether distributions to the investor may be deferred using a Qualified Settlement Fund, authorized by Section 468B of the Internal Revenue Code and Treasury Regulations | Justice Partners managers plan to dedicate a percentage of profits (per successful tort, after return of principal) to justice reform | Mass tort settlements have near zero correlation with returns on the stock and bond markets | We cannot guarantee any return, but if our model is successful, the aim for expected return multiples range from 2x-6x[1] of invested capital, with settlements occurring in 3 to 5 years |

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 147 of 978

**JUSTICE PARTNERS**

THE OPPORTUNITY

# What is a Mass Tort?

» A mass tort is a suit in which many plaintiffs seek compensation for injuries caused by a single action of a defendant(s). One bad drug or faulty medical device can affect hundreds, even hundreds of thousands of claimants, all entitled to compensation if a claim is successfully tried or settled

» Over $300 billion in settlements have been awarded, including these well known, historically large claims

| Litigation Timeline | | Largest Mass Tort Settlements |
|---|---|---|
| 2 Years | Roundup | 10,000,000,000 |
| 2 Years | BP Oil spill | 7,800,000,000 |
| 3 Years | Fen-Fen | 3,750,000,000 |
| 3 Years | DePuy ASR | 2,500,000,000 |
| 4 Years | Actos | 2,400,000,000 |
| 3 Years | Stryker Hip | 2,100,000,000 |
| 5 Years | Xarelto | 750,000,000 |
| 4 Years | Testosterone Therapy | 600,000,000 |
| 3 Years | Dupont C8 | 350,000,000 |
| 3 Years | Benicar | 300,000,000 |
| 3 Years | Granuflu | 250,000,000 |

Confidential – Subject to Confidentiality Order

7

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 148 of 978

THE OPPORTUNITY

# What is a Mass Tort?

» Most claimants are low- to middle-income individuals who don't have the resources to pursue claims

» Without law firms financing client acquisition and legal services, these individuals would be unlikely to receive compensation for the damage done, frequently, years before

There's a business opportunity in facilitating these suits

The upfront investment in client recruiting, research, litigation costs and operation expenses can provide the Firm with the ability to benefit from operational efficiencies, increased client acquisition, thus potential increased client returns.

8

Confidential – Subject to Confidentiality Order

# Financing the Legal Process

Law firms—and their equity partner investors—are compensated for mass torts through contingency fees only after a successful settlement.

As a result, they must finance all the activities leading up to that settlement.

As an investor in Justice Partners, you will provide the Firm with the capital to finance essential elements of the mass tort process, including:

» Acquisition of clients: The more clients that are uncovered and participate, the higher the eventual settlement. The capital raised by Justice Partners is allocated to client acquisition, working capital, Firm operational expenses, and other litigation costs. We anticipate spending more than other firms on client acquisition

- Most law firms only spend about 25% on this expense
- We believe Justice Partners will be able to acquire, on average, **4x more new cases** than a traditional mass tort law firm

» Research and third-party experts: We pay upfront for the information and expert witness testimony that can prove our case

» Legal services: We anticipate entering co-counsel arrangements for legal services with mass tort firms

Confidential – Subject to Confidentiality Order

9

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 150 of 978

# Distribution and Tax Implications

**DISTRIBUTIONS**

» Justice Partners will give its Preferred Equity Investors the ability to receive distributions upon settlement of a case, net of any Firm and Fund expenses

**TAX DEFERRAL**

» Investors should check with their tax advisor to explore whether distributions to the Investors may be deferred using a Qualified Settlement Fund, authorized by Section 468B of the Internal Revenue Code and Treasury Regulations. While deferred, the funds can be managed by their financial advisor, borrowed against, or invested in any legitimate business

» A tax opinion and IRS Private Letter Ruling can be provided upon request

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 152 of 978

HOW JUSTICE PARTNERS WORKS

# Social Impact

Justice Partners works for positive social change both through its business model and through an active commitment to justice reform

These are the main ways we deliver social impact:

| | | | |
|---|---|---|---|
| Through our focus on client acquisition, we empower individuals to sue large corporations who have caused them injury | We avoid frivolous cases, focusing our energies on instances where individuals have experienced real and significant injuries | We are dedicated to strengthening the justice system and making it fairer for everyone | Justice Partners managers plan to dedicate a percentage of profits (per successful tort, after return of principal) to justice reform |

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 153 of 978

## JUSTICE PARTNERS

MASS TORT JUSTICE IN ACTION: CASE STUDIES ON RECENT LEGISLATION

# Actos Diabetes Medicine Causes Bladder Cancer

## THE INJURY

» In 2011, the FDA issued a warning informing the public that use of Actos, a type 2 diabetes drug, may be associated with an increased risk of bladder cancer

» Individuals started filing claims in state and federal court, alleging that Actos was defectively designed and defendants, Takeda and Eli Lilly, failed to warn patients about the risk of bladder cancer associated with the use of the medication

## RESOLUTION

» The first federal trial resulted in a plaintiffs' verdict of $1.48 million in compensatory damages and $9 billion in punitive damages in 2014

» Nine cases went to trial before an Actos Resolution Program was established in April of 2015 to resolve all Actos bladder cancer claims, estimated to be approximately 9,000, pursuant to the Master Settlement Agreement ("MSA") for $2.4 billion, averaging $250,000/claim

» The Court awarded 8.6% of the gross award for common benefit fees to Lead Counsel

13

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 154 of 978

**JUSTICE PARTNERS**

MASS TORT JUSTICE IN ACTION: CASE STUDIES ON RECENT LEGISLATION

# Actos Diabetes Medicine Causes Bladder Cancer

**INVESTMENT RETURNS**

| | | | |
|---|---|---|---|
| Amount Invested | $5,000,000 | Total Claimants | 1,250 |
| Cost/Claimant | $4,000 | Viable Claimants | 1,000 |
| Viable Claimants | 80% | Gross Settlement to Victims | $200,000,000 |
| Average Settlement | $200,000 | Attorneys' Fees | $80,000,000 |
| Attorney Fees | 40% | Common Benefit Fees | $17,200,000 |
| Common Benefit | 8.6% | Attorneys' Fees for Distribution | $62,800,000 |
| | | **Net Distribution to LP's** | **$25,120,000** |

*Case study assumes that $5 million was used to acquire 1.250 Actos cases, at $4,000/case, with 1,000 of those claimants being viable[1]*

Confidential – Subject to Confidentiality Order

14

![Justice Partners logo]

# DePuy ASR's Hip Replacement Devices Failed in 40% of Cases

## THE INJURY

» In 2010, DuPuy, a subsidiary of Johnson & Johnson, voluntarily recalled over 90,000 of its metal-on-metal ASR hip implants because one out of every eight devices failed within the first 5 years, later estimated to be 40% of all implants, as a result of component loosening, component malalignment, dislocation, and/or fractures. Consequently, a substantial number of patients required complicated, expensive, and painful revision surgery with a prolonged recovery time

» Individuals filed claims in state and federal court alleging that the metal-on-metal ASR hip implant was defectively designed and/or manufactured, and that DuPuy failed to provide adequate warnings concerning the medical devices

## RESOLUTION

» In 2013, Johnson & Johnson announced a settlement for $2.475 billion for all claimants who were required to undergo revision surgery to replace their ASR XL Acetabular Hip System or ASR Hip Resurfacing System before August 31, 2013. A second settlement was reached for $490 million in 2015, which resolved revisionary surgery claims between August 31, 2013 and January 31, 2015

» In 2017, the parties modified and amended certain provisions of the 2015 settlement to compensate those who had surgery to replace their device through February 2015, 2017

» Under the settlements, all eligible claimants received maximum awards of $250,000, subject to reduction for things such as smoking, prior hip replacement surgery, or a body mass index

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 156 of 978

# DePuy ASR's Hip Replacement Devices Failed in 40% of Cases

## INVESTMENT RETURNS

| | | | |
|---|---|---|---|
| Amount Invested | $10,000,000 | Total Claimants | 3,333 |
| Cost/Claimant | $3,000 | Viable Claimants | 2,000 |
| Viable Claimants | 60% | Gross Settlement to Victims | $450,000,000 |
| Average Settlement | $225,000 | Attorneys' Fees | $180,000,000 |
| Attorney Fees | 40% | Common Benefit Fees | $27,000,000 |
| Common Benefit | 6% | Attorneys' Fees for Distribution | $153,000,000 |
| | | **Net Distribution to LP's** | **$61,200,000** |

*Case study assumes that $10 million was used to acquire 3,333 DePuy cases, at $3,000/case, with 2,000 of those claimants being viable[1]*

Confidential – Subject to Confidentiality Order

16

JUSTICE PARTNERS

MASS TORT JUSTICE IN ACTION: CASE STUDIES ON RECENT LEGISLATION

# Zantac: A Popular Heartburn Medicine Causes Cancer

## THE INJURY

» Zantac, a popular heartburn medicine, was found to contain a carcinogenic contaminant known as N-nitroso dimethylamine (NDMA). NDMA is also a potent hepatotoxin that causes liver damage even after short-term exposure and can increase the risk of liver, kidney, and lung tumors. Despite scientific research that demonstrated a clear link between ranitidine, the active ingredient in Zantac, and NDMA, drug makers chose not to disclose this risk to the government or consumers

## RESOLUTION

» The Zantac mass tort has yet to be resolved



Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 158 of 978

**JUSTICE PARTNERS**

MASS TORT JUSTICE IN ACTION: CASE STUDIES ON RECENT LEGISLATION

# Zantac: A Popular Heartburn Medicine Causes Cancer

**POTENTIAL INVESTMENT RETURNS[1]**

| Marketing Analysis | Case Analysis |
| --- | --- |
| » Cost per Qualified Lead (QL): $600 | » Average Gross Case Value: $200,000 |
| » Average 40% Conversion | » Average Attorney Fee: 33% – We will subtract 7% for common benefit fees and other miscellaneous fees |
| » Average Packet Cost (600/.4) = $1,500.00 | |
| » $150.00 Per Client Work Up Cost | » $66,666.67 Attorney Fees per case |
| » $1,650.00 Average Cost of a Client | » Settlement Date: Conservative timeline of 4 yrs |

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 159 of 978

# Four Ways to Incorporate Justice Partners Into Wealth Management

**1 IMPACT INVESTING**

Justice Partners generates positive social impact through its main activities—enabling low-income claimants to receive compensation for injury and discouraging corporate malfeasance.

**2 DIVERSIFICATION**

The Justice Partner's performance is uncorrelated with any other investment. Investors receive returns when a claim is settled. As a result, an investment in Justice Partners can provide significant diversification benefits

**3 TAX PLANNING**

The Justice Partner's unique structure enables investors to defer gains indefinitely, enabling them to carefully plan when and how they will report income. Gains can be deferred, for instance, until the investor has lower income in retirement or until after the calendar year in which a significant liquidity event occurs

**4 ESTATE PLANNING**

Investors should check with their tax advisor, but the Investor may explore avenues to defer gains to a subsequent generation, for example through an irrevocable trust established before any distributions are made.

Confidential – Subject to Confidentiality Order

# Sylvia Benito, CFA

### Chief Executive Officer at Justice Partners

Sylvia Benito is portfolio manager with 20 years of experience in managing family office investments. She began her career as an entrepreneur, co-founding a start up in South America, The Oasis Institute, which she successfully exited before becoming a professional investor. She has worked in various capacities in wealth management, from hedge fund analyst to investment strategist for ultra-high-net-worth individuals, managing over $1B in assets.

Sylvia worked with Lee at Integrated Financial, developing and bringing to market an attorney deferred compensation program, a role in which she gained expertise and understanding of the mass tort world. With Justice Partners, she ties together her financial investment expertise to a deep belief that mass tort cases enhance corporate governance and ultimately, serve our country's economy.

Sylvia holds her CFA charter and is trained in family governance and systems.

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 160 of 978

# Lee Melchionni, Esq.

### Chief Operating Officer at Justice Partners

Lee Melchionni is the COO at Justice Partners. Lee has worked closely for several years with attorneys and their clients, to develop customized financial solutions focused on financial security. Lee has provided solutions that allow attorneys to receive tax-deferred periodic payments over any period of their choosing. Lee is an expert in settlement annuities, market-based structured settlements, qualified settlements funds, financial planning and trust solutions. Lee has especially strong ties to the mass tort community, with excellent relationships with client acquisition specialists and trial lawyers tied into leadership roles with ongoing mass tort litigations.

Lee was a four-year letterman with Duke University's Men's Basketball Team from 2003-2006, a tenure that included four ACC Basketball Championships, and a Final Four appearance. Selected as a Senior Captain by his peers and Coach Mike Krzyzewski, Lee has long understood that hard work and collaboration are critical to success. Prior to forming Justice Partners, Lee was a Private Client Advisor at U.S. Trust, where he worked closely with high-net-worth individuals and families, to help them grow, preserve, and transfer wealth effectively. Previously, Lee was a Certified NBA and NFL Player Agent at Wasserman, where he represented clients in contract and endorsement negotiations. Lee also played professional basketball in Novara, Italy.

Lee earned his B.A. from Duke University and his J.D. from Loyola Law School in Los Angeles. He is a member of the Bar of the Commonwealth of Pennsylvania, as well as the District of Columbia.

Originally from Lancaster, PA, Lee continues to be active in the in the Duke University Alumni Community, as well as Big Brother Big Sister of America.

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 161 of 978

## Key Advisors and Resources

» Legal: Greenberg Traurig, LLP PA

» Ethics: Jack Marshall, ProEthics, LTD.

» Fund Administration: Industry Fintech

» CPA/Audit: EisnerAmper

Confidential – Subject to Confidentiality Order

22

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 162 of 978

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 163 of 978

# Essential Information About Justice Partners

**TERMS**

| | |
|---|---|
| Target Fund Size | $30MM |
| Fund Length | 3-5 years with option to extend to 6 |
| Investment Period | 6-12 months |
| Minimum Investment | $500,000 |
| Expected Return | 2x-6x in 3-5 years |
| Preferred Return | 15% preferred return |
| Management Fee | 0% |
| Incentive Fee | 15% (once 300% of capital contribution is returned, 20% catch up) |
| Exit Strategy | Return Funds disbursed upon settlement of each case |

Confidential – Subject to Confidentiality Order

## Contact Us for More Information

**Sylvia Benito, CEO**

Sylvia@capital4justice.com

C+502.298.4792

**Lee Melchionni, COO**

lee@capital4justice.com

C+717.380.7709

Confidential – Subject to Confidentiality Order

# JUSTICE PARTNERS

# Justice Partners ESG Policy

Our purpose is to change the lives of others, one case at a time. Each litigation is carefully chosen, as we identify as many factors as possible to circumvent cases that do not emphasize our promise and intention. At our core, we believe it is a necessity and an opportunity for our stakeholders, the justice system, individuals we service, our fund's performance, and our overall global footprint, to ensure ESG is an integral part of our investment process. However, we are also aware that many ESG policies are merely words, and not ultimately meaningful. As a group, we seek to fulfill the spirit of this policy by challenging ourselves to choose what is in the highest benefit of both our shareholders and our stakeholders. Our ESG Policy is regularly referenced and evolves as updates occur so that it fulfills our own philosophy, as well as current industry demands and best practices and regulations.

**Our Leading Principles**

» At Justice Partners, we evaluate our decision-making through a precise economic, societal, and environmental lens to ensure that meaningful and favorable litigations ensue. We understand and foresee the importance of helping corporations become more responsible to their customers, community, operations, and the living environment.

» We interpret the scope of ESG to include the principles in the United-Nations supported Principles for Responsible Investment (PRI) report, with a direct emphasis on Principles 1 and 2:

1.  We will incorporate ESG issues into investment analysis and decision-making processes.
    A. The work of all Justice Partners employees will be consistent with the highest standards of professional conduct
    B. Justice Partners will consider applicable ESG issues in all cases
    C. Appointing an advisor who has ESG expertise
    D. Full disclosure of ESG factors in our investor reports
    E. Providing commentary on ESG factors in each case
    F. Working constructively with our investors who express an interest in ESG matters through direct engagement
    G. Hiring of appropriate PR to disclose and amplify the impact of our cases to the media
2.  We will be active owners and incorporate ESG issues into our ownership policies and practices
    A. Hiring practices must reflect the creation of a diverse and inclusive team
    B. Team members are encouraged to actively learn about the ESG metrics that each case addresses

**Our Priorities**

» It is our priority to consciously pursue new litigation opportunities by considering multiple key themes: attentive management and monitoring; risk management beliefs and parameters; inclusive and sustainable economic conditions; reduction of inequality; lowering levels of poverty; development of strong communities; formation of high quality job positions and other professional and/or self-improvement endeavors; cybersecurity and data privacy procedures; smart institutional energy management; and healthy environmental practices.

» We incorporate these themes into our case selections, investments, and due process, because we believe they carry weight toward judicial successes.

**Accountability**

» Justice Partners is committed to actively supporting the issue of justice reform, in partnership with the Innocence Project. Upon successful settlement of each litigation, the managers will donate a portion of their profits into the Justice Partners Foundation to support ongoing justice reform initiatives. We believe that our fund's performance is intrinsically tied to choosing cases that have tangible and meaningful impact—avoiding frivolous or nuisance cases, and staying in alignment with our moral compass. We will seek, where possible, to engage defendants to make meaningful changes on ESG metrics that have impact according to the nature of the case.

**Our Promise to Investors**

» We commit to an engagement focused on the health of stakeholder interests, advancing market and media impact potentials, and the continuation of education and exploration of sustainable litigation practice.

## Confidential – Subject to Confidentiality Order

25

**JUSTICE PARTNERS**

# Additional Disclaimers

1. Targeted or projected IRR or similar projections or yields of any kind (whether gross or net) is provided as an indicator as to how the Manager intends to manage the Partnership and are not intended to be viewed as indicators of likely performance returns to investors. There can be no assurance that any such targeted IRR set forth herein will be attained, and actual results may be significantly different from the targeted IRR. General economic factors, political changes, legal and regulatory requirements, changes in the markets or real estate risks, competition, and consumer preferences, all of which are not predictable, can have a material effect on the reliability of targeted IRR. Furthermore, for future actual results to be consistent with any targeted IRR (and regardless there can be no guarantee), several factors and assumptions must prove correct.

The projected returns contained herein are based on data obtained third parties or developed by the Manager. See the legends and disclaimers at the beginning this Presentation regarding any data, projections, forward looking statements or other information or views discussed in this Presentation, including in this section. Limited Partners should make their own evaluation of likely future results. The Manager strongly recommends you consider the inherent limitations of projected performance.

All figures are only projections. There can be no guarantee of similar results or distributions at the same rate. Future performance may materially differ from the information presented.

Confidential – Subject to Confidentiality Order

# Exhibit 5

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2022-022470-CA-01

ALLAN TEH,
an individual,

    Plaintiff,

vs.

JUSTICE PARTNERS, LLC,
a limited liability company,

    Defendants.

_____/

**ORIGINAL**

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF LEE MELCHIONNI

TAKEN ON BEHALF OF THE PLAINTIFF

AUGUST 22, 2023
11:31 A.M. TO 1:11 P.M.

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23

REPORTED BY:
BRIEL MADDALENA, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



APPEARANCES OF COUNSEL

ON BEHALF OF THE PLAINTIFF:

       MATTHEW JONES, ESQUIRE
       JONES & ADAMS, P.A.
       999 PONCE DE LEON BOULEVARD, SUITE 925
       CORAL GABLES, FLORIDA 33134
       305-270-8858
       MATTHEW@JONES-ADAMS.COM
       (REMOTELY VIA ZOOM)

       CHEYENNE MOGHADAM, ESQUIRE
       JONES & ADAMS, P.A.
       999 PONCE DE LEON BOULEVARD, SUITE 925
       CORAL GABLES, FLORIDA 33134
       305-270-8858
       C.MOGHADAM@JONES-ADAMS.COM
       (REMOTELY VIA ZOOM)

ON BEHALF OF THE DEFENDANT:

       KENNETH BRESSLER, ESQUIRE
       BLANK ROME
       1271 AVENUE OF THE AMERICAS
       NEW YORK, NEW YORK 10020
       212-885-5203
       KEN.BRESSLER@BLANKROME.COM
       (REMOTELY VIA ZOOM)

ALSO PRESENT:

SYLVIA BENITO
       (REMOTELY VIA ZOOM)


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

```
                    INDEX OF EXAMINATION

WITNESS:  LEE MELCHIONNI
                                                  PAGE
DIRECT EXAMINATION
     BY MATTHEW JONES, ESQUIRE                       5
```



INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Plaintiff's | | |
| EXHIBIT 1 | NOTICE OF TAKING DEPOSITION | 7 |
| EXHIBIT 2 | NOVEMBER 5, 2022 LETTER | 14 |
| EXHIBIT 3 | NOVEMBER 16, 2022 LETTER | 21 |
| EXHIBIT 4 | FEBRUARY 16 LETTER | 31 |
| EXHIBIT 5 | JUSTICE PARTNERS LLC OPERATING AGREEMENT | 34 |
| EXHIBIT 6 | PROMISSORY NOTE | 38 |
| EXHIBIT 7 | INVOICES | 45 |
| EXHIBIT 8 | JUSTICE PARTNERS, LLC FINANCIAL STATEMENT | 53 |
| EXHIBIT 9 | JUSTICE PARTNERS, LLC FINANCIAL STATEMENTS | 56 |


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

VIDEOTAPED DEPOSITION OF LEE MELCHIONNI

AUGUST 22, 2023

THE COURT REPORTER:  We are now on the record. Today's date is August 22nd, 2023.  The time is approximately 11:31 a.m.

We are here in the matter of Case Number 2022-022470-CA -01.

Pursuant to Florida Supreme Court Order AOSC20-23, all parties are appearing remotely.

The Court Reporter is Briel Maddalena with Universal Court Reporting.  Would Counsels please introduce themselves for the record?

MR. JONES:  Matthew Jones and Cheyenne Moghandam on behalf of the Plaintiff.

MR. BRESSLER:  Ken Bressler for Defendant.

MR. JONES:  And I believe we have Ms. Benito is also present in the depo, right, Ken?

MR. BRESSLER:  Yes, Ms. Benito is present.

THE COURT REPORTER:  Okay.

Thereupon:

LEE MELCHIONNI,

Was called as a witness, and after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. JONES:



Q    Please state your full legal name.

A    Lee Matthew Melchionni.

Q    And where are you currently located?

A    Atlanta, Georgia.

Q    Is that your place of residence or is that where you live?

A    Correct.

Q    Okay.  And what's your current address?

MR. BRESSLER:  Please give your business address.  If there's any issue, Mr. Jones with serving, we will deal with that with you.

A    I don't recall our business address off the top of my head.

BY MR. JONES:

Q    We just want to know if you have an address where you can be located.

MR. BRESSLER:  We will accept service for Mr. Melchionni.

MR. JONES:  So, to be clear, are you instructing the witness not to tell us where he is located?

MR. BRESSLER:  Well, I'm telling him not to give you his personal residence.

BY MR. JONES:

Q    Very good.  What's -- actually, let's back up,

we're going to mark as Exhibit Number 1, Notice of Taking Videotaped Deposition Duces Tecum.

     (Thereupon, Plaintiff's Exhibit 1 was entered into the record.)

BY MR. JONES:

  Q   We have a couple of options on this.  We'll start off with just putting it on share screen and Cheyenne can share the folder.

     But Ken and Lee, you let us know if it's an inconvenient method in terms of the documents that you want to review and look at.

     MR. BRESSLER:    I don't see any option to you,    if you have other ones, let us know and we can --

     MR. JONES:    Well, let's go off the record just briefly just so we can talk about logistics.

     (Thereupon, a short discussion was held off record.)

     (Deposition resumed.)

BY MR. JONES:

  Q   So, Mr. Melchionni, on share screen and marked as Exhibit Number 1 is the Notice of Taking Videotaped Deposition Duces Tecum.  You see that?

  A   I do.

  Q   And you're here today pursuant to that Notice?

A    I am.

Q    Thank you.  Did you bring any documents with you today to the deposition?

A    No.

Q    Okay.  And why is that?

A    That's advice of Counsel.  As you know, we objected to the request for documents to be produced.

Q    Okay.  Other than advice of Counsel, certainly don't want to know what you communicated with Mr. Bressler.  Other than that, is there any other reason you didn't bring any documents?

A    No.

Q    Okay.  Do you currently hold a specific position or title at Justice Partners LLC?

A    I do.

Q    And what is that position or title?

A    Chief Operating Officer.

Q    Chief Operating Officer, correct?

A    Correct.

Q    Any other titles or positions?

A    No.

Q    Are you able to give us a brief job description of what Chief Operating Officer means in the context of Justice Partners LLC?

A    My role was to develop relationships with co-

counsels, identify litigations that Justice Partners would participate in.

Q    Right.

MR. BRESSLER:  Cheyenne, if you're done with this Exhibit, can you take it down?

MR. JONES:  Absolutely.

BY MR. JONES:

Q    You used the past tense was or are you still in that role at Justice Partners?

A    I am.

Q    Okay.  Do you have a contract of employment or for services as COO for Justice Partners LLC?

A    I don't believe so, no.

Q    Okay.  Do you also have a position or title at Justice Partners Law Group?

MR. BRESSLER:  Objection, don't answer.  It's irrelevant.  Your notice request -- this deposition is concerning what documents exist between or at the Defendant here pursuant to your request for books and records.  Any other entity is irrelevant here.

MR. JONES:  So, you're instructing the witness not to answer?

MR. BRESSLER:  Correct.

MR. JONES:  Very good.



BY MR. JONES:

Q    Prior to the deposition today, did you have a chance to -- and I don't want to know what you communicated with your lawyer, I don't want to know any attorney-client privilege communication.

So, other than that, and prior to your deposition today, did you have a chance to review documents ahead of this deposition and in preparation for this deposition?

A    I did.

Q    Okay.  So, let's just take it generally logistically with regard to that preparation in your review of those documents.  Were you viewing those documents on a particular device?

A    A computer.

Q    Right, was it a laptop?

A    Yes.

Q    Okay.  Where is that laptop located?

A    In my home.

Q    Okay.  And what is this laptop in your home that you reviewed these documents on?  I take it that it's within your possession, custody and control as of today's date, correct?

A    Correct.

Q    Okay.  Is this the device that you are



currently logged onto for purposes of this deposition?

A    Correct.

Q    Okay.  Now, the documents that you reviewed on this laptop, are they locally on this laptop or were you viewing them through some sort of cloud service or something similar to that?

A    Something similar to that.

Q    Okay.  So, what is the cloud service that you utilize to view these documents that you just mentioned on your laptop?

A    I believe they were shared with me via e-mail attachment.

Q    Okay.  So, somebody provided those documents for your review that you saw on your laptop via e-mail. Is that your testimony?

A    Correct.

Q    Who sent you those documents to review?

A    Industry FinTech and our Counsel.

Q    Okay.  So, I definitely do not want to know what you discussed or communicated with your Attorney. Other than that, just by way of example, your comments regarding Industry FinTech, who specifically sent those documents to you from FinTech?

A    Arthur Weissman.

Q    Okay.  Anybody else?



A     We do interact with, I can't remember Sandy's last name, but other employees of Industry FinTech.

Q     Okay.  And again, not with regard to documents your lawyer sent you but with regard to the other non-privileged documents, describe as best you can, the nature of these documents.  Was it agreements, e-mails, was it all kinds of different things?

MR. BRESSLER:  For clarifying, I want to make sure that it's understood because you're asking the witness for documents sent to him specifically to prepare for his deposition by Industry FinTech.

MR. JONES:  So far, yes, that's the pending question.

A     I believe it was documents that you requested, Mr. Jones.

BY MR. JONES:

Q     Yes, but since I only get to ask you now the nature of the documents you've looked at to prepare for this deposition, that's why I'm asking that.  We're familiar with the documents we requested.

I just want to know what was sent to you by Industry FinTech.  So, what did they send you via e-mail?

A     Documents.

Q     I'm sorry, it cut off, did you just say --

A    Documents --

Q    Okay.

A    I'm not sure what you're getting at here.

Q    Right.  And that included -- just by way of example, that would've been included and we'll cover it shortly, but would that have included the executed promissory note between LLC and Law Group?

A    You're asking me if they sent an executed promissory note to me.

Q    Yes, I was just giving you that as an example, I'm trying to find out the nature of the documents that you reviewed ahead of this deposition.  And I'm asking you just by way of example, did you get the executed document between Justice Partners LLC and Justice Partners Law Group?

A    I don't believe I got that particular document.

Q    Okay.  So, I'll just keep asking until I figure out what it is.  Did Mr. Weissman or this e-mail from Industry FinTech include prior e-mail communications?

A    No, I don't believe so.

Q    Okay.  Did this e-mail attaching documents or documents that were sent to you by Industry FinTech, did it include things like balance sheets or PNLs, things



like that?

A    Yes.

Q    Okay.  Did it include bank statements?

A    I believe so.

Q    Okay.  The documents that Mr. Weissman sent from Industry FinTech, did it include things like general ledgers?

A    I believe so.

Q    Okay.  We're going to cover that shortly.  So, the next Exhibit we're going to mark is Exhibit 2.

        (Thereupon, Plaintiff's Exhibit 2 was entered into the record.)

BY MR. JONES:

Q    We can share screen it and certainly, Mr. Bressler will you let us know if it becomes distracting, we'll take it down but we're going to ask a few questions about this.

        This is a November 5th, 2022 letter from my firm to Justice Partners LLC.  Do you recall receiving this letter at any point in time?

A    I do.

Q    Okay.  Can we agree that you received this letter on or shortly after November 5th, 2022?

A    Yes.

Q    Okay.  When you got this letter, and again I

don't want to know what you communicated with your attorneys but when you got this letter, did there come a point in time when you started assembling documents responsive to this letter?

A    Yes.

Q    Okay.  And we're not going to go through every single one of them because obviously we'd like to finish this deposition today, but let's just go through what we can.

I take it that when you got this request for documents on November 5th, you found the time to look for the various income tax returns and reports associated with those returns, right?

A    Correct.

Q    Okay.  Let's look at Number 2, when you got this request, did you attempt to locate the financial statements of the company including profit and loss statements, balance sheets and cash flow statements?

A    Correct.

Q    Okay.  So, you were involved in looking for those documents, correct?

A    We have a fund administrator, Industry FinTech who has all of those documents.

Q    Okay.

A    So, depends on how you want to define

involved.

Q    Well, you're the Chief Operating Officer, so are you able to tell us what role the Chief Operating Officer has with regard to looking for documents when they get a request like this?

MR. BRESSLER:  Objection. Form.

BY MR. JONES:

Q    You agree that you were involved in looking for these documents, correct?

A    Correct.

Q    Okay.  So, you said that there's a fund administrator involved Industry FinTech?

A    Correct.

Q    Okay.  Is Justice Partners LLC to your knowledge as the CEO, a fund?

MR. BRESSLER:  Objection --

A    I'm not the CEO.

BY MR. JONES:

Q    I said COO, in your knowledge as a COO is it your testimony that Justice Partners LLC is a fund?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    You can go ahead and answer.

A    I don't know the legal definition of fund, no.

Q    Okay.  Without regard to the legal definition

of fund, with regard to your role as the CEO, do you know what a fund is?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    You can go ahead and answer.

A    I don't understand the question.

Q    Well, you used the term fund administrator, how about I ask it this way?  When you said the word fund administrator, do you know what the word fund means when you provided that testimony?

A    Vehicle where you pick investor capital and use those funds to invest in various investments.

Q    Okay.  Is it your testimony and again, not a legal definition, but is it your testimony as the COO that Justice Partners LLC is a fund as you just described?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    Go ahead and answer.

A    I believe so.

Q    Okay.  Number 3, copies of all documents evidencing, distributions and disbursements.  So, I take it that you were involved with regard to looking for those documents?

A    Correct.

Q    So, with regard to trying to determine whether there was a distribution or disbursement and again in the context of you being the COO of this company, where would you look for those documents if you were trying to locate them?

A    Bank statements and general ledger.

Q    Okay.  Anything else?

A    Not to my knowledge.  Industry FinTech may have a different answer.

Q    Okay.  Would Industry FinTech be in a position to better answer that question?  Is that your testimony?

A    I don't think so, I think you would see them in the bank statements and general ledger.

Q    I'm sorry, did you say you think so?

A    I don't think so.  I believe you would see them in the bank statements and general ledger.

Q    Okay.  So, to make that point, who is the person at Justice Partners LLC that looked at the documents, general ledger, bank statements to find out if there were any distributions or disbursements when they received this November 5th letter?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    You can go ahead and answer.

A    We reviewed it, Sylvia Benito and myself,



reviewed with our Counsel.

Q    Okay.  Well, I certainly don't want to know about communications with your Counsel, but you and Sylvia Benito reviewed what, with regard to figuring out what were the disbursements, if any, and what were the distributions, if any, of Justice Partners LLC?

A    Bank statements and general ledger.

Q    Okay.  And that's all you reviewed with respect to Number 3, correct?

A    I believe so.

Q    Okay.  And did there come a point in time following the receipt of this November 5th letter where you in particular Number 3 and we can agree that -- actually, strike that, we'll get to that as a separate exhibit.

Let's go to Number 4, which states all documents related in Mr. Teh's equity interest in the company.  And this request includes but is not limited to marketing, subscription, operational, accounting and audit records of the company.  Were you involved in looking for those records?

A    Correct.

Q    Was Ms. Benito involved in looking for those records?

A    I don't recall.

Q    Okay.  You said a moment ago with regard to Number 3 that Ms. Benito was involved but with regard to Number 4, you do not recall?

A    I don't -- she may have been.

Q    Okay.  So, if you recall, could you tell us what you -- where you specifically looked with regard to the marketing records involving Mr. Teh's equity interest in the company?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    You can answer.

A    Marketing records, the Justice Partners materials provided to Mr. Teh and his employees.

Q    Right.  And I asked you where you were looking for those records.  Like, were you looking on a server, were you looking on a laptop?  Was it in a file room, a cabinet?

Where did you go to determine if there were any marketing records relating to Mr. Teh's equity interest in the company?

A    I believe there is a -- Industry FinTech maintains a deal room.

Q    And when you say deal room, you mean electronically I take it?

A    Correct.


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                    Page 21

Q    All right.  And so, there came a point in time after you got this November 5th letter where you somehow accessed this Industry FinTech deal room and you were looking for these marketing records?

A    Correct.

Q    Okay.  Did you locate any?

A    I believe what was provided.

Q    Okay.  So, let's put a pin in that and let's go to Exhibit Number 3 Which will be the November 16th, 2022 letter from Mr. Bressler's office and we'll share screen that and let's go to Number 4 of that letter.

(Thereupon, Plaintiff's Exhibit 3 was entered into the record.)

MR. JONES:  Cheyenne, you may have to zoom in a little bit for the witness.

BY MR. JONES:

Q    Where in response to our request Number 4, which was all documents relating to Mr. Teh's equity interest in the company, this request includes but is not limited to marketing, subscription, operational accounting and audit records of the company.

The response given to us by Justice Partners for Number 4 was, and I'm quoting "The following documents, evidencing Mr. Teh's interest in Justice Partners: and offering circular of Series A preferred



units to offering Allan Teh dated December 15th, 2020."

Did I read that correctly?

    A    I believe so.

    Q    Okay.  So, is it your testimony that with regard to our request Number 4, the singular document, the offering circular, that's the scope of the documents that you were able to locate?

    A    Correct.

    Q    Okay.  So, other than the offering circular, you did not locate any, just by way of example, operational accounting and audit records of the company?

    MR. BRESSLER:  Objection to form.

    A    I believe Number 4 states what was provided to you.

BY MR. JONES:

    Q    Okay.  So, let's go back to Exhibit Number 2, Item Number 4, where the request was marketing subscription, operational accounting and audit records of the company.

    And your testimony is the offering circular, dated December 15th, 2020, that's all you found or could locate.  That's your testimony?

    MR. BRESSLER:  Objection, form.

BY MR. JONES:

    Q    Go ahead and answer.

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                    Page 23

MR. BRESSLER:  My objection just so you know as to the timing.

A    I believe what was provided to you, we provided to you advice of Counsel, what was requested.

BY MR. JONES:

Q    Okay.  Well, I certainly don't want to know about the communication you had with your Counsel, but what I'm getting at, and it should be fairly obvious, is in November 5th, 2022, we asked for, in addition to other things, operational accounting and audit records of the company.

And your response was this singular document, this offering circular dated December 15th, 2020.  And I want to know if when you got the November 5th letter, did you actually look for operational accounting and audit records of the company?

A    We did.

Q    Okay.  And is it your testimony that you were not able to locate any?

A    No, we can locate them.  We did locate them.

Q    Okay.  Do you know why they weren't provided in response to our request Number 4?

MR. BRESSLER:  Objection, they were provided.

MR. JONES:  Well, I didn't know that you were under oath today, Mr. Bressler and so your offering



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

of testimony is interesting to say the least.

MR. BRESSLER:  And you're misstating in your question trying to trick him.

MR. JONES:  I trust you've read the local rules regarding speaking objections and you'll tailor your objections accordingly.

MR. BRESSLER:  You do what you have to do, Mr. Jones, but I would trust that you would also not try to trick him when you know you've received other documents.

MR. JONES:  Now, the witness knows how you want him to testify, which is how the local rules are configured to take into account exactly what you just tried to do.

MR. BRESSLER:  So, in other words, you're saying you'd like to trick him by telling him that's all that was produced.

MR. JONES:  You have to explain that to the Judge.  That's fine.

MR. BRESSLER:  I'm happy to.

BY MR. JONES:

Q    So, you're going to go ahead and answer my question, right, Mr. Melchionni?

A    What was your question?

Q    Would you like the Court Reporter to read it


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

back?

A    That would be great.

(Thereupon, the question was read back.)

A    I do not.

BY MR. JONES:

Q    Okay.  And I want to be clear because we really will get the chance to talk to the Court about this at some point.

Is it your testimony, Mr. Melchionni, that you provided audit records in response to our November 5th letter?

A    It appears that these documents have been provided to you --

Q    Okay --

A    -- and you're trying to trick me around the date that they were provided to you, Mr. Jones.

Q    Okay.  And you said I was trying to trick you around the date, right?  That's what you just said?

A    Well, these documents have been provided to you.

Q    Okay.  So, I want to be --

A    You continue to ask me around the date.

Q    Right, okay.

A    If you --

Q    I want to make sure that we're clear in the

record.  Is it your testimony, that prior to Mr. Teh suing Justice Partners that Justice Partners and/or you provided operational accounting and audit records to him in response to this request for records?

    A    The documents requested in Number 4 were provided to your client.

    Q    Okay.  So, do you know when they were provided, pre or post filing of the lawsuit?

    A    I don't know.

    Q    Let's go to request Number 5 on Exhibit 2, we asked for the general ledger of the company and I just have a few quick questions in that regard.  Did you personally look for that document with regard to that request?

        MR. BRESSLER:  Objection, form.

    A    Industry FinTech maintains that document.

BY MR. JONES:

    Q    Okay.  But that wasn't my question, so I'll ask my question again.  Did you personally look for that document when you got this request?

    A    Yes.

        MR. BRESSLER:  Object to form.

BY MR. JONES:

    Q    Okay.  And so, yes, you did look for this document.  Where did you look for this document?  In the



same data room that you just described earlier?

A    I believe.

Q    Okay.

A    Industry FinTech was notified of these requests and helped us maintain or obtain the requested document.

Q    Okay.  So, at the point in time you got this request and this is in the context of you being the COO of the company, back in November of 2022, when you got this request, did you reach out to any accountants that Justice Partners LLC utilized at the time?

A    Not at that time.

Q    Okay.  As you sit here -- actually, strike that.  As of November of 2022, do you have any personal knowledge as to whether or not Justice Partners LLC utilized the services of an accounting or CPA firm during that timeframe?

A    Yes.

Q    And what was the name of that accounting or CPA firm?

A    I don't recall.

Q    Okay.  And I want to make sure I understood your answer and I apologize if it's repetitive.  Did you say you did recall or did not recall whether or not you reached out to that accounting firm when you got these



requests back in November?

A    I did not reach out to the accounting firm.

Q    Okay.  Do you know if Ms. Benito reached out to that accounting firm?

A    I do not.

Q    Okay.  Do you know if Industry FinTech or anybody on their behalf reached out to that accounting firm?

A    I do not.

Q    Okay.  With regard to the relationship between Justice Partners LLC and the use of services that are provided by Industry FinTech, are you the point person with regard to that arrangement?

A    Correct.

Q    Okay.  So, you understand that there's a written agreement between Justice Partners LLC and Industry FinTech, correct?

A    Correct.

Q    Do you understand that the scope of the services offered by Industry FinTech, do they include items, bookkeeping items, like the maintenance of general ledgers?

A    Correct.

Q    Okay.  So, as you sit here today, you're testifying that they do provide that service for Justice



Partners LLC, correct?

A    Correct.

Q    Okay.  Number 6 of our request has for all loan documents for loans held by or in the name of the company.

And we see that the response as we've already, if you want us to put it up in front of you to Exhibit 3 that's already marked, is the loan and security agreement between Justice Partners LLC and Justice Partners Law Group.

Is that is due -- to the extent -- nope, strike that.  Can you and I agree that that's the only loan agreement or facility that currently exists between Justice Partners LLC and Justice Partners Law Group?

A    Correct.

Q    Okay.  And we'll get to that in a little bit, I just wanted to make sure there was no other loan agreement that you had any knowledge of.

Now, Number 9 of our requests, you'll see that we ask for all communications regarding the equity entrance to Mr. Teh and the company, but if you bring up Exhibit 3, you'll see that there's no response to Number 9.  Do you have any explanation in that regard?

A    My understanding that Delaware law is that e-mails are not responsive to a books and records claim.



Q    Okay.  And that's your understanding of why there wasn't even an acknowledged response to that number?

A    Correct.

Q    Okay.  And the reason I ask is because if you click between Exhibit 2 and Exhibit 3, there's a misnumbering that occurs because our Number 10 asks for "All contracts entered into by the company" and there is no Number 10 on your response.

So, now we're going to talk about our Number 10, your response Number 9, okay?  Does that make sense?

A    It does.

Q    Okay.  So, as of November 16th, 2022, your response was, to our request, you just wrote, all contracts entered into by Justice Partners, and I'll be clear that's what Mr. Bressler wrote.

I know you didn't write that, but I'm asking you as the COO, what is your understanding as of November 16th, 2022, what contracts had been entered into by Justice Partners?

A    A loan agreement and a promissory note and then an agreement with the Lake Law Firm.

Q    Okay.  So, your sworn testimony is that of -- as of for November --

A    I believe if you're part of our contract with

IFT, which is a back office contract unrelated to business.

Q    Got you.  So, I believe your sworn testimony is that as of November 16th, 2022, Justice Partners had three agreements in place, three contracts in place, one with IFT that you just mentioned, one with Lake Law Firm and then the loan agreement you just mentioned.  Did I get that right?

A    I believe so.

Q    Okay.  All right.  So, let's talk about what we're going to mark as Exhibit 4, this is the February 16th letter from Ms. Young, who was in Mr. Bressler's office.

(Thereupon, Plaintiff's Exhibit 4 was entered into the record.)

BY MR. JONES:

Q    And again, I know you didn't write this letter and so, my questions will center upon the efforts and work done with regard to securing these documents for referenced in the letter, so.

And just a couple of generalities, do you have a recollection as you sit here today regarding the efforts that you made or may have made regarding securing these documents that were produced by Ms. Young that are Bates Numbered 1 through 373?



A    I do.

Q    Okay.  So, again, these are just broader logistical things.  With regard to this tranche of records that were produced in February -- actually, February 16th, 2023, just tell us what efforts you made to track down these documents and locate them.

A    All of these documents are held by Industry FinTech.

Q    Okay.

A    Ms. Young worked with Industry FinTech to obtain these documents.

Q    Okay.  So, that's all I'm getting at this point in time at least, is the documents that are Bates Numbered Justice Partners The 1 through 373, your testimony is that all of these documents came from this data room that Industry FinTech maintained.  Is that correct?

A    Industry FinTech maintained those documents.

Q    Got you.  So, with regard to documents that may have been located in another location other than Fin -- Industry FinTech, did you look in any other locations in that regard?

A    There is no other location.

Q    So, that's what you've anticipated my follow-up question.  Is it your sworn testimony that all of the

documents relating to Justice Partners LLC, meaning all of their corporate documentation, all of that which is required either by law or by contract, that Justice Partners have.

That all of those documents are held by and maintained by Industry FinTech?

A    To my knowledge, yes.

Q    Okay.  Because -- and again, I don't want to beat a dead horse here but I think that you understand the concept that in a corporation, a third party or non-party may hold some documents but also the corporation itself may have a location where documents are located, right?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    Does that make sense?

A    Sure.

Q    Okay.  And all I'm trying to get at is your sworn testimony is you have looked and there is no other location in which Justice Partners has its corporate documentation, accounting documentation and operational documentation, correct?

A    Your statement is correct.

Q    No, okay.  All right.  So, let's bring up the Justice Partners LLC operating agreement and mark it as



the next Exhibit, I think we're on Number 5.

(Thereupon, Plaintiff's Exhibit 5 was entered into the record.)

MR. JONES:  Cheyenne, you can -- Mr. Bressler, I think you already have that but we're certainly happy to e-mail it to you so you can send it to the witness, whatever your pleasure.

MR. BRESSLER:  Put it on the screen -- why don't you e-mail it to me and put it on the screen.

MR. JONES:  Very good.  One moment while I e-mail it to Mr. --

MR. BRESSLER:  You can start your questioning.

MR. JONES:  Okay.  Is that okay?  You'll have to listen to this loud car behind me.  Sorry, about the --

MR. BRESSLER:  Fine with me.  Why don't you start?

BY MR. JONES:

Q    Very good.  So, let's go to Page 27 of the operating agreement and you'll have to blow it up a little bit and we're at Section 10.1, Page 27 of the operating agreement.

And specifically, Mr. Melchionni, we're talking about Section 10.1, lowercase a, books and



records?

A    Okay.

Q    Okay.  And it says -- and I'll make sure that -- I don't want to talk too fast, but it says "The company will maintain true, complete and correct books of account of the company, all in accordance with generally accepted accounting principles applied on a consistent basis and shall keep minutes of the proceedings of or maintained written consents executed by the members and the manager."  So, do you know if that was done?

A    I believe so.

Q    Okay.  And what was your undergraduate degree in?

A    History.

Q    Okay.  Did you get any graduate degree in finance or accounting?

A    No.

Q    Did you ever hold a series seven or other license issued by the SEC or FINRA?

A    I did.

Q    Okay.  So, you have a reasonable familiarity with the concept of generally accepted accounting principles?

A    It has been a while.



Q    All right.  But do you understand what that term generally means?

A    I do.

Q    Okay.  So, let's go to the next sentence.  It says, "The books of account shall contain particulars of all monies, goods or effects, belonging to or owing to or by the company or paid, received, sold or purchased in the course of the business.

And all such other transactions matters and things relating to the business of the company as are usually entered in books of accounts kept by persons engaged in the business of a like kind and character.

In addition, the company shall keep all records required to be kept pursuant to the Act."  Do you know if that was done?

MR. BRESSLER:  Objection, form.  This deposition is about whether there are documents that you asked for that exist and that you don't have.

This is going beyond, I'll allow you to ask it but I will keep it in check.  And if you go too far off of the purpose of this deposition, I will block it.

BY MR. JONES:

Q    You can go ahead and answer the question.


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

A    I believe so.

Q    Okay.  And further to Mr. Bressler's commentary just a moment ago, the last sentence of that paragraph says, "The company will provide an unaudited financial at the end of each fiscal year to its members."  Do you know if that was done?

A    I believe so.

Q    So, you have an understanding that there was an unaudited financial at the end of 2021 that was provided to all the members?

A    I don't recall.  I know we provided an audited financial statement end of 2022.

Q    Right, what about 2021?

A    I don't recall.

Q    Who's responsible for preparing that statement?

A    Industry FinTech, I believe.

Q    Okay.  Do the officers and principals of Justice Partners LLC play any role with regard to preparing and providing those statements?

MR. BRESSLER:  Objection, form.

A    No.

BY MR. JONES:

Q    So, is it your understanding as COO with regard to providing these statements and that we've been

referencing these last two questions, that Industry FinTech is solely responsible for providing those statements?

     A     Yes.

          MR. JONES:   That was Number 5, Cheyenne, I think.

          MR. MOGHANDAM:   Yes.

          MR. JONES:   All right.   So, now we're going to go to Exhibit Number 6 and you can e-mail this to Mr. Bressler.

          (Thereupon, Plaintiff's Exhibit 6 was entered into the record.)

          MR. BRESSLER:   So, far, Mr. Jones, I've not received any Exhibits from Cheyenne.

          MR. MOGHANDAM:   Unfortunately, I can't share screen and e-mail at the same time.   So, if you'd like me to e-mail prior to going into the Exhibits, whatever works best for you guys.

          MR. JONES:   We've been at this for 45 minutes.   You want to take a two or three minute break and e-mail a tranche of things to you, Ken?

          MR. BRESSLER:   Sure.

          MR. JONES:   Okay.   Whatever just --

          MR. BRESSLER:   Just send me all the -- send me all the exhibits, I won't open them and share them

with the client and --

MR. JONES:  You can open them all you want. Yeah, send a big chunk of things to Ken, it's no big deal me.  All right.  So, we're going to take a quick break, you're going to get a tranche of documents that way we can push them out.

(Thereupon, a short discussion was held off record.)

(Deposition resumed.)

BY MR. JONES:

Q    All right.  So, the next Exhibit is the senior secured promissory note and while I'm asking my questions, Cheyenne will continue to e-mail the other items, it should be a tranche of multiple e-mails.

MR. JONES:  And Cheyenne, you just keep working on sending those e-mails to Mr. Bressler.

BY MR. JONES:

Q    And actually before I start talking about the senior secure promissory note, it was -- I forgot to tell you at the beginning of the deposition, Mr. Melchionni, you're not getting e-mails or texts while you're rendering your testimony here, are you?

A    No.

Q    Okay.  Because there's been a couple of recent cases where that's an issue and I hope that's not the

case because that would be improper.  So, I appreciate that.

So, now let's talk about the senior secured promissory note.  You can see that -- is this the one you were talking about earlier where we were talking about the note?

A    Correct.

Q    Okay.  And you can see that it says commitment amount 45 million, original issue date April 14th, 2021, correct?

A    Correct.

Q    Okay.  Now, if you go to the end of the document though, you'll see that's your signature, correct?

A    Correct.

Q    And this is a nine-page document and it says there, date signed June 23rd, 2023, effective date April 14th, 2021.  Did I read that correct?

A    You did.

Q    So, why was this $45 million senior secured promissory note signed more than two years after the effective date?

A    Oversight.

Q    Okay.  Whose oversight?

A    Mine.

Q    Okay.  Is that something you forgot to do or what do you mean by that?

A    It should have been signed at the effective date.  It was not and we remedied the issue.

Q    Okay.  So, who's the lender in this document? Justice Partners LLC, right?

MR. BRESSLER:  Objection, document speaks for itself.

A    The document speaks for itself.

BY MR. JONES:

Q    I'm sure it does, now that Mr. Bressler gave you that speaking objection, who's the lender that you can tell?  You are a COO, so you can just read there and the lender is Justice Partners LLC, right?

A    As you said.

Q    Am I correct?

A    I believe so.

Q    Right --

A    I --

Q    So, Justice Partners LLC is agreeing to loan up to $45 million to Justice Partners Law Group, correct?

A    Correct.

Q    Now, at the time that you signed this document in June of 2023, you were also the COO of Justice



Partners LLC, correct?

A    Correct.

Q    And what's your title at Justice Partners Law Group?

A    I believe Managing Partner.

Q    Okay.  Now, do you have a recollection that at some point in time before this document was produced to us that we received the unexecuted version of that document?

A    I do.

Q    Okay.  Do you know why we were sent the unexecuted version of that document?

A    It had not been executed when it was sent to you.

Q    Okay.  In Paragraph 2 of this document, on the first page it says that the lender Justice Partners, LLC, which you testified earlier, shall maintain an account on its books, which shall evidence the outstanding principle balance of all advances interest due and owing thereon and any fees and expenses due from time to time under this note.  You see that?

A    I do.

Q    Has that been done?

MR. BRESSLER:  Objection, goes beyond the scope.  You can answer.

A    I believe so, by Industry FinTech.

BY MR. JONES:

Q    Okay.  So, your testimony is that with regard to the person or entity that would have knowledge in that regard that would be Industry FinTech?

MR. BRESSLER:  Objection, form.

A    I believe so.

BY MR. JONES:

Q    That's all I'm getting at, sir, is that I just want to know with regard to books and records that relate to outstanding principle balance of advances, interest due and fees and expenses.

Either you're the person I ask that question to or you're going to tell me that Industry FinTech is to whom I have to direct that and I just want to know who's maintaining those books and records.  Is it you or Industry FinTech?

A    I believe Industry FinTech.

Q    Okay.  With respect to the appropriate -- if you look at the next sentence, with respect to the appropriate entries debited to the loan account and the amount of each advance hereunder, is that similarly something that I have to direct my inquiries regarding those books and records to Industry FinTech or do you have knowledge in that regard?



A     Industry FinTech would have a record of that.

Q     Okay.  I get that.  Now, but the follow-up is, do you have a record of it as well or is it only Industry FinTech?

A     Only Industry FinTech.

Q     Okay.  And I trust that that's the balance -- that your testimony is the similar with regard to the balance of that paragraph.

For example, the credits to the loan account repayments of advances and payments of interest, fees and expenses made by the borrower, that would also be directed to Industry FinTech, correct?

A     Correct.

Q     All right.  Now --

MR. JONES:  Cheyenne, did you have a chance to e-mail those to Mr. Bressler?

MR. MOGHANDAM:  I have them.

MR. JONES:  Very good.  Now have they been sent as a group, Cheyenne, as a zipped up group or are they separate?

MR. MOGHANDAM:  A group.

MR. JONES:  They were sent together, but each PDF is separate as --

MR. MOGHANDAM:  Okay.

MR. JONES:  So, just share screen how that



looks because I want to make sure we have efficient

marking of exhibits here.  We can mark them as

Composite Exhibit A.  Ken, is that okay with you?

MR. BRESSLER:  All the rest -- all these

exhibits?  All these are invoices?

MR. JONES:  Yes, they're all -- I think it's a

tranche of nothing but invoices, which is why I

offered to mark them as a Composite of just

invoices.

MR. BRESSLER:  You should do whatever you

think is appropriate.  It also includes the

executed secured promissory note, but you can do

whatever you like.

MR. JONES:  All right.  So, what we're going

to do is we're going to mark, Madam Court Reporter,

the invoices and Cheyenne will clear this up at the

conclusion of the depo, but the invoices will all

be marked as Composite Exhibit Number 7.

(Thereupon, Plaintiff's Composite Exhibit 7

was entered into the record.)

MR. BRESSLER:  And I'm sending them to Lee and

to Sylvia.

MR. JONES:  Very good.  And Cheyenne, whenever

you can, we're going to walk through these invoices

pretty quickly and I would only ask Cheyenne, is

that you ensure everything you can do -- I understand it may be difficult, but ensure that they're chronologically arranged.  So, I see on this invoice Number 1, 05/18/2021, let's just make sure we stay in chronological order until I say otherwise, all right?

MR. MOGHANDAM:  Would you like me -- do you mind if I take 10 seconds just to verify the order before we move forward or do you want to --

MR. JONES:  Let's do it.  Let's do it, 10 seconds.

MR. MOGHANDAM:  Good to go.

MR. JONES:  All right.

BY MR. JONES:

Q    So, Mr. Melchionni, you see as part of our Composite Exhibit Number 7, an invoice dated 05/18/2021?

A    I do.

Q    You do, all right.  And you see that's a monthly salary draw.  Is that a salary draw payable to you?

A    Correct.

Q    Okay.  And let's click to the next one again, chronological order.  I'm just trying to arrange my screen here.  Here we have one June 10th, 2021 payable to you, $10,000, correct?



A    Correct.

Q    All right.  What's the next one?  I think that's July --

A    We can stipulate if you represent so that there's one every month.

Q    Right.  All right.  So, let me just count them up.  We can stipulate that starting in May of '21 going through certainly for the balance of 2021 you were receiving a monthly draw salary of $10,000 a month, correct?

A    Correct.

Q    Okay.  And that continued on into 2022 until, I believe, it may or may not be your testimony, that it stopped in August of 2022.  Is that a correct statement?

A    I believe so.

Q    Okay.  And so, these invoices are in as Composite 7.  So, what I would like to know is, first of all, are these invoices -- just give us the logistics of how they're generated, like, are they printed out, like in a QuickBooks form or do you know anything about that?

A    I believe I just created a PDF invoice and submitted it through Industry FinTech.

Q    Okay.  And you did that contemporaneous with the dates that are indicated on the invoice.  Is that your testimony?

A    Correct.

Q    Okay.  So, back in, just by way of example to be clear, June 10th, 2021, you would've generated an invoice and submitted it to Industry FinTech, correct?

A    Correct.

Q    And then you would be paid shortly thereafter, it says terms net seven, but your testimony is that you would receive payment corresponding with that invoice a few days later.  Is that your testimony?

A    Correct.

Q    Okay.  And is there -- well, strike that.  Are you able to explain why these disbursements to you were not disclosed in the responses that you initially gave when we were asking for these records back in November 5th, 2022?

MR. BRESSLER:  Objection.  You can answer.

BY MR. JONES:

Q    You can answer.

A    I believe they were covered in the bank statements and general ledger.

Q    Okay.  So, your testimony is that these invoices that we are looking at and have been marked as Composite Exhibit 7 would all be set out in the bank statements and general ledger that were previously referenced?



A    I believe they were reflected in the bank statements and general ledger.

Q    Okay.  And that's your testimony with regard to why they were not included when we asked for them?

MR. BRESSLER:  Objection.

BY MR. JONES:

Q    Did I get that right?

A    I believe they were covered in the bank statements and general ledger.

Q    Okay.  Do you know how these disbursements showed up in the bank statements or general ledger, how they were described or set forth?

A    I do not.

Q    Okay.  Who is responsible, if you know who is responsible, for inputting the information that ends up on this general ledger to which you've made reference?

A    I believe Industry FinTech maintains the general ledger.

Q    Okay.  But how does Industry FinTech come into possession of the data that they use to put in that general ledger, they get an invoice from you, right?

A    No, I'm not clear what you're asking.

Q    Sure.  I'll ask it a different way.  So, let's be specific so it's not -- on the screen --

MR. JONES:  Cheyenne, go to the July 2021

invoice for Mr. Melchionni.  July 2021.

BY MR. JONES:

Q    Just by way of example, you're saying Industry FinTech would be the one inputting that data into the general ledger, and I was asking where they got that data, and I'm just asking you, did they get that data because you e-mailed them an invoice back on July 17th, 2021 that's it?

A    Correct.

Q    Okay.  So, if you sent this invoice to Industry FinTech back in July of '21, there's an e-mail from you to Industry FinTech attaching this invoice back in July of 2021, correct?

A    At some point, I don't recall, they used a system called bill.com and I would submit the invoices through that and that's how invoices would be submitted and other various invoices approved.

Q    Okay.  So, you're saying, is it your testimony that you generated an invoice on your computer and submitted it to the bill.com service and that would somehow get to Industry FinTech?

A    Correct.  For some of these, I don't remember when Industry FinTech started using that system.

Q    Okay.  So, how would you transmit or upload the information to bill.com?

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                        Page 51

A    I go to bill.com then we have a Justice Partners account, they're uploaded there.

Q    So, Justice Partners LLC had an account at bill.com back in July of 2021?

A    It may have been Industry FinTech's account, but that's how invoices were submitted.

Q    And when you say how invoices were submitted, did you fill out a form that bill.com utilized, like and it would populate into a bill.com or did you literally generate an invoice the one that we're looking at right now, the July --

A    PDF was uploaded.

Q    Right.  So, you would generate a PDF on your computer, presumably a laptop, correct?

0A    Correct.

Q    And then you would take that PDF and you would somehow transmit it to bill.com, correct?

A    Correct.

Q    You would upload it or e-mail it, do you recall?

A    Upload.

Q    Okay.  So, you'd log on to bill.com and you'd find one portal or one option or one tab and you would upload the PDF that you generated on your laptop, correct?

A     Correct.

Q     I take it that you've maintained all of those original PDFs that you -- in that regard?

A     I believe so.

Q     So, on your laptop we will find a PDF dated July 17th, 2021 that was created on that date?

A     Correct.

Q     And that would be your similar sworn testimony with regard to the other PDFs that are marked as Composite Exhibit Number 7?

A     Correct.

Q     We'll find a corresponding PDF created on that particular date on your laptop.  That's your testimony?

A     Correct.

MR. BRESSLER:  By the way, now that you're not asking a question, I neglected to tell the Reporter that this should be marked -- this whole transcript should be marked -- let me see what our highest -- I think it's highly confidential.

MR. JONES:  All right.  That -- I am just going to take your representation, I can't remember the classifications of confidential, but we'll mark it however the order says, but --

MR. BRESSLER:  And I  can immediately now and we'll check and see and --

MR. JONES:  Yeah, yeah, yeah, we'll figure it out.  All right.  Okay.  You can take that PDF down, Cheyenne and let's see.  All right.

Cheyenne, if you can go to the, what I'm calling at the top of it, it says Justice Partners LLC, financial statements December 31st, 2021 that'll be our next Exhibit it'll be Number 8 and you can e-mail that to Mr. Bressler.

(Thereupon, Plaintiff's Exhibit 8 was entered into the record.)

MR. JONES:  And you can share screen it when you're done with that.

MR. MOGHANDAM:  Can you give me the date one more time, sir, that you're referring to?

MR. JONES:  So the Justice Partners LLC Financial statements, December 31st, 2021.  I believe we received this document from Mr. Bressler's office around July 26th.

BY MR. JONES:

Q    All right.  So, I'm just going to ask you a few questions regarding this.  But first of all, have you ever seen this cash flow statement for 2021?

A    I believe so.

Q    Do you know when it was generated?

A    I do not.

Q    Do you know who created it?

A    I believe Industry FinTech.

Q    Okay.  Do you know anybody at Justice Partners LLC that was involved in assembling, gathering or marshaling the data that was used to generate this cash flow statement?

A    No.

Q    So, you and I can agree that Industry FinTech is a distinct company from Justice Partners LLC, correct?

A    Correct.

Q    Okay.  Are there offices in the same location?

A    We use that as a business address, Justice Partners really does not have a physical location.

Q    Okay.  Does Justice Partners own any tangible assets, you know, like file room cabinets, computers things like that?

A    No.

Q    No?

A    No.

Q    Okay.  So, I guess the question still stands as you sit here today, do you know of any person who holds any title or capacity or position at Justice Partners LLC that was involved in assembling and gathering the information that was used to generate this



cash flow statement?

         MR. BRESSLER:  Objection, form.

    A    Industry FinTech was the third party provider that handled that for us.

BY MR. JONES:

    Q    Correct.  And is that another way of saying that as you sit here today, you don't have any knowledge of anybody who holds a position at Justice Partners LLC, who is involved in gathering and assembling and compiling this information, correct?

    A    Correct.

         MR. BRESSLER:  Objection, form.

BY MR. JONES:

    Q    Correct?

    A    Correct.

    Q    Very good.

         MR. JONES:  All right.  So, you can take that share screen down, Cheyenne.  The next one -- now, Cheyenne, did you upload and did you get to Mr. Bressler the financial statement of December 31st, 2021?

         MR. MOGHANDAM:  I have not e-mailed that to him yet just because I was sharing screen.

         MR. JONES:  Yeah, go ahead.

         MR. BRESSLER:  Share screen, it's fine.


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

MR. JONES:  Go ahead and share screen at first.  Thank you.

MR. MOGHANDAM:  I apologize.  Are you referring to the second Exhibit or are you referring to the previous one or are we moving to a different one?

MR. JONES:  Yeah, well, first of all, Madam Court Reporter or Cheyenne, I'm doing my own tabulation.  Exhibit Number 8 is the one we just had, right?

MR. MOGHANDAM:  Correct.

MR. JONES:  And what was the title of it?  I want to make sure that I title it correctly.

MR. MOGHANDAM:  The Justice Partners LLC cash flow Statement 2021.

MR. JONES:  Correct and that's a one Page document, correct?

MR. MOGHANDAM:  Correct.

MR. JONES:  All right.  So, the next document, which will be Number 9, is the Justice Partners LLC Financial Statements.  December 31st, 2021.

(Thereupon, Plaintiff's Exhibit 9 was entered into the record.)

MR. JONES:  It is from what I can tell a nine-page document.



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

MR. MOGHANDAM:  I apologize.  Sir, can you tell me the title of that document one more time?

MR. JONES:  Justice Partners, LLC Financial Statements, December 31st, 2021.

Actually, I'm just going to go ahead and ask a few questions on it while you look for that because it has some names on it that I have to ask Mr. Melchionni.

BY MR. JONES:

Q    So, when we get that document loaded, Mr. Melchionni, you'll see on it that there's a firm called JVA Accountants and Advisors.  Does that name ring a bell?

A    It does.

Q    Okay.  And on the document that we will be sending to you shortly, it's the person that signed it. It doesn't give a human that signed it, but there's three people on this JVA letterhead, Joseph Velocci, Anthony Velocci, and Nancy Colucco or Colucco.

Did any of those names ring a bell with regard to your role at Justice Partners, LLC?

A    They do.

Q    Okay.  All three of them or one in particular or a group of them?

A    Joe Velocci.


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Q    Joe Velocci.  Okay.  So, is Joe Velocci the accountant and/or CPA for Justice Partners LLC?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    You can go ahead and answer.

A    He was the accountant we used to do the -- these particular statements.

Q    Right.  And so, we have it up on share screen. And first of all, do you recall reviewing this document before your deposition today?

MR. BRESSLER:  Objection form.

A    Briefly.

BY MR. JONES:

Q    Okay.  Well, let's go to the first substantive page.  We have this blank page is Number 1 and there's a table of contents.  And then the third Page is the report of Independent Certified Public Accountants.  You see that?

A    I do.

Q    And it says -- well, first of all, are you able to point to us, let's go to the next page just because I'm going to ask about dates.  If you go to the next page where it says Palm Beach Gardens Florida, April 7th, 2023.  You see that?

A    I do.



Q    So, tell us what knowledge you have as to why the members of Justice Partners LLC ostensibly are receiving this report of Independent Certified Public Accountants for 2021 in April of 2023.

A    I don't know.

Q    So, as the COO of Justice Partners, you don't have any testimony or knowledge in that regard, correct?

MR. BRESSLER:  Objection, form, objection beyond the scope.

MR. JONES:  Just trying to find out about these particular books and records referenced in this report, but you don't have any knowledge.

MR. BRESSLER:  The question you're asking has nothing to do with other books or records exist. You can answer -- he already has answered, but you can answer again if you want to.

A    No.

BY MR. JONES:

Q    Okay.  So, with regard to the provision of the books and records in response to the request of a particular member, do you see on the first page of this report of Independent Certified Public Accounts where it says "To the members of Justice Partners LLC", you see that?  It's the very first line.

A    Um-hum.

Q     You see that?

A     Um-hum.

Q     Is that a yes?

A     I see it, yes.

Q     Do you know if that actually took place?

A     What took place?

Q     Did the members of Justice Partners LLC get this report in April of 2023?

A     I don't recall.

Q     Who's responsible at Justice Partners LLC for making sure that the members get the appropriate set of documents and reports?

MR. BRESSLER:  Objection, form objection beyond the scope and I'm going to cut it off now. This deposition is about what documents exist. Whether it was sent to the members of Justice Partners LLC in 2023 is irrelevant.  The deposition is about your demand in November 2022.  Move on.

MR. JONES:  Well, you're either going to instruct the witness or not --

MR. BRESSLER:  I can, I instruct him not to answer --

MR. JONES:  Okay.

MR. BRESSLER:  -- move on.

MR. JONES:  Second of all -- second of all

just to be clear the deposition is what documents existed and who has them?  You can't leave that part out of the statute or the case law.

MR. BRESSLER:  Okay.  Move on.  I instruct him not to answer.

MR. JONES:  And lastly, just to make the point real clear, I'm not taking instructions from you today, Mr. Bressler, we're going to proceed and then you'll terminate the deposition as you see fit.

MR. BRESSLER:  I'm instructing the witness not to answer.

MR. JONES:  Okay.  I got it.  So, and to be clear, are you instructing this witness not to answer any more questions relating to this report of Independent Certified Public Accountants?

MR. BRESSLER:  We'll go question by question.

MR. JONES:  Very good.

BY MR. JONES:

Q    All right.  So, regarding this report, sir, if you page through this report and Cheyenne will page down on Page 3, Page 4, you'll see various figures and data regarding Justice Partners LLC.

What I would like to know is, were you involved in the review of any documents that were



utilized in coming up with any of these figures and if so, where are those documents located?

A    All documents were maintained by Industry FinTech.

Q    And with respect to the part of my question about where they're located, your answer would be similar to what you said earlier today about this data room that Industry FinTech maintains?

A    Correct.

Q    Okay.  With regard to your understanding about what documents exist and where they're located, if you go to Page 6 of the report that we're talking about, you'll see cash flows from financing activities $11,950,000 where it states net cash provided used in financing activities.

Again, with regard to the documents that speak to those particular figures, is it your testimony that all of those documents are in the possession, custody and control of Industry FinTech?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    I'm sorry, what was your answer?

A    Correct.

Q    All right.  And then I'm almost done with this document.  Just underneath that, same question with



regard to cash and cash equivalence, with regard to the existence of any documents and who's got control of them, possession, custody or control of them, the cash and cash equivalence as of December 31st, 2021, is that something that Industry FinTech would have?

MR. BRESSLER:  Objection, form.

A     Correct.

BY MR. JONES:

Q     All right.  Now, going back to Exhibit 8, that was the cash flow statement for the year 2021, I believe.

MR. JONES:  Cheyenne, if you could put that on, that was the single page Exhibit we had.  It was just the previous Exhibit, Cheyenne.  There you go.

BY MR. JONES:

Q     And now if you look at this cash flow statement for the year in 2021 and you compare it with our request that's set out in Exhibit Number 2, which you previously testified to where we asked for the cash flow statements back in November of '22.

Do you have any explanation or testimony to offer that would explain why we didn't get this document response?

MR. BRESSLER:  Objection, form.


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

A     Each member of Justice Partners has access to the data room and I believe this document is uploaded in there that they can view 24/7 365.

BY MR. JONES:

Q     So, your testimony is that each member of Justice Partners LLC has independent access to the FinTech data room that allows them to view things like this cash flow statement for the year end of 2021. That's your testimony?

A     I could be incorrect, but I believe that each individual Justice Partners investor has access to a place where these documents are held at Industry FinTech.

Q     Do you know, as COO of Justice Partners LLC, do you know if in fact this cash flow statement for the year end 2021 actually existed in the Industry FinTech data room back in 2021?

A     In the Industry FinTech data room?

Q     Um-hum.

A     I can't say with certainty whether it existed, I believe so.

Q     Okay.  But you agree with regard to this particular document and whether it existed at that time that you just referenced, it would be Industry FinTech who could answer that question?

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                    Page 65

A     Correct.

Q     Okay.  All right.  So, if I were to ask you why and when it comes to the documents that we received in July 26th of this year, why those documents were not produced pursuant to our original request for documents, your answer would be that the members of Justice Partners LLC all have access to the Industry FinTech data room, correct?

MR. BRESSLER:  Objection, form.

A     What are you asking me?

BY MR. JONES:

Q     So, we've already heard your testimony with regard to the, just by way of example, the invoices that we covered and how those documents were not provided in response to our original request for documents.

Your testimony was that that information was contained in bank statements and general ledgers, we'll see about that.

But your explanation appears to be that these documents were somehow available to the members where they could have logged on to Industry FinTech through some portal at any point in time.  I just want to know if that's your testimony.

MR. BRESSLER:  Objection, form.

A     I'm not sure if you're trying to trick me or



not.  I believe these documents were provided to you.

BY MR. JONES:

Q    Okay.  I don't think there's any dispute, sir that the invoices that we've now marked in this case as Composite Exhibit Number 7, I believe those specific invoices were not provided in response --

A    Are you talking about the invoices or are you talking about the cash flow statement on the screen? I'm confused.

Q    I was talk -- nope, now, I'm just talking about to make sure we're clear on the documents. Exhibit -- Composite Exhibit Number 7 was a series of invoices from you regarding ostensibly some disbursements and moneys that you received.

And correct me if I'm wrong, but you made it clear that those invoices were provided not in response to our original request for production, but we received those on July 26th of this year.  Do you have an understanding of that?

A    Okay.

Q    You agree with that, right?

A    Agree.

Q    All right.  And all I'm getting at, sir, is because obviously I want to finish the deposition as much as you do, I'm trying to figure out if, when I ask

you about the documents that we did not get in response
to our original request for records.

For example, the cash flow statement that we
just referenced, I just want to know if it's your
testimony that those documents were all available to the
members of Justice Partners LLC.

If they would've just logged on to the
Industry FinTech portal, they would've been there for
the members to view.  I just want to know if that's your
testimony.

A    As I stated previously, I can't say it --

Q    Say that again.

A    As I stated previously, I cannot say with
certainty, but I believe they were in that portal.

Q    Okay.  And can then -- the appropriate follow-
up is then with regard to that level of certainty that
you just mentioned, you agree that it would be Industry
FinTech people who would best be able to answer that
question, correct?

A    Correct.

Q    All right.  All right.

MR. JONES:  Cheyenne, if you can share screen,
Mr. Bressler's August 17th e-mail, August 17th,
2023 regarding some additional production.  Let me
know if you need any time.



BY MR. JONES:

Q    I am just showing you this e-mail quickly. We're now going to talk about some recent document production we got, Mr. Melchionni, now.

MR. JONES:  Cheyenne, I'm not going to ask you if you saw Mr. Bressler's e-mail, but I just wanted to contextualize the documents we're talking about now.

Now, in response to Mr. Bressler's or not in response, attached to Mr. Bressler's e-mail is a series of documents that I'll try to cover quickly, but it was the -- you can share screen the loan and security agreement, Cheyenne.  And just so you know, it's Bates 384 through 400.

BY MR. JONES:

Q    All right.  Do you recall seeing that agreement, Mr. Melchionni?

A    No.

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    And this is similar to my earlier questions. I just want to know if you have any testimony to offer as to why this loan and security agreement was not turned over pursuant to our original request for documents back in November of 2018.



MR. BRESSLER:  Objection.

BY MR. JONES:

Q    2022.

MR. BRESSLER:  Objection, form.

A    I'm not sure whether you're trying to trick me, I believe --

BY MR. JONES:

Q    I'm not --

A    -- you have the document in possession I'm not sure what you're asking.

Q    Yeah, I'm not trying to trick anybody I want to know --

A    You want to know why the document has been produced --

Q    Yeah, it's a straightforward question.  Here let's go to the top of this document.  It's a loan and security agreement and from what I can tell, it's between Justice Partners LLC and Justice Partners Law Group, right?

A    Okay.

Q    It's a contract between those two companies, right?

A    Correct.

Q    When we asked for this document back in November 5th, 2022 and we got the original response with



a set of documents, this document was not included in your response and I just want to know, what's the explanation why we didn't -- why didn't we get this document as part of that original response?

          MR. BRESSLER:  Objection to form and

     misstatement of fact.

BY MR. JONES:

     Q     You can go ahead and answer.

     A     I don't know.

     Q     Okay.  So, let's go to the bottom of this document.  From what I can tell you signed this document as General Partner of Justice Partners LLC.  Is that what it says?

     A     That's what it says.

     Q     Does Justice Partners LLC have a General Partner?

     A     We are the manager, I believe Sylvia and myself are the managing general partner, GP.

     Q     You and Sylvia are the managing general partners of Justice Partners LLC, that's your testimony?

     A     Yes.

     Q     Okay.  And you also signed this agreement on behalf of Justice Partners Law Group as a managing partner, correct?

     A     Correct.



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                    Page 71

Q    Did you inform the members of Justice Partners LLC whether you signed this document?

A    No.

Q    Why not?

MR. BRESSLER:  Objection form.  Don't answer, got nothing to do with the deposition.

MR. JONES:  Just want to make it clear you're instructing the witness not to answer.

MR. BRESSLER:  That is clear.

MR. JONES:  All right.  All right.  You can take that document off screen, Cheyenne.

BY MR. JONES:

Q    Now, with regard to any people that, or entities that have knowledge regarding the location and possession of the books and records of Justice Partners LLC, do you have any understanding whatsoever that Ed Lake or the Lake Law Firm would have possession, custody, or control of any Justice Partners LLC records?

A    No.

Q    Meaning you don't know either way or you know for a fact they don't have any records?

A    They don't have any records.

Q    Okay.  So, your testimony is that the Lake Law Firm doesn't have any records relating to Justice Partners LLC.  Is that your testimony?

A    Records being defined as you have a contract with them, do you consider that a record?

Q    Well, it's actually what you consider a record.  You're the COO of Justice Partners, LLC.  And what I would like to know is do you have any knowledge as to whether or not this other law firm called the Lake Law Firm, do you know whether they have Justice Partners records -- Justice Partners LLC records in their possession, custody or control?

MR. BRESSLER:  Objection form.

A    They do not.

BY MR. JONES:

Q    You don't know either way, correct?

A    They do not.

Q    Okay.  You know for a fact that they do not -- I'm sorry.  So, that's your testimony, correct?

A    Correct.

Q    All right.  Do you know if the Lake Law Firm has any records that pertain to the loan and security agreement between Justice Partners and Justice Partners Law Group?

MR. BRESSLER:  Objection, form.

A    They do not.

BY MR. JONES:

Q    Okay.

MR. JONES:  All right.  I don't have a lot of questions left.  Do you want to -- I take it you want to push through and not take a lunch break, right, Ken?

MR. BRESSLER:  Yes.

MR. JONES:  Okay.  Then let me just take five minutes as a quick comfort break and then we will wrap this up quickly.

(Thereupon, a short discussion was held off record.)

(Deposition resumed.)

MR. JONES:  So, Cheyenne, you're going to put up on share screen our request for production and you're going to go to Number 19.  And then I think the last couple of things will just be these last two documents.

And this relates to, Mr. Melchionni, the documents that do exist as they relate to specific entities.  So, if you can put that up on the share screen when you get a chance.

All right.  Go to Page 6, Request Number 19. All right.  So, zoom in a little bit just so Mr. Melchionni can read that.

BY MR. JONES:

Q    We asked for copies of all contracts or



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                          Page 74

agreements entered into by Justice Partners LLC, and

then I don't think you have it on --

MR. JONES:  I mean, unless you can get it

quick up there, Cheyenne, their response.

BY MR. JONES:

Q    But on the June 12th, 2023 at 05:38 p.m. we

received a response that says here it is -- zoom in a

little bit.

The response to our request says that Justice

Partners objects it as duplicative, but the production

produced all contracts entered into Justice Partners,

and then it specifically mentions Bates Numbers 351

through 353.  You see that?

A    I do.

MR. JONES:  Okay.  So, Cheyenne will now put

on the share screen those Bates Numbers you talked

about that Justice Partners LLC, contracts, that's

what Request Number 19 asked for.

BY MR. JONES:

Q    All right.  So, here is the April 15th, 2021

invoice, the 351 Bates Number, and you can see it's from

the Lake Law Firm, but it says it's billed to Justice

Partners Law Group.

And so, what we're trying to find out is why

are you saying that that's a Justice Partners LLC



contract when it says it's a bill to Justice Partners Law Group?

A    I don't know.

Q    Okay.  Same question as to Bates Number 353. There's 353 and then you see it's from the Lake Law Firm to Justice Partners Law Group.  Is your answer the same as to the previous answer?

A    It obviously pertains to Justice Partner Business, but yes.

Q    And why does it obviously pertain to Justice Partners Business?

A    Justice Partners Law Group is involved in the -- involved in litigation, which would then -- the funds produced from that would flow through to Justice Partners LLC.

Q    Right.  And with regard to who has the existence of certain documents and who has possession of these documents and whether or not the response of the request for production is accurate, I just want to know, you and I can agree that Bates Numbers 351 and 353, those are not contracts between Justice Partners, LLC and anybody.  These are invoices directed to Justice Partners Law Group, correct?

A    Correct.

Q    Right.



MR. JONES:  Obviously we're reserving our rights with respect to the questions that received an instruction not to answer, but I don't have anything else to ask this witness at this time.

MR. BRESSLER:  Okay.  Why don't we go off the record and talk about what time you want to start Sylvia's?

MR. JONES:  I only need 15 minutes.

(Deposition concluded at 01:11 p.m.)

(Reading and signing of the deposition by the witness has been reserved.)



CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF POLK

I, BRIEL MADDALENA, Court Reporter and Notary Public for the State of Florida, do hereby certify that I was authorized to and did digitally report and transcribe the foregoing proceedings, and that the transcript is a true and complete record of my notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Witness my hand this 25th day of August, 2023.



_____
BRIEL MADDALENA, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA

UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF POLK


     I, BRIEL MADDALENA, the undersigned authority,

certify that LEE MELCHIONNI, appeared before me remotely

pursuant to Florida Supreme Court Order AOSC20-23 and

was duly sworn on the 22nd day of August, 2023.


Witness my hand this 25th day of August, 2023.



BRIEL MADDALENA, COURT REPORTER
Notary Public, State of Florida
Commission No.:  HH095918
Commission Expiration:  02/22/2025

DATE:      AUGUST 25, 2023
TO:        LEE MELCHIONNI
C/O        KENNETH BRESSLER, ESQUIRE
           BLANK ROME
           1271 AVENUE OF THE AMERICAS
           NEW YORK, NEW YORK 10020

IN RE:     ALLAN TEH VS. JUSTICE PARTNERS, LCC

CASE NO:   2022-022470-CA-01

Dear MR. MELCHIONNI,

Please take notice that on AUGUST 22, 2023, you gave your deposition in the above-referenced matter.  At that time, you did not waive signature.  It is now necessary that you sign your deposition.  You may do so by contacting your own attorney or the attorney who took your deposition and make an appointment to do so at their office.  You may also contact our office at the below number, Monday - Friday, 9:00 AM - 5:00 PM, for further information and assistance.

If you do not read and sign your deposition within thirty (30) days, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court.

If you wish to waive your signature, sign your name in the blank at the bottom of this letter and promptly return it to us.

Very truly yours,

BRIEL MADDALENA, Court Reporter
Universal Court Reporting
(954)712-2600

I do hereby waive my signature.


_____
LEE MELCHIONNI
Cc: via transcript:              MATTHEW JONES, ESQUIRE


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Errata Sheet

NAME OF CASE: Allan Teh vs Justice Partner, LLC

DATE OF DEPOSITION: 08/22/2023

NAME OF WITNESS: Lee Melchionni

Reason Codes:

    1. To clarify the record.

    2. To conform to the facts.

    3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**$**

**$10,000**
46:25 47:9

**$11,950,000**
62:14

**$45**
40:20 41:21

**-**

**-01**
5:7

**0**

**01:11**
76:9

**022470-CA**
5:7

**05/18/2021**
46:4,16

**05:38**
74:6

**0A**
51:15

**1**

**1**
7:1,3,22 31:25
32:14 46:4 58:15

**10**
30:7,9,11 46:8,10

**10.1**
34:22,25

**10th**
46:24 48:3

**11:31**
5:5

**12th**
74:6

**14th**
40:9,18

**15**
76:8

**15th**
22:1,21 23:13
74:20

**16th**
21:9 30:13,19
31:4,12 32:5

**17th**
50:7 52:6 67:23

**19**
73:14,21 74:18

**2**

**2**
14:10,11 15:15
22:16 26:10 30:6
42:15 63:19

**2018**
68:25

**2020**
22:1,21 23:13

**2021**
37:9,13 40:9,18
46:24 47:8 48:3
49:25 50:1,8,13
51:4 52:6 53:6,16,
22 55:21 56:15,21
57:4 59:4 63:4,10,
18 64:8,16,17
74:20

**2022**
14:18,23 21:10

23:9 27:9,14
30:13,19 31:4
37:12 47:12,14
48:15 60:18 69:3,
25

**2022-**
5:6

**2023**
5:2,4 32:5 40:17
41:25 58:24 59:4
60:8,17 67:24 74:6

**21**
47:7 50:11

**22**
5:2 63:21

**22nd**
5:4

**23rd**
40:17

**24/7**
64:3

**26th**
53:18 65:4 66:18

**27**
34:20,22

**3**

**3**
17:21 19:9,13 20:2
21:9,12 29:7,22
30:6 61:22

**31st**
53:6,16 55:20
56:21 57:4 63:4

**351**
74:12,21 75:20

**353**
74:13 75:4,5,20

**365**
64:3

**373**
31:25 32:14

**384**
68:14

**4**

**4**
19:16 20:3 21:11,
17,23 22:5,13,17
23:22 26:5 31:11,
14 61:22

**400**
68:14

**45**
38:19 40:9

**5**

**5**
26:10 34:1,2 38:5

**5th**
14:18,23 15:11
18:21 19:12 21:2
23:9,14 25:10
48:15 69:25

**6**

**6**
29:3 38:9,11 62:12
73:21

**7**

**7**
45:18,19 46:16
47:17 48:23 52:10
66:5,12



877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**7th**
58:24

**8**

**8**
53:7,9 56:9 63:9

**9**

**9**
29:19,23 30:11
56:20,22

**A**

**a.m.**
5:5

**able**
8:22 16:3 22:7
23:19 48:12 58:21
67:18

**about**
7:16 14:17 17:8
19:3 23:7 25:7
30:10 31:10 34:16,
25 36:17 37:13
39:18 40:3,5,6
47:20 58:22 59:10
60:15,18 62:6,7,
10,12 65:18 66:7,
8,11 67:1 68:3,7
74:17 76:6

**Absolutely**
9:6

**accept**
6:17

**accepted**
35:7,23

**access**
64:1,6,11 65:7

**accessed**
21:3

**accordance**
35:6

**accordingly**
24:6

**account**
24:13 35:6 36:5
42:18 43:21 44:9
51:2,3,5

**accountant**
58:2,6

**accountants**
27:10 57:12 58:17
59:4 61:16

**accounting**
19:19 21:21 22:11,
18 23:10,15 26:3
27:16,19,25 28:2,
4,7 33:21 35:7,17,
23

**accounts**
36:11 59:22

**accurate**
75:19

**acknowledged**
30:2

**Act**
36:14

**activities**
62:13,15

**actually**
6:25 19:14 23:15
27:13 32:4 39:18
57:5 60:5 64:16
72:3

**addition**
23:9 36:13

**additional**
67:24

**address**
6:8,10,12,15 54:13

**administrator**
15:22 16:12 17:7,9

**advance**
43:22

**advances**
42:19 43:11 44:10

**advice**
8:6,8 23:4

**Advisors**
57:12

**after**
5:22 14:23 21:2
40:21

**again**
12:3 14:25 17:13
18:2 26:19 31:17
32:2 33:8 46:22
59:16 62:16 67:12

**ago**
20:1 37:3

**agree**
14:22 16:8 19:13
29:12 54:8 64:22
66:21,22 67:17
75:20

**agreeing**
41:20

**agreement**
28:16 29:9,13,18
30:21,22 31:7
33:25 34:21,23
68:13,17,23 69:17
70:22 72:20

**agreements**
12:6 31:5 74:1

**ahead**
10:8 13:12 16:23
17:5,19 18:24

22:25 24:22 36:25
55:24 56:1 57:5
58:5 70:8

**all**
5:9 12:7 15:23
17:21 19:8,16
21:1,18 22:21
24:17 29:3,20
30:8,14 31:10
32:7,12,15,25
33:1,2,5,18,24
35:6 36:1,6,9,13
37:10 38:8,24,25
39:2,4,11 42:19
43:9 44:14 45:4,5,
6,14,17 46:6,13,18
47:2,6,18 48:23
52:2,20 53:2,3,20,
21 55:17 56:7,19
57:23 58:9,20
60:25 61:20 62:3,
18,24 63:9 65:2,7
66:23 67:5,21
68:16 71:10 72:18
73:1,21,22,25
74:11,20

**Allan**
22:1

**allow**
36:20

**allows**
64:7

**almost**
62:24

**already**
29:6,8 34:5 59:15
65:12

**also**
5:17 9:14 24:8
33:11 41:25 44:11
45:11 70:22

**am**



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

8:1 9:10 41:16
52:20 68:2

**amount**
40:9 43:22

**and/or**
26:2 58:2

**another**
32:20 55:6

**answer**
9:16,23 16:23
17:5,19 18:9,11,24
20:11 22:25 24:22
27:23 36:25 42:25
48:16,18 58:5
59:15,16 60:22
61:5,12,15 62:6,22
64:25 65:6 67:18
70:8 71:5,8 75:6,7
76:3

**answered**
59:15

**Anthony**
57:19

**anticipated**
32:24

**any**
6:10 7:12 8:2,10,
11,20 9:20 10:4
14:20 18:20 19:5,6
20:19 21:6 22:10
23:19 27:10,14
29:18,23 32:21
35:16 37:19 38:14
42:20 54:15,22,23
55:7 57:20 59:7,12
61:15,25 62:1
63:2,22 65:22 66:3
67:25 68:22 71:13,
16,18,21,22,24
72:5,19

**anybody**
11:25 28:7 54:3

55:8 69:11 75:22

**anything**
18:7 47:20 76:4

**AOSC20-23**
5:9

**apologize**
27:23 56:3 57:1

**appearing**
5:9

**appears**
25:12 65:19

**applied**
35:7

**appreciate**
40:1

**appropriate**
43:19,21 45:11
60:11 67:15

**approved**
50:17

**approximately**
5:5

**April**
40:9,17 58:24 59:4
60:8 74:20

**around**
25:15,18,22 53:18

**arrange**
46:23

**arranged**
46:3

**arrangement**
28:13

**Arthur**
11:24

**ask**
12:17 14:16 17:8
25:22 26:19 29:20

30:5 36:20 43:13
45:25 49:23 53:20
57:5,7 58:22 65:2
66:25 68:5 76:4

**asked**
20:14 23:9 26:11
36:18 49:4 63:20
69:24 73:25 74:18

**asking**
12:9,19 13:8,12,18
30:17 39:12 48:14
49:22 50:5,6 52:16
59:13 65:10 69:10

**asks**
30:7

**assembling**
15:3 54:4,24 55:9

**assets**
54:16

**associated**
15:13

**Atlanta**
6:4

**attached**
68:10

**attaching**
13:23 50:12

**attachment**
11:12

**attempt**
15:16

**Attorney**
11:20

**attorney-client**
10:5

**attorneys**
15:2

**audit**
19:20 21:21 22:11,

18 23:10,16 25:10
26:3

**audited**
37:11

**August**
5:2,4 47:14 67:23

**available**
65:20 67:5

---

**B**

**back**
6:25 22:16 25:1,3
27:9 28:1 31:1
48:2,14 50:7,11,12
51:4 63:9,21 64:17
68:25 69:24

**balance**
13:25 15:18 42:19
43:11 44:6,8 47:8

**bank**
14:3 18:6,13,16,19
19:7 48:19,23
49:1,8,11 65:17

**basis**
35:8

**Bates**
31:25 32:13 68:14
74:12,16,21 75:4,
20

**Beach**
58:23

**beat**
33:9

**because**
12:9 15:7 25:6
30:5,7 33:8 39:24
40:1 45:1 50:7
55:23 57:6 58:22
66:24



**UNIVERSAL COURT REPORTING**
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**becomes**
14:15

**before**
39:18 42:7 46:9
58:10

**beginning**
39:20

**behalf**
5:14 28:7 70:23

**behind**
34:15

**believe**
5:16 9:13 11:11
12:14 13:16,22
14:4,8 17:20 18:15
19:10 20:21 21:7
22:3,13 23:3 27:2
30:25 31:3,9 35:12
37:1,7,17 41:17
42:5 43:1,7,18
47:13,15,21 48:19
49:1,8,17 52:4
53:17,23 54:2
63:11 64:2,10,21
66:1,5 67:14 69:6
70:17

**bell**
57:13,20

**belonging**
36:6

**Benito**
5:16,18 18:25
19:4,23 20:2 28:3

**best**
12:5 38:18 67:18

**better**
18:11

**between**
9:18 13:7,14
28:10,16 29:9,13
30:6 69:18,21

**beyond**
36:20 42:24 59:9
60:14

**big**
39:3,4

**bill**
75:1

**bill.com**
50:15,20,25 51:1,
4,8,9,17,22

**billed**
74:22

**bit**
21:15 29:16 34:22
73:22 74:8

**blank**
58:15

**block**
36:22

**blow**
34:21

**bookkeeping**
28:21

**books**
9:20 29:25 34:25
35:5 36:5,11 42:18
43:10,16,24 59:11,
14,20 71:15

**borrower**
44:11

**bottom**
70:10

**break**
38:20 39:5 73:3,7

**Bressler**
5:15,18 6:9,17,22
7:12 8:10 9:4,16,
24 12:8 14:15

72:20 75:21

16:6,16,21 17:3,17
18:22 20:9 22:12,
23 23:1,23,25
24:2,7,15,20
26:15,22 30:16
33:14 34:4,8,12,17
36:16 37:21 38:10,
13,22,24 39:16
41:7,11 42:24 43:6
44:16 45:4,10,21
48:16 49:5 52:15,
24 53:8 55:2,12,
20,25 58:3,11
59:8,13 60:13,21,
24 61:4,8,11,17
62:20 63:6,25
65:9,24 68:19
69:1,4 70:5 71:5,9
72:10,22 73:5 76:5

**Bressler's**
21:10 31:12 37:2
53:18 67:23 68:6,
9,10

**brief**
8:22

**briefly**
7:16 58:12

**Briel**
5:10

**bring**
8:2,11 29:21 33:24

**broader**
32:2

**business**
6:9,12 31:2 36:8,
10,12 54:13 75:9,
11

---

**C**

---

**cabinet**
20:17

**cabinets**
54:16

**called**
5:22 50:15 57:11
72:6

**calling**
53:5

**came**
21:1 32:15

**can**
6:16 7:8,14,16 9:5
12:5 14:14,22 15:9
16:23 17:5 18:24
19:13 20:11 23:20
29:12 34:4,6,12
36:25 38:9 39:2,6
40:4,8 41:13 42:25
45:2,12,24 46:1
47:4,7 48:16,18
52:24 53:2,4,8,11,
13 54:8 55:17
56:24 57:1 58:5
59:15,16 60:21
64:3 67:15,22
68:12 69:17 70:8,
11 71:10 73:19,23
74:3,21 75:20

**can't**
12:1 38:15 52:21
61:2 64:20 67:11

**cannot**
67:13

**capacity**
54:23

**capital**
17:11

**car**
34:15

**case**
5:6 40:1 61:3 66:4



UNIVERSAL COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

cases
39:25

cash
15:18 53:22 54:5 55:1 56:14 62:13,14 63:1,3,4,10,17,20 64:8,15 66:8 67:3

center
31:18

CEO
16:15,17 17:1

certain
75:17

certainly
8:8 14:14 19:2 23:6 34:5 47:8

certainty
64:20 67:14,16

Certified
58:17 59:3,22 61:16

chance
10:3,7 25:7 44:15 73:20

character
36:12

check
36:21 52:25

Cheyenne
5:13 7:8 9:4 21:14 34:4 38:5,14 39:13,15 44:15,19 45:16,23,25 49:25 53:3,4 55:18,19 56:8 61:21 63:12,14 67:22 68:5,13 71:11 73:12 74:4,15

Chief
8:17,18,23 16:2,3

chronological
46:5,23

chronologically
46:3

chunk
39:3

circular
21:25 22:6,9,20 23:13

claim
29:25

clarifying
12:8

classifications
52:22

clear
6:19 25:6,25 30:16 45:16 48:3 49:22 61:1,7,14 66:11,16 71:7,9

click
30:6 46:22

client
26:6 39:1

cloud
11:5,8

co-
8:25

Colucco
57:19

come
15:2 19:11 49:19

comes
65:3

comfort
73:7

coming
62:1

commentary
37:3

comments
11:21

commitment
40:8

communicated
8:9 10:4 11:20 15:1

communication
10:5 23:7

communications
13:21 19:3 29:20

companies
69:21

company
15:17 18:3 19:18,20 20:8,20 21:19,21 22:11,19 23:11,16 26:11 27:9 29:5,21 30:8 35:5,6 36:7,10,13 37:4 54:9

compare
63:18

compiling
55:10

complete
35:5

Composite
45:3,8,18,19 46:16 47:17 48:23 52:10 66:5,12

computer
10:15 50:19 51:14

computers
54:16

concept
33:10 35:23

concerning
9:18

concluded
76:9

conclusion
45:17

confidential
52:19,22

configured
24:13

confused
66:9

consents
35:9

consider
72:2,3

consistent
35:8

contain
36:5

contained
65:17

contemporaneous
47:23

contents
58:16

context
8:24 18:3 27:8

contextualize
68:7

continue
25:22 39:13

continued
47:12

contract
9:11 30:25 31:1 33:3 69:21 72:1

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

75:1

**contracts**
30:8,15,19 31:5
73:25 74:11,17
75:21

**control**
10:22 62:19 63:2,3
71:18 72:9

**COO**
9:12 16:19 17:14
18:3 27:8 30:18
37:24 41:13,25
59:6 64:14 72:4

**copies**
17:21 73:25

**corporate**
33:2,20

**corporation**
33:10,11

**correct**
6:7 8:18,19 9:24
10:23,24 11:2,16
15:14,19,21 16:9,
10,13 17:25 19:9,
22 20:25 21:5 22:8
28:14,17,18,23
29:1,2,15 30:4
32:17 33:22,23
35:5 40:7,10,11,
14,15,18 41:16,22,
23 42:1,2 44:12,13
46:21,25 47:1,10,
11,14 48:1,4,5,10
50:9,13,22 51:14,
15,17,18,25 52:1,
7,11,14 54:10,11
55:6,10,11,14,15
56:11,16,17,18
59:7 62:9,23 63:7
65:1,8 66:15
67:19,20 69:23
70:24,25 72:13,16,
17 75:23,24

**correctly**
22:2 56:13

**corresponding**
48:8 52:12

**could**
20:5 22:21 63:12
64:10,25 65:21

**Counsel**
8:6,8 11:18 19:1,3
23:4,7

**counsels**
5:11 9:1

**count**
47:6

**couple**
7:6 31:21 39:24
73:15

**course**
36:8

**Court**
5:3,8,10,11,19
24:25 25:7 45:15
56:8

**cover**
13:5 14:9 68:11

**covered**
48:19 49:8 65:14

**CPA**
27:16,20 58:2

**created**
47:21 52:6,12 54:1

**credits**
44:9

**current**
6:8

**currently**
6:3 8:13 11:1
29:13

**custody**
10:22 62:18 63:3
71:18 72:9

**cut**
12:25 60:14

_____

**D**

**data**
27:1 32:16 49:20
50:4,6 54:5 61:22
62:7 64:2,7,17,18
65:8

**date**
5:4 10:23 25:16,
18,22 40:9,17,22
41:4 52:6,13 53:13

**dated**
22:1,21 23:13
46:16 52:5

**dates**
47:24 58:22

**days**
48:9

**dead**
33:9

**deal**
6:11 20:22,23 21:3
39:4

**debited**
43:21

**December**
22:1,21 23:13
53:6,16 55:20
56:21 57:4 63:4

**Defendant**
5:15 9:19

**define**
15:25

**defined**
72:1

**definitely**
11:19

**definition**
16:24,25 17:14

**degree**
35:13,16

**Delaware**
29:24

**demand**
60:18

**depends**
15:25

**depo**
5:17 45:17

**deposition**
5:1 7:2,19,23 8:3
9:17 10:2,7,8,9
11:1 12:11,19
13:12 15:8 36:17,
22 39:9,20 58:10
60:15,17 61:1,9
66:24 71:6 73:11
76:9,10

**describe**
12:5

**described**
17:16 27:1 49:12

**description**
8:23

**determine**
18:1 20:18

**develop**
8:25

**device**
10:14,25

**didn't**
8:11 23:24 30:17

31:17 63:23 70:3

**different**
12:7 18:9 49:23
56:6

**difficult**
46:2

**direct**
5:24 43:15,23

**directed**
44:12 75:22

**disbursement**
18:2

**disbursements**
17:22 18:20 19:5
48:12 49:10 66:14

**disclosed**
48:13

**discussed**
11:20

**discussion**
7:17 39:7 73:9

**dispute**
66:3

**distinct**
54:9

**distracting**
14:15

**distribution**
18:2

**distributions**
17:22 18:20 19:6

**document**
13:14,17 22:5
23:12 26:13,16,20,
25 27:6 40:13,16
41:5,7,9,24 42:7,9,
12,15 53:17 56:17,
19,25 57:2,10,15
58:9 62:25 63:23

64:2,23 68:3 69:9,
13,16,24 70:1,4,11
71:2,11

**documentation**
33:2,21,22

**documents**
7:10 8:2,7,11 9:18
10:8,13,14,21
11:3,9,13,17,23
12:3,5,6,10,14,18,
20,24 13:1,11,23,
24 14:5 15:3,11,
21,23 16:4,9
17:21,24 18:4,19
19:17 21:18,24
22:6 24:10 25:12,
19 26:5 29:4
31:19,24 32:6,7,
11,13,15,18,19
33:1,5,11,12 36:17
39:6 60:12,15
61:1,25 62:2,3,11,
16,18 63:2 64:12
65:3,4,5,14,15,20
66:1,11 67:1,5
68:7,11,25 70:1
73:16,18 75:17,18

**doesn't**
57:17 71:24

**don't**
6:12 7:12 8:9 9:13,
16 10:3,4 13:16,22
15:1 16:24 17:6
18:12,15 19:2,25
20:4 23:6 26:9
27:21 33:8 34:9,17
35:4 36:18 37:11,
14 50:14,22 55:7
59:5,6,12 60:9
66:3 70:9 71:5,20,
21,22 72:13 73:1
74:2 75:3 76:3,5

**done**
9:4 31:19 35:11

36:15 37:6 42:23
53:12 62:24

**down**
9:5 14:16 32:6
53:3 55:18 61:21

**draw**
46:19 47:9

**Duces**
7:2,23

**due**
29:11 42:20 43:12

**duly**
5:23

**duplicative**
74:10

**during**
27:17

---

**E**

---

**e-**
12:22 29:24 34:10
38:20

**e-mail**
11:11,14 13:19,20,
23 34:6,9 38:9,16,
17 39:13 44:16
50:11 51:19 53:8
67:23 68:2,6,10

**e-mailed**
50:7 55:22

**e-mails**
12:6 39:14,16,21

**each**
37:5 43:22 44:22
64:1,5,10

**earlier**
27:1 40:5 42:17
62:7 68:21

**Ed**
71:16

**effective**
40:17,22 41:3

**effects**
36:6

**efficient**
45:1

**efforts**
31:18,23 32:5

**either**
33:3 43:13 60:19
71:20 72:13

**electronically**
20:24

**else**
11:25 18:7 76:4

**employees**
12:2 20:13

**employment**
9:11

**end**
37:5,9,12 40:12
64:8,16

**ends**
49:15

**engaged**
36:12

**ensure**
46:1,2

**entered**
7:3 14:11 21:12
30:8,15,19 31:14
34:2 36:11 38:11
45:20 53:9 56:22
74:1,11

**entities**
71:14 73:19

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**entity**
9:20 43:4

**entrance**
29:21

**entries**
43:21

**equity**
19:17 20:7,19
21:18 29:20

**equivalence**
63:1,4

**every**
15:6 47:5

**everything**
46:1

**evidence**
42:18

**evidencing**
17:22 21:24

**exactly**
24:13

**EXAMINATION**
5:24

**example**
11:21 13:5,10,13
22:10 44:9 48:2
50:3 65:13 67:3

**executed**
13:6,8,13 35:9
42:13 45:12

**exhibit**
7:1,3,22 9:5 14:10,
11 19:15 21:9,12
22:16 26:10 29:7,
22 30:6 31:11,14
34:1,2 38:9,11
39:11 45:3,18,19
46:16 48:23 52:10
53:7,9 56:4,9,22
63:9,13,14,19

**exhibits**
66:5,12

**exhibits**
38:14,17,25 45:2,5

**exist**
9:18 36:18 59:14
60:15 62:11 73:18

**existed**
61:2 64:16,20,23

**existence**
63:2 75:17

**exists**
29:13

**expenses**
42:20 43:12 44:11

**explain**
24:18 48:12 63:23

**explanation**
29:23 63:22 65:19
70:3

**extent**
29:11

---

**F**

**facility**
29:13

**fact**
64:15 70:6 71:21
72:15

**fairly**
23:8

**familiar**
12:20

**familiarity**
35:22

**far**
12:12 36:21 38:13

**fast**
35:4

**February**
31:11 32:4,5

**fees**
42:20 43:12 44:10

**few**
14:16 26:12 48:9
53:21 57:6

**figure**
13:19 53:1 66:25

**figures**
61:22 62:1,17

**figuring**
19:4

**file**
20:16 54:16

**filing**
26:8

**fill**
51:8

**Fin**
32:20

**finance**
35:17

**financial**
15:16 37:5,9,12
53:6,16 55:20
56:21 57:3

**financing**
62:13,15

**find**
13:11 18:19 51:23
52:5,12 59:10
74:24

**fine**
24:19 34:17 55:25

**finish**
15:7 66:24

**FINRA**
35:20

**Fintech**
11:18,22,23 12:2,
11,22 13:20,24
14:6 15:22 16:12
18:8,10 20:21 21:3
26:16 27:4 28:6,
12,17,20 32:8,10,
16,18,21 33:6
37:17 38:2 43:1,5,
14,17,18,24 44:1,
4,5,12 47:22 48:4
49:17,19 50:4,11,
12,21,23 54:2,8
55:3 62:4,8,19
63:5 64:7,13,16,
18,24 65:7,21
67:8,18

**Fintech's**
51:5

**firm**
14:19 27:16,20,25
28:2,4,8 30:22
31:6 57:11 71:17,
24 72:6,7,18 74:22
75:5

**first**
5:22 42:16 47:17
53:21 56:2,7 58:9,
14,20 59:21,24

**fiscal**
37:5

**fit**
61:10

**five**
73:6

**Florida**
5:8 58:23

**flow**
15:18 53:22 54:6
55:1 56:15 63:10,
17,21 64:8,15 66:8
67:3 75:14



flows
62:13

folder
7:8

follow-
32:24 67:15

follow-up
44:2

following
19:12 21:23

follows
5:23

forgot
39:19 41:1

form
16:6,21 17:3,17
18:22 20:9 22:12,
23 26:15,22 33:14
36:16 37:21 43:6
47:20 51:8 55:2,12
58:3,11 59:8 60:13
62:20 63:6,25
65:9,24 68:19 69:4
70:5 71:5 72:10,22

forth
49:12

forward
46:9

found
15:11 22:21

from
11:23 13:20 14:6,
18 21:10 31:12
32:15 38:14 42:20
49:21 50:12 53:17
54:9 56:24 61:7
62:13 66:13 69:17
70:11 74:21 75:5,
14

front
29:7

full
6:1

fund
15:22 16:11,15,20,
24 17:1,2,7,9,15

funds
17:12 75:13

further
37:2

### G

Gardens
58:23

gathering
54:4,25 55:9

gave
41:11 48:13

general
14:7 18:6,13,16,19
19:7 26:11 28:22
48:20,24 49:2,9,
11,16,18,21 50:5
65:17 70:12,15,18,
19

generalities
31:21

generally
10:11 35:7,23 36:2

generate
51:10,13 54:5,25

generated
47:19 48:3 50:19
51:24 53:24

Georgia
6:4

get
12:17 13:13 16:5
19:14 25:7 29:16
31:8 33:18 35:16

39:5 44:2 49:7,21
50:6,21 55:19
57:10 60:7,11
63:23 67:1 70:3
73:20 74:3

getting
13:3 23:8 32:12
39:21 43:9 66:23

give
6:9,23 8:22 47:18
53:13 57:17

given
21:22

giving
13:10

go
7:15 15:6,8 16:23
17:5,19 18:24
19:16 20:18 21:9,
11 22:16,25 24:22
26:10 34:20 36:4,
21,25 38:9 40:12
46:12 49:25 51:1
53:4 55:24 56:1
57:5 58:5,14,21,22
61:17 62:12 63:15
69:16 70:8,10
73:14,21 76:5

goes
42:24

going
7:1 14:9,10,16
15:6 24:22 30:10
31:11 36:20 38:8,
17 39:4,5 43:14
45:14,15,24 47:7
52:21 53:20 57:5
58:22 60:14,19
61:8 63:9 68:3,5
73:12,14

good
6:25 9:25 34:10,20

44:18 45:23 46:12
55:16 61:18

goods
36:6

GP
70:18

graduate
35:16

great
25:2

group
9:15 13:7,15
29:10,14 41:21
42:4 44:19,21
57:24 69:19 70:23
72:21 74:23 75:2,
6,12,23

guess
54:21

guys
38:18

### H

had
23:7 29:18 30:19
31:4 42:13 51:3
56:10 63:13

handled
55:4

happy
24:20 34:6

has
15:23 16:4 29:3
33:20 35:25 42:23
57:7 59:13,15 61:2
64:1,6,11 69:13
72:19 75:16,17
76:11

have



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

5:16 6:15 7:6,13
9:11,14 10:2,7
13:6 15:22 18:9
20:4 21:14 24:7,18
25:12,19 26:12
27:14 29:23 31:21,
23 32:20 33:4,12,
19 34:5,14,21
35:22 36:19 37:8
41:3 42:6 43:4,15,
23,25 44:1,3,15,
17,18 45:1 46:24
48:22 51:1,5 53:21
54:14 55:7,22 57:7
58:8,15 59:1,7,12
63:5,22 65:7,21
66:18 68:22 69:9
70:15 71:14,16,17,
21,22,24 72:1,5,7
73:1 74:2 76:3

**having**
5:22

**he**
6:20 58:6 59:15

**head**
6:13

**heard**
65:12

**held**
7:17 29:4 32:7
33:5 39:7 64:12
73:9

**helped**
27:5

**here**
5:6 7:25 9:19,21
13:3 27:13 28:24
31:22 33:9 39:22
45:2 46:24 54:22
55:7 69:15 74:7,20

**hereunder**
43:22

**highest**
52:18

**highly**
52:19

**him**
6:22 12:10 24:3,9,
12,16 26:3 55:23
60:21 61:4

**his**
6:23 12:11 20:13

**History**
35:15

**hold**
8:13 33:11 35:19

**holds**
54:23 55:8

**home**
10:19,20

**hope**
39:25

**horse**
33:9

**human**
57:17

---

**I**

---

**I'LL**
13:18 26:18 30:15
35:3 36:20 49:23
68:11

**I'M**
6:22 12:19,25
13:3,11,12 16:17
18:14 21:23 23:8
24:20 30:17 32:12
33:18 39:12 41:11
43:9 45:21 46:23
49:22 50:6 53:4,20
56:8 57:5 58:22

60:14 61:7,11
62:22,24 65:25
66:8,10,15,23,25
68:5 69:5,8,9,11
72:16

**I'VE**
38:13

**identify**
9:1

**IFT**
31:1,6

**immediately**
52:24

**improper**
40:1

**in**
5:6,17 7:10 8:23
9:2,9 10:8,12,19,
20 14:20 15:3,20
16:8,19 17:12
18:2,10,13,16
19:11,13,17,20,23
20:8,16,20 21:1,8,
14,17,19,24 23:9,
22 24:2,15 25:10,
25 26:4,5,12,25
27:7,8,9 28:1 29:4,
7,16,23 31:5,12,20
32:4,13,20,21,22
33:10,20 35:6,14,
16 36:8,11,12,13,
21 41:5,25 42:7,15
43:4,25 46:5 47:7,
14,16,20 48:2,13,
14,19,23 49:1,8,
11,20 50:11,13
51:4 52:3 54:4,12,
24 55:9 57:23
59:4,7,11,20 60:8,
17,18 61:25 62:1,
14,18 63:18,19,21
64:2,15,16,17,18
65:4,14,17,22

66:4,6,16 67:1,14
68:9,25 69:9,24
70:1 72:8 73:22
74:7 75:12,13

**include**
13:20,25 14:3,6
28:20

**included**
13:4,5,6 49:4 70:1

**includes**
19:18 21:19 45:11

**including**
15:17

**income**
15:12

**inconvenient**
7:10

**incorrect**
64:10

**independent**
58:17 59:3,22
61:16 64:6

**indicated**
47:24

**individual**
64:11

**Industry**
11:18,22 12:2,11,
22 13:20,24 14:6
15:22 16:12 18:8,
10 20:21 21:3
26:16 27:4 28:6,
12,17,20 32:7,10,
16,18,21 33:6
37:17 38:1 43:1,5,
14,17,18,24 44:1,
4,5,12 47:22 48:4
49:17,19 50:3,11,
12,21,23 51:5
54:2,8 55:3 62:3,8,
19 63:5 64:12,16,


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

18,24 65:7,21
67:8,17

**inform**
71:1

**information**
49:15 50:25 54:25
55:10 65:16

**initially**
48:13

**inputting**
49:15 50:4

**inquiries**
43:23

**instruct**
60:20,21 61:4

**instructing**
6:20 9:22 61:11,14
71:8

**instruction**
76:3

**instructions**
61:7

**interact**
12:1

**interest**
19:17 20:8,20
21:19,24 42:19
43:12 44:10

**interesting**
24:1

**into**
7:4 14:12 21:13
24:13 30:8,15,20
31:15 34:3 38:12,
17 45:20 47:12
49:19 50:4 51:9
53:10 56:23 74:1,
11

**introduce**
5:12

**invest**
17:12

**investments**
17:12

**investor**
17:11 64:11

**invoice**
46:4,16 47:21,24
48:4,8 49:21 50:1,
7,10,12,19 51:10
74:21

**invoices**
45:5,7,9,16,17,24
47:16,18 48:22
50:15,16,17 51:6,7
65:13 66:4,6,7,13,
16 75:22

**involved**
15:20 16:1,8,12
17:23 19:20,23
20:2 54:4,24 55:9
61:25 75:12,13

**involving**
20:7

**irrelevant**
9:17,20 60:17

**issue**
6:10 39:25 40:9
41:4

**issued**
35:20

**it'll**
53:7

**it's**
7:9 9:16 10:22
12:9 27:23 39:3
45:6 49:24 52:19
55:25 57:16 59:24
67:4 68:14 69:15,
16,17,21 72:3
74:21,22 75:1,5

**Item**
22:17

**items**
28:21 39:14

**its**
33:20 37:5 42:18

**itself**
33:12 41:8,9

---

**J**

**job**
8:22

**Joe**
57:25 58:1

**Jones**
5:13,16,25 6:10,
14,19,24 7:5,15,20
9:6,7,22,25 10:1
12:12,15,16 14:13
16:7,18,22 17:4,18
18:23 20:10 21:14,
16 22:15,24 23:5,
24 24:4,8,11,18,21
25:5,16 26:17,23
31:16 33:15 34:4,
10,14,19 36:24
37:23 38:5,8,13,
19,23 39:2,10,15,
17 41:10 43:2,8
44:15,18,22,25
45:6,14,23 46:10,
13,14 48:17 49:6,
25 50:2 52:20
53:1,11,15,19
55:5,13,17,24
56:1,7,12,16,19,24
57:3,9 58:4,13
59:10,18 60:19,23,
25 61:6,13,18,19
62:21 63:8,12,16
64:4 65:11 66:2
67:22 68:1,5,15,20

69:2,7 70:7 71:7,
10,12 72:12,24
73:1,6,12,24 74:3,
5,15,19 76:1,8

**Joseph**
57:18

**Judge**
24:19

**July**
47:3 49:25 50:1,7,
11,13 51:4,11 52:6
53:18 65:4 66:18

**June**
40:17 41:25 46:24
48:3 74:6

**just**
6:15 7:7,16 10:11
11:9,21 12:21,25
13:4,10,13,18 15:8
17:15 22:10 23:1
24:14 25:18 26:11
27:1 29:17 30:14
31:6,7,21 32:2,5
37:3 38:23,24
39:15 41:13 43:9,
15 44:25 45:8
46:4,8,23 47:6,18,
21 48:2 50:3,6
52:20 53:20 55:23
56:9 57:5 58:21
59:10 61:1,6 62:25
63:14 64:24 65:13,
22 66:10 67:4,7,9,
17 68:2,6,13,22
70:2 71:7 73:6,15,
22 75:19

**Justice**
8:14,24 9:1,9,12,
15 13:14 14:19
16:14,20 17:15
18:18 19:6 20:12
21:22,24 26:2
27:11,15 28:11,16,


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376

www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

25 29:9,14 30:15, 20 31:4 32:14 33:1,3,20,25 37:19 41:6,14,20,21,25 42:3,16 51:1,3 53:5,15 54:3,9,13, 15,23 55:8 56:14, 20 57:3,21 58:2 59:2,6,23 60:7,10, 16 61:23 64:1,6, 11,14 65:6 67:6 69:18 70:12,15,20, 23 71:1,15,18,24 72:4,7,8,20 74:1,9, 11,17,22,25 75:1, 6,8,10,12,14,21,22

**JVA**
57:12,18

**K**

**keep**
13:18 35:8 36:13, 21 39:15

**Ken**
5:15,17 7:9 38:21 39:3 45:3 73:4

**kept**
36:11,14

**kind**
36:12

**kinds**
12:7

**know**
6:15 7:9,13 8:6,9 10:3,4 11:19 12:21 14:15 15:1 16:24 17:2,9 19:2 23:1,6, 14,21,24 24:9 26:7,9 28:3,6 30:17 31:17 35:10 36:15 37:6,11 42:11 43:10,15

47:17,20 49:10,14 53:24 54:1,3,16,22 59:5 60:5 61:24 64:14,15 65:22 67:4,9,25 68:14,22 69:12,13 70:2,9 71:20 72:5,7,13, 15,18 75:3,19

**knowledge**
16:15,19 18:8 27:15 29:18 33:7 43:4,25 55:7 59:1, 7,12 71:14 72:5

**knows**
24:11

**L**

**Lake**
30:22 31:6 71:17, 23 72:6,18 74:22 75:5

**laptop**
10:16,18,20 11:4, 10,14 20:16 51:14, 24 52:5,13

**last**
12:2 37:3 38:1 73:15

**lastly**
61:6

**later**
48:9

**law**
9:15 13:7,15 29:10,14,24 30:22 31:6 33:3 41:21 42:3 61:3 69:18 70:23 71:17,23 72:6,7,18,21 74:22,23 75:2,5,6, 12,23

**lawsuit**
26:8

**lawyer**
10:4 12:4

**least**
24:1 32:13

**leave**
61:2

**ledger**
18:6,13,16,19 19:7 26:11 48:20,24 49:2,9,11,16,18,21 50:5

**ledgers**
14:7 28:22 65:17

**Lee**
5:1,21 6:2 7:9 45:21

**left**
73:2

**legal**
6:1 16:24,25 17:14

**lender**
41:5,12,14 42:16

**let's**
6:25 7:15 10:11 15:8,15 19:16 21:8,11 22:16 26:10 31:10 33:24 34:20 36:4 40:3 46:4,10,22 49:23 53:3 58:14,21 69:16 70:10

**letter**
14:18,20,23,25 15:2,4 18:21 19:12 21:2,10,11 23:14 25:11 31:12,17,20

**letterhead**
57:18

**level**
67:16

**license**
35:20

**limited**
19:18 21:20

**line**
59:24

**listen**
34:15

**literally**
51:9

**litigation**
75:13

**litigations**
9:1

**little**
21:15 29:16 34:22 73:22 74:8

**live**
6:6

**LLC**
8:14,24 9:12 13:7, 14 14:19 16:14,20 17:15 18:18 19:6 27:11,15 28:11,16 29:1,9,14 33:1,25 37:19 41:6,14,20 42:1,17 51:3 53:6, 15 54:4,9,24 55:8 56:14,20 57:3,21 58:2 59:2,23 60:7, 10,17 61:23 64:6, 14 65:7 67:6 69:18 70:12,15,20 71:2, 16,18,25 72:4,8 74:1,17,25 75:15, 21

**loaded**
57:10

UNIVERSAL COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**loan**
29:4,8,13,17 30:21
31:7 41:20 43:21
44:9 68:12,23
69:16 72:19

**loans**
29:4

**local**
24:4,12

**locally**
11:4

**locate**
15:16 18:5 21:6
22:7,10,22 23:19,
20 32:6

**located**
6:3,16,21 10:18
32:20 33:12 62:2,
6,11

**location**
32:20,23 33:12,20
54:12,14 71:14

**locations**
32:21

**log**
51:22

**logged**
11:1 65:21 67:7

**logistical**
32:3

**logistically**
10:12

**logistics**
7:16 47:18

**look**
7:11 15:11,15 18:4
23:15 26:13,19,24,
25 32:21 43:20
57:6 63:17

**looked**
12:18 18:18 20:6
33:19

**looking**
15:20 16:4,8 17:23
19:21,23 20:14,15,
16 21:4 48:22
51:10

**looks**
45:1

**loss**
15:17

**lot**
73:1

**loud**
34:15

**lowercase**
34:25

**lunch**
73:3

---

**M**

**Madam**
45:15 56:7

**Maddalena**
5:10

**made**
31:23 32:5 44:11
49:16 66:15

**mail**
12:23 34:11 38:21

**mails**
29:25

**maintain**
27:5 35:5 42:17

**maintained**
32:16,18 33:6 35:9
52:2 62:3

**maintaining**
43:16

**maintains**
20:22 26:16 49:17
62:8

**maintenance**
28:21

**make**
12:8 18:17 25:25
27:22 29:17 30:11
33:16 35:3 45:1
46:4 56:13 61:6
66:11 71:7

**making**
60:11

**manager**
35:10 70:17

**managing**
42:5 70:18,19,23

**mark**
7:1 14:10 31:11
33:25 45:2,8,15
52:22

**marked**
7:21 29:8 45:18
48:22 52:9,17,18
66:4

**marketing**
19:19 20:7,12,19
21:4,20 22:17

**marking**
45:2

**marshaling**
54:5

**materials**
20:13

**matter**
5:6

**matters**
36:9

**Matthew**
5:13 6:2

**may**
18:8 20:4 21:14
31:23 32:20 33:11,
12 46:2 47:7,13
51:5

**me**
11:11 13:8,9
25:15,22 34:9,15,
17 38:17,24 39:4
43:14 46:7 47:6
52:18 53:13 57:2
65:10,25 66:15
67:24 69:6 73:6

**mean**
20:23 41:2 74:3

**meaning**
33:1 71:20

**means**
8:23 17:9 36:2

**Melchionni**
5:1,21 6:2,18 7:21
24:23 25:9 34:24
39:21 46:15 50:1
57:8,11 68:4,17
73:17,23

**member**
59:21 64:1,5

**members**
35:10 37:6,10
59:2,23 60:7,11,16
65:6,20 67:6,9
71:1

**mentioned**
11:9 31:6,7 67:17

**mentions**
74:12

**method**
7:10


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**million**
40:9,20 41:21

**mind**
46:8

**Mine**
40:25

**minute**
38:20

**minutes**
35:8 38:19 73:7
76:8

**misnumbering**
30:7

**misstatement**
70:6

**misstating**
24:2

**Moghandam**
5:14 38:7,15
44:17,21,24 46:7,
12 53:13 55:22
56:3,11,14,18 57:1

**moment**
20:1 34:10 37:3

**moneys**
66:14

**monies**
36:6

**month**
47:5,9

**monthly**
46:19 47:9

**more**
40:21 53:14 57:2
61:15

**move**
46:9 60:18,24 61:4

**moving**
56:5

**much**
66:25

**multiple**
39:14

**my**
6:13 8:25 10:19
14:18 18:8 23:1
24:22 26:18,19
29:24 31:18 32:24
33:7 39:12 43:23
46:23 56:8 62:5
68:21

**myself**
18:25 70:18

---

### N

**name**
6:1 12:2 27:19
29:4 57:12

**names**
57:7,20

**Nancy**
57:19

**nature**
12:6,18 13:11

**need**
67:25 76:8

**neglected**
52:16

**net**
48:7 62:14

**next**
14:10 34:1 36:4
39:11 43:20 46:22
47:2 53:7 55:18
56:19 58:21,23

**nine-**
56:24

**nine-page**
40:16

**no**
8:4,12,21 9:13
13:22 16:24 23:20
29:17,22 30:9
32:23 33:19,24
35:18 37:22 39:3,
23 49:22 54:7,18,
19,20 59:17 68:18
71:3,19

**non-**
12:4 33:10

**nope**
29:11 66:10

**not**
6:20,22 9:23 11:19
12:3 13:3 15:6
16:17 17:13 18:8
19:18 20:3 21:20
22:10 23:19 24:8
25:4 27:12,15,24
28:2,5,9 29:25
38:13 39:21,25
41:4 42:13 47:13
48:13 49:4,13,22,
24 52:15 53:25
54:14 55:22 60:20,
21 61:5,7,11,14
65:4,14,25 66:1,6,
16 67:1 68:5,9,23
69:5,8,9,11 70:1
71:4,8 72:6,11,14,
15,23 73:3 75:18,
21 76:3

**note**
13:7,9 30:21
39:12,19 40:4,6,21
42:21 45:12

**nothing**
45:7 59:14 71:6

**notice**
7:1,22,25 9:17

**notified**
27:4

**November**
14:18,23 15:11
18:21 19:12 21:2,9
23:9,14 25:10
27:9,14 28:1
30:13,19,24 31:4
48:14 60:18 63:21
68:25 69:25

**now**
5:3 11:3 12:17
24:11 29:19 30:10
38:8 40:3,12
41:11,24 42:6
44:2,14,18 51:11
52:15,24 55:18
60:14 63:9,17
66:4,10 68:3,4,8,9
71:13 74:15

**number**
5:6 7:1,22 15:15
17:21 19:9,13,16
20:2,3 21:9,11,17,
23 22:5,13,16,17
23:22 26:5,10
29:3,19,22 30:3,7,
9,10,11 34:1 38:5,
9 45:18 46:4,16
52:10 53:7 56:9,20
58:15 63:19 66:5,
12 73:14,21 74:18,
21 75:4

**Numbered**
31:25 32:14

**Numbers**
74:12,16 75:20

---

### O

**oath**
23:25



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**Object**
26:22

**objected**
8:7

**objection**
9:16 16:6,16,21
17:3,17 18:22 20:9
22:12,23 23:1,23
26:15 33:14 36:16
37:21 41:7,12
42:24 43:6 48:16
49:5 55:2,12 58:3,
11 59:8 60:13
62:20 63:6,25
65:9,24 68:19
69:1,4 70:5 71:5
72:10,22

**objections**
24:5,6

**objects**
74:10

**obtain**
27:5 32:11

**obvious**
23:8

**obviously**
15:7 66:24 75:8,10
76:1

**occurs**
30:7

**off**
6:12 7:7,15,17
12:25 36:22 39:7
60:14 71:11 73:9
76:5

**offer**
63:23 68:22

**offered**
28:20 45:8

**offering**
21:25 22:1,6,9,20

23:13,25

**office**
21:10 31:1,13
53:18

**Officer**
8:17,18,23 16:2,4

**officers**
37:18

**offices**
54:12

**okay**
5:19 6:8 8:5,8,13
9:11,14 10:11,18,
20,25 11:3,8,13,
19,25 12:3 13:2,
18,23 14:3,5,9,22,
25 15:6,15,20,24
16:11,14,25 17:13,
21 18:7,10,17
19:2,8,11 20:1,5
21:6,8 22:4,9,16
23:6,18,21 25:6,
14,17,21,23 26:7,
18,24 27:3,7,13,22
28:3,6,10,15,24
29:3,16 30:1,5,11,
13,23 31:10 32:2,
9,12 33:8,18,24
34:14 35:2,3,13,
16,22 36:4 37:2,18
38:23 39:24 40:8,
12,24 41:1,5 42:6,
11,15 43:3,19
44:2,6,24 45:3
46:22 47:12,16,23
48:2,11,21 49:3,
10,14,19 50:10,18,
24 51:22 53:2
54:3,12,15,21
57:15,23 58:1,14
59:19 60:23 61:4,
13 62:10 64:22
65:2 66:3,20 67:15
69:20 70:10,22

71:23 72:15,25
73:6 74:15 75:4
76:5

**on**
5:3,14 7:6,7,21
10:14,21 11:3,4,
10,14 14:23 15:11,
25 20:15,16 26:10
28:7 30:9 34:1,8,9
35:7 39:16 42:15,
18 46:3 47:12,24
49:16,24 50:7,19
51:13,22,24 52:5,
6,12,13 57:6,7,11,
15,18 58:8 59:21
60:18,24 61:4,22
63:13 65:21 66:8,
11,18 67:7 70:22
73:13,19 74:2,6,16

**one**
15:7 31:5,6 34:10
40:4 46:22,24
47:2,5 50:4 51:10,
23 53:13 55:18
56:5,6,9,16 57:2,
23

**ones**
7:13

**only**
12:17 29:12 44:3,5
45:25 76:8

**onto**
11:1

**open**
38:25 39:2

**operating**
8:17,18,23 16:2,3
33:25 34:21,23

**operational**
19:19 21:20 22:11,
18 23:10,15 26:3
33:21

**option**
7:12 51:23

**options**
7:6

**order**
5:8 46:5,8,23
52:23

**original**
40:9 52:3 65:5,15
66:17 67:2 68:24
69:25 70:4

**ostensibly**
59:2 66:13

**other**
7:13 8:8,10,20
9:20 10:6 11:21
12:2,4 22:9 23:10
24:10,15 29:17
32:20,21,23 33:19
35:19 36:9 39:13
50:17 52:9 59:14
72:6

**otherwise**
46:6

**our**
6:12 11:18 19:1
21:17 22:5 23:22
25:10 29:3,19
30:7,10,14,25
46:15 52:18 53:7
63:19 65:5,15
66:17 67:2 68:24
73:13 74:9 76:1

**out**
13:11,19 18:19
19:4 27:10,25
28:2,3,7 39:6
47:19 48:23 51:8
53:2 59:10 61:3
63:19 66:25 74:24

**outstanding**
42:19 43:11



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**over**
68:24

**oversight**
40:23,24

**owing**
36:6 42:20

**own**
54:15 56:8

**P**

**p.m.**
74:6 76:9

**page**
34:20,22 42:16
56:16,25 58:15,16,
21,23 59:21 61:21,
22 62:12 63:13
73:21

**paid**
36:7 48:6

**Palm**
58:23

**paragraph**
37:4 42:15 44:8

**part**
30:25 46:15 61:3
62:5 70:4

**participate**
9:2

**particular**
10:14 13:16 19:13
52:13 57:23 58:7
59:11,21 62:17
64:23

**particulars**
36:5

**parties**
5:9

**partner**
42:5 70:12,16,18,
24 75:8

**partners**
8:14,24 9:1,9,12,
15 13:14,15 14:19
16:14,20 17:15
18:18 19:6 20:12
21:22,25 26:2
27:11,15 28:11,16
29:1,9,10,14
30:15,20 31:4
32:14 33:1,4,20,25
37:19 41:6,14,20,
21 42:1,3,16 51:2,
3 53:5,15 54:3,9,
14,15,24 55:8
56:14,20 57:3,21
58:2 59:2,6,23
60:7,10,17 61:23
64:1,6,11,14 65:7
67:6 69:18 70:12,
15,20,23 71:1,15,
18,25 72:4,7,8,20
74:1,10,11,17,23,
25 75:1,6,11,12,
15,21,23

**party**
33:10,11 55:3

**past**
9:8

**payable**
46:19,24

**payment**
48:8

**payments**
44:10

**PDF**
44:23 47:21 51:12,
13,16,24 52:5,12
53:2

**PDFS**

52:3,9

**pending**
12:12

**people**
57:18 67:18 71:13

**person**
18:18 28:12 43:4,
13 54:22 57:16

**personal**
6:23 27:14

**personally**
26:13,19

**persons**
36:11

**pertain**
72:19 75:10

**pertains**
75:8

**physical**
54:14

**pick**
17:11

**pin**
21:8

**place**
6:5 31:5 60:5,6
64:12

**Plaintiff**
5:14

**Plaintiff's**
7:3 14:11 21:12
31:14 34:2 38:11
45:19 53:9 56:22

**play**
37:19

**please**
5:11 6:1,9

**pleasure**

34:7

**PNLS**
13:25

**point**
14:20 15:3 18:17
19:11 21:1 25:8
27:7 28:12 32:13
42:7 50:14 58:21
61:6 65:22

**populate**
51:9

**portal**
51:23 65:22 67:8,
14

**position**
8:14,16 9:14 18:10
54:23 55:8

**positions**
8:20

**possession**
10:22 49:20 62:18
63:3 69:9 71:15,17
72:9 75:17

**post**
26:8

**pre**
26:8

**preferred**
21:25

**preparation**
10:8,12

**prepare**
12:11,18

**preparing**
37:15,20

**present**
5:17,18

**presumably**
51:14



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

**pretty**
45:25

**previous**
56:5 63:14 75:7

**previously**
48:24 63:20 67:11, 13

**principals**
37:18

**principle**
42:19 43:11

**principles**
35:7,24

**printed**
47:19

**prior**
10:2,6 13:20 26:1 38:17

**privilege**
10:5

**privileged**
12:5

**proceed**
61:8

**proceedings**
35:9

**produced**
8:7 24:17 31:24 32:4 42:7 65:5 69:14 74:11 75:14

**production**
66:17 67:24 68:4 73:13 74:10 75:19

**profit**
15:17

**promissory**
13:7,9 30:21 39:12,19 40:4,21 45:12

**provide**
28:25 37:4

**provided**
11:13 17:10 20:13 21:7 22:13 23:3,4, 21,23 25:10,13,16, 19 26:3,6,8 28:12 37:10,11 62:14 65:14 66:1,6,16

**provider**
55:3

**providing**
37:20,25 38:2

**provision**
59:19

**Public**
58:17 59:3,22 61:16

**purchased**
36:7

**purpose**
36:22

**purposes**
11:1

**pursuant**
5:8 7:25 9:19 36:14 65:5 68:24

**push**
39:6 73:3

**put**
21:8 29:7 34:8,9 49:20 63:12 73:12, 19 74:15

**putting**
7:7

---

**Q**

**question**
12:13 17:6 18:11

24:3,23,24 25:3 26:18,19 32:25 36:25 43:13 52:16 54:21 59:13 61:17 62:5,25 64:25 67:19 69:15 75:4

**questioning**
34:13

**questions**
14:17 26:12 31:18 38:1 39:13 53:21 57:6 61:15 68:21 73:2 76:2

**quick**
26:12 39:5 73:7 74:4

**Quickbooks**
47:20

**quickly**
45:25 68:2,11 73:8

**quoting**
21:23

---

**R**

**reach**
27:10 28:2

**reached**
27:25 28:3,7

**read**
22:2 24:4,25 25:3 40:18 41:13 73:23

**reading**
76:10

**real**
61:7

**really**
25:7 54:14

**reason**
8:10 30:5

**reasonable**
35:22

**recall**
6:12 14:19 19:25 20:3,5 27:21,24 37:11,14 50:14 51:20 58:9 60:9 68:16

**receipt**
19:12

**receive**
48:8

**received**
14:22 18:21 24:9 36:7 38:14 42:8 53:17 65:3 66:14, 17 74:7 76:2

**receiving**
14:19 47:9 59:3

**recent**
39:24 68:3

**recollection**
31:22 42:6

**record**
5:3,12 7:4,15,18 14:12 21:13 26:1 31:15 34:3 38:12 39:8 44:1,3 45:20 53:10 56:23 72:2,4 73:10 76:6

**records**
9:20 19:20,21,24 20:7,12,15,19 21:4,21 22:11,18 23:10,16 25:10 26:3,4 29:25 32:4 35:1 36:14 43:10, 16,24 48:14 59:11, 14,20 67:2 71:15, 18,21,22,24 72:1, 8,19



**reference**
49:16

**referenced**
31:20 48:25 59:11
64:24 67:4

**referencing**
38:1

**referring**
53:14 56:4,5

**reflected**
49:1

**regard**
10:12 12:3,4 16:4,
25 17:1,23 18:1
19:4 20:1,2,6 22:5
26:12,13 28:10,13
29:23 31:19 32:3,
19,22 37:19,25
43:3,5,10,25 44:7
49:3 52:3,9 57:20
59:7,19 62:10,16
63:1 64:22 65:13
67:16 71:13 75:16

**regarding**
11:22 24:5 29:20
31:22,23 43:23
53:21 61:20,23
66:13 67:24 71:14

**relate**
43:11 73:18

**related**
19:17

**relates**
73:17

**relating**
20:19 21:18 33:1
36:10 61:15 71:24

**relationship**
28:10

**relationships**
8:25

**remedied**
41:4

**remember**
12:1 50:22 52:21

**remotely**
5:9

**rendering**
39:22

**repayments**
44:10

**repetitive**
27:23

**report**
58:17 59:3,12,22
60:8 61:15,20,21
62:12

**Reporter**
5:3,10,19 24:25
45:15 52:16 56:8

**Reporting**
5:11

**reports**
15:12 60:12

**represent**
47:4

**representation**
52:21

**request**
8:7 9:17,19 15:10,
16 16:5 19:18
21:17,19 22:5,17
23:22 26:4,10,14,
20 27:8,10 29:3
30:14 59:20 63:19
65:5,15 66:17 67:2
68:24 73:13,21
74:9,18 75:19

**requested**
12:14,20 23:4 26:5
27:5

**requests**
27:5 28:1 29:19

**required**
33:3 36:14

**reserved**
76:11

**reserving**
76:1

**residence**
6:5,23

**respect**
19:9 43:19,20 62:5
76:2

**response**
21:17,22 23:12,22
25:10 26:4 29:6,22
30:2,9,11,14 59:20
63:24 65:15 66:6,
16 67:1 68:9,10
69:25 70:2,4 74:4,
7,9 75:18

**responses**
48:13

**responsible**
37:15 38:2 49:14,
15 60:10

**responsive**
15:4 29:25

**rest**
45:4

**resumed**
7:19 39:9 73:11

**returns**
15:12,13

**review**
7:11 10:7,13
11:14,17 61:25

**reviewed**
10:21 11:3 13:12
18:25 19:1,4,8

**reviewing**
58:9

**right**
5:17 9:3 10:16
13:4 15:13 20:14
21:1 24:23 25:18,
23 31:8,10 33:13,
24 36:1 37:13 38:8
39:4,11 41:6,14,18
44:14 45:14 46:6,
13,18 47:2,6 49:7,
21 51:10,13 52:20
53:2,3,20 55:17
56:10,19 58:8
61:20 62:24 63:9
65:2 66:21,23
67:21 68:16 69:19,
22 71:10 72:18
73:1,4,21,22 74:20
75:16,25

**rights**
76:2

**ring**
57:12,20

**role**
8:25 9:9 16:3 17:1
37:19 57:21

**room**
20:16,22,23 21:3
27:1 32:16 54:16
62:8 64:2,7,17,18
65:8

**rules**
24:5,12

---

**S**

**said**
16:11,19 17:8 20:1
25:17,18 41:15
62:7

**salary**



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

46:19 47:9

**same**
27:1 38:16 54:12
62:25 75:4,6

**Sandy's**
12:1

**saw**
11:14 68:6

**say**
12:25 18:14 20:23
24:1 27:24 46:5
51:7 64:20 67:11,
12,13

**saying**
24:16 50:3,18 55:6
74:25

**says**
35:3,4 36:5 37:4
40:8,16 42:16 48:7
52:23 53:5 58:20,
23 59:23 70:13,14
74:7,9,22 75:1

**scope**
22:6 28:19 42:25
59:9 60:14

**screen**
7:7,21 14:14 21:11
34:8,9 38:16 44:25
46:24 49:24 53:11
55:18,23,25 56:1
58:8 66:8 67:22
68:12 71:11 73:13,
20 74:16

**SEC**
35:20

**second**
56:4 60:25

**seconds**
46:8,11

**Section**
34:22,25

**secure**
39:19

**secured**
39:12 40:3,20
45:12

**securing**
31:19,24

**security**
29:8 68:13,23
69:17 72:19

**see**
7:12,23 18:12,15
29:6,19,22 40:4,8,
13 42:21 46:3,15,
18 52:18,25 53:3
57:11 58:18,24
59:21,23 60:1,4
61:9,22 62:13
65:18 74:13,21
75:5

**seeing**
68:16

**seen**
53:22

**send**
12:22 34:6 38:24
39:3

**sending**
39:16 45:21 57:16

**senior**
39:11,19 40:3,20

**sense**
30:11 33:16

**sent**
11:17,22 12:4,10,
21 13:8,24 14:5
42:11,13 44:19,22
50:10 60:16

**sentence**
36:4 37:3 43:20

**separate**
19:14 44:20,23

**series**
21:25 35:19 66:12
68:11

**server**
20:15

**service**
6:17 11:5,8 28:25
50:20

**services**
9:12 27:16 28:11,
20

**serving**
6:11

**set**
48:23 49:12 60:11
63:19 70:1

**seven**
35:19 48:7

**shall**
35:8 36:5,13
42:17,18

**share**
7:7,8,21 14:14
21:10 38:15,25
44:25 53:11 55:18,
25 56:1 58:8 67:22
68:12 73:13,19
74:16

**shared**
11:11

**sharing**
55:23

**she**
20:4

**sheets**
13:25 15:18

**short**
7:17 39:7 73:9

**shortly**
13:6 14:9,23 48:6
57:16

**should**
23:8 39:14 41:3
45:10 52:17,18

**showed**
49:11

**showing**
68:2

**signature**
40:13

**signed**
40:17,21 41:3,24
57:16,17 70:11,22
71:2

**signing**
76:10

**similar**
11:6,7 44:7 52:8
62:7 68:21

**similarly**
43:22

**since**
12:17

**single**
15:7 63:13

**singular**
22:5 23:12

**sir**
43:9 53:14 57:1
61:20 66:3,23

**sit**
27:13 28:24 31:22
54:22 55:7

**sold**
36:7

**solely**
38:2



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**some**
11:5 25:8 33:11
42:7 50:14,22 57:7
65:22 66:13 67:24
68:3

**somebody**
11:13

**somehow**
21:2 50:21 51:17
65:20

**something**
11:6,7 41:1 43:23
63:5

**sorry**
12:25 18:14 34:15
62:22 72:16

**sort**
11:5

**speak**
62:16

**speaking**
24:5 41:12

**speaks**
41:7,9

**specific**
8:13 49:24 66:5
73:18

**specifically**
11:22 12:10 20:6
34:24 74:12

**stands**
54:21

**start**
7:7 34:12,18 39:18
76:6

**started**
15:3 50:23

**starting**
47:7

**state**
6:1

**stated**
67:11,13

**statement**
33:23 37:12,16
47:14 53:22 54:6
55:1,20 56:15
63:10,18 64:8,15
66:8 67:3

**statements**
14:3 15:17,18
18:6,13,16,19 19:7
37:20,25 38:3
48:20,24 49:2,9,11
53:6,16 56:21 57:4
58:7 63:21 65:17

**states**
19:16 22:13 62:14

**statute**
61:3

**stay**
46:5

**still**
9:8 54:21

**stipulate**
47:4,7

**stopped**
47:14

**straightforward**
69:15

**strike**
19:14 27:13 29:12
48:11

**submit**
50:15

**submitted**
47:22 48:4 50:16,
20 51:6,7

**subscription**
19:19 21:20 22:18

**substantive**
58:14

**suing**
26:2

**Supreme**
5:8

**sure**
12:9 13:3 25:25
27:22 29:17 33:17
35:3 38:22 41:11
45:1 46:5 49:23
56:13 60:11 65:25
66:11 69:5,10

**sworn**
5:23 30:23 31:3
32:25 33:19 52:8

**Sylvia**
18:25 19:4 45:22
70:17,19

**Sylvia's**
76:7

**system**
50:15,23

———————————

**T**

———————————

**tab**
51:23

**table**
58:16

**tabulation**
56:9

**tailor**
24:6

**take**
9:5 10:11,21 14:16
15:10 17:22 20:24
24:13 38:20 39:4

46:8 51:16 52:2,21
53:2 55:17 71:11
73:2,3,6

**taking**
7:2,22 61:7

**talk**
7:16 25:7 30:10
31:10 35:4 40:3
66:10 68:3 76:6

**talked**
74:16

**talking**
34:25 39:18 40:5
62:12 66:7,8,10
68:7

**tangible**
54:15

**tax**
15:12

**Tecum**
7:2,23

**Teh**
20:13 22:1 26:1
29:21

**Teh's**
19:17 20:7,19
21:18,24

**tell**
6:20 16:3 20:5
32:5 39:20 41:13
43:14 52:16 56:24
57:2 59:1 69:17
70:11

**telling**
6:22 24:16

**tense**
9:8

**term**
17:7 36:2



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**terminate**
61:9

**terms**
7:10 48:7

**testified**
5:23 42:17 63:20

**testify**
24:12

**testifying**
28:25

**testimony**
11:15 16:20 17:10,
13,14 18:11 22:4,
20,22 23:18 24:1
25:9 26:1 30:23
31:3 32:15,25
33:19 39:22 43:3
44:7 47:13,25
48:7,9,21 49:3
50:18 52:8,13 59:7
62:17 63:22 64:5,9
65:12,16,23 67:5,
10 68:22 70:20
71:23,25 72:16

**texts**
39:21

**than**
8:8,10 10:6 11:21
22:9 32:20 40:21

**Thank**
8:2 56:2

**that**
6:5,11 7:10,23,25
8:5,10,16 9:1,9
10:6,12,18,21,25
11:3,6,7,8,9,14,15,
21 12:9,14,19
13:4,5,6,10,11,16,
24 14:1,5,9,22
15:10 16:8,11,20
17:10,15,23 18:11,
17,18 19:13,14

20:2 21:8,11 22:2,
4,7 23:18,24 24:8,
17,18 25:2,9,12,
16,25 26:1,2,12,
13,16,18,19 27:1,
10,12,14,17,19,25
28:4,7,11,13,15,
19,25 29:6,11,12,
13,16,18,19,22,23,
24 30:2,7,11,17,23
31:4,6,8,23,24,25
32:4,13,15,16,19,
22,25 33:2,3,5,9,
10,16 34:5,14
35:3,11 36:1,15,18
37:3,6,8,9,15,25
38:1,5 39:6 40:1,2,
4,8,18 41:1,2,11,
12,24 42:6,8,12,
16,21,23 43:3,4,5,
9,10,13,14,15,22,
23,25 44:1,2,6,7,8,
11,25 45:3 46:1,2,
19 47:4,7,12,13,
14,20,23,24 48:7,
8,9,11,13,21,22,24
49:7,15,20 50:4,5,
6,16,19,20,23
51:8,10,16,24
52:2,3,6,8,9,12,15,
17,20 53:2,8,12,14
54:4,5,8,13,17,24,
25 55:4,6,7,17,22
56:13 57:2,6,7,10,
11,12,15,16,17
58:18,24 59:7,24
60:1,3,5,11 61:2,
25 62:8,12,16,17,
25 63:4,5,9,12,13,
23 64:3,5,7,10,23,
24,25 65:3,6,13,
16,18,19 66:4,14,
16,19,21 67:1,3,5,
12,14,16,17,18
68:11,16 70:4,12
71:9,11,13,14,16,

23,25 72:2,15,19
73:18,19,23 74:7,
9,13,17,25 75:14,
20 76:2

**that'll**
53:7

**that's**
8:6 12:12,19 19:8
22:6,21,22 24:17,
19 25:18 29:8,12
30:1,16 32:12,24
39:25 40:13 43:9
44:6 46:18 47:3
49:3 50:8,16 51:6
52:13 56:16 63:19
64:9 65:23 67:9
70:14,20 72:16
74:17,25

**their**
28:7 33:2 72:8
74:4

**them**
11:5 15:7 18:5,12,
16 23:20 32:6
38:25 39:2,6 44:17
45:2,8,21 47:6
49:4 50:7 57:23,24
61:2 63:3 64:7
72:2

**themselves**
5:12

**then**
30:22 31:7 48:6
51:1,16 58:16 61:9
62:24 67:15,16
73:6,7,14 74:2,12
75:5,13

**there**
8:10 15:2 18:2,20
19:11 20:18,21
21:1 29:17 30:2,8
32:23 33:19 36:17
37:8 40:17 41:13

48:11 51:2 54:12
63:14 64:3 67:8
74:4

**there's**
6:10 16:11 28:15
29:22 30:6 39:24
47:5 50:11 57:11,
17 58:15 66:3 75:5

**thereafter**
48:6

**thereon**
42:20

**thereupon**
5:20 7:3,17 14:11
21:12 25:3 31:14
34:2 38:11 39:7
45:19 53:9 56:22
73:9

**these**
10:21 11:9 12:6
16:9 21:4 25:12,19
27:4,25 31:19,24
32:2,6,7,11,15
37:25 38:1 45:4,5,
24 47:16,18 48:12,
14,21 49:10 50:22
58:7 59:11 62:1
64:12 65:19 66:1
73:15 75:18,22

**they**
11:4,11 12:22 13:8
16:5 18:21 23:21,
23 25:16 26:7
28:20,25 44:18,20,
22 47:19 48:19
49:1,4,8,12,20,21
50:5,6,14 57:22
64:3 65:21 67:7,8,
14 71:21,22 72:7,
11,14,15,23 73:18

**they're**
45:6 46:3 47:19
51:2 62:6,11

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**things**
12:7 13:25 14:6 23:10 32:3 36:10 38:21 39:3 54:17 64:7 73:15

**think**
18:12,14,15 33:9 34:1,5 38:6 45:6, 11 47:2 52:19 66:3 73:14 74:2

**third**
33:10 55:3 58:16

**this**
7:6 9:5,17 10:8,9, 20,25 11:1,4 12:19 13:12,19,23 14:17, 18,20,22,25 15:2, 4,8,10,16 16:5 17:8 18:3,21 19:12,18 21:2,3,19 23:12,13 25:8 26:4,20,24,25 27:7,8,10 31:11,17 32:3,12,15 34:15 36:16,20,22 38:9, 19 40:4,16,20 41:5,24 42:7,15,21 45:16 46:4 49:16 50:10,12 52:17 53:17,21,22 54:5, 25 55:10 57:18 58:9,15 59:3,12,21 60:8,15 61:14,15, 20,21 62:7,24 63:17,23 64:2,8, 15,22 65:4 66:4,18 68:2,21,23 69:16, 24 70:1,3,10,11,22 71:2 72:6 73:8,17 76:4

**those**
10:13 11:13,17,22 15:13,21,23 17:12, 24 18:4 19:21,23

20:15 32:18 33:5 37:20 38:2 39:16 43:16,24 44:16 52:2 57:20 62:2, 17,18 65:4,14 66:5,16,18 67:5 69:21 74:16 75:21

**though**
40:13

**three**
31:5 38:20 57:18, 23

**through**
11:5 15:6,8 31:25 32:14 45:24 47:8, 22 50:16 61:21 65:21 68:14 73:3 74:13 75:14

**time**
5:4 14:20 15:3,11 19:11 21:1 27:7, 11,12 32:13 38:16 41:24 42:7,21 53:14 57:2 64:23 65:22 67:25 76:4,6

**timeframe**
27:17

**timing**
23:2

**title**
8:14,16 9:14 42:3 54:23 56:12,13 57:2

**titles**
8:20

**today**
7:25 8:3 10:2,7 15:8 23:25 28:24 31:22 54:22 55:7 58:10 61:8 62:7

**today's**

5:4 10:23

**together**
44:22

**took**
60:5,6

**top**
6:13 53:5 69:16

**track**
32:6

**tranche**
32:3 38:21 39:5,14 45:7

**transactions**
36:9

**transcript**
52:17

**transmit**
50:24 51:17

**trick**
24:3,9,16 25:15,17 65:25 69:5,11

**tried**
24:14

**true**
35:5

**trust**
24:4,8 44:6

**try**
24:9 68:11

**trying**
13:11 18:1,4 24:3 25:15,17 33:18 46:23 59:10 65:25 66:25 69:5,11 74:24

**turned**
68:24

**two**
38:1,20 40:21

69:21 73:16

_____

**U**
_____

**Um-hum**
59:25 60:2 64:19

**unaudited**
37:4,9

**under**
23:25 42:21

**undergraduate**
35:13

**underneath**
62:25

**understand**
17:6 28:15,19 33:9 36:1 46:2

**understanding**
29:24 30:1,18 37:8,24 62:10 66:19 71:16

**understood**
12:9 27:22

**unexecuted**
42:8,12

**Unfortunately**
38:15

**units**
22:1

**Universal**
5:11

**unless**
74:3

**unrelated**
31:1

**until**
13:18 46:5 47:12

**up**
6:25 29:7,21 32:25

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

33:24 34:21 41:21 44:19 45:16 47:7 49:11,15 58:8 62:1 67:16 73:8,13,19 74:4

**upload**
50:24 51:19,21,24 55:19

**uploaded**
51:2,12 64:2

**upon**
31:18

**us**
6:20 7:9,13 8:22 14:15 16:3 20:5 21:22 27:5 29:7 32:5 42:8 47:18 55:4 58:21 59:1

**use**
17:12 28:11 49:20 54:13

**used**
9:8 17:7 50:14 54:5,25 58:6 62:14

**using**
50:23

**usually**
36:11

**utilize**
11:9

**utilized**
27:11,16 51:8 62:1

--- V ---

**various**
15:12 17:12 50:17 61:22

**Vehicle**
17:11

**Velocci**
57:18,19,25 58:1

**verify**
46:8

**version**
42:8,12

**via**
11:11,14 12:22

**Videotaped**
5:1 7:2,22

**view**
11:9 64:3,7 67:9

**viewing**
10:13 11:5

--- W ---

**walk**
45:24

**want**
6:15 7:11 8:9 10:3, 4 11:19 12:8,21 15:1,25 19:2 23:6, 14 24:12 25:6,21, 25 27:22 29:7 33:8 35:4 38:20 39:2 43:10,15 45:1 46:9 56:13 59:16 65:22 66:24 67:4,9 68:22 69:11,13 70:2 71:7 73:2,3 75:19 76:6

**wanted**
29:17 68:6

**wasn't**
26:18 30:2

**way**
11:21 13:4,13 17:8 22:10 39:6 48:2 49:23 50:3 52:15 55:6 65:13 71:20 72:13

**we**
5:3,6,16 6:11,15, 17 7:6,14,16 8:6 12:1,20 14:14,22 15:8,22 18:25 19:13 23:3,9,17,20 25:6 26:10 29:6,20 37:11 39:6 40:5 41:4 42:8,11 45:1, 2 46:5,9,24 47:4,7 48:14,22 49:4 51:1 52:5 53:17 54:13 56:5,9 57:10,15 58:6,8,15 63:13, 20,23 65:3,14 66:17 67:1,3 68:4 69:24,25 70:3,17 73:7,25 74:6 76:5

**we'd**
15:7

**we'll**
7:6 13:5 14:16 19:14 21:10 29:16 52:12,22,25 53:1 61:17 65:17

**we're**
7:1 12:19 14:9,10, 16 15:6 25:25 30:10 31:11 34:1, 5,22,24 38:8 39:4 45:14,15,24 51:10 61:8 62:12 66:11 68:3,7 74:24 76:1

**we've**
29:6 37:25 38:19 65:12 66:4

**Weissman**
11:24 13:19 14:5

**were**
10:13 11:4,11 13:24 15:20 16:8 17:23 18:4,20 19:5,20 20:14,15,

16,18 21:3 22:7 23:18,23,24 25:16 26:5,7 31:24 32:4 40:5 41:25 42:11 44:22 47:8 48:12, 14,19,24 49:1,4,8, 12 51:6,7 61:24,25 62:3 65:2,4,14,20 66:1,6,16 67:5,14

**weren't**
23:21

**what**
8:9,16,23 9:18 10:3,20 11:8,20 12:21,22 13:3,19 15:1,8 16:3 17:2,9 19:4,5 20:6 21:7 22:13 23:3,4,8 24:7,13,24 25:18 27:19 30:16,18,19 31:10 32:5,24 35:13 36:1 37:13 41:2 45:14 47:17 49:22 52:18 53:4 56:12,24 59:1 60:6,15 61:1,24 62:7,11,22 65:10 69:10,17 70:11,13, 14 72:3,5 74:18,24 76:6

**what's**
6:8,25 42:3 47:2 70:2

**whatever**
34:7 38:18,23 45:10,13

**whatsoever**
71:16

**when**
14:25 15:2,3,10,15 16:4 17:8,10 18:20 20:23 23:14 24:9 26:7,20 27:9,25



877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

42:13 48:14 49:4 50:23 51:7 53:11, 24 57:10 65:3 66:25 69:24 73:20 75:1

**whenever**
45:23

**where**
6:3,6,16,20 10:18 17:11 18:3 19:12 20:6,14,18 21:2,17 22:17 26:25 33:12 39:25 40:5 50:5 58:23 59:22 62:2, 6,11,14 63:20 64:12 65:20

**whether**
18:1 27:15,24 36:17 60:16 64:20, 23 69:5 71:2 72:6, 7 75:18

**which**
19:16 21:9,18 24:12 31:1 33:2,20 42:17,18 45:7 49:16 56:20 63:19 75:13

**while**
34:10 35:25 39:12, 21 57:6

**who**
11:17,22 15:23 18:17 31:12 49:14 54:1,22 55:8,9 61:2 64:25 67:18 75:16,17

**who's**
37:15 41:5,12 43:16 60:10 63:2

**whole**
52:17

**whom**
43:15

**Whose**
40:24

**why**
8:5 12:19 23:21 30:1 34:8,17 40:20 42:11 45:7 48:12 49:4 59:1 63:23 65:3,4 68:23 69:13 70:3 71:4 74:24 75:10 76:5

**will**
6:11,17 14:15 21:9 25:7 31:18 35:5 36:21,22 37:4 39:13 45:16,17 52:5 56:20 57:15 61:21 73:7,15 74:15

**with**
5:10 6:10,11 7:7 8:2,9,25 9:4 10:4, 12 11:11,20 12:1, 3,4,20 15:1,13 16:4 17:1,23 18:1 19:1,3,4,8 20:1,2,6 22:4 23:7 26:13 28:10,13 30:22,25 31:6,19 32:3,10,19 34:17 35:6,23 37:19,24 39:1 43:3,10,19,20 44:7 45:3 47:23 48:8 49:3 52:9 53:12 57:20 59:14,19 62:1,5,10,16,24,25 63:1,18 64:20,22 65:12 66:21 67:13, 16 69:25 71:6,13 72:2 75:16 76:2

**within**
10:22

**Without**
16:25

**witness**
5:22 6:20 9:22 12:10 21:15 24:11 34:7 60:20 61:11, 14 71:8 76:4,11

**won't**
38:25

**word**
17:8,9

**words**
24:15

**work**
31:19

**worked**
32:10

**working**
39:16

**works**
38:18

**would**
5:11 9:2 13:6 18:4, 10,12,15 24:8,25 25:2 40:1 43:4,5 44:1,11 45:25 46:7 47:17 48:6,8,23 50:4,15,16,20,24 51:9,13,16,19,23 52:8 61:24 62:6 63:5,23 64:24 65:6 67:17,18 71:17 72:5 75:13,14

**would've**
13:5 48:3 67:7,8

**wrap**
73:8

**write**
30:17 31:17

**written**

28:16 35:9

**wrong**
66:15

**wrote**
30:14,16

---

Y

---

**yeah**
39:3 53:1 55:24 56:7 69:11,15

**year**
37:5 63:10,18 64:8,16 65:4 66:18

**years**
40:21

**yes**
5:18 10:17 12:12, 17 13:10 14:2,24 15:5 26:21,24 27:18 33:7 38:4,7 45:6 60:3,4 70:21 73:5 75:9

**yet**
55:23

**you**
6:3,6,11,15,16,19, 23 7:9,10,13,23 8:2,3,6,9,11,13,22 9:5,8,11,14 10:2,3, 7,13,21,25 11:3,4, 8,9,14,17,20,23 12:4,5,14,17,21, 22,25 13:10,12,13, 24 14:15,19,22,25 15:1,2,3,10,11,15, 16,20,25 16:3,8, 11,23 17:1,5,7,8,9, 10,11,15,23 18:3, 4,12,14,15,24 19:3,8,13,20 20:1, 3,5,6,11,14,15,16,



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

18,23 21:2,3,6,14 22:7,10,14,21 23:1,3,4,7,14,15, 18,21,24 24:7,8,9, 11,14,18,25 25:9, 13,16,17,18,20,22, 24 26:2,7,12,19, 20,24,25 27:1,7,8, 9,10,13,14,23,24, 25 28:3,6,12,15, 19,24 29:7,12,18, 21,23 30:5,14,17, 18 31:3,6,7,17,21, 22,23 32:5,19,21 33:9,19 34:4,5,6,9, 12,17 35:10,16,19, 22 36:1,15,18,20, 21,25 37:6,8 38:9, 18,20,21 39:2,15, 20,22 40:4,5,8,12, 19 41:1,2,12,13, 15,24,25 42:6,11, 14,17,21,25 43:16, 20,24 44:3,15 45:3,10,12,13,24 46:1,7,9,15,18,20, 25 47:4,8,20,23 48:3,6,7,12,13,16, 18 49:10,14,21 50:6,7,10,12,19,24 51:7,8,9,13,16,19, 23,24 52:3 53:2,4, 8,11,13,20,22,24 54:1,3,8,16,22 55:7,17,19 56:2,3, 4 57:1,6,16 58:5,9, 17,20,22,24 59:1, 6,12,15,16,21,23 60:1,5 61:2,7,9,14, 21,24 62:7,11 63:12,14,17,18,20, 22 64:14,15,22,24 65:2,10 66:1,7,13, 14,15,18,21,25 67:1,17,22,25 68:2,5,6,12,13,16,

22 69:9,13 70:8, 11,19,22 71:1,2, 10,16,20 72:1,2,3, 5,7,13,15,18 73:2, 19,20 74:2,3,13, 16,21,25 75:5,20 76:6

**you'd**
24:16 38:16 51:22

**you'll**
24:5 29:19,22 34:14,21 40:13 57:11 61:9,22 62:13

**you're**
7:25 9:4,22 12:9 13:3,8 16:2 24:2, 15,22 25:15 28:24 30:25 39:5,21,22 43:13,14 49:22 50:3,18 52:15 53:12,14 59:13 60:19 65:25 69:5, 10 71:7 72:4 73:12,14

**you've**
12:18 24:4,9 32:24 49:16 52:2

**Young**
31:12,24 32:10

**your**
6:1,5,8,9 9:17,19 10:4,6,12,20,22 11:10,14,15,20,21 12:4 15:1 16:14, 19,20 17:1,13,14 18:11 19:3 22:4, 20,22 23:7,12,18, 25 24:2,6,24 25:9 26:1,6 27:23 30:1, 9,11,13,18,23 31:3 32:14,25 33:18,23 34:7,12 35:13

37:24 39:22 40:13 42:3 43:3 44:7 47:13,25 48:7,9,21 49:3 50:18,19 51:13,24 52:5,8, 13,21 57:21 58:10 60:18 62:6,10,17, 22 64:5,9 65:6,12, 16,19,23 67:4,9 70:2,20 71:23,25 72:16 75:6

---

**Z**

---

**zipped**
44:19

**zoom**
21:14 73:22 74:7

UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

# Composite Exhibit 7

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT dated as of the date executed below between **Justice Partners, LLC** (the "**Lender**") a Delaware limited liability company with an address located at 20900 NE 30th Ave., Suite 510, Miami, Florida 33180, and **Justice Partners Law Group, LP** a District of Columbia limited partnership (the "**Borrower**") located at 1100 H Street NW, Suite 840, Washington, D.C., 20005.  In order to induce the Lender to advance money or grant other financial accommodations on one or more occasions to the undersigned Borrower, the undersigned Borrower represents, warrants, covenants to and agrees with the Lender as follows:

1.     **Definitions.**  For purposes of this Agreement, unless the context clearly requires otherwise, in addition to the terms defined elsewhere herein, the following terms shall have the meanings set forth below:

*Advances* means the Borrower's Advances with the Lender referred to in Section 2.1 infra.

*Affiliate* means any person and/or entity, which directly or indirectly controls, or is controlled by, or is under common control, with the Borrower.

*Agreement* means this Loan and Security Agreement.

*Collateral* means the Collateral described in Section 3, infra.

*Collateral Account* means the account of Borrower with the Lender established under Section 8.2 (c) infra.

*Control* shall be deemed to exist if any person, entity or corporation, or combination thereof, shall have possession, directly and/or indirectly, of the power to direct the management and/or policies of the Borrower or any person, entity, or corporation deemed to be an Affiliate of the Borrower, and shall be deemed to include any holder of 50% or more of any stock or other interest in the Borrower or in any person, entity or corporation deemed to be an Affiliate of the Borrower, whether such holding is direct or indirect.

*Deposit* means any deposits, credits, securities, interests, participations, shares, collateral or property of the Borrower at any time now or thereafter in the possession, custody, safekeeping or control of or in transit to the Bank, or any other holder for the purpose of securing Inventory financing of Borrower, and the proceeds thereof.

*Deposit Accounts* means all deposit accounts maintained by the Borrower with the Bank for the purpose of financing renovation, expansion, furniture and fixtures of Borrower, and the proceeds thereof.

*Events of Default* shall have the meaning given such term in Section 8 of this Agreement infra

*Indebtedness* means the total of all obligations of the Borrower to the Lender, whether current or long-term, including without limitation, guaranties, endorsements, or other arrangements whereby responsibility is assumed for the obligations of others.

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group

</div>

1

CONFIDENTIAL                                                        Justice-Partners-Teh-000112

*Inventory* means all inventory, including, without limitation, all inventory in the possession of others or in transit, all goods held for sale or lease or to be furnished under contracts for service or which have been so furnished, and completed and unshipped merchandise, and all products and proceeds (including insurance and condemnation proceeds) of the foregoing, as defined by the Uniform Commercial Code of the State of Delaware, whether presently owned or hereafter acquired.

*Legal Requirements* means all applicable present and future statutes, laws, ordinances, rules and/or regulations of any governmental authority, all orders, writs, injunctions, decrees and judicial decisions and all covenants which bind or materially affect the Borrower or any part of its assets.

*Loan Account* means the accounting as to the Loans issued by the Lender pursuant to Section 2.2 infra.

*Loan Documents* means the following documents collectively: (i) This Agreement; (ii) Each Promissory Note of the Borrower to the Lender, including the Note (collectively the "Notes") evidencing the indebtedness for the Loan; (iii) a UCC-1 Financing Statement; (iv) all other documents and instruments heretofore or hereafter executed by the Borrower in favor of the Lender relating to the Loans, including any guaranty, pledge, security and/or subordination agreement and related Uniform Commercial Code financing statements; and (v) in each case, the term "Loan Documents" and any reference herein to any particular Loan Document shall mean and include all amendments, modifications, replacements, renewals or extensions of any and all such documents, whenever executed.

*Loans* means: (i) Advances evidenced by the Note; and (ii) Any other loans made by the Lender to the Borrower after the date of this Agreement.

*Maturity Date* means the fifth anniversary of the date of the first Advance, as may be extended. The Borrower shall have the option to extend the Maturity Date for two successive 12-month extensions, as applicable (the "**Final Maturity Date**"). Subject to the conditions set forth below, Borrower may extend the Initial Maturity Date for two separate 12-month periods (each, an "**Extension Period**"). Each Extension Period shall be subject to satisfaction of the following conditions: (i) notice is delivered to the Lender at least 90 days but not more than 120 days prior to the expiration of the Initial Maturity Date, or if extended, the expiration of the first Extension Period; (ii) no default or event of default exists on the date that the notice described in clause "(i)" is provided by the Borrower, or on the first day of the applicable Extension Period; and (iii) certain other conditions set forth in the Loan Agreement have been satisfied.

*Note* means the Borrower's Senior Secured Promissory Note evidencing indebtedness for Advances of even date herewith.

*Obligations* means all liabilities, duties and/or obligations now or hereafter owing from the Borrower to the Lender of whatever kind or nature, whether or not currently contemplated at the time of this Agreement, whether such obligations be direct or indirect, absolute or contingent or due or to become due, including all obligations of the Borrower, actual or contingent, in respect to the letters of credit or Lender's acceptances issued by the Lender for the account of, or guaranteed

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group

</div>

2

BOC 37448230v3

CONFIDENTIAL

Justice-Partners-Teb-000113

by, the Borrower, including, without limitation all obligations of any partnership or joint venture as to which the Borrower is or may become, liable, which term shall include all accrued interest and/or all costs and expenses, including reasonable attorneys' fees, costs and expenses relating to the appraisal and/or valuation of assets and all reasonable costs and expenses incurred or paid by the Lender in exercising, preserving, defending, collecting, enforcing or protecting any of its rights under the Obligations or in any litigation arising out of the transactions evidenced by the Obligations.

*Required Permits* means all permits, licenses, approvals, consents and waivers necessary pursuant to any Legal Requirement to be obtained from, or made by, any governmental authority for the ownership by the Borrower of its assets or for the conduct of its business.

*Term* shall mean the date of execution through repayment of the Loan.

*Termination Date* shall mean the Maturity Date, at the end of the Term, subject to any extensions.

## 2. Loans.

### 2.1 Advances.

(a)     Pursuant to this Agreement, and upon satisfaction of the conditions precedent in Section 5 hereof, during the period from the date hereof until the fifth anniversary of the date of the last Advance hereunder (as such date may be extended from time to time), the Lender may make Advances and the Borrower may borrow under this Agreement.

(b)     All Advances under this Agreement shall be evidenced by the Note, shall bear interest, and shall be due and payable in full on the Termination Date.

### 2.2 Loan Account.

(a)     The Lender shall maintain an accounting (the "Loan Account") on its books to record: (i) all Loans; (ii) all payments made by the Borrower; and (iii) all other appropriate debits and credits as provided in this Agreement with respect to the Obligations.  All entries in the Loan Account shall be made in accordance with the Lender's customary accounting practices as in effect from time to time.  Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Lender from or on behalf of Borrower, and the Borrower hereby irrevocably agrees that the Lender shall have the continuing exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default against the Obligations in such manner as the Lender may deem advisable.

(b)     The balance in the Loan Account, as set forth on the Lender's most recent printout or other written statement, shall be presumptive evidence of the amounts due and owing to the Lender by Borrower; provided, however, that any failure to so record or any error in so recording shall not affect the payment of the Obligations.  Any periodic statement prepared by the Lender setting forth the principal balance of the Loan Account and the calculation of interest due thereon shall be subject to subsequent adjustment by the Lender but shall, absent manifest errors or

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group

</div>

3

CONFIDENTIAL

omissions, be presumed final, conclusive and binding upon the Borrower, and shall constitute an account stated unless within thirty (30) days after receipt of such statement, the Borrower shall deliver to the Lender its written objection thereto specifying the error or errors, if any, contained in such statement. In the absence of a written objection delivered to the Lender as set forth above, the Lender's statement of the Loan Account shall be presumptive evidence against the Borrower of the amount of the Obligations and the burden of proof to show manifest errors or omissions shall be on the Borrower.

3.      **Grant of Security Interest; Obligations Secured.** The Borrower hereby grants to the Lender a senior security interest in all of the Borrower's present and future right, title and interest in all of its assets, including but not limited to its interest in any Qualified Settlement Fund, and all distributions, cash and other property or proceeds from time to time received in respect thereof, furniture and fixtures, inventory, deposit accounts and reserve bank accounts, lease reserve accounts, and secured accounts receivable wherever located and whether now existing or hereafter created or arising, collectively called the "**Collateral.**" The security interest in the Collateral granted herein is to secure the payment and performance of the Obligations. Lender is hereby authorized by Borrower to file any and all documents with the appropriate authorities as necessary to authenticate and/or perfect the security interests granted herein.

4.      **Representations and Warranties.** The Borrower hereby represents and warrants to the Lender (which representations and warranties will survive the delivery of this Agreement and the making of any advances of any Loan and shall be deemed to be continuing until all Loans are fully paid and this Agreement is terminated) that:

(a)      (i) The Borrower is, and will continue to be, duly organized and validly existing; the Borrower is in good standing under the laws of the State of incorporation thereof; (ii) the Borrower is qualified and in good standing to do business in all other jurisdictions in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary; (iii) the Borrower has the power to execute and deliver this Agreement and each Loan Document and to borrow hereunder; and (iv) the Borrower has all Required Permits, without unusual restrictions or limitations, to own, operate and lease its properties and to conduct the business in which it is presently engaged, all of which are in full force and effect.

(b)      The making and performance by the Borrower of this Agreement and the Loan Documents have been authorized by all necessary corporate action by its Board of Directors. The execution and delivery of this Agreement and the other Loan Documents, the consummation of the transactions herein and therein contemplated, the fulfillment of or compliance with the terms and provisions hereof and thereof, (i) are within its powers, (ii) will not violate any provision of law or of its organizational documents, or (iii) will not result in the breach of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of the Borrower pursuant to any indenture or Lender loan or credit agreement (other than pursuant to this Agreement and the other Loan Documents) or other agreement or instrument to which the Borrower is a party. To the Borrower's knowledge, no approval, authorization, consent or other order or registration or filing with any governmental body is required in connection with the making and performance of this Agreement.

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group

</div>

4

BOC 37448230v3

CONFIDENTIAL

(c)     Subject to any limitations stated therein or in connection therewith, all information furnished, or to be furnished, by the Borrower pursuant to the terms hereof is, or will be at the time the same is furnished, accurate and complete in all material respects necessary to make the information furnished, in the light of the circumstances under which such information is furnished, not misleading.

(d)     The Borrower is in material compliance with all Legal Requirements applicable to it, its property or the conduct of its business, including, without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment.

(e)     No proceedings by or before any private, public or governmental body, agency or authority and no litigation is pending, or, so far as is known to the Borrower, its officers or directors, or threatened against the Borrower, except such as are disclosed in any addendums attached hereto.

(f)     No Event of Default has occurred and no event has occurred, or is continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice specified therein, would constitute such an Event of Default.

(g)     The Borrower agrees that the proceeds of Loan shall only be used in connection for general working capital purposes and to fund mass tort litigation expenses. It is understood that no portion of the Loan shall be used to pay an interest due or payable under this Agreement.

(h)     This Agreement and all other Loan Documents, upon the execution and delivery thereof, will be legal, valid, binding and enforceable obligations of the Borrower as the case may be, in accordance with the terms of each; provided, however, that the Borrower's representation as to enforceability is qualified to the extent that enforcement of the rights and remedies created by this Agreement and the Loan Documents may be subject to applicable bankruptcy, insolvency, reorganization or similar laws affecting the rights of creditors and secured parties generally, and does not apply with respect to the availability of the remedy of specific performance, injunctive relief or any other equitable remedy.

(i)     The Borrower has good and marketable title to its properties and assets, including all of the Collateral, subject to no mortgage, pledge, lien, security interest, encumbrance or other charge which is not set forth in any addendums attached hereto.

(j)     The Borrower has filed all tax returns and reports required to be filed by it with all federal, state or local authorities and has paid in full, or made adequate provision for the payment of, all taxes, interest, penalties, assessments or deficiencies shown to be due or claimed to be due on or in respect of such tax returns and reports.

(k)     The Borrower conducts its business solely in its own name without the use of a trade name or the intervention of, or through, any other entity of any kind, other than as disclosed on any addendums attached hereto. All books and records relating to the assets of the Borrower are located at the Borrower's chief executive office and its other places and locations where its assets are located.

BOC 37448230v3

CONFIDENTIAL                                                                    Justice-Partners-Teh-000116

(l)     The Borrower and any of the Borrower's tenants have not given, nor have they received, any notice that: (i) there has been a release, or there is a threat of release, of toxic substances, oil or hazardous wastes on or from any real property owned or operated by the Borrower; (ii) the Borrower or any tenants may be, or is, liable for the costs of cleaning up or responding to a release of any toxic substances, oil or hazardous wastes; or (iii) any of such real property is subject to a lien for any liability arising from costs incurred in response to a release of toxic substances, oil or hazardous wastes.

5.     **Conditions Precedent.**

5.1     **Conditions to Initial Advance.** In addition to any other conditions contained in this Agreement, the initial advance shall be subject to the following conditions precedent:

(a)     *Proof of Action.* The Lender shall have received such documents evidencing the Borrower's power to execute and deliver this Agreement and the other Loan Documents as the Lender or its counsel shall request.

(b)     *The Notes and Loan Documents.* The Borrower shall have delivered to the Lender the Notes, this Agreement, and the other Loan Documents and such other documents as the Lender may request.

(c)     *Liens to be Discharged.* The Lender shall be satisfied with arrangements made to pay, discharge and terminate debt owed, and security interests granted by, the Borrower to non-permitted debt and security interest holders.

5.2     **Conditions to Every Advance.** In addition to all other conditions contained in this Agreement, every advance shall be subject to the following conditions precedent that:

(a)     *No Event of Default.* No Event of Default has occurred and no event shall have occurred, or be continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice as specified therein, would constitute an Event of Default.

(b)     *No Material Adverse Change.* There shall have been no material adverse change (as determined by the Lender in its sole discretion) in the assets, liabilities, financial condition or business of the Borrower since the date of any financial statements delivered to the Lender before or after the date of this Agreement.

(c)     *Representations and Warranties.* That the representations and warranties contained in Section 4 hereof and in each other Loan Document shall be true and correct in all material respects. Any request for a borrowing shall be deemed a certification by the Borrower as to the truth and accuracy in all material respects of the representations and warranties contained in Section 4 infra and in each other Loan Document as of the date of such request.

6.     **Affirmative Covenants.** The Borrower covenants and agrees that from the date hereof until payment in full of all Loans and the performance of all Borrower's obligations hereunder, and under all other Loan Documents, is complete and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall:

CONFIDENTIAL

(a)     Comply with all terms and conditions of this Agreement and the other Loan Documents and pay all material debts of the Borrower before the same shall become delinquent.

(b)     The Borrower shall deliver to the Lender: (i) within 30 days after the close of each fiscal year, a balance sheet of the Borrower as of the close of each fiscal year and statements of income and retained earnings for that portion of the fiscal year-to-date then ended, prepared in conformity with GAAP; (ii)(1) within 90 days after the close of each fiscal year of the Borrower, in accountant-prepared draft form, and (2) within 30 days of completion, in final, unaudited accountant reviewed form, financial statements ("Financial Statements"), including, a balance sheet as of the close of such year and statements of income and retained earnings and cash flows for the year then ended, prepared in conformity with GAAP, applied on a basis consistent with that of the preceding year or containing disclosure of the effect on financial position or results of operations of any change in the application of accounting principles during the year; (iii) the other financial reports, if any, delivered to the owners of the Borrower, and upon request, such other information about the financial condition, business and operations of the Borrower, as the Lender may from time to time, reasonably request; and (iv) promptly upon becoming aware of any Event of Default, or any event which with the giving of notice or the passage of time would constitute an Event of Default, notice thereof, in writing.  The Lender may modify or waive the performance of this section (b) in its sole discretion.

(c)     (i) Keep its properties insured against fire and other hazards (so called "All Risk" coverage) in amounts and with companies satisfactory to the Lender to the same extent and covering such risks as is customary in the same or a similar business, but in no event in an amount less than the full insurable value thereof, which policies shall name the Lender as additional insured as its interest may appear, (ii) maintain public liability coverage against claims for personal injuries or death, and (iii) maintain all worker's compensation, employment or similar insurance as may be required by applicable law.  Such All Risk property insurance coverage shall provide for a minimum of 30 days' written notice to the Lender of cancellation or modification.  The Borrower agrees to deliver copies of all of the aforesaid insurance policies to the Lender.  In the event of any loss or damage to any of its assets, including any collateral securing any Loan, the Borrower shall give prompt written notice to the Lender and to Borrower's insurers of such loss or damage and shall promptly file proofs of loss with said insurers.

(d)     Comply with all Legal Requirements, including without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment.  The Borrower shall pay all taxes, assessments, governmental charges or levies, or claims for labor, supplies, rent and other obligations made against the Borrower or any of its properties which, if unpaid, might become a lien or charge against it or any of its properties, except liabilities being contested in good faith with the prior written consent of the Lender and against which, if requested by the Lender, the Borrower shall maintain reserves in amount and in form (book, cash, bond or otherwise) satisfactory to the Lender.

(e)     Maintain its chief executive office, principal places of business and locations of assets at the locations set forth in this Agreement.  The Borrower shall promptly give the Lender written notice of any change in any of such addresses.  All business records of the Borrower,

CONFIDENTIAL

including those pertaining to all Collateral, shall be kept at the said chief executive office of the Borrower, unless prior written consent of the Lender is obtained to a change of location.

(f)      Allow the Lender, by or through any of its officers, agents, attorneys, or accountants designated by it, for the purpose of ascertaining whether or not each and every provision hereof and of any other Loan Document is being performed and for the purpose of examining and appraising the assets of the Borrower and the records relating thereto, to enter the offices of the Borrower to examine or inspect any of the properties, books and records or extracts therefrom and to make copies thereof and to discuss the affairs, finances and accounts thereof with the Borrower and its accountants, at such reasonable times with advance notice to Borrower and as often as the Lender may reasonably determine The Borrower will reimburse the Lender for all costs associated with its examination, appraisals and audits.

(g)      Promptly advise the Lender of the commencement, or threat of litigation, including arbitration proceedings and any proceedings before any governmental agency, which might have a material adverse effect upon the assets, liabilities, financial condition or business of the Borrower.

(h)      Promptly notify the Lender in writing of (i) any enforcement, cleanup, removal or other action instituted or threatened against the Borrower by any federal, state, county or municipal authority or agency pursuant to any public health, safety or environmental laws, rules, ordinances and regulations, (ii) any and all claims made or threatened by any third party against the Borrower or any real property owned or operated by any of them relating to the existence of, or damage, loss or injury from any toxic substances, oil or hazardous wastes or any other conditions constituting actual or potential violations of such laws, rules, ordinances or regulations and (iii) any enforcement or compliance action, instituted or threatened or claim made or threatened by any federal or state authority relating to the employment of labor or employee benefits.

(i)      Continue to conduct the business of the Borrower as presently conducted, maintain its existence and maintain its properties in good repair, working order and operating condition. The Borrower shall promptly notify the Lender of any event causing material loss or unusual depreciation in the value of the business assets of the Borrower and the amount of same.

(j)      The Borrower will notify the Lender promptly upon Borrower's entry into any transaction with any federal, state or local governmental entity which would give rise to an account receivable which would be subject to the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement (herein a "Government Account") and the Borrower will execute all such instruments and take all such action as may be reasonably requested by the Lender so that all moneys due, or to become due, thereunder will be effectively assigned to the Lender and notice thereof given to such account debtor in accordance with the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement.

(k)      (i) The Borrower will keep the Collateral in good order and repair, will not waste or destroy the Collateral or any part thereof and will not knowingly use the Collateral in violation of any applicable Legal Requirement or any policy of insurance thereon. The Borrower will notify the Lender in writing promptly upon its learning of any event, condition, loss, damage, litigation,

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                                                          8

CONFIDENTIAL                                                          Justice-Partners-Teh-000119

administrative proceeding or other circumstance which may materially and adversely affect the assets, liabilities, financial condition or business of the Borrower or the Lender's security interest in the Collateral.  In the event that the Lender shall reasonably determine that there has been any loss, damage or material diminution in the value of the Collateral, the Borrower will, whenever the Lender requests, pay to the Lender such amount as the Lender shall have reasonably determined represents such loss, damage or material diminution in value (any such payment not to affect the Lender's security interest in such Collateral).  (ii) Without limiting the generality of the foregoing, the Borrower shall notify the Lender promptly of any claim or dispute that may materially affect the value of the Borrower's Accounts.

(l)     The Borrower will, at such intervals as the Lender may request, notify the Lender, in a form satisfactory to the Lender, of all Collateral which has come into existence since the date hereof or the date of the last such notification, whichever is later.

(m)     At its option, but without obligation to do so, the Lender may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral; may place and pay for insurance on the Collateral; may order and pay for the repair, maintenance and preservation of the Collateral; and may pay any fees for filing or recording such instruments or documents as may be necessary or desirable to perfect the security interest granted herein.  The Borrower agrees to reimburse the Lender on demand for any payment made, or any expense incurred, by the Lender pursuant to the foregoing authorization, and all such payments and expenses shall constitute part of the principal amount of Obligations hereby secured and shall bear interest at the highest rate payable on the Obligations of the Borrower to the Lender.

7.     **Negative Covenants.** The Borrower covenants and agrees that until payment is made in full on all Loans, the performance of all Borrower's obligations hereunder and under all other Loan Documents is complete, and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall not directly or indirectly:

(a)     Incur or permit to exist any lien, mortgage, security interest, pledge, charge or other encumbrance against any of the Collateral, whether now owned or hereafter acquired, except: (i) liens in favor of the Lender required by this Agreement and/or any other Loan Document; (ii) tax liens which are being contested in good faith; (iii) liens, mortgages, security interests, pledges, charges or other encumbrances in favor of the Lender or specifically permitted, in writing, by the Lender; and (iv) liens and mortgages already disclosed herein.

(b)     Sell, lease, pledge, transfer or otherwise dispose of all or any of its assets (other than the disposition of inventory in the ordinary course of its business as presently conducted, or the sale of obsolete equipment or equipment no longer usable in the conduct of the Borrower's business), whether now owned or hereafter acquired except for liens or encumbrances required or permitted hereby or by any Loan Document.

(c)     Make or consent to a material change in the ownership or capital structure of the Borrower, or make a material change in the nature of the business or the management of the Borrower or in the manner in which the business of the Borrower is conducted.

BOC 37448230v3

CONFIDENTIAL

Justice-Partners-Teh-000120

(d)　　Impair the Collateral as determined in the sole discretion of the Lender.

(e)　　Enter into or effect any merger, other corporate reorganization, change of control of the Borrower, sale of the Borrower, or any other transaction in which all or substantially all of the assets of the Borrower are sold, transferred, licensed or otherwise disposed of.

(f)　　Revocation/lapse of licensure of any of the principals of Borrower.

(g)　　Any Event of Default under and as defined in any of the Loan Documents.

(h)　　Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any capital stock or equity of any party to any Loan Document, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any party to any Loan Document (a "Restricted Payment"), unless after payment such Restricted Payment, the aggregate fair market value of the Collateral shall exceed 100% of the value of the outstanding principal balance of the Loan plus all accrued unpaid interest thereon.

## 8.　Events of Default; Remedies.

**8.1　Events of Default.** The occurrence of any of the following events, for any reason whatsoever, shall constitute an "Event of Default" hereunder:

(a)　　(i) Failure to make due payment of principal and/or interest on any Loan provided such failure continues for a period of five (5) business days or (ii) failure by the Borrower, or any Affiliate, to make due payment of any other liability or obligation owing by the Borrower, or any Affiliate, to the Lender, now existing or hereafter incurred, whether direct or contingent (herein, "Other Lender Debt"), provided such failure continues for a period of five (5) business days; or

(b)　　Failure by the Borrower to observe or perform any covenant contained in (i) this Agreement, or any of their respective obligations under any other Loan Document or (ii) any document or instrument evidencing, securing or otherwise relating to any Other Lender Debt provided that if said failure is curable, it continues for a period of ten (10) days; or

(c)　　Any representation or warranty made by the Borrower to the Lender or any statement, certificate or other data furnished by any of them in connection herewith or with any other Loan Document proves at any time to be incorrect in any material respect; or

(d)　　A judgment or judgments for the payment of money shall be rendered against the Borrower, which shall remain unsatisfied and in effect for a period of sixty (60) days without a stay of execution; or

(e)　　Any levy, seizure, attachment, execution or similar process shall be issued or levied on any of the Borrower's property, which process could have a material adverse effect on the business of the Borrower in the Lender's reasonable judgment; or

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group
</div>

10

CONFIDENTIAL

(f)      The Borrower shall (i) apply for or consent to the appointment of a receiver, conservator, trustee or liquidator of all or a substantial part of any of its assets; (ii) be unable, or admit in writing its inability, to pay its debts as they mature; (iii) file or permit the filing of any petition, case, arrangement, reorganization, or the like under any insolvency or Bankruptcy law, or the adjudication of it as Bankrupt, or the making of an assignment for the benefit of creditors or the consenting to any form of arrangement for the satisfaction, settlement or delay of debt or the appointment of a receiver for all or any part of its properties; or (iv) take any action for the purpose of effecting any of the foregoing; or

(g)      An order, judgment or decree shall be entered, or a case shall be commenced, against the Borrower, without the application, approval or consent of the Borrower by, or in, any court of competent jurisdiction, approving a petition or permitting the commencement of a case seeking reorganization or liquidation of the Borrower or appointing a receiver, trustee, conservator or liquidator of the Borrower, or of all or a substantial part of its assets and the Borrower, by any act, indicates its approval thereof, consent thereto, or acquiescence therein, or, in any event, such order, judgment, decree or case shall continue unstayed, or undismissed, and in effect for any period of ninety (90) consecutive days; or

(h)      The Borrower shall dissolve or liquidate, or be dissolved or liquidated, or cease to exist legally, or merge or consolidate with, or be merged or consolidated with or into any other entity; or

(i)      Failure by the Borrower to pay or perform any other Obligation, whether contingent or otherwise, or if any such other Obligation shall be accelerated, or if there exists any event of default under any instrument, document or agreement governing, evidencing or securing such other Obligation; or

(j)      The Lender reasonably believes that any material adverse change in the assets, liabilities, financial condition or business of the Borrower has occurred since the date before or after the date of this Agreement; or

(k)      The Borrower sells, liquidates, transfers or otherwise disposes of an asset not in strict accordance with the terms of this Loan Agreement; or

(l)      If at any time the Lender reasonably believes in good faith that the prospect of payment of any Obligation or the performance of any agreement of the Borrower is materially impaired, or that there is such a change in the assets, liabilities, financial condition or business of the Borrower as the Lender believes in good faith materially impairs the Lender's security or increases its risk of non-collection; or the Borrower fails to create the required number of direct or indirect jobs (as specified in the Economic Analysis of the Project) to cover any Advance.

## 8.2    Remedies.

(a)      Upon the occurrence of any Event of Default, and at any time thereafter, the availability of advances hereunder shall, at the option of the Lender, be deemed to be automatically terminated and the Lender, at its option, may declare one or more, or all, of the Loans outstanding hereunder, together with accrued interest thereon and all applicable late charges and surcharges

BOC 37448230v3

and all other liabilities and obligations of the Borrower to the Lender, to be forthwith due and payable, whereupon the same shall become forthwith due and payable; all of the foregoing without presentment or demand for payment, notice of non-payment, protest or any other notice or demand of any kind, all of which are expressly waived by the Borrower.

(b)      The Lender shall have the following additional rights and remedies:

(i)      All of the rights and remedies of a secured party under the Uniform Commercial Code or any other applicable law or at equity, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by law, in addition to any other rights and remedies contained in this Agreement, any other Loan Document or in any document, instrument or agreement evidencing, governing or securing the Obligations.

(ii)      The right to (1) take possession of the Collateral, without resort to legal process and without prior notice to Borrower, and for that purpose Borrower hereby irrevocably appoints the Lender its attorney-in-fact to enter upon any premises on which the Collateral or any part thereof may be situated and remove the Collateral therefrom, or (2) require the Borrower to assemble the Collateral and make it available to the Lender in a place to be designated by the Lender, in its sole discretion, or (3) instruct the Bank, without further consent of Borrower, to transfer the balance of all deposit accounts of Borrower to Lender and to thereafter treat Lender as the owner of such deposit accounts and the Bank's customer with respect to such deposit account.  The Borrower shall make available to the Lender all premises, locations and facilities necessary for the Lender's taking possession of the Collateral or for removing or putting the Collateral in saleable form.

(iii)      The right to sell or otherwise dispose of all or any part of the Collateral by one or more public or private sales.  The Lender will give the Borrower at least five (5) business days' prior written notice of the time and place of any public sale thereof, or of the time after which any private sale or any other intended disposition (which may include, without limitation, a public sale or lease of all or part of the Collateral) is to be made.  The Borrower agrees that five (5) business days is a reasonable time for any such notice.  The Lender, its employees, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is subject to widely distributed standard price quotations.  Any public or private sale shall be free from any right of redemption, which the Borrower hereby waives and releases.  If there is a deficiency after such sale and the application of the net proceeds from such sale, the Borrower shall be responsible for the same, with interest.

(iv)      The right, after an Event of Default shall have occurred (and Borrower irrevocably appoints the Lender as attorney-in-fact for the Borrower for this purpose, such appointment being coupled with an interest), upon notice to Borrower and without resort to legal process, to notify the persons liable for payment of all accounts (as defined in the Uniform Commercial Code) at any time and direct such persons to make payments directly to the Lender, and to perform all acts the Borrower could take to collect on such accounts,

BOC 37448230v3

including, without limitation, the right to notify postal authorities to change the address for delivery, open mail, endorse checks, bring collection suits, and realize upon Collateral securing such accounts. At the Lender's request, all bills and statements sent by the Borrower to the persons liable for payments of such accounts shall state that they have been assigned to, and are solely payable to, the Lender, and Borrower shall direct persons liable for the payment of such accounts to pay directly to the Lender any sums due or to become due on account thereof.

(v)     The right from and after an Event of Default, from time to time without demand or notice, and without being required to look first to any other Collateral to apply and set off any or all of the Deposits against any and all Obligations even though such Obligations are unmatured.

(c)     Collateral Account. Upon an Event of Default:

(i)     The Borrower shall direct each of its creditors and/or customers that all payments or other distributions of whatever kind made to the Borrower shall be made to a post office box designated by the Lender (the "**Lock Box**"). The Lender shall have sole access to the Lock Box, and is hereby authorized by the Borrower to open all mail addressed to the Lock Box, and to apply all proceeds received therein, as herein provided. If Borrower should receive itself any such payments, the Borrower shall hold all such collections in trust for the Lender without commingling the same with other funds of the Borrower and will promptly, on the day of receipt thereof, transmit such collections to the Lender in the identical form in which they were received by the Borrower, with such endorsements as may be appropriate, accompanied by a report, in a form approved by the Lender, showing the amount of such collections and such other information as the Lender may require.

(ii)     All collections in the form of cash, checks or other demand remittances so received by, or transmitted to, the Lender shall upon receipt by the Lender be credited to the Collateral Account established hereunder. Each such credit shall be conditional upon final payment to the Lender of all items giving rise to such credit, and, if any item is not so paid, the credit for such item shall be reversed whether or not the item has been returned and the amount thereof, in the Lender's discretion may be charged to any operating account of Borrower with the Lender. All collections in the form of notes, drafts, acceptances or other instruments not payable on demand shall be delivered by the Borrower to the Lender. When such items are collected, the amount thereof shall be credited by the Lender to the Collateral Account, with appropriate notice to the Borrower. Until such items are collected, the Borrower will not, without the consent of the Lender, make any entry on its books or records indicating that the same were received in payment of the receivable giving rise thereto.

(iii)     At such intervals as the Lender may deem appropriate, the Lender shall charge and apply the full amount then on deposit in the Collateral Account in reduction or payment of Borrower's Loan Account, such application to be subject to the final payment in cash of all items theretofore credited to such Collateral Account.

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group

</div>

13

CONFIDENTIAL

9.      **Lien and Set Off.** The Borrower hereby gives the Lender a lien and right of set off for all of Borrower's liabilities and obligations to the Lender upon and against all Collateral now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to it.

10.     **Audit Rights.** At any time during the term of the Loan, the Lender shall have the right to audit the books and records of the Borrower upon prior written notice to the Borrower in accordance with procedures to be set forth in the Loan Documents.

11.     **Non-Recourse.** No recourse shall be had to Borrower for payment of principal and interest under the Loan Documents, and Lender shall look solely to the Collateral as security for payment of principal and interest due under the Note and other Loan Documents. In no event shall Borrower be held personally liable for any payment of principal or interest under the Note and other Loan Documents or for any Event of Default.

12.     **Miscellaneous.**

12.1     **Certain Waivers.** Borrower hereby waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of dishonor, and hereby agrees to any extension or delay in the time for payment or enforcement, to renewal of any Loan and to any substitution or release of any Collateral, all without notice and without any effect on their liabilities. Any delay on the part of the Lender in exercising any right hereunder, or under any other Loan Document which may secure any Loan, shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of a subsequent default. The Lender may revoke any permission or waiver previously granted to Borrower, such revocation to be effective prospectively when given, whether given orally or in writing. The rights and remedies of the Lender shall be cumulative and not in the alternative, and shall include all rights and remedies granted herein, in any other Loan Document and under all applicable laws.

LENDER AND BORROWER IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER OR BORROWER IN RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER LOAN DOCUMENT.

BORROWER (i) ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION AND (ii) TO THE EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVES ANY RIGHT TO PRIOR NOTICE OF, AND A HEARING ON, THE RIGHT OF ANY HOLDER OF THE NOTES, TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OF ANY OF THEIR PROPERTY, AT ANY TIME, PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS AGREEMENT.

12.2     **Notices.** All notices, requests or demands to or upon a party to this Agreement shall be given or made by the other party hereto in writing, in person or by depositing in the mail, postage prepaid, return receipt requested, addressed to the addressee at the address set forth herein as the

CONFIDENTIAL                                              Justice-Partners-Teh-000125

Borrower's chief executive office or to such other addresses as such addressee may have designated in writing to the other party hereto.

**12.3   Expenses; Additional Documents.**   The Borrower will pay all taxes levied or assessed upon the principal sum of the advances made against the Lender, all fees of the Lender for its Lock-Box services and all other fees provided herein, and all expenses arising out of the preparation, amendment, waiver, modification, protection, collection and/or other enforcement of this Agreement, or any other Loan Document, or of any Collateral or security interest now or hereafter granted to secure the Loans or mortgage, security interest or lien, granted hereunder or under any other Loan Document (including, without limitation, attorneys' fees).   The Borrower will, from time to time, at its sole expense, execute and deliver to the Lender all such other and further instruments and documents, and take or cause to be taken all such other and further action as the Lender shall request in order to effect and confirm or vest more securely all rights contemplated by this Agreement or any other Loan Document.

**12.4   Addendums.**   Any Addendums that are attached hereto are and shall constitute a part of this Agreement.

**12.5   Governing Law; Consent to Jurisdiction.**   This Agreement, the other Loan Documents and the rights and obligations of the parties hereunder, and thereunder, shall be construed and interpreted in accordance with the laws of the State of Delaware, USA.   The Borrower agrees that the execution of this Agreement and the other Loan Documents, and the performance of the Borrower's obligations hereunder, and thereunder, shall be deemed to have a Delaware situs and the Borrower shall be subject to the personal jurisdiction of the courts of Delaware with respect to any action the Lender or its successors or assigns may commence hereunder or thereunder. Accordingly, the Borrower hereby specifically and irrevocably consents to the jurisdiction of the courts of Delaware with respect to all matters concerning this Agreement, the other Loan Documents, the Notes or the enforcement of any of the foregoing.

**12.6   Survival of Representations.**   All representations, warranties, covenants and agreements herein contained or made in writing in connection with this Agreement shall survive the execution and delivery of the Loan Documents and shall continue in full force and effect until all amounts payable on account of all Loans, the Loan Documents and this Agreement shall have been paid in full and this Agreement has been terminated.

**12.7   Integration; Severability; Successors.**   This Agreement is the final, complete and exclusive statement of the terms governing this Agreement.   If any provision of this Agreement shall to any extent be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Agreement shall not be affected.   The provisions of this Agreement shall bind the heirs, executors, administrators, assigns and successors of the Borrower and shall inure to the benefit of the Lender, its successors and assigns.

**12.8   Determinations as to Compliance.**   All documents and assurances of any type related to the fulfillment of any condition or compliance with any provision hereof or of any other Loan Document and all other matters related to the Loans are subject to the prior approval and satisfaction of the Lender, its counsel and other consultants.

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                                    15

</div>

CONFIDENTIAL                                                        Justice-Partners-Teh-000126

**12.9   Termination of this Agreement.** This Agreement shall terminate upon the written agreement of the parties hereto to the termination of any privilege of the Borrower to take advances and/or full and final payment of all amounts with respect to all Loans or amounts otherwise due hereunder and under the other Loan Documents.

**12.10   Attorney's Fees.** Lender shall be entitled to recover all reasonable attorney's fees and expenses incurred by it in connection with enforcement of this Loan Agreement, including costs of collection.

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group

16

BOC 37448230v3

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned executes this Agreement as an instrument under seal as of the date first set forth above.

BORROWER:   **Justice Partners Law Group, LP, a District of Columbia limited partnership**

By: _____          Date: _____

_____              _____
Printed Name                                    Title

LENDER:        **Justice Partners, LLC, a Delaware limited liability company**

By: _____          Date: _____

_____              _____
Printed Name                                    Title

CONFIDENTIAL                                    Justice-Partners-Teh-000128

THIS NOTE HAS NOT BEEN THE SUBJECT OF REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE AND THE SAME HAS BEEN ISSUED IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THIS NOTE MAY NOT BE SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT AS PERMITTED UNDER SUCH SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

## SENIOR SECURED PROMISSORY NOTE

Commitment Amount: up to $45,000,000

_____, 2021
Original Issue Date

**FOR VALUE RECEIVED**, the undersigned, Justice Partners Law Group, a District of Columbia limited partnership with an address located at 1100 H Street NW, Suite 840, Washington, D.C., 20005 ( the "Borrower"), hereby promises to pay to the order of JUSTICE PARTNERS, LLC, a Delaware limited liability company with an address located at 20900 NE 30th Ave., Suite 510, Miami, Florida 33180 (the "**Lender**"), or at such other place as the Lender may from time to time designate in writing, in lawful currency of the United States of America, the principal sum of up to Forty-Five Million Dollars and 00/100 ($45,000,000.00) (the "**Principal Amount**"), in accordance with the provisions of this secured promissory note (this "**Note**").

1.      Background. This Note is being issued on _____, 2021 (the "**Original Issue Date**") in connection with the execution of that certain Senior Secured Loan Agreement with the Borrower, dated as of the Original Issue Date, by and between the Borrower and the Lender (the "**Loan Agreement**").

2.      Advances. This Note shall may be funded in one or more tranches from time to time in accordance with the terms and conditions contained in this Note, such that the Borrower shall be entitled to borrow from the Lender a principal amount or multiple principal amounts (each an "**Advance**" and collectively, the "**Advances**") to the extent that the sum of all unpaid Advances does not, at any time, exceed the Commitment Amount. The initial Advance shall be Two Hundred and Fifty Thousand U.S. Dollars (US$ 250,000.00). The Lender shall maintain an account on its books which shall evidence the outstanding principal balance of all Advances, Interest due and owing thereon and any fees and expenses due from time to time under this Note (the "**Loan Account**"). The Lender shall by appropriate entries debit to the Loan Account the amount of each Advance hereunder, together with all accrued Interest and any fees and expenses due hereunder, and credit to the Loan Account repayments of Advances and payments of Interest, fees and expenses made by the Borrower.

3.      Security and Ranking. The obligations of the Borrower under this Note, including all fees, principal and interest payments due or becoming due under this Note, shall be secured

1

ACTIVE 54090108v2

obligations of the Borrower, to be secured by a first priority, perfected security interest in all of its assets of Borrower, including its interest in any Qualified Settlement Fund, and all distributions, cash and other property or proceeds from time to time received in respect thereof (the "**Collateral**") pursuant to the terms of security agreement (together with all documents evidencing, securing and/or otherwise executed and/or delivered in connection with the Loan (the "**Security Agreement**"). Reference is made to the Security Agreement for a description of the Collateral (as defined therein) and the rights and remedies of the Lender (or another holder) in respect thereof. This Note, the Security Agreement and any UCC financing statements and other documents, instruments and agreements evidencing, guaranteeing or securing this Note, and all written amendments, replacements or supplements to any of them, are collectively referred to as the "**Loan Documents**".   The Loan shall rank senior to all other indebtedness of the Borrower issued hereafter in both liquidation and distributions and the Borrower shall not be permitted to enter into any other secured debt obligations without the prior written consent of the Lender, in its sole and absolute discretion

4.   <u>Maturity Date; Term.</u>  This Note shall mature, and be due and payable on a date that is equal to the five-year anniversary from the date of the First Advance (the "**Maturity Date**") and shall be for a term commencing on the date hereof and ending on the Maturity Date (the "**Term**"), subject to two successive 12-month extensions, as applicable (the "**Final Maturity Date**"). Subject to the conditions set forth below, Borrower may extend the Initial Maturity Date for two separate 12-month periods (each, an "**Extension Period**"). Each Extension Period shall be subject to satisfaction of the following conditions: (i) notice is delivered to the Lender at least 90 days but not more than 120 days prior to the expiration of the Initial Maturity Date, or if extended, the expiration of the first Extension Period; (ii) no default or event of default exists on the date that the notice described in clause "(i)" is provided by the Borrower, or on the first day of the applicable Extension Period; and (iii) certain other conditions set forth in the Loan Agreement have been satisfied.

5.   <u>Interest Rate.</u>  Interest shall accrue on the unpaid principal balance of this Note at a rate equal to 18.0% per annum and payable on the Maturity Date. Following the occurrence of an Event of Default, interest on the Loan shall be increased twenty-four percent (24%) (the "**Default Rate**").

6.   <u>Payments of Principal Amount and Interest.</u>  Any payments made pursuant to this Note shall be applied first toward any fees, expenses and costs due and then toward the Interest and finally toward the Principal Amount. All payments of accrued but unpaid Interest and the Principal Amount are due, without notice on the Maturity Date.

7.   <u>Prepayment.</u>  The Loan may be pre-paid, in whole or in part, at any time by the Company. Borrower shall pay all expenses of Lender in connection with any such prepayment.

8.   <u>Procedures for Advances.</u>

(a)   Subject to the terms and conditions of this Note, the Lender shall make Advances to the Borrower from time to time during the period from the Original Issuance Date to the day that is thirty (30) days prior to the Maturity Date up to an aggregate amount not to exceed at any time the Commitment Amount. As long as the sum of all of the unpaid principal

2

amounts of the outstanding Advances does not exceed the Commitment Amount, the Borrower may borrow, repay and re-borrow principal amounts under this Note.

(b)  Whenever the Borrower desires the Lender to make an Advance hereunder, the Borrower shall deliver to the Lender a written notice requesting an Advance no later than 9:00 a.m. EST at least seven (7) days before the date on which the Borrower is requesting the Lender to make the Advance (such date, the "**Funding Date**"). Each such notice shall be duly executed by a duly authorized officer of the Borrower and shall specify the proposed Funding Date and the amount of the Advance requested.

(c)  In addition to the foregoing, the obligation of the Lender to make Advances hereunder shall be subject to fulfillment of the following conditions precedent on the date of such Advance:

(i)  There shall be no Event of Default (defined below) and no event which, with the passing of time or the giving of notice, would become an Event of Default; and

(ii)  The Lender shall have received such approvals, opinions or documents as the Lender may reasonably request.

9.  <u>Repayments and Prepayments.</u>

(a)  <u>Order.</u>  Any payments made pursuant to this Note shall be applied first toward any fees, expenses and costs due and then toward Interest due and finally toward the outstanding principal balance of the Advances.

(b)  <u>Optional Prepayment.</u>  The outstanding principal balance of any Advance may be prepaid in whole or in part at any time, without penalty or premium and without any prior written notice to the Lender before the Maturity Date; *provided*, that all accrued and unpaid Interest and any other charges accrued as of the date of prepayment are also paid in full. Any prepayments shall not result in deferment or delay of the due date of any subsequent payment(s).

10.  <u>Success Fee.</u>  In addition to any other amounts payable pursuant to this Note, at the Maturity Date, the Borrower, in its sole discretion based upon its available funds, shall pay the Lender an amount equal to no less than fifty percent (50%) and up to one hundred percent (100%) of the amount of the funds in any Qualified Settlement Fund for the benefit of the Borrower (the "Success Fee"). Any payments due under this Note with respect to the Default Rate, shall be excluded from the calculation of the Success Fee.

11.  <u>Events of Default.</u>

(a)  <u>General.</u> The occurrence of any one or more of the following events shall constitute an event of default (each, an "**Event of Default**") under this Note:

(i)  <u>Failure to Pay Principal Amount.</u>  The Borrower fails to pay the Principal Amount, Interest or other sum due under this Note when due; or

<div align="center">3</div>

(ii)     Breach of Covenant.   The Borrower breaches any covenant or other term or condition of this Note or any of the other Loan Documents in any respect and such breach, if subject to cure, continues for a period of ten (10) business days after written notice to the Borrower from the Lender.

(iii)    Representations and Warranties.   Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower in any of the Loan Documents shall be incorrect or misleading in any material respect when made or deemed made;

(iv)     Encumbrance Defects.   Any encumbrance of any kind created by any of the Loan Documents shall at any time fail to constitute a valid encumbrance on all of the Collateral purported to be subject thereto, securing the obligations purported to be secured thereby, or the Borrower shall so assert in writing, other than any such failure arising or resulting from any action or inaction on the part of the Lender;

(v)      Legal Action.   The Borrower or any Member of the Borrower (other than the Lender) shall file any claim or action against the Lender or any of its affiliates;

(vi)     Receiver or Trustee.   The Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee, or such a receiver or trustee shall otherwise be appointed;

(vii)    Judgments.   Any money judgment, writ or similar final process shall be entered or filed against the Borrower or any of its property or other assets for more than Fifty Thousand and 00/100 Dollars ($50,000.00), and shall remain unvacated, unbonded or unstayed for a period of forty-five (45) days; or

(viii)   Bankruptcy.   Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law or any law, or the issuance of any notice in relation to such event, for the relief of debtors shall be instituted by or against the Borrower, and if instituted against the Borrower, are not dismissed within forty-five (45) days of initiation.

(b)      Waiver of Events of Default.  The Lender may waive any Event of Default hereunder. Such waiver shall be evidenced by written notice or other document specifying the Event or Events of Default being waived.

12.      Remedies.

(a)      General.   In addition to all rights and remedies legally or equitably available to the Lender, including under the Security Agreement, upon the occurrence of any Event of Default, the Lender shall have the option, in its sole and absolute discretion, to declare all amounts due under this Note immediately due and payable in full, all without additional notice, presentment or right to cure the Event of Default, all of which hereby are expressly waived.

4

with or without substitution, and to the release of any person or entity liable for the payment hereof; and

(i)     Additional Borrowers, Etc. Consent to the addition of any and all other makers, endorsers, guarantors, and other obligors for the payment hereof, and to the acceptance of any and all other security for the payment hereof, and agree that the addition of any such makers, endorsers, guarantors or other obligors, or security shall not affect the liability of the Borrower, any guarantor and all others now liable for all or any part of the obligations evidenced hereby

13.     Notices.     All notices, demands, requests, consents, approvals and other communications that may or are required to be given by either party to the other party hereunder shall be deemed to be sufficient if in writing and (i) delivered in person, (ii) delivered and received by facsimile, if a confirmatory mailing in accordance herewith is also made, (iii) duly sent by registered mail return receipt requested and postage prepaid, or (iv) duly sent by overnight delivery service, addressed to such party at the address set forth in the first paragraph of this Note. All notices, demands, requests, consents, approvals and other communications shall be deemed to have been received (i) at the same time it was personally delivered, (ii) on the receipt of delivery by facsimile if accompanied by a confirmatory mailing, (iii) five (5) days after mailing via registered mail return receipt requested whether signed for or not, to the foregoing persons at the addresses set forth above or (iv) the next day when sent by overnight delivery service. The above shall constitute service despite rejection or other refusal to accept or inability to deliver because of changed address for which no notice has been received.

14.     Attorney Fees. If there is an Event of Default and an action is brought with respect to this Note, or in the event that this Note is collected in whole or in part by suit or through probate or bankruptcy proceedings, or other legal proceedings of any kind, the Borrower promises and agrees to pay, in addition to all the sums payable hereunder, the Lender's reasonable expenses and costs of collection, including without limitation reasonable attorneys' fees and disbursements, whether or not suit is brought and through all appeals.

15.     Lender Records Conclusive. The principal balance, Interest and other fees and expenses, each as noted on the Loan Account maintained by the Lender, shall be presumptive evidence of such outstanding principal balance, Interest and fees and expenses due under this Note. No failure by the Lender to make, and no error by the Lender in making, any annotation on the Loan Account shall affect the Borrower's obligation to pay the outstanding principal balance and Interest or any other obligation of the Borrower to the Lender pursuant to this Note.

16.     Legends. It is understood that this Note (and any replacement thereof) shall bear the legend (in addition to any legends which may be required in the opinion of the Borrower's counsel by the securities laws of the state where the Lender is located) substantially as set forth on the first page of this Note.

17.     Invalidity of any Part. If any provision or part of any provision of this Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Note and this Note shall be construed as if such invalid, illegal or unenforceable provision or party hereof had never been contained herein, but only to the extent of if its invalidity, illegality or unenforceability.

6

CONFIDENTIAL                                    Justice-Partners-Teh-000134

(b)    No Waiver.  Failure to exercise the rights and remedies under Section 9(a) hereof in respect of any Event of Default shall not constitute a waiver of the right to exercise same with respect to such Event of Default or with respect to any subsequent Event of Default. No holder hereof shall, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by the holder hereof, and then only to the extent specifically set forth therein.

(c)    Cumulative.  The rights, remedies and powers of the holder hereof, as provided in this Note are cumulative and concurrent, and may be pursued singly, successively or together against the Borrower at the sole discretion of the holder hereof.

13.    Covenants and Waivers.  As a material inducement for the Lender to make Advances to the Borrower, the Borrower and all others who now or may at any time become liable for all or any part of the obligations evidenced hereby, expressly agree hereby to be jointly and severally bound, and jointly and severally:

(a)    No Distributions.  Agree not to make any distributions to its Members for as long as there remain any outstanding amounts, whether principal, Interest or other fees and expenses, under this Note;

(b)    No Amendments.  Agree not to amend, modify, alter or supplement the Operating Agreement or waive or consent to the waiver of any material provision of the Operating Agreement, without the prior written consent of the Borrower, which may be granted or withheld in the Borrower's sole discretion;

(c)    Certain Rights.  Waive and renounce any and all homestead, redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness evidenced by this Note or the Collateral or by any extension or renewal hereof;

(d)    Presentment.  Waive presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor, and notice of protest;

(e)    Notices.  Except as expressly provided herein, waive any and all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default, or enforcement of the payment hereof or hereunder;

(f)    Diligence or Delays.  Waive any and all lack of diligence and delays in the enforcement of the payment hereof;

(g)    Unconditional Obligation.  Agree that the liability of the Borrower, any guarantor, endorser or obligor shall be unconditional and without regard to the liability of any other person or entity for the payment hereof, and shall not in any manner be affected by any indulgence or forbearance granted or consented to by the Lender to any of them with respect hereto;

(h)    Extensions.  Consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by the Lender with respect to the payment or other provisions hereof, and to the release of any security at any time given for the payment hereof, or any part thereof,

5

Justice-Partners-Teh-000133

18.     Survival. All agreements, representations and warranties made in this Note and in all the Other Agreements to be executed and delivered pursuant hereto shall survive the execution and delivery to the Lender of this Note and all other documents delivered hereunder or contemplated hereby, and shall continue in full force and effect so long as this Note remains outstanding, unperformed or unpaid.

19.     Construction; Governing Law.   All issues and questions concerning the construction, validity and interpretation of this Note and all matters pertaining hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

20.     **Consent to Jurisdiction.** TO INDUCE THE LENDER TO ACCEPT THIS NOTE, THE BORROWER IRREVOCABLY AGREES THAT, SUBJECT TO THE LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS NOTE WILL BE LITIGATED IN COURTS HAVING SITUS IN WILMINGTON, DELAWARE.  THE BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN WILMINGTON, DELAWARE, WAIVES PERSONAL SERVICE OF PROCESS UPON THE BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE BORROWER AT THE ADDRESS STATED IN THE PREAMBLE  AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

21.     **Waiver of Jury Trial.** THE BORROWER AND THE LENDER (BY ACCEPTANCE OF THIS NOTE), HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT OR INSTITUTED BY THE LENDER, THE BORROWER OR ANY SUCCESSOR OR ASSIGN OF THE LENDER OR THE BORROWER (a) UNDER THIS NOTE OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS NOTE OR (b) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  THE BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

22.     Assignment. This Note is not assignable or transferable by the Borrower except that Lender may assign this Note, the Security Agreement and all of the Loan Documents at any time.

7

23.     <u>Severability.</u>  In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

24.     <u>Titles and Subtitles.</u>  The titles of the Sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

*[Signature Page Follows]*

CONFIDENTIAL

Justice-Partners-Teh-000136

## SECURED PROMISSORY NOTE SIGNATURE PAGE

IN WITNESS WHEREOF, the Borrower has executed this secured promissory note as of the date first above written.

Justice Partners Law Group, LP
a District of Columbia limited partnership

By:_____ \_\_\_\_

9

ACTIVE 54090108v2

CONFIDENTIAL

# Composite Exhibit 8

**LOAN AND SECURITY AGREEMENT**

THIS LOAN AND SECURITY AGREEMENT dated as of the date executed below between **Justice Partners, LLC** (the "**Lender**") a Delaware limited liability company with an address located at 20900 NE 30th Ave., Suite 510, Miami, Florida 33180, and **Justice Partners Law Group, LP** a District of Columbia limited partnership (the "**Borrowe**r") located at 1100 H Street NW, Suite 840, Washington, D.C., 20005.  In order to induce the Lender to advance money or grant other financial accommodations on one or more occasions to the undersigned Borrower, the undersigned Borrower represents, warrants, covenants to and agrees with the Lender as follows:

**1.      Definitions.**  For purposes of this Agreement, unless the context clearly requires otherwise, in addition to the terms defined elsewhere herein, the following terms shall have the meanings set forth below:

*Advances* means the Borrower's Advances with the Lender referred to in Section 2.1 infra.

*Affiliate* means any person and/or entity, which directly or indirectly controls, or is controlled by, or is under common control, with the Borrower.

*Agreement* means this Loan and Security Agreement.

*Collateral* means the Collateral described in Section 3, infra.

*Collateral Account* means the account of Borrower with the Lender established under Section 8.2 (c) infra.

*Control* shall be deemed to exist if any person, entity or corporation, or combination thereof, shall have possession, directly and/or indirectly, of the power to direct the management and/or policies of the Borrower or any person, entity, or corporation deemed to be an Affiliate of the Borrower, and shall be deemed to include any holder of 50% or more of any stock or other interest in the Borrower or in any person, entity or corporation deemed to be an Affiliate of the Borrower, whether such holding is direct or indirect.

*Deposit* means any deposits, credits, securities, interests, participations, shares, collateral or property of the Borrower at any time now or thereafter in the possession, custody, safekeeping or control of or in transit to the Bank, or any other holder for the purpose of securing Inventory financing of Borrower, and the proceeds thereof.

*Deposit Accounts* means all deposit accounts maintained by the Borrower with the Bank for the purpose of financing renovation, expansion, furniture and fixtures of Borrower, and the proceeds thereof.

*Events of Default* shall have the meaning given such term in Section 8 of this Agreement infra

*Indebtedness* means the total of all obligations of the Borrower to the Lender, whether current or long-term, including without limitation, guaranties, endorsements, or other arrangements whereby responsibility is assumed for the obligations of others.

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group

</div>

1

BOC 37448230v3

CONFIDENTIAL                                                  Justice-Partners-Teh000384

*Inventory* means all inventory, including, without limitation, all inventory in the possession of others or in transit, all goods held for sale or lease or to be furnished under contracts for service or which have been so furnished, and completed and unshipped merchandise, and all products and proceeds (including insurance and condemnation proceeds) of the foregoing, as defined by the Uniform Commercial Code of the State of Delaware, whether presently owned or hereafter acquired.

*Legal Requirements* means all applicable present and future statutes, laws, ordinances, rules and/or regulations of any governmental authority, all orders, writs, injunctions, decrees and judicial decisions and all covenants which bind or materially affect the Borrower or any part of its assets.

*Loan Account* means the accounting as to the Loans issued by the Lender pursuant to Section 2.2 infra.

*Loan Documents* means the following documents collectively: (i) This Agreement; (ii) Each Promissory Note of the Borrower to the Lender, including the Note (collectively the "Notes") evidencing the indebtedness for the Loan; (iii) a UCC-1 Financing Statement; (iv) all other documents and instruments heretofore or hereafter executed by the Borrower in favor of the Lender relating to the Loans, including any guaranty, pledge, security and/or subordination agreement and related Uniform Commercial Code financing statements; and (v) in each case, the term "Loan Documents" and any reference herein to any particular Loan Document shall mean and include all amendments, modifications, replacements, renewals or extensions of any and all such documents, whenever executed.

*Loans* means: (i) Advances evidenced by the Note; and (ii) Any other loans made by the Lender to the Borrower after the date of this Agreement.

*Maturity Date* means the fifth anniversary of the date of the first Advance, as may be extended. The Borrower shall have the option to extend the Maturity Date for two successive 12-month extensions, as applicable (the "**Final Maturity Date**"). Subject to the conditions set forth below, Borrower may extend the Initial Maturity Date for two separate 12-month periods (each, an "**Extension Period**"). Each Extension Period shall be subject to satisfaction of the following conditions: (i) notice is delivered to the Lender at least 90 days but not more than 120 days prior to the expiration of the Initial Maturity Date, or if extended, the expiration of the first Extension Period; (ii) no default or event of default exists on the date that the notice described in clause "(i)" is provided by the Borrower, or on the first day of the applicable Extension Period; and (iii) certain other conditions set forth in the Loan Agreement have been satisfied.

*Note* means the Borrower's Senior Secured Promissory Note evidencing indebtedness for Advances of even date herewith.

*Obligations* means all liabilities, duties and/or obligations now or hereafter owing from the Borrower to the Lender of whatever kind or nature, whether or not currently contemplated at the time of this Agreement, whether such obligations be direct or indirect, absolute or contingent or due or to become due, including all obligations of the Borrower, actual or contingent, in respect to the letters of credit or Lender's acceptances issued by the Lender for the account of, or guaranteed

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group
</div>

2

BOC 37448230v3

CONFIDENTIAL                                                                                          Justice-Partners-Teh000385

by, the Borrower, including, without limitation all obligations of any partnership or joint venture as to which the Borrower is or may become, liable, which term shall include all accrued interest and/or all costs and expenses, including reasonable attorneys' fees, costs and expenses relating to the appraisal and/or valuation of assets and all reasonable costs and expenses incurred or paid by the Lender in exercising, preserving, defending, collecting, enforcing or protecting any of its rights under the Obligations or in any litigation arising out of the transactions evidenced by the Obligations.

*Required Permits* means all permits, licenses, approvals, consents and waivers necessary pursuant to any Legal Requirement to be obtained from, or made by, any governmental authority for the ownership by the Borrower of its assets or for the conduct of its business.

*Term* shall mean the date of execution through repayment of the Loan.

*Termination Date* shall mean the Maturity Date, at the end of the Term, subject to any extensions.

## 2.     Loans.

### 2.1     Advances.

(a)     Pursuant to this Agreement, and upon satisfaction of the conditions precedent in Section 5 hereof, during the period from the date hereof until the fifth anniversary of the date of the last Advance hereunder (as such date may be extended from time to time), the Lender may make Advances and the Borrower may borrow under this Agreement.

(b)     All Advances under this Agreement shall be evidenced by the Note, shall bear interest, and shall be due and payable in full on the Termination Date.

### 2.2     Loan Account.

(a)     The Lender shall maintain an accounting (the "Loan Account") on its books to record: (i) all Loans; (ii) all payments made by the Borrower; and (iii) all other appropriate debits and credits as provided in this Agreement with respect to the Obligations.  All entries in the Loan Account shall be made in accordance with the Lender's customary accounting practices as in effect from time to time.  Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Lender from or on behalf of Borrower, and the Borrower hereby irrevocably agrees that the Lender shall have the continuing exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default against the Obligations in such manner as the Lender may deem advisable.

(b)     The balance in the Loan Account, as set forth on the Lender's most recent printout or other written statement, shall be presumptive evidence of the amounts due and owing to the Lender by Borrower; provided, however, that any failure to so record or any error in so recording shall not affect the payment of the Obligations.  Any periodic statement prepared by the Lender setting forth the principal balance of the Loan Account and the calculation of interest due thereon shall be subject to subsequent adjustment by the Lender but shall, absent manifest errors or

BOC 37448230v3

CONFIDENTIAL                                                        Justice-Partners-Teh000386

omissions, be presumed final, conclusive and binding upon the Borrower, and shall constitute an account stated unless within thirty (30) days after receipt of such statement, the Borrower shall deliver to the Lender its written objection thereto specifying the error or errors, if any, contained in such statement.  In the absence of a written objection delivered to the Lender as set forth above, the Lender's statement of the Loan Account shall be presumptive evidence against the Borrower of the amount of the Obligations and the burden of proof to show manifest errors or omissions shall be on the Borrower.

**3.      Grant of Security Interest; Obligations Secured.**  The Borrower hereby grants to the Lender a senior security interest in all of the Borrower's present and future right, title and interest in all of its assets, including but not limited to its interest in any Qualified Settlement Fund, and all distributions, cash and other property or proceeds from time to time received in respect thereof, furniture and fixtures, inventory, deposit accounts and reserve bank accounts, lease reserve accounts, and secured accounts receivable wherever located and whether now existing or hereafter created or arising, collectively called the "**Collateral**."  The security interest in the Collateral granted herein is to secure the payment and performance of the Obligations.  Lender is hereby authorized by Borrower to file any and all documents with the appropriate authorities as necessary to authenticate and/or perfect the security interests granted herein.

**4.      Representations and Warranties.**  The Borrower hereby represents and warrants to the Lender (which representations and warranties will survive the delivery of this Agreement and the making of any advances of any Loan and shall be deemed to be continuing until all Loans are fully paid and this Agreement is terminated) that:

(a)      (i) The Borrower is, and will continue to be, duly organized and validly existing; the Borrower is in good standing under the laws of the State of incorporation thereof; (ii) the Borrower is qualified and in good standing to do business in all other jurisdictions in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary; (iii) the Borrower has the power to execute and deliver this Agreement and each Loan Document and to borrow hereunder; and (iv) the Borrower has all Required Permits, without unusual restrictions or limitations, to own, operate and lease its properties and to conduct the business in which it is presently engaged, all of which are in full force and effect.

(b)      The making and performance by the Borrower of this Agreement and the Loan Documents have been authorized by all necessary corporate action by its Board of Directors.  The execution and delivery of this Agreement and the other Loan Documents, the consummation of the transactions herein and therein contemplated, the fulfillment of or compliance with the terms and provisions hereof and thereof, (i) are within its powers, (ii) will not violate any provision of law or of its organizational documents, or (iii) will not result in the breach of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of the Borrower pursuant to any indenture or Lender loan or credit agreement (other than pursuant to this Agreement and the other Loan Documents) or other agreement or instrument to which the Borrower is a party.  To the Borrower's knowledge, no approval, authorization, consent or other order or registration or filing with any governmental body is required in connection with the making and performance of this Agreement.

BOC 37448230v3

CONFIDENTIAL                                                      Justice-Partners-Teh000387

(c)      Subject to any limitations stated therein or in connection therewith, all information furnished, or to be furnished, by the Borrower pursuant to the terms hereof is, or will be at the time the same is furnished, accurate and complete in all material respects necessary to make the information furnished, in the light of the circumstances under which such information is furnished, not misleading.

(d)      The Borrower is in material compliance with all Legal Requirements applicable to it, its property or the conduct of its business, including, without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment.

(e)      No proceedings by or before any private, public or governmental body, agency or authority and no litigation is pending, or, so far as is known to the Borrower, its officers or directors, or threatened against the Borrower, except such as are disclosed in any addendums attached hereto.

(f)      No Event of Default has occurred and no event has occurred, or is continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice specified therein, would constitute such an Event of Default.

(g)      The Borrower agrees that the proceeds of Loan shall only be used in connection for general working capital purposes and to fund mass tort litigation expenses.  It is understood that no portion of the Loan shall be used to pay an interest due or payable under this Agreement.

(h)      This Agreement and all other Loan Documents, upon the execution and delivery thereof, will be legal, valid, binding and enforceable obligations of the Borrower as the case may be, in accordance with the terms of each; provided, however, that the Borrower's representation as to enforceability is qualified to the extent that enforcement of the rights and remedies created by this Agreement and the Loan Documents may be subject to applicable bankruptcy, insolvency, reorganization or similar laws affecting the rights of creditors and secured parties generally, and does not apply with respect to the availability of the remedy of specific performance, injunctive relief or any other equitable remedy.

(i)      The Borrower has good and marketable title to its properties and assets, including all of the Collateral, subject to no mortgage, pledge, lien, security interest, encumbrance or other charge which is not set forth in any addendums attached hereto.

(j)      The Borrower has filed all tax returns and reports required to be filed by it with all federal, state or local authorities and has paid in full, or made adequate provision for the payment of, all taxes, interest, penalties, assessments or deficiencies shown to be due or claimed to be due on or in respect of such tax returns and reports.

(k)      The Borrower conducts its business solely in its own name without the use of a trade name or the intervention of, or through, any other entity of any kind, other than as disclosed on any addendums attached hereto.  All books and records relating to the assets of the Borrower are located at the Borrower's chief executive office and its other places and locations where its assets are located.

BOC 37448230v3

CONFIDENTIAL                                                                 Justice-Partners-Teh000388

(l)     The Borrower and any of the Borrower's tenants have not given, nor have they received, any notice that: (i) there has been a release, or there is a threat of release, of toxic substances, oil or hazardous wastes on or from any real property owned or operated by the Borrower; (ii) the Borrower or any tenants may be, or is, liable for the costs of cleaning up or responding to a release of any toxic substances, oil or hazardous wastes; or (iii) any of such real property is subject to a lien for any liability arising from costs incurred in response to a release of toxic substances, oil or hazardous wastes.

**5.     Conditions Precedent.**

**5.1     Conditions to Initial Advance.**  In addition to any other conditions contained in this Agreement, the initial advance shall be subject to the following conditions precedent:

(a)     *Proof of Action.*  The Lender shall have received such documents evidencing the Borrower's power to execute and deliver this Agreement and the other Loan Documents as the Lender or its counsel shall request.

(b)     *The Notes and Loan Documents.*  The Borrower shall have delivered to the Lender the Notes, this Agreement, and the other Loan Documents and such other documents as the Lender may request.

(c)     *Liens to be Discharged.*  The Lender shall be satisfied with arrangements made to pay, discharge and terminate debt owed, and security interests granted by, the Borrower to non-permitted debt and security interest holders.

**5.2     Conditions to Every Advance.**  In addition to all other conditions contained in this Agreement, every advance shall be subject to the following conditions precedent that:

(a)     *No Event of Default.*  No Event of Default has occurred and no event shall have occurred, or be continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice as specified therein, would constitute an Event of Default.

(b)     *No Material Adverse Change.*  There shall have been no material adverse change (as determined by the Lender in its sole discretion) in the assets, liabilities, financial condition or business of the Borrower since the date of any financial statements delivered to the Lender before or after the date of this Agreement.

(c)     *Representations and Warranties.*  That the representations and warranties contained in Section 4 hereof and in each other Loan Document shall be true and correct in all material respects.  Any request for a borrowing shall be deemed a certification by the Borrower as to the truth and accuracy in all material respects of the representations and warranties contained in Section 4 infra and in each other Loan Document as of the date of such request.

**6.     Affirmative Covenants.**  The Borrower covenants and agrees that from the date hereof until payment in full of all Loans and the performance of all Borrower's obligations hereunder, and under all other Loan Documents, is complete and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall:

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group
</div>

6

*BOC 37448230v3*

CONFIDENTIAL                                                                 Justice-Partners-Teh000389

(a) Comply with all terms and conditions of this Agreement and the other Loan Documents and pay all material debts of the Borrower before the same shall become delinquent.

(b) The Borrower shall deliver to the Lender: (i) within 30 days after the close of each fiscal year, a balance sheet of the Borrower as of the close of each fiscal year and statements of income and retained earnings for that portion of the fiscal year-to-date then ended, prepared in conformity with GAAP; (ii)(1) within 90 days after the close of each fiscal year of the Borrower, in accountant-prepared draft form, and (2) within 30 days of completion, in final, unaudited accountant reviewed form, financial statements ("Financial Statements"), including, a balance sheet as of the close of such year and statements of income and retained earnings and cash flows for the year then ended, prepared in conformity with GAAP, applied on a basis consistent with that of the preceding year or containing disclosure of the effect on financial position or results of operations of any change in the application of accounting principles during the year; (iii) the other financial reports, if any, delivered to the owners of the Borrower, and upon request, such other information about the financial condition, business and operations of the Borrower, as the Lender may from time to time, reasonably request; and (iv) promptly upon becoming aware of any Event of Default, or any event which with the giving of notice or the passage of time would constitute an Event of Default, notice thereof, in writing. The Lender may modify or waive the performance of this section (b) in its sole discretion.

(c) (i) Keep its properties insured against fire and other hazards (so called "All Risk" coverage) in amounts and with companies satisfactory to the Lender to the same extent and covering such risks as is customary in the same or a similar business, but in no event in an amount less than the full insurable value thereof, which policies shall name the Lender as additional insured as its interest may appear, (ii) maintain public liability coverage against claims for personal injuries or death, and (iii) maintain all worker's compensation, employment or similar insurance as may be required by applicable law. Such All Risk property insurance coverage shall provide for a minimum of 30 days' written notice to the Lender of cancellation or modification. The Borrower agrees to deliver copies of all of the aforesaid insurance policies to the Lender. In the event of any loss or damage to any of its assets, including any collateral securing any Loan, the Borrower shall give prompt written notice to the Lender and to Borrower's insurers of such loss or damage and shall promptly file proofs of loss with said insurers.

(d) Comply with all Legal Requirements, including without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment. The Borrower shall pay all taxes, assessments, governmental charges or levies, or claims for labor, supplies, rent and other obligations made against the Borrower or any of its properties which, if unpaid, might become a lien or charge against it or any of its properties, except liabilities being contested in good faith with the prior written consent of the Lender and against which, if requested by the Lender, the Borrower shall maintain reserves in amount and in form (book, cash, bond or otherwise) satisfactory to the Lender.

(e) Maintain its chief executive office, principal places of business and locations of assets at the locations set forth in this Agreement. The Borrower shall promptly give the Lender written notice of any change in any of such addresses. All business records of the Borrower,

<div align="center">
LOAN AND SECURITY AGREEMENT<br>
Justice Partners Law Group
</div>

7

CONFIDENTIAL

including those pertaining to all Collateral, shall be kept at the said chief executive office of the Borrower, unless prior written consent of the Lender is obtained to a change of location.

(f)     Allow the Lender, by or through any of its officers, agents, attorneys, or accountants designated by it, for the purpose of ascertaining whether or not each and every provision hereof and of any other Loan Document is being performed and for the purpose of examining and appraising the assets of the Borrower and the records relating thereto, to enter the offices of the Borrower to examine or inspect any of the properties, books and records or extracts therefrom and to make copies thereof and to discuss the affairs, finances and accounts thereof with the Borrower and its accountants, at such reasonable times with advance notice to Borrower and as often as the Lender may reasonably determine The Borrower will reimburse the Lender for all costs associated with its examination, appraisals and audits.

(g)     Promptly advise the Lender of the commencement, or threat of litigation, including arbitration proceedings and any proceedings before any governmental agency, which might have a material adverse effect upon the assets, liabilities, financial condition or business of the Borrower.

(h)     Promptly notify the Lender in writing of (i) any enforcement, cleanup, removal or other action instituted or threatened against the Borrower by any federal, state, county or municipal authority or agency pursuant to any public health, safety or environmental laws, rules, ordinances and regulations, (ii) any and all claims made or threatened by any third party against the Borrower or any real property owned or operated by any of them relating to the existence of, or damage, loss or injury from any toxic substances, oil or hazardous wastes or any other conditions constituting actual or potential violations of such laws, rules, ordinances or regulations and (iii) any enforcement or compliance action, instituted or threatened or claim made or threatened by any federal or state authority relating to the employment of labor or employee benefits.

(i)     Continue to conduct the business of the Borrower as presently conducted, maintain its existence and maintain its properties in good repair, working order and operating condition. The Borrower shall promptly notify the Lender of any event causing material loss or unusual depreciation in the value of the business assets of the Borrower and the amount of same.

(j)     The Borrower will notify the Lender promptly upon Borrower's entry into any transaction with any federal, state or local governmental entity which would give rise to an account receivable which would be subject to the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement (herein a "Government Account") and the Borrower will execute all such instruments and take all such action as may be reasonably requested by the Lender so that all moneys due, or to become due, thereunder will be effectively assigned to the Lender and notice thereof given to such account debtor in accordance with the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement.

(k)     (i) The Borrower will keep the Collateral in good order and repair, will not waste or destroy the Collateral or any part thereof and will not knowingly use the Collateral in violation of any applicable Legal Requirement or any policy of insurance thereon.  The Borrower will notify the Lender in writing promptly upon its learning of any event, condition, loss, damage, litigation,

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                                                             8

*BOC 37448230v3*

administrative proceeding or other circumstance which may materially and adversely affect the assets, liabilities, financial condition or business of the Borrower or the Lender's security interest in the Collateral.  In the event that the Lender shall reasonably determine that there has been any loss, damage or material diminution in the value of the Collateral, the Borrower will, whenever the Lender requests, pay to the Lender such amount as the Lender shall have reasonably determined represents such loss, damage or material diminution in value (any such payment not to affect the Lender's security interest in such Collateral).  (ii) Without limiting the generality of the foregoing, the Borrower shall notify the Lender promptly of any claim or dispute that may materially affect the value of the Borrower's Accounts.

(l)      The Borrower will, at such intervals as the Lender may request, notify the Lender, in a form satisfactory to the Lender, of all Collateral which has come into existence since the date hereof or the date of the last such notification, whichever is later.

(m)      At its option, but without obligation to do so, the Lender may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral; may place and pay for insurance on the Collateral; may order and pay for the repair, maintenance and preservation of the Collateral; and may pay any fees for filing or recording such instruments or documents as may be necessary or desirable to perfect the security interest granted herein.  The Borrower agrees to reimburse the Lender on demand for any payment made, or any expense incurred, by the Lender pursuant to the foregoing authorization, and all such payments and expenses shall constitute part of the principal amount of Obligations hereby secured and shall bear interest at the highest rate payable on the Obligations of the Borrower to the Lender.

7.      **Negative Covenants.**  The Borrower covenants and agrees that until payment is made in full on all Loans, the performance of all Borrower's obligations hereunder and under all other Loan Documents is complete, and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall not directly or indirectly:

(a)      Incur or permit to exist any lien, mortgage, security interest, pledge, charge or other encumbrance against any of the Collateral, whether now owned or hereafter acquired, except: (i) liens in favor of the Lender required by this Agreement and/or any other Loan Document; (ii) tax liens which are being contested in good faith; (iii) liens, mortgages, security interests, pledges, charges or other encumbrances in favor of the Lender or specifically permitted, in writing, by the Lender; and (iv) liens and mortgages already disclosed herein.

(b)      Sell, lease, pledge, transfer or otherwise dispose of all or any of its assets (other than the disposition of inventory in the ordinary course of its business as presently conducted, or the sale of obsolete equipment or equipment no longer usable in the conduct of the Borrower's business), whether now owned or hereafter acquired except for liens or encumbrances required or permitted hereby or by any Loan Document.

(c)      Make or consent to a material change in the ownership or capital structure of the Borrower, or make a material change in the nature of the business or the management of the Borrower or in the manner in which the business of the Borrower is conducted.

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group

</div>

9

BOC 37448230v3

(d)     Impair the Collateral as determined in the sole discretion of the Lender.

(e)     Enter into or effect any merger, other corporate reorganization, change of control of the Borrower, sale of the Borrower, or any other transaction in which all or substantially all of the assets of the Borrower are sold, transferred, licensed or otherwise disposed of.

(f)     Revocation/lapse of licensure of any of the principals of Borrower.

(g)     Any Event of Default under and as defined in any of the Loan Documents.

(h)     Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any capital stock or equity of any party to any Loan Document, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any party to any Loan Document (a "Restricted Payment"), unless after payment such Restricted Payment, the aggregate fair market value of the Collateral shall exceed 100% of the value of the outstanding principal balance of the Loan plus all accrued unpaid interest thereon.

## 8.     Events of Default; Remedies.

**8.1     Events of Default.**  The occurrence of any of the following events, for any reason whatsoever, shall constitute an "Event of Default" hereunder:

(a)     (i) Failure to make due payment of principal and/or interest on any Loan provided such failure continues for a period of five (5) business days or (ii) failure by the Borrower, or any Affiliate, to make due payment of any other liability or obligation owing by the Borrower, or any Affiliate, to the Lender, now existing or hereafter incurred, whether direct or contingent (herein, "Other Lender Debt"), provided such failure continues for a period of five (5) business days; or

(b)     Failure by the Borrower to observe or perform any covenant contained in (i) this Agreement, or any of their respective obligations under any other Loan Document or (ii) any document or instrument evidencing, securing or otherwise relating to any Other Lender Debt provided that if said failure is curable, it continues for a period of ten (10) days; or

(c)     Any representation or warranty made by the Borrower to the Lender or any statement, certificate or other data furnished by any of them in connection herewith or with any other Loan Document proves at any time to be incorrect in any material respect; or

(d)     A judgment or judgments for the payment of money shall be rendered against the Borrower, which shall remain unsatisfied and in effect for a period of sixty (60) days without a stay of execution; or

(e)     Any levy, seizure, attachment, execution or similar process shall be issued or levied on any of the Borrower's property, which process could have a material adverse effect on the business of the Borrower in the Lender's reasonable judgment; or

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group
</div>

10

CONFIDENTIAL

Justice-Partners-Teh000393

(f)     The Borrower shall (i) apply for or consent to the appointment of a receiver, conservator, trustee or liquidator of all or a substantial part of any of its assets; (ii) be unable, or admit in writing its inability, to pay its debts as they mature; (iii) file or permit the filing of any petition, case, arrangement, reorganization, or the like under any insolvency or Bankruptcy law, or the adjudication of it as Bankrupt, or the making of an assignment for the benefit of creditors or the consenting to any form of arrangement for the satisfaction, settlement or delay of debt or the appointment of a receiver for all or any part of its properties; or (iv) take any action for the purpose of effecting any of the foregoing; or

(g)     An order, judgment or decree shall be entered, or a case shall be commenced, against the Borrower, without the application, approval or consent of the Borrower by, or in, any court of competent jurisdiction, approving a petition or permitting the commencement of a case seeking reorganization or liquidation of the Borrower or appointing a receiver, trustee, conservator or liquidator of the Borrower, or of all or a substantial part of its assets and the Borrower, by any act, indicates its approval thereof, consent thereto, or acquiescence therein, or, in any event, such order, judgment, decree or case shall continue unstayed, or undismissed, and in effect for any period of ninety (90) consecutive days; or

(h)     The Borrower shall dissolve or liquidate, or be dissolved or liquidated, or cease to exist legally, or merge or consolidate with, or be merged or consolidated with or into any other entity; or

(i)     Failure by the Borrower to pay or perform any other Obligation, whether contingent or otherwise, or if any such other Obligation shall be accelerated, or if there exists any event of default under any instrument, document or agreement governing, evidencing or securing such other Obligation; or

(j)     The Lender reasonably believes that any material adverse change in the assets, liabilities, financial condition or business of the Borrower has occurred since the date before or after the date of this Agreement; or

(k)     The Borrower sells, liquidates, transfers or otherwise disposes of an asset not in strict accordance with the terms of this Loan Agreement; or

(l)     If at any time the Lender reasonably believes in good faith that the prospect of payment of any Obligation or the performance of any agreement of the Borrower is materially impaired, or that there is such a change in the assets, liabilities, financial condition or business of the Borrower as the Lender believes in good faith materially impairs the Lender's security or increases its risk of non-collection; or the Borrower fails to create the required number of direct or indirect jobs (as specified in the Economic Analysis of the Project) to cover any Advance.

## 8.2    Remedies.

(a)     Upon the occurrence of any Event of Default, and at any time thereafter, the availability of advances hereunder shall, at the option of the Lender, be deemed to be automatically terminated and the Lender, at its option, may declare one or more, or all, of the Loans outstanding hereunder, together with accrued interest thereon and all applicable late charges and surcharges

BOC 37448230v3

CONFIDENTIAL                                                         Justice-Partners-Teh000394

and all other liabilities and obligations of the Borrower to the Lender, to be forthwith due and payable, whereupon the same shall become forthwith due and payable; all of the foregoing without presentment or demand for payment, notice of non-payment, protest or any other notice or demand of any kind, all of which are expressly waived by the Borrower.

(b)     The Lender shall have the following additional rights and remedies:

(i)     All of the rights and remedies of a secured party under the Uniform Commercial Code or any other applicable law or at equity, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by law, in addition to any other rights and remedies contained in this Agreement, any other Loan Document or in any document, instrument or agreement evidencing, governing or securing the Obligations.

(ii)     The right to (1) take possession of the Collateral, without resort to legal process and without prior notice to Borrower, and for that purpose Borrower hereby irrevocably appoints the Lender its attorney-in-fact to enter upon any premises on which the Collateral or any part thereof may be situated and remove the Collateral therefrom, or (2) require the Borrower to assemble the Collateral and make it available to the Lender in a place to be designated by the Lender, in its sole discretion, or (3) instruct the Bank, without further consent of Borrower, to transfer the balance of all deposit accounts of Borrower to Lender and to thereafter treat Lender as the owner of such deposit accounts and the Bank's customer with respect to such deposit account.  The Borrower shall make available to the Lender all premises, locations and facilities necessary for the Lender's taking possession of the Collateral or for removing or putting the Collateral in saleable form.

(iii)     The right to sell or otherwise dispose of all or any part of the Collateral by one or more public or private sales.  The Lender will give the Borrower at least five (5) business days' prior written notice of the time and place of any public sale thereof, or of the time after which any private sale or any other intended disposition (which may include, without limitation, a public sale or lease of all or part of the Collateral) is to be made.  The Borrower agrees that five (5) business days is a reasonable time for any such notice.  The Lender, its employees, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is subject to widely distributed standard price quotations.  Any public or private sale shall be free from any right of redemption, which the Borrower hereby waives and releases.  If there is a deficiency after such sale and the application of the net proceeds from such sale, the Borrower shall be responsible for the same, with interest.

(iv)     The right, after an Event of Default shall have occurred (and Borrower irrevocably appoints the Lender as attorney-in-fact for the Borrower for this purpose, such appointment being coupled with an interest), upon notice to Borrower and without resort to legal process, to notify the persons liable for payment of all accounts (as defined in the Uniform Commercial Code) at any time and direct such persons to make payments directly to the Lender, and to perform all acts the Borrower could take to collect on such accounts,

<div align="center">LOAN AND SECURITY AGREEMENT<br>Justice Partners Law Group</div>

12

CONFIDENTIAL

including, without limitation, the right to notify postal authorities to change the address for delivery, open mail, endorse checks, bring collection suits, and realize upon Collateral securing such accounts. At the Lender's request, all bills and statements sent by the Borrower to the persons liable for payments of such accounts shall state that they have been assigned to, and are solely payable to, the Lender, and Borrower shall direct persons liable for the payment of such accounts to pay directly to the Lender any sums due or to become due on account thereof.

(v)     The right from and after an Event of Default, from time to time without demand or notice, and without being required to look first to any other Collateral to apply and set off any or all of the Deposits against any and all Obligations even though such Obligations are unmatured.

(c)     Collateral Account.  Upon an Event of Default:

(i)     The Borrower shall direct each of its creditors and/or customers that all payments or other distributions of whatever kind made to the Borrower shall be made to a post office box designated by the Lender (the "**Lock Box**").  The Lender shall have sole access to the Lock Box, and is hereby authorized by the Borrower to open all mail addressed to the Lock Box, and to apply all proceeds received therein, as herein provided. If Borrower should receive itself any such payments, the Borrower shall hold all such collections in trust for the Lender without commingling the same with other funds of the Borrower and will promptly, on the day of receipt thereof, transmit such collections to the Lender in the identical form in which they were received by the Borrower, with such endorsements as may be appropriate, accompanied by a report, in a form approved by the Lender, showing the amount of such collections and such other information as the Lender may require.

(ii)     All collections in the form of cash, checks or other demand remittances so received by, or transmitted to, the Lender shall upon receipt by the Lender be credited to the Collateral Account established hereunder.  Each such credit shall be conditional upon final payment to the Lender of all items giving rise to such credit, and, if any item is not so paid, the credit for such item shall be reversed whether or not the item has been returned and the amount thereof, in the Lender's discretion may be charged to any operating account of Borrower with the Lender.  All collections in the form of notes, drafts, acceptances or other instruments not payable on demand shall be delivered by the Borrower to the Lender. When such items are collected, the amount thereof shall be credited by the Lender to the Collateral Account, with appropriate notice to the Borrower.  Until such items are collected, the Borrower will not, without the consent of the Lender, make any entry on its books or records indicating that the same were received in payment of the receivable giving rise thereto.

(iii)     At such intervals as the Lender may deem appropriate, the Lender shall charge and apply the full amount then on deposit in the Collateral Account in reduction or payment of Borrower's Loan Account, such application to be subject to the final payment in cash of all items theretofore credited to such Collateral Account.

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                                                              13

BOC 37448230v3

CONFIDENTIAL                                                              Justice-Partners-Teh000396

**9.** **Lien and Set Off.** The Borrower hereby gives the Lender a lien and right of set off for all of Borrower's liabilities and obligations to the Lender upon and against all Collateral now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to it.

**10.** **Audit Rights.** At any time during the term of the Loan, the Lender shall have the right to audit the books and records of the Borrower upon prior written notice to the Borrower in accordance with procedures to be set forth in the Loan Documents.

**11.** **Non-Recourse.** No recourse shall be had to Borrower for payment of principal and interest under the Loan Documents, and Lender shall look solely to the Collateral as security for payment of principal and interest due under the Note and other Loan Documents. In no event shall Borrower be held personally liable for any payment of principal or interest under the Note and other Loan Documents or for any Event of Default.

**12.** **Miscellaneous.**

**12.1** **Certain Waivers.** Borrower hereby waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of dishonor, and hereby agrees to any extension or delay in the time for payment or enforcement, to renewal of any Loan and to any substitution or release of any Collateral, all without notice and without any effect on their liabilities. Any delay on the part of the Lender in exercising any right hereunder, or under any other Loan Document which may secure any Loan, shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of a subsequent default. The Lender may revoke any permission or waiver previously granted to Borrower, such revocation to be effective prospectively when given, whether given orally or in writing. The rights and remedies of the Lender shall be cumulative and not in the alternative, and shall include all rights and remedies granted herein, in any other Loan Document and under all applicable laws.

LENDER AND BORROWER IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER OR BORROWER IN RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER LOAN DOCUMENT.

BORROWER (i) ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION AND (ii) TO THE EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVES ANY RIGHT TO PRIOR NOTICE OF, AND A HEARING ON, THE RIGHT OF ANY HOLDER OF THE NOTES, TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OF ANY OF THEIR PROPERTY, AT ANY TIME, PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS AGREEMENT.

**12.2** **Notices.** All notices, requests or demands to or upon a party to this Agreement shall be given or made by the other party hereto in writing, in person or by depositing in the mail, postage prepaid, return receipt requested, addressed to the addressee at the address set forth herein as the

CONFIDENTIAL

Justice-Partners-Teh000397

Borrower's chief executive office or to such other addresses as such addressee may have designated in writing to the other party hereto.

**12.3    Expenses; Additional Documents.**   The Borrower will pay all taxes levied or assessed upon the principal sum of the advances made against the Lender, all fees of the Lender for its Lock-Box services and all other fees provided herein, and all expenses arising out of the preparation, amendment, waiver, modification, protection, collection and/or other enforcement of this Agreement, or any other Loan Document, or of any Collateral or security interest now or hereafter granted to secure the Loans or mortgage, security interest or lien, granted hereunder or under any other Loan Document (including, without limitation, attorneys' fees).   The Borrower will, from time to time, at its sole expense, execute and deliver to the Lender all such other and further instruments and documents, and take or cause to be taken all such other and further action as the Lender shall request in order to effect and confirm or vest more securely all rights contemplated by this Agreement or any other Loan Document.

**12.4    Addendums.**  Any Addendums that are attached hereto are and shall constitute a part of this Agreement.

**12.5    Governing Law; Consent to Jurisdiction.**  This Agreement, the other Loan Documents and the rights and obligations of the parties hereunder, and thereunder, shall be construed and interpreted in accordance with the laws of the State of Delaware, USA.  The Borrower agrees that the execution of this Agreement and the other Loan Documents, and the performance of the Borrower's obligations hereunder, and thereunder, shall be deemed to have a Delaware situs and the Borrower shall be subject to the personal jurisdiction of the courts of Delaware with respect to any action the Lender or its successors or assigns may commence hereunder or thereunder. Accordingly, the Borrower hereby specifically and irrevocably consents to the jurisdiction of the courts of Delaware with respect to all matters concerning this Agreement, the other Loan Documents, the Notes or the enforcement of any of the foregoing.

**12.6    Survival of Representations.**  All representations, warranties, covenants and agreements herein contained or made in writing in connection with this Agreement shall survive the execution and delivery of the Loan Documents and shall continue in full force and effect until all amounts payable on account of all Loans, the Loan Documents and this Agreement shall have been paid in full and this Agreement has been terminated.

**12.7    Integration; Severability; Successors.**   This Agreement is the final, complete and exclusive statement of the terms governing this Agreement.  If any provision of this Agreement shall to any extent be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Agreement shall not be affected.  The provisions of this Agreement shall bind the heirs, executors, administrators, assigns and successors of the Borrower and shall inure to the benefit of the Lender, its successors and assigns.

**12.8    Determinations as to Compliance.**  All documents and assurances of any type related to the fulfillment of any condition or compliance with any provision hereof or of any other Loan Document and all other matters related to the Loans are subject to the prior approval and satisfaction of the Lender, its counsel and other consultants.

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group

</div>

15

CONFIDENTIAL

**12.9    Termination of this Agreement.**  This Agreement shall terminate upon the written agreement of the parties hereto to the termination of any privilege of the Borrower to take advances and/or full and final payment of all amounts with respect to all Loans or amounts otherwise due hereunder and under the other Loan Documents.

**12.10   Attorney's Fees.**  Lender shall be entitled to recover all reasonable attorney's fees and expenses incurred by it in connection with enforcement of this Loan Agreement, including costs of collection.

CONFIDENTIAL                                                      Justice-Partners-Teh000399

IN WITNESS WHEREOF, the undersigned executes this Agreement as an instrument under seal as of the date first set forth above.

BORROWER:   **Justice Partners Law Group, LP, a District of Columbia limited partnership**

By: _____          Date: _____

_____                _____
Printed Name                                                    Title

LENDER:      **Justice Partners, LLC, a Delaware limited liability company**

By: _____          Date: _____

_____                _____
Printed Name                                                    Title

CONFIDENTIAL                                                    Justice-Partners-Teh000400

**THIS NOTE HAS NOT BEEN THE SUBJECT OF REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE AND THE SAME HAS BEEN ISSUED IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THIS NOTE MAY NOT BE SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT AS PERMITTED UNDER SUCH SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.**

## <u>SENIOR SECURED PROMISSORY NOTE</u>

Commitment Amount:  up to $45,000,000                                    _____, 2021
                                                                                          Original Issue Date

**FOR VALUE RECEIVED**, the undersigned, Justice Partners Law Group, a District of Columbia limited partnership with an address located at 1100 H Street NW, Suite 840, Washington, D.C., 20005 ( the "Borrower"), hereby promises to pay to the order of JUSTICE PARTNERS, LLC, a Delaware limited liability company with an address located at 20900 NE 30th Ave., Suite 510, Miami, Florida 33180 (the "**Lender**"), or at such other place as the Lender may from time to time designate in writing, in lawful currency of the United States of America, the principal sum of up to Forty-Five Million Dollars and 00/100 ($45,000,000.00) (the "**Principal Amount**"), in accordance with the provisions of this secured promissory note (this "**Note**").

1.      <u>Background</u>.  This Note is being issued on _____, 2021 (the "**Original Issue Date**") in connection with the execution of that certain Senior Secured Loan Agreement with the Borrower, dated as of the Original Issue Date, by and between the Borrower and the Lender (the "**Loan Agreement**").

2.      <u>Advances.</u>  This Note shall may be funded in one or more tranches from time to time in accordance with the terms and conditions contained in this Note, such that the Borrower shall be entitled to borrow from the Lender a principal amount or multiple principal amounts (each an "**Advance**" and collectively, the "**Advances**") to the extent that the sum of all unpaid Advances does not, at any time, exceed the Commitment Amount.  The initial Advance shall be Two Hundred and Fifty Thousand U.S. Dollars (US$ 250,000.00).  The Lender shall maintain an account on its books which shall evidence the outstanding principal balance of all Advances, Interest due and owing thereon and any fees and expenses due from time to time under this Note (the "**Loan Account**").  The Lender shall by appropriate entries debit to the Loan Account the amount of each Advance hereunder, together with all accrued Interest and any fees and expenses due hereunder, and credit to the Loan Account repayments of Advances and payments of Interest, fees and expenses made by the Borrower.

3.      <u>Security and Ranking</u>.The obligations of the Borrower under this Note, including all fees, principal and interest payments due or becoming due under this Note, shall be secured

<div align="center">1</div>

obligations of the Borrower, to be secured by a first priority, perfected security interest in all of its assets of Borrower, including its interest in any Qualified Settlement Fund, and all distributions, cash and other property or proceeds from time to time received in respect thereof (the "**Collateral**") pursuant to the terms of security agreement (together with all documents evidencing, securing and/or otherwise executed and/or delivered in connection with the Loan (the "**Security Agreement**"). Reference is made to the Security Agreement for a description of the Collateral (as defined therein) and the rights and remedies of the Lender (or another holder) in respect thereof. This Note, the Security Agreement and any UCC financing statements and other documents, instruments and agreements evidencing, guaranteeing or securing this Note, and all written amendments, replacements or supplements to any of them, are collectively referred to as the "**Loan Documents**".   The Loan shall rank senior to all other indebtedness of the Borrower issued hereafter in both liquidation and distributions and the Borrower shall not be permitted to enter into any other secured debt obligations without the prior written consent of the Lender, in its sole and absolute discretion

4.       Maturity Date; Term.  This Note shall mature, and be due and payable on a date that is equal to the five-year anniversary from the date of the First Advance (the "**Maturity Date**") and shall be for a term commencing on the date hereof and ending on the Maturity Date (the "**Term**"), subject to two successive 12-month extensions, as applicable (the "**Final Maturity Date**").  Subject to the conditions set forth below, Borrower may extend the Initial Maturity Date for two separate 12-month periods (each, an "**Extension Period**").  Each Extension Period shall be subject to satisfaction of the following conditions:  (i) notice is delivered to the Lender at least 90 days but not more than 120 days prior to the expiration of the Initial Maturity Date, or if extended, the expiration of the first Extension Period; (ii) no default or event of default exists on the date that the notice described in clause "(i)" is provided by the Borrower, or on the first day of the applicable Extension Period; and (iii) certain other conditions set forth in the Loan Agreement have been satisfied.

5.       Interest Rate.  Interest shall accrue on the unpaid principal balance of this Note at a rate equal to 18.0% per annum and payable on the Maturity Date.  Following the occurrence of an Event of Default, interest on the Loan shall be increased twenty-four percent (24%) (the "**Default Rate**").

6.       Payments of Principal Amount and Interest.  Any payments made pursuant to this Note shall be applied first toward any fees, expenses and costs due and then toward the Interest and finally toward the Principal Amount.  All payments of accrued but unpaid Interest and the Principal Amount are due, without notice on the Maturity Date.

7.       Prepayment.  The Loan may be pre-paid, in whole or in part, at any time by the Company.  Borrower shall pay all expenses of Lender in connection with any such prepayment.

8.       Procedures for Advances.

(a)       Subject to the terms and conditions of this Note, the Lender shall make Advances to the Borrower from time to time during the period from the Original Issuance Date to the day that is thirty (30) days prior to the Maturity Date up to an aggregate amount not to exceed at any time the Commitment Amount.  As long as the sum of all of the unpaid principal

2

amounts of the outstanding Advances does not exceed the Commitment Amount, the Borrower may borrow, repay and re-borrow principal amounts under this Note.

(b)     Whenever the Borrower desires the Lender to make an Advance hereunder, the Borrower shall deliver to the Lender a written notice requesting an Advance no later than 9:00 a.m. EST at least seven (7) days before the date on which the Borrower is requesting the Lender to make the Advance (such date, the "**Funding Date**").  Each such notice shall be duly executed by a duly authorized officer of the Borrower and shall specify the proposed Funding Date and the amount of the Advance requested.

(c)     In addition to the foregoing, the obligation of the Lender to make Advances hereunder shall be subject to fulfillment of the following conditions precedent on the date of such Advance:

(i)     There shall be no Event of Default (defined below) and no event which, with the passing of time or the giving of notice, would become an Event of Default; and

(ii)     The Lender shall have received such approvals, opinions or documents as the Lender may reasonably request.

9.     Repayments and Prepayments.

(a)     Order.  Any payments made pursuant to this Note shall be applied first toward any fees, expenses and costs due and then toward Interest due and finally toward the outstanding principal balance of the Advances.

(b)     Optional Prepayment.  The outstanding principal balance of any Advance may be prepaid in whole or in part at any time, without penalty or premium and without any prior written notice to the Lender before the Maturity Date; *provided*, that all accrued and unpaid Interest and any other charges accrued as of the date of prepayment are also paid in full.  Any prepayments shall not result in deferment or delay of the due date of any subsequent payment(s).

10.     Success Fee.  In addition to any other amounts payable pursuant to this Note, at the Maturity Date, the Borrower, in its sole discretion based upon its available funds, shall pay the Lender an amount equal to no less than fifty percent (50%) and up to one hundred percent (100%) of the amount of the funds in any Qualified Settlement Fund for the benefit of the Borrower (the "**Success Fee**").  Any payments due under this Note with respect to the Default Rate, shall be excluded from the calculation of the Success Fee.

11.     Events of Default.

(a)     General. The occurrence of any one or more of the following events shall constitute an event of default (each, an "**Event of Default**") under this Note:

(i)     Failure to Pay Principal Amount.  The Borrower fails to pay the Principal Amount, Interest or other sum due under this Note when due; or

3

(ii)     <u>Breach of Covenant</u>.  The Borrower breaches any covenant or other term or condition of this Note or any of the other Loan Documents in any respect and such breach, if subject to cure, continues for a period of ten (10) business days after written notice to the Borrower from the Lender.

(iii)    <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower in any of the Loan Documents shall be incorrect or misleading in any material respect when made or deemed made;

(iv)    <u>Encumbrance Defects</u>.  Any encumbrance of any kind created by any of the Loan Documents shall at any time fail to constitute a valid encumbrance on all of the Collateral purported to be subject thereto, securing the obligations purported to be secured thereby, or the Borrower shall so assert in writing, other than any such failure arising or resulting from any action or inaction on the part of the Lender;

(v)     <u>Legal Action</u>.  The Borrower or any Member of the Borrower (other than the Lender) shall file any claim or action against the Lender or any of its affiliates;

(vi)    <u>Receiver or Trustee</u>.  The Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee, or such a receiver or trustee shall otherwise be appointed;

(vii)   <u>Judgments</u>.  Any money judgment, writ or similar final process shall be entered or filed against the Borrower or any of its property or other assets for more than Fifty Thousand and 00/100 Dollars ($50,000.00), and shall remain unvacated, unbonded or unstayed for a period of forty-five (45) days; or

(viii)  <u>Bankruptcy</u>.  Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law or any law, or the issuance of any notice in relation to such event, for the relief of debtors shall be instituted by or against the Borrower, and if instituted against the Borrower, are not dismissed within forty-five (45) days of initiation.

(b)     <u>Waiver of Events of Default</u>. The Lender may waive any Event of Default hereunder. Such waiver shall be evidenced by written notice or other document specifying the Event or Events of Default being waived.

12.     <u>Remedies.</u>

(a)     <u>General</u>.  In addition to all rights and remedies legally or equitably available to the Lender, including under the Security Agreement, upon the occurrence of any Event of Default, the Lender shall have the option, in its sole and absolute discretion, to declare all amounts due under this Note immediately due and payable in full, all without additional notice, presentment or right to cure the Event of Default, all of which hereby are expressly waived.

4

(b)     No Waiver.  Failure to exercise the rights and remedies under Section 9(a) hereof in respect of any Event of Default shall not constitute a waiver of the right to exercise same with respect to such Event of Default or with respect to any subsequent Event of Default. No holder hereof shall, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by the holder hereof, and then only to the extent specifically set forth therein.

(c)     Cumulative.  The rights, remedies and powers of the holder hereof, as provided in this Note are cumulative and concurrent, and may be pursued singly, successively or together against the Borrower at the sole discretion of the holder hereof.

13.     Covenants and Waivers.  As a material inducement for the Lender to make Advances to the Borrower, the Borrower and all others who now or may at any time become liable for all or any part of the obligations evidenced hereby, expressly agree hereby to be jointly and severally bound, and jointly and severally:

(a)     No Distributions.  Agree not to make any distributions to its Members for as long as there remain any outstanding amounts, whether principal, Interest or other fees and expenses, under this Note;

(b)     No Amendments.  Agree not to amend, modify, alter or supplement the Operating Agreement or waive or consent to the waiver of any material provision of the Operating Agreement, without the prior written consent of the Borrower, which may be granted or withheld in the Borrower's sole discretion;

(c)     Certain Rights.  Waive and renounce any and all homestead, redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness evidenced by this Note or the Collateral or by any extension or renewal hereof;

(d)     Presentment.  Waive presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor, and notice of protest;

(e)     Notices.  Except as expressly provided herein, waive any and all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default, or enforcement of the payment hereof or hereunder;

(f)     Diligence or Delays.  Waive any and all lack of diligence and delays in the enforcement of the payment hereof;

(g)     Unconditional Obligation.  Agree that the liability of the Borrower, any guarantor, endorser or obligor shall be unconditional and without regard to the liability of any other person or entity for the payment hereof, and shall not in any manner be affected by any indulgence or forbearance granted or consented to by the Lender to any of them with respect hereto;

(h)     Extensions.  Consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by the Lender with respect to the payment or other provisions hereof, and to the release of any security at any time given for the payment hereof, or

5

any part thereof, with or without substitution, and to the release of any person or entity liable for the payment hereof; and

(i)       Additional Borrowers, Etc. Consent to the addition of any and all other makers, endorsers, guarantors, and other obligors for the payment hereof, and to the acceptance of any and all other security for the payment hereof, and agree that the addition of any such makers, endorsers, guarantors or other obligors, or security shall not affect the liability of the Borrower, any guarantor and all others now liable for all or any part of the obligations evidenced hereby

13.       Notices.    All notices, demands, requests, consents, approvals and other communications that may or are required to be given by either party to the other party hereunder shall be deemed to be sufficient if in writing and (i) delivered in person, (ii) delivered and received by facsimile, if a confirmatory mailing in accordance herewith is also made, (iii) duly sent by registered mail return receipt requested and postage prepaid, or (iv) duly sent by overnight delivery service, addressed to such party at the address set forth in the first paragraph of this Note.  All notices, demands, requests, consents, approvals and other communications shall be deemed to have been received (i) at the same time it was personally delivered, (ii) on the receipt of delivery by facsimile if accompanied by a confirmatory mailing, (iii) five (5) days after mailing via registered mail return receipt requested whether signed for or not, to the foregoing persons at the addresses set forth above or (iv) the next day when sent by overnight delivery service.  The above shall constitute service despite rejection or other refusal to accept or inability to deliver because of changed address for which no notice has been received.

14.       Attorney Fees. If there is an Event of Default and an action is brought with respect to this Note, or in the event that this Note is collected in whole or in part by suit or through probate or bankruptcy proceedings, or other legal proceedings of any kind, the Borrower promises and agrees to pay, in addition to all the sums payable hereunder, the Lender's reasonable expenses and costs of collection, including without limitation reasonable attorneys' fees and disbursements, whether or not suit is brought and through all appeals.

15.       Lender Records Conclusive.  The principal balance, Interest and other fees and expenses, each as noted on the Loan Account maintained by the Lender, shall be presumptive evidence of such outstanding principal balance, Interest and fees and expenses due under this Note. No failure by the Lender to make, and no error by the Lender in making, any annotation on the Loan Account shall affect the Borrower's obligation to pay the outstanding principal balance and Interest or any other obligation of the Borrower to the Lender pursuant to this Note.

16.       Legends.  It is understood that this Note (and any replacement thereof) shall bear the legend (in addition to any legends which may be required in the opinion of the Borrower's counsel by the securities laws of the state where the Lender is located) substantially as set forth on the first page of this Note.

17.       Invalidity of any Part. If any provision or part of any provision of this Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Note and this Note shall be

6

construed as if such invalid, illegal or unenforceable provision or party hereof had never been contained herein, but only to the extent of if its invalidity, illegality or unenforceability.

18.   Survival.  All agreements, representations and warranties made in this Note and in all the Other Agreements to be executed and delivered pursuant hereto shall survive the execution and delivery to the Lender of this Note and all other documents delivered hereunder or contemplated hereby. and shall continue in full force and effect so long as this Note remains outstanding, unperformed or unpaid.

19.   Construction; Governing Law.   All issues and questions concerning the construction, validity and interpretation of this Note and all matters pertaining hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

20.   **Consent to Jurisdiction**.  TO INDUCE THE LENDER TO ACCEPT THIS NOTE, THE BORROWER IRREVOCABLY AGREES THAT, SUBJECT TO THE LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS NOTE WILL BE LITIGATED IN COURTS HAVING SITUS IN WILMINGTON, DELAWARE.  THE BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN WILMINGTON, DELAWARE, WAIVES PERSONAL SERVICE OF PROCESS UPON THE BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE BORROWER AT THE ADDRESS STATED IN THE PREAMBLE  AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

21.   **Waiver of Jury Trial**.  THE BORROWER AND THE LENDER (BY ACCEPTANCE OF THIS NOTE), HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT OR INSTITUTED BY THE LENDER, THE BORROWER OR ANY SUCCESSOR OR ASSIGN OF THE LENDER OR THE BORROWER (a) UNDER THIS NOTE OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS NOTE OR (b) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.   THE BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

22.   Assignment.  This Note is not assignable or transferable by the Borrower except that Lender may assign this Note, the Security Agreement and all of the Loan Documents at any time.

7

8

23.     <u>Severability</u>.  In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

24.     <u>Titles and Subtitles</u>.   The titles of the Sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

[*Signature Page Follows*]

**SECURED PROMISSORY NOTE SIGNATURE PAGE**

IN WITNESS WHEREOF, the Borrower has executed this secured promissory note as of the date first above written.

Justice Partners Law Group, LP
a District of Columbia limited partnership

By:_____ ____

9

CONFIDENTIAL                                                                                                Justice-Partners-Teh000383

## Subject: Re: Data request / update



**Lee Melchionni** <lee@capital4justice.com>                                Wed, Oct 20, 2021, 2:33 PM
to Sohail Shahrasebi, Sylvia Benito, ALLAN TEH

# Exhibit 9

Sohail,

For Allan's independent law firm, KS Law Group, we spent $3,880,080.00 to acquire 155 RoundUp cases, 200 Talc Cases, 212 Hernia Mesh Cases, and 212 3M cases. We are entitled to 60% of the attorney fee.

For Justice Partners, we have spent $11,250,000.00 to acquire 200 Firefighter Foam Cases, 208 Talc Cases, 380 Hernia Mesh Cases, 350 3M Cases, 150 RoundUp Cases, and 200 Zantac Cases. We are entitled to 72% of the attorney fee.

In addition, we purchased 12% of the attorney fee for 1128 Talc Cases, 1220 Hernia Mesh Cases, 302 3M Cases, and 300 RoundUp Cases. All of these cases were mature, meaning the clients had already been acquired and cases worked up to a certain point, mitigating case acquisition, drop off, and timing of settlement risk.

Best,
Lee

On Tue, Oct 19, 2021 at 9:52 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

> Lee thanks for this. When you get a chance, as a follow-up can you please send me the $ invested per case type? Thank you.
>
> **From:** Lee Melchionni <lee@capital4justice.com>
> **Sent:** Monday, October 18, 2021 5:37 PM
> **To:** Sohail Shahrasebi <Sohail@kstreetcap.com>
> **Cc:** Sylvia Benito <sylvia@capital4justice.com>
> **Subject:** Re: Data request / update
>
> Sohail,
>
> We have answered your questions in blue below. Do not hesitate to reach out with follow up questions.
> - Could we be given the following
>   - A final copy of the legal documents supporting the supporting the Denovo US law firm?
>     - We have attached an opinion from our ethics counsel, Jack Marshall, on non-lawyer partners.
>   - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
>     - We have invested all of the $8mln committed. I have broken down the number of cases and case type, for Justice Partners and then KS Law Group below.

- Justice Partners
- 200 Firefighter Foam
- 208 Talc
- 380 Hernia Mesh
- 350 3M
- 150 RoundUp
- 200 Zantac

    - KS Law Group
    - 155 RoundUp
    - 200 Talc
    - 212 Hernia Mesh
    - 212 3M

- Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.

    - The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost.

- Update on the status of the various cases in the US and timing on each case

    - Hernia Mesh - We continue to march towards settlement with multiple manufacturers.  We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022.
    - Talc - We will send a separate, longer update, given the bankruptcy news. We are in the process of gathering information.
    - 3M - There have been four trials with mostly positive results. The first trial resulted in a $7.1M verdict for three plaintiffs in April, while the second ended in a victory for 3M in May. This was not a surprise, given that it was a 3M pick for trial. The third trial found 3M 62% liable for the $1.7M in damages a veteran sustained. A jury in the fourth trial awarded a U.S. Army veteran $8.2M after finding that 3M's Combat Arms Earplugs Version 2 caused him to suffer hearing loss and tinnitus. There are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months.
    - RoundUp - in 2020, a global settlement agreement was proposed, where $10 billion was allocated to resolve existing claims and a controversial scientific panel was created to decide the fate of future claims. In March 2021 the RoundUp MDL Judge rejected Bayer's motion for approval of the proposed settlement for all future RoundUp claims. In August 2021 Bayer announced that it had set aside $4.5B for future RoundUp claims and that it had pulled glyphosate-based RoundUp from the U.S. consumer market.
    - Firefighter Foam - There is no substantive update since our last investor communication.
    - Zantac - There is no substantive update since our last investor communication.

- On the Diesel stuff

- Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

    - Yes, our attorneys are currently preparing documents.

On Fri, Oct 15, 2021 at 9:34 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

Hey Guys –

I spoke with Allan and he is asking for a bunch of stuff related to both the US cases we've invested in and Europe cases we intend to invest in.

- Could we be given the following

    - A final copy of the legal documents supporting the supporting the Denovo US law firm?
    - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
    - Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
    - Update on the status of the various cases in the US and timing on each case

- On the Diesel stuff

    - Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

Sorry again for the request. Just fulfilling Allan's demands.

Best Regards,
Sohail Shahrasebi


Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139
O: 786-484-0771
M: 646-707-4484

# Exhibit 10



Dear Justice Partners Investors,

In the portal you will find our latest update, including the status report on each individual docket. We are also including a new spreadsheet modeling overall expected returns. This spreadsheet will now be updated on a quarterly basis or as often as changes in the litigation occur such as expected settlement amounts or timelines.

As always, please reach out to us with any questions. We are available for calls at your convenience.

Thank You,

Sylvia and Lee

# 3M Earplugs

## April 2023

### Case Details

There is a pending motion to dismiss Aero's bankruptcy but there has not been a ruling yet. A bankruptcy court in the Southern District of Indiana denied Aero's initial attempt to get into bankruptcy. The MDL is located in the Northern District of Florida. The Judge in the MDL granted plaintiff summary judgment for 3M's full and independent liability. 3M is appealing the motion for summary judgment to the 11th circuit. New cases are still being filed and there are roughly 220,000 cases in the MDL.

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 216 | 60 | 141 |

## Leads by Status



- Filed
- Pending
- Retained- Sent to Firm
- Attempting to Contact
- Closed - Dual Rep Rev Sh...
- Filed - Dual Rep Rev Share
- Unable to Reach/ Unresp...
- Ready for Law Firm
- Ready for Skip Tracing

2.78%
17.13%
48.15%
27.78%

## Pending Leads by Reason

| Reason | Leads |
|---|---:|
| Atty Review | 3 |
| Med Recs - Client | 4 |
| Med Recs - Client; Med Recs - Vendor | 1 |
| Med Recs - Vendor | 41 |
| Nurse Review | 7 |
| Nurse Review; PPF/PFS/Census | 1 |
| PPF/PFS/Census | 1 |
| Proof of Usage | 2 |

# Camp Lejeune

## April 2023

### Case Details

In speaking to several attorneys involved in the litigation, they agree that they are encouraged by Judge Devers' approach to handling the cases. Judge Devers asked the Department of Justice in the most recent hearing how many offers were made on the claims forms that were submitted by plaintiffs. The response by the DOJ was zero. Judge Devers proceeded to ask why this was the case and stated that Congress did not pass the bill so that the Eastern District of North Carolina Court could litigate every single Camp Lejeune claim. There has been talk of setting up a potential settlement grid for a certain number of injuries and a potential belief that a leadership group of attorneys will be appointed. Camp Lejeune continues to potentially take shape like an MDL.

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 21 | 20 | 0 |

## Leads by Status



- Pending
- Ready to Submit

4.76%

95.24%

## Pending Leads by Reason

| Reason | Leads |
|---|---:|
| Med Recs – Client | 1 |
| Med Recs – Vendor | 15 |
| Med Recs – Vendor; Nurse Review | 1 |
| Nurse Review | 3 |

# Fire Foam

## April 2023

### Case Details

The MDL is in the Federal Court in the District of South Carolina. There are currently 4,000 cases filed right now. The cases being consolidated in front of a single judge is a positive step. There is a bellwether trial set for May in Stuart, FL. The Stuart city water authority is claiming that the city water supply was contaminated by carcinogenic firefighting foam. We will continue to monitor the litigation.

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 149 | 33 | 114 |



**Leads by Status**

- Retained- Sent to Firm
- Pending
- Attempting to Contact
- Unable to Reach/ Unresp...

0.67%
22.15%
76.51%

## Pending Leads by Reason

| Reason | Leads |
|---|---:|
| Med Recs - Client | 1 |
| Med Recs - Vendor | 15 |
| Med Recs - Vendor; PPF/PFS/Census | 1 |
| Nurse Review | 3 |
| PPF/PFS/Census | 13 |

# Hernia Mesh

## April 2023

**Case Details**

There is no material news to report. In our discussions with co-counsel, they have said that Bard's approach has been to approach individual law firms with significant dockets and start settlement talks. To date, no settlements have occurred. There is a bellwether trial scheduled in October for Bard.

| Total Leads | Pending Leads | Filed/Retained Leads |
|:-----------:|:-------------:|:--------------------:|
| 195 | 138 | 49 |

### Leads by Status



- Pending — 70.77%
- Retained- Sent to Firm — 16.92%
- Filed — 8.21%
- Ready to Submit — 1.54%
- Attempting to Contact
- Unable to Reach/ Unresp...

### Pending Leads by Reason

| Reason | Leads |
|--------|------:|
| Atty Review; Med Recs - Vendor | 1 |
| Case WorkUp; Med Recs - Vendor | 1 |
| Med Recs - Client | 7 |
| Med Recs - Client; Med Recs - Vendor | 1 |
| Med Recs - Vendor | 120 |
| Med Recs - Vendor; Other (see Notes) | 1 |
| Med Recs - Vendor; Retainer | 1 |
| Nurse Review | 3 |
| Other (see Notes) | 2 |

# Talcum Powder

## April 2023

### Case Details

Johnson and Johnson ("J&J") recently announced a proposed $8.9 billion package to cover its liability from its talcum powder product. Multiple law firms with significant talcum powder dockets have spoken out against the settlement, including Levin Papantonio Rafferty, Beasley Allen, and Arnold & Itkin. Under the proposal, a J&J subsidiary would re-file for Chapter 11 bankruptcy protection and seek court approval for the plan. In order for J&J's subsidiary to get approval of the settlement, 75% of the victims would have to vote in favor of the bankruptcy plan. In our conversations with multiple co-counsels, no one is sure of the path forward. Law Firms in favor of the settlement believe this plan gets money into the victims' hands sooner, with a potential settlement value ranging from high five figures to the low six figures. However, those who oppose the settlement believe that if J&J is allowed to transfer their talcum powder liabilities into Chapter 11 bankruptcy, then this tactic could potentially transform mass torts forever, paving the way for copycat tactics across all mass tort litigations. We will continue to speak with our co-counsels to get new information as it becomes available.

| Total Leads | Pending Leads | Filed/Retained Leads |
|:-----------:|:-------------:|:--------------------:|
| 30 | 14 | 16 |

## Leads by Status



- Retained- Sent to Firm
- Pending

46.67% — 53.33%

## Pending Leads by Reason

| Reason | Leads |
|--------|------:|
| Med Recs - Vendor | 8 |
| Med Recs; Med Recs - Vendor | 3 |
| PPE/PFS/Census | 3 |

# Zantac

## April 2023

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 29 | 14 | 15 |

## Leads by Status



- Retained- Sent to Firm
- Pending

48.28%   51.72%

## Pending Leads by Reason

| Reason | Leads |
|---|---:|
| Med Recs - Vendor | 7 |
| Med Recs - Vendor; PPF/PFS/Census; Proof of Usage | 1 |
| Nurse Review; PPF/PFS/Census | 1 |
| PPF/PFS/Census | 3 |
| Retainer | 2 |

# B2B - ERC

April 2023

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 73 | 0 | 0 |



## Leads by Status

- Sent to Phillips
- Disqualified

49.32% — 50.68%



## Pending Leads by Reason

| Reason | Leads |
|---|---|
| | |

**Justice Partners**
3/31/23

| Litigation | Investment | Investment Date | Cost/case | Target | Current | Contracted Replacement | Contracted Replacement % | Replacements Due | Settlement Date | Average Settlement | Attorney % | Investor% | Estimated Return/Case |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Hernia Mesh** | $ 1,900,000 | 4/15/21 | $ 5,000 | 380 | 210 | 266 | 70% | 56 | 2/1/24 | $ 70,000 | 40% | 60% | $ 16,800 |
| **Talc** | $ 1,185,600 | 4/15/21 | $ 5,700 | 208 | 34 | 156 | 75% | 122 | 1/1/24 | $ 100,000 | 40% | 60% | $ 24,000 |
| **Firefighter Foam** | $ 1,089,400 | 4/15/21 | $ 5,447 | 200 | 150 | 150 | 75% | - | 1/1/25 | $ 90,000 | 40% | 60% | $ 21,600 |
| **Camp Lejeune (CL)** | $ 750,000 | 4/15/21 | $ 5,000 | 150 | 24 | 113 | 75% | 89 | 1/1/25 | $ 125,000 | 33% | 60% | $ 24,750 |
| **3M** | $ 700,000 | 4/15/21 | $ 2,000 | 350 | 225 | 263 | 75% | 38 | 11/1/23 | $ 25,000 | 40% | 60% | $ 6,000 |
| **Zantac** | $ 500,000 | 4/15/21 | $ 2,500 | 200 | 29 | 0 | 0% | - | 1/1/25 | $ 80,000 | 40% | 60% | $ 19,200 |
| **Back End Portfolio** | $ 5,125,000 | 10/11/21 | | | | | | | | | | | |
| JP Hernia Mesh | | | $ 1,000 | 380 | 210 | 266 | 70% | 56 | 2/1/24 | $ 70,000 | 40% | 12% | $ 3,360 |
| JP Talc | | | $ 1,140 | 208 | 34 | 156 | 75% | 122 | 1/1/24 | $ 100,000 | 40% | 12% | $ 4,800 |
| JP Firefighter Foam | | | $ 1,089 | 200 | 150 | 150 | 75% | - | 1/1/25 | $ 90,000 | 40% | 12% | $ 4,320 |
| JP CL | | | $ 1,000 | 150 | 24 | 113 | 75% | 89 | 1/1/25 | $ 125,000 | 33% | 12% | $ 4,950 |
| JP 3M | | | $ 400 | 350 | 225 | 263 | 75% | 38 | 11/1/23 | $ 25,000 | 40% | 12% | $ 1,200 |
| Zantac | | | $ 500 | 200 | 29 | 0 | 0% | - | 1/1/25 | $ 80,000 | 40% | 12% | $ 3,840 |
| | | | | | | | | | | | | | |
| Other Talc | | | $ 1,140 | 1,026 | 110 | 770 | 75% | 660 | 1/1/24 | $ 100,000 | 40% | 12% | $ 4,800 |
| Other Hernia Mesh | | | $ 1,000 | 1,153 | 593 | 807 | 70% | 214 | 2/1/24 | $ 70,000 | 40% | 12% | $ 3,360 |
| Other 3M | | | $ 400 | 320 | 178 | 240 | 75% | 62 | 11/1/23 | $ 25,000 | 40% | 12% | $ 1,200 |
| Other Roundup | | | $ 860 | 205 | 110 | 154 | 75% | 44 | 3/1/24 | $ 75,000 | 40% | 12% | $ 3,600 |

**SCENARIOS***

| Contracted Replacement | Investment | Return on Current Cases | Replacement Value | Potential Return | Gross** Multiple |
|---|---|---|---|---|---|
| **Hernia Mesh** | $ 1,900,000 | $ 3,528,000 | $ 940,800 | $ 4,468,800 | 2.4 |
| **Talc** | $ 1,185,600 | $ 816,000 | $ 2,928,000 | $ 3,744,000 | 3.2 |
| **Firefighter Foam** | $ 1,089,400 | $ 3,240,000 | $ - | $ 3,240,000 | 3.0 |
| **Camp Lejeune (CL)** | $ 750,000 | $ 594,000 | $ 2,190,375 | $ 2,784,375 | 3.7 |
| **3M** | $ 700,000 | $ 1,350,000 | $ 225,000 | $ 1,575,000 | 2.3 |
| **Zantac** | $ 500,000 | $ 556,800 | $ - | $ 556,800 | 1.1 |
| **Back End Portfolio** | $ 5,125,000 | $ 5,147,040 | $ 5,373,711 | $ 10,520,751 | 2.1 |
| JP Hernia Mesh | | $ 705,600 | $ 188,160 | $ 893,760 | |
| JP Talc | | $ 163,200 | $ 585,600 | $ 748,800 | |
| JP Firefighter Foam | | $ 648,000 | $ - | $ 648,000 | |
| JP CL | | $ 118,800 | $ 438,075 | $ 556,875 | |
| JP 3M | | $ 270,000 | $ 45,000 | $ 315,000 | |
| Zantac | | $ 111,360 | $ - | $ 111,360 | |
| Other Talc | | $ 528,000 | $ 3,165,600 | $ 3,693,600 | |
| Other Hernia Mesh | | $ 1,992,480 | $ 719,376 | $ 2,711,856 | |
| Other 3M | | $ 213,600 | $ 74,400 | $ 288,000 | |
| Other Roundup | | $ 396,000 | $ 157,500 | $ 553,500 | |
| | $ 11,250,000 | $ 15,231,840 | $ 11,657,886 | $ 26,889,726 | 2.4 |

| Case Cost+Interest*** | Investment | Return on Current Cases | Case Cost+INT | Potential Return | Gross** Multiple | Time (yrs) from Invest |
|---|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | $ 3,528,000 | $ 398,720 | $ 3,926,720 | 2.1 | 2.8 |
| Talc | $ 1,185,600 | $ 816,000 | $ 985,525 | $ 1,801,525 | 1.5 | 2.7 |
| Firefighter Foam | $ 1,089,400 | $ 3,240,000 | $ - | $ 3,240,000 | 3.0 | 3.7 |
| Camp Lejeune (CL) | $ 750,000 | $ 594,000 | $ 662,610 | $ 1,256,610 | 1.7 | 3.7 |
| 3M | $ 700,000 | $ 1,350,000 | $ 105,288 | $ 1,455,288 | 2.1 | 2.5 |
| Zantac | $ 500,000 | $ 556,800 | $ - | $ 556,800 | 1.1 | 3.7 |
| Back End Portfolio | $ 5,125,000 | $ 5,147,040 | $ 1,571,990 | $ 6,719,030 | 1.3 | |
| JP Hernia Mesh | | $ 705,600 | $ 66,347 | $ 771,947 | | 2.3 |
| JP Talc | | $ 163,200 | $ 163,832 | $ 327,032 | | 2.2 |
| JP Firefighter Foam | | $ 648,000 | $ - | $ 648,000 | | 3.2 |
| JP CL | | $ 118,800 | $ 111,350 | $ 230,150 | | 3.2 |
| JP 3M | | $ 270,000 | $ 17,469 | $ 287,469 | | 2.1 |
| Zantac | | $ 111,360 | $ - | $ 111,360 | | 3.2 |
| Other Talc | | $ 528,000 | $ 885,635 | $ 1,413,635 | | 2.2 |
| Other Hernia Mesh | | $ 1,992,480 | $ 253,659 | $ 2,246,139 | | 2.3 |
| Other 3M | | $ 213,600 | $ 28,882 | $ 242,482 | | 2.1 |
| Other Roundup | | $ 396,000 | $ 44,816 | $ 440,816 | | 2.4 |
| | $ 11,250,000 | $ 15,231,840 | $ 3,724,133 | $ 18,955,973 | 1.7 | |

| Partial Substitution**** | Investment | Return on Current Cases | Replacement & Substitution | Potential Return | Gross** Multiple | ERC% | ERC per Case | Expected Return/ERC | Camp Lejeune % | CL per Case | Expected Return/CL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | $ 3,528,000 | $ 940,800 | $ 4,468,800 | 2.4 | | | | | | |
| Talc | $ 1,185,600 | $ 816,000 | $ 2,684,000 | $ 3,500,000 | 3.0 | 50% | 7 | $ 2,750 | 50% | 1 | $ 24,750 |
| Firefighter Foam | $ 1,089,400 | $ 3,240,000 | $ - | $ 3,240,000 | 3.0 | | | | | | |
| Camp Lejeune (CL) | $ 750,000 | $ 594,000 | $ 2,190,375 | $ 2,784,375 | 3.7 | | | | | | |
| 3M | $ 700,000 | $ 1,350,000 | $ 309,375 | $ 1,659,375 | 2.4 | 100% | 3 | $ 2,750 | | | |
| Zantac | $ 500,000 | $ 556,800 | $ - | $ 556,800 | 1.1 | | | | | | |
| Back End Portfolio | $ 5,125,000 | $ 5,147,040 | $ 4,735,124 | $ 9,882,164 | 1.9 | | | | | | |
| JP Hernia Mesh | | $ 705,600 | $ 188,160 | $ 893,760 | | | | | | | |
| JP Talc | | $ 163,200 | $ 469,700 | $ 632,900 | | 50% | 1 | $ 2,750 | 50% | 0.2 | $ 24,750 |
| JP Firefighter Foam | | $ 648,000 | $ - | $ 648,000 | | | | | | | |
| JP CL | | $ 118,800 | $ 438,075 | $ 556,875 | | | | | | | |
| JP 3M | | $ 270,000 | $ 61,875 | $ 331,875 | | 100% | 0.6 | $ 2,750 | | | |
| Zantac | | $ 111,360 | $ - | $ 111,360 | | | | | | | |
| Other Talc | | $ 528,000 | $ 2,539,075 | $ 3,067,075 | | 50% | 1 | $ 2,750 | 50% | 0.2 | $ 24,750 |
| Other Hernia Mesh | | $ 1,992,480 | $ 719,376 | $ 2,711,856 | | | | | | | |
| Other 3M | | $ 213,600 | $ 102,300 | $ 315,900 | | 100% | 0.6 | $ 2,750 | | | |
| Other Roundup | | $ 396,000 | $ 216,563 | $ 612,563 | | | | | 100% | 0.2 | $ 24,750 |
| | $ 11,250,000 | $ 15,231,840 | $ 10,859,674 | $ 26,091,514 | 2.3 | | | | | | |

*Hypotehtical returns under various scenarios

** Gross return before carry, fees, and expenses (JP's LPs recieves a 15% simple preferred return per year until the original principal is returned before any carry is paid to the GP)

***Case cost plus 20% plus 8% per year (simple interest...not compounded) calculated from investment date to settlment date for JP cases. Case cost plus 8% per year for Back End

****Assumes Talc, 3M, & Round Up are partially substuted by ERC and/or Camp Lejeune, while the other cases are replaced as contracted

# Disclosures

Justice Partners LPs receive a 15% preferred return before any carry is paid to the GP.

If cases cannot be replaced, our case cost plus 20% plus 8% simple annual interest (not compounding) is returned to investors until order is filled.

The replacement contract provides for replacement up to 70-75% (depending on the case) for any loss due to lack of medical records.

Camp Le Jeune attorney fee is currently modeled at 33% not the historical 40% due to possible fee reductions from Congress.

Replacements as currently contracted:

3M attrition is replaced with 4 employees in Employee Retention Tax Credit Claims
Roundup is replaced 1:1 with Camp Le Jeune
Talc is replaced with a 1:1 Camp LeJeune or 7 employees in the Employee Retention Tax Credit

Range of settlement dates is based on an average of estimates from our co-counsel and are subject to revision.

Management Fee is no longer being charged to conserve the cash balance. Expenses include legal fees which may or may not be reimbursed.

The GP of Justice Partners will update and revise this spreadsheet on a 1/4ly basis with any changes in timeline or settlement estimates.

# Exhibit 11



## THE LAKE LAW FIRM™

Edward J. Lake, Esq.*
Michael J. Blom, Esq.*
Shelby Morales, Esq.°

Trial Counsel
Milberg Coleman
Bryson Phillips Grossman

July 6, 2023

**TO.**

**KS Law Group
JPLG**

RE: KS LAW GROUP AND JPLG CASES

My name is Edward Lake, and I am the founding partner of The Lake Law Firm (LLF) and am 100% owner in both LLF and Persist Communications. Attached hereto is exhibit (A) showing fee splits between LLF and our co-counsel, exhibit (B) showing all cases presently open and assigned to KS Law Group, and exhibit (C) showing all cases presently open and assigned to JPLG.

Affirmed by Edward Lake, Esq. on July 6th, 2023.

*Edward Lake*

 888-LAKE-LAW

 www.thelakelawfirm.com

One Rockefeller Plaza | 510 Broad Hollow Rd.
11th Floor | Suite 306
New York, NY 10020 | Melville, NY 11747

Licensed in NY* | Licensed in IL°

Exhibit C

All cases presently open and assigned to JPLG Law Group

| Full Name | Case Type |
|-----------|-----------|
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh

Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh

Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs

3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs

3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs

3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs

3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs

3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam

Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam

Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam

III

Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac

Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC



B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC

**signNow**

## Document History

SignNow E-Signature Audit Log

All dates expressed in MM/DD/YYYY (US)

| | |
|---|---|
| **Document name:** | KS-JPLG letter 7.6.23 |
| **Document created:** | 07/06/2023 18:45:54 |
| **Document pages:** | 1 |
| **Document ID:** | a7334d670440406f8d26e0d527d6f9a9160a961f |
| **Document Sent:** | 07/06/2023 18:50:19 UTC |
| **Document Status:** | Signed |
| | 07/06/2023 18:52:53UTC |

| | |
|---|---|
| **Sender:** | mblom@thelakelawfirm.com |
| **Signers:** | elake@forpersist.com, mblom@thelakelawfirm.com |
| **CC:** | |

| Client | Event | By | Server Time | Client Time | IP Address |
|---|---|---|---|---|---|
| SignNow Web Application | Uploaded the Document | mblom@thelakelawfirm.com | 07/06/2023 18:45:54 pm UTC | 07/06/2023 18:45:53 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | mblom@thelakelawfirm.com | 07/06/2023 18:46:10 pm UTC | 07/06/2023 18:46:10 pm UTC | 72.76.179.198 |
| SignNow Web Application | Document Saved | mblom@thelakelawfirm.com | 07/06/2023 18:49:18 pm UTC | 07/06/2023 18:49:17 pm UTC | 72.76.179.198 |
| SignNow Web Application | Invite Sent to: elake@forpersist.com, mblom@thelakelawfirm.com | mblom@thelakelawfirm.com | 07/06/2023 18:50:21 pm UTC | 07/06/2023 18:50:18 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Signed the Document | elake@forpersist.com | 07/06/2023 18:52:53 pm UTC | 07/06/2023 18:52:52 pm UTC | 12.151.95.4 |

**signNow**

## Document History

SignNow E-Signature Audit Log

All dates expressed in MM/DD/YYYY (US)

| | |
|---|---|
| **Document name:** | Exhibit A |
| **Document created:** | 07/06/2023 18:45:54 |
| **Document pages:** | 17 |
| **Document ID:** | afd741c9820f4d069e0d7ccad881a204c5da5b85 |
| **Document Sent:** | 07/06/2023 18:50:19 UTC |
| **Document Status:** | Signed |
| | 07/06/2023 18:50:19UTC |

| | |
|---|---|
| **Sender:** | mblom@thelakelawfirm.com |
| **Signers:** | elake@forpersist.com, mblom@thelakelawfirm.com |
| **CC:** | |

| Client | Event | By | Server Time | Client Time | IP Address |
|---|---|---|---|---|---|
| SignNow Web Application | Uploaded the Document | mblom@thelakelawfirm.com | 07/06/2023 18:45:55 pm UTC | 07/06/2023 18:45:53 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | mblom@thelakelawfirm.com | 07/06/2023 18:46:10 pm UTC | 07/06/2023 18:46:10 pm UTC | 72.76.179.198 |
| SignNow Web Application | Document Saved | mblom@thelakelawfirm.com | 07/06/2023 18:49:18 pm UTC | 07/06/2023 18:49:17 pm UTC | 72.76.179.198 |
| SignNow Web Application | Invite Sent to: elake@forpersist.com, mblom@thelakelawfirm.com | mblom@thelakelawfirm.com | 07/06/2023 18:50:21 pm UTC | 07/06/2023 18:50:18 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Document Saved | elake@forpersist.com | 07/06/2023 18:52:54 pm UTC | 07/06/2023 18:52:54 pm UTC | 12.151.95.4 |

**signNow**

## Document History

SignNow E-Signature Audit Log

All dates expressed in MM/DD/YYYY (US)

| | |
|---|---|
| **Document name:** | Exhibit B |
| **Document created:** | 07/06/2023 18:45:54 |
| **Document pages:** | 11 |
| **Document ID:** | 0e85822abc1a4677a99b6c09875056c1bfe26fb7 |
| **Document Sent:** | 07/06/2023 18:50:19 UTC |
| **Document Status:** | Signed |
| | 07/06/2023 18:50:19UTC |

| | |
|---|---|
| **Sender:** | mblom@thelakelawfirm.com |
| **Signers:** | elake@forpersist.com, mblom@thelakelawfirm.com |
| **CC:** | |

| Client | Event | By | Server Time | Client Time | IP Address |
|---|---|---|---|---|---|
| SignNow Web Application | Uploaded the Document | mblom@thelakelawfirm.com | 07/06/2023 18:45:54 pm UTC | 07/06/2023 18:45:53 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | mblom@thelakelawfirm.com | 07/06/2023 18:46:10 pm UTC | 07/06/2023 18:46:10 pm UTC | 72.76.179.198 |
| SignNow Web Application | Document Saved | mblom@thelakelawfirm.com | 07/06/2023 18:49:18 pm UTC | 07/06/2023 18:49:17 pm UTC | 72.76.179.198 |
| SignNow Web Application | Invite Sent to: elake@forpersist.com, mblom@thelakelawfirm.com | mblom@thelakelawfirm.com | 07/06/2023 18:50:21 pm UTC | 07/06/2023 18:50:18 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Document Saved | elake@forpersist.com | 07/06/2023 18:52:55 pm UTC | 07/06/2023 18:52:54 pm UTC | 12.151.95.4 |

**signNow**

## Document History

SignNow E-Signature Audit Log

All dates expressed in MM/DD/YYYY (US)

| | |
|---|---|
| **Document name:** | Exhibit C-2 |
| **Document created:** | 07/06/2023 18:45:54 |
| **Document pages:** | 15 |
| **Document ID:** | 8b2fdbb21ad14148a5879189cd95172318427c3d |
| **Document Sent:** | 07/06/2023 18:50:19 UTC |
| **Document Status:** | Signed |
| | 07/06/2023 18:50:19UTC |

| | |
|---|---|
| **Sender:** | mblom@thelakelawfirm.com |
| **Signers:** | elake@forpersist.com, mblom@thelakelawfirm.com |
| **CC:** | |

| Client | Event | By | Server Time | Client Time | IP Address |
|---|---|---|---|---|---|
| SignNow Web Application | Uploaded the Document | mblom@thelakelawfirm.com | 07/06/2023 18:45:54 pm UTC | 07/06/2023 18:45:53 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | mblom@thelakelawfirm.com | 07/06/2023 18:46:10 pm UTC | 07/06/2023 18:46:10 pm UTC | 72.76.179.198 |
| SignNow Web Application | Document Saved | mblom@thelakelawfirm.com | 07/06/2023 18:49:18 pm UTC | 07/06/2023 18:49:17 pm UTC | 72.76.179.198 |
| SignNow Web Application | Invite Sent to: elake@forpersist.com, mblom@thelakelawfirm.com | mblom@thelakelawfirm.com | 07/06/2023 18:50:21 pm UTC | 07/06/2023 18:50:18 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Document Saved | elake@forpersist.com | 07/06/2023 18:52:56 pm UTC | 07/06/2023 18:52:55 pm UTC | 12.151.95.4 |



# Exhibit 12

Dear Justice Partners LPs,

We hope you are doing well. Below please find an updated spreadsheet with our projected returns. If you have any questions, please do not hesitate to reach out to us.

Of note, last quarter 3M reached a global settlement which is positive news for JP.

We would also like to inform you that Lee has taken an additional role as Senior Partner at Milberg, one of the largest mass tort firms in the world, where his focus will be on their global funding deals. This position will not affect his role at Justice Partners and give the fund increased information on the progress of several of our cases.

We appreciate your continued support,

Sylvia and Lee

Lee Melchionni, Esq.

Sylvia Benito, CFA

**Justice Partners**
9/30/23

| Litigation | Investment | Investment Date | Cost/case | Target | Current | Contracted Replacement | Contracted Replacement % | Replacements Due | Estimated Settlement Date | Average Settlement | Attorney % | Investor% | Estimated Return/Case |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Hernia Mesh** | $ 1,900,000 | 4/15/21 | $ 5,000 | 380 | 137 | 266 | 70% | 129 | 2/1/24 | $ 70,000 | 40% | 60% | $ 16,800 |
| **Talc** | $ 1,185,600 | 4/15/21 | $ 5,700 | 208 | 24 | 156 | 75% | 132 | 1/1/24 | $ 100,000 | 40% | 60% | $ 24,000 |
| **Firefighter Foam** | $ 1,089,400 | 4/15/21 | $ 5,447 | 200 | 152 | 150 | 75% | (2) | 1/1/25 | $ 90,000 | 40% | 60% | $ 21,600 |
| **Camp Lejeune (CL)** | $ 750,000 | 4/15/21 | $ 4,491 | 167 | 16 | 167 | 100% | 151 | 1/1/25 | $ 125,000 | 33% | 60% | $ 24,750 |
| **3M** | $ 700,000 | 4/15/21 | $ 2,000 | 350 | 163 | 263 | 75% | 100 | 11/1/23 | $ 25,000 | 40% | 60% | $ 6,000 |
| **Zantac** | $ 500,000 | 4/15/21 | $ 2,500 | 200 | 13 | 0 | 0% | - | 1/1/25 | $ 80,000 | 40% | 60% | $ 19,200 |
| **Back End Portfolio** | $ 5,125,000 | 10/11/21 | | | | | | | | | | | |
| JP Hernia Mesh | | | $ 1,000 | 380 | 137 | 266 | 70% | 129 | 2/1/24 | $ 70,000 | 40% | 12% | $ 3,360 |
| JP Talc | | | $ 1,140 | 208 | 24 | 156 | 75% | 132 | 1/1/24 | $ 100,000 | 40% | 12% | $ 4,800 |
| JP Firefighter Foam | | | $ 1,089 | 200 | 152 | 150 | 75% | (2) | 1/1/25 | $ 90,000 | 40% | 12% | $ 4,320 |
| JP CL | | | $ 898 | 167 | 16 | 167 | 100% | 151 | 1/1/25 | $ 125,000 | 33% | 12% | $ 4,950 |
| JP 3M | | | $ 400 | 350 | 163 | 263 | 75% | 100 | 11/1/23 | $ 25,000 | 40% | 12% | $ 1,200 |
| Zantac | | | $ 500 | 200 | 13 | 0 | 0% | - | 1/1/25 | $ 80,000 | 40% | 12% | $ 3,840 |
| Other Talc | | | $ 1,140 | 1,026 | 100 | 770 | 75% | 670 | 1/1/24 | $ 100,000 | 40% | 12% | $ 4,800 |
| Other Hernia Mesh | | | $ 1,000 | 1,153 | 411 | 807 | 70% | 396 | 2/1/24 | $ 70,000 | 40% | 12% | $ 3,360 |
| Other 3M | | | $ 400 | 320 | 145 | 240 | 75% | 95 | 11/1/23 | $ 25,000 | 40% | 12% | $ 1,200 |
| Other Roundup | | | $ 860 | 205 | 88 | 154 | 75% | 66 | 3/1/24 | $ 75,000 | 40% | 12% | $ 3,600 |

**SCENARIOS***

| Contracted Replacement | Investment | Return on Current Cases | Replacement Value | Potential Return | Gross** Multiple |
|---|---|---|---|---|---|
| **Hernia Mesh** | $ 1,900,000 | $ 2,301,600 | $ 2,167,200 | $ 4,468,800 | 2.4 |
| **Talc** | $ 1,185,600 | $ 576,000 | $ 3,168,000 | $ 3,744,000 | 3.2 |
| **Firefighter Foam** | $ 1,089,400 | $ 3,283,200 | $ (43,200) | $ 3,240,000 | 3.0 |
| **Camp Lejeune (CL)** | $ 750,000 | $ 396,000 | $ 3,737,250 | $ 4,133,250 | 5.5 |
| **3M** | $ 700,000 | $ 978,000 | $ 597,000 | $ 1,575,000 | 2.3 |
| **Zantac** | $ 500,000 | $ 249,600 | $ - | $ 249,600 | 0.5 |
| **Back End Portfolio** | $ 5,125,000 | $ 3,908,640 | $ 6,820,446 | $ 10,729,086 | 2.1 |
| *JP Hernia Mesh* | | $ 460,320 | $ 433,440 | $ 893,760 | |
| *JP Talc* | | $ 115,200 | $ 633,600 | $ 748,800 | |
| *JP Firefighter Foam* | | $ 656,640 | $ (8,640) | $ 648,000 | |
| *JP CL* | | $ 79,200 | $ 747,450 | $ 826,650 | |
| *JP 3M* | | $ 195,600 | $ 119,400 | $ 315,000 | |
| *Zantac* | | $ 49,920 | $ - | $ 49,920 | |
| *Other Talc* | | $ 480,000 | $ 3,213,600 | $ 3,693,600 | |
| *Other Hernia Mesh* | | $ 1,380,960 | $ 1,330,896 | $ 2,711,856 | |
| *Other 3M* | | $ 174,000 | $ 114,000 | $ 288,000 | |
| *Other Roundup* | | $ 316,800 | $ 236,700 | $ 553,500 | |
| | $ 11,250,000 | $ 11,693,040 | $ 16,446,696 | $ 28,139,736 | 2.5 |

| Case Cost+Interest*** | Investment | Return on Current Cases | Case Cost+INT | Potential Return | Gross** Multiple | Time (yrs) from Invest |
|---|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | $ 2,301,600 | $ 918,480 | $ 3,220,080 | 1.7 | 2.8 |
| Talc | $ 1,185,600 | $ 576,000 | $ 1,066,305 | $ 1,642,305 | 1.4 | 2.7 |
| Firefighter Foam | $ 1,089,400 | $ 3,283,200 | $ (16,313) | $ 3,266,887 | 3.0 | 3.7 |
| Camp Lejeune (CL) | $ 750,000 | $ 396,000 | $ 1,015,469 | $ 1,411,469 | 1.9 | 3.7 |
| 3M | $ 700,000 | $ 978,000 | $ 279,363 | $ 1,257,363 | 1.8 | 2.5 |
| Zantac | $ 500,000 | $ 249,600 | $ - | $ 249,600 | 0.5 | 3.7 |
| Back End Portfolio | $ 5,125,000 | $ 3,908,640 | $ 2,024,310 | $ 5,932,950 | 1.2 | |
| JP Hernia Mesh | | $ 460,320 | $ 152,835 | $ 613,155 | | 2.3 |
| JP Talc | | $ 115,200 | $ 177,261 | $ 292,461 | | 2.2 |
| JP Firefighter Foam | | $ 656,640 | $ (2,741) | $ 653,899 | | 3.2 |
| JP CL | | $ 79,200 | $ 170,647 | $ 249,847 | | 3.2 |
| JP 3M | | $ 195,600 | $ 46,351 | $ 241,951 | | 2.1 |
| Zantac | | $ 49,920 | $ - | $ 49,920 | | 3.2 |
| Other Talc | | $ 480,000 | $ 899,064 | $ 1,379,064 | | 2.2 |
| Other Hernia Mesh | | $ 1,380,960 | $ 469,286 | $ 1,850,246 | | 2.3 |
| Other 3M | | $ 174,000 | $ 44,255 | $ 218,255 | | 2.1 |
| Other Roundup | | $ 316,800 | $ 67,352 | $ 384,152 | | 2.4 |
| | $ 11,250,000 | $ 11,693,040 | $ 5,287,615 | $ 16,980,655 | 1.5 | |

| Partial Substitution**** | Investment | Return on Current Cases | Replacement & Substitution | Potential Return | Gross** Multiple | ERC% | ERC per Case | Expected Return/ERC | Camp Lejeune % | CL per Case | Expected Return/CL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | $ 2,301,600 | $ 2,167,200 | $ 4,468,800 | 2.4 | | | | | | |
| Talc | $ 1,185,600 | $ 576,000 | $ 2,904,000 | $ 3,480,000 | 2.9 | 50% | 7 | $ 2,750 | 50% | 1 | $ 24,750 |
| Firefighter Foam | $ 1,089,400 | $ 3,283,200 | $ (43,200) | $ 3,240,000 | 3.0 | | | | | | |
| Camp Lejeune (CL) | $ 750,000 | $ 396,000 | $ 3,737,250 | $ 4,133,250 | 5.5 | | | | | | |
| 3M | $ 700,000 | $ 978,000 | $ 820,875 | $ 1,798,875 | 2.6 | 100% | 3 | $ 2,750 | | | |
| Zantac | $ 500,000 | $ 249,600 | $ - | $ 249,600 | 0.5 | | | | | | |
| Back End Portfolio | $ 5,125,000 | $ 3,908,640 | $ 6,235,309 | $ 10,143,949 | 2.0 | | | | | | |
| JP Hernia Mesh | | $ 460,320 | $ 433,440 | $ 893,760 | | | | | | | |
| JP Talc | | $ 115,200 | $ 508,200 | $ 623,400 | | 50% | 1 | $ 2,750 | 50% | 0.2 | $ 24,750 |
| JP Firefighter Foam | | $ 656,640 | $ (8,640) | $ 648,000 | | | | | | | |
| JP CL | | $ 79,200 | $ 747,450 | $ 826,650 | | | | | | | |
| JP 3M | | $ 195,600 | $ 164,175 | $ 359,775 | | 100% | 0.6 | $ 2,750 | | | |
| Zantac | | $ 49,920 | $ - | $ 49,920 | | | | | | | |
| Other Talc | | $ 480,000 | $ 2,577,575 | $ 3,057,575 | | 50% | 1 | $ 2,750 | 50% | 0.2 | $ 24,750 |
| Other Hernia Mesh | | $ 1,380,960 | $ 1,330,896 | $ 2,711,856 | | | | | | | |
| Other 3M | | $ 174,000 | $ 156,750 | $ 330,750 | | 100% | 0.6 | $ 2,750 | | | |
| Other Roundup | | $ 316,800 | $ 325,463 | $ 642,263 | | | | | 100% | 0.2 | $ 24,750 |
| | $ 11,250,000 | $ 11,693,040 | $ 15,821,434 | $ 27,514,474 | 2.4 | | | | | | |

*Hypotehtical returns under various scenarios

** Gross return before carry, fees, and expenses (JP's LPs recieves a 15% simple preferred return per year until the original principal is returned before any carry is paid to the GP)

***Case cost plus 20% plus 8% per year (simple interest...not compounded) calculated from investment date to settlment date for JP cases. Case cost plus 8% per year for Back End

****Assumes Talc, 3M, & Round Up are partially substuted by ERC and/or Camp Lejeune, while the other cases are replaced as contracted





# Exhibit 13

Dear Justice Partners Investor:

In an effort to shore up and protect our investments in cases being handled by the Lake Law Firm ("LLF"), on January 17, 2024, Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term Funding and Security Agreement (the "Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF. The purpose of the loan is to allow LLF to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business. We are informed that LLF is currently in discussions with two potential longer-term lenders. The loan accrues interest at the rate of five percent per annum and matures April 1, 2024.

Under the Agreement, LLF granted a first priority security interest in its unencumbered assets and a second priority security interest in assets subject to a pre-existing security interest. The assets comprise LLF's mass tort and personal injury case portfolio, including co-counsel agreements and all fees, income, revenue, and other proceeds of the cases. Ms. Benito and Mr. Melchionni hold these security interests for the benefit of our investors.

In addition, under the Agreement, LLF assigned to Ms. Benito and Mr. Melchionni one hundred cases based on improvised explosive devices ("IED Cases"). The Agreement provides that if, and only if, LLF repays all amounts owed to our investors on or before January 10, 2025, Ms. Benito and Mr. Melchionni will transfer the IED Cases back to LLF. If all amounts owed to our investors are not fully repaid by such date, Ms. Benito and Mr. Melchionni will use the proceeds of the IED Cases (either through sale, recovery, or both) to repay principal and interest in full to our investors. Any excess proceeds will be paid over to LLF.

We believe that this has added significantly more security to your positions in the portfolio. In addition, this means that a full buyout of the portfolio has been negotiated within a one-year timeline. If that buyout does not occur, we have the collateral to liquidate and return to investors within a reasonable timeline thereafter.

As always, please reach out to us with any questions.

Best Regards,

Lee Melchionni, ESQ

Sylvia Benito, CFA

# Exhibit 14

---

From: **Noonan, Amanda** <Amanda.Noonan@blankrome.com>
Date: Fri, Feb 9, 2024 at 3:24 PM
Subject: February KS Law Update
To: matthew@jones-adams.com <matthew@jones-adams.com>, Cheyenne Moghadam <c.moghadam@jones-adams.com>
CC: Bressler, Ken <ken.bressler@blankrome.com>

Please see attached and below the investor update for KS Law.

I hope you are well. Attached is KS Law's case list update. I have broken down the litigations below and included a status definition.

In an effort to shore up and protect our investments in cases being handled by the Lake Law Firm ("LLF"), on January 17, 2024, Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term Funding and Security Agreement (the "Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF. The purpose of the loan is to allow LLF to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business. We are informed that LLF is currently in discussions with two potential longer-term lenders. The loan accrues interest at the rate of five percent per annum and matures April 1, 2024.

Under the Agreement, LLF granted a first priority security interest in its unencumbered assets and a second priority security interest in assets subject to a pre-existing security interest. The assets comprise LLF's mass tort and personal injury case portfolio, including co-counsel agreements and all fees, income, revenue, and other proceeds of the cases. Ms. Benito and Mr. Melchionni hold these security interests for the benefit of our investors.

In addition, under the Agreement, LLF assigned to Ms. Benito and Mr. Melchionni one hundred cases based on improvised explosive devices ("IED Cases"). The Agreement provides that if, and only if, LLF repays all amounts owed to our investors on or before January 10, 2025, Ms. Benito and Mr. Melchionni will transfer the IED Cases back to LLF. If all amounts owed to our investors are not fully repaid by such date, Ms. Benito and Mr. Melchionni will use the proceeds of the IED Cases (either through sale, recovery, or both) to repay principal and interest in full to our investors. Any excess proceeds will be paid over to LLF.

We believe that this has added significantly more security to your position in the portfolio. In addition, this means that a full buyout of the portfolio has been negotiated within a one-year timeline. If that buyout does not occur, we have the collateral to liquidate and return to investors within a reasonable timeline thereafter. As always, please reach out to us with any questions.

**3M Earplugs**

- 1 3M survey that has been completed
- 1 case that is closed with a dual representation revenue share
- 83 cases have been filed
- 1 cases that have been filed with a dual representation revenue share
- 15 cases have been retained - sent to firm

**Employee Retention Tax Credit Program**

- KS Law Group has 41 companies with 636 employees

**Hernia Mesh**

- 34 cases have been filed
- 20 cases are pending
- 19 cases have been sent to firm
- 6 cases that are unable to reach/unresponsive

**Round Up**

- 1 case is attempting to contact
- 16 cases have been filed
- 23 cases are pending
- 21 cases have been retained and sent to firm
- 2 cases that have a health status follow up
- 6 cases have skip tracking completed
- 4 cases have been unable to reach/unresponsive

**Talcum Powder**

- 4 cases have been filed

- 2 cases have been retained and to the firm

- <u>Attempting to Contact</u> - The client has signed the retainer and our co-counsel is reaching out to confirm all of the information on the intake form is accurate.

- <u>Skip Tracing Completed</u> - A case was unresponsive and the private investigator has provided to co-counsel any information that they could find about the client.

- <u>Unable to Reach/Unresponsive</u> - A client has become unable to reach.

- <u>Pending</u> - This is the stage before we send it to the filing firm. The reason the case is pending is listed on the spreadsheet.

- <u>Ready for PPF</u> - Medical records are in, the case looks good, only the required discovery document is needed before being sent to the filing firm for filing.

- <u>Ready to Submit</u> - The case is going through a last quality control check before being sent to the filing firm for filing.

- <u>Retained Sent to Firm</u> - Co-counsel has completed all required work up and the case has been sent to the filing firm for filing.

- <u>Closed Dual Rep Rev Share</u> - Fee split negotiated but Dual Rep co-counsel has not filed the case yet.

- <u>Filed Dual Rep Rev Share</u> - Fee split negotiated and case has been filed.

- <u>Filed</u> - The case has been filed by the filing firm.

**Amanda M Noonan** | BLANKROME
444 West Lake Street | Suite 1650 | Chicago, IL 60606
O: 312.776.2537 | F: 312.896.9181 | amanda.noonan@blankrome.com

*********************************************************************************************************

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

*********************************************************************************************************

# Exhibit 15

ml.

### The New York Times

## *Johnson & Johnson Reaches Deal for $8.9 Billion Talc Settlement*

The company faces a flood of lawsuits claiming its talc products caused cancer. The proposed settlement requires approval by a bankruptcy court, but has the backing of plaintiffs' lawyers.

 Give this article



The talc in Johnson & Johnson's baby powder may have been contaminated with asbestos, plaintiffs claim.   Lucas Jackson/Reuters

 **By Tiffany Hsu**

Tiffany Hsu has followed the Johnson & Johnson talc litigation closely for more than five years.

April 4, 2023

Johnson & Johnson said on Tuesday that it had agreed to pay $8.9 billion to tens of thousands of people who claimed the company's talcum powder products caused cancer, a proposal that lawyers for the plaintiffs called a "significant victory" in a legal fight that has

**Special offer:** Subscribe for $4.25 $1 a week for the first year.          EXPAND

Filing # 212482014 E-Filed 12/09/2024 06:05:44 PM

IN THE CIRCUIT COURT OF THE 11ᵀᴴ
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

     Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,

     Defendants
_____/

## ANSWER TO THE COMPLAINT

Defendants Lee Melchionni ("Melchionni"), Sylvia Benito ("Benito"), Justice Partners

Management, LLC ("Justice Partners Management"), and Justice Partners Law Group, LP

("Justice Partners Law Group"; and together with Melchionni, Benito, Justice Partners

Management, "JP Defendants"), by their undersigned counsel, hereby file their Answer and

Affirmative Defenses to Plaintiff, Allan Teh's ("Teh" or "Plaintiff") Complaint, filed October 25,

2024, and state as follows:

1.     Admit that Plaintiff is attempting to seek damages, declaratory relief, and equitable

relief in excess of the minimum jurisdictional limits of this Court but deny the remaining

allegations contained in Paragraph 1.

2.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2.

3.      Admit that Defendant Melchionni is the Chief Operating Officer of Justice Partners, LLC ("Justice Partners") and that the business address of Justice Partners is 20900 NE 30th Ave., Miami, Florida 33180 but deny the remaining allegations contained in Paragraph 3.

4.      Admit that Defendant Benito is the Chief Executive Officer of Justice Partners, that she resides in Miami-Dade County Florida, that she is a citizen of the State of Florida, and that the business address of Justice Partners is 20900 NE 30th Avenue, Miami, Florida 33180.  The JP Defendants deny the remaining allegations contained in Paragraph 4.

5.      Admit the allegations contained in Paragraph 5.

6.      Admit the allegations contained in Paragraph 6.

7.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7.

8.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8.

9.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9.

10.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10.

11.     Paragraph 11 asserts legal conclusions to which no response is required.  The JP Defendants otherwise deny the allegations in paragraph 11.

12.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12.

13.     Aver that Section 9.3 of the Series A Preferred Units of Justice Partners, LLC's Offering Circular (the "Offering Circular") speaks for itself but otherwise deny the allegations contained in Paragraph 13.

14.     Deny the allegations contained in Paragraph 14.

15.     Admit the allegations contained in Paragraph 15.

16.     Admit the allegations contained in Paragraph 16.

17.     Admit that Plaintiff purchased 4,000 Units of Series A Preferred Units in Justice Partners for $4,000,000 but deny the remaining allegations in Paragraph 17.

18.     Deny the allegations contained in Paragraph 18.

19.     Deny the allegations contained in Paragraph 19.

20.     Deny the allegations contained in Paragraph 20.

21.     Aver that the Offering Circular speaks for itself, but otherwise deny the allegations contained in Paragraph 21..

22.     Aver that the Offering Circular speaks for itself, but otherwise deny the allegations contained in Paragraph 22.

23.     Deny the allegations contained in Paragraph 23.

24.     Admit that Defendant Melchionni is the COO of Justice Partners, the Managing Partner of Justice Partner Law Group, and an "Authorized Member" of Justice Partners Management but deny the remaining allegations contained in Paragraph 24.

25.     Deny the allegations contained in Paragraph 25.

26.     Deny the allegations contained in Paragraph 26.

27.     Deny the allegations contained in Paragraph 27.

28.     Deny the allegations contained in Paragraph 28.

29. Deny the allegations contained in Paragraph 29.

30. Deny the allegations contained in Paragraph 30.

31. Admit that Plaintiff made a Demand for Books and Records on Justice Partners on November 5, 2022 and initiated the Books and Records Action on November 25, 2022 but deny the remaining allegations in Paragraph 31.

32. Deny the allegations contained in Paragraph 32.

33. Aver that the Section 10.1 of Justice Partners' Operating Agreement (the "Operating Agreement") speaks for itself.

34. Aver that Section 10.3 of the Operating Agreement speaks for itself.

35. Aver that the Operating Agreement speaks for itself.

36. Deny the allegations contained in Paragraph 36.

37. Deny the allegations in Paragraph 37.

38. Deny the allegations in Paragraph 38.

39. Deny the allegations contained in Paragraph 39.

40. Deny the allegations contained in Paragraph 40.

41. Deny the allegations contained in Paragraph 41.

42. Deny the allegations in Paragraph 42.

43. Admit that the first of the Lake Law Invoices is dated April 15, 2021 and that it states that $6,125,000 was transferred to Persist's TD bank account ending in *2721, but deny the remaining allegations contained in Paragraph 43.

44. Admit that the second of the Lake Law Invoices is dated October 11, 2021 and that it states that $5,125,000 was transferred to Persist's TD bank account ending in *2721 but deny the remaining allegations contained in Paragraph 44.

45. Admit that both invoices contain the quoted language but deny the remaining allegations in Paragraph 45.

46. Aver that Justice Partners' 2021-2022 General Ledger speaks for itself but otherwise deny the allegations in Paragraph 46.

47. Deny the allegations contained in Paragraph 47.

48. Deny the allegations contained in Paragraph 48.

49. Deny the allegations contained in Paragraph 49.

50. Aver that the Senior Secured Promissory Note speaks for itself but otherwise deny the allegations in Paragraph 50.

51. Deny the allegations in Paragraph 51.

52. Admit that the executed Senior Secured Promissory Note was produced on August 18, 2023 in the Books and Records Action but deny the remaining allegations contained in Paragraph 52.

53. Aver that the deposition transcript speaks for itself but otherwise deny the allegations in Paragraph 53.

54. Admit the allegations contained in Paragraph 54.

55. Admit that the effective date of the Senior Secured Promissory Note is April 14, 2021, but deny the remaining allegations contained in Paragraph 55.

56. Admit that the effective date of the Senior Secured Promissory Note is a day prior to the date of the first of the Lake Law Invoices, April 15th, 2021, but deny the remaining allegations contained in Paragraph 56.

57. Deny the allegations contained in Paragraph 57.

58. Deny the allegations contained in Paragraph 58.

59.     Deny the allegations in Paragraph 59.

60.     Deny the allegations contained in Paragraph 60.

61.     Deny the allegations contained in Paragraph 61.

62.     Aver that the October 20, 2021 email attached as Exhibit 9 speaks for itself but otherwise deny the allegations contained in Paragraph 62.

63.     Aver that the October 20, 2021 email attached as Exhibit 9 speaks for itself, but otherwise deny the  allegations contained in Paragraph 63.

64.     Deny the allegations contained in Paragraph 64.

65.     Deny the allegations contained in Paragraph 65.

66.     Deny the allegations contained in Paragraph 66.

67.     Deny the allegations contained in Paragraph 67.

68.     Deny the allegations contained in Paragraph 68.

69.     Admit that Melchionni and Benito, and Justice Partners Management provided an investor report to Plaintiff in April 2023 ("April 2023 Investor Report") but deny the remaining allegations contained in Paragraph 69.

70.     Deny the allegations contained in Paragraph 70.

71.     Aver that the April 2023 Investor Report speaks for itself but otherwise deny the allegations contained in Paragraph 71.

72.     Deny the allegations contained in Paragraph 72.

73.     Deny the allegations contained in Paragraph 73.

74.     Admit that Plaintiff received a document labelled "All cases presently open and assigned to JPLG Law Group" but deny the remaining allegations contained in Paragraph 74.

75.     Admit that the Lake Law Firm generated an exhibit described as "All cases presently open and assigned to JPLG Law Group" that was provided to Plaintiff, but deny the remaining allegations contained in Paragraph 75.

76.     Deny the allegations contained in Paragraph 76.

77.     Deny the allegations contained in Paragraph 77.

78.     Aver that the September 2023 investor report ("September 2023 Investor Report") speaks for itself and deny the remaining allegations contained in Paragraph 78.

79.     Aver that the September 2023 Investor Report speaks for itself and deny the remaining allegations contained in Paragraph 79.

80.     Deny the allegations contained in Paragraph 80.

81.     Deny the allegations contained in Paragraph 81.

82.     Aver that the January 2024 investor report ("January 2024 Investor Report") speaks for itself and deny the remaining allegations contained in Paragraph 82.

83.     Aver that the January 2024 Investor Report states that "Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term Funding and Security Agreement (the "Short-Term Funding Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF" and deny the remaining allegations contained in Paragraph 83.

84.     Aver that the January 2024 Investor Report contains this quoted language but deny the remaining allegations contained in Paragraph 84.

85.     Deny the allegations contained in Paragraph 85.

86.     Aver that Melchionni, Benito and Plaintiff executed a Limited Liability Partnership Agreement on August 24, 2021, creating a District of Columbia law firm, KS Law Group, LLP, but deny the remaining allegations contained in Paragraph 86.

87.     Deny the allegations contained in Paragraph 87.

88.     Admit the allegations contained in Paragraph 88.

89.     Deny the allegations contained in Paragraph 89.

90.     Aver that the February 9, 2024 KS Law update speaks for itself, but deny the remaining allegations in Paragraph 90.

91.     Deny the allegations contained in Paragraph 91.

92.     Deny the allegations contained in Paragraph 92.

93.     Deny the allegations contained in Paragraph 93.

94.     Deny the allegations contained in Paragraph 94.

95.     Deny the allegations contained in Paragraph 95.

96.     Deny the allegations contained in Paragraph 96 [Misnumbered 80].

97.     Deny the allegations contained in Paragraph 97 [Misnumbered 81].

<div align="center">

**AS AND FOR A DEFENSE TO COUNT I**
**DIRECT CLAIM FOR CIVIL CONSPIRACY TO COMMIT FRAUD**
**(AS TO JP DEFENDANTS)**

</div>

98.     Restates and realleges its response to paragraphs 1 through 97 [Misstated as 81] as though fully set forth herein.

99.     Deny the allegations contained in Paragraph 99 [Misnumbered 83].

100.    Deny the allegations contained in Paragraph 100 [Misnumbered 84].

101.    Deny the allegations contained in Paragraph 101 [Misnumbered 85].

102.    Deny the allegations contained in Paragraph 102 [Misnumbered 86].

103. Deny the allegations contained in Paragraph 103 [Misnumbered 87].

104. Deny the allegations contained in Paragraph 104 [Misnumbered 88].

**AS AND FOR A DEFENSE TO COUNT II**
**DIRECT CLAIM FOR FRAUD**
**(AS TO LEE MELCHIONNI)**

105. Restates and realleges its response to paragraphs 1 through 97 [Misstated as 81] as though fully set forth herein.

106. Deny the allegations contained in Paragraph 106 [Misnumbered 90].

107. Deny the allegations contained in Paragraph 107 [Misnumbered 91].

108. Deny the allegations contained in Paragraph 108 [Misnumbered 92].

109. Deny the allegations contained in Paragraph 109 [Misnumbered 93].

110. Deny the allegations contained in Paragraph 110 [Misnumbered 94].

111. Deny the allegations contained in Paragraph 111 [Misnumbered 95].

**AS AND FOR A DEFENSE TO COUNT III**
**DIRECT CLAIM FOR FRAUD**
**(AS TO SYLVIA BENITO)**

112. Restates and realleges its response to paragraphs 1 through 97 [Misstated as 81] as though fully set forth herein.

113. Deny the allegations contained in Paragraph 113 [Misnumbered 97].

114. Deny the allegations contained in Paragraph 114 [Misnumbered 98].

115. Deny the allegations contained in Paragraph 115 [Misnumbered 99].

116. Deny the allegations contained in Paragraph 115 [Misnumbered 100].

117. Deny the allegations contained in Paragraph 116 [Misnumbered 101].

118. Deny the allegations contained in Paragraph 117 [Misnumbered 102].

**AS AND FOR A DEFENSE TO COUNT IV**
**DIRECT CLAIM BREACH OF FIDUCIARY DUTY**
**(AS TO LEE MELCHIONNI)**

119. Restates and realleges its response to paragraphs 1 through 97 [Misstated as 81] as though fully set forth herein.

120. Deny the allegations contained in Paragraph 120 [Misnumbered 104].

121. Deny the allegations contained in Paragraph 121 [Misnumbered 105].

122. Deny the allegations contained in Paragraph 122 [Misnumbered 106].

123. Deny the allegations contained in Paragraph 123 [Misnumbered 107].

124. Deny the allegations contained in Paragraph 124 [Misnumbered 108].

125. Deny the allegations contained in Paragraph 125 [Misnumbered 109].

**AS AND FOR A DEFENSE TO COUNT VI[1]**
**DIRECT CLAIM BREACH OF FIDUCIARY DUTY**
**(AS TO SYLVIA BENITO)**

126. Restates and realleges its response to paragraphs 1 through 97 as though fully set forth herein.

127. Deny the allegations contained in Paragraph 127 [Misnumbered 111].

128. Deny the allegations contained in Paragraph 128 [Misnumbered 112].

129. Deny the allegations contained in Paragraph 129 [Misnumbered 113].

130. Deny the allegations contained in Paragraph 130 [Misnumbered 114].

131. Deny the allegations contained in Paragraph 131 [Misnumbered 115].

132. Deny the allegations contained in Paragraph 132 [Misnumbered 116].

---

[1] Plaintiff has incorrectly designated this as "Count VI"; it is properly numbered "Count V".

**AS FOR A DEFENSE TO COUNT VII**
**CLAIM FOR AIDING AND ABETTING FRAUD**
**(AS TO THE LAKE LAW FIRM, LLC)**

133-140. The allegations in these paragraphs are not directed towards the JP Defendants

and, therefore, no response by the JP Defendants is required [Misnumbered 117-124].

**AS FOR A DEFENSE TO COUNT VIII**
**CLAIM FOR AIDING AND ABETTING FRAUD**
**(AS TO PERSIST COMMUNICATIONS INC.)**

141-149. The allegations in these paragraphs are not directed towards the JP Defendants

and, therefore, no response by the JP Defendants is required [Misnumbered 124-132].

**AS FOR A DEFENSE TO COUNT IX**
**CLAIM FOR AIDING AND ABETTING FRAUD**
**(AS TO EDWARD LAKE)**

150-157. The allegations in these paragraphs are not directed towards the JP Defendants

and, therefore, no response by the JP Defendants is required [Misnumbered 133-140].

**AFFIRMATIVE DEFENSES**

The JP Defendants reserve their right to defend this matter on the basis of the following

listed defenses. By doing so, the JP Defendants do not assume the burden of proof on any issue for

which the burden legally rests on Plaintiff. For their affirmative defenses, the JP Defendants

incorporate their responses above, and further state as follows:

**FIRST AFFIRMATIVE DEFENSE**

1.      Plaintiff's Complaint fails to state a valid claim for relief against JP Defendants

**SECOND AFFIRMATIVE DEFENSE**

2.      Plaintiff's claims are barred, in whole or in part, because there was no confidential

or fiduciary relationship between Plaintiff and JP Defendants.

### THIRD AFFIRMATIVE DEFENSE

3.      Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE

4.      Plaintiff's claims are barred, in whole or in part, by the doctrine of assumption of risk. Plaintiff knowingly and voluntarily assumed the risks associated with his investment in Justice Partners under the terms of the Operating Agreement, as contained within the Offering Circular. The alleged injuries and damages, if any, were caused by and arose out of risks of which Plaintiff or his agents had full knowledge of, and which Plaintiff assumed.

### FIFTH AFFIRMATIVE DEFENSE

5.      The Complaint does not describe the claims made against JP Defendants with sufficient particularity to enable JP Defendants to determine all defenses they have. Accordingly, JP Defendants reserve the right to assert additional defenses that may be pertinent to the Complaint once the precise nature of each claim is ascertained through discovery.

### SIXTH AFFIRMATIVE DEFENSE

6.      Plaintiff's claims are barred, in whole or in part, by the Operating Agreement, including, but not limited to, Section 6.12 and Section 8.2.

### SEVENTH AFFIRMATIVE DEFENSE

7.      Plaintiff's claims are barred, in whole or in part, by the doctrine of *res judicata* and/or the doctrine of claim-splitting, including, without limitation, because Plaintiff's claims are improperly split from those filed in this Court on March 15, 2023 in *Teh v. Melchionni, et al.* (Case No. 2023-004474-CA-01).

## EIGHTH AFFIRMATIVE DEFENSE

8.    The actions of persons or entities other than JP Defendants constitute an independent, intervening and/or superseding cause and the claims against JP Defendants are barred or otherwise proportionately reduced.

## NINTH AFFIRMATIVE DEFENSE

9.    Plaintiff is barred from recovering their loss or damage, if any, to the extent he has failed to make reasonable efforts to mitigate such loss or damage, which would have prevented his loss or damage, if any.

## TENTH AFFIRMATIVE DEFENSE

10.    Plaintiff's claims are barred under the doctrines of ratification, waiver and estoppel, including, without limitation, by assenting to the terms of the Subscription Agreement and attachments thereto.

Dated: December 9, 2024

Respectfully submitted,

*/s/ Daniel S.Bitran*
DANIEL S. BITRAN
Florida Bar No. 124041
dbitran@mitrani.com
miamidocketing@mitrani.com
**MITRANI, RYNOR, ADAMSKY & TOLAND, P.A**.

LAUREN ELLIOT
lelliot@seidenlaw.com
IAN WIESS
iwiess@seidenlaw.com
PRIYA LEHAL
plehal@seidenlaw.com
**SEIDEN LAW LLP**
*Pro Hac Vice Motions Forthcoming*

*Counsel for Defendants Lee Melchionni,*
*Sylvia Benito, Justice Partners Management,*
*LLC and Justice Partners Law Group, LP*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 9, 2024, the foregoing document was filed via the

Florida Courts e-Filing Portal which will serve a true and correct copy to the following e-mail

addresses:

Matthew Jones, Esq.
**JONES & ADAMS, P.A.**
999 Ponce de Leon Blvd., No. 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
matthew@jones-adams.com
*Counsel for Plaintiff*

Filing # 215044582 E-Filed 01/21/2025 08:31:19 PM

Filing # 215106108 E-Filed 01/22/2025 03:05:40 PM

3  I-7+ 9!÷7!%8D17+9!0,+!eIIG  !JFIlDD7,-_2!!

W^C8D.I!DbL81+Hf1-D_*DL.(!MD8-7DF1_-D7!7,7!-I. !/,*D+!3 I. ,I-!/IF!&b.D1,I-!I/!% ,GD2!

Y^ " LLIF7,-_*9(!.MD8-7DF1_-D7!FD8D1.1!+!HFD)!Db.D1,I- !I/! .ED. 9![UV7+91!.I! FDJI-7! .I!

) *+,-. ,//a1!4IG J*+,-. 2!

d^  BF+. ,-_! .MDFD8D1.D7!FD3,D! E,**!-I. !JFD87,LD+-9! I/! .MDJ+F,D1(!+1!.M1!G+..DF',1!-I. !

JFDD. *9! lD!/IF!F,+*2!

X^ %M1!FD8D1.!,1!G+7D,-!_II7!/+ ,.M!÷7!-I. !/IF!MD8FJI1D1!I/!7D*+92!

!

**63**  **#, #$ / , #*!** CDD-7+-. 1(!) DF,1.!4IG G8-, L+.,I-1 (!5-L2(!%MD#+PD# +E !N,FG(!+-7! &7E+F7!#+PD FDJDL/8**9! +1P! .M1!' I-IF+Hf1 4I8F. ! .I!  _F+. ! .M1! 3 I. ,I-! +**lE ,-_! .MD CDD-7+-. 1!+-!Db.D1,I-! I/! .,GD.I! FDJI-7! .I!) *+,-. ,//a1!4IG J*+,-. (!÷-7!_F+. !+**!I. MDFD3,D! .M+!.MD4I8F.!7DDG1!81.!+-7!JFIJDF2

!

## ! !"#$ %&'#!( ) %( )* % " "' +"

5LDF,/9!.M+!JF,IF!I!I!/,*,-_! .M1!GI. ,I-(! 57,1L811D7!.MDFD3,D!FD8D1.D7!,-!.M1!GI. ,I-! H9DS G+,*,-_!4I8-1 D*!I/! ADLIF7!I-! %8D17+9(!?+-8+F9LZ(!UVU!Y-7! K D7-D17+9(!?+-8+F9UU(UVU Y( +-7!.MDJJI1 ,-_!J+F9!+_FDD1!I!I!.MDFD8D1.D7!FD3,D!LL-. +,-D7!,-!.MDGI. ,I-2!

!

## . #, '- $-. &'# ¼$ !( #, 8-. #!

!

**-!3 #, #9: !. #, '- $:** !.M+!+!+!.F8D+-7! LIFFD.!LIJ9! I/! .MDIFD_I, -_! E+1!JFI0,7D7!0,+! N*1IF,7+!4I8F. 1!DS,*,-_! ) IF.+**I-! .M1!?+-8+F9!UU(UVU(Y.IT!3 +..MD0!?I-D1 1(!&1f2!+.!?6$&;! h!" C" 3 ; (!) 2"2(4IF+*B+Hf1!4D-. FD``! ) I-L D7D#+D-! >*072(! 8,.D`UY4IF+*B+Hf1(!N#!ccZcW!!

[G+..MD_i _d-D1S+7+G12IIG ^:!" G,+7!O81M-DF(&1f2!+.!; &5C&$ !#" K (##) !cUUj!"#!" 0D-8D!; 8,.D ZUVV!SE !<IFP(!$<!ZVVVZ]f[81M-DFi_1D7D*+E 2IIG ^2

!

!
**; #49#, !4&6!; , / 1 +*!÷2&2**
UcjY!$K !&bD18.,0D!4D-. DF!CF,0D!
; 8,.D ZVV

!" #$'"%&() &%*+, -&/0 /&
!"#$%&' %()*+,-./*%0 *1-*2,2/*4%,. -*%677%9+:%:-914%=%''>"6 %%@A91%6$>D!7 D7677%%:)B%6$>D6EDCF7%

>IL+!A+I-( !N*IF,7+!ccWcZ!
) MI-DT[`YW^!cISWZVIV
N+bT[XYW^!ISZXIV!
) FG+F9!IG+,*T!   G+..i  _DHID*E_FI8J2IIG !
; DLI-7+ F9!IG+,*T 0,LIF,+i  _DHID*E_FI8J2IIG !
; DF0LDIDG+,*T    DIDF0LDi  _DHID*E_FI8J2IIG !
[NIF!)*D+7,-_1!6 -*9^!

>9T!QQR1R!+..!BDHID!_!
3 " %%dB&#>&A(!&1f8, FD
N*+2!>+F2!$2TZZYWdY
                !

!" #$"%&( ) &%*+, -&/0 /&
!"#$%&'  %)*+,- ./*%0 *1-*2%2./*4%5,. -*%77%9+:%:-914%=%''>"6 %%@A91%6$>D!7 D677%%:)B%5>D6EDSCF7%

Filing # 215147075 E-Filed 01/23/2025 09:10:21 AM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2024-020751-CA-01
SECTION: CA43
JUDGE: Thomas J. Rebull

**Allan Teh**

Plaintiff(s)

vs.

**PERSIST COMMUNICATIONS, INC. et al**

Defendant(s)

_____/

## AGREED ORDER ON DEFENDANTS', PERSIST COMMUNICATIONS, INC., THE LAKE LAW FIRM, MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S COMPLAINT

THIS MATTER having come before the Court by Stipulation of all Parties, and the Court having notice of the agreement of counsel and being fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that:

1. Defendants', Persist Communications, Inc., The Lake Law Firm, and Edward Lake's, Motion for Extension of Time to Respond to Plaintiff's Complaint is hereby GRANTED.

2. Defendants, Persist Communications, Inc., The Lake Law Firm, and Edward Lake, shall file their response to Plaintiff's Complaint on or before February 11, 2025.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 23rd day of January, 2025.

2024-020751-CA-01 01-23-2025 9:00 AM

2024-020751-CA-01 01-23-2025 9:00 AM
Hon. Thomas J. Rebull

**CIRCUIT COURT JUDGE**
Electronically Signed

> No Further Judicial Action Required on **THIS MOTION**
>
> CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Cheyenne Moghadam, c.moghadam@jones-adams.com
Daniel Bitran, dbitran@mitrani.com
Daniel Bitran, jlopez@mitrani.com
Daniel Bitran, miamidocketing@mitrani.com
Eric Santiago Rojo-Dotel, matthew@jones-adams.com
Eric Santiago Rojo-Dotel, c.moghadam@jones-adams.com
Eric Santiago Rojo-Dotel, e.rojodotel@jones-adams.com
Isaac J. Mitrani, imitrani@mitrani.com
Isaac J. Mitrani, jlopez@mitrani.com
Isaac J. Mitrani, miamidocketing@mitrani.com
Jesus A Lopez, jlopez@mitrani.com
Matthew R Gelber, matt@gelberlawgroup.com
Matthew R Gelber, eservice@gelberlawgroup.com


**Physically Served:**

[1] ... *Allan Teh v. Justice Partners, LLC* ... *Allan Teh v. Melchionni, Benito, Persist Comm. and Lake Law Firm* ... *Allan Teh v. KS Law Group, LLP, Melchionni, Benito, Persist Comm. and Lake Law Firm* ...

Page 4 of 7

.MDDᵗDGD. 1! I/! /F÷87!,1!,-18//,L,D. 2!" LLIF7,-_*9(!) *+,-. ,//`1!*+E 18,.!G 81.!HDD7,1G,11D7!E,.M! JFDᵗ87,LD2!%MDDᵗDGD. 1! I/! /F÷87! +FD [Z^!+! /+*1D FDFDDD. +.,I- :! [U^!.MDG+PDF!I/! 18LM! FDFDDD.+.,I- `1!P-IE *D7_DIF!HDᵗD!,-! ,.1!/+*1,.9!IF!FDDP*D11!,-7,//DFDLDl.I! ,.1! .F8M! [c^!+-! ,-. D. ,-I-! .I!,-78LDl+L,I-! H÷1D7!I-! .MDFDFDDD. +.,I-: ![WᵗFᵗDᵗII-+ HᶠDFDᵗ}+-LDH9!MDFDᵗD,J,D. !I/! .MDFDFDDD. +.,I- :!+-7! [Y^ᵗⅤ+G+_D2! *Trifecta Multimedia Holdings, Inc. v. WCG Clinical Servs. LLC*(!$I2!UVUSᵗⅤnooᵗⅭ8?%#(!UVUW#ᴷUloVolV![ᴄᴅᵗ2!4M2ᵗ8?D!ZV(!UVUWᵗ^2!

!    ; ,-LDᵗ) *+,-. ,//! +*ᵗD_D7!.Mᵗ#!3 DᵗLMᵗ,--, !+-7! >D-, .I! F+! +-7! F8-!?81.,LDᵗ) +F÷DF{(!.MD DᵗDGD. 1!I/!.MDᵗ+81DI/!+L,I-! HDᵗIG D÷H8F72%MDᵗ+*1D1.+.DGD. !G81.!HDᵗG+7D.I!+-I. MDᵗJDFI-! h!-I. !.MDᵗ1D⁰D12ᵗ6 -D!L+--I. !7DF+87!MG1D7ᵗ/!+-9! GIFD.M÷! MDᵗ+-! LI-1 J,FDᵗIE ,.MMG1D7ᵗ/2!" 1! -I. D7!+HI0Dᵗ|3 DᵗLMᵗ,--, !+-7!>D-, .I!+FDᵗ+*ᵗD_D7!.I!HDᵗHI.M.MDᵗG+PDF!+-7!FDᵗ,J,D. !I/! .MDD+*ᵗD_D7! 1.+.DGD. 12!

!    ; DᵗD-_!.M÷!.MDᵗL*+,G!/IF!/F÷87!+_+,-1.!3 DᵗLMᵗ,--, !+-7!>D-, .I!/+,*ᵗ(!1I!.II! G81.!.MDᵗL*+,G1! /IF!+,7,-_! +-7! +HDᵗ,-_! /F÷87!+_+,-1.!##ᴺ(!) DFᵗ11.(!+-7! &#2!&0Dᵗ! ,/!.MDᵗ8-7DFᵗⅤ9,-_! L*+,G!E+1! JFIJDFᵗⅤ9!J*ᵗD7(!.MDᵗ+*ᵗD_+.,I-1 !+FDᵗEID/8*ᵗ9!7D,L,D. !+1!.I! EM÷!.MDᵗ!ᴄⅮⅮ7+-. 1!7,7!.I! +,7!+-7! +HDᵗ2!#D_+*ᵗII-L *81,I-1 !+FD-I. !18//,L,D. (!Dᵗ|DJDL,+*ᵗ9!,-!.MDᵗI-. Da. !I//!/F÷872!

### .2    'C >!&ᵗIF꞉KJ79; ꞉?!&KJ; ?7!#N8 JHᵗN!4JP >!0  G?7ᵗO>!" ꞉?@꞉?꞉?>N!&?!+ᵗHJ꞉; 7꞉Mᵗ3ᵗMᵗI꞉!$J꞉ᵗI꞉N!79! +꞉>ᵗH꞉>!7ᵗC꞉!. 9Hᵗ9HJ7>!Q>꞉I꞉!

!
; JDL,/,L+*ᵗ9!JDF+,-, -_! .I! .MDᵗ+*ᵗD_+.,I-1 !G+7Dᵗ+_+,-1.!&#(!.Mᵗ|!*+E 18,.!G81.!HDD7,1G,11Dᵗ72! &0Dᵗ!+118G,-_ (!*arguendo*(!.M÷!) *+,-. ,//`1!8-/I8-7D 7!+*ᵗD_+,-1 !EDFDᵗF8ᵗID(.MDᵗ7I!-I. +GI8-. !.I! +-9! L+81DᵗI/! +L,I-! +_+,- 1.!&#(!JDFI-+ **92ᵗ) *+,-. ,//!L+--I. !L,.D.I! +-9! +8.MIF,9!.M+. !&# !MG1D7ᵗ/! .IIP! J+F!,-!+-9!I/! .Mᵗ|!L÷-78L .(!-I. !.I! GD. ,I-! .M÷!.MDᵗ) *+,-. ,//!+-9! +8.MIF,9!.M÷!.I! 7DGI-1 .F+DMIE!MD L+-!J,DFID.MDᵗIFJIF+.D0Dᵗ*!+-7!+..+LP!&#!JDFI-+ *ᵗ92!BDᵗDF+*ᵗ9(!+ᵗJ*+,-. ,//!1DDP,-_!.I!J,DFID.MD LIFJIF+.D0Dᵗ*!G81.!1MIE!.M÷![Z^!MDE -DF!1DᵃDFLᵗ1D7!LIG J*DD7IG ,-, I-! I/! .MDᵗIFJIF+,I-! ,-!

!" #$'%꞉&꞉( ) &?%*+, -&?/0 /&
!"#$%&꞉'  %)*+,-./*%ᵗ0 *1-*2ᵗ3ᵗ2/*4%ᵗᵗ,. -*%677%ᵗ9+꞉%꞉-914%ᵗ%=%'꞉'>"6 %ᵗⱮ@A91Bᵗᵗ6$>D!7 D7677%ᵗ%꞉:)Bᵗᵗ6$>D6EDᵗCF7%

FDJDL.!.I!.MDF+1+L,I-! +..+LPD7:!+-7![U^!M+!18LM7IG ,-, I-! E+1!81D7!.I!LIG G,.!/F+87!IF!EFI-_!

+_+,-1.!.MDJ*+,-. ,//! EML,MFD8*.D7!,-! J*+,-. ,//`1!,-f8F9]2!*Conason v. Megan Holding, LLC*(!UY!

$2<2c7Z(Zl![UZY^[.-. DF-+*!e8I .+.,I-! G+FP1IG ,..D7:!*TNS Holdings*(!oU$ 2<2U7!+.!cco![Zool^2!

" 1!+**87D7!.I! *supra*(!.MD-0D1.GD. 1!.M+!/IFGD7!.MDH+1,1!I/! .M]!*+E 18,.!,-0I*0D+-!,-0D1.GD. !

H9!#+E !BFI8J!.I!##N!+-7!) DF]1.!.I! JFIL8FDG+11!.IF.1!*D+712!%MBDDE+1!-I! LI-. F+L.!D. DFD7!,-. I!

E,.M)!*+,-. ,//(!" **+-!%DM!$!I FE DFD+-9!I /!.MDDLI-. F+L.1!E,.M&7E+F7!#+PD(!JDFI-+ **92) *+,-. ,//!

/+,*1!.I!GDD!M],!H8F7D.I!,-7, L+.D.M+!&#!M+!+-9!FDJI-1 ,H,*,.9!.I!%DM!!DFI-+ **9!/IF!+-9!I/!.MDD!

/+**+L,I81!+**D_+.,I-1 2!"LLIF7,-_*9(!.MD+E 18,.!+_+,-1.!&#!IMI8*7!HD7,1G,11D72!

**63   #, #$ / , #*!**) DF]1.!4IG G8-, L+.,I-1 (!5-L2(!%MD#+PD#+E !N,FG(!+-7! &7E+F7#+PD)

GI0D!.I! 7,1G,11!.MD4IG J*+,-. !E,.MJFD87,LD(!+E+F7FD+lI-+ H'D!+..IF-D9`1!/DD1!+-7! LI1.1(!+-7!

_F+. !+**!I.MD!F!,D!.M+!.MD4I8F.!7DDG1!f81.!+-7!JFIJDF2

<u>! !"#$ %&'#!( ) %[ )* % "'' +"</u>

5!LDF,/9!.M+!JF,IF!!.I!/,*,-_! .M]!GI. ,I-(! 5!7,1L811D7!.MDFB,D!FD8D1.D7!,-!.M]!GI. ,I-! 0,+!

D&G+,*!I-! NDHF8F!9.ZZ(!!UVUY4(7!.MDJJI1 ,-_!J+F9!7ID1!-I. !+_FD].I!.MDFD8D1.D7!FD]D2!

i; ) " 4&!5$%&$ %56$ " ##<!#&N%l>#" $ Oj!

!

### . #,  '- $-. &'# !/$ !( #,  Q-. #!

!

-!3 #,  #OL !. #,  '- $ L !. M!+!.F8D+-7! LFFD.!LJ9! I/! .MDIFD_I, -_! E+1!JFI0,7D7!0,+! N!F,7+!4I8F. 1!DS,*;-_! ) IF.+*I-! .M!!NDHF8F9ZZ(UVU(Y.IT!3 +..MD!?I-D1(!&le2!+.!?6$&;!  p! " C" 3 ; (!) 2"2(4IF+*B+HD1!4D-. FDboo!) I-L D7D#D-! >*072(! 8,.DoUY4IF+*B+HD1(!N#!ccZcW!! [G+..MDq fI-D1S+7+G12ILG ^!!"G,+7 !O8lM-D(&le2!!.!; &5C&$ !#" K (##) !cUU!!#$!" 0D8D!; 8,.D ZUVV!SE !<IFP(!$< !ZVVVZ+[81M-Dq 1D7D*+E 2ILG ^2

!

### R#4O#,  !4&6!R , / 1 +*!2&2
UclY!$K !&aDL8.,0D4D-. DF!CF0D! ; 8,.DZVV >IL+!A+I-( !N!F,7+!ccWcZ! ) MI-DT[oYW^!cSWZVV N+aT![XYW^!USZXnV ) FG+F9!DG+,*T!  G+..q _DHD*E_FI8J2ILG ! ; DLI-7+ F9!DG+,*T 0,LIF,+q _DHD*E_FI8J2ILG ! ; DF0LDDG+,*T   DDF0LDq _DHD*E_FI8J2ILG ! [NIF!)*D+7,-_1!6 -*9^!

!! ! >9T!QGR1R!+..!BDHD!  ! 3"%%! B&#>&A(!&le8,FD N*+2!>+F2!$2TZZYWhY !

Filing # 217347872 E-Filed 02/21/2025 04:55:26 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

      Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,

Defendants
_____/

## RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS [DE #19]

      Plaintiff, Allan Teh, by and through undersigned counsel hereby files this Response in Opposition to Defendants, The Lake Law Firm, LLC ("Lake Law") and Persist Communications' ("Persist), Edward J. Lake ("Mr. Lake") (collectively the "Defendants") Motion to Dismiss Plaintiff's Complaint, and in support states as follows:

## INTRODUCTION

      Defendants' Motion to Dismiss is filed for the sole purpose of delaying these proceedings. Defendants' filed an untimely Motion for Extension of Time to Respond to Complaint which for purposes of judicial economy Plaintiff did not oppose. However, despite the other named Defendants recognizing the sufficiency of the allegations pled in Plaintiff's Complaint and filing their Answer and Affirmative Defenses [DE #5] back on **December 9th, 2024,** the present

1

Defendants have elected to file a seven page, nonsensical, and devoid of relevant case law Motion to Dismiss.

The majority of Defendants' Motion is a false rendition of facts that fall entirely outside the four corners of Plaintiff's Complaint. The Defendants request this Court to take their word that no wrongdoing occurred when Plaintiff's $4 million, along with the entirety of Justice Partners' $11,750,000 of invested capital, was misappropriated by the Defendants. Defendants argue that that misappropriation is merely related to "contracts" that remain, **4 years later**, in their "executory phase."

Defendants' claims are absurd on their own, but especially in light of Plaintiff's allegations that the fraudulent transfer of Plaintiff's funds was "effectuated without any cognizable consideration, contract or agreement in place." *See ¶ 47 of Complaint*. Along with this Court's findings in the Related Case of *Teh v. Justice Partners*, 2022-022470-CA-01, where this Court entered Judgment in favor of the Plaintiff's Books and Records Action, Defendants' Motion must be summarily denied.

## STANDARD OF REVIEW

A motion to dismiss tests "whether the plaintiff has stated a cause of action, not whether the plaintiff will prevail at trial." *Lonestar Alternative Sol., Inc. v. Leview-Boymelgreen Soleil Developers, LLC.*, 10 So. 3d 1169, 1171 (Fla. 3d DCA 2009). The trial court is bound by the four corners of the complaint and attachments, and all ambiguities and inferences drawn from "the recitals in the complaint, together with the exhibits attached," must be construed in the light most favorable to the plaintiff. *Id*. (*quoting Vienneau v. Metro. Life Ins. Co.*, 548 So.2d 856, 858 (Fla. 4th DCA 1989)). The material allegations of the complaint must be taken as true. *See Davidson v. Iona-McGregor Fire Protection and Rescue District,* 674 So. 2d 858, 859 (Fla. 2d DCA 1996). A

2

motion to dismiss a complaint "must be decided on questions of law and questions of law only." *Connolly v. Sebeco, Inc.*, 89 So. 2d 482, 484 (Fla. 1956). It is error for the trial court to rely "upon matters raised in the motion, but not contained within the four corners of the complaint." *Chatham Mfg., Corp. v. Cates*, 969 So.2d 515, 516 (Fla. 1st DCA 2007). A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that Plaintiff cannot prove a set of facts that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Bracewell v. Nicholson Air Servs., Inc.* 680 F.2d 103, 104 (11th Cir. 1982). "If a complaint does not state a cause of action, the opportunity to amend a complaint should be liberally given, unless it is apparent the pleading cannot be amended to state a cause of action." *Samuels v. King Motor Co.*, 782 So. 2d 489, 495 (Fla. 4th DCA 2001).

The Supreme Court of Delaware, utilizing a notice pleading standard, echoes Plaintiff's position that Defendant is attempting to bypass discovery and make premature and unqualified factual conclusions. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003). Delaware law clearly states that a plaintiff need not plead evidence but rather, "the plaintiff need only allege the facts that, if true, state a claim upon which relief can be granted. *Id.* A complaint that provides fair notice of the causes of action therein shifts the burden to the defendant "to determine the details of the cause of action by way of *discovery* for the purpose of raising legal defenses." *Id.*

## ARGUMENT

### I.      Plaintiff's Complaint sufficiently pleads aiding and abetting fraud.

First, prior to analyzing Defendants' arguments as to Plaintiff's claims for aiding and abetting fraud, Plaintiff must do away with Defendants' arguments on Page 4 of their Motion titled "Plaintiff's Claim is Not an Individual Action." The header seems to be misplaced as the section contains no case law or any arguments on why Plaintiff's claims cannot be brought on an individual

3

basis. The misplaced section appears to be just a summary of Defendants' overall arguments and can be disregarded by this Court.

Moving on to Defendants' somewhat more substantive arguments, it appears Defendants' only argument as to why Plaintiff's claims for aiding and abetting fraud fail is because somehow Plaintiff has not pled the underlying fraud with sufficient particularity.

Delaware Law clearly states that fraud does not merely consist of overt misrepresentations but "may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak." *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). Thus, one is equally culpable of fraud, who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading. *See Lock v. Schreppler,* Del.Super., 426 A.2d 856, 860–61 (1981) (concealment of material facts); *Leech v. Husbands,* Del.Super., 152 A. 729, 731–32 (1930) (same).

Plaintiff's Complaint alleges that he was defrauded by Defendants Lee Melchionni and Sylvia Benito. Despite Plaintiff's claims being brough individually, Defendants' sole argument is that:

> "Since Plaintiff alleged that Melchionni and Benito ran and run Justice Partners, the elements of the cause of action become absurd. The false statement must be made to another person – not themselves. One cannot defraud himself any more than he can conspire with himself."

*See Page 5 of Defendants' Motion*

Defendants' argument is nonsensical. The Plaintiff is alleging the complete opposite of defrauding himself and has pled with particularity the bad actors that have directly damaged him pursuant to their fraudulent scheme. Plaintiff's Complaint alleges that Defendants have misappropriated the entirety of his $4 million investment in Justice Partners, LLC. Defendants,

4

Melchionni and Benito perpetrated this fraud by misrepresenting the nature and purpose of Plaintiff's $4 million investment. Prior to Plaintiff's investment Melchionni and Benito, in various emails and marketing documents, represented that those funds would be provided as a "loan" to Justice Partners Law Group, LP. That "loan" was represented for the purpose of acquiring and working up various mass tort litigation cases that upon their settlement would render attorneys' fees that would flow back to the Plaintiff. *See ¶ 20, 21, 22, 23.* None of the Defendants' representations were accurate. The "loan" to JP Law Group was never effectuated, no mass tort cases have been acquired, and JP Law Group does not have a single retainer executed with any "clients." *See ¶ 23, 26, 27.*

Defendants, Lake Law, Persist, and Mr. Lake, aided and abetted that fraud in several substantial ways. Defendants generated "Invoices" that represented payments to Defendants from JP Law Group. *See Composite Exhibit 2 of Plaintiff's Complaint.* These payments never occurred because JP Law Group never received funds from Justice Partners. *See ¶ 26.* Defendants also generated several updates that misrepresented that JP Law Group had several hundred mass tort cases attributable to it. *See Exhibit 10 and 11 of Plaintiff's Complaint.* These updates were false, as JP Law Group has no executed retainer agreements with any clients and therefore is not entitled to any attorneys' fees as wrongfully represented by Melchionni and Benito. *See ¶ 26* As the "Invoices" and case "updates" were all generated by Persist, Lake Law, and Mr. Lake, they inherently had knowledge of their falsity and therefore did so with the knowledge and intent to substantially assist Melchionni and Benito's fraud upon the Plaintiff. *See Composite Exhibit 2 and Exhibit 11 of Plaintiff's Complaint.*

5

Plaintiff has sufficiently pled both the underlying fraud conducted by Defendants Melchionni and Benito, as well as the substantial assistance by Lake Law, Persist, and Lake Law which aided and abetted that fraud.

## I.      Plaintiff has sufficiently pled aiding and abetting fraud as to Defendant, Edward J. Lake, individually.

The Defendants' final argument is that Plaintiff has not sufficiently pled aiding and abetting as to Defendant, Edward J. Lake, in order to pierce the corporate veil. Defendants are incorrect.

To pierce the corporate veil three factors must be present: (1) "the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant." *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008). All elements to pierce the corporate veil are present in Plaintiff's Complaint and "the recitals in the complaint, together with the exhibits attached," must be construed in the light most favorable to the plaintiff. *Id*. (*quoting Vienneau v. Metro. Life Ins. Co.*, 548 So.2d 856, 858 (Fla. 4th DCA 1989)).

Firstly, Composite Exhibit 2 to Plaintiff's Complaint sets forth Invoices that both explicitly state: "Edward J. Lake, Esq. (EL) **agrees to the following.**" The Invoices proceed to set forth a series of obligations, all of which Mr. Lake has failed to comply with. Additionally, as set forth in Paragraph 75 of the Complaint, "Defendant Edward J. Lake, is the 100% owner of both Lake Law and Persist." Those entities were fraudulently transferred $4 million of Plaintiff's funds, have retained those funds, and **have provided nothing in return**. Therefore, these entities, wholly

owned by Mr. Lake, have been used "fraudulently or for an improper purpose" and Plaintiff's Complaint has therefore properly pled aiding and abetting fraud as to Mr. Lake individually.

**WHEREFORE,** Plaintiff, Allan Teh, respectfully requests that Defendants' Motion to Dismiss [DE #19] be denied and for such further relief this Court deems just and proper.

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 21st day of February, 2025.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
 Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:     /s/ Matthew L. Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335

7

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

      Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,

Defendants

_____/

## **AGREED MOTION TO TRANSFER**

Plaintiff, Allan Teh ("Teh"), by and through undersigned counsel and with the agreement of all Parties, files this Motion to Transfer the above referenced case to Judicial Section 44 before Judge Walsh, and in support thereof states:

1.      Due to the overlapping legal and factual issues with several Related Cases, as well as overlapping parties and identical counsel, the above-captioned case should be transferred to Judicial Section 44 before Judge Walsh.

2.      Three of the Related Cases are currently open and before Judge Walsh.

3.      These cases include: *Teh v. KS Law Group, et. al.*, Case #2023-015702-CA-01; *Teh v. Justice Partners, et. al.*, Case #2023-018039-CA-01; and *Teh v. Lee Melchionni, et. al*, Case #2023-004474.

4.      Judge Walsh also presided over another Related Case, *Allan Teh v. Justice Partners* Case No: 2022-022470-01, which is currently "Closed."

5.      The pending Complaint and Related Case involves overlapping legal and factual issues, as well as overlapping parties and identical counsel.

6.      These overlapping factors create a risk of inconsistent ruling and necessitate the transfer of this case to Judge Walsh.

**WHEREFORE,** Plaintiff respectfully requests that this case be transferred to Judicial Section 44.

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties via the Florida E-Filing Portal on April 7th, 2025.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:    /s/ Matthew L. Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335

IN THE CIRCUIT COURT OF THE 11ᵀᴴ JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01 (43)

ALLAN TEH,

    Plaintiff,

v.

PERSIST COMMUNICATIONS, INC. et al

Defendants

_____/

FILED FOR RECORD
CLERK, CIRCUIT G COUNTY COURTS
DADE COUNTY, FLA.
CIVIL #75
2025 MAY -8 PM 2: 04

## [PROPOSED] AGREED ORDER GRANTING AGREED MOTION TO TRANSFER

**THIS CAUSE** having come before this Court on the Parties' Agreed Motion to Transfer
and the Court being fully advised of the agreement of counsel, it is hereupon,

**ORDERED** and **ADJUDGED** that the Parties Agreed Motion to Transfer is **GRANTED,**
and that this case is hereby transferred to **Section 44** before Judge **Lisa S. Walsh.** Due to related
cases: **2023-15702-CA-01, 2023-18039-CA-01 and 2023-4474-CA-01**

**DONE AND ORDERED** in Chambers at Miami, Florida, on this 08 day of **May,** 2025.

_____

HONORABLE JOSE RODRIGUEZ
Circuit Civil Division

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 404 of 978

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2024-020751-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**PERSIST COMMUNICATIONS, INC. et al**

Defendant(s)

_____/

### ORDER SETTING INITIAL CASE MANAGEMENT CONFERENCE AND TO PREPARE A MANDATORY CASE MANAGEMENT REPORT

**WHEREAS**, the Complex Business Litigation Procedures shall apply to all actions in the Complex Business Litigation Section and Fla. R. Civ. P. 1.201 Complex Litigation, except to the extent that, in any particular action, they are superseded by an Order.

**WHEREAS,** the Complex Business Litigation Procedures are designed to facilitate the proceedings of cases by the Eleventh Judicial Circuit Complex Business Litigation Section; to promote the transmission and access to case information by the Court, litigants, counsel, and the public; and to facilitate the efficient and effective presentation of evidence in the courtroom. These Procedures shall be construed and enforced to avoid technical delay, **encourage civility**, permit just and prompt determination of all proceedings, and promote the efficient administration of justice.

**NOTICE IS HEREBY GIVEN** that all outstanding and future motions pertaining to cases within the Complex Business Litigation Section must adhere to Complex Business Litigation Section Procedures, which are available at the court's website:

*http://www.jud11.flcourts.org/About-the-Court/Ourt-Courts/Civil-Court/Complex-Business-Litigation*.

**NOTICE IS HEREBY GIVEN** that on _____**August 4th, 2025**_ at _**9:00** **AM** via Zoom, the undersigned shall convene a Case Management Conference ("CMC") in this cause.

**The Parties are ordered to provide courtesy copies of all motions and where required, memoranda pertaining thereto, hereinafter filed in this case, to the undersigned Judge via CourtMAP as a supporting document to the event. Courtesy copies are not needed to be e-mailed.**

**Orders, agreed and otherwise, shall be submitted via CourtMAP.**

**Plaintiff is required to provide a full set of pending motion(s) to dismiss, opposition(s) and reply to chambers a minimum of one (1) week prior to the initially scheduled CMC. MOTIONS FILED WITHOUT COURTESY COPIES UPLOADED TO THE EVENT ON COURTMAP AS SUPPORTING DOCUMENTS MAY NOT BE CONSIDERED.**

**<u>Any previously filed motion not in compliance with procedures, e.g., memorandum of law where required, must be resubmitted in conformity with the Complex Business Litigation Procedures</u>.**

**Counsel for Plaintiff(s) and Third Party Plaintiff(s) is/are ORDERED** to confirm all parties subsequently named or appearing herein have been served copies of this Notice and Order. If any subsequently served or named party has not been served with a copy of this notice, Plaintiff and Third Party Plaintiff <u>shall</u> provide the party with a copy of this Notice.

**Trial Counsel and their clients shall appear via Zoom for the CMC.**[1]  Failure of any party to attend, including the insurance carrier representative, shall subject that party to sanctions and/or fees.  Regardless of the pendency of any undecided motions, Trial Counsel shall meet no less than 30 days in advance of the CMC and address the following which will be included in the Joint Case Management Report, along with other appropriate topics, including those set forth in Fla. R. Civ. P. 1.201(b) Complex Litigation, some of which subjects and topics will be incorporated into a Case Management Order:

1. The name of lead trial counsel for each party, and the name of any unrepresented party;

2. A brief factual statement of the case;

3. Pleading issues, including service of process, venue, joinder of additional parties, theories of liability, damages claimed and applicable defenses;

4. The identity and number of any motions to dismiss or other preliminary or pre-discovery motions which have been filed and the time period in which they shall be filed, briefed and argued;

5. A discovery plan and schedule including the length of the discovery period, the anticipated number of fact and expert depositions to be permitted and, as appropriate, the length and sequence of such depositions;

5.a.  A description of pertinent documents and a list of fact witnesses the parties believe to be relevant.

6. Anticipated areas of any expert testimony, the number of experts to be called by each party, timing for identification of experts, and exchange of expert reports;

7. An estimate of the volume of documents and computerized information likely to be the subject of discovery from parties and nonparties and whether there are technological means which may render document discovery more manageable at an acceptable cost;

8. The possibility of obtaining admissions of fact and voluntary exchange of documents and electronically stored information, stipulations regarding authenticity of documents,

electronically stored information, and the need for advance rulings from the Court on admissibility of evidence.

9. The advisability of using the general magistrate for discovery purposes at no cost to the parties; and the advisability of using the general and/or a special magistrate(s) for fact finding, mediation, or discovery disputes or such other matters as the parties may agree upon;

10. The time period, after the close of discovery within which post-discovery dispositive motions shall be filed, briefed and argued, and a tentative schedule for such activities;

11. The possibility of settlement and the timing of Alternative Dispute Resolution, including the selection of a mediator or arbitrator(s);

12. Whether or not a party or parties desire to use technologically advanced methods of presentation or court-reporting and, to the extent that this is the case, a determination of the following:

    a. Fairness issues, including but not necessarily limited to use of such capabilities by some but not all of the parties and/or by parties whose resources permit or require variations in the use of such capabilities;

    b. Issues related to compatibility of court and party facilities and equipment;

    c. Issues related to the use of demonstrative exhibits and any balancing of relevance and potential prejudice which may need to occur in connection with such exhibits;

    d. Such other issues related to the use of the Court's and parties' special technological facilities as may be raised by any party or the Court or its technological advisor, given the nature of the case and the resources of the parties.

13. A good faith estimate by counsel for each party based upon consultation with all of the parties of the costs and fees each party is likely to incur in pursuing the litigation through trial court adjudication;

14. A preliminary listing of the principal legal and factual issues which counsel believe will need to be decided in the case;

15. A preliminary listing of any legal principles and facts that are not in dispute;

16. A good faith estimate by counsel for each party of the length of time to try the case;

17. Whether a demand for jury trial has been made.

Within ten (10) days of the meeting among Trial Counsel, but no less than fourteen (14) days in advance of the Case Management Conference, the Parties shall file a Joint Case Management Report addressing the matters described in paragraphs 1 - 17 above and shall provide a courtesy copy to the Court via CourtMap as supporting documents to the event.

All counsel and parties are responsible for filing a Joint Case Management Report in full compliance with this Order. Plaintiff's counsel shall have the primary responsibility to coordinate the meeting of Lead Trial Counsel and unrepresented parties in person, and the filing of the Joint Case Management Report. If counsel is unable to coordinate such compliance, counsel shall timely notify the Court by written motion to be set and heard on motion calendar or request for a status conference.   Failure to provide the required case management report may subject the violating

party(ies) to sanctions and/or fees.

Pursuant to the provisions of Fla. R. Civ. P. 1.201(b)(3), and notwithstanding rule 1.440, at the initial case management conference, the Court will set the trial date or dates no sooner than 6 months and no later than 24 months from the date of the initial case management conference unless good cause is shown for an earlier or later setting. **As provided in the rule, continuance of the trial of a complex action should rarely be granted, and then only upon good cause shown.**

## CASE MANAGEMENT SCHEDULE (as reflected in Case Management Report

- **Pursuant to amended Rule 1.280(a), as of January 1, 2025, initial disclosures must be made without the necessity of discovery requests "within 60 days after the service of the complaint or joinder, unless a different time is set by court order."**

- 

- **Parties shall file a certification of compliance with Rule 1.280(a) within 60 days after the service of the complaint or joinder.  Failure to comply with the requirements of Rule 1.280(a)  and to file a certification of compliance may result in sanctions. See Rule 1.380, Fla. R. Civ. P.**

- **Deadlines in this case management order will be enforced unless amended by court order**

- **Joint agreed motions to extend a deadline may be rejected if such extension will affect the remaining deadlines in this order.**

- **If any party is unable to meet the deadlines set forth in the case management order for any reason, including due to the unavailability of hearing time, the affected party may promptly set a case management conference and alert the court. The notice of case management conference must identify the issues to be addressed in the case management conference.**

- **Motions for continuance shall be addressed pursuant to Rule 1.460. The court will not grant joint agreed motions for continuance of trial without a hearing and compliance with the rule.**

| | |
|---|---|
| TIME FOR SERVICE UPON ALL DEFENDANTS | |
| TIME FOR SERVICE ON EXTENSION | |
| ESI EXCHANGE PROPOSAL (including search terms, formats, data sources to be searched, etc) | |

| | |
|---|---|
| RESOLUTION OF ALL OBJECTIONS TO PLEADINGS | |
| MOTIONS TO AMEND/ADD PARTIES (includes AFFIRMATIVE DEFENSES) | |
| FACT WITNESS DEPOSITIONS/ DISCOVERY CONCLUDES | |
| COMPLETION OF PAPER DISCOVERY (Requests must be made in advance of this deadline to comply with deadline for completion) | |
| INITIAL MEDIATION DEADLINE | |
| NUMBER OF EXPERTS PER PARTY/SIDE | |
| PLAINTIFF/THIRD PARTY PLAINTIFF/CROSS PLAINTIFF(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION **MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| DEFENDANT/THIRD PARTY/CROSS DEFENDANT(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION **MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| REBUTTAL EXPERT DISCLOSURE REPORTS DUE **MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| EXPERT DEPOSITIONS COMPLETED | |
| RESOLUTION OF ALL PRETRIAL MOTIONS | |
| DAUBERT MOTIONS FILED | |
| DISPOSITIVE MOTIONS FILED (must be at least 90 days before trial date) | |

| DISPOSITIVE MOTIONS SET (75 days from date filed) | |
|---|---|
| MOTIONS IN LIMINE FILED | |
| FINAL MEDIATION DEADLINE | |
| FINAL PRETRIAL CONFERENCE | |

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 24<u>th</u> day of May, 2025.

2024-020751-CA-01 05-24-2025 9:42 AM

<u>2024-020751-CA-01 05-24-2025 9:42 AM</u>
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

Case No: 2024-020751-CA-01

Filing # 228553670 E-Filed 08/01/2025 01:28:13 PM

### IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

     Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,

Defendants
_____/

### NOTICE OF FILING JOINT CASE MANAGEMENT REPORT

Plaintiff, Allan Teh, by and through undersigned counsel, having met and conferred with

opposing counsel, hereby files the Parties' attached Joint Case Management Report.

### CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to

all of the parties on the e-filing service list via the Court's e-portal on this 1st day of August 2025.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:      /s/ Matthew L. Jones, Esq.
              Matthew L. Jones, Esq.
              Florida Bar No. 909335

**JOINT CASE MANAGEMENT REPORT**

| | |
|---|---|
| ESI EXCHANGE PROPOSAL (including search terms, formats, data sources to be searched, etc) | Completed |
| MOTIONS TO AMEND/ADD PARTIES (Includes Affirmative Defenses) | **August 25, 2025** |
| FACT WITNESS DEPOSITIONS/ DISCOVERY CONCLUDES | Completed pursuant to the 12/5/2024 Amended Order Setting Trial And Final Pre-Trial Conference (the "**12/5/2024 Order**") in Plaintiff's related derivative action (Case No. 2023-018039-CA-01) (the "**Derivative Action**"), subject to the Parties' agreement that if the Lake Law Firm or Persist Communications, Inc. plead any affirmative defense in this action that they did not plead in the Derivative Action, discovery will be limited to any new issues implicated by those new affirmative defenses. |
| INITIAL MEDIATION DEADLINE | On or before **September 13th, 2025** |
| NUMBER OF EXPERTS PER PARTY/SIDE | **2 Experts** for Plaintiff; <br> **2 Experts** total for Defendants Lee Melchionni, Sylvia Benito, Justice Partners Management, and Justice Partners Law Group; <br> **2 Experts** total for Defendants Persist Communications, Inc., The Lake Law Firm, and Edward Lake |
| PLAINTIFF/THIRD PARTY PLAINTIFF/CROSS PLAINTIFF(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION <br><br> **MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | Completed pursuant to the 12/5/2024 Order, subject to Plaintiff's agreement to provide a report for Mr. Portuondo and the parties' ongoing efforts to proceed with depositions of Plaintiff's experts. |
| DEFENDANT/THIRD PARTY/CROSS | Completed |

| | |
|---|---|
| DEFENDANT(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION **MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| REBUTTAL EXPERT DISCLOSURE REPORTS DUE **MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | Not applicable. |
| EXPERT DEPOSITIONS COMPLETED | The Parties agree to cooperate in good faith to schedule and complete all expert depositions as soon as reasonably possible. |
| DISPOSITIVE MOTIONS FILED | **November 17, 2025** |
| DAUBERT/FRYE MOTIONS FILED | **March 2, 2026** |
| MOTIONS IN LIMINE FILED | **February 16, 2026** |
| FINAL MEDIATION DEADLINE | On or before **February 16, 2026** |
| FINAL PRETRIAL CONFERENCE **THE COURT SHALL ADDRESS ALL PENDING MOTIONS, INCLUDING JURY INSTRUCTIONS, VERDICT FORM, MOTIONS IN LIMINE, DEPOSITION** | **March 17th, 2026** |

| DESIGNATIONS, OBJECTIONS TO EXHIBITS AND FRYE MOTIONS | |
|---|---|
| | |

Filing # 230598643 E-Filed 09/01/2025 06:30:57 PM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2024-020751-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**PERSIST COMMUNICATIONS, INC. et al**

Defendant(s)

_____/

## UNIFORM PRE-TRIAL PREPARATION ORDER

You have a Final Pre-Trial Conference scheduled before Judge Lisa Walsh in the Complex Business Litigation Division. The following task(s) shall be completed, as indicated below, prior to the final pre-trial conference:

All parties must submit an exhibit list to the Court two (2) business days prior to the start of the final pre-trial conference.

1. All exhibits must be submitted to all Parties no later than twenty (20) days prior to the start of the final pre-trial conference. Opposing counsel must identify, in writing, the specific objection to any exhibit(s). The objection to any exhibit must be submitted to opposing counsel and the Court in writing ten (10) days prior to the start of final pre-trial conference.

2. Objections to admission of any exhibit under section 90.803(6)(c) or 90.902(11), Florida Statutes, are deemed waived if not timely made in accordance with section (1) above.

3. The Parties must meet and confer five (5) days prior to the final pre-trial conference concerning the exhibit list and endeavor to resolve any objections and disputes.

4. The witness list must be submitted to all Parties no later than twenty (20) days before the end of the Fact Discovery cut-off date listed in the Court's Scheduling Order. Opposing counsel must identify, in writing, the specific objection to any witness(s). The objection to any witness must be submitted to opposing counsel and the Court in writing ten (10) days prior to the start of final pre-trial conference. The Parties must meet and confer five (5) days prior to the final pre-trial conference concerning the witness list and endeavor to resolve any disputes and objections.

5. All exhibits are to be pre-marked and initialed and provided to clerk on the first day of trial.

Plaintiff's exhibits are marked, if stipulated or agreed, into evidence with a numerical marking, i.e., 1, 2, 3. Plaintiff's exhibits, if not yet deemed admitted, are marked for identification as 1a. 1b, 1c, for identification. Defendant shall likewise mark agreed exhibits alphabetically, i.e., a, b, c, and mark for identification as, i.e., a1, a2, a3.

6. No document or exhibit, except impeachment exhibits, may be offered into evidence unless it has been pre-marked.

7. Proposed jury instructions and verdict forms must be submitted to the Court **two (2) weeks** prior to the final pre-trial conference. All counsel must meet and confer (at least 5 days prior to the final pre-trial conference) concerning jury instructions/verdict form and endeavor to submit an agreed set of jury instructions to the Court. The parties shall submit, in Word, a single set of jury instructions, redlining any disputed instructions in track changes format. These shall be submitted, along with a verdict form, to the judicial assistant at dwright@jud11.flcourts.org. Failure to comply with this section waives any party's right to have the court substantively instruct the jury before opening statement.

8. The parties must identify any unique jury selections issues or concerns that the case presents and provide those concerns (in writing) to the court at least thirty (30) days prior to the start of final pre-trial conference.

9. All parties must provide deposition designations (this includes video testimony) they intend to read during the trial to opposing counsel twenty (20) days prior to the final pre-trial conference. Cross designations must be provided five (5) days after receipt of original designations. Any objections to the proposed designations must be submitted—in writing—five (5) days prior to the start of final pre-trial conference. The Parties must meet and confer concerning the designations and endeavor to resolve any disputes five (5) days prior to the final pre-trial conference.

10. The Court will generally be in trial session from 10 a.m. until 6 p.m. All parties are responsible for having witnesses available and ready to testify until 6 p.m. The Court generally recesses for lunch at 12:30 p.m. The lunch recess is for 1 hour. The Court will resume the trial promptly at 1:30 p.m. Periodic breaks are taken throughout the day as requested or needed.

11. Remote appearance of witnesses is governed by the Rules of Judicial Administration. Counsel who intends to use any technology (video trial testimony, Zoom, Skype, etc.) during the trial must ensure the technology device and necessary equipment and accessories are working properly prior to its use. If counsel is unfamiliar with the technology, they must ensure a technician or other individual who is familiar with the technology is available to address any issues that may arise during the presentation. The space in the court room is limited, therefore, the parties must work together to share screens, monitors or projectors. In addition, simply using a single laptop, Zoom account, and projection screen is insufficient to comply with remote witness procedures. All jurors must be able to see and hear the witness, and the witness must be able to see and hear the court, counsel, and opposing counsel. A single laptop and projection screen without sufficient audio and video setup results in the witness not seeing or hearing the judge and/ or jury. The party calling the witness is responsible for ensuring that the system used causes no feedback, that sufficient bandwidth exists, and that there are no technological interruptions.

12. Counsel must bring to the Court's attention, at the final pre-trial conference, any personal,

medical issues, childcare issues or similar type concerns that may impact the 10 a.m. to 6 p.m. schedule of the Court.

13. All trial stipulations must be in writing and submitted to the Court two (2) business days prior to the final pre-trial conference.

14. All motions in limine must be in writing and filed 30 days in advance of the final pre-trial conference.

15. All parties are responsible for preparing a joint final pre-trial report that must include a brief written synopsis detailing the factual and/or legal issues to be resolved by the Court and/or the jury.

16. Any power point presentations that include exhibits of any kind whatsoever intended to be used during opening statement must be shared with opposing counsel prior to start of the trial.

17. If either party desires the Court to judicially notice any adjudicative facts pursuant to Florida Evidence Code 90.201 through 90.204 such request shall be in writing and filed prior to the final pre-trial conference. The request shall specify with particularity the specific facts sought to be recognized and provide any legal authorities in support.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 1<u>st</u> <u>day of September,</u> <u>2025</u>.

2024-020751-CA-01 09-01-2025 6:28 PM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

Case No: 2024-020751-CA-01                                                                 Page 3 of 4

**Electronically Served:**

- Cheyenne Moghadam: c.moghadam@jones-adams.com
- Daniel Bitran: dbitran@mitrani.com
- Daniel Bitran: jlopez@mitrani.com
- Daniel Bitran: miamidocketing@mitrani.com
- Isaac J. Mitrani: imitrani@mitrani.com
- Isaac J. Mitrani: jlopez@mitrani.com
- Isaac J. Mitrani: miamidocketing@mitrani.com
- Jesus A Lopez: jlopez@mitrani.com
- Eric Santiago Rojo-Dotel: matthew@jones-adams.com
- Eric Santiago Rojo-Dotel: c.moghadam@jones-adams.com
- Eric Santiago Rojo-Dotel: e.rojodotel@jones-adams.com
- Isaac J. Mitrani Esq.: imitrani@mitrani.com
- Isaac J. Mitrani Esq.: jlopez@mitrani.com
- Isaac J. Mitrani Esq.: miamidocketing@mitrani.com
- Matthew R Gelber: matt@gelberlawgroup.com
- Matthew R Gelber: lais@gelberlawgroup.com
- Matthew R Gelber: eservice@gelberlawgroup.com

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2024-020751-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**PERSIST COMMUNICATIONS, INC. et al**

Defendant(s)

_____/

## ORDER SETTING JURY TRIAL AND FINAL PRETRIAL CONFERENCE AND CALENDAR CALL

| 3 WEEK TRIAL PERIOD JURY TRIAL DATE | January 5, 2026- January 23, 2026 |
|---|---|
| FINAL PRE-TRIAL CONFERENCE DATE | December 17, 2025 @1:30pm- https://zoom.us/j/5374476802 |
| FINAL CASE MANAGEMENT CONFERENCE DATE | (same as above) |
| NUMBER OF TRIAL DAYS REQUESTED | Jury Trial |

**THIS CAUSE** came before the Court for a Case Management Conference pursuant to the Court's notice and order. All counsel and the parties were present or by Zoom or telephone. After reviewing the Joint Case Management Report, with the stipulation of the Parties to the trial date set forth below and being otherwise fully informed, it is

**ORDERED AND ADJUDGED** as follows: The parties are directed to comply in all respects with the Complex Business Litigation Rules located at: www.jud11.flcourts.org.

Unless later modified by Order of this Court, the attached schedule of events shall control the management and proceedings in this case.

The parties are represented by designated "Lead Trial Counsel":

In all respects, the presumptive limitations on discovery contained in the Complex Business Litigation Rules shall apply.  Deadlines in this order shall be enforced unless good cause is shown.

**The parties are to meet and confer and agree upon a Mediator. The parties must then confer to obtain dates for both the "Initial and Final" Mediation and present such dates at the next interim case management conference.**

Plaintiff shall file a notice of mediation no later than five (5) days prior to mediation.  Plaintiff is **Ordered** to file a notice of the outcome of the mediation no later than five (5) days following the conclusion of the mediation conference.

**The designation of experts shall comply with CBL 6.3 and MUST INCLUDE the Expert's qualifications, report detailing his/her opinion, the basis for their opinion and the documents relied upon for their opinion.**

**The Final Pre-Trial Conference and the Calendar Call shall be heard on the same day/ time and the Court shall set a time to rule upon or hear ALL PENDING MOTIONS, ~~which is to include~~ including Jury Instructions, Verdict Form, Motions in Limine, Deposition Designations, Objections to Exhibits and *Daubert* Motions (All Motions must be filed in accordance to the deadline in this scheduling order).**

**Pursuant to Fla. R. Civ. P. 1.201 (b)(3) continuance of the trial will be granted only upon good cause shown.**

I

The Court shall hold an Interim Case Management Conference approximately every 30 days:

| September 24, 2025 | 9:30 AM |
|---|---|

| | |
|---|---|
| October 22, 2025 | 9:30 AM |
| November 26, 2025 | 9:30 AM |
| | |

n the event any party files a petition for writ of certiorari or a notice of appeal during the course of the proceeding which would divest this Court of jurisdiction, said party shall provide the Court with a copy of same in order to advise the Court that such a proceeding has been commenced, as well as the disposition of same. Absent an automatic stay or a stay granted by this Court or the appellate court, the filing of an interlocutory appeal or petition for extraordinary relief may not in and of itself interrupt or delay proceedings in this Court.

### CASE MANAGEMENT SCHEDULE (as reflected in Case Management Report

- **Pursuant to amended Rule 1.280(a), as of January 1, 2025, initial disclosures must be made without the necessity of discovery requests "within 60 days after the service of the complaint or joinder, unless a different time is set by court order."**

- **Deadlines in this case management order will be enforced unless amended by court order**

- **Joint agreed motions to extend a deadline may be rejected if such extension will affect the remaining deadlines in this order.**

- **If any party is unable to meet the deadlines set forth in the case management order for any reason, including due to the unavailability of hearing time, the affected party may promptly set a case management conference and alert the court. The notice of case management conference must identify the issues to be addressed in the case management conference.**

- **Motions for continuance shall be addressed pursuant to Rule 1.460. The court will not grant joint agreed motions for continuance of trial without a hearing and compliance with the rule.**

| | |
|---|---|
| ESI EXCHANGE PROPOSAL (including search terms, formats, data sources to be searched, etc) | Completed |
| MOTIONS TO AMEND/ADD PARTIES (Includes Affirmative Defenses) | **August 25, 2025** |
| FACT WITNESS DEPOSITIONS/ | Completed |

| | |
|---|---|
| DISCOVERY CONCLUDES | |
| INITIAL MEDIATION DEADLINE | On or before **September 13th, 2025** |
| NUMBER OF EXPERTS PER PARTY/SIDE | **2 Experts** for Plaintiff;<br>**2 Experts** total for Defendants Lee Melchionni, Sylvia Benito, Justice Partners Management, and Justice Partners Law Group;<br>**2 Experts** total for Defendants Persist Communications, Inc.,<br><br>The Lake Law Firm, and Edward Lake |
| PLAINTIFF/THIRD PARTY PLAINTIFF/CROSS PLAINTIFF(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION<br><br>**MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | Completed. |
| DEFENDANT/THIRD PARTY/CROSS | Completed |
| DEFENDANT(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION **MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| REBUTTAL EXPERT DISCLOSURE | Not applicable. |

| | |
|---|---|
| REPORTS DUE<br><br>**MUST INCLUDE:<br>EXPERTS<br>QUALIFICATIONS,<br>REPORT DETAILING<br>OPINION, BASIS<br>FOR OPINION, AND<br>DOCUMENTS RELIED<br>UPON FOR OPINION** | |
| EXPERT DEPOSITIONS COMPLETED | The Parties agree to cooperate in good faith to schedule<br><br>and complete all expert depositions as soon as reasonably possible. |
| DISPOSITIVE MOTIONS FILED | **September 30, 2025** |
| DAUBERT/FRYE MOTIONS FILED | **March 2, 2026** |
| MOTIONS IN LIMINE FILED | **February 16, 2026** |
| FINAL MEDIATION DEADLINE | On or before **February 16, 2026** |
| FINAL PRETRIAL<br>CONFERENCE<br>**THE COURT SHALL ADDRESS ALL<br>PENDING MOTIONS,<br>INCLUDING JURY<br>INSTRUCTIONS,<br>VERDICT FORM,<br>MOTIONS IN LIMINE,<br>DEPOSITION** | December 17, 2025 |
| **DESIGNATIONS,<br>OBJECTIONS TO<br>EXHIBITS AND FRYE MOTIONS** | |

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 1<u>st</u> <u>day of September,</u>
<u>2025</u>.

<u>2024-020751-CA-01 09-01-2025 6:28 PM</u>
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**

- Cheyenne Moghadam: c.moghadam@jones-adams.com
- Daniel Bitran: dbitran@mitrani.com
- Daniel Bitran: jlopez@mitrani.com
- Daniel Bitran: miamidocketing@mitrani.com
- Isaac J. Mitrani: imitrani@mitrani.com
- Isaac J. Mitrani: jlopez@mitrani.com
- Isaac J. Mitrani: miamidocketing@mitrani.com
- Jesus A Lopez: jlopez@mitrani.com
- Eric Santiago Rojo-Dotel: matthew@jones-adams.com
- Eric Santiago Rojo-Dotel: c.moghadam@jones-adams.com
- Eric Santiago Rojo-Dotel: e.rojodotel@jones-adams.com
- Isaac J. Mitrani Esq.: imitrani@mitrani.com
- Isaac J. Mitrani Esq.: jlopez@mitrani.com
- Isaac J. Mitrani Esq.: miamidocketing@mitrani.com
- Matthew R Gelber: matt@gelberlawgroup.com
- Matthew R Gelber: lais@gelberlawgroup.com
- Matthew R Gelber: eservice@gelberlawgroup.com

Filing # 231379556 E-Filed 09/11/2025 03:50:02 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

      Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,

Defendants

_____/

## NOTICE OF FILING SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS [DE #20]

Plaintiff, Allan Teh, by and through undersigned counsel hereby files this Notice of Filing

Supplemental Authority in further support of Plaintiff's Response in Opposition to Defendants'

Motion to Dismiss [DE #20] and attaches to this Notice *Blanton v. Arbor Facility*, Inc., 2025 WL

2263610 (Fla. 5th DCA Aug. 8, 2025).

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to

all of the parties via the Florida E-Filing Portal on September 11th, 2025.

**JONES & ADAMS, P.A.**
Coral Gables Centre

999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:     /s/ Matthew L. Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335

2025 WL 2263610
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED
FOR PUBLICATION IN THE PERMANENT
LAW REPORTS. UNTIL RELEASED, IT IS
SUBJECT TO REVISION OR WITHDRAWAL.

District Court of Appeal of Florida, Fifth District.

Rhonda Lynn **BLANTON**, as Personal
Representative of the Estate of
Linda Eulee Daughtry, Appellant,

v.

**ARBOR FACILITY**, INC., Apex Global
Solutions, LLC, Vintage Healthcare,
LLC, Michael Bleich, Dwayne Graham,
Millennial Healthcare Services, LLC, Old
Wire Road Care, Inc., Florida Care FL, Inc.,
and Premier Clinical Solutions, Inc., n/k/a
Kings Health Management, Inc., Appellees.

Case No. 5D2024-1126
|
August 8, 2025

On appeal from the Circuit Court for Sumter County. Michelle
T. Morley, Judge. LT Case No. 2023-CA-000098

**Attorneys and Law Firms**

Joanna Greber Dettloff, Megan Archey, and Kyle D. Ross, of
Mendes, Reins & Wilander, PLLC, Tampa, for Appellant.

Kelli Biferie Hastings and Mark A. Humphrey, of Humphrey
Law Group, Longwood, for Appellees, **Arbor Facility**, Inc.,
Apex Global Solutions, LLC, Vintage Healthcare, LLC,
Michael Bleich, and Dwayne Graham.

Diana N. Evans, Jacob B. Hanson, and Michael J. Birnkrant,
of Bradley Arant Boult Cummings LLP, Tampa, for Appellee,
Millennial Healthcare Services, LLC.

**Opinion**

Jay, C.J.

 **\*1**  The trial court dismissed this case with prejudice after
finding that the complaint failed to state a cause of action. We
reverse.

I.

Cypress Care Center ("CCC") is the nursing home where
Linda Daughtry ("Decedent") lived for much of March and
April 2021. Her estate later sued several defendants, alleging
that they operated CCC as a high-census, high-acuity **facility**
without providing commensurate staff. Estate alleged that this
ongoing staffing shortage deprived Decedent of the care she
needed.

The court dismissed multiple iterations of the complaint,
each time finding it to be legally insufficient. Ultimately,
Estate filed its fourth amended complaint, which is the subject
of this appeal. It raised nursing home negligence claims
against **Arbor Facility**, Inc., Apex Global Solutions, LLC,
Vintage Healthcare, LLC, Millennial Healthcare Services,
LLC, Michael Bleich, and Dwayne Graham. Estate alleged
that **Arbor** held the license to operate CCC, that Apex,
Vintage, Millennial, and Bleich were management or
consulting companies, and that Bleich and Graham were
managing employees. Again, Estate claimed that CCC's
chronic understaffing caused Decedent to receive poor care
and suffer various injuries.

The defendants again sought dismissal. They argued that
Estate did not properly explain how they were eligible
to be sued under the nursing home negligence statute or
how their actions or omissions caused Decedent's injuries.
At the hearing that followed, the court found that Estate
was "still focused on conclusions rather than facts," and
that another chance to amend the complaint would not
"serve any purpose." Accordingly, the court announced
that it would dismiss the case with prejudice. In its
dismissal order, the court wrote that Estate "failed to pursue
administrative remedies before bringing this action and has
already attempted four times to state a cause of action."

Estate moved for reconsideration, arguing that it "made
significant efforts" to address the court's concerns "by
pleading additional factual allegations with respect to each
Defendant's duties and breach of those duties." It noted
that while the original complaint had 119 paragraphs,
the fourth amended complaint had 346. The court denied
reconsideration.

## II.

Our review of an order granting a motion to dismiss with prejudice is de novo. *Poirier v. Vills. Senior Hous. I OPCO, LLC*, 395 So. 3d 640, 642 (Fla. 5th DCA 2024).

### A.

"The purpose of a complaint is to advise the Court and the defendant of the nature of a cause of action asserted by the plaintiff." *Connolly v. Sebeco, Inc.*, 89 So. 2d 482, 484 (Fla. 1956). It is "merely a tentative outline" of the plaintiff's position before the case is developed by discovery. *See Poirier*, 395 So. 3d at 643. The plaintiff need only set forth "a short and plain statement of the ultimate facts" that show entitlement to relief. *Id.* at 642 (quoting *Beckler v. Hoffman*, 550 So. 2d 68, 70 (Fla. 5th DCA 1989)). "It is not necessary or even proper" for the complaint "to allege ... evidentiary facts." *See* Philip J. Padovano, *Florida Civil Practice* § 8:2 (2025 ed.). "This simplified pleading procedure is the primary intent" of Florida Rule of Civil Procedure 1.110, "which eliminated pleading technicalities." *Poirier*, 395 So. 3d at 643.

**\*2** In turn, the "function of a motion to dismiss ... is to raise as a question of law the sufficiency of the facts alleged to state a cause of action." *Connolly*, 89 So. 2d at 484; *see also Hernando County v. Hernando Cnty. Fair Ass'n*, 385 So. 3d 668, 670 (Fla. 5th DCA 2024) (reiterating that a motion to dismiss tests a complaint for "legal sufficiency"). It is not a vehicle for resolving factual disputes. *Fla. Bar v. Greene*, 926 So. 2d 1195, 1199 (Fla. 2006). To the contrary, when ruling on the motion, the court "must assume all facts alleged in the complaint to be true." *Connolly*, 89 So. 2d at 484. So long as the complaint introduces the defendant to "the plaintiff's charge of wrongdoing so that the defendant can intelligently answer the [complaint]," the court errs if it grants dismissal "on the ground that more specific allegations are required." *Poirier*, 395 So. 3d at 643 (quoting *Meadows Cmty. Ass'n v. Russell-Tutty*, 928 So. 2d 1276, 1278 (Fla. 2d DCA 2006)).

Applying these principles, "the issue before us is whether the complaint ... make[s] out a prima facie case for relief" and enables the defendants "to intelligently answer and defend [themselves]." *See Foerman v. Seaboard Coast Line R.R. Co.*, 279 So. 2d 825, 828 (Fla. 1973). We hold that it does.

The complaint arises from section 400.023, Florida Statutes (2021), "which governs civil suits for negligence involving nursing home residents." *Sun Coast Nursing Ctrs., Inc. v. Littman*, 293 So. 3d 1056, 1057 (Fla. 4th DCA 2020). Under the heading, "Violations of the Standard of Care and Injuries," it alleges that Decedent was incontinent and used a wheelchair. She "was at risk for pressure ulcers" but "was not placed on a turning/repositioning program, nor was a pressure reducing device for chair implemented." Citing an assessment from March 2021, the complaint alleges that CCC staff knew about this risk for pressure ulcers and the need for preventative measures but still failed to act. It reports that Decedent was hospitalized "with a pressure injury to her sacrum" in April 2021. According to the complaint, such an injury cannot occur absent "repeated neglect." The complaint also asserts that staff did not properly document Decedent's condition. It concludes that these "failures stemmed from a nursing staff that is inadequately trained and/or insufficient in number."

In sum, the complaint alleges that Decedent received substandard care because the defendants operated a chronically understaffed nursing home. The court must accept this allegation and its reasonable inferences as true. *See Greene*, 926 So. 2d at 1199; *Connolly*, 89 So. 2d at 484. Indeed, as in *Poirier*, it is "difficult to ascertain from the trial court's ruling why it found that the Estate had failed to allege sufficient causes of action against Appellees." 395 So. 3d at 643. Had the court ordered Estate to amend its complaint yet again, we are hard-pressed to understand what Estate could have done to satisfy the seemingly unending demand for greater and greater detail.

### B.

Estate's allegation that several defendants were management or consulting companies also does not merit dismissal. The nursing home negligence statute allows claims "against the licensee, the licensee's management or consulting company, the licensee's managing employees, and any direct caregivers." § 400.023(1), Fla. Stat. A management or consulting company is "an individual or entity who contracts with, or receives a fee from, a licensee to provide" certain services. *Id.* § 400.023(2)(b). These services are the hiring or firing of the administrator or director of nursing, controlling staffing levels or the budget, or implementing and enforcing policies and procedures. *Id.*

**\*3** Citing specific agreements, Estate alleged that Apex, Vintage, Millennial, and Bleich all met this definition. Seizing on the word "company," the defendants argued that under the statute, a nursing home can have only one management or consulting company. They maintained that by alleging the existence of multiple such companies, the complaint contradicted itself.

Regardless of whatever merit this argument could have eventually, it is not ripe for adjudication on a motion to dismiss. It is well settled that "a party may assert inconsistent claims in the same pleading." *Thomas v. Trench Training Sys., LLC*, 377 So. 3d 198, 202 (Fla. 2d DCA 2023) (quoting *Johnson v. Dep't of HRS*, 695 So. 2d 927, 930 (Fla. 2d DCA 1997)). "Indeed, parties may even plead allegations that negate one another." *Id.* at 203. When pleading in the alternative, a plaintiff "invariably will encounter the argument" that the complaint is inconsistent. *See* Christine M. Hoke and Leeza D. Newman, *Florida Civil Practice Before Trial* § 12.5 (14th ed. 2022). "This is not a valid

objection, because alternative pleading by its very nature is inconsistent." *Id.* As such, it is not a pleading defect for Estate to allege that multiple defendants qualify as a management or consulting company.

III.

Accepting Estate's allegations as true and drawing all reasonable inferences in its favor, Estate pleaded grounds for relief under the nursing home negligence statute. Thus, the court erred by granting a dismissal with prejudice.[*]

Reversed and Remanded.

Edwards and Pratt, JJ., concur.

**All Citations**

--- So.3d ----, 2025 WL 2263610

Footnotes

[*]     The exhaustion of administrative remedies—which the court's order cited—also does not support dismissal. That doctrine requires "a party challenging an agency action or decision" to "exhaust all administrative remedies before seeking judicial review." *Pretzer v. Swearingen*, 394 So. 3d 175, 186 (Fla. 1st DCA 2024). Estate did not challenge any agency action. Instead, it cited agency regulations when alleging the defendants' negligence. The primary jurisdiction doctrine —a companion rule discussed by the answer briefs—is likewise irrelevant. It applies when a claim turns on issues that "a regulatory scheme" places "within the special competence of an administrative body." *Id.* at 190 (quoting *Flo-Sun, Inc. v. Kirk*, 783 So. 2d 1029, 1037 n.5 (Fla. 2001)). Holding that it applies here would negate the express purpose of the nursing home negligence statute, which creates an "exclusive cause of action" that "may be brought in any court of competent jurisdiction." *See* § 400.023(1), Fla. Stat.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Filing # 232480226 E-Filed 09/27/2025 04:30:30 PM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2024-020751-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**PERSIST COMMUNICATIONS, INC. et al**

Defendant(s)

_____/

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT [DE #19]

**THIS CAUSE** having come before this Court on Defendants, Persist Communications, Inc., The Lake Law Firm, LLC, and Edward Lake's, Motion to Dismiss Plaintiff's Complaint [DE #19] and the Court having heard argument of counsel, reviewed the file, and being otherwise fully advised in the premises, it is

**ORDERED** and **ADJUDGED** that Defendant's Motion is **GRANTED** for reasons stated on the record, with leave for Plaintiff to amend the Complaint on or before twenty (20) days from the entry of this Order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 27<u>th</u> day of <u>September, 2025</u>.

<u>2024-020751-CA-01 09-27-2025 4:24 PM</u>
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**

- Cheyenne Moghadam: c.moghadam@jones-adams.com
- Daniel Bitran: dbitran@mitrani.com
- Daniel Bitran: jlopez@mitrani.com
- Daniel Bitran: miamidocketing@mitrani.com
- Isaac J. Mitrani: imitrani@mitrani.com
- Isaac J. Mitrani: jlopez@mitrani.com
- Isaac J. Mitrani: miamidocketing@mitrani.com
- Jesus A Lopez: jlopez@mitrani.com
- Eric Santiago Rojo-Dotel: matthew@jones-adams.com
- Eric Santiago Rojo-Dotel: c.moghadam@jones-adams.com
- Eric Santiago Rojo-Dotel: e.rojodotel@jones-adams.com
- Isaac J. Mitrani Esq.: imitrani@mitrani.com
- Isaac J. Mitrani Esq.: jlopez@mitrani.com
- Isaac J. Mitrani Esq.: miamidocketing@mitrani.com
- Matthew R Gelber: matt@gelberlawgroup.com
- Matthew R Gelber: lais@gelberlawgroup.com
- Matthew R Gelber: eservice@gelberlawgroup.com

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

       Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,

       Defendants

_____/

## NOTICE OF FILING AMENDED COMPLAINT

Pursuant to this Court's September 27th, 2025, Order [DE #33], Plaintiff, Allan Teh,

by and through undersigned counsel hereby files this First Amended Complaint.

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered

to all of the parties via the Florida E-Filing Portal on October 17th, 2025.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:     /s/ Matthew L. Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

       Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,

       Defendants

_____/

## FIRST AMENDED COMPLAINT

Plaintiff, ALLAN TEH ("Teh"), files this Direct Action against Defendants, LEE MELCHIONNI ("Melchionni"), SYLVIA BENITO ("Benito"), JUSTICE PARTNERS MANAGEMENT, LLC ("Management"), JUSTICE PARTNERS LAW GROUP, LP, ("Law Group") PERSIST COMMUNICATIONS, INC ("Persist"), THE LAKE LAW FIRM, LLC ("Lake Law") (collectively referred to as "Defendants"), and EDWARD LAKE ("Lake") and in support thereof alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. This direct action is for damages, declaratory relief and equitable relief in excess of the minimum jurisdictional limits of this Court.

2. The Plaintiff, Allan Teh, is a citizen and resident of the State of Florida.

Page **1** of **34**

3.      Defendant, Melchionni, is the Chief Operating Officer of Justice Partners and is a citizen and resident of the State of Florida. His current residential address is located in Miami-Dade County Florida. His apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

4.      Defendant, Benito, is the Chief Executive Officer of Justice Partners and is a citizen and resident of the State of Florida. Her current residential address is located in Miami-Dade County Florida. Her apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

5.      Defendant, Management, is the Manager of LLC and is a Delaware Limited Liability Company doing business in Miami-Dade County, Florida.

6.      Defendant, Law Group, is a District of Columbia Limited Partnership doing business in Miami-Dade County, Florida.

7.      Defendant Persist is a Florida Corporation formed in the State of Florida and doing business in the state of Florida. Persist's current office and the place of operation is located in Broward County, Florida - specifically, 1815 Cordova Road, Fort Lauderdale, FL 33316.

8.      Persist's President and Registered Agent is Edward Lake ("Mr. Lake").  Mr. Lake's address as President and Registered Agent of Persist is the same principal address as Persist and The Lake Law Firm - 1815 Cordova Road, Fort Lauderdale, FL 33316. *See attached Persist Annual Report filed on January 20, 2023 as **Exhibit 1** and Lake Law invoices dated 4/15/2021 and 10/11/2021 as **Composite Exhibit 2.***

9.     Upon information and belief, Defendant, Edward Lake, is the sole owner, member, and officer of Persist Communications. Edward Lake is in primary control of all alleged business operations and activities of Persist.

10.    Upon information and belief, Edward Lake exerts dominion and control over Persist as the controlling director, member and/or officer whose control and dominion render Persist a mere business conduit or alter ego used for Edward Lake's personal benefit and financial gain. Edward Lake is using Persist for an improper purpose to the detriment of the Plaintiff.

11.    Lake Law, upon information and belief, is a New York law firm with operations in the State of Florida. Lake Law Firm has an office located in Broward County Florida and issues invoices regarding alleged services offered and rendered in the State of Florida and utilizes  the 1815 Cordova Road, Fort Lauderdale, FL 33316 office address on its invoices.  *See **Composite Exhibit 2**.*

12.    Upon information and belief, Defendant, Edward Lake, is the sole owner, member, and officer of The Lake Law Firm. Edward Lake is in primary control of all alleged business operations and activities of The Lake Law Firm.

13.    Upon information and belief, Edward Lake exerts dominion and control over The Lake Law Firm as the controlling director, member and/or officer whose control and dominion render Lake Law a mere business conduit or alter ego used for Edward Lake's personal benefit and financial gain. Edward Lake is using Lake Law for an improper purpose to the detriment of the Plaintiff.

14.    As more fully set forth herein, Lake Law has purposefully availed itself of the privilege of conducting activities within Florida and is therefore under the jurisdiction

of this Court. As set out herein and pursuant to Fla. Stat. §48.193 et seq., Lake Law is subject to specific personal jurisdiction because Lake Law committed multiple acts and breaches enumerated in Fla. Stat. §48.193(1) including, but not limited to: operating, conducting, engaging in, and carrying on a business or business venture in Florida, Lake Law has an office in Florida, has committed various and multiple tortious acts within the State of Florida and has breached and is continuing to breach agreements in Florida by failing to perform acts required by the agreements to be performed in Florida.

15.     This venue and forum are appropriate based upon Fla. Stat. § 47.011 and Fla. Stat. § 47.051, and also because virtually every act, breach and transaction set out in this Derivative Complaint occurred in Miami-Dade County, Florida. To the extent other acts, breaches and transactions are stated within this complaint, those occurred in Broward County, Florida. Moreover, the overwhelming majority of fact witnesses are located in Miami-Dade County, Florida.

16.     Defendant, Edward Lake is a citizen and resident of the State of Florida.

17.     Pursuant to Section 9.3 of the Offering Circular attached hereto as **Exhibit 3** the parties to the Agreement irrevocably agree that all actions or proceedings arising out of or related to the Subscription Agreement will be litigated solely in the venue and jurisdiction of any court located within the State of Florida.

18.     Pursuant to Section 13.8 of the LLC's Operating Agreement, this action can only be brought in courts located in Florida, "County of Dade" [sic].

## GENERAL ALLEGATIONS

19.     The Manager of LLC is Defendant, Justice Partners Management, LLC, ("Management") a Delaware Limited Liability Company formed on February 15th, 2021.

20.     Pursuant to the Offering Circular, Melchionni is an "Authorized Member" of JP Management. *See Pg. 67 of Offering Circular attached as **Exhibit 3.***

21.     On April 6, 2021, Plaintiff acquired a sizable equity interest in Justice Partners through the purchase of 4,000 Units of Series A Preferred Units, at a purchase price of $4,000,000. *See Offering Circular attached as **Exhibit 3.***

22.     As more fully set out herein, the Plaintiff's acquisition of this equity interest was the result of a variety of misrepresentations by the Defendants herein.

23.     Defendants, Melchionni, Benito, Management, jointly and individually, fraudulently induced multiple individuals and entities, including the Plaintiff, to invest a total of $11,725,000 in the LLC.

24.     The represented purpose of the formation of LLC as stated in the marketing documents and Offering Circular provided by the Defendants was to take the entirety of the invested proceeds and provide those funds as a "Loan" to Defendant, Law Group. *See Page 3 of Marketing Deck attached as **Exhibit 4.***

25.     The LLC Operating Agreement and incorporated documents and agreements – presented to the Plaintiff prior to his investment and as a specific inducement to undertake such investment, used the terms "Loan" and "Investment" interchangeably, defining "Investment" as "investments and loans made, directly, or indirectly, by the Company [LLC] in accordance with this Agreement to Justice Partners Law Group, LP." *See Pg. 28 of Offering Circular attached as **Exhibit 3.***

26.     The Defendants, Melchionni and Benito both collectively and individually, represented that the "Loan" was to be utilized by the Law Group "as to facilitate the financing of mass tort litigation expenses, which include, but are not limited to: research,

client acquisition; marketing; expert fees; general working capital purposes for the Firm [Law Group], and any other businesses ancillary or complementary thereto." *See Page 17 of Offering Circular attached as **Exhibit 3.***

27.     As discovery has revealed in other related litigation, the only method or basis that could result in the return of the Plaintiff's or other investors' principal investment, and possible profits, is: (1) Law Group's acquisition of mass tort litigation cases; (2) the settlement or successful trial of those mass tort litigation cases; (3) via legitimate retainer agreements, contingency fee agreements, and/or referral/co-counsel agreements, that would ultimately yield attorneys' fees revenue which would then result in funds that would then flow up to the LLC for purposes of distribution and/or repayment to the investors and members of the LLC.

28.     Defendant Melchionni, the COO of the LLC, the Managing Partner of Defendant Law Group, as well as an "Authorized Member" of Management, admitted under oath in a separate legal proceeding that the Law Group is inextricably linked with Justice Partners.

29.     Specifically, Melchionni confirmed these allegations by testifying: "Justice Partners Law Group is involved in the . . .litigation, which would then - - the funds produced from that would flow through to Justice Partners LLC." *See Pg. 75 Lns. 12-15 of Deposition Transcript of Melchionni attached as **Exhibit 5***.

30.     As set out more fully below, the "Loan" of $11,725,000 to Law Group **was never effectuated**, and **JP Law Group has not acquired any mass tort litigation cases or clients**.

31.    Instead, Defendants Melchionni, Benito, Management, and Law Group, jointly and individually, conspired with Defendants, Lake Law Persist, and Edward Lake jointly and individually, to defraud the LLC's investors and members.

32.    Prior to Mr. Teh's investment and after that investment, Melchionni, Benito, and Management, jointly and individually, misrepresented the nature of the LLC's members' investment and loan to Law Group, and instead effectuated the fraudulently transfer of $11,250,000 to Defendants, Lake Law and Persist. *See Lake Law Invoices attached as* **Exhibit 2.**

33.    In furtherance of that scheme, Melchionni, Benito, Management, and Law Group, jointly and individually, misrepresented the capacity, authority, ability and status of the Law Group's acquisition of mass tort litigation cases. These misrepresentations were made before and after the Plaintiff's investment.

34.    Upon information and belief prior to Plaintiff's April 6, 2021, investment in Justice Partners Defendants, Melchionni, Benito, Management, Lake Law, Persist, and Edward Lake entered into a common plan and agreement to induce Plaintiff to invest $4,000,000 into Justice Partners through false representations that the funds would be loaned to Justice Partners Law Group for acquisition of mass tort cases.

35.    Upon information and belief, in furtherance of the conspiracy, and as more fully set forth herein, the Defendants agreed that Lake Law, Persist, and Edward Lake would generate false and backdated invoices and documentation purporting to show case acquisitions and co-counsel relationships that did not exist.

36.    Upon information and belief Lake Law, Persist, and Edward Lake in agreement with, and at the direction and knowledge of Melchionni and Benito, created

invoices backdated to coincide with the purported "loan" and falsely represented that 11,250,000 dollars had been used to acquire thousands of mass tort cases.

37.     These coordinated acts were undertaken to mislead Plaintiff into believing his investment was supported by legitimate mass tort assets and that the funds were properly loaned to JP Law Group.

38.     As set forth in detail herein, Plaintiff justifiably relied on these representations and suffered damages exceeding $4,000,000 as a direct and proximate result of the conspiracy."

39.     Following Plaintiff's April 6th, 2021, acquisition of 4,000 Units of Series A Preferred Units of the LLC, at a purchase price of $4,000,000 he did not receive any substantive correspondence, information or documentation to allow him to assess the value, status, and quality of $4,000,000 equity interest.

40.     In response, and following the LLC's failure to comply with Plaintiff's November 5th, 2022, Demand for Books and Records, Plaintiff, on November 25th, 2022, initiated a Books and Records Action in the Circuit Court for the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, *Teh v. Justice Partners, LLC, et al.*, Case No. 2022-022470-CA-1 (the "Books and Records Action").

41.     During those legal proceedings the LLC at the direction of Melchionni, Benito, and Management, turned over a small set of documents, albeit insufficient, that directly revealed: 1) Melchionni's, Benito's, and Management's obvious breach and disregard as to the terms of Justice Partners Operating Agreement; 2) the lack of evidence to support that any "Loan" was ever provided to Law Group; and 3) the

fraudulent and unauthorized transfer of $11,250,000 to Defendant's Lake Law and Persist.

42. Section 10.1 of the Justice Partners Operating Agreement provides:

The Company will maintain true, **complete and correct books of account of the Company, all in accordance with generally accepted accounting principles** applied on a consistent basis and shall keep minutes of the proceedings of, or maintain written consents executed by, the Members and the Manager. The books of account **shall contain particulars of all monies, goods or effects belonging to or owing to or by the Company**, or paid, received, sold or purchased in the course of the business, and all such other transactions, **matters and things relating to the business of the Company as are usually entered in books of accounts kept by Persons engaged in a business of a like kind and character**. In addition, the Company shall keep all records required to be kept pursuant to the Act. Any Member shall, upon prior written notice and during normal business hours, have access to the information described in the Act, for the purpose of inspecting or, at the expense of such Member, copying the same. Any Member reviewing the books and records of the Company pursuant to the preceding sentence shall do so in a manner which does not unduly interfere with the conduct of the business of the Company. The Company will provide an unaudited financial at the end of each fiscal year to its Members.

*Section 10.1(a): Books and Records*

43. Section 10.3 of the Justice Partners Operating Agreement provides:

The Manager **may not commingle the Company's funds with the funds of any** Member, Director, officer or other Person.

*Section 10.3: Company Funds*

44. The term "Person" is identified in the LLC Operating Agreement as "a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity."

45. Prior to the plaintiff's investment , the Defendants specifically stated that the plaintiff's invested funds would be segregated and safeguarded into a discrete operating

account for the subject operating LLC. This representation was material and essential regarding the Plaintiff's decision to undertake this investment.

46.     However, the Defendants, Melchionni and Benito, have admitted on multiple occasions that, in direct breach of Section 10.3, Justice Partners funds have been extensively co-mingled with other entities via their unauthorized and undisclosed use of a "third-party fund administrator" Industry Fintech Inc.

47.     As evidence of these misrepresentations, and in direct breach of Section 10.1(a) of the Operating Agreement, and despite being the COO of Justice Partners, Melchionni has repeatedly contended that it is Industry Fintech, not the LLC that generates and handles the financial records of LLC.

48.     Melchionni went as far as to represent under oath that *only* Industry Fintech maintains and has custody of document which would evidence and outline the status of the "Loan" to Law Group. *See Pg. 43-4 Lns. 19-13 of Deposition Transcript of Melchionni attached as* **Exhibit 5***.*

49.     No such documents or records in that regard have ever been produced to the Plaintiff.

50.     The LLC's funds were so extensively co-mingled that the heavily redacted bank statements provided during the Books and Records Action were unusable to forensically determine the flow of the subject funds.

51.     As additional evidence of these misrepresentations, during the Books and Records Action, Melchionni and Benito produced two "Invoices" generated by Defendants, Lake Law and Persist. *See Invoices attached as Composite* **Exhibit 2.**

52.     The first "Invoice" was apparently generated by Lake Law and Persist on April 15th, 2021, **only two days** following Plaintiff's initial transfer of $2 million into Justice Partners' bank account, and states that **$6,125,000** was transferred into Persist's TD Bank Account ending in #2721.

53.     The second "Invoice" was generated by Lake Law and Persist on October 11th, 2021, and states that an additional **$5,125,000** was transferred into Persist's TD Bank Account ending in #2721.

54.     Interestingly, both "Invoices" contain the language "BILL TO: Justice Partners Law Group."

55.     However, Justice Partners (2021-2022) General Ledger, provided by Melchionni and Benito, establishes that it was in fact the LLC, **not the** Law Group, which transferred the funds to Persist and Lake Law. *See General Ledger as* **Exhibit 6** *which will be filed Under Seal.*

56.     The misrepresentations and fraudulent payments and transfers referenced above, totaling **$11,250,000**, were effectuated and undertaken at the direction of Melchionni, Benito, Management, Lake Law, Lake and Persist, jointly and individually. Such transfers were made and effectuated without any cognizable consideration, contract or agreement in place.

57.     The fact that the funds transferred to Lake Law and Persist came from the LLC and not JP Law's bank accounts is and express admission and concession that the misrepresented "Loan" to Law Group was never actually made or realized.

58.     However, such well documented fraudulent misrepresentations and acts did not get in the way of the Defendants attempting a ham-handed cover up regarding such

a breaches.  Specifically, on February 16th, 2022, **103 days** following Plaintiff's original records request, Melchionni and Benito, ostensibly on behalf of the LLC, provided Plaintiff with an **unexecuted** "Senior Secured Promissory Note" supposedly evidencing the memorialization of the "Loan" from the LLC to JP Law Group. *See Unexecuted Loan Agreements attached as* **Composite Exhibit 7.**

59.     Interestingly, and according to the terms of the unexecuted "Senior Security Instrument", the LLC "shall maintain an account on its books and records which shall evidence the outstanding principal balance of all Advances, Interest due and owing thereon and any fees and expenses due from time to time under this Note." *See* **Exhibit 7.**

60.     Only after this Court entered a verdict against the LLC in a separate action did the Defendants bother to generate and then send to the Plaintiff a quanta of these documents.  Even that production is grossly deficient.

61.     More interestingly, on August 18th, 2023, counsel for Justice Partners in the Books and Records Action produced an **executed version** of the "Senior Security Instrument." *See Executed Loan Agreements attached as* **Exhibit 8.**

62.     On August 22nd, 2023, when Melchionni, under oath, was asked why the executed version of the "Senior Security Instrument" was not originally provided back in February 16th, 2023 in response to the records requests, he simply answered "[i]t had not been executed when it was sent to you." *See Page 42, Lns. 11-14 of Melchionni Deposition Transcript attached as* **Exhibit 5.**

63.     The Senior Security Instrument was executed **by Melchionni**, on behalf of Law Group, on **June 23rd, 2023**, **808 days following Plaintiff's acquisition of his $4,000,000 equity interest**. *See Exhibit 8.*

64.     However, although the Instrument was apparently executed on June 23rd, 2023, Melchionni, on behalf of both the LLC and the Law Group, simply announced that the "effective date" of the agreement would be **April 14th, 2021**.

65.     Coincidentally, the "effective date" of April 14th, 2021, is **a day before the first "Invoice" was generated by Lake Law and Persist on April 15th, 2021**.

66.     Rather than following through on the representations made to the Plaintiff regarding the actual use of the invested funds or adhering to the LLC's Operating Agreement and properly providing a "Loan" to the Law Group, Defendants, Melchionni, Benito, and Management instead fraudulently paid and transferred essentially the entirety of the LLC's cash, assets and invested funds directly to Defendants, Lake Law, Lake and Persist.

67.     The Defendants made these misrepresentations and conducted this fraudulent scheme in order to obtain and then retain complete control over the use of the LLC's cash, assets, and investors' funds as well as siphon "good cases" away from the LLC's members and investors for Defendants' own pecuniary gain.

68.     Specifically, Defendants Melchionni and Benito have significant material interests and positions in other similarly configured law firms.  As a result of those Defendants' inter-firm relationships, those Defendants are able to assign, re-assign or otherwise designate "good cases" to one or more firms ("cherry-picking") but also assign

or re-assign "bad cases" to other firms at which those Defendants have significant interests and positions.

69.     The Defendants, Melchionni and Benito, conspicuously failed to advise the Plaintiff of these positions and relationships before he his investment.

70.     An example of this conduct comes in the form of the various nonsensical "updates" provided by the Defendants to the LLC's members and investors regarding the status of these supposed mass tort litigation cases "acquired" by the Law Group.

71.     One such "update" (i.e., a "representation") occurred on October 20, 2021, when Melchionni and Benito emailed Plaintiff explicitly stating that the LLC had "spent $11,250,000 to **acquire** 200 Firefighter Foam Cases, 208 Talc Cases, 380 Hernia Mesh Cases, 350 3M Cases, 150 RoundUp Cases, and 200 Zantac Cases." *See October 20th, 2021 Email attached* **as Exhibit 9.**

72.     Melchionni and Benito stated in that same October 20, 2021 email that Justice Partners would be "entitled to 72% of the attorney fee" obtained through these mass tort litigations.

73.     Melchionni assured Plaintiff on several occasions that there would be no case drop-off in the cases acquired by Justice Partners stating "I prenegotiate exactly what we are paying for cases so I do not have to worry about drop off or price increases mid campaign." *See Email attached as* **Exhibit 9.**

74.     However, those representations made are incongruent, and hold no relationship with the cases "acquired" by the Law Group, as set forth in the two "Invoices" generated by Lake Law and Persist.

75. Specifically, the April 15th, 2022, and October 11th, 2021, "Invoices" state that for the same $11,250,000 figure, the Law Group "acquired":

a. 1,200 3M Mass Tort Cases;

b. 200 Fire Foam Mass Tort Cases;

c. 1,986 Hernia Mesh Mass Tort Cases;

d. 250 Round Up Mass Tort Cases;

e. 1,544 Talcum Powder Mass Tort Cases; and

f. 200 Zantac Mass Tort Cases.

*See attached* **Exhibit 2.**

76. As is crystal clear, those "Invoices" bear no relationship to the other representations or verifiable reality.

77. Not only do the Invoices illustrate Lake Law and Persist's failures to satisfy any of their represented obligations, but also establish Edward Lake's failure to satisfy or comply with the obligations he is individually liable for.

78. Each invoice states that "Edward J. Lake, Esq. (EL) agrees to the following: 1) Market, intake, and sign-up potential clients; 2) Gather medical records, a medical summary, a plaintiff fact sheet and/or court complaint, as necessary; 3) EL will act liaison between the undersigned trial firms; 4) The Lake Law Offices will handle any client inquiries; 5) Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery; 6) Joint venture fee splits will be as follows: 20% The Lake Law Offices; 60% Client firm; 20% Trial firm." *See Composite* **Exhibit 2.**

79.     The inclusion of the language "Edward J. Lake, Esq. agrees" followed by an explicit listing of his duties represents Lake's clear intention to be individually liable for obligations and representations set forth in the two Invoices.

80.     The Defendants' misrepresentations and nonsensical "updates" continued.

81.     Specifically, Melchionni, Benito, and Management provided "investor report" in April of 2023. *See April 2023 Investor Report attached as* **Exhibit 10.**

82.     In that "report", the mass tort "cases" previously represented to be "acquired" by the Law Group and by Agreement the LLC as a lender/investor of the Law Group, those case were now referred to as mere "leads," while maintaining the same acquisition cost of "$11,250,000."

83.     Specifically, the April 2023 Report now states that the LLC and the Law Group have:

  a. 216 Total "Leads" of 3M Ear Plug Mass Tort Cases with 60 pending leads and 141 filed/retained leads;

  b. 21 Total "Leads" of Camp Lejune Mass Tort Cases with 20 pending leads and 0 filed/retained leads;

  c. 149 Total Leads of Fire Foam Mass Tort Cases with 33 pending leads and 114 filed/retained leads;

  d. 195 Total Leads of Hernia Mesh Mass Tort Cases with 138 pending leads and 49 filed/retained leads;

  e. 30 Total Leads of Talcum Powder Mass Tort Cases with 14 pending leads and 16 filed/retained leads;

f. 29 Total Leads of Zantac Mass Tort Cases with 14 pending leads and 16 filed/retained leads; and

g. 73 Total Leads of B2B/ERC Mass Tort Cases with 0 pending leads and 0 filed/retained leads. *See Exhibit 10.*

84. Not only do the represented values not make logical sense, but now other undisclosed categories of cases are referenced and the phrase "Leads" was never disclosed to the Plaintiff prior to his investment.

85. The Defendants' misrepresentations continued.

86. On July 11th, 2023, Plaintiff received a document labeled "All cases presently open and assigned to JPLG Law Group [Law Group]" *See List of cases attached as Exhibit 11.*

87. This list of "cases presently open and assigned to JPLG Law Group" was not provided, or generated by the LLC Melchionni, Benito, or Management, but rather Defendant Edward J. Lake, the 100% owner of both Lake Law and Persist.

88. This previously undisclosed list now provides a wholly new set of values for the mass tort cases supposedly "acquired" by the Law Group, and now provides that the Law Group has:

a. 152 Hernia Mesh Mass Tort Cases;

b. 30 Talcum Powder Mass Tort Cases;

c. 200 3M Earplug Mass Tort Cases;

d. 18 Camp Lejune Mass Tort Cases;

e. 150 Fire Foam Mass Tort Cases;

f. 28 Zantac Mass Tort Cases; and

g.  52 B2B/ERC Mass Tort Cases.

*See attached **Exhibit 11.***

89. Not content with the misrepresentations thus far, they continued.

90. On December 1st, 2023, Plaintiff received a purported LLC September 2023 "Investor Report" generated by Melchionni, Benito, and Management, containing once again a wholly new data set representing the cases "acquired" by JP Law Group. *See September Investor Report attached as **Exhibit 12.***

91. In that "report" the Defendants now claim that the cases "acquired" by the Law Group and by Agreement, the LLC, include:

a.  137 Hernia Mesh Mass Tort Cases;

b.  24 Talcum Powder Mass Tort Cases;

c.  152 Fire Foam Mass Tort Cases;

d.  16 Camp Lejune Mass Tort Cases;

e.  163 3M Earplug Mass Tort Cases; and

f.  13 Zantac Mass Tort Cases. *See **Exhibit 13.***

92. Not only are the number of "acquired" cases materially different than prior representations but the September 2023 Investor Report is wholly devoid of any reference to the 52 B2B/ERC Mass Tort Cases represented in Edward J. Lake's prior correspondence dated July 11th, 2023, and attached as **Exhibit 11.**

93. Defendants' misrepresentations reached new heights of absurdity when on January 25th, 2024, Plaintiff received the LLC's January 2024 "Investor Update" ("January Report"). *See January 2024 Investor Update attached as **Exhibit 13.***

94. The opening paragraph of the January Report states:

In an effort to shore up and protect our investments in cases being handled by the Lake Law Firm ("LLF"), on **January 17, 2024, Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term Funding and Security Agreement (the "Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF.** The purpose of the loan is to allow LLF to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business. We are informed that LLF is currently in discussions with two potential longer-term lenders. The loan accrues interest at the rate of five percent per annum and matures April 1, 2024.

95.     The January Report sets forth that Melchionni and Benito in their individual capacity provided Defendant Lake Law with an additional **$400,000**.

96.     Melchionni and Benito went as far to state that the funds will be used by Lake Law "to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business."

97.     The absurdity and obvious nature of Melchionni and Benito's misrepresentations continued on February 29th, 2024, when Plaintiff received and update **for an entirely separate and distinct investment** he entered into with Melchionni and Benito, **which was identical to the LLC's January Report**. *See February 29th ,2024 KS Law Update attached as* **Exhibit 14.**

98.     The investment involves a District of Columbia law firm, KS Law Group, LLP ("KS Law"), which was formed by Melchionni, Benito, and the Plaintiff, on August 24th, 2021.

99.     KS Law was to operate in the same capacity as the Justice Partners Law Group but with the Plaintiff being the sole investor/capital partner.

100.     Plaintiff has initiated several different lawsuits and arbitration proceedings in regard to the KS Law investment.

101.    As evidence of the fraudulent conduct set out herein, the February 29th, 2024, KS Law update was **verbatim** to the January Justice Partners LLC Report.

102.    The first paragraph of the KS Law update read as follow:

In an effort to shore up and protect our investments in cases being handled by the Lake Law Firm ("LLF"), **on January 17, 2024, Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term Funding and Security Agreement (the "Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF.** The purpose of the loan is to allow LLF to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business. We are informed that LLF is currently in discussions with two potential longer-term lenders. The loan accrues interest at the rate of five percent per annum and matures April 1, 2024.

103.    For Melchionni and Benito to represent identical "updates" in two entirely separate and distinct entities and investments strains the limits of credibility and further demonstrates their disregard for their legal obligations as well as any semblance of transparency or integrity.

104.    To this day, the Plaintiff still has not been able to accurately assess the value, status, and quality of his investment.

105.    As if to highlight to serious nature of these claims, the misrepresentations made to the Plaintiff regarding Talcum Powder Cases are especially troubling in light of Johnson & Johnson's April 13th, 2023, press release announcing an **8.9 Billion Dollar** settlement offer to claimants in Talcum Powder cases. *See Press Release attached as Exhibit 15.*

106.    Additionally, it is important to note that the Justice Partners Law Group is **law firm** formed in the District of Columbia and is required to comply with the D.C. Rules of Professional Conduct.

107.    Rules 1.5(c) and 1.5(e) of the D.C. Rules of Professional Conduct explicitly state:

1.5(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. **A contingent fee agreement shall be in writing** and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation, other expenses to be deducted from the recovery, whether such expenses are to be deducted before or after the contingent fee is calculated, and whether the client will be liable for expenses regardless of the outcome of the matter. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and if there is a recovery, showing the remittance to the client and the method of its determination.

1.5(e) A division of a fee between lawyers who are not in the same firm may be made only if:

(1) The division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.

(2) **The client is advised, in writing**, of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged;

(3) The client gives informed consent to the arrangement; and

(4) The total fee is reasonable.

108.    As previously stated, and upon information and belief, Law Group is apparently not a party to any known fee agreement and no "client" has ever been informed of Law Group's involvement in their case.

109.    Defendants, Melchionni, Benito, and JP Management, acting in concert with Defendants, the Law Group, Lake Law, Lake and Persist as described herein, have

defrauded the Plaintiff and caused substantial damage in that regard.  These damages are separate and distinct from any damages incurred by Justice Partners LLC.

## COUNT 1
## DIRECT CLAIM FOR CIVIL CONSPIRACY TO COMMIT FRAUD
### (AS TO ALL DEFENDANTS)

110.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 109 as if fully set forth herein.

111.   Prior to Plaintiff's April 6, 2021, $4,000,000 investment in Justice Partners, Defendants Lee Melchionni, Sylvia Benito, Justice Partners Management, LLC, Justice Partners Law Group, LP, The Lake Law Firm, LLC, Persist Communications, Inc., and Edward Lake, acting jointly and in concert, entered into a common plan and agreement to induce Plaintiff to invest through false representations concerning the use and purpose of his funds.

112.   The purpose and objective of the conspiracy were to mislead Plaintiff into believing that his investment would be "loaned" to Justice Partners Law Group for the legitimate acquisition of thousands of mass-tort cases, when, in fact, Defendants had already agreed that the funds would be diverted to accounts owned and controlled by Defendants Lake, Lake Law, and Persist for the own pecuniary gain of the Defendants.

113.   In furtherance of this plan, and prior to Plaintiff's investment, Defendants agreed that Lake Law, Persist, and Edward Lake would generate false and backdated invoices and documents purporting to evidence mass-tort case acquisitions and co-counsel relationships that did not exist. This included fabricating invoices backdated to April 15, 2021, and October 11, 2021, that collectively claimed $11,250,000 in "case acquisitions" despite no such assets ever being acquired.

114.   To lend legitimacy to the fraudulent transfers, Defendants also agreed to create a "Senior Security Instrument" purporting to document a loan from Justice Partners, LLC to the Law Group. The instrument was executed more than two years after Plaintiff's investment (June 23, 2023) but falsely backdated to April 14, 2021, the day before the first backdated invoice to create the illusion of a contemporaneous, authorized transaction.

115.   Acting in concert:

a.   Melchionni and Benito directed the transfer of investor funds from Justice Partners' account to Persist's TD Bank account ending in 2721, even though Persist had no contractual entitlement or role in the venture.

b.   Lake Law and Persist issued matching invoices and received the funds while representing that Edward J. Lake, Esq. agrees to market, intake, and sign-up clients; gather medical records; act as liaison between trial firms; and handle client inquiries.

c.   Lake personally approved and transmitted these invoices and directed the receipt and disbursement of investor funds under his control

d.   All Defendants then collaborated to circulate a series of false "Investor Updates" (October 20, 2021; April 2023; September 2023; January 2024) repeating knowingly fabricated case counts and asset values to conceal the misappropriation.

116.   Even after Plaintiff's investment, Defendants continued to act in concert to conceal the scheme. When Plaintiff demanded records in November 2022, Defendants responded with incomplete and misleading documents, and ultimately fabricated an

executed version of the "Senior Security Instrument" to give the appearance that the transfers had been legitimate. Each Defendant benefitted from the fraudulent diversion of funds.

117.   The overt acts undertaken by Defendants in furtherance of this conspiracy include, but are not limited to:

a. generating and backdating false invoices totaling $11,250,000;

b. issuing knowingly false "Investor Reports" purporting to show nonexistent case portfolios

c. transferring and commingling investor funds into accounts owned by Lake and his entities

d. fabricating and circulating inconsistent "case acquisition" data across multiple updates and entities (Justice Partners and KS Law).

118.   As a direct and proximate result of Defendants' unlawful agreement, coordinated actions, and concealment, Plaintiff was fraudulently induced to invest $4,000,000, lost the entirety of his investment, and has been denied truthful and reliable information necessary to assess his ownership interest or recover his funds.

**WHEREFORE**, Plaintiff, requests this Honorable Court enter judgment against all Defendants for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

## COUNT 2
### DIRECT CLAIM FOR FRAUD
### (AS TO LEE MELCHIONNI)

119.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 109 as if fully set forth herein.

120.     At all times material hereto, there has been a relationship of trust and confidence between this Defendant on one hand and the Plaintiff. The genesis of this trust and confidence is consequent to this Defendant's solicitation and multiple representations to the Plaintiff in an effort to induce him to make the investment set out herein.

121.     In addition to that which alleged herein, Melchionni has committed fraud by, among other things, participating in self-dealing and fraudulent transactions whereby transferring essentially all of the Plaintiff's funds to Defendants, Persist and Lake Law, without any consideration or known agreement in place.

122.     Further, Melchionni, has co-mingled the Plaintiff's funds in an effort to utilize said funds for his own pecuniary gain.

123.     By virtue of Melchionni's fiduciary relationship, Melchionni had the continuing duty of care, honesty, and loyalty to the Plaintiff which he has blatantly ignored and breached.

124.     Melchionni knew or should have known that his conduct and inaction would necessarily damage the Plaintiff.

125.     Melchionni's material breaches of his duties have proximately caused serious damage to the Plaintiff. All such damages proximately result from Melchionni's breaches of his duties.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

### COUNT 3
### DIRECT CLAIM FOR FRAUD
### (AS TO SYLVIA BENTIO)

126.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 109 as if fully set forth herein.

127.    At all times material hereto, there has been a relationship of trust and confidence between this Defendant on one hand and the Plaintiff. The genesis of this trust and confidence is consequent to this Defendant's solicitation and multiple representations to the Plaintiff in an effort to induce him to make the investment set out herein.

128.    As alleged above and herein, Benito has committed fraud by, among other things, participating in self-dealing and fraudulent transactions whereby transferring essentially all of Plaintiff's funds to Defendants, Persist and Lake Law, without any known consideration or agreement in place.

129.    Further, Benito, has co-mingled the plaintiff's funds in an effort to utilize said funds for her own pecuniary gain.

130.    By virtue of Benito's fiduciary relationship, Benito had the continuing duty of care, honesty, and loyalty to the plaintiff which she has blatantly ignored and breached.

131.    Benito knew or should have known that his conduct and inaction would necessarily damage the plaintiff.

132.    Benito's material breaches of her duties have proximately caused serious damage to the plaintiff. All such damages proximately result from Benito's breaches of her duties.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper..

**COUNT 4**
**DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY**
**(AS TO LEE MELCHIONNI)**

133.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 109 as if fully set forth herein.

134.    At all times material hereto, there has been a relationship of trust and confidence between this Defendant on one hand and the Plaintiff. The genesis of this trust and confidence is consequent to this Defendant's solicitation and multiple representations to the Plaintiff in an effort to induce him to make the investment set out herein.

135.    As alleged herein, Melchionni has committed fraud and breached its fiduciary duties by misdirecting and misappropriating the Plaintiff's funds, wasting assets, and fraudulently concealing and failing to disclose the same, for his own personal pecuniary gain and to the detriment of the Plaintiff.

136.    For example, Plaintiff has discovered that Melchionni without any safeguards, benchmarks, or monitoring agreements in place, fraudulently transferred essentially all of the Plaintiff's funds to Defendants, Persist and Lake Law.

137.    Melchionni has also failed to properly account for Plaintiff's funds by improperly co-mingling those funds with several other entities under his power and control for his own pecuniary gain.

138.    As further evidence of his breaches in this regard, Melchionni has failed to maintain proper bookkeeping in regard to any "loans" paid or provided to Justice Partners Law Group.

139.    The misconduct of Melchionni has materially harmed the plaintiff.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

## COUNT 6
### DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY
### (AS TO SYLVIA BENTIO)

140.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 109 as if fully set forth herein.

141.    At all times material hereto, there has been a relationship of trust and confidence between this Defendant on one hand and the Plaintiff. The genesis of this trust and confidence is consequent to this Defendant's solicitation and multiple representations to the Plaintiff in an effort to induce him to make the investment set out herein.

142.    As alleged herein, Benito has committed fraud and breached her fiduciary duties by misdirecting and misappropriating the Plaintiff's funds, wasting assets, and fraudulently concealing and failing to disclose the same, for his own personal pecuniary gain and to the detriment of the Plaintiff.

143.    For example, Plaintiff has discovered that Benito without any safeguards, benchmarks, or monitoring agreements in place, fraudulently transferred and participated in a scheme to transfer essentially all of the Plaintiff's funds to Defendants, Persist and Lake Law.

144.    Benito has also failed to properly account for Plaintiff's funds by improperly co-mingling those funds with several other entities under her power and control for her own pecuniary gain.

145.    As further evidence of her breaches in this regard, Benito has failed to maintain proper bookkeeping in regard to any "loans" paid or provided to Justice Partners Law Group.

146.    The misconduct of Benito has materially harmed the plaintiff.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

## COUNT 7
## CLAIM FOR AIDING AND ABETTING FRAUD
### (AS TO THE LAKE LAW FIRM, LLC)

147.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 109 as if fully set forth herein.

148.    As is clear from the allegations set out herein, Lake Law, knowingly and substantially assisted Defendants, Melchionni, Benito, and Lake in a scheme to defraud the Plaintiff.

149.    Defendant The Lake Law Firm, LLC ("Lake Law"), acting through its sole member and officer Edward Lake, knowingly and substantially assisted Defendants Lee Melchionni, Sylvia Benito, Justice Partners Management, LLC, and Justice Partners Law Group in perpetrating a fraudulent scheme to induce Plaintiff to invest $4,000,000 in Justice Partners.

150.    Prior to Plaintiff's April 6, 2021, investment, Lake Law agreed with Melchionni, Benito, and Management to fabricate or back-date invoices and documentation purporting to show the acquisition of thousands of mass-tort cases.

151.   Lake Law issued a backdated invoice to "Justice Partners Law Group" falsely stating that $6,125,000 had been spent to acquire mass-tort cases. A second backdated invoice dated October 11, 2021, falsely represented another $5,125,000 in case acquisitions. Both invoices were knowingly false and designed to conceal that no such cases existed.

152.   Lake Law knowingly represented on its invoices that Edward J. Lake, Esq. agrees to market, intake and sign-up clients; gather medical records; act as liaison between trial firms; and handle client inquiries. These statements were included to lend legitimacy to the fraudulent transfer of investor funds to Lake Law and Persist Communications.

153.   Lake Law knew or should have known that Justice Partners Law Group had no co-counsel, trial-counsel, or referring-counsel agreements and that its invoices would be used to mislead investors and the Plaintiff regarding the existence of mass-tort assets.

154.   By generating and transmitting these false invoices, accepting investor funds, and generating a series of subsequent and knowingly false updates misrepresenting the acquisition of mass tort cases Lake Law provided substantial assistance to the primary fraud.

155.   Lake Law's knowing participation and material assistance were a substantial factor in causing Plaintiff's $4,000,000 loss.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

## COUNT 8

### CLAIM FOR AIDING AND ABETTING FRAUD
### (AS TO PERSIST COMMUNICATIONS INC.)

156.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 109 as if fully set forth herein.

157.    Defendant Persist Communications, Inc. ("Persist"), acting under the direction of its owner Edward Lake, knowingly and substantially assisted Defendants Melchionni, Benito, Management, and Justice Partners Law Group in defrauding Plaintiff.

158.    Persist and its agents and principals participated in the pre-investment plan to fabricate invoices and subsequent updates falsely showing transfers of $11,250,000 for the acquisition of mass-tort cases and served as the principal conduit for receipt and distribution of Plaintiff's funds.

159.    Persist's TD Bank account ending in 2721 received $6,125,000 on April 15, 2021, and $5,125,000 on October 11, 2021, as reflected in the invoices jointly issued with Lake Law. Persist had no contractual entitlement to those funds and rendered no services of value in exchange.

160.    Persist knowingly represented itself as performing "marketing, intake, and client acquisition" work for Justice Partners Law Group even though no such work occurred and no clients were acquired.

161.    Persist used its corporate structure interchangeably with Lake Law to conceal and distribute the fraudulently transferred funds and to mislead investors into believing that the Lake entities were engaged in legitimate mass-tort operations.

162.    By receiving and transferring the misappropriated funds, Persist substantially assisted the fraud and was a critical component of the overall scheme.

163. Persist's conduct directly and proximately caused Plaintiff's $4,000,000 loss.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

## COUNT 9
## CLAIM FOR AIDING AND ABETTING FRAUD
## (AS TO EDWARD LAKE)

164. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 109 as if fully set forth herein.

165. Defendant Edward Lake ("Lake"), individually and as sole principal of Lake Law and Persist, knowingly and substantially assisted Defendants Melchionni, Benito, and Management in executing the fraudulent scheme described herein.

166. Prior to Plaintiff's investment, Lake personally agreed to generate false and back-dated invoices to create the illusion that Justice Partners Law Group had acquired thousands of mass-tort cases.

167. Each invoice explicitly states that Edward J. Lake, Esq. agrees to: (1) market, intake, and sign-up clients; (2) gather medical records and plaintiff fact sheets; (3) act as liaison between trial firms; (4) handle client inquiries. By signing and issuing those invoices, Edward Lake personally undertook and warranted those obligations, thereby assuming individual responsibility for the representations made therein.

168. Edward Lake knew these representations were false as he was obviously in a position to know that no mass-tort clients had been retained, no case files existed, and no co-counsel or referral agreements were in place, but nevertheless he endorsed

the invoices to induce Plaintiff's investment and to justify the transfer of Plaintiff's funds to his control.

169.    Acting through his entities and personally, Edward Lake controlled both sides of the purported transaction. Edward Lake materially and substantially assisted in Justice Partners' funds being sent to accounts he owned and controlled through Lake Law and Persist.

170.    Edward Lake's individual acts of creating, approving, and transmitting false backdated invoices, directing receipt and use of investor funds, and generating a series of subsequent false "updates" misrepresenting the acquisition of mass tort cases constitute substantial assistance to the primary fraud and render him individually liable irrespective of the corporate form.

171.    As a direct and proximate result of Edward Lake's conduct, Plaintiff sustained damages exceeding $4,000,000.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.


Dated: October 17, 2025

Respectfully submitted,

JONES & ADAMS, P.A.
Attorney for Plaintiff
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

By:

/s/ Matthew Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335
matthew@jones-adams.com

# 2023 FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P15000085963

**Entity Name:** PERSIST COMMUNICATIONS, CORPORATION

**FILED**
**Jan 20, 2023**
**Secretary of State**
**7254299730CC**

**Current Principal  Place of Business:**

1815 CORDOVA RD
FT. LAUDERDALE, FL  33316

# Exhibit 1

**Current Mailing Address:**

1815 CORDOVA RD
FT. LAUDERDALE,  FL  33316  US

**FEI Number: 81-0851001**

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

LAKE, EDWARD J
1815 CORDOVA RD
FT. LAUDERDALE, FL  33316  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   EDWARD LAKE                                                        01/20/2023

              Electronic Signature of Registered Agent                         Date

**Officer/Director Detail :**

Title            PRESIDENT

Name             LAKE, EDWARD J

Address          1815 CORDOVA RD

City-State-Zip:  FT. LAUDERDALE  FL  33316

I *hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: EDWARD J LAKE                              PRESIDENT              01/20/2023

              Electronic Signature of Signing Officer/Director Detail                      Date

**Composite Exhibit 2**



## Invoice

| BILL TO: Justice Partners Law Group | CAMPAIGN: HM/TALC/RU/3M/FF/Zantac |
|---|---|
| | **DATE**: 4/15/2021 |
| | **DUE DATE**: |
| Phone: | **TERMS**: See Below |

| Quantity | Description | Unit Price | Line Total |
|---|---|---|---|
| 380 | **Hernia Mesh** | $5,000 | $1,900,000 |
| 208 | **Talc** | $5,700 | $1,185,600 |
| 150 | **Round Up** | $5,000 | $750,000 |
| 350 | **3M** | $2,000 | $700,000 |
| 200 | **Fire Foam** | $5,447 | $1,089,400 |
| 200 | **Zantac** | $2,500 | $500,000 |
| | | Total | $6,125,000.00 |

**Hernia Mesh:** Cases provided with the following criteria below & guaranteed by medical records:

- Records showing revision, removal, or replacement surgery, or scheduled within 90 days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery 2011+

**Talc:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer)
- 75 years old or younger
- 4 years plus of exposure
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer w/ chemo or treatment
- Death w/in 18 months and original diagnosis within four (4) years of death

**Round Up:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with NHL or subtype within the last 10 years, unless medical records access then 2007 forward.
- Direct exposure ONLY to RoundUp for more than one year
- No existing attorney

**REMITTANCE BY WIRE:** *Beneficiary Name: Persist | *Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316 | *Bank Account No.: 4326532721 | *Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

Justice-Partners-Teh-000351

**Zantac:** Cases provided with the following criteria below & guaranteed by medical records:

- OTC or Prescribed Zantac
- Intermittent use for a minimum of 1 year.
- Diagnosed after using injury(s) of:
- § Cancers: stomach (gastric), bladder, esophageal, kidney, pancreatic, liver, testicular, colon, prostate, breast (tier 2 ductal carcinoma)
- Death certificate must indicate qualifying cancer as cause of death
- Death within SOL
- No previous or existing attorney representation.

**3M:** Cases provided with the following criteria below & guaranteed by medical records:

- Used 3M Combat Arms CAEv2 Earplugs between 2003-2015
- Diagnosed with tinnitus or documented loss of hearing 10% or more in at least one ear
- No existing attorney

**Fire Foam:** Cases provided with the following criteria below:

- Used or was exposed to fire foam
- Diagnosed with one of the following cancers:
  - Kidney Cancer
  - Testicular Cancer
  - Prostate Cancer
  - Bladder Cancer
  - Pancreatic Cancer
  - Neuroendocrine Tumors
  - Leukemia
  - Lymphoma
  - Thyroid Cancer
- Diagnosed 2012+
- No previous or existing attorney

**Edward J. Lake, Esq. (EL) agrees to the following:**

1. Market, intake, and sign-up potential clients.
2. Gather medical records, a medical summary, a plaintiff fact sheet and/or court complaint, as necessary.
3. EL will act as liaison between the undesigned and trial firms.
4. The Lake Law Offices will handle any client inquiries.
5. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.
6. Joint venture fee splits will be as follows: 20 % The Lake Law Offices; 60% Client firm; 20% Trial firm.

Forty-five (45) days' notice required prior stopping campaign.
Due to the nature of how the retainers are generated, there may be a 5-10% over delivery which will be billable to the client once the campaign allocation has been reached, and payable within 15 days.

Print Name: _____

Signature: _____ Date: _____

## REMITTANCE BY WIRE:

*Beneficiary Name: Persist
*Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316
*Bank Account No.: 4326532721
*Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*



# Invoice

| BILL TO: Justice Partners Law Group | CAMPAIGN: HM/TALC/RU/3M/FF/Zantac |
|---|---|
| | DATE: 10/11/2021 |
| | DUE DATE: |
| Phone: | TERMS: Additional 12% split fee amendment |

| Quantity | Description | Total | |
|---|---|---|---|
| 1,606 | Hernia Mesh | Total | $5,125,000.00 |
| 1,336 | Talc | | |
| 100 | Round Up | | |
| 850 | 3M | | |

**Hernia Mesh:** Cases provided with the following criteria below & guaranteed by medical records:

- Records showing revision, removal, or replacement surgery, or scheduled within 90 days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery 2011+

**Talc:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer)
- 75 years old or younger
- 4 years plus of exposure
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer w/ chemo or treatment
- Death w/in 18 months and original diagnosis within four (4) years of death

**Round Up:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with NHL or subtype within the last 10 years, unless medical records access then 2007 forward.
- Direct exposure ONLY to RoundUp for more than one year
- No existing attorney

**3M:** Cases provided with the following criteria below & guaranteed by medical records:

- Used 3M Combat Arms CAEv2 Earplugs between 2003-2015
- Diagnosed with tinnitus or documented loss of hearing 10% or more in at least one ear
- No existing attorney

**REMITTANCE BY WIRE:** *Beneficiary Name: Persist | *Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316 | *Bank Account No.: 4326532721 | *Bank Routing Info: 067014822

CONFIDENTIAL

Justice-Partners-Teh-000353

**Edward J. Lake, Esq. (EL) agrees to the following:**

1. Market, intake, and sign-up potential clients.
2. Gather medical records, a medical summary, a plaintiff fact sheet and/or court complaint, as necessary.
3. EL will act as liaison between the undesigned and trial firms.
4. The Lake Law Offices will handle any client inquiries.
5. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.
6. Joint venture fee splits will be as follows: 13 % The Lake Law Offices; 60% Client firm; 15% Trial firm.
7. Additional 12% backend on for a total of 72% backend on the cases above

Forty-five (45) days' notice required prior stopping campaign.
Due to the nature of how the retainers are generated, there may be a 5-10% over delivery which will be billable to the client once the campaign allocation has been reached, and payable within 15 days.

Print Name: _Lee Melchionni_____

Signature: _~~Lee Mell~~_____ Date: _10/12/21_

## REMITTANCE BY WIRE:

*Beneficiary Name: Persist
*Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316
*Bank Account No.: 4326532721
*Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

Justice-Partners-Teh-000354

# Exhibit 3

Name of Offeree: Allan Teh

Copy No.:

---

**OFFERING CIRCULAR**

**SERIES A PREFERRED UNITS**

**OF**

**JUSTICE PARTNERS, LLC**

**December 15, 2020**

---

## TABLE OF CONTENTS

| DOCUMENTS | | TAB NO. |
|---|---|---|
| Subscription Agreement | | 1 |
| Exhibits to Subscription Agreement: | | |
| Exhibit A | Term Sheet | 2 |
| Exhibit B | Operating Agreement | 3 |
| Exhibit C | Risk Factors | 4 |
| Exhibit D | Definition of Accredited Investor | 5 |
| Exhibit E | Definition of Bad Actor Disqualifying Event | 6 |
| Exhibit F | Accredited Investor Questionnaire | 7 |
| Exhibit G | Bad Actor Questionnaire | 8 |
| Exhibit H | Investor Presentation | 9 |

*ACTIVE 53694223v2*

04-06-2021 @ 11:48:08 AM EST

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY APPLICABLE STATE OR FOREIGN SECURITIES LAWS, NOR HAS THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") OR ANY STATE OR FOREIGN REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS AGREEMENT OR ENDORSED THE MERITS OF THIS AGREEMENT, AND ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE SECURITIES ARE OFFERED PURSUANT TO EXEMPTIONS PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER, CERTAIN STATE SECURITIES LAWS AND CERTAIN RULES AND REGULATIONS PROMULGATED PURSUANT THERETO. THE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE OR FOREIGN SECURITIES LAWS OR AN OPINION OF COUNSEL ACCEPTABLE TO US AND OUR COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED.

## SUBSCRIPTION AGREEMENT

This **SUBSCRIPTION AGREEMENT** (this "**Agreement**"), dated as of the date set forth on the signature page hereto, is by and between Justice Partners, LLC, a Delaware limited liability company (the "**Company**"), and the subscriber identified on the signature page hereto (the "**Subscriber**").

**WHEREAS**, the Company and the Subscriber are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission under the Securities Act of 1933, as amended (the "**Securities Act**");

**WHEREAS**, the Company is offering its non-voting Series A Preferred Units up to 45,000 Preferred Units (the "**Series A Preferred Units**") in an aggregate amount of up to $45,000,000 (the "**Offering Amount**") to investors (each, an "**Investor**" and together, the "**Investors**" or the "**Series A Preferred Units Holders**"), to be sold on a "best efforts" basis in a private placement offering (the "**Offering**") as more particularly described in the form of non-binding term sheet attached as Exhibit A hereto (as may be amended or modified from time to time, the "**Term Sheet**") and below; *provided* that the Company may, in its sole discretion increase the Offering Amount without notice to the Subscriber; and

**WHEREAS**, terms of the Series A Preferred Units, including preferences, ranking and other provisions, are as outlined in the Term Sheet and set forth in detail in the Company's Operating Agreement, dated as of December 15, 2020, attached as Exhibit B hereto (the "**Limited Partnership Agreement Agreement**").

**NOW, THEREFORE**, in consideration of the mutual covenants and other agreements contained in this Agreement, the Company and the Subscriber hereby agree as follows:

2

*ACTIVE 53694223v2*

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

04-06-2021 @ 11:48:08 AM EST

**1.** **Subscription For Series A Preferred Units; Purchase Price.**

1.1     Purchase.  The Subscriber, intending to be legally bound, hereby irrevocably agrees to subscribe for and agrees to purchase up to that number of Series A Preferred Units set forth on the signature page hereto at a purchase price of One Thousand Dollars and 00/100 ($1,000.00) per Series A Preferred Unit ("**Per Unit Price**"). This subscription is submitted to the Company in accordance with and subject to the terms and conditions described in this Agreement.

1.2     Purchase Price.  The aggregate purchase price for the Series A Preferred Units subscribed for is equal to the number of Series A Preferred Units subscribed for multiplied by the Per Interest Price and is set forth on the signature page hereto (the "**Purchase Price**").

1.3     Subscription Proceeds.  All subscription proceeds received and accepted will be deposited directly into the Company's Limited Partnership Agreement account and following acceptance by the Company hereunder and payment by the Company of its costs and expenses, including organization and Offering expenses and commissions, if any, such funds will be used by the Company for expansion of current operations and development and launch of new products and general corporate purposes, including salaries. The Company may use proceeds of the Offering immediately upon each Closing.

1.4     Payment. Payment of the Purchase Price shall be due and payable upon execution and delivery of this Agreement by the Subscriber to the Company, unless otherwise agreed to by the Company.  The Subscriber shall be required to deliver to the Company the Purchase Price in cash by delivery of a certified check payable to the Company or by wire transfer of immediately available funds to the following account of the Company:

Bank: JP Morgan

Acct #: ▮▮▮▮▮8466

Routing Transit #: ▮▮▮▮▮▮▮

Acct: Justice Partners, LLC

1.5     Acknowledgements.  By executing this Agreement, the Subscriber acknowledges that (i) the Subscriber has been informed of various matters relating to the Company, including but not limited to, this Agreement, the Term Sheet attached as Exhibit A,  the Risk Factors attached as Exhibit C hereto (the "**Risk Factors**") the Company Limited Partnership Agreement attached as Exhibit B and the Investor Presentation attached as Exhibit H (together, the "**Offering Documents**"); (ii) that the Subscriber is an "accredited investor" as such term is defined in Rule 501 of Regulation D, which definition is attached as Exhibit D attached hereto; and (iii) that the Subscriber is not and has not been the subject of any "bad actor disqualifying event," as described in the excerpt of Rule 506(d) attached hereto as Exhibit E (a "**Bad Actor Disqualifying Event**").

3

*ACTIVE 53694223v2*

Brent Steinberg
04-06-2021 @ 11:48:08 AM EST

1.6     Closing; Conditions to Closing.  Closing on the purchase and sale of the Series A Preferred Units shall be consummated on such date as the Company accepts the Subscriber's offer to purchase the Series A Preferred Units as evidenced by the Company's counter-execution of the signature page to this Agreement, the Company's execution of the Series A Preferred Units issued to the Subscriber and the issuance of a fully executed Series A Preferred Units certificate to the Subscriber ("**Closing**"). On or prior to the date of each Closing, the following shall have occurred:

(a)     The Subscriber shall have thoroughly reviewed the Offering Documents;

(b)     The Subscriber shall have delivered to the Company a dated and executed signature page to this Agreement, with all blanks properly completed;

(c)     The Subscriber shall have delivered to the Company a dated completed and signed Accredited Investor Questionnaire attached as Exhibit F hereto and Bad Actor Questionnaire attached as Exhibit G hereto, each with all blanks properly completed;

(d)     The Company shall have received the Purchase Price from the Subscriber; and

(e)     Any other conditions to Closing set forth in this Agreement shall have been satisfied or waived.

**2.     Subscriber Representations and Warranties as to Suitability Standards.**

The Subscriber hereby represents and warrants that:

2.1     Investment Decision. The Subscriber and the Subscriber's advisors (which advisors do not include the Company or its principals, representatives or counsel) have such knowledge and experience in legal, financial and business matters as to be capable of evaluating the merits and risks of the prospective investment in the Company, of protecting the Subscriber's interests in connection therewith and making an informed investment decision.

2.2     Information Furnished.  The Subscriber has been furnished with or has had access to any and all material documents and information regarding the Company and its intended business as it, he or she desires, including but not limited to the Offering Documents, as well as the opportunity to ask questions of the Company's management.  The Subscriber hereby acknowledges that the Company has made available to the Subscriber prior to any investment in the Company all information requested by the Subscriber and deemed by the Subscriber to be reasonably necessary to enable the Subscriber to evaluate the risks and merits of an investment in the Company.  The Subscriber, after a review of this information and other information obtained, is aware of the speculative nature of any investment in the Company.

2.3     Financial Information.  The Subscriber is not relying on any financial information, including without limitation financial projections or oral representations in making the decision to purchase the Series A Preferred Units.

4

04-06-2021 @ 11:48:08 AM EST

2.4     Own Account.  The Subscriber is acquiring the Series A Preferred Units for the Subscriber's own account, not on behalf of other persons, and for investment purposes only and not with a view to resale or distribution, transfer, assignment, resale or subdivision of Series A Preferred Units.  The Subscriber understands that, due to the restrictions referred to in Section 5 below, and the lack of any market existing or to exist for Series A Preferred Units, the Subscriber's investment in the Company will be highly illiquid and will have to be held indefinitely.

2.5     Economic Risk.  The Subscriber can bear the economic risk of the investment in the Company without impairing the Subscriber's ability to provide for itself, himself or herself and/or his or her family (as applicable) in the same manner that the Subscriber would have been able to provide prior to making an investment in the Company.  The Subscriber understands that he, she or it may continue to bear the economic risk of the investment in the Company for an indefinite period of time.

2.6     Subscriber's Commitments.  The Subscriber's overall commitment to investments which are not readily marketable is not disproportionate to the Subscriber's net worth, the Subscriber's investment in the Series A Preferred Units will not cause such overall commitment to become excessive, and the investment is suitable for the Subscriber when viewed in light of the Subscriber's other securities holdings and the Subscriber's financial situation and needs.

2.7     Adequate Means. The Subscriber has adequate means of providing for the Subscriber's current needs and personal contingencies.

2.8     Risk Factors.  The Subscriber recognizes that the Company is a development stage company with limited sales and that any investment in the Company involves substantial risk, and the Subscriber has evaluated and fully understands all risks in the Subscriber's decision to purchase Series A Preferred Units hereunder, including, but not limited to, the Risk Factors.

2.9     No Review. The Subscriber understands that the offer and sale of the Series A Preferred Units have not been submitted to, reviewed by, nor have the merits of this investment been endorsed or approved by any state or federal agency, commission, authority or self-regulatory organization.

2.10     Company's Businesses.  The Subscriber understands the businesses in which the Company is engaged or proposes to be engaged in and the risks associated therewith.

2.11     Individual Subscriber.  If the Subscriber is an individual, the Subscriber is at least eighteen (18) years of age and a bona fide resident and domiciliary (not a temporary or transient resident) of the state or country indicated on the signature page hereof and the Subscriber has no present intention of becoming a resident of any other state or jurisdiction.

2.12     Non-Individual Subscriber.  If the Subscriber is not an individual, the Subscriber is domiciled in the state or country indicated on the signature page hereof, has no present intention of becoming domiciled in any other state or jurisdiction and is an "Accredited Investor" or an

5

*ACTIVE 53694223v2*

04-06-2021 @ 11:48:08 AM EST

"Institutional Investor" as defined under the "Blue Sky" or securities laws or regulations of the state in which it is domiciled, as applicable.

2.13    Local Standards. The Subscriber otherwise meets any special suitability standards applicable in the Subscriber's state or country of residence or domicile.

2.14    Accredited Investor.  The Subscriber is an "accredited investor" as that term is defined and used under Regulation D and which definition is set forth on Exhibit C attached hereto and represents that the information provided in the Accredited Investor Questionnaire, attached as Exhibit E hereto, and any exhibits attached thereto, are true and correct.

2.15    Bad Actor Disqualifying Event.  The Subscriber represents and warrants that as of the date hereof, the Subscriber is not and has not been the subject of any Bad Actor Disqualifying Event that would require disclosure in the Company's offering documents, and represents that the information provided in the Bad Actor Questionnaire, attached hereto as Exhibit F hereto, and any exhibits attached thereto are true and correct, and hereby agrees to promptly notify the Company if the undersigned becomes aware of a Bad Actor Disqualifying Event after the date of this Agreement and through the termination date of the Offering.

2.16    True and Correct.  All of the written information pertaining to the Subscriber which the Subscriber has heretofore furnished to the Company, and all information pertaining to the Subscriber which is set forth in this Agreement, including all representations and warranties made by the Subscriber, is correct and complete as of the date hereof and, if there should be any material change in such information hereafter, the Subscriber shall promptly furnish such revised or corrected information to the Company. The Subscriber otherwise meets any special suitability standards applicable to the Subscriber's state of residence.

2.17    No Inconsistent Oral Statements or Written Materials. The Subscriber has not been furnished with any oral representation or oral information or written materials in connection with the Offering that is in any way contrary to or inconsistent with statements made in this Agreement and the attachments hereto.

2.18    Communication of Offer. The Subscriber is not purchasing the Series A Preferred Units as a result of any advertisement, article, notice or other communication regarding the Series A Preferred Units published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

3.    **Representations, Warranties and Agreements of the Subscriber.**

The Subscriber hereby represents, warrants and agrees as follows:

3.1    Organization and Standing of the Subscriber.  If the Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly

6

*ACTIVE 53694223v2*

04-06-2021 @ 11:48:08 AM EST

existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has the requisite corporate power to own its assets and to carry on its business.

3.2     Authority; Enforceability.  The Subscriber has the requisite power and authority to enter into and perform this Agreement and to purchase the Series A Preferred Units being sold to it hereunder. The execution, delivery and performance of this Agreement by the Subscriber and the consummation by it of the transaction contemplated hereby has been duly authorized by all necessary corporate or partnership action, and no further consent or authorization of the Subscriber or its board of directors, stockholders, partners, members, as the case may be, is required.  This Agreement and other agreements delivered together with this Agreement or in connection herewith have been duly authorized, executed and delivered by the Subscriber and constitutes, or shall constitute when executed and delivered, valid and binding agreements enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity; and the Subscriber has full corporate power and authority necessary to enter into this Agreement and such other agreements and to perform its obligations hereunder and under all other agreements entered into by the Subscriber relating hereto.

3.3     No Conflicts.  The execution, delivery and performance of this Agreement and the consummation by the Subscriber of the transactions contemplated hereby or relating hereto do not and will not (i) result in a violation of the Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which the Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to the Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on the Subscriber).  The Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement or to purchase the Series A Preferred  Stock in accordance with the terms hereof, provided that for purposes of the representation made in this sentence, the Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

3.4     No Governmental Review.  The Subscriber understands that no United States federal or state agency or any other governmental or state agency has passed on or made recommendations or endorsement of the Securities or the suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

3.5     Securities Registration.  The Subscriber understands that the Series A Preferred Units have not been registered under the Securities Act or related laws and regulations or any other applicable securities laws of any other jurisdiction (collectively, the "**Securities Laws**").  The

7

Subscriber understands that it, he or she has no rights whatsoever to request, and that the Company is under no obligation whatsoever to furnish, a registration of the Series A Preferred Units under the Securities Laws.

3.6     Confidentiality.  The Subscriber understands and hereby acknowledges and agrees that all of the information appearing herein and otherwise provided to the Subscriber in connection with the purchase of the Series A Preferred Units made hereby is confidential and that the Subscriber and the Subscriber's representatives and agents may not disclose such information to any person that is not a party to the transactions contemplated hereby.

3.7     Investment Company Act.  The Subscriber understands that the Company has not been registered as an investment company under the Investment Company Act in reliance upon an exemption from registration provided by Section 3(c)(1) thereunder (which exemption is generally available only to an issuer, the securities of which are beneficially owned by not more than 100 persons as defined in the Investment Company Act).  The Subscriber hereby further represents and warrants that it is not a participant-directed defined contribution plan.

3.8     Additional Information.  The Subscriber understands that that he, she or it may, at the Company's discretion, and in compliance with the Jumpstart Our Business Startups Act legislation enacted by the President of the United States on April 5, 2012, be required to provide current financial and other information to the Company to enable it to determine whether he, she or it is qualified to purchase the Series A Preferred Units.

4.     **Representations, Warranties and Agreements of the Company.**

The Company hereby represents, warrants and agrees as follows:

4.1     Organization and Standing.  The Company was organized under the laws of the State of Delaware on December 15, 2020.  The Company's business address on the date hereof is 20900 NE 30th Avenue, Suite 510, Miami, FL 33180. The Company has the requisite corporation power to own its properties and to carry on its business as now being conducted and as presently proposed to be conducted.

4.2     Authorization and Power.  The Company has the requisite corporation power and authority to execute and perform this Agreement.  This Agreement has been duly executed and delivered by the Company and constitutes its valid and binding obligation, enforceable against it in accordance with its terms, except to the extent that its enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally or by general equitable principles.

5.     **Transfer Restrictions.**

5.1     General.  The Subscriber represents that he/she/it understands that the sale or transfer of the Series A Preferred Units is restricted and that:

8

*ACTIVE 53694223v2*

Brent Steinberg
04-06-2021 @ 11:48:08 AM EST

(a)      No Registration. The Series A Preferred Units has not been registered under the Securities Act or the laws of any other jurisdiction by reason of a specific exemption or exemptions from registration under the Securities Act and applicable state securities laws, and that the Company's reliance on such exemptions is predicated on the accuracy and completeness of the Subscriber's representations, warranties, acknowledgments and agreements herein.   The Series A Preferred Units cannot be sold or transferred by the Subscriber unless subsequently registered under applicable law or an exemption from registration is available.   The Company is not required to register the Series A Preferred Units or to make any exemption from registration available.

(b)      Opinion. The right to sell or transfer any of the Series A Preferred Units will be restricted as described in this Agreement which include restrictions against sale or transfer in violation of applicable securities laws, the requirement that an opinion of counsel be furnished that any proposed sale or transfer will not violate such laws and other restrictions and requirements.

(c)      No Public Market.  There will be no public market for the Series A Preferred Units and the Subscriber may not be able to sell the Series A Preferred Units.  Accordingly, the Subscriber must bear the economic risk of the Subscriber's investment in the Series A Preferred Units for an indefinite period of time.

5.2      Legend.  The Subscriber acknowledges that the certificates representing the Series A Preferred Units, if issued by the Company, will bear a legend substantially in the form of the following:

**"THIS SERIES A PREFERRED   UNITS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND NEITHER THIS SERIES A PREFERRED   UNITS, SUCH SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR SUCH LAWS OR AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS WHICH, IN THE OPINION OF COUNSEL FOR THE LENDER, WHICH COUNSEL AND OPINION ARE REASONABLY SATISFACTORY TO COUNSEL FOR THE BORROWER, IS AVAILABLE."**

5.3      Sale Requirements. The Subscriber agrees that he/she/it will not offer to sell, sell or transfer the Series A Preferred Units or any part thereof or interest therein without registration under the Securities Act and applicable state securities laws or without providing to the Company an opinion of counsel acceptable to the Company that such offer, sale or transfer is exempt from registration under the Securities Act and under applicable state securities laws or otherwise in violation of this Agreement, the Articles of Organization or any of the Company's other governing documents.

6.      **Representations and Warranties Regarding Verification of Subscription Funds.**

9

**Before making the following representations and warranties, the Subscriber should check the Office of Foreign Assets Control ("OFAC") website at <http://www.treas.gov/ofac> with respect to federal regulations and executive orders administered by OFAC which prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals which are listed on the OFAC website. In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[1] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth below. The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations.**

The Subscriber represents and warrants that:

6.1     OFAC List Countries.  The amounts invested by the Subscriber in the Company in the Offering were not and are not directly or indirectly derived from activities that contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations. Federal regulations and Executive Orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at <http://www.treas.gov/ofac>.  In addition, the OFAC Programs prohibit dealing with individuals[2] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists;

6.2     OFAC List Entity.  To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs;

6.3     Account Freeze.  The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations;

6.4     Suspension of Redemption Right.  The Subscriber acknowledges that the Company may, by written notice to the Subscriber, suspend the redemption rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering

---

[1] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

[2] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

10

*ACTIVE 53694223v2*

Brent Steinberg
04-06-2021 @ 11:48:08 AM EST

regulations applicable to the Company or any of the Company's service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs;

6.5     Senior Foreign Political Figure. To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a senior foreign political figure[3], or any immediate family member[4] or close associate[5] of a senior foreign political figure, as such terms are defined in their respective footnotes;

6.6     Foreign Banks. If the Subscriber is affiliated with a non-U.S. banking institution (a "**Foreign Bank**"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains Limited Partnership Agreement records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate; and

6.7     Notification of Changes. The Subscriber understands, acknowledges and agrees that if the Subscriber becomes aware of any change in the information set forth in these representations that the Subscriber shall promptly notify the Company of such changes.

## 7.     **Subscription Irrevocable by Subscriber but Subject to Rejection by the Company.**

7.1     Irrevocable by Subscriber. This Agreement is not, and shall not be, revocable by the Subscriber.

7.2     Company Termination or Withdrawal. The Company, in its sole discretion, has the right to terminate or withdraw the Offering at any time, to accept or reject subscriptions in other than the order in which they were received, to reject any subscription in whole or in part, to allot

---

[3] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[4] An "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[5] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

11

04-06-2021 @ 11:48:08 AM EST

to the Subscriber less than the value of Series A Preferred Units subscribed for, and to return without interest the amount paid by the Subscriber.

7.3     Not Binding. The Subscriber understands and agrees that this Agreement is not binding upon the Company until the Company accepts it, which acceptance is at the sole discretion of the Company and is to be evidenced by the Company's completion, execution and delivery of this Agreement, fully executed, to the relevant Subscriber.

7.4     Company Rejection. In the event of rejection of this subscription in whole (but not in part), or if the sale of the Series A Preferred Units subscribed for by the Subscriber is not consummated by the Company for any reason (in which event this Agreement shall be deemed to be rejected), this Agreement and any other agreement entered into between the Subscriber and the Company relating to this subscription shall thereafter have no force or effect and the Company shall promptly cause to be returned to the Subscriber the Purchase Price remitted by the Subscriber, without interest thereon or deduction therefrom.  If this subscription is accepted in part, the Company shall promptly cause to be returned to the Subscriber that portion of the Purchase Price remitted by the Subscriber which represents payment for the Series A Preferred Units for which this subscription was not accepted, without interest thereon or deduction therefrom.

## 8.     Indemnification.

The Subscriber hereby indemnifies and holds harmless the Company, its members, managers, officers, directors, agents, employees, advisors, affiliates and successors from and against all liability, damage, claims, losses, costs and expenses (including reasonable attorneys' fees) which it may incur by reason of the failure of the Subscriber to fulfill any of the terms and conditions of this Agreement, or by reason of any breach of the representations and warranties made by the Subscriber herein or in any document provided by the Subscriber to the Company or any of its affiliates.

## 9.     Miscellaneous.

9.1     Notices.    All notices, demands, requests, consents, approvals and other communications that may or are required to be given by either party to the other party hereunder shall be deemed to be sufficient if in writing and (i) delivered in person, (ii) delivered and received by facsimile, if a confirmatory mailing in accordance herewith is also made, (iii) duly sent by registered mail return receipt requested and postage prepaid, or (iv) duly sent by overnight delivery service, in each case as addressed to such party at the address set forth below:

If to the Company, to:

Justice Partners, LLC
20900 NE 30th Ave, Suite 510
Miami, FL 33180
Attn: Lee Melchionni

With a copy to:

12

*ACTIVE 53694223v2*

Brent Steinberg
04-06-2021 @ 11:48:08 AM EST

Bruce C. Rosetto, Esq.
Greenberg Traurig, P.A.
777 S. Flagler Drive, Suite 300 East
West Palm Beach, FL  33401
Facsimile #: 561-367-6225

If to the Subscriber:

To the address listed on the Signature Page

All notices, demands, requests, consents, approvals and other communications shall be deemed to have been received (i) at the same time it was personally delivered, (ii) on the receipt of delivery by facsimile if accompanied by a confirmatory mailing, (iii) five (5) days after mailing via registered mail return receipt requested whether signed for or not, to the foregoing persons at the addresses set forth above or (iv) the next day when sent by overnight delivery service. The above shall constitute service despite rejection or other refusal to accept or inability to deliver because of changed address for which no notice has been received.

9.2     Construction; Governing Law.     All issues and questions concerning the construction, validity and interpretation of this Agreement and all matters pertaining hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

9.3     Consent to Jurisdiction.     THE PARTIES HERETO IRREVOCABLY AGREE THAT ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT WILL BE LITIGATED SOLELY IN THE VENUE AND JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF FLORIDA. THE PARTIES HEREBY CONSENT AND SUBMIT TO THE JURISDICTION OF ANY COURT LOCATED WITHIN THE STATE OF FLORIDA, WAIVE PERSONAL SERVICE OF PROCESS AND AGREE THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE PARTIES AT THE ADDRESS STATED IN THE NOTICE PROVISIONS OF THIS AGREEMENT, AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT. THE PREVAILING PARTY(IES) IN ANY SUCH ACTION OR PROCEEDING SHALL BE ENTITLED TO RECOVER ITS REASONABLE ATTORNEYS' FEES AND COSTS FROM THE OTHER PARTY(IES).

9.4     Waiver of Jury Trial.     THE PARTIES HERETO, HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT OR INSTITUTED BY EITHER PARTY OR ANY SUCCESSOR OR ASSIGN OF EITHER PARTY (a) UNDER THIS AGREEMENT OR ANY

13

*ACTIVE 53694223v2*

Brent Steinberg
04-06-2021 @ 11:48:08 AM EST

RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (b) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH PARTY AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE OTHER PARTY ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

9.5     Construction.  In construing this Agreement, the singular shall be held to include the plural, the plural shall include the singular, the use of any gender shall include every other and all genders, and captions and paragraph headings shall be disregarded.

9.6     Severability.  The invalidity of any one or more of the words, phrases, sentences, clauses, sections or subsections contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part hereof, all of which are inserted conditionally on their being valid in law, and, in the event that any one or more of the words, phrases, sentences, clauses, sections or subsections contained in this Agreement shall be declared invalid, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, section or sections, or subsection or subsections had not been inserted.

9.7     Section Headings.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of any provisions of this Agreement.

9.8     Counterparts.  This Agreement may be executed in any number of counterparts (including by facsimile transmission) and by the several parties hereto in separate counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

9.9     Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes all prior agreements, understandings, negotiations and discussions, both written and oral, between the parties hereto with respect to the subject matter hereof.  This Agreement may not be amended or modified in any way except by a written instrument executed by each of the parties.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

14

ACTIVE 53694223v2

04-06-2021 @ 11:48:08 AM EST

The undersigned Subscriber hereby agrees to purchase __4,000__ Units of the Series A Preferred Units, at an aggregate Purchase Price of US$ __$4,000,000.00__ and is tendering such amount pursuant to the provisions of Section 1.3 hereof.

Date: __4/6/2021__ __, 2021

_Allan Teh_

**Signature of Subscriber**

Allan Teh

**Print Name of Subscriber**

Residence/Domicile: 50 S Pointe DR. PH#2  Miami Beach, Florida 33139

Number and Street

_____

City/State/Zip

USA

Country

Social Security/Taxpayer
Identification Number(s): 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

The Company hereby accepts the foregoing subscription for __4,000__ Units of Series A Preferred Units as of __4/6/2021__ __, 2021.

Justice Partners, LLC, a Delaware limited liability company

_Lee Melch_

By: _____

Name: Lee Melchionni
Title: Manager

_ACTIVE 54225632v1_

Brent Steinberg
04-06-2021 @ 11:48:08 AM EST

**EXHIBIT A**
**TERM SHEET**

SUMMARY OF PRINCIPAL TERMS
FOR
PRIVATE PLACEMENT
OF UP TO
**$45,000,000 OF CLASS A PREFERRED UNITS**

---

**JUSTICE PARTNERS, LLC**
a Delaware limited liability company

*The terms and conditions set forth herein are subject to change and this non-binding term sheet (the "*__Term Sheet__*") does not constitute an offer to purchase securities.  The terms and conditions set forth herein are indicative only and subject to change based on market conditions.  Moreover, the terms and conditions set forth are subject to customary legal review and due diligence review. Neither this Term Sheet nor any discussion or negotiation of the proposed transaction constitutes an agreement or obligation on the part of any person to purchase or sell securities of Justice Partners, LLC or enter into any agreement to purchase securities of the company.*

### I.    Terms of Justice Partners, LLC Offering

**ISSUER:** Justice Partners, LLC, a Delaware limited liability company (the "**Company**").

**TYPE OF SECURITY:** The Company intends to offer its non-voting Class A Preferred Units up to 45,000 Units (the "**Class A Preferred Units**") in an aggregate amount of up to $45,000,000 (the "**Class A Preferred Offering**") to investors (each, an "**Investor**" and together, the "**Investors**" or the "**Class A Preferred Units Holders**"), pursuant to the terms and conditions of a subscription agreement to be entered into by each Investor and the Company (each, a "**Subscription Agreement**" and collectively, the "**Subscription Agreements**"). The Company reserves the right to raise more than $45,000,000 in the Offering in its sole discretion without notice to Investors.

Capitalized terms used but not otherwise defined in this Term Sheet shall have the meaning set forth in the Operating Agreement.

**USE OF PROCEEDS** The Company intends to use all the proceeds from this Offering to loan (the "**Loan**") to the Justice Partners Law Group, LP (the "**Firm**" or the "**Borrower**").

*BOC 37522681v3*

*ACTIVE 54225632v1*

04-06-2021 @ 11:48:09 AM EST

| | |
|---|---|
| **PURPOSE:** | The purpose of the Company (the "**Purpose**") is to make the Loan to the Firm, so as to facilitate the financing of mass tort litigation expenses, which include, but are not limited to: research; client acquisition; marketing; expert fees; general working capital purposes for the Firm, and any other businesses ancillary or complementary thereto. |
| **MANAGER:** | The Company will be managed by Justice Partners Management, LLC, a Delaware limited liability company (the "**Managers**"). |
| **PURCHASE PRICE; MINIMUM/MAXIMUM INVESTMENT AMOUNTS:** | The purchase price shall be One Thousand Dollars and 00/100 ($1,000) per Unit ("**Per Unit Price**"). The minimum individual investment amount in the Offering is $500,000 for 500 Units. |
| **THE OFFERING:** | The Class A Preferred Offering will be an exempt private placement under federal and state securities laws and regulations. The Company may accept funds in this Offering in one or more Closings (defined below). |
| **CLOSINGS:** | Each closing of a purchase and sale of the Class A Preferred Units shall be consummated on such date(s) as the Company accepts an Investor's offer to purchase the Class A Preferred Units as evidenced by the Company's counter-execution of the signature page to the Subscription Agreement for each such Investor and the return of a fully executed Subscription Agreement to the relevant Investor (each, a "**Closing**" and collectively, the "**Closings**"). |
| **CONDITIONS PRECEDENT TO CLOSE:** | On or prior to the date of each Closing, the following shall have occurred: (i) the Investor shall have paid to the Company the Purchase Price by a bank cashier's check or by wire transfer of immediately available U.S. funds; (ii) the Investor shall have delivered to the Company a dated and executed signature page to the Subscription Agreement, with all blanks properly completed; (iii) the Investor shall have delivered to the Company a dated completed and signed Accredited Investor Questionnaire, with all blanks properly completed; and (iv) the Purchaser shall have thoroughly reviewed the Subscription Agreement and the Risk Factors, the Term Sheet, and the Operating Agreement, each as attached to the Subscription Agreement. |

*BOC 37522681v3*

*ACTIVE 54225632v1*

04-06-2021 @ 11:48:09 AM EST

**RANKING:** The Class A Preferred Units shall be senior to any other class of units. As long as any Class A Preferred Units remain outstanding shall not without obtaining the prior approval of the Class A Preferred Members owning at least a majority of the Class A Preferred Units then outstanding, create, authorize or issue any other class of Units, the terms of which provide that such class of Units shall rank prior to the Class A Preferred Units in respect of rights upon dissolution, liquidation or winding up of the Company; *provided, however*, the Company may, at any time, create, authorize or issue, without the consent of any of the Class A Preferred Members, other classes of Units or series thereof which rank junior to, or on parity with, the Class A Preferred Units in respect to dissolution, liquidation or winding up of the Company.

**PREFERRED RETURN:** Fifteen percent (15%) per annum simple multiplied by the Class A Preferred Holder's respective Capital Account (the "**Preferred Return**"), which shall accrue from the date of the Company's acceptance of the Investor's Capital Contribution, until the Firm receives its first mass tort settlement proceeds via a Master Qualified Settlement Fund.

**MATURITY:** The Class A Preferred Units shall have no maturity date and will remain outstanding unless the Units are repurchased or redeemed as set forth herein.

**FINANCIAL REPORT:** The Company will provide an audited financial report in accordance with GAAP at the end of each fiscal year to its Members.

*BOC 37522681v3*

*ACTIVE 54225632v1*

04-06-2021 @ 11:48:09 AM EST

**DISTRIBUTIONS:** The Company may make distributions of distributable cash (net of expenses, reserves, etc.), or declare a distribution to be held in suspense to meet tax law requirements, each, a "**Distribution**" as follows:

1.  Return of Capital: First, one hundred percent (100%) to Class A Preferred Members until Distributions to such Class A Preferred Members of Distributable Cash on a cumulative basis pursuant to this clause (a) equal such Class A Preferred Member's Capital Contributions.

2.  Preferred Return: Second, one hundred percent (100%) to Class A Preferred Members until Distributions to such Class A Preferred Members of Distributable Cash on a cumulative basis pursuant to this clause (b) equal the Preferred Return.

3.  Catch Up: Third, one hundred percent (100%) to the Manager until Distributions to the Manager of Distributable Cash on a cumulative basis as carried interest Distributions equal fifteen percent (15%) of all Distributions of Distributable Cash made pursuant to Section 5.2(a) and Section 5.2(b) of the Company's Operating Agreement;

4.  Split: Any balance, (i) eighty-five percent (85%) to Class A Preferred Members and (ii) fifteen percent (15%) to the Manager; and

5.  Performance Milestone: Notwithstanding the foregoing, upon each Class A Preferred Member receiving Distributions equal to three times (3x) such Class A Preferred Member's Capital Contributions (the "**Performance Milestone**"), (i) one hundred percent (100%) of Distributable Cash after the Performance Milestone to the Manager until Distributions to the Manager of such Distributable Cash on a cumulative basis as carried interest Distributions equal 20% of all Distributions of Distributable Cash made pursuant to Section 5.2(a), Section 5.2(b) and Section 5.2(c) of the Company's Operating Agreement, and (ii) any balance, (x) eighty percent (80%) to Class A Preferred Members and (y) twenty percent (20%) to the Manager.

*BOC 37522681v3*

*ACTIVE 54225632v1*

04-06-2021 @ 11:48:09 AM EST

| | |
|---|---|
| **LIQUIDATION PREFERENCE:** | In the event of any liquidation, dissolution or winding up of the affairs of the Company, whether voluntary or otherwise, after payment or provision for payment of the debts and other liabilities of the Company, the Class A Preferred Members shall be entitled to receive, before the Common Members or other classes of preferred units of the Company ranking junior thereto, out of the remaining net assets of the Company, the amount each Class A Preferred Member Capital Account in the Class A Preferred Units plus 15%. After such payment shall have been made in full to the Class A Preferred Members, or funds or assets necessary for such payment shall have been set aside in trust for the account of the Class A Preferred Members, so as to be and continue to be available therefor, the Class A Preferred Members shall be entitled to no further participation in such distribution of the assets of the Company. |
| **SELLING COMPENSATION:** | The Company may utilize broker dealers or a placement agent to assist in raising the capital in connection with this Offering and in such event the Company would be paying standard compensation fees and expenses of any such broker dealer or placement agent. |
| **TRANSFER RIGHTS:** | Except as set forth in the Operating Agreement of the Company, no Class A Preferred Unit Holder may transfer its Units or any rights or interests therein without the prior consent of the Company, which consent may be withheld in the Company's sole discretion. |
| **INVESTORS:** | Each Investor is required to be "accredited" as such term is defined under Securities and Exchange Commission Rule 501 of Regulation D. Each Class A Preferred Unit Holder will be required to execute a Subscription Agreement and an Accredited Investor Questionnaire and provide any other documentation which may be required for the Company to comply with the Jumpstart our Business Startups Act or the JOBS Act. In addition, Investors should have funds other than those invested in the Company adequate to meet their personal needs and contingencies and must be knowledgeable and experienced in financial and business matters generally. The manager of the Company may, in his sole discretion, decline to admit any prospective investor regardless of whether such person meets the foregoing suitability requirements. |
| **NON-BINDING TERM SHEET; CONFIDENTIALITY:** | This Term Sheet merely constitutes a statement of the intentions with respect to the transactions described herein and is not a legally binding document and the terms of the proposed transaction and information produced by the Company (whether written or verbal) shall remain confidential. |
| **EXPENSES:** | The Company and the Investors will each bear their own legal and other expenses with respect to the transactions contemplated herein. |

BOC 37522681v3

ACTIVE 54225632v1

04-06-2021 @ 11:48:09 AM EST

**RESTRICTIONS ON TRANSFER**

The Units will be restricted as to transferability under state and federal laws regulating securities. The issuance of the Units will not be registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or any other similar state statutes, in reliance upon exemptions from the registration requirements contained therein. Accordingly, the Units will be "restricted securities" as defined in Rule 144 of the Securities Act. As "restricted securities," an Investor must hold them indefinitely and may not dispose or otherwise sell them without registration under the Securities Act and any applicable state securities laws unless exemptions form registrations are available. Moreover, in the event an Investor desires to sell or otherwise dispose of any of the Units, the Investor will be required to furnish the Company with an opinion of counsel acceptable to us that the transfer would not violate the registration requirements of the Securities Act or applicable state securities laws. Any certificate or other document evidencing the Securities will be imprinted with a conspicuous legend stating that the Securities have not been registered under the Securities Act and state securities laws, and referring to the restrictions on transferability and sale of the Units. In addition, the Company's records concerning the Units will include "stop transfer notations" with respect to such Units.

BOC 37522681v3

ACTIVE 54225632v1

**EXHIBIT B**
**OPERATING AGREEMENT**

---

**JUSTICE PARTNERS LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

---

**OPERATING AGREEMENT**

**EFFECTIVE AS OF DECEMBER 15, 2020**

THE LIMITED LIABILITY COMPANY INTERESTS (AND THE UNITS INTO WHICH THEY ARE DIVIDED) ISSUED IN ACCORDANCE WITH AND DESCRIBED IN THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THEIR INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME.

*BOC 37522681v3*

*ACTIVE 54225632v1*

**TABLE OF CONTENTS**

**Page No.**

**ARTICLE I DEFINITIONS** .......................................................................................................................1

    1.1    Definitions ...................................................................................................................1

    1.2    Further Definitions .......................................................................................................7

**ARTICLE II ORGANIZATION** ................................................................................................................7

    2.1    Formation.....................................................................................................................7

    2.2    Name............................................................................................................................7

    2.3    Purpose .......................................................................................................................7

    2.4    Powers .........................................................................................................................8

    2.5    Term.............................................................................................................................8

    2.6    Registered Office; Registered Agent; Principal Office; Other Offices ..............................8

    2.7    Company Property .......................................................................................................8

    2.8    Expenses .....................................................................................................................8

**ARTICLE III UNITS AND CAPITALIZATION** ....................................................................................8

    3.1    Units.............................................................................................................................8

    3.2    Certificates..................................................................................................................9

    3.3    Capital Contributions...................................................................................................9

    3.4    Default in Payment. ...................................................................................................10

    3.5    Additional Capital – Other ........................................................................................11

    3.6    Reserved ....................................................................................................................11

    3.7    Securities Laws...........................................................................................................11

**ARTICLE IV CAPITAL ACCOUNTS** ..................................................................................................12

    4.1    Establishment and Determination of Capital Accounts...............................................12

    4.2    Computation of Amounts ...........................................................................................12

    4.3    Negative Capital Accounts.........................................................................................12

    4.4    Company Capital .......................................................................................................12

    4.5    No Withdrawal ...........................................................................................................13

    4.6    Loans from Members..................................................................................................13

    4.7    Adjustments to Book Value........................................................................................13

**ARTICLE V DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES**............................13

    5.1    Generally ...................................................................................................................13

    5.2    Distributions ..............................................................................................................13

    5.3    Allocation of Profits and Losses.................................................................................14

    5.4    Special Allocations ....................................................................................................14

    5.5    Tax Allocations; Code Section 704(c).........................................................................15

    5.6    Amounts Withheld.....................................................................................................16

*ACTIVE 54225632v1*

**ARTICLE VI MANAGEMENT** ........................................................................................................**16**

6.1      Manager.................................................................................................................16
6.2      Authority of the Manager. ....................................................................................16
6.3      Power of Attorney .................................................................................................18
6.4      Devotion of Time; No Exclusive Duty to Company..............................................18
6.5      Manager's Compensation; Reimbursement ..........................................................19
6.6      Delegation of Duties.............................................................................................19
6.7      Officers .................................................................................................................19
6.8      Reliance by Third Parties .....................................................................................19
6.9      Resignation and Replacement of Manager............................................................20
6.10     Removal of Manager .............................................................................................20
6.11     Successor Funds; Presentation of Opportunities to the Company.........................20
6.12     Standards of Conduct and Modification of Duties. ...............................................20

**ARTICLE VII MEMBERS** ............................................................................................................**22**

7.1      Participation in Management..................................................................................22
7.2      Right of Members to Bring Action........................................................................23
7.3      No Exclusive Duty to Company ............................................................................23
7.4      A Member's Duty of Loyalty.................................................................................23
7.5      No Authority of Individual Member ......................................................................23
7.6      Related Party Transactions ....................................................................................23

**ARTICLE VIII LIMITED LIABILITY, EXCULPATION AND INDEMNIFICATION** .................**23**

8.1      Limited Liability of Members. ..............................................................................23
8.2      Exculpation of Covered Persons............................................................................24
8.3      Right to Indemnification for Covered Persons.......................................................24
8.4      Contract with Company.........................................................................................25
8.5      Advance Payment..................................................................................................25
8.6      Indemnification of Employees and Agents ...........................................................25
8.7      Appearance as a Witness.......................................................................................25
8.8      Nonexclusivity of Rights.......................................................................................25
8.9      Insurance................................................................................................................25
8.10     Savings Clause.......................................................................................................26
8.11     Transactions with the Company .............................................................................26

**ARTICLE IX TAX MATTERS** .....................................................................................................**26**

9.1      Tax Returns............................................................................................................26
9.2      Tax Matters Representative....................................................................................26
9.3      Indemnification and Reimbursement for Payments on Behalf of a Member..........26

**ARTICLE X BOOKS AND RECORDS; REPORTS AND CONFIDENTIALITY** ..........................**27**

10.1     Maintenance of Books............................................................................................27
10.2     Reports...................................................................................................................28
10.3     Company Funds......................................................................................................28
10.4     Confidentiality.......................................................................................................28

*ACTIVE 54225632v1*

**ARTICLE XI TRANSFERS; ADMISSION OF MEMBERS** .............................................................**29**

11.1     Transfer Restrictions ............................................................................................. 29
11.2     Permitted Transfers .............................................................................................. 29
11.3     Void Transfer ........................................................................................................ 30
11.4     Effect of Valid Transfer ....................................................................................... 30
11.5     Admission of Substitute Member ......................................................................... 31
11.6     Admission of Additional Members ....................................................................... 32
11.7     Death, Incapacity or Bankruptcy of a Member .................................................. 32

**ARTICLE XII DISSOLUTION, LIQUIDATION AND TERMINATION** .........................................**33**

12.1     Dissolution ............................................................................................................ 33
12.2     Authority to Wind Up ........................................................................................... 33
12.3     Accounting ............................................................................................................ 33
12.4     Distribution of Assets ........................................................................................... 34
12.5     Liquidating Distribution ...................................................................................... 34
12.6     Distributions in Kind ........................................................................................... 34
12.7     Liquidating Trustee .............................................................................................. 34
12.8     Winding Up ........................................................................................................... 35
12.9     Termination ........................................................................................................... 35
12.10    Return of Capital .................................................................................................. 35

**ARTICLE XIII GENERAL PROVISIONS** ....................................................................................**35**

13.1     Offset .................................................................................................................... 35
13.2     Notices .................................................................................................................. 35
13.3     Entire Agreement .................................................................................................. 36
13.4     Effect of Waiver or Consent ................................................................................. 36
13.5     Amendments .......................................................................................................... 36
13.6     Binding Effect ....................................................................................................... 37
13.7     Governing Law; Severability ............................................................................... 37
13.8     Jurisdiction; Venue .............................................................................................. 38
13.9     Waiver of Jury Trial; Expedited Arbitration ...................................................... 38
13.10    Further Assurances ............................................................................................... 39
13.11    Waiver of Certain Rights ...................................................................................... 39
13.12    Notice to Members of Provisions ......................................................................... 39
13.13    Remedies ............................................................................................................... 39
13.14    Severability ........................................................................................................... 39
13.15    Descriptive Headings; Interpretations ................................................................ 40
13.16    UCC Article 8 Election ......................................................................................... 40
13.17    Creditors ............................................................................................................... 40
13.18    Survival ................................................................................................................. 40
13.19    Counterparts ......................................................................................................... 40
13.20    Compliance with Anti-Money Laundering Requirements .................................... 40

*[Remainder of Page Intentionally Left Blank]*

*ACTIVE 54225632v1*

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

**OPERATING AGREEMENT**
**OF**
**JUSTICE PARTNERS LLC**
**A DELAWARE LIMITED LIABILITY COMPANY**

This Operating Agreement (this "**Agreement**") is entered into and effective as of December 15, 2020 (the "**Effective Date**"), by and among **JUSTICE PARTNERS LLC**, a Delaware limited liability company (the "**Company**") the initial members set forth on Exhibit A hereto (the "**Members**"), and those Persons who subsequently become Members by executing a joinder to this Agreement.

**WHEREAS**, Certificate of Formation (the "**Certificate**") was filed with the Department of State of the State of Delaware on October 8, 2020 in order to form the Company as a Delaware limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act;

**WHEREAS**, the Members now enter into this Agreement in order to set forth the terms and conditions that will regulate and govern the operation and management of the Company and regulate and govern the respective rights and obligations of the Members with respect to the Company.

**NOW, THEREFORE**, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1    **Definitions**.  For purposes of this Agreement, the following terms have the meanings set forth below with respect thereto:

"**Act**" means the Delaware Limited Liability Company Act, 6 *Del. C*., Sections 18-101 *et seq*., as amended from time to time.as it may be amended from time to time, and any successor to such statute.

"**Affiliate**" shall mean, with respect to any Person, (a) any other Person directly or indirectly controlling, controlled by, or under common control with, such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise, and (bi) any officer, director, partner or member thereof.

"**Bankrupt Member**" means any Member (a) that (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to or acquiesces in the appointment of a trustee, receive or liquidator of the Member or of all or any substantial part of the Member's properties; or (b) against which a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law has been commenced and sixty (60) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and sixty (60) days have expired without the appointments having been vacated or

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

stayed, or sixty (60) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"**Base Rate**" means, on any date, a variable rate per annum equal to the rate of interest most recently published by *The Wall Street Journal* as the "prime rate" at large U.S. money center banks.

"**Book Value**" means, with respect to any Company property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treas. Reg. §1.704-1(b)(2)(iv)(d)-(g).

"**Business Day**" means any day other than a Saturday, a Sunday or a holiday on which national banking associations in the State of Delaware are closed.

"**Capital Base**" means all Capital Contributions made to the Company by an applicable Contributing Common Member pursuant to Section **Error! Reference source not found.**, including any additional Capital Contribution in question.

"**Capital Commitment**" means, with respect to each Member, the amount set forth opposite such Member's name on Schedule A to be contributed by such Member to the Company pursuant to and in accordance with Section 3, as such amount may be amended from time to time pursuant to the terms of this Agreement.

"**Capital Contribution**" means the amount of cash or cash equivalents, or the fair market value (as determined by the Manager) of any other property, that is contributed by a Member to the capital of the Company in respect of any Unit.

"**Class A Common Unit**" means a Class A Common Unit or fraction thereof of the Company representing the interest of the Manager in Profits, Losses and Distributions and having the rights and obligations specified with respect thereto as set forth in this Agreement.

"**Class A Preferred Members**" shall mean those Members holding Class A Preferred Units in the Company, their permitted successors and assigns and any other Person who may be admitted to the Company as a Class A Preferred Member in accordance with the terms of this Agreement.

"**Class A Preferred Members Membership Percentage**" means, with respect to each Class A Preferred Member as of any particular time, such Class A Preferred Member's percentage ownership of the total outstanding Class A Preferred Units of the Company set forth on the Schedule of Members.

"**Class A Preferred Units**" means a Class A Preferred Unit or fraction thereof of the Company representing the interest of a Class A Preferred Member in Profits, Losses and Distributions and having the rights and obligations specified with respect thereto as set forth in this Agreement.

"**Code**" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"**Common Members**" shall mean those Members holding Common Units in the Company, their permitted successors and assigns and any other Person who may be admitted to the Company as a Common Member in accordance with the terms of this Agreement.

"**Common Unit**" means a Common Unit or fraction thereof of the Company representing the interest of a Common Member in Profits, Losses and Distributions and having the rights and obligations specified with respect thereto as set forth in this Agreement.

"**Company**" means Justice Partners LLC, a Delaware limited liability company.

"**Company Business**" means to engage in any business activities as determined by the Members.

"**Company Minimum Gain**" has the meaning set forth for "partnership minimum gain" in Treasury Regulations Section 1.704-2(d).

"**Covered Person**" means any and all of the following: (a) the Directors and any departing or former Directors and the Affiliates of any of them; (b) any Person who is or was a Manager, managing partner, general partner, director, officer, employee, agent, fiduciary or trustee of the Board, or of any of the Affiliates of any of them; (c) any Person who is or was serving as a Manager, managing member, general partner, director, officer, employee, agent, fiduciary or trustee of another Person owing a fiduciary duty to the Company or its Affiliates; (d) any director, officer, manager, partner or other principal of the Company; or (e) any other Person designated by the Manager.

"**Distributable Cash**" means all cash received by the Company relating to the Investments other than Capital Contributions, including, without limitation, income, dividends, distributions, interest and proceeds from an Investment and any other miscellaneous receipts or revenues of the Company related directly to Investments held by the Company.

"**Distribution**" means any distribution made by the Company to a Member, whether in cash (including Distributable Cash), property or securities of the Company and whether by liquidating distribution or otherwise; *provided that* none of the following shall be a Distribution: (a) any redemption or repurchase by the Company of any securities of the Company (including Units); (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by Unit split, pro rata Unit distribution or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as an employee, officer, consultant or other provider of services to the Company; provided, further that the Manager will be entitled to withhold from any Distribution, at its discretion, appropriate reserves for expenses and liabilities of the Company, as well as for any required tax withholdings and that amounts withheld for taxes will be treated as Distributions for purposes of the calculations described in this Agreement.

"**Fair Value**" means, in respect of any class of Units, as of the date of determination, the fair market value of such Units as determined by (i) an independent appraisal firm with experience in the valuing companies in a business similar to the Company Business or (ii) the unanimous approval of all Members.

"**Fiscal Year**" of the Company means the calendar year, or such other annual accounting period as established by the Manager.

"**Incapacitated**" means, with respect to a natural person, his or her incompetency or insanity, as determined by the Manager in its sole discretion.

"**Investment Expenses**" means, collectively, the (a) Management Expenses, (b) Organizational Expenses and (c) Operating Expenses.

"**Investments**" means investments and loans made, directly or indirectly, by the Company in accordance with this Agreement to Justice Partners Law Group, LP.

- 3 -

04-06-2021 @ 11:48:09 AM EST

"**Liquidation Event**" means (a) the voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Company; (b) the commencement by the Company of a voluntary case under the federal bankruptcy laws or any other applicable federal, state or international bankruptcy, insolvency or similar law, the consent to the entry of an order for relief in an involuntary case under such law or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Company or of any substantial part of its property, the making of an assignment by the Company for the benefit of its creditors, the admission in writing by the Company of its inability to pay its debts generally as they become due, the entry of a decree or order for relief in respect of the Company by a court having jurisdiction in the premises in an involuntary case under the federal bankruptcy laws or any other applicable federal, state or international bankruptcy, insolvency or similar law, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Company or of any substantial part of its property; (c) the sale, lease, Transfer, conveyance or other disposition, in one transaction or a series of related or unrelated transactions, of all or substantially all of the assets of the Company and its wholly-owned subsidiaries, taken as a whole; (d) a transaction or series of related or unrelated transactions, including by way of merger, consolidation, recapitalization, reorganization or sale or issuance of shares, the result of which is that the Common Members immediately prior to such transaction are, after giving effect to such transaction, no longer (or their respective Affiliates or Permitted Transferees are no longer), in the aggregate, the "beneficial owners" (as such term is defined in Rule 13d-3 and Rule 13d-5 promulgated under the Securities Exchange Act of 1934, as amended) directly or indirectly, through one or more intermediaries, of more than fifty percent (50.0%) of the voting power of the outstanding voting securities of the Company or any successor thereto resulting from any such transaction(s); or (e) any other transaction or series of related transactions in which substantially all control of the Company or its property is Transferred to a third party.

"**Liquidating Trustee**" means such Person as is selected at the time of dissolution by the Manager, which Person may include a Director or an Affiliate of any Member, who shall be empowered to give and receive notices, reports and payments in connection with the dissolution, liquidation and/or winding up of the Company and shall hold and exercise such other rights and powers as are necessary or required to permit all parties to deal with the Liquidating Trustee in connection with the dissolution, liquidation, and/or winding up of the Company.

"**Losses**" for any period means all items of Company loss, deduction and expense for such period determined according to Section 4.2.

"**Majority in Interest of the Members**" means a Member or Members, voting together as a single class, collectively holding in excess of fifty percent (50.0%) Membership Percentage of the Company.

"**Manager**" has the meaning set forth in Section 6.1.

"**Member Minimum Gain**" has the meaning set forth for "partner nonrecourse debt minimum gain" in Treasury Regulations Section 1.704-2(i).

"**Member Nonrecourse Deductions**" has the meaning set forth for "partner nonrecourse deductions" in Treasury Regulations Section 1.704-2(i).

"**Members**" means the Persons listed as the holders of Units as set forth on the Schedule of Members to include any other Person that both acquires a Unit and is admitted to the Company as a Substitute Member or additional Member in accordance with the terms of this Agreement, but only so long as such Person is shown on the Company's books and records as the owner of one or more Units. The term "**Member**" means any one of the Members. The Members shall constitute the "members" (as that term is

- 4 -

04-06-2021 @ 11:48:09 AM EST

defined in the Act) of the Company.  For the avoidance of doubt, unless otherwise noted in this Agreement, any reference to "Member" or "Members" in this Agreement will include the Manager.

"**Membership Percentage**" means, with respect to each Member as of any particular time, such Member's percentage ownership of the total outstanding Units of the Company set forth on the Schedule of Members.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

"**Operating Expenses**" means, except as otherwise specifically provided in this Agreement, the Company's pro rata share of all third-party costs and expenses of maintaining the operations of the Company and appraising and valuing, acquiring, maintaining, financing, hedging and disposing of Investments, including, without limitation, taxes, fees and other governmental charges levied against the Company; insurance; administrative and research fees; expenses of custodians, outside advisors, counsel accountants, auditors, administrators and other consultants and professionals; technological expenses; interest on and fees, costs and expenses arising out of all financings entered into by the Company (including, without limitation, those of lenders, investment banks, and other financing sources); travel expenses; brokerage commissions; custodial expenses; litigation expenses (including the amount of any judgments or settlements paid in connection therewith); winding up and liquidation expenses; expenses incurred in connection with any tax audit, investigation, settlement or review; expenses associated with the preparation and distribution of reports, financial statements, tax returns and K-1s to the Members; indemnification and other unreimbursed expenses; and any extraordinary expenses to the extent not reimbursed or paid by insurance, but specifically excluding the Organizational Expenses.

"**Organizational Expenses**" means the Company's pro rata share of all out-of-pocket expenses incurred in connection with the organization and formation of the Manager, the Company and any related investment vehicle, and other related entities organized by the Manager or its Affiliates and the offering of the interests therein, including, without limitation, legal and accounting fees and expenses; printing costs; filing fees; and the transportation, meal, and lodging expenses of the personnel of the Manager.

"**Person**" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"**Preferred Return**" means a fifteen percent (15%) per annum cumulative preferred return (non-compounding) on the amount of each Capital Contribution made by a Class A Preferred Member; *provided*, that  the Preferred Return is computed for the period that (i) begins on the date such Capital Contribution is paid to the Company and (ii) ends on the earlier of (A) the date such Preferred Return is paid to any Member pursuant to the provisions of Section 5.2 or (B) the QSF Preferred Return End Date.

"**Preferred Unit**" means a series of preferred units of interest in the Company having the rights, including the votes per Unit, if any, as set forth in this Agreement governing such series of Preferred Units.

"**Profits**" for any period means all items of Company income and gain for such period determined according to Section 4.2.

"**QSF Event**" means the date upon which capital is deposited into a Qualified Settlement Fund or similar fund, account, or trust established under applicable law for the benefit of the members or Justice Partners Law Group, LP.

- 5 -

"**QSF Preferred Return End Date**" means the date any Member elects to defer Distributions to be made to such Member under Section 5.2, due to and upon a QSF Event.

"**Remaining Capital Commitment**" means, with respect to any Member at any given time, such Member's Capital Commitment adjusted as follows: (a) reduced by such Member's Capital Contributions and (b) increased by (i) any unused Capital Contributions of such Member returned, and (ii) any refunds of Capital Contributions of such Member, in each case in accordance with this Agreement.

"**Schedule of Members**" shall mean the Schedule of Members attached hereto as Exhibit A, setting forth as of a certain date specified thereon, with respect to each Member, the name, address, respective number and class of Units owned by such Member and the amount of Capital Contributions made by such Member with respect thereto, as may be amended, adjusted or updated from time to time, by the Manager without the need for any further action, consent or approval by any of the Members.

"**Securities Act**" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

"**Substitute Member**" means a Person that is admitted as a Member to the Company pursuant to Section 11.5(a).

"**Super Majority in Interest of the Members**" means a Member or Members , voting together as a single class, collectively holding in excess of seventy percent (70.0%) of the votes associated with the outstanding Class A Common Units and authorized to vote outstanding Preferred Units, not including Units of a defaulted Member(s).

"**Taxable Year**" means the Company's taxable year ending December 31 (or part thereof, in the case of the Company's last taxable year), or such other year as is determined by the Manager in compliance with Section 706 of the Code.

"**Total Capital Base**" means, as of any date in question, all Capital Contributions theretofore made to the Company by all Members, including the additional Capital Contributions made by the Contributing Class A Preferred Members for which an adjustment to the Class A Preferred Membership Percentages is made pursuant to Section **Error! Reference source not found.**.

"**Transfer**" means any sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other disposition or encumbrance of an interest (whether with or without consideration, whether voluntarily or involuntarily or by operation of Law) or the acts thereof with correlative meanings to the terms "**Transferee**," "**Transferor**," "**Transferred**."

"**Treasury Regulations**" means, unless the context clearly indicates otherwise, the regulations in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Units**" means units in the Company held by a Member representing such Member's membership interests in the Company, which shall be paid for in cash or such other form of consideration as the Manager may determine in its reasonable discretion, whether held in the form of Common Units, Preferred Units or other type of units or other interests in the Company as may be issued by the Company; *provided,* that any class, group or series of Units issued shall have the relative rights, powers and duties set forth in this Agreement. A Unit shall entitle the Member to (a) an interest in the Profits, Losses, Distributions, and net

- 6 -

proceeds of liquidation of the Company, as set forth herein; (b) any right to vote as set forth herein or as required under the Act; and (c) any right to participate in the management of the Company as set forth herein or as required under the Act.  A Unit is personal property and a Member shall have no interest in the specific assets or property of the Company.

1.2     **Further Definitions**.  The following terms, as used in this Agreement, have the meanings given to them in the Section or place indicated below:

| Term | Section |
|------|---------|
| Additional Funds | Section 3.5 |
| Agreement | Preamble |
| Certificate | Recitals |
| Capital Account | Section 4.1 |
| Capital Call | Section 3.3(b) |
| Confidential Information | Section 10.4 |
| Designated Member | Section 11.7(a) |
| Funding Date | Section 3.3(b) |
| Indemnifying Member | Section 9.3(a) |
| Liquidating Distribution | Section 12.4 |
| Permitted Transfer | Section 11.2(a) |
| Permitted Transferee | Section 11.2(a) |
| Proceeding | Section 8.3 |
| Purchase Date | Section 11.7(b) |
| Purchase Price | Section 11.7(b) |
| Subscription Agreement | Section 4.1 |
| Tax Matters Representative | Section 10.2 |

## ARTICLE II
## ORGANIZATION

2.1     **Formation**.  The Company was formed as a Delaware limited liability company by the filing of Certificate of Formation (the "**Certificate**") for the Company with the Secretary of State of the State of Delaware under and pursuant to the Act.

2.2     **Name**.  The name of the Company is "JUSTICE PARTNERS LLC", and all Company Business shall be conducted in that name or such other names that comply with applicable law as the Manager may select from time to time.

2.3     **Purpose**.  The purpose of the Company is to carry on any and all lawful businesses and activities permitted from time to time under the Act and other applicable law, including without limitation, making (directly or indirectly), holding, managing, selling, exchanging or otherwise dealing in Investments and to engage in any other acts or activities necessary, advisable, related or incidental thereto and in any other acts or activities permitted by law.  Notwithstanding the foregoing, without the consent of the Manager and a vote of the Members holding a Majority in Interest of the Members, the Company shall not engage in any business other than (a) the Company Business; and (b) such other activities as may be necessary, advisable or appropriate to the accomplishment of the Company Business as determined by the Manager.  Subject to the terms and conditions of this Agreement, the Company is specifically authorized to enter into, make and perform all contracts and other undertakings, and engage in all other activities and transactions, as the Manager may deem necessary, advisable or convenient for carrying out the purposes of the Company.

- 7 -

04-06-2021 @ 11:48:09 AM EST

2.4     **Powers**.  The Company shall possess and may exercise all powers and privileges granted by the Act, all other applicable laws or by this Agreement, together with any powers incidental thereto, insofar as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

2.5     **Term**.  The term of the Company commenced on the date the Certificate were filed with the office of the Secretary of State of Delaware and shall continue until dissolution and liquidation thereof as determined under Article XII.

2.6     **Registered Office; Registered Agent; Principal Office; Other Offices**.  The Company shall maintain a registered office in the State of Delaware.  The Manager may, from time to time, change the Company's registered office and/or registered agent.  The principal office of the Company shall be at such place as the Manager may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain records there.  The Company may have such other offices as the Manager may designate from time to time.

2.7     **Company Property**.  Company assets shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company assets or any portion thereof.  Legal title to any or all Company assets may be held in the name of the Company or one or more nominees, as the Manager may determine.  The Manager hereby declares and warrants that any Company assets for which legal title is held in the name of any nominee shall be held in trust by such nominee for the use and benefit of the Company in accordance with the provisions of this Agreement.  All Company assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company assets is held.  The Units of each Member shall constitute personal property.

2.8     **Expenses**.  Except as otherwise provided, and subject to any limits in this Agreement, the Company and the Manager acting on behalf of the Company, will pay all Operating Expenses.

<div align="center">

**ARTICLE III**
**UNITS AND CAPITALIZATION**

</div>

3.1     **Units**.

(a)     General.  Each Member's interest in the Company, including such Member's interest, if any, in the capital, income, gains, losses, deductions and expenses of the Company and the right to vote, if any, on certain Company matters as provided in this Agreement, shall be represented by the Units which may be issued in one (1) or more classes or series of classes, as approved by the Manager.

(b)     Election for Profits Interests.  By executing this Agreement, each Member authorizes and directs the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "**IRS Notice**") apply to any interest in the Company transferred to a service provider by the Company on or after the effective date of such Revenue Procedure in connection with services provided to the Company.  For purposes of making such Safe Harbor election, the Tax Matters Representative is hereby designated as the "partner who has responsibility for U.S. federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by the Tax Matters Representative constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS Notice.  The Company and each Member hereby agree to comply with all requirements of the Safe Harbor described in the IRS Notice, including, without limitation, the requirement that each Member shall prepare and file any U.S. federal income tax returns such Member

- 8 -

is required to file reporting the income tax effects of each "Safe Harbor Partnership Interest" issued by the Company in a manner consistent with the requirements of the IRS Notice. A Member's obligations to comply with the requirements of this Section shall survive such Member's ceasing to be a Member of the Company and/or the termination, dissolution, liquidation and winding up of the Company, and, for purposes of this Section, the Company shall be treated as continuing in existence. Each Member authorizes the Tax Matters Representative to amend this Section to the extent necessary to achieve similar tax treatment with respect to any interest in the Company transferred to a service provider by the Company in connection with services provided to the Company as set forth in Section 4 of the IRS Notice (e.g., to reflect changes from the rules set forth in the IRS Notice in subsequent U.S. Department of Treasury or Internal Revenue Service guidance).

3.2     **Certificates**.

(a)     General. The Units owned by the Members will be recorded on the Schedule of Members and will not be required to be represented by physical certificates. The Manager may in its discretion issue certificates to the Members representing the Units held by each Member, containing such legends as the Manager deems appropriate or required by applicable securities laws in the Manager's discretion, including as set forth in Section 3.2(b). If certificates represent the Units, the certificates shall be signed by, or in the name of the Company by any one (1) Director and shall represent the number of Units held by a Member registered in certificate form. Any signature on such certificate may be a facsimile. If any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Company with the same effect as if such individual was an officer, transfer agent or registrar at the date of issue.

(b)     Legends. Each certificate shall be stamped or otherwise imprinted with a legend in substantially the following form:

ANY ASSIGNMENT OR TRANSFER OF AN INTEREST IN THIS LIMITED LIABILITY COMPANY IS SUBJECT TO THE RESTRICTIONS IMPOSED ON TRANSFER BY THE OPERATING AGREEMENT OF THE COMPANY DATED DECEMBER 15, 2020.

A certificate representing Units that are subject to further restrictions on Transfer or to other restrictions may have a notation of such additional restriction(s) imprinted thereon.

(c)     Lost, Stolen or Destroyed Certificates; Issuance of New Certificates. The Company may issue a new certificate in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Company may require the owner of the lost, stolen or destroyed certificate, or his, her or its legal representative, to give the Company a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

3.3     **Capital Contributions**.

(a)     Each Member has made, or concurrently with the execution of this Agreement is making, a Capital Contribution to the Company in the amount set forth in the records of the Company. No Member shall be entitled to any interest or compensation with respect to such Member's Capital Contribution or share of the capital of the Company, except as expressly provided herein. No Member shall have any liability for the repayment of the Capital Contribution of any other Member and each Member shall look only to the assets of the Company for return of such Member's Capital Contributions to the extent permitted herein.

- 9 -

(b)        Except as specifically set forth in this Agreement, the Manager may, in its sole discretion, from time to time determine that the reasonable business needs of the Company require that Capital Contributions be contributed to the Company in such amounts and at such times as the Manager determines is needed and approves and may request the Class A Members to make such contributions (each, a "**Capital Call**"); *provided*, that the Manager shall not make Capital Calls from any Class A Preferred Member for amounts in excess of the aggregate Remaining Capital Commitments of such Class A Preferred Member and no such Class A Preferred Member shall be obligated to contribute Capital Contributions in amounts in excess of its Remaining Capital Commitment.  The Manager shall provide written notice of the Capital Call to the Class A Preferred Members and each of the Class A Preferred Members shall be required to fund to the Company its pro rata share (based upon such Class A Preferred Members respective Class A Preferred Members Membership Percentage) of the amount of the Capital Call which amount shall be due, in cash, on the date determined by the Manager (the "**Funding Date**"), which shall be specified in the notice of the Capital Call provided by the Manager.

3.4        **Default in Payment.**

(a)        The Company shall be entitled to enforce the obligations of each Member to make the Capital Contributions set forth in Section 3.4, and the Company shall have all remedies available at law or in equity in the event any Capital Contribution is not so made.

(b)        If a Member (a "Defaulting Member") fails to pay any installment of its Capital Commitment (or any other amount required to be paid by it pursuant to a Capital Call, under any other provision of this Agreement or the Subscription Agreement) within five (5) days after the due date therefor, the Manager may send a notice of default (a "Default Notice") to such Member.  If the installment is not received by the Company within ten (10) days after the receipt by the Defaulting Member of a Default Notice (i) such failure shall constitute a breach of this Agreement and (ii) in the Manager's sole discretion, such amount shall constitute a demand loan ("Default Loan") to such Member that shall bear interest payable to the Company at a rate of eighteen percent (18%) per annum, compounded monthly, or, if lower, the highest rate of interest permitted under applicable law, from and after the original due date of such installment (the "Default Date") until the earliest of either (A) the payment of such installment, including any interest accruing under this Section 3.4(b), (B) the purchase of such Defaulting Member's Defaulted Interest (as defined below) under Section 3.4(c), or (C) the conclusion of foreclosure proceedings under Section 3.4(e).  Any interest paid by a Defaulting Member pursuant to this Section 3.4(b) shall not be treated as a Capital Contribution but shall be treated as income of the Company.

(c)        In addition to, and not in limitation of, the foregoing, the Manager may designate (in its sole discretion) in the Default Notice provided to a Defaulting Member, one or more parties, which parties may be the Company, the other Members, the Manager, Affiliates of the Manager **or third parties**, that will be permitted to acquire (by redemption in the case of the Company or by purchase in the case of any other Person) all or any portion of the Interest of the Defaulting Member in the Company (the "Defaulted Interest"); provided that such default has not been cured by the Defaulting Member within ten (10) days after receipt by the Defaulting Member of the Default Notice.  If a Defaulting Member shall pay any overdue installment of its Capital Commitment, plus interest in accordance with Section 3.4(b), prior to the expiration of the above referenced ten (10) day period, (i) such Member shall cease to be a Defaulting Member, (ii) such Member shall cease to be in breach of this Agreement and (iii) the remedies provided in this Section 3.4(c) and in Section 3.4(e) shall not be available with respect thereto.  If a Defaulting Member shall fail to cure its default within the above referenced ten (10) day period, such failure shall constitute a breach of this Agreement and such Defaulting Member shall forfeit its Interest and thereby cease to be a Member for all purposes as of the date of the issuance of the Default Notice.

- 10 -

(d)      With respect to any redemption or purchase made pursuant to Section 3.4(c), the aggregate consideration payable to the Defaulting Member shall be a cash payment in an amount equal to fifty percent (50%) of the lesser of such Defaulting Member's (i) Estimated Value Capital Account or (ii) Capital Account, as of the Default Date, less the attorneys' fees and costs of enforcing payment and the transfer and removal of the Defaulting Member as a Member.  The provisions of Section 3.4, including the discount set forth in the immediately preceding sentence shall constitute a penalty for breach of this Agreement as permitted by the Delaware Act that has been fully negotiated and discussed and each Member completely understands and comprehends the intent, effect and potential ramifications thereof.  The Members agree that the provisions of Section 3.4, including this Section 3.4(d) are a reasonable remedy for the monetary damage that would result from any Member's failing to make its required Capital Contributions as and when from time to time required pursuant to the provisions of this Agreement.

(e)      In addition to or in lieu of, and not in limitation of, any of the foregoing, upon termination of the ten (10) day period provided in Section 3.4(c) if a breach of this Agreement by the Defaulting Member has occurred, the Manager, in its sole discretion, may (i) commence proceedings to collect any due and unpaid installment of the Defaulting Member's Capital Commitment (plus interest in accordance with Section 3.4(b)) and the expenses of collection, including arbitration or court costs and attorneys' fees and disbursements, and (ii) elect (effective upon giving notice to the Defaulting Member) that the Defaulting Member have no further co-investment opportunities to the extent that the Defaulting Member otherwise would qualify for such opportunities.

(f)      Any actions taken by the Manager or the Company pursuant to this Section 3.4 shall be in addition to and not in limitation of any other rights or remedies that the Company may have against the Defaulting Member, including, but not limited to, the right to hold the Defaulting Member responsible for any damages or liabilities (including attorneys' fees, arbitration or court costs and other expenses of collection) to which the Company may be subjected (in whole or in part) under applicable law as a result of the default by the Defaulting Member.

3.5      **Additional Capital – Other**.   Notwithstanding anything in this Agreement to the contrary, the Manager may, at any time and from time to time, determine that the Company requires additional funds ("**Additional Funds**").  Accordingly, in the discretion of the Manager, the Company may raise Additional Funds in any manner provided in, and including in accordance with, the following:

(a)      Third Party Loans.  At the discretion of the Manager, the Company may raise all or any portion of the Additional Funds by incurring or assuming debt, or by entering into credit, guaranty, financing or refinancing arrangements, upon such terms as the Manager determines appropriate; and

(b)      Affiliate Loans.  If the Manager determines at any time (or from time to time) that the Company needs Additional Funds from the Members, the Manager or its designees may, in the Manager's sole and absolute discretion, loan such funds to the Company.  Any such loan will be unsecured and accrue interest at a rate of ten percent (10%) per annum, compounded annually and based on a calendar year of three hundred sixty-five (365) days.

3.6      **Reserved**.

3.7      **Securities Laws**.  To accomplish the purpose of this Article, the Manager is hereby authorized to do all things necessary to admit Members, including, but not limited to, qualifying the Units for sale with state securities regulatory authorities or perfecting exemptions from qualification, and entering into such underwriting or agency arrangements for the offering and sale of Units upon such terms and conditions as the Manager may deem advisable.

- 11 -

## ARTICLE IV
## CAPITAL ACCOUNTS

4.1 **Establishment and Determination of Capital Accounts**. A capital account ("**Capital Account**") shall be established for each Member. The Capital Account of each Member shall consist of its initial Capital Contribution and shall be (a) increased by (i) any additional Capital Contributions made by such Member pursuant to the terms of this Agreement and (ii) such Member's share of items of income and gain allocated to such Member pursuant to Article V (Distributions; Allocations of Profits and Losses), (b) decreased by (i) such Member's share of items of loss, deduction and expense allocated to such Member pursuant to Article V and (ii) any Distributions to such Member of cash or the fair market value of any other property (net of liabilities assumed by such Member and liabilities to which such property is subject) distributed to such Member, and (c) adjusted as otherwise required by the Code and the regulations thereunder, including, but not limited to, the rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Any references in this Agreement to the Capital Account of a Member shall be deemed to refer to such Capital Account as the same may be increased or decreased from time to time as set forth above.

4.2 **Computation of Amounts**. For purposes of computing the amount of any item of income, gain, loss, deduction or expense to be reflected in Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes; *provided, that*:

(a) any income that is exempt from Federal income tax shall be added to such taxable income or losses;

(b) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)*(i)*, shall be subtracted from such taxable income or losses;

(c) if the Book Value of any Company property is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)*(e)* (in connection with a distribution of such property) or *(f)* (in connection with a revaluation of Capital Accounts), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property;

(d) if property that is reflected on the books of the Company has a Book Value that differs from the adjusted tax basis of such property, depreciation, amortization and gain or loss with respect to such property shall be determined by reference to such Book Value; and

(e) the computation of all items of income, gain, loss, deduction and expense shall be made without regard to any election pursuant to Section 754 of the Code that may be made by the Company, unless the adjustment to basis of Company property pursuant to such election is reflected in Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)*(m)*.

4.3 **Negative Capital Accounts**. No Member shall be required to pay to the Company or any other Member any deficit or negative balance that may exist from time to time in such Member's Capital Account. Notwithstanding anything expressed or implied to the contrary in this Agreement, upon liquidation, dissolution or winding up of the Company, no Member shall be required to make any Capital Contribution to the Company in respect of any deficit in such Member's Capital Account.

4.4 **Company Capital**. Except as expressly provided in this Agreement, no Member shall be paid interest on any Capital Contribution to the Company or on such Member's Capital Account, and no Member shall have any right (a) to demand the return of such Member's Capital Contribution or any other

04-06-2021 @ 11:48:09 AM EST

Distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon dissolution of the Company pursuant to Article XII; (b) to seek or obtain a partition of any Company assets; or (c) to own or use any particular or individual assets of the Company.

4.5     **No Withdrawal**.  Except as expressly provided in this Agreement, no Member shall be entitled to withdraw any part of such Member's Capital Contribution or Capital Account or to receive any Distribution from the Company.

4.6     **Loans from Members**.  Loans by Members to the Company shall not be considered Capital Contributions.  If any Member shall loan funds to the Company in excess of the amounts required hereunder to be contributed by such Member to the capital of the Company, the making of such loans shall not result in any increase in the amount of the Capital Account of such Member.  The amount of any such loans shall be a debt of the Company to such Member and shall be payable or collectible in accordance with the terms and conditions of Section 3.5(b) (Affiliate Loans), or on such other terms and conditions upon which such loans are made and which are approved by Members holding a Majority in Interest of the Members and the Member making the loan.

4.7     **Adjustments to Book Value**.  The Company shall adjust the Book Value of its assets to fair market value in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*f*) as of the following times:  (a) at the Manager's discretion in connection with the issuance of Units in the Company; (b) at the Manager's discretion in connection with the Distribution by the Company to a Member of more than a *de minimis* amount of Company assets, including cash, if as a result of such Distribution, such Member's interest in the Company is reduced; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(*g*).  Any such increase or decrease in Book Value of an asset shall be allocated as a Profit or Loss to the Capital Accounts of the Members under Section 5.2 (determined immediately prior to the issuance of the new Units or the distribution of assets in an ownership reduction transaction).

## ARTICLE V
## DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES

5.1     **Generally**.  Subject to the provisions of the Act, the Manager shall have discretion regarding the amounts and timing of Distributions to Members, in each case subject to the retention of, or payment to third parties of, such funds as the Manager deems necessary with respect to the reasonable business needs of the Company, which shall include (but not by way of limitation) the payment or the making of provision for the payment when due of Company obligations, including establishing reserves and the payment of any Investment Expenses, including without limitation management or administrative fees and expenses or any other obligations.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Members on account of their Units in the Company if such distribution would violate the Act or any other applicable law or any of the Company's covenants respecting its financings, leases or other contractual commitments.

5.2     **Distributions**.  The Company may make Distributions, the frequency and amount of which shall be determined by the Manager, in its sole discretion, to the Members as follows:

(a)     Return of Capital: First, one hundred percent (100%) to Class A Preferred Members until Distributions to such Class A Preferred Members of Distributable Cash on a cumulative basis pursuant to this clause (a) equal such Class A Preferred Member's Capital Contributions.

(b)     Preferred Return: Second, one hundred percent (100%) to Class A Preferred

- 13 -

Members until Distributions to such Class A Preferred Members of Distributable Cash on a cumulative basis pursuant to this clause (b) equal the Preferred Return.

(c)    Catch Up: Third, one hundred percent (100%) to the Manager until Distributions to the Manager of Distributable Cash on a cumulative basis as carried interest Distributions equal fifteen percent (15%) of all Distributions of Distributable Cash made pursuant to Section 5.2(a) and Section 5.2(b);

(d)    Split: Any balance, (i) eighty-five percent (85%) to Class A Preferred Members and (ii) fifteen percent (15%) to the Manager; and

(e)    Performance Milestone:  Notwithstanding the foregoing, upon each Class A Preferred Member receiving Distributions equal to three times (3x) such Class A Preferred Member's Capital Contributions (the "**Performance Milestone**"), (i) one hundred percent (100%) of Distributable Cash after the Performance Milestone to the Manager until Distributions to the Manager of such Distributable Cash on a cumulative basis as carried interest Distributions equal 20% of all Distributions of Distributable Cash made pursuant to Section 5.2(a), Section 5.2(b) and Section 5.2(c) and (ii) any balance, (x) eighty percent (80%) to Class A Preferred Members and (y) twenty percent (20%) to the Manager.

5.3    **Allocation of Profits and Losses**.  For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and Distributions during such Fiscal Year and all special allocations pursuant to Section 5.4 with respect to such Fiscal Year, all Profits and Losses (other than Profits and Losses specially allocated pursuant to Section 5.4) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (a) the amount which would be distributed to such Member, determined as if the Company were to liquidate all of its assets for the Book Value thereof and distribute the proceeds thereof (after payment of all Company debts, liabilities and obligations) pursuant to Section 5.2(a) hereof, *minus* (b) the sum of (i) such Member's share of Company Minimum Gain (as determined according to Treasury Regulations Section 1.704-2(d) and (g)(3)) and Member Minimum Gain (as determined according to Treasury Regulations Section 1.704-2(i)) and (ii) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Year.

5.4    **Special Allocations**.  Notwithstanding the provisions of Section 5.2:

(a)    Nonrecourse Deductions.  Nonrecourse Deductions shall be allocated to the Members pro rata in proportion to the total number of such Units held by each such Member.  If there is a net decrease in Company Minimum Gain during any Taxable Year, each Member shall be specially allocated items of taxable income or gain for such Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f)(6) and 1.704-2(j)(2).  This paragraph is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Nonrecourse Deductions.  Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Minimum Gain during any Taxable Year, each Member that has a share of such Member Minimum Gain shall be specially allocated items of taxable income or gain for such Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to that Member's share of the net decrease in Member Minimum Gain.  Items to

- 14 -

be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This paragraph is intended to comply with the minimum gain chargeback requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)      Unexpected Adjustments.  If any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-l(b)(2)(ii)(d)(4), (5) or (6), items of taxable income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate the adjusted capital account deficit (determined according to Treasury Regulations Section 1.704-1 (b)(2)(ii)(d)) created by such adjustments, allocations or Distributions as quickly as possible.  This paragraph is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1 (b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)      Curative Allocations.  The allocations set forth in paragraphs (a), (b) and (c) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this Article (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Profits and Losses among Members so that, to the extent possible, the net amount of such allocations of Profits and Losses and other items and the Regulatory Allocations (including Regulatory Allocations that, although not yet made, are expected to be made in the future) to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

(e)      Transactions between Members and the Company.  If, and to the extent that, any Member is deemed to recognize any item of income, gain, loss, deduction or credit as a result of any transaction between such Member and the Company pursuant to Code Sections 1272-1274, 7872, 483, 482, 83 or any similar provision now or hereafter in effect, and the Manager determines that any corresponding Profit or Loss of the Company should be allocated to the Member who recognized such item in order to reflect the Member's economic interests in the Company, then the Manager may so allocate such Profit or Loss.

(f)      Excess Nonrecourse Liabilities.  For purposes of calculating a Member's share of "excess nonrecourse liabilities" of the Company (within the meaning of Treasury Regulations Section 1.752-3(a)(3)), the Members intend that they be considered as sharing profits of the Company in proportion to their respective Membership Percentages.

(g)      Company Nonrecourse Liability.  Deductions attributable to any "nonrecourse liability" of the Company, as defined in accordance with Section 1.704-2(b)(3) of the Treasury Regulations, shall be allocated among the Members in proportion to their respective Membership Percentages.

5.5      **Tax Allocations; Code Section 704(c)**.

(a)      General.  The income, gains, losses, deductions and expenses of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, deductions and expenses among the Members for computing their Capital Accounts, *except that* if any such allocation is not permitted by the Code or other applicable law, the Company's subsequent income, gains, losses, deductions and expenses shall be allocated among the Members so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)      Section 704(c).  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, deduction and expense with respect to any property contributed

- 15 -

04-06-2021 @ 11:48:09 AM EST

to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution.

(c)      Adjustment of Book Value.  If the Book Value of any Company asset is adjusted pursuant to this Section, subsequent allocations of items of taxable income, gain, loss, deduction and expense with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)      Manager's Authority.  Any elections or other decisions relating to allocations for federal, state and local income tax purposes shall be made by the Manager in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations pursuant to this Section 5.5 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or Distributions pursuant to any provisions of this Agreement.  The Members are aware of the income tax consequences of the allocations made by this Article and hereby agree to be bound by the provisions of this Article in reporting their shares of Company income and loss for income tax purposes.

5.6      **Amounts Withheld**.  All amounts withheld from or offset against any Distribution to a Member pursuant to Section 9.3 shall be treated as amounts distributed to such Member pursuant to this Article V for all purposes under this Agreement.

## ARTICLE VI
## MANAGEMENT

6.1      **Manager**.  The business and affairs of the Company shall be managed by the Manager. Unless removed, resigned or the provisions of Section 6.11 are applicable, the initial hereunder shall be Justice Partners Management, LLC, a Delaware limited liability company at all times during the term of this Agreement (the "**Manager**").

6.2      **Authority of the Manager.**

(a)      General.  Except for situations in which the approval of the Members is required by this Agreement, including Section 7.1 (Participation in Management) and Section 7.2 (Voting), or by the non-waivable provisions of applicable law, and subject at all times to Section 6.1 (Manager), the Manager shall have exclusive, full and complete authority, power and discretion to make all decisions and take all actions for the Company, its business, affairs and properties not otherwise provided for in this Agreement, and to perform any and all other acts or activities customary or incident to the management of Company Business , including, but not limited to:

(i)      Acquire, own, hold, construct, operate, maintain and improve real or personal property in the Company's name;

(ii)      Borrow money in the Company's name from financial institutions, the Manager, the Members or their Affiliates, on such terms as the Manager deems appropriate, and in connection therewith, to hypothecate, mortgage, encumber and grant security interests in Company assets to secure repayment of the borrowed sums, and to execute for and on the Company's behalf any Financing Instruments as may be reasonably required to accomplish the same, including, but not limited to, causing the Company to enter into one or more borrowings that are secured in whole or in part by the Company's funded or unfunded Capital Contributions, and in connection with such borrowings, each Member agrees to execute the requisite documentation required for the Company to obtain such financing;

- 16 -

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

(iii) Pay or prepay, in whole or in part, refinance, amend, modify or extend any Financing Instruments affecting Company assets and in connection therewith to execute for and on the Company's behalf any extensions, renewals or modifications of such Financing Instruments;

(iv) Purchase liability and other insurance to, among other things, protect the Company's property and any Person who is or was serving as a Covered Person;

(v) Invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments, including but not limited to temporary or interim investments of any capital of the Company or the making of bridge loans to other investments as determined in the sole discretion of Manager;

(vi) Purchase or sell any real estate in any class or sector, non-real estate assets or securities (whether preferred or common equity, convertible security or other security) in any company;

(vii) Make and execute any loans and other debt financings which may or may not be collateralized or other assets including mortgages, senior secured loans, subordinated and mezzanine loans and other structured financing transactions;

(viii) Pledge any of the Company assets, including the Capital Accounts of the Members;

(ix) Make and implement all investment policies and procedures;

(x) Conduct all functions of any kind related to the day to day management;

(xi) Sell, exchange or otherwise dispose of Company assets in the ordinary course of business as part of a single transaction or plan, so long as such transaction is not a sale of all or substantially all of the Company's property and does not violate or cause a default under any agreement to which the Company may be bound;

(xii) Execute on the Company's behalf all instruments and documents, including, without limitation, checks; drafts; Financing Instruments; documents providing for the acquisition or disposition of Company property; assignments and bills of sale; leases; and any other instruments or documents necessary or desirable to conduct the Company's business;

(xiii) Select, employ, hire, fire, and determine compensation for employees, accountants, legal counsel, managing Agents, tradesmen, contractors, subcontractors or other Persons to perform services for the Company;

(xiv) Enter into any and all other agreements on the Company's behalf in reasonable furtherance of the Company's purpose and business, in such forms as the Manager may approve; and

(xv) Perform all other acts necessary or appropriate to the conduct the Company's business and to the extent not specifically included above or not expressly excluded in the Agreement, the Manager is deemed to have full authority.

(b) <u>Major Decisions</u>. Notwithstanding anything to the contrary herein, the following Major Decisions shall require the approval of the Super Majority in Interest of the Members:

- 17 -

(i)      approving, amending or abandoning a plan of conversion or merger of the Company wherein the Company is not the surviving entity, including in connection with a Liquidation Event;

(ii)     sale or disposing of all or substantially all of the Company's assets or property outside the ordinary course of business, including in connection with a Liquidation Event;

(iii)    Incurring any borrowings, loan financings, and/or debt facility in excess of $250,000, other than any Investment, trade payables or equipment financings in the ordinary course of business, whether in a single transaction or a series of transactions;

(iv)     Any acquisitions, whether by asset purchase, stock or membership purchase, or merger;

(v)      Admission of any new Member, other than through a Permitted Transfer;

(vi)     Conducting a public or private offering or sale of any Company equity securities or convertible into equity securities (such as but not limited to options, warrants or notes) of the Company or other rights (contingent or otherwise) to acquire any equity securities;

(vii)    Entering into any contract, commitment, agreement, joint venture, or other contractual understanding (whether written or verbal) outside of the ordinary course of business in excess of $250,000 whether in a single transaction or a series of transactions;

(viii)   Changing the nature of the Company Business;

(ix)     dissolving and winding up the Company;

(x)      filing a petition under the federal bankruptcy laws or under any other receivership, insolvency or reorganization laws; the making of any of the above or analogous decisions with respect to the Company, and

(xi)     The making of any of the above or analogous decisions with respect to the Company.

6.3      **Power of Attorney**.  Each Member hereby constitutes and appoints the Manager and the Liquidating Trustee if not the Manager with full power to act without the others as such Member's true and lawful representative and attorney in-fact, in such Member's name, place and stead, to make, execute, sign, acknowledge and deliver or file in such form and substance as is approved by the Manager (a) all instruments, documents and certificates which may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Company, or to qualify or continue the qualification of the Company in all jurisdictions in which the Company may conduct business or own property, and any amendment to, modification to, restatement of or cancellation of any such instrument, document or certificate and (b) all conveyances and other instruments, documents and certificates which may be required to effectuate the dissolution and termination of the Company approved in accordance with the terms of this Agreement.  The powers of attorney granted herein shall be deemed to be coupled with an interest, shall be irrevocable and shall survive the death, disability, incompetency, bankruptcy, insolvency or termination of any Member and the Transfer of all or any portion of the Units held by such Member, and shall extend to such Member's heirs, successors, assigns and personal representatives.

6.4      **Devotion of Time; No Exclusive Duty to Company**.  The Manager shall devote such time

- 18 -

and attention to the business of the Company as the Manager shall determine, in the exercise of his reasonable judgment, to be necessary for the conduct of Company Business.  The Manager shall not be required to manage the Company as his sole and exclusive function and he will have other business interests and will engage in other activities in addition to those relating to the Company.

6.5     **Manager's Compensation; Reimbursement**. The Manager, in its sole discretion, shall set forth all compensation and other remuneration for itself, any employees, consultants, contractors, professionals or others that perform services on behalf of the Company.  In addition, to the extent that the Manager or its Affiliates incur expenses or advance funds on behalf of the Company, the Manager or Affiliate, as the case may be, shall be entitled to reimbursement of such funds, without interest, separate from and in addition to the rights to the income, gain, Losses, credits, deductions and Distributions of the Company as set forth in Article V (collectively, the "**Management Expenses**").   The Manager will determine in good faith the reimbursable expenses that are allocable to the Company.

6.6     **Delegation of Duties**.  The Manager may, from time to time, delegate to one or more Persons (including any officer as set forth in Section 6.7 (Officers)) such authority and duties as the Manager may deem advisable.  The Manager also may assign titles to any Member or other individual and may delegate to such Member or other individual certain authority and duties.  Any number of titles may be held by the same Member or other individual.  Any delegation pursuant to this Section may be revoked at any time by the Manager.

6.7     **Officers.**

(a)     Designation and Appointment.  The Manager may (but need not), from time to time, designate and appoint one or more persons as an officer of the Company.  An officer need not be a Member.  Any officers so designated shall have such authority and perform such duties as the Manager may, from time to time, delegate to them.  The Manager may assign titles (including chairperson, chief executive officer, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer) to particular officers.  Unless the Manager otherwise decide, if the title is one commonly used for officers of a business corporation formed, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to (i) any specific delegation of authority and duties made to such officer by the Manager pursuant to the third sentence of this Section 6.7(a) and (ii) any delegation of authority and duties made to one or more officers pursuant to the terms of Section 6.6 (Delegation of Duties).  Each officer shall hold office until such officer's successor shall be duly designated and shall qualify or until such officer's death or until such officer shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same individual.  The salaries or other compensation, if any, of the officers and agents (and the Manager) of the Company shall be fixed from time to time by the Manager in its sole discretion.

(b)     Resignation and Removal.  Any officer (subject to any contract rights available to the Company, if applicable) may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Manager.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any officer may be removed as such, either with or without cause, by the Manager in its sole discretion at any time; *provided, however*, that such removal shall be without prejudice to the contract rights, if any, of the individual so removed.  Designation of an officer shall not of itself create contract rights.  Any vacancy occurring in any office of the Company may be filled by the Manager.

6.8     **Reliance by Third Parties**. Any Person dealing with the Company, other than a Member, may rely on the authority of the Manager (or any officer authorized by the Manager) in taking any action

- 19 -

in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement. Every agreement, instrument or document executed by the Manager (or any officer authorized by the Manager) in the name of the Company with respect to any business or property of the Company shall be conclusive evidence in favor of any Person relying thereon or claiming thereunder that (a) at the time of the execution or delivery thereof, this Agreement was in full force and effect; (b) such agreement, instrument or document was duly executed according to this Agreement and is binding upon the Company; and (c) the Manager or such officer was duly authorized and empowered to execute and deliver such agreement, instrument or document for and on behalf of the Company.

6.9     **Resignation and Replacement of Manager**.  The Manager may resign at any time. Upon a resignation of the initial Manager, a new Manager shall be designated by the resigning initial Manager (each, a "**Substitute Manager**"). In the event of the resignation of a Substitute Manager, the initial Manager who named the Substitute Manager shall name the new Substitute Manager to replace the resigning Substitute Manager.  In the event of a resignation of a Manager who was appointed by a Super Majority in Interest of the Members, a Super Majority in Interest of the Members shall name the new Manager to replace the resigning Manager.  If any Manager that is also a Member resigns, such resignation shall not affect the Manager's rights as a Member or constitute a withdrawal of a Member.

6.10     **Removal of Manager**. The Manager may be removed only with cause by the Super Majority in Interest of the Members and upon such removal, a new Manager shall be designated and appointed by the Super Majority in Interest of the Members.

6.11     **Successor Funds; Presentation of Opportunities to the Company**.

(a)     Without consent of the Class A Members at least equal to 70% of the Membership Percentage of the Company, (not counting Capital Commitments of Defaulting Members), until the earlier of (i) the termination of the Commitment Period and (ii) the date on which 75% of the Aggregate Commitments of the Class A Preferred Members have been invested, committed and/or reserved for investment and/or have been drawn or reserved to fund Investment Expenses, the Manager shall not, and shall cause each of its Affiliates not to, hold a closing with third party investors on behalf of another pooled investment fund, for which the Manager or its Affiliate acts as a manager or the primary source of transactions, with objectives substantially similar to those of the Company (a "**Successor Fund**").

(b)     Until the date on which the Manager may sponsor a Successor Fund in accordance with Section 6.11(a), the Manager and its Affiliates shall offer to the Company any investment opportunities presented to them that the Manager determines in good faith to be suitable and appropriate for the Company and consistent with the investment objectives set forth in Section 2.3. Notwithstanding the foregoing, (i) the Company may share investment opportunities and invest side-by-side with any Person (other than an Affiliate of the Manager) in instances where such Person provides investment opportunities, operating capabilities, or other strategic or competitive opportunities or advantages to the Company, (ii) the Manager or any Affiliate thereof may make (as principal or on behalf of other investment vehicles) any investment which the Manager has not made or pursued, in whole or in part, on behalf of the Company after making the assessment set forth in this Section 6.11(b) and (iii) the Company may co-invest with a prior fund or a Successor Fund in any investment opportunity offered to the Company, and the Manager may allocate such portion of such investment opportunity to such prior fund or Successor Fund as the Manager determines, in its sole discretion, to be appropriate.

6.12     **Standards of Conduct and Modification of Duties.**

- 20 -

04-06-2021 @ 11:48:09 AM EST

(a)     General.  In the performance of his duties, the Manager shall not be deemed to be held to any higher standards than those set forth in the Act.

(b)     Good Faith.  Whenever the Manager make a determination or takes or declines to take any other action in his capacity as Manager of the Company as opposed to in his individual capacity, whether under this Agreement or any other agreement contemplated hereby or otherwise, then, unless another express standard is provided for in this Agreement, the Manager shall make such determination or take or decline to take such other action in good faith and shall not be subject to any higher standard contemplated hereby or under the Act or any other law, rule or regulation or at equity.  A determination, other action or failure to act by the Manager will be deemed to be in good faith unless the Manager acted in a manner that was in wanton and willful disregard for the interests of the Company.  The standard shall be deemed to have been met if the Manager took into consideration the interests of the Company in making any decision or taking or declining to take any action, regardless of the actual decision made or action taken or not taken.  In any proceeding brought by the Company, any Member, or any Person who acquires an interest in a Unit or any other Person who is bound by this Agreement challenging such action, determination or failure to act, the Person bringing or prosecuting such proceeding shall have the burden of proving that such determination, action or failure to act was not in good faith.

(c)     Individual Capacity. Whenever the Manager makes a determination or takes or declines to take any other action in his individual capacity as opposed to in his capacity as Manager of the Company, whether under this Agreement or any other agreement contemplated hereby or otherwise, then the Manager is entitled, to the fullest extent permitted by law, to make such determination or to take or decline to take such other action free of any fiduciary duty or other duty existing at law, in equity or otherwise or obligation whatsoever to the Company, any Member, any other Person who acquires an interest in a Unit or any other Person who otherwise is bound by this Agreement, and the Manager  shall not, to the fullest extent permitted by law, be required to act in good faith or pursuant to any other standard imposed by this Agreement or any other agreement contemplated hereby or under the Act or any other law, rule or regulation or at equity.  By way of illustration and not of limitation, whenever the phrases, "at the option of the Manager," "in its sole discretion" or some variation of those phrases, are used in this Agreement, it indicates that the Manager is acting in his individual capacity.  For the avoidance of doubt, whenever the Manager votes or transfers Units it may own, or refrain from voting or transferring Units he may own, he shall be acting in his individual capacity.

(d)     Duty of Loyalty.  Whenever the Manager makes a determination or takes or declines to take any other action in his capacity as Manager of the Company as opposed to in his individual capacity, whether under this Agreement or any other agreement contemplated hereby or otherwise, then the Manager shall make such determination or take or decline to take such action in a manner that is consistent with his duty of loyalty to the Company.  It is hereby understood, acknowledged and agreed that the Manager' duty of loyalty shall not be violated by the Manager taking any of the following or similar actions:

(i)     the ownership, either directly or through Affiliates, of other entities of the same business type and within the same business sector as the Company;

(ii)     the ownership, either directly or through Affiliates, of companies that do business with the Company; and/or

(iii)     the ownership of assets, including land, that may be purchased by or leased to the Company.

- 21 -

04-06-2021 @ 11:48:09 AM EST

(e)   Conflict of Interest. Whenever a potential conflict of interest exists or arises between the Manager or any Affiliates, on the one hand, and the Company, any Member or any Person who acquires an interest in a Unit or any other Person who is bound by this Agreement on the other hand, the Manager is entitled to make such decision or take or decline to take such action in his discretion without obtaining approval from the Members.  In such cases, it will be presumed that in making his decisions or taking or declining to take such actions, the Manager upheld his duty of loyalty, his duty of care and his duty to act in good faith, each as clarified herein.  In any proceeding brought by the Company, any Member who acquires an interest in a Unit or any other Person who is bound by this Agreement, challenging such action, determination or failure to act, the Person bringing or prosecuting such proceeding shall have the burden of proving that such determination, action or failure to act was not made in a manner consistent with the Manager' duty of loyalty, duty of care and duty to act in good faith, each as may be clarified herein.

(f)   No Obligation.  Notwithstanding anything to the contrary in this Agreement, the Manager and his Affiliates or any other Covered Person shall have no duty or obligation, express or implied, to (i) sell or otherwise dispose of any asset of the Company other than in the ordinary course of business or (ii) permit any Member to use any facilities or assets of any of the Affiliates of the Manager, except as may be provided in contracts entered into from time to time specifically dealing with such use. Any determination by the Manager or any of his Affiliates to enter into such contracts shall be in his or such Affiliates sole discretion.

(g)   Manager's Determination. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any other agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement the Manager is permitted or required to make a decision (a) in his "consent," "approval," "determination," "sole discretion" or "discretion" or under a grant of similar authority or latitude, or any variation thereof, the Manager shall be entitled to act in his sole discretion and absolute discretion and to consider only such interests and factors as he desires, including his own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in his "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard.  If any questions should arise with respect to the operation of the Company that are not specifically provided for in this Agreement or the Act, or with respect to the interpretation of this Agreement, the Manager is hereby authorized to make a final determination with respect to any such question and to interpret this Agreement in good faith, and his determination and interpretation so made shall be final and binding on all parties.  Notwithstanding any other provision of this Agreement, including the preceding provisions of this Section, the Manager shall comply with the implied contractual covenant of good faith and fair dealing.

## ARTICLE VII
## MEMBERS

7.1   **Participation in Management**.  No Member (in his, her or its capacity as such) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditures on behalf of the Company, unless (a) such specific authority has been expressly granted to and not revoked from such Person by the Manager or (b) such specific authority has been expressly granted to such Person pursuant to this Agreement.  Each Member shall take part in the management of the Company by exercising the voting and consent rights granted to such Member under this Agreement; provided however that any Member that does not have voting rights will have no ability to participate in an action or decision of the Company except to the extent specifically provided in this Agreement or pursuant to applicable law.

7.2     **Right of Members to Bring Action**.  No Member in the Member's capacity as a Member may bring a suit or action against the Company or against any other Member in the other Member's capacity as a member in any court for any reason except to obtain urgent judicial relief.  No Member may bring a suit or action against any Person in the name of or on behalf of the Company except with the affirmative vote of Members collectively holding in excess of seventy-five percent (75.0%) of the outstanding Units, not including Units of a defaulted Member(s).

7.3     **No Exclusive Duty to Company**.  No Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of any other Member or the Directors or any of their Affiliates or to the income or proceeds derived therefrom.

7.4     **A Member's Duty of Loyalty**.  Each Member agrees:  (a) to account to the Company and hold as trustee for the Company any property, profit or benefit derived by such Member in the conduct and winding up of the Company business or derived from the use by the Member of Company property, including the appropriation of a Company opportunity, and (b) to refrain from dealing with the Company in the conduct or winding up of the Company business on behalf of a party having an interest adverse to the Company.

7.5     **No Authority of Individual Member**.  Except as set forth in this Agreement, no Member, acting individually, or any of their respective Affiliates, has the power or authority to bind any other Member or to authorize any action to be taken by the Company, or to act as agent for the Company or any other Member, unless that power or authority has been specifically delegated or authorized by the Manager.

7.6     **Related Party Transactions**.  The Company may transact business with a Director or Member or officer or any Affiliate thereof *provided,* that (i) the Members are made aware of the material facts as to the relationship of the party to the Company and (ii) a determination by the Manager that the contract or transaction made is fair as to the Company as of the time it is executed and delivered.

## ARTICLE VIII
## LIMITED LIABILITY, EXCULPATION AND INDEMNIFICATION

8.1     **Limited Liability of Members**.

(a)     Limitation of Liability.  Except as otherwise required by applicable law and as explicitly set forth in this Agreement, the debts, liabilities, commitments and other obligations of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall have any personal liability whatsoever in its capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company or to any other Person, for the debts, liabilities, commitments or any other obligations of the Company or for any Losses of the Company. Notwithstanding anything contained herein to the contrary, there shall be no limitations on liability or right of indemnification under this Agreement for the conduct or actions of any Member that are outside of the scope of such Member's authority or permitted actions with respect to this Agreement, the Act or other applicable law.

(b)     Observance of Formalities.  Notwithstanding anything contained herein to the contrary, the failure of the Company, the Directors or any Member, to observe any formalities or procedural or other requirements relating to the exercise of its powers or management of Company Business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on any of the Members.

- 23 -

(c)    Return of Distributions.  In accordance with the Act and the laws of the State of Delaware, a Member may, under certain circumstances, be required to return amounts previously distributed to such Member.

8.2    **Exculpation of Covered Persons**.  Covered Persons shall not be liable for errors in judgment.  Additionally, to the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company, the Members and any Person who acquires an interest in a Unit or is otherwise bound by this Agreement, the Directors and any other Covered Person acting in connection with Company Business or affairs shall not be liable, to the fullest extent permitted by law, to the Company, the Members and any Person who acquires an interest in a Unit or is otherwise bound by this Agreement, for its reliance on the provisions of this Agreement.  Any Covered Person may consult with counsel and accountants, any Member, officer, employee or committee of the Company and other professional expert in respect of Company affairs, and provided such Covered Person acts in good faith reliance upon the advice or opinion of such counsel or accountants or other persons, such Covered Person shall not be liable for any loss suffered by the Company in reliance thereon.  Additionally, the Manager may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents, and the Manager shall not be responsible for any misconduct or negligence on the part of any such agent appointed by the Manager in good faith.  If the Act is hereafter amended or interpreted to permit further limitation of the personal liability of Covered Persons beyond the foregoing, then this paragraph shall be interpreted to limit the personal liability of Covered Persons to the fullest extent permitted by the Act, as amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to limit the personal liability of Covered Persons to a greater extent than that permitted by said law prior to such amendment).  In furtherance of, and without limiting the generality of the foregoing, no Covered Person shall be (a) personally liable for the debts, obligations or liabilities of the Company, including any such debts, obligations or liabilities arising under a judgment, decree or order of a court; (b) obligated to cure any deficit in any Capital Account; (c) required to return all or any portion of any Capital Contribution; or (d) required to lend any funds to the Company.

8.3    **Right to Indemnification for Covered Persons**.  Subject to the limitations and conditions as provided in this Article, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative (hereinafter a "**Proceeding**"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he, she or it, or a Person of whom he, she or it is the legal representative, is or was a Covered Person or while a Covered Person is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, shall be indemnified by the Company to the fullest extent permitted by the Act, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article shall continue as to a Person who has ceased to serve in the capacity that initially entitled such Person to indemnity hereunder; *provided*, that no such Person shall be indemnified for any judgments, penalties, fines, settlements or expenses (i) to the extent attributable to conduct for which indemnification would not be permitted under the Act or other applicable law, (ii) for any present or future breaches of any representations, warranties or covenants by such Person contained in this Agreement or in any other agreement with the Company; or (iii) in any action (except an action to enforce indemnification rights set

- 24 -

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

forth in this Section) brought by such Person.  It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

8.4 **Contract with Company**.  The rights granted pursuant to this Article shall be deemed contract rights, and no amendment, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any amendment, modification or repeal.

8.5 **Advance Payment**.  The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 8.3 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; *provided*, *however*, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article or otherwise.

8.6 **Indemnification of Employees and Agents**.  The Company, by adoption of a resolution of the Manager, may indemnify and advance expenses to any employees or agents of the Company who are not or were not Covered Persons but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against liabilities and expenses asserted against such Person and incurred by such Person in such a capacity or arising out of their status as such a Person, to the same extent that it may indemnify and advance expenses to Covered Persons under this Article.

8.7 **Appearance as a Witness**.  Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Covered Person in connection with the appearance as a witness or other participation in a Proceeding at a time when the Covered Person is not a named defendant or respondent in the Proceeding.

8.8 **Nonexclusivity of Rights**.  The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right that a Covered Person or other Person indemnified pursuant to Section 8.3 or Section 8.6 may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement, any agreement, vote of Members or otherwise.  The provisions of this Article are for the benefit of the Covered Persons and their heirs, successors, assigns, executors and administrators and shall not be deemed to create any rights for the benefit of any other Persons.

8.9 **Insurance**.  The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as a Covered Person or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article.

- 25 -

8.10     **Savings Clause**.  If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless the Directors or any other Person indemnified pursuant to this Article as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

8.11     **Transactions with the Company**.  A Covered Person shall not be denied indemnification in whole or in part under Section 8.3 because the Covered Person had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

## ARTICLE IX
## TAX MATTERS

9.1     **Tax Returns**.  The Manager shall cause to be prepared and filed all necessary federal and state income tax and other tax returns for the Company, including making any elections the Manager may deem appropriate and in the best interests of the Members.  Each Member shall furnish to the Manager all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax and other tax returns to be prepared and filed.

9.2     **Tax Matters Representative**.  Unless and until the Members shall unanimously agree otherwise, Sylvia Benito shall be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code (the "**Tax Matters Representative**").  If for any reason the position of "tax matters partner" becomes vacant, such position shall be filled by the majority vote of the Manager.

(a)     Authority of Tax Matters Representative.  The Tax Matters Representative is authorized to represent the Company before the Internal Revenue Service and any other governmental agency with jurisdiction, and to sign such consents and to enter into settlements and other agreements with such agencies as the Tax Matters Representative deems necessary or advisable.

(b)     Tax Elections.  The Tax Matters Representative may, in its sole discretion, make or revoke any election under the Code or the Treasury Regulations issued thereunder (including for this purpose any new or amended Treasury Regulations issued after the date of formation of the Company), including an election to be taxed as a corporation for U.S. federal income tax purposes pursuant to Treasury Regulations Section 301.7701-3.

(c)     Reimbursement of Expenses.  Promptly following the written request of the Tax Matters Representative, the Company shall, to the fullest extent permitted by law, reimburse and indemnify the Tax Matters Representative for all reasonable expenses, including reasonable legal and accounting fees, claims, liabilities, losses and damages incurred by the Tax Matters Representative in connection with any administrative or judicial proceeding (i) with respect to the tax liability of the Company and/or (ii) with respect to the tax liability of the Members in connection with the operations of the Company.

(d)     Survival of Provisions.  The provisions of this Section shall survive the termination of the Company or the termination of any Member's interest in the Company and shall remain binding on the Members for as long a period of time as is necessary to resolve with the Internal Revenue Service any and all matters regarding the Federal income taxation or other taxes of the Company or the Members.

9.3     **Indemnification and Reimbursement for Payments on Behalf of a Member**.

- 26 -

04-06-2021 @ 11:48:09 AM EST

(a)       If the Company is obligated to pay any amount to a governmental agency (or otherwise makes a payment) because of a Member's status or otherwise specifically attributable to a Member (including, without limitation, federal withholding taxes with respect to foreign Persons, state personal property taxes, state withholding taxes, state unincorporated business taxes, etc.), then such Member (the "**Indemnifying Member**") shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payments).  The amount to be indemnified shall be charged against the Capital Account of the Indemnifying Member, and, at the option of the Manager, either:

(i)       promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company equal to the full amount to be indemnified (and the amount paid shall be added to the Indemnifying Member's Capital Account but shall not be treated as a Capital Contribution); or

(ii)      the Company shall reduce Distributions which would otherwise be made to the Indemnifying Member, until the Company has recovered the amount to be indemnified (and, notwithstanding Section 4.1, the amount withheld shall not be treated as a Capital Contribution).

(b)       A Member's obligation to make contributions to the Company under this Section shall survive the termination, dissolution, liquidation and winding up of the Company, and for purposes of this Section, the Company shall be treated as continuing in existence.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section, including instituting a lawsuit to collect such contribution with interest calculated at a rate equal to the Base Rate plus three (3) percentage points per annum (but not in excess of the highest rate per annum permitted by law).

## ARTICLE X
## BOOKS AND RECORDS; REPORTS AND CONFIDENTIALITY

10.1    **Maintenance of Books**.

(a)       Books and Records.  The Company will maintain true, complete and correct books of account of the Company, all in accordance with generally accepted accounting principles applied on a consistent basis and shall keep minutes of the proceedings of, or maintain written consents executed by, the Members and the Manager.  The books of account shall contain particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the business, and all such other transactions, matters and things relating to the business of the Company as are usually entered in books of accounts kept by Persons engaged in a business of a like kind and character.  In addition, the Company shall keep all records required to be kept pursuant to the Act.  Any Member shall, upon prior written notice and during normal business hours, have access to the information described in the Act, for the purpose of inspecting or, at the expense of such Member, copying the same.  Any Member reviewing the books and records of the Company pursuant to the preceding sentence shall do so in a manner which does not unduly interfere with the conduct of the business of the Company.  The Company will provide an unaudited financial at the end of each fiscal year to its Members.

(b)       Schedule of Members.  The Company will maintain, and as required update, the Schedule of Members without the need for any further action, consent or approval by any of the Members.  Unless otherwise determined by the Manager, the Schedule of Members will be and remain confidential, and each Member hereby accepts, acknowledges and agrees that, notwithstanding anything herein to the contrary, to the maximum extent permitted by law, such Member will have no right to view or obtain the Schedule of Members or otherwise obtain any such information relating to any Member other than himself

- 27 -

or herself.

(c)      Form of Records.  Any records maintained by the Company in the regular course of its business, including the Schedule of Members, books of account, and records of Company proceedings may be kept on, or be in the form of, computer disks, memory chips or any other information storage device; *provided,* that the records so kept can be converted into clearly legible written form within a reasonable period of time.

10.2      **Reports**.

(a)      Tax Information.  The Company shall prepare and deliver (via mail, electronically, fax or other means of communication) to each Member and, to the extent necessary, to each former Member (or such Member's legal representatives), a report setting forth in sufficient detail such information as shall enable such Member or former Member (or such Member's legal representatives) to prepare its respective federal, state and local income tax returns in accordance with the laws, rules and regulations then prevailing. The Company shall also provide Form K-1s to each of the Members as soon as reasonably practicable after the end of each Taxable Year.

(b)      Cost of Reports; No Additional Information.

(i)      The Company shall bear the costs of all reports and other information provided pursuant to this Section.

(ii)      To the fullest extent possible under the law, the Manager may keep confidential from the Members, for such period of time as the Manager determines, (A) any information that the Manager determines to be in the nature of trade secrets, (B) other information the disclosure of which the Manager believes (1) is not in the best interests of the Company or any of its Affiliates, (2) could damage the Company or its Affiliates or their businesses or (3) that the Manager or the Company are required by law or by agreement with any third party to keep confidential (other than agreements with Affiliates of the Company the primary purpose of which is to circumvent the obligations set forth in this Section).

(iii)      Notwithstanding any other provision of this Agreement or the Act, each of the Members, each other Person who acquires an interest in a Unit and each other Person bound by this Agreement hereby agrees to the fullest extent permitted by law that they do not have rights to receive information from the Company or any Covered Person for the purpose of determining whether to pursue litigation or assist in pending litigation against the Company or any Covered Person relating to the affairs of the Company except pursuant to the applicable rules of discovery relating to litigation commenced by such Person.

10.3      **Company Funds**.  The Manager may not commingle the Company's funds with the funds of any Member, Director, officer or other Person.

10.4      **Confidentiality**.  Each Member recognizes and acknowledges that it may receive certain confidential and proprietary information and trade secrets of the Company, including but not limited to confidential information of the Company regarding identifiable, specific and discrete business opportunities being pursued by the Company (the "**Confidential Information**").  Each Member (on behalf of itself and, to the extent that such Member would be responsible for the acts of the following Persons under principles of agency law, its directors, officers, shareholders, partners, employees, agents and members) agrees that it will not, during or after the term of this Agreement, whether through an Affiliate or otherwise, take commercial or proprietary advantage of or profit from any Confidential Information or disclose

- 28 -

Confidential Information to any Person for any reason or purpose whatsoever, except (i) to authorized representatives and employees of the Company and as otherwise may be proper in the course of performing such Member's obligations, or enforcing such Member's rights, under this Agreement; (ii) as part of such Member's normal reporting or review procedure, or in connection with such Member's or such Member's Affiliates' normal fund raising, marketing, informational or reporting activities, or to such Member's (or any of its Affiliates') Affiliates, employees, auditors, attorneys or other agents; (iii) to any bona fide prospective purchaser of the equity or assets of such Member or its Affiliates or the Units held by such Member, or prospective merger partner of such Member or its Affiliates, *provided,* that such purchaser or merger partner to be bound by the provisions of this Section 10.4; or (iv) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation; *provided,* that the Member required to make such disclosure shall provide to the Manager prompt prior notice of such requirement.  For purposes of this Section, Confidential Information shall not include any information of which (x) such Person became aware prior to its affiliation with the Company, or (y) such Person learns from sources other than the Company (*provided* that such Person does not know or have reason to know, at the time of such Person's disclosure of such information, that such information was acquired by such source through violation of law, or breach of contractual confidentiality obligations or breach of fiduciary duties).  Nothing in this Section shall in any way limit or otherwise modify any confidentiality covenants entered into by the Company's employees with the Company.

## ARTICLE XI
## TRANSFERS; ADMISSION OF MEMBERS

11.1     **Transfer Restrictions**.  Except as otherwise set forth in this Article, no Member shall Transfer all or any portion of any interest in any Units (including to any other Member, or by gift, or by operation of law or otherwise) without first obtaining the prior written consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.  Notwithstanding anything herein to the contrary, all Transfers will be in compliance with the Securities Act and applicable state securities laws as determined by the Company and its securities counsel.

11.2     **Permitted Transfers**.

(a)     General.  The restrictions on Transfer provided in this Article shall not be applicable to the following (each, a "**Permitted Transfer**" and the transferee of each, a "**Permitted Transferee**"):

(i)     any Transfer by a Member to a spouse, parent, sibling or other descendant of a Member or to a trust primarily for the benefit of any such individual;

(ii)     any Transfer by a Member to an Affiliate of such Member;

(iii)     any gift Transfer from a Member to a member of that Member's immediate family or for estate planning purposes; or

(iv)     any Transfer upon the death of any Member to such Member's executors, administrators or testamentary trustees;

*provided,* that the transferee in each case is otherwise qualified to be a Member pursuant to the terms of this Agreement and complies with the provisions for membership set forth in this Agreement and/or required by the Manager from time to time.

- 29 -

(b)      Transferring Member Ceases to be Member.  Upon a Transfer of all a Member's Units in connection with a Permitted Transfer in compliance with the provisions of this Agreement and the admission of the Transferee thereof as a Substitute Member, the Transferring Member shall cease to be a Member hereunder.

11.3      **Void Transfer**.  Any purported Transfer, no matter how effected, by any Member of any Units in the Company in contravention of this Agreement or which does not comply with the terms, conditions and procedures of this Agreement shall be void and ineffectual and shall not bind or be recognized by the Company or any other party and shall not result in a Transfer of any interest in the Company.  No such purported assignee shall have any voting rights or any right to any Profits, Losses or Distributions of the Company.

11.4      **Effect of Valid Transfer**.

(a)      Assignment.  A Transfer of Units permitted hereunder shall be effective as of the date of assignment and compliance with the conditions to such Transfer.  Profits, Losses and other Company items shall be allocated between the assignor and the assignee according to Code Section 706, using the "interim closing of the books" or the "daily proration" method selected by the Manager.  Distributions made before the effective date of such Transfer shall be paid to the assignor, and Distributions made after such date shall be paid to the assignee.

(b)      Record Owner.  Notwithstanding the foregoing, the Company and the Manager shall be entitled to treat the record owner of any Units or other interest in the Company as the absolute owner thereof and shall incur no liability for Distributions of cash or other property made in good faith to such owner until such time as a written assignment of such Units or other interest in the Company, which assignment is permitted pursuant to the terms and conditions of this Article, has been received and accepted by the Manager and recorded on the books of the Company.

(c)      Rights and Obligations of Assignee.  Unless and until an assignee becomes a Substitute Member pursuant to Section 11.5, the assignee shall not be entitled to any of the rights granted to a Member hereunder or under applicable law, other than the rights granted specifically to assignees pursuant to this Agreement or pursuant to the Act; *provided,* that without relieving the assigning Member from any such limitations or obligations, as more fully described in Section 11.4(e) hereof, such assignee shall be bound by any limitations and obligations of a Member contained herein by which a Member would be bound on account of the assignee's interest in the Company (including the obligation to make required Capital Contributions with respect to any Transferred Units).

(d)      Acceptance of Benefits.  Any Person who acquires in any manner whatsoever any Units or other interest in the Company, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all the terms and conditions of this Agreement that any predecessor in such Units or other interest in the Company of such Person was subject to or by which such predecessor was bound.

(e)      Rights and Obligations of Assignor.  Any Member who shall assign any Units or other interest in the Company shall cease to be a Member of the Company with respect to such Units or other interest and shall no longer have any rights or privileges of a Member with respect to such Units or other interest, except that the applicable provisions of Article IX (Tax Matters) shall continue to inure to the benefit of such Member in accordance with the terms thereof.  Unless and until such an assignee is admitted as a Substitute Member in accordance with the provisions of Section 11.5 hereof, (i) such

- 30 -

assigning Member shall retain all the duties, liabilities and obligations of a Member with respect to such Units or other interest, including, without limitation, the obligation (together with its assignee, pursuant to Section 11.4(c) hereof) to make and return Capital Contributions on account of such Units or other interest pursuant to the terms of this Agreement and (ii) the Manager may, in its discretion, reinstate all or any portion of the rights and privileges of such Member with respect to such Units or other interest for any period of time prior to the date such assignee becomes a Substitute Member.  Nothing contained herein shall relieve any Member who Transfers any Units or other interest in the Company from any liability of such Member to the Company or the other Members with respect to such Units or other interest that may exist on the date such assignee becomes a Substitute Member or that is otherwise specified in the Act and incorporated into this Agreement or for any liability to the Company or any other Person for any present or future breaches of any representations, warranties or covenants by such Member (in its capacity as such) contained herein or in the other agreements with the Company.

11.5    **Admission of Substitute Member**.

(a)    Admission.  An authorized assignee of any Units or other interests in the Company of a Member, or any portion thereof, shall become a Substitute Member entitled to all the rights of a Member if and only if (i) the assignor gives the assignee such right; (ii) the Manager has granted its prior written consent to such assignment and substitution, if required, which consent may be withheld in the discretion of the Manager; (iii) such assignee shall execute and deliver a joinder agreement or counterpart signature page to this Agreement agreeing to be bound by all the terms and conditions of this Agreement; and (iv) such assignee shall execute such other documents and instruments as may be necessary or appropriate to effect such Person's admission as a Substitute Member, in a form satisfactory to the Manager.  In the event of the admission of an assignee as a Substitute Member, all references herein to the assignor shall be deemed to apply to such Substitute Member, and such Substitute Member shall succeed to all the rights and obligations of the assignor hereunder; *provided,* that the assignor shall continue to remain subject to Section 10.4 (Confidentiality) and Section 11.4(e).  Each Member agrees that, notwithstanding the Transfer of all or any portion of its interest in the Company, as between the Member as assignor and the Company, the Member as assignor shall remain liable to return any Distributions previously made to such Member if return of any such Distributions is required by any provision of this Agreement or the Act.

(b)    Timing.  Any such assignee will become a Substitute Member on the later of (i) the effective date of Transfer and (ii) the date on which all the conditions set forth in Section 11.5(a) have been satisfied.  No further action or consent by the Members shall be required in connection with the admission of Substitute Members to the Company pursuant to Section 11.5(a).

(c)    Failure.  In the event a Transferee of a Unit is not admitted as a Substitute Member, such Transferee shall be deemed a mere assignee of Profits only without any voting rights or right, power or authority of a Member hereunder and shall bear Losses in the same manner as its predecessor in interest, and the Transferor of such interest shall thereafter be considered to have no further rights or interest in the Company with respect to the interest Transferred, but shall nonetheless be subject to its obligations under this Agreement with respect to such interest. Additionally, the Transferor shall be deemed to be a defaulted Member.  Upon admission of a Transferee as a Substitute Member, the Transferor shall automatically be withdrawn from the Company and be relieved of any corresponding obligations, to the extent of its Transferred Units.

(d)    Costs.  All reasonable costs and expenses incurred by the Company in connection with any Transfer, and, if applicable, the admission of a Person as a Substitute Member, shall be paid by the transferor.

- 31 -

(e)　　Update Schedule of Members.　Upon the admission of a Substitute Member, the Manager shall update the Schedule of Members to reflect the changes in ownership of Units and Membership Percentages, including the name, address, number and class of Units and amount of Capital Contributions of such Substitute Member and to eliminate the name and address of and other information relating to the assigning Member with regard to the assigned Units and other interests in the Company.

11.6　　**Admission of Additional Members**.

(a)　　Admission.　A Person may be admitted to the Company as an additional Member only as contemplated under Section 3.5 (Additional Capital – Other) or Section **Error! Reference source not found.** (Additional Units) hereof and only if such additional Member shall execute and deliver a counterpart of this Agreement agreeing to be bound by all the terms and conditions of this Agreement, and such other documents and instruments as may be necessary or appropriate to effect such Person's admission as an additional Member, in a form satisfactory to the Manager.　Such admission shall become effective on the date on which the Manager determines in its discretion that such conditions have been satisfied and when any such admission is shown on the books and records of the Company.　No action or consent by Members shall be required in connection with the admission of new Members to the Company.

(b)　　Update Schedule of Members.　Upon the admission of an additional Member, the Manager shall update the Schedule of Members to reflect the changes in ownership of Units and Membership Percentages resulting from the issuance of Units, including the name, address, number and class of Units and amount of Capital Contributions of such additional Member.

11.7　　**Death, Incapacity or Bankruptcy of a Member.**

(a)　　General.　If a Member dies, becomes Incapacitated or a Bankrupt Member (the "**Designated Member**"), the remaining Member or Members (the "**Remaining Members**") shall forthwith become vested with the exclusive obligation, in proportion to their relative Membership Percentages, to purchase the entire right, title and interest of the Designated Member at a purchase price equal to the Fair Value of such interest; *provided*, *however*, that such calculation of Membership Percentages shall be made assuming that all Units owned by the Designated Member were distributed to all the Remaining Members pro rata in proportion to their then current Membership Percentages.

(b)　　Fair Value.　The Remaining Members succeeding to the entire right, title and interest of the Designated Member shall pay to such Designated Member (or his/her/its legal representative) the Fair Value thereof within ninety (90) days of the death of the Designated Member or the Designated Member's becoming Incapacitated or a Bankrupt Member (such date, the "**Purchase Date**"); *provided*, that the Fair Value shall be determined as of a date that is at least thirty (30) days prior to the Purchase Date.　In the event the Fair Value is determined by independent appraisal, the cost of each appraiser shall be paid by the party choosing such appraiser; *provided*, *further* that payment of Fair Value may be made, in the discretion of the Remaining Members, in cash or an unsecured, 8% interest rate per annum twelve (12) month promissory note.

(c)　　Designated Member's Obligations.　A Designated Member (or his/her/its legal representative) whose entire right, title and interest is to be purchased and succeeded to by the Remaining Members pursuant to this Section shall, on or before the Purchase Date, execute and deliver such deeds, bills of sale and other instruments as shall reasonably be requested by such Remaining Members to effect the conveyance and Transfer of the entire right, title and interest of such Designated Member in the Company and shall, to the extent requested by the Remaining Members, cooperate to effect a smooth and efficient continuation of the Company affairs.

- 32 -

(d) <u>Bankrupt Member</u>. If a Bankrupt Member (or his/her/its legal representative) disputes the right of the Remaining Members to purchase and succeed to the Bankrupt Member's entire right, title and interest in the Company, such Bankrupt Member (and his/her/its legal representative) shall nevertheless execute instruments and cooperate with the Remaining Members pursuant to the immediately preceding sentence, without, however, being deemed to have waived his/her/its rights to damages if the Remaining Members shall have purchased and succeeded to the interest of the Bankrupt Member under this Section without having the right to do so.

## ARTICLE XII
## DISSOLUTION, LIQUIDATION AND TERMINATION

12.1    **Dissolution**.

(a)    <u>General</u>. The Company shall be dissolved, its assets disposed of and its affairs wound up upon the first to occur of the following:

(i)    approval of the Manager and of Members holding a Majority in Interest of the Members;

(ii)    the entry of a decree of judicial dissolution of the Company under the Act or such other event requiring dissolution under the Act; and

(iii)    a determination by the Manager to dissolve the Company because it has determined that there is a substantial likelihood that due to a change in the text, application or interpretation of the provisions of the U.S. federal securities laws (including the Securities Act), or any other applicable statute, regulation, case law, administrative ruling or other similar authority (including changes that result in the Company being taxable as a corporation or association under U.S. federal income tax law), the Company cannot operate effectively in the manner contemplated herein.

(b)    <u>Specific Occurrences</u>. The Company shall not be dissolved by the admission of additional or Substitute Members. The death, retirement, resignation, bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company.

(c)    <u>Perpetual Existence</u>. Except as otherwise set forth in this Article, the Company is intended to have perpetual existence.

12.2    **Authority to Wind Up**. Upon the dissolution of the Company as set forth in Section 12.1, the Manager shall have all necessary power and authority required to marshal the assets of the Company, to pay the Company's creditors, to distribute assets and otherwise wind up the business and affairs of the Company. In particular, the Manager shall have the authority to continue to conduct the business and affairs of the Company insofar as such continued operation remains consistent, in the judgment of the Manager, with the orderly winding up of the Company.

12.3    **Accounting**. Upon the dissolution of the Company, an accounting shall be made of the assets and liabilities of the Company and the Capital Account of each Member as of the date of dissolution and of the items of Profits and Losses from the date of the last previous accounting to the date of dissolution. The Liquidating Trustee shall cause Financial Statements presenting such accounting to be prepared and certified.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

12.4    **Distribution of Assets**.  Upon a Liquidation Event, the assets of the Company shall be distributed as follows in accordance with the Act (the "**Liquidating Distribution**"):

(a)    *first*, to creditors of the Company in satisfaction of the liabilities of the Company, including Members who are creditors (other than in respect of Distributions owing to them hereunder);

(b)    *second*, to the payment of the expenses of the Liquidation Event;

(c)    *third*, to establish any necessary reserves, in amounts established by the Manager or the Liquidating Trustee, as the case may be, to provide for other liabilities, including contingent liabilities, if any;

(d)    *fourth*, if applicable, to the holders of each series of Class A Preferred Units, in such amount and with such allocation as set forth in Section 5.2(d) and

(e)    *thereafter*, to the Common Members in accordance with Section 5.2(a);

*provided*, that the distribution of cash, securities and other property to a Member in accordance with the provisions of this Section shall constitute a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Interest and all the Company's property, and shall constitute a compromise to which all Members have consented within the meaning of the Act.  If such cash, securities and other property are insufficient to return such Member's Capital Contributions or returns thereon, the Member shall have no recourse against the Manager, any of the other Members or Officers of the Company.

12.5    **Liquidating Distribution**.  The Liquidating Distribution shall be made on or before the later to occur of (i) the last day of the Taxable Year of the Company in which the Liquidation Event occurs and (ii) ninety (90) days thereafter (the "**Final Liquidation Date**").  If the Liquidating Trustee, in its discretion, determines that the Liquidating Distributions will not be timely made, it may distribute all the assets and liabilities of the Company in trust with the Liquidating Trustee, or such other Person as may be selected by the Liquidating Trustee acting as trustee; the purpose of the trust is to allow the Company to comply with the timing requirements under Regulation Section 1.704-1(b).  The Liquidating Trustee, acting as trustee of said trust, shall distribute the former Company assets (however constituted, enhanced or otherwise) as promptly as such trustee deems proper and in the same manner as directed in this Section (without regard to this sentence or the preceding two sentences) and otherwise as required hereunder.  The trust shall be terminated as soon as possible after the trust property is distributed to the beneficiaries thereof.

12.6    **Distributions in Kind**.  Any Company property distributed in kind shall be transferred and conveyed to the distributees as tenants in common subject to any liabilities attached thereto so as to vest in them undivided interests in the whole of such property in proportion to their respective rights to share in the proceeds of the sale of such property in accordance with this Article.

12.7    **Liquidating Trustee**.

(a)    General.  Upon the dissolution of the Company, the affairs of the Company shall be wound up and terminated and the Members shall continue to share Profits, Losses, Distributions and other items of the Company during the winding up period in accordance with the provisions of this Agreement.  The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Liquidating Trustee, who is hereby authorized to do all acts authorized by law for these purposes.  The Liquidating Trustee, in carrying out such winding up and distribution, shall have full power and authority to sell, assign, Transfer and encumber all or any of the Company assets.  On dissolution of the Company, the Manager shall act as liquidator or may appoint one or more Members as

- 34 -

liquidator(s). The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense.

(b)     Indemnification. The Liquidating Trustee shall be indemnified and held harmless by the Company from and against any and all claims, liabilities, costs, damages and causes of action of any nature whatsoever arising out of or incidental to the Liquidating Trustee's taking of or failure to take any action authorized under, or within the scope of, this Agreement; *provided*, *however*, that the Liquidating Trustee shall not be entitled to indemnification for:

(i)     matters entirely unrelated to the Liquidating Trustee's actions under the provisions of this Agreement; or

(ii)     the fraud, willful misconduct, self-dealing or criminal activity of the Liquidating Trustee.

12.8    **Winding Up**. The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all the remaining property and assets of the Company have been distributed to the Members.

12.9    **Termination**. Upon the completion of the winding up of the Company and the distribution of all Company assets as provided herein, the Company shall terminate and the Liquidating Trustee shall have the authority to execute and record any and all other documents required to effectuate the termination of the Company.

12.10    **Return of Capital**. The Liquidating Trustee shall not be personally liable for the return of Capital Contributions or any portion thereof to the Members (it being understood that any such return shall be made solely from Company assets).

## ARTICLE XIII
## GENERAL PROVISIONS

13.1    **Offset**. Whenever the Company is to pay any sum to any Member under this Agreement or pursuant to any other agreement or right, any amounts that such Member owes to the Company under this Agreement or pursuant to any other agreement or right may be offset against and deducted from that sum before payment.

13.2    **Notices**. Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and shall be deemed to have been received, given or made when (a) delivered personally to the recipient; (b) telecopied or delivered by electronic mail to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied or e-mailed before 5:00 p.m. Miami, Florida time on a Business Day, and otherwise on the next Business Day; (c) one (1) Business Day after being sent by reputable overnight courier service (charges prepaid); or (d) five (5) Business Days after being deposited in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested. All notices, requests and consents to be sent to a Member must be sent to or made at the address given for that Member on the Schedule of Members on the books and records of the Company, or such other address as that Member may specify by notice to the Company and the other Members. Any notice, request or consent to the Company or the Manager must be given to the Manager at the following address:

- 35 -

<table>
<tr><td>To the Company<br>or the Manager:</td><td>20900 NE 30th Ave<br>Suite 510<br>Miami, FL 33180</td></tr>
</table>

Whenever any notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

13.3     **Entire Agreement**.  This Agreement and the Subscription Agreements (including all exhibits and schedules thereto) contain the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all prior agreements, arrangements, understandings, proposals, representations and warranties with respect thereto.

13.4     **Effect of Waiver or Consent**.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run.

13.5     **Amendments**.

(a)     General.  This Agreement may be amended or modified from time to time only by a written instrument adopted by the Manager and executed and agreed to by Members holding the required number of Units set forth herein; *provided, however,* that (i) an amendment or modification reducing disproportionately a Member's Units or other interest in Profits, Losses or Distributions or increasing a Member's Capital Contribution shall be effective only with that Member's consent and (ii) an amendment or modification reducing the vote required for any consent or vote in this Agreement shall be effective only with the consent or vote of Members having the Units theretofore required.

(b)     No Member Approval.  The Manager may without prior notice or consent of any Member generally make amendments to reflect or effect any of the following:

(i)     to correct any mistake, clerical, technical or other errors, cure any ambiguity or omission in this Agreement, make an inconsequential revision, provide clarity or to correct or supplement any provision herein that may be defective or inconsistent with any other provisions of this Agreement or to effect the intent of the provisions of this Agreement or that is otherwise contemplated by this Agreement;

(ii)     any increase or decrease in the Units or any class or series thereof;

(iii)     the creation, authorization and/or issuance of additional Units or other limited liability company interests in the Company;

(iv)     the admission of new members and Substitute Members of the Company in accordance with the provisions of this Agreement;

(v)     the cancellation or repurchase of Units or other interests in the Company which have been issued subject to vesting or similar arrangements;

- 36 -

(vi)     that the Units shall be certificated upon determination by the Manager;

(vii)    update the Schedule of Members, including in connection with any of subclauses (ii) through (vi) above;

(viii)   an election for the Company to be bound by any successor statute governing limited liability companies governed by and under the laws of Delaware;

(ix)     changes to this Agreement to conform to changes in the Act or interpretations thereof which the Manager believes appropriate, necessary or desirable, *provided,* that in its opinion such amendment does not have a materially adverse effect upon the Members or the Company;

(x)      the exercise of any power granted to the Manager under this Agreement;

(xi)     changes which, in the discretion of the Manager, are advisable to qualify or to continue the qualification of the Company as a limited liability company in which the Members and the Manager has limited liability under the laws of any state or that are necessary or advisable, in the discretion of the Manager, to ensure that the Company will not be treated as an association taxable as a corporation for federal income tax purposes;

(xii)    to amend the provisions of <u>Article V</u> (Distributions; Allocations of Profits and Losses) if the Company is advised at any time by legal counsel that the allocations provided therein are unlikely to be respected for federal income tax purposes, in which case the Manager is empowered to amend such provisions to the extent necessary in accordance with the advice of counsel to effect the plans of allocations and Distributions provided in this Agreement (new allocations made by the Manager in reliance upon the advice of counsel described above shall not give rise to any claim or cause of action by any Member), or otherwise to achieve the tax treatment contemplated by this Agreement;

(xiii)   as necessary to reflect the respective allocations, Distributions, voting, liquidation and other rights, preferences, privileges and restrictions with respect to new Units or interests issued by the Company, or to effectuate Distributions, splits and combinations of Units as contemplated by the Agreement, or to effectuate a modification to the manner in which capital accounts of the Members, or any debits or credits thereto, as contemplated by the Agreement; or

(xiv)    to effect any other amendment that does not have a materially adverse effect on the Members.

13.6    **Binding Effect**.  Subject to the restrictions on Transfer set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members, and their respective heirs, legal representatives, successors and assigns.

13.7    **Governing Law; Severability**.  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.  In the event of a direct conflict between the provisions of this Agreement and any provision of the Certificate or any mandatory provision of the Act, the applicable provision of the Certificate or the Act shall control.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by law.

- 37 -

13.8    **Jurisdiction; Venue**.  Except as provided in Section 13.9, any action or proceeding against the parties relating in any way to this Agreement may be brought and enforced only in the courts of the State of Florida, and the parties irrevocably submit to the jurisdiction of such courts in respect of any such action or proceeding.  The parties irrevocably waive, to the fullest extent permitted by law, any objection that they may now or hereafter have to the laying of venue of any such action or proceeding in the state or federal courts of the State of Florida, County of Dade and any claim that any such action or proceeding brought in any such court has been brought in any inconvenient forum.  To the fullest extent permitted by law, the parties hereby irrevocably consent to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to it at its address as set forth herein.  Nothing herein shall affect the right of the parties to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction.

13.9    **Waiver of Jury Trial; Expedited Arbitration**.  BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES UNDER THIS AGREEMENT OR ANY DOCUMENTS RELATED HERETO.

Any dispute between or among the Manager and the Members or any interpretation of this Agreement shall be submitted to expedited arbitration as provided below (but any damages must be resolved in a court described in Section 13.8).  The prevailing party in any arbitration or litigation shall be reimbursed for its arbitration costs (including attorneys' fees) by the non-prevailing party.

If any dispute arises concerning the interpretation, validity, or performance of this Agreement or any of its terms and provisions, including but not limited to the issue of whether or not a dispute is arbitrable, then the parties shall submit such dispute for binding determination before a retired judge selected from *JAMS/ENDISPUTE* or any similar organization mutually acceptable to the parties.  The parties shall mutually agree on one arbitrator from the list provided by the arbitrating organization; *provided,* that if the parties cannot agree, then each party shall select one arbitrator from the list, and the two arbitrators so selected shall agree upon a third arbitrator chosen from the same list, which third arbitrator shall determine the dispute.  The arbitration shall take place in Palm Beach County, Florida, and shall be conducted in accordance with the then prevailing rules of the arbitrating organization, except as set forth in this Section 13.9.  The parties shall have all the same rights of discovery as if the arbitration proceeding were a lawsuit in a court of Delaware.  The arbitrator shall apply Delaware substantive law to the proceeding.  The arbitrator shall, to the fullest extent permitted by law, have the power to grant all legal and equitable remedies, including provisional remedies, and award compensatory damages provided by law; however, the arbitrator may not order relief in excess of what a court could order.  The arbitrator shall not have authority to award punitive or exemplary damages.  The arbitrator shall prepare and provide the parties with a written award including factual findings and the legal reasoning upon which the award is based.  The arbitrator shall not have the power to commit errors of law or legal reasoning or to make findings of fact except upon sufficiency of the evidence.  Any award that contains errors of law or legal reasoning or makes findings of fact except upon the sufficiency of the evidence exceeds the power of the arbitrator, and may be corrected or vacated as provided by applicable law in the courts described in Section 13.8.  The arbitrator shall award costs and attorneys' fees in accordance with the terms and conditions of this Agreement.  Any

- 38 -

court having jurisdiction may enter judgment on the award rendered by the arbitrator, or correct or vacate such award as provided by applicable law.  The parties understand that by agreement to binding arbitration they are giving up the rights they may otherwise have to trial by a court or a jury and all rights of appeal, and to an award of punitive or exemplary damages.  Pending resolution of any arbitration proceeding, either party may apply to any court of competent jurisdiction for any provisional remedy, including but not limited to a temporary restraining order or a preliminary injunction, excluding however, any dispute relating to discovery matters, and for enforcement of any such order.  The application for or enforcement of any provisional remedy by a party shall not operate as a waiver of the within agreement to submit a dispute to binding arbitration. Notwithstanding any provision of this Section 13.9 to the contrary, the failure of any Member or any member of the Manager to enter into, or answer a demand for, arbitration in accordance with this Section 13.9 shall grant the counterparty the right to a default judgment with respect to such dispute, which default judgment may be entered by any court having jurisdiction.

Notwithstanding any provision of this Agreement to the contrary, this Section shall be construed to the maximum extent possible to comply with the laws of the State of Delaware, including the Delaware General Arbitration Act (the "**Delaware Arbitration Act**").  If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this Section, including any rules of the American Arbitration Association, shall be invalid or unenforceable under the Delaware Arbitration Act, or other applicable law, such invalidity shall not invalidate all of this Section.  In that case, this Section shall be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of the Delaware Arbitration Act or other applicable law and, in the event such term or provision cannot be so limited, this Section shall be construed to omit such invalid or unenforceable provision.

13.10    **Further Assurances**.    In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

13.11    **Waiver of Certain Rights**.  Each Member irrevocably waives any (i) right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company, to the extent permitted to be waived under the Act, and (ii) rights of appraisal it may have under the Act.

13.12    **Notice to Members of Provisions**.   By executing this Agreement, each Member acknowledges that it has actual notice of (i) all the provisions hereof (including, without limitation, the restrictions on Transfer set forth in Article XI), and (ii) all the provisions of the Certificate.

13.13    **Remedies**.  Each Member shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all the rights which such Person has under any law.  Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

13.14    **Severability**.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never

- 39 -

been contained herein. If the Act is subsequently amended or interpreted in such a way as to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

13.15    **Descriptive Headings; Interpretations**. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. All references to Certificate and Sections refer to articles and sections of this Agreement, and all references to Schedules are to schedules attached hereto, each of which is incorporated herein and made a part hereof for all purposes. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. The use of the words "and," "or" and "either" shall not be exclusive. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. Wherever required by the context, references to a Fiscal Year shall refer to a portion thereof. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

13.16    **UCC Article 8 Election**. Each Unit of the Company shall constitute a "security" within the meaning of, and be governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 and the Company hereby "opts-in" to such provisions for the purpose of the Uniform Commercial Code.

13.17    **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any of its Affiliates, and no creditor who makes a loan to the Company or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Company Profits, Losses, Distributions, capital or property other than as a secured creditor.

13.18    **Survival**. All indemnities and reimbursement obligations made pursuant to this Agreement shall survive dissolution and liquidation of the Company until the expiration of the longest applicable statute of limitations (including extensions and waivers) with respect to the matter for which a party would be entitled to be indemnified or reimbursed, as the case may be.

13.19    **Counterparts**. This Agreement may be executed in multiple counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

13.20    **Compliance with Anti-Money Laundering Requirements**. Notwithstanding any other provision of this Agreement to the contrary, the Manager, in its own name and on behalf of the Company, shall be authorized without the consent of any Person, including any other Member, to take such action as they determine in its discretion to be necessary or advisable to comply with any anti-money laundering or

- 40 -

04-06-2021 @ 11:48:09 AM EST

anti-terrorist laws, rules, regulations, directives or special measures, including the actions contemplated by the Subscription Agreements.

*[Signature Page Follows]*

- 41 -

## SIGNATURE PAGE TO OPERATING AGREEMENT
## OF
## JUSTICE PARTNERS LLC

The undersigned hereby execute the Operating Agreement of JUSTICE PARTNERS LLC, a Delaware limited liability company, with effect from the date first above written.

**COMPANY:**
**JUSTICE PARTNERS LLC**

By: _____
Name:  Lee Melchionni
Title:  Authorized Member

**MANAGER:**
**JUSTICE PARTNERS MANAGEMENT, LLC**

By: _____
Name:  Lee Melchionni
Title:  Authorized Member

*ACTIVE 47915850v1*

04-06-2021 @ 11:48:09 AM EST

## JOINDER AGREEMENT

This Joinder Agreement ("Joinder") is executed by the undersigned pursuant to the terms of the Operating Agreement of JUSTICE PARTNERS LLC (the "Company"), dated as of December 15, 2020, a copy of which has been provided to the undersigned and is incorporated herein by reference (the "Agreement"). By execution of this Joinder, the undersigned agrees as follows:

Acknowledgement. The undersigned acknowledges that undersigned is acquiring Units that are subject to the terms and conditions of the Agreement. Capitalized terms used herein without definition are defined in the Agreement and are used herein with the same meanings set forth herein.

Agreement. The undersigned (a) consents and agrees to all the provisions of the Agreement; (b) agrees that all Units now owned or hereafter acquired by the undersigned are bound by and subject to the terms of the Agreement; (c) adopts the Agreement with the same force and effect as if the undersigned were originally a party thereto; provided that joinder in the Agreement will not constitute admission as a Member unless and until he, she or it is duly admitted in accordance with the terms of the Agreement; and (d) acknowledges that for purposes of the Agreement, the undersigned is a holder of Class A Preferred Units / Class A Common Units as applicable as set forth below.

Notice. Any notice required or permitted by the Agreement will be given to the undersigned at the address listed besides the undersigned's signature below.

EXECUTED AND DATED on this 6 day of April , 20 2021

_____

Address for Notices: 50 S Pointe DR. PH#2 Miami Beach, Florida 33139

Number and Type of Units: 4,000 
_____

*ACTIVE 47915850v1*

04-06-2021 @ 11:48:09 AM EST

## EXHIBIT A

SCHEDULE OF MEMBERS
OF
**JUSTICE PARTNERS LLC**
*(current as of December 15, 2020)*

| Name and address | Number of Class A Common Units | Class A Common Membership Percentage | Number of Class A Preferred Units | Class A Preferred Membership Percentage | Aggregate Membership Percentage |
|---|---|---|---|---|---|
| True Vision Ventures LLC | 30,000 | 100% | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **TOTAL** | | | 100% | | 100% |

*ACTIVE 47915850v1*

04-06-2021 @ 11:48:09 AM EST

## EXHIBIT C
## RISK FACTORS

THERE ARE CERTAIN RISKS INHERENT IN AN INVESTMENT IN THE SERIES A PREFERRED UNITS (THE "**SECURITIES**" OR THE "**SERIES A PREFERRED UNITS**"). THE FOLLOWING DOES NOT PURPORT TO BE EXCLUSIVE OR TO SUMMARIZE ALL RISKS THAT MAY BE ASSOCIATED WITH PURCHASING OR OWNING THE SECURITIES. EACH POTENTIAL INVESTOR IS ADVISED AND EXPECTED TO CONDUCT ITS OWN INVESTIGATION INTO THE COMPANY AND THE RISKS AND SPECULATIVE FACTORS INHERENT IN AN INVESTMENT IN THE SECURITIES AND TO ARRIVE AT AN INDEPENDENT EVALUATION OF AN INVESTMENT IN THE SECURITIES. THE AGREEMENT TO WHICH THESE RISK FACTORS ARE ATTACHED IS PROVIDED FOR ASSISTANCE ONLY AND SHOULD BE READ IN ITS ENTIRETY AND IT IS NOT INTENDED TO BE, AND MUST NOT ALONE BE TAKEN AS, A RECOMMENDATION TO PURCHASE ANY SECURITIES OR AS THE BASIS FOR AN INVESTMENT DECISION. EACH INVESTOR SHOULD CONSULT HIS OWN TAX, INVESTMENT AND LEGAL ADVISORS CONCERNING THE MERITS OF THIS OFFERING. ALL REFERENCES TO "WE", "OUR", "US" AND "THE COMPANY" REFER TO JUSTICE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY.

### RISKS RELATED TO THE COMPANY

*We are a recently formed developmental stage entities with no operating history and we have not yet generated any revenues or achieved profitability.*

We are a developmental stage operation with no operating history upon which investors may base an evaluation of our potential future performance.  As a result, there can be no assurance that we will be able to develop consistent revenue sources, or that our operations will become profitable even if we are able to invest the funds raised in this Offering in accordance with our business plans. Our prospects must be considered in light of the risks, expenses and difficulties frequently encountered by entities in the early stages of development. Such risks include, but are not limited to, an evolving business model, developing the business plan, developing the business infrastructure and the management of growth. We must, among other things, in connection with the use of all proceeds of the Offering to make the proposed loan (the "**Loan**") to the Justice Partners Law Group, LP, a partnership organized under the laws of the District of Columbia ("**Justice Partners Law Group**"), respond to legal, economic and market variables outside our control, conduct adequate due diligence, respond to competitive developments.  There can be no assurance that we will be successful in meeting these challenges and addressing such risks and the failure to do so could have a materially adverse effect on our business, results of operations and financial condition.

As a development stage company, we are also subject to risks and or levels of risk that are often greater than those encountered by companies with established operations and relationships. There can be no assurance that we will be successful in meeting these challenges and addressing such risks and the failure to do so could have a materially adverse effect on our business, results of operations and financial condition.

*ACTIVE 47915850v1*

04-06-2021 @ 11:48:09 AM EST

*Investors will have no rights in the day-to-day decision making of the Company.*

The Company is a managed by its Manager, Justice Partners Management, LLC, (the "**Manager**") under the direction of Sylvia Benito (the "**Principal**"). Day-to-day managerial control of the Company is vested in the Manager, and the Manager has very broad management authority. The investors will not have the ability to participate in the management of the Company. Therefore, purchasers of the Series A Preferred Interests ability to participate in decisions made by the Company will be restricted and holders of the Series A Preferred Interests may not agree with all decisions of its management.

*The Company does not have operations.*

The Company has no direct operations of its own. Its only significant asset is or will be the Loan. The Justice Partners Law Group's ability to distribute profits to its Qualified Settlement Fund, will depend exclusively on its ability to source clients, as well as its success in litigating and/or settling mass tort claims, which is not within the control of either Justice Partners Law Group or the Company, and is instead largely determined by outside factors. Thus, there can be no assurance that the Justice Partners Law Group will be profitable or have any earnings or cash flow available for-profit distribution to the Company, and thus to the Series A Preferred Members.

*The Company's success is dependent exclusively on the success of the Justice Partners Law Group.*

The Justice Partners Law Group was only recently formed and has no operational history to date. The Company is dependent entirely on the efforts of Justice Partners Law Group to engage clients and successfully litigate and/or settle class action claims. Justice Partners Law Group anticipates entering into co-counsel relationships with litigation counsel in exchange for a portion of the legal fees, and thus, the success of the Company and Justice Partners Law Group is largely dependent upon the success of co-counsel. The inability to enter into and maintain co-counsel relationships will have a material adverse effect on the Company. Furthermore, no assurances can be given that Justice Partners Law Group will be successful in engaging clients, entering into and maintaining co-counsel relationships, and/or successfully disposing either via settlement or litigation award, any litigation matter. Therefore, to the extent that the Justice Partners Law Group is not successful in any of these endeavors, Investors in the Company may lose their entire investment.

*The Loan to Justice Law Partners may violate the Rules of Professional Conduct.*

There are limited circumstances in which a law firm or an attorney may share legal fees with non-lawyers in the District of Columbia. Here, the Loan features a "success fee" equal to up to 100% of the principal amount of the Loan. In the event of an equitable subordination claim, a court could find that Company has assumed a degree of control over the Justice Partners Law Group, thereby having a non-attorney share fees and control the law firm in violation of the Rules of Professional Conduct. Likewise, a court could find that the success fee is an improper sharing of attorney fees violative of the Rules of Professional Conducts. In such situation, the Investors may be entitled to seek rescission of the purchase of their Series A Preferred Units. If a number of Investors were

*ACTIVE 47915850v1*

successful in seeking rescission, the Company would face significant financial demands, which could adversely affect us as a whole.

### No Opinion of Counsel Regarding the Loan.

Neither the Company nor the Justice Partners Law Group received an opinion of counsel or a ruling from the District of Columbia Bar that this structure is acceptable under the Rules of Professional Conduct.

### The Company may be exposed to lender liability risks including equitable subordination.

In recent years, a number of judicial decisions in the United States have upheld the right of borrowers to sue lending institutions on the basis of various evolving legal theories (collectively termed "**lender liability**").   Generally, lender liability is founded upon the premise that an institutional lender has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the borrower or has assumed a degree of control over the borrower resulting in creation of a fiduciary duty owed to the borrower or its other creditors or shareholders.  Because of the nature of the Loan, the Company could be subject to allegations of lender liability.

In addition, under common law principles that in some cases form the basis for lender liability claims, if a lending institution (a) intentionally takes an action that results in the undercapitalization of a borrower to the detriment of other creditors of such borrower, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors of (d) uses its influence as an equity holder, if applicable, to dominate or control a borrower to the detriment of the other creditors of such borrower, a court may elect to subordinate the claim of the offending lending institution to the claims of the disadvantaged creditor or creditors, a remedy called "equitable subordination." Because of the nature of the Loan, the Company  be subject to claims from creditors of the Justice Partners Law Group that the Loan should be equitably subordinated.

### Payments under the Loan may constitute an avoidable preference in the event of insolvency.

If certain bankruptcy or insolvency proceedings are initiated by or against the Justice Partners Law Group within 90 calendar days after any payment is made by the Justice Partners Law Group to the Company under the Loan, or within one year after any payment is made by the Justice Partners Law Group to the Company, then to the extent the Company is deemed to be an "insider" as defined in the Bankruptcy Law, all or a portion of such payment may be avoided as a preferential transfer under the Bankruptcy Law and the Company may be required to return such payment. There can be no assurance that in the event of any bankruptcy case and related litigation that payments on the Loan will be made in full, on time or at all.

### The Company will be exposed to potential litigation if it attempts to foreclose on the collateral or otherwise enforce its rights.

It is possible that the Company may find it necessary or desirable to foreclose on the collateral securing the Loan.  The foreclosure process may be lengthy and expensive.  The Justice Partners Law Group may resist an action for foreclosure by asserting numerous claims, counterclaims and defenses against the Company including, without limitation, numerous lender liability claims and

ACTIVE 47915850v1

04-06-2021 @ 11:48:09 AM EST

defenses, even when such assertions may have no basis in fact, in an effort to prolong the foreclosure action and force the Company into a modification of the Loan. A foreclosure action can sometimes take several years or more to litigate. At any time prior to or during the foreclosure proceedings, the Justice Partners Law Group may file for bankruptcy, which would have the effect of staying the foreclosure action and further delaying the foreclosure process. Additionally, proposed legislation would, if enacted, empower bankruptcy courts to reduce the principal balance of the Loan. Any such reductions would adversely affect the value of Loan and the Company's ability to repay an investor's capital contribution to the Company and the Preferred Return.

***The Series A Preferred Members will not be an owner of the Justice Partners Law Group and will not enjoy the rights, privileges and benefits of a direct investment in the Justice Partners Law Group.***

Although the Company will use the proceeds from the Series A Preferred Members to make the Loan to the Justice Partners Law Group, you will not become an owner or a direct creditor of the Justice Partners Law Group as a result of the Loan. By investing in the Company, you will become an equity holder of only the Company as a Series A Preferred Member, and you will only be entitled to exercise the rights, privileges and benefits afforded the Series A Preferred Members, as set forth in the Operating Agreement. Accordingly, you will not have the right to vote or direct the voting of any equity interests in the Justice Partners Law Group.

***No person or entity is obligated to make additional capital contributions or loans to the Justice Partners Law Group.***

No person or entity has any obligation or commitment whatsoever to make any capital contributions or loans to the Justice Partners Law Group. Accordingly, if the Justice Partners Law Group does not receive sufficient funds from the its operations to make distributions to the Qualified Settlement Fund, and repay the Loan, the Series A Preferred Members may not receive their Preferred Returns or any return of their investment. Justice Partners Law Group may not rely on capital contributions or loans from any person or entity and, therefore, may not be able to satisfy its obligations under the terms of the Loan.

***The is limited security for the Loan and no guarantee for any profits of the Justice Partners Law Group.***

The Loan is a Loan to the Justice Partners Law Group, secured by the assets of the Justice Partners Law Group, which are negligible. It is currently contemplated that the Principal will serve as a co-trustee of a Qualified Settlement Fund administered by Justice Partners Law Group. The Justice Partners Law Group is a newly formed entity that is anticipated to have *de minimis* revenue and limited underlying assets. In the event of a liquidation, the value the Justice Partners Law Group will completely dependent upon market and economic conditions, the availability of buyers and similar factors at the time of liquidation. There also can be no assurance that the Justice Partners Law Group  will be saleable and, even if saleable, the timing of its liquidation is uncertain. To the extent that liens or other rights granted to third parties encumber the Justice Partners Law Group's assets, including the rights granted under the any Qualified Settlement Fund to the clients of the Justice Partners Law Group, such third parties have or may exercise rights and remedies with respect to the assets of the Justice Partners Law Group.

*ACTIVE 47915850v1*

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

*The Company's ability to exercise its rights under the Loan Documents is effectively limited by the provisions of the District of Columbia's rules regarding law firm ownership.*

The Company's security interest in the Justice Partners Law Group is possibly unenforceable, as pursuant to Rule 5.4 of the District of Columbia's Rules of Professional Responsibility, sharing of legal fees with non-lawyers is not permitted, except under limited circumstances.  As a result, the Company's ability to exercise any rights under the Loan Documents is limited.

*No Series A Preferred Member may exercise or otherwise enforce the Company's rights under the Loan Documents.*

If an event of default occurs under the Loan Documents, only the Principal, and neither the Company nor any Series A Preferred Member of the Company may seek to enforce any rights under the Loan Documents.  There can be no assurance that the Justice Partners Law Group will have sufficient assets, or will be able to obtain other funds, to pay the principal and unpaid interest on the Loan, and as a result, the Company may be unable to pay the Preferred Return or make any distribution to the Series A Preferred Members.

*There is no guarantee or assurance that the Company will make distributions to the Series A Preferred Members.*

The Company intends to make cash distributions to the Series A Preferred Members only after the Loan has been repaid, as the Company has no other business activities except for the Loan.  Justice Partner's upon disposition of a class action law suit and after the payment of expenses of both the Company and Justice Partners Law Group.  There can be no assurance that cash will be available, or that distributions will be made.

*Control of the Company is vested in the Manager, and the Manager is entitled to receive fees.*

Full day-to-day management control over the Company rests with the Manager, and the Series A Preferred Interest Holders lack any managerial control over the Company or investments. Therefore, our success is largely dependent on the Manager for the day-to-day management of the business and investments.  In addition, the Manager, and consequently the Company, is currently dependent on the continued service of Sylvia Benito, the Principal.  The loss of the Manager's services, including if any services of the Principal were to cease or lapse for any reason, may cause the Company to be adversely affected.  In addition, the Manager, or its designated affiliate, is entitled to receive, after payment of the Preferred Return, 15% of any distributions until the Series A Preferred Unit Holders receive a return of 3x their respective Capital Contributions, and 20% thereafter.  While the Manager intends that such services be provided at competitive market rates, such compensation was not determined through arm's-length negotiation.

*The Operating Agreement places limitations on liability.*

The Operating Agreement contains provisions providing for the indemnification of our members, managers, officers, employees and other agents. As a result of the inclusion of such provisions, neither the Common Unit nor Preferred Unit holders may be able to recover monetary damages against our members, managers, officers, employees or other agents for actions taken by them,

ACTIVE 47915850v1

04-06-2021 @ 11:48:09 AM EST

although it may be possible to obtain injunctive or other equitable relief with respect to certain actions. If equitable remedies are found not to be available to Common Unit or Preferred Unit holders in any particular case, our members may not have an effective remedy against the challenged conduct.

## RISKS RELATED TO THE OFFERING AND YOUR INVESTMENT

***Your investment in the Series A Preferred Units is a long-term investment.***

Investors should be aware of the long-term nature of their investment in the Company. Prospective investors will be required to represent in writing that they are purchasing the Series A Preferred Units for their own account for long-term investment and not with a view towards resale or distribution. Accordingly, purchasers of the Series A Preferred Units must be willing and able to bear the economic risk of their investment for an indefinite period of time.

***The Purchase Price for the Series A Preferred Units was determined arbitrarily may not bear a reasonable relationship to the value of the Common Units.***

The Purchase Price for the Series A Preferred Units has been determined solely by us. The determination of the Purchase Price was arbitrary and is not an indication of the value of the Series A Preferred Units, the underlying Common Units or the assets or our earnings and it bears no inherent relationship to our assets, book value, net income or any other recognized measure of value.

***The Investors will not have any voice in either the Company or in the Justice Partners Law Group.***

The holders of Series A Preferred Units are not entitled to vote for any matter with regard to the Company or with regard to Justice Partners Law Group, including with regard to the Loan to Justice Partners Law Group.   Such purchasers, either individually or as a collective group, will not have the ability to control our actions in major decisions.

***The Securities are not registered with the Securities and Exchange Commission.***

The Securities will not be registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or any state's blue-sky laws in reliance upon exemptions contained in the Securities Act and in such laws. The Securities may not be resold unless they are registered thereunder or an exemption from registration is available. Holders of Securities have no right to require the registration of the Series A Preferred Units or underlying Common Units. The exemption from registration of the Securities in accordance with applicable provisions of the securities laws of the United States and state law cannot be guaranteed. Neither the SEC, any state nor any of their agencies have reviewed or passed upon the merits of the Series A Preferred Units or Common Units or the accuracy of this Agreement.

***The Offering is not registered with the SEC or state securities authorities and there will be no regulatory review or approval of the sale of the Series A Preferred Units.***

The Offering of will not be registered with the SEC under the Securities Act or the securities

*ACTIVE 47915850v1*

04-06-2021 @ 11:48:09 AM EST

agency of any state and no such agency will review or pass upon the sale of the Series A Preferred Units. The Series A Preferred Units are being offered in reliance on certain exemptions from the registration provisions of the Securities Act and state securities laws applicable only to offers and sales to investors meeting the suitability requirements set forth in the Subscription Agreement to which these Risk Factors are attached. No governmental regulatory agency has or will review or pass upon the sale of the Series A Preferred Units. As such, prospective investors will not have the benefit of review by the SEC or any state securities regulatory authority. Therefore, you are assuming the task and the risks of assessing the adequacy of disclosure and the fairness of the terms of this Offering on your own, or in conjunction with your personal advisors.

*(a)* *If we fail to comply with state, federal and international securities laws we may be subject to a rescission action.*

The Securities are being offered, and will be sold, to investors in reliance upon certain exemptions from the registration requirements provided in the Securities Act and state securities laws, or "Blue-Sky" laws. If we fail to comply with the requirements of these exemptions, it is possible that Investors may be entitled to seek rescission of their purchase of the Securities, if they so desire. It is possible that one or more Investors seeking rescission would succeed. This might also occur under the applicable "Blue-Sky" laws and regulations in states where the Securities will be offered without registration or qualification pursuant to a private offering or other exemption. If a number of Investors were successful in seeking rescission, we would face significant financial demands, which could adversely affect us as a whole.

*Our failure to comply with federal, state and relevant international securities law and regulations in connection with this Offering could subject us to enforcement actions and impair our ability to raise capital in the future.*

We are relying upon exemptions from the registration provisions of federal, state and relevant international securities laws in this Offering. In relying upon such exemptions we have the burden of compliance with such laws for this Offering. If for any reason we fail to comply, we may, among other things, be subjected to both investigations and administrative actions by federal, state or foreign agencies or actions for rescission or for damages. Such actions, if commenced, could have a material adverse effect on our ability to raise necessary capital in the future. While we endeavor to fully comply with all such laws, there is no assurance that any non-compliance will not have material adverse effect on us.

*To satisfy the requirements of applicable securities laws there is limited transferability and liquidity in the Securities.*

To satisfy the requirements of certain exemptions from registration under the Securities Act, and to conform to applicable state securities laws, each Investor must acquire the Securities for investment purposes only and not with a view towards distribution. Consequently, certain conditions of the Securities Act may need to be satisfied prior to any sale, transfer, or other disposition of the Securities. Some of these conditions may include a minimum holding period, availability of certain reports, including financial statements from us, limitations on the percentage of securities sold, and the manner in which they are sold.

*ACTIVE 47915850v1*

04-06-2021 @ 11:48:09 AM EST

**No assignment, transfer or disposition of any Securities may be made unless we receive an opinion of counsel provided at the holder's expense, in a form satisfactory to us stating that the proposed sale, transfer or other disposition will not result in a violation of applicable federal, state or foreign securities laws and regulations.**

*Our Securities have no public market and no assurance can be given that any public market will ever develop, or if developed that any such market will be sustained.*

The Securities have not been registered under the Securities Act, and are being offered in reliance upon exemptions from the registration requirements thereunder in a manner that is intended to comply with the requirements of Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder, and are only being offered hereunder to "accredited investors" as defined in the Securities Act. The Securities cannot be sold, transferred, pledged, hypothecated, assigned or otherwise disposed of, and unless they are registered under the Securities Act, or if in the opinion of counsel, satisfactory to us, such sale, transfer, pledge, hypothecation, assignment or disposition is exempt from such registration requirements. We have no current intent to file a registration statement with respect to the Securities and we have not made any representations with respect to the future filing of any registration statement or with respect to effectuating any public offering for the Securities. There is currently no trading market for the Securities and it is not anticipated that a trading market will ever develop. Accordingly, even in the absence of the foregoing restrictions on transfer, it is unlikely that an Investor will be able to readily dispose of the Securities or pledge them as collateral for a loan. Consequently, the Securities are suitable only for long-term investment by persons with no need for liquidity and who can absorb the loss of their entire investment.

*The Securities offered by the Company lack liquidity and transferability.*

There is no active secondary market for security holders to either purchase or sell their Series A Preferred Units or Common Units. We are not responsible for supporting or maintaining a market for the Securities. As a result, Investors may be unable to sell or transfer their Securities indefinitely and thus may be unable to realize any profit on their investment. Investors who need to be able to liquidate their investment with certainty should not invest their funds in the Securities.

*There is currently no public or private trading market for the Securities and as a result the Securities lack liquidity and transferability.*

Because there is no public or private trading market for the Securities and no such market is expected to develop, the liquidity and transferability of the Securities will be adversely affected. The Securities cannot be sold unless they are registered under the Securities Act or are exempt therefrom. There can be no assurances that we will ever register the Securities for resale under federal, state or foreign securities laws. Consequently, you may not be able to liquidate your Securities in the event of an emergency or for any other reason. Accordingly, this investment is designed for investors with no need for liquidity and who can afford to bear the risk of losing their entire investment.

*The value of the Securities will fluctuate.*

The value of the Series A Preferred Units and the underlying Common Units will fluctuate

ACTIVE 47915850v1

depending upon numerous factors, including without limitation, the success of our business, customer expansion, competitive developments, our ability to adapt to changing conditions and technology, changes in laws, the cost of keeping current with new technology and methods, inflation, recession, labor matters, including the departure or addition of key personnel to our management team, acts of god and other factors.

*You are not entitled to rely on other information.*

In making the decision to purchase the Securities, an Investor may consider information and materials not included this Agreement. **We have not authorized the use of such information nor do we make any representation or warranty as to any such information or material, and no assurances can be given as to its accuracy or completeness.** In addition, no assurances can be given to any subsequent purchaser of any of our securities that such information or material, if any, will be available, accurate, current or complete.

*Investments in the Securities may have adverse tax consequences.*

Investors are encouraged to contact their financial and tax advisors to determine the consequences, if any, of (i) their purchase of the Series A Preferred Units, and (ii) if the Series A Preferred Units are converted, their acquisition of Common Units.

*The members are subject to restrictions on transferability and there is a lack of public market for the Series A Preferred Units.*

The Series A Preferred Units are subject to significant restrictions on resale and the Common Units issuable upon conversion thereof are subject to significant restrictions on transferability and resale and may not be transferred or resold except as permitted under the Operating Agreement, the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. Additionally, neither the Series A Preferred Units nor the Common Units are registered under the Securities Act or qualified under the "Blue-Sky" laws of any state or jurisdiction, nor do we have any current intention to seek registration. Currently there is no trading market for the Series A Preferred Units or the Common Units and as a result, all Investors should assume the Series A Preferred Units and the Common Units issuable upon conversion thereof are illiquid.

*The purchase of the Series A Preferred Units is a speculative investment.*

Our goals are highly speculative and there is no assurance that we will be able to meet any of them. Our ability to achieve our objectives may be determined by factors beyond our control and that cannot be predicted at this time. Consequently, there can be no assurance that our efforts to start and expand our business operations will prove to be sufficient to enable us to generate the funds require to operate our business. Investors who purchase the Series A Preferred Units should be aware that they may not earn a substantial return on their investment and may, in fact lose their investment entirely.

*There can be no assurance that you will realize a return on your investment.*

No assurance can be given that you will realize a return on your investment or that you will not

ACTIVE 47915850v1

lose your entire investment. For this reason, you should read the Subscription Agreement to which these Risk Factors are attached and all other exhibits attached thereto carefully. Additionally, you should consult with your own personal legal and financial advisors prior to making any investment decision.

***We can provide no assurances or certainty as to an investment in the Company being profitable.***

There is no assurance that cash flow or profits will be generated by our investments. The lack of cash flow or profits will negatively affect our ability to meet our goals. Neither the Company nor any of its members or affiliates are obligated to provide the Investors with a guarantee against a loss on their investment or negative cash flows, and neither the Company nor any of its members or affiliates have or intend to provide such a guarantee.

***The Company and investors may be required to meet certain anti-money laundering regulations.***

The Uniting and Strengthening America by Fulfilling Rights and Ending Eavesdropping, Dragnet-collection and Online Monitoring Act of 2015 (the "**USA FREEDOM Act**") requires that financial institutions establish and maintain compliance programs to guard against money laundering activities.  The USA FREEDOM Act requires the Secretary of the U.S. Treasury to prescribe regulations in connection with anti-money laundering policies of financial institutions.  The Financial Crimes Enforcement Network ("**FinCEN**"), an agency of the U.S. Treasury, has announced that it is likely that such regulations would subject certain pooled investment vehicles to enact anti-money laundering policies.  It is possible that legislation or regulations could be promulgated that would require the Manager or other service providers to the Company, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to the Series A Preferred Members.  The Manager reserves the right to request such information as is necessary to verify the identity of a Series A Preferred Member and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by FinCEN and/or the SEC.  In the event of delay or failure by a Series A Preferred Member to produce any information required for verification purposes, the subscription monies relating thereto may be refused.

***A Series A Preferred Member's investment return may be reduced if the Company is required to register as an investment company under the Investment Company Act; if the Company becomes an unregistered investment company, the Company could not continue its business.***

The Company does not intend to register as an investment company under the Investment Company Act of 1940, as amended (the "**Investment Company Act**"), and instead intends to rely on an exemption provided under Section 3(c)(1) of the Investment Company Act for companies with not more than 100 beneficial owners, but may also rely on other exceptions or exemptions to registration under the Investment Company Act.  If the Company is unable to qualify for an exception or exemption under the Investment Company Act, including Section 3(c)(1), or otherwise was obligated to register as an investment company, the Company would have to comply with a variety of substantive requirements under the Investment Company Act that impose, among other things:

- limitations on capital structure;

*ACTIVE 47915850v1*

04-06-2021 @ 11:48:09 AM EST

- restrictions on specified investments;

- prohibitions on transactions with affiliates; and

- compliance with reporting, record keeping, voting, proxy disclosure and other rules and regulations that would significantly increase the Company's operating expenses.

Further, if the Company were required to register as an investment company but failed to do so, the Company would be prohibited from engaging in the Company's business and criminal and civil actions could be brought against the Company, the Manager and their respective management personnel.  In addition, the Company's contracts, including the Preferred Loan Documents, would be unenforceable unless a court required enforcement, and a court could appoint a receiver to take control of the Company and liquidate the Company's business.  The Manager will seek to minimize the degree of governmental regulation and oversight to which it and the Company are subject, but no assurance can be made that the Company will not be subject to additional government regulation.

### *The Manager is not subject to regulatory oversight.*

The Manager does not believe it is required to register, and does not intend to register, as an investment advisor under the Investment Advisers Act of 1940 (the "**Advisers Act**"), or under any comparable state investment law, and instead intends to rely upon an available exemption from registration.  In consequence, the Manager generally is not subject to the restrictions contained in the Advisers Act, although the Manager may become subject to such restrictions in the future.  The Manager will seek to minimize the degree of governmental regulation and oversight to which it and the Company are subject.  While it is anticipated that this approach will reduce compliance and other costs, this approach will also eliminate a variety of investor protections (including certain protections arising under the Securities Act, the Investment Company Act and the Advisers Act) that would be available if the Manager and the Company were subject to greater regulatory and oversight burdens.

### *The Company has no assets.*

The Company will technically not have any assets, but for the Loan.  The performance of the Company is therefore directly dependent upon the performance of the Justice Partners Law Group, and its ability to repay the Loan, and will not be offset or improved by the value of any other assets.  Any adverse financial, operational or business circumstances of the Justice Partners Law Group, will therefore, directly and adversely impact the Company's performance and returns to its investors.

### *If any securities offering of the Company fails to comply with state or federal securities laws, the Company may be required to refund to its investors their investment capital, plus interest, which may result in the Company's and/or Justice Partners Law Group's liquidation and potential economic loss .*

The Company is currently undertaking an offering of securities that is not registered with the SEC based on certain exemptions from state and federal registration requirements.  If the SEC or

*ACTIVE 47915850v1*

applicable state regulatory agency later determines that any of these securities offerings did not fully comply with federal or state law, as applicable, the Company may be required to refund to certain investors their investment capital, plus interest. If the Company is required to return any such capital or make any such interest payment, both the capital and assets of the Company and/or the Justice Partners Law Group could be adversely affected, thus jeopardizing the ability of the Company to operate successfully. In addition, if suits for rescission are brought under the Securities Act and successfully concluded for failure to register any of the Company's or Justice Partners Law Group's securities offerings, or for acts or omissions constituting offenses under the Securities Act, the Securities Exchange Act of 1934, as amended, or applicable state securities laws, the capital and assets of the Company could be adversely affected, jeopardizing the Company's ability to operate successfully. Further, the Company may be required to expend time and capital to defend an action by investigators of the SEC or state securities agencies of a particular state, even where the Company is ultimately exonerated. In addition, the structure of the Loan in the Justice Partners Group may be violative of the rules relating to attorney ethics and professional responsibility, as the Principal is merely a nominee for the Company's Series A Preferred Investors.

## RISKS ASSOCIATED WITH RETIREMENT PLANS

***An investment in the Company may not qualify as an appropriate investment for retirement plans.***

There are special considerations that apply to pension or profit sharing trusts or IRA's investing in our securities and thus you should consult with your financial and retirement plan advisors prior to investing any money from your retirement plan. If you are investing the assets of a Pension, Profit Sharing, 401(k), Keogh, or other qualified Retirement Plan, or the assets of an IRA in our Securities, you could incur liability or subject the plan to taxation if:

- your investment is not consistent with your fiduciary obligations under ERISA under the Internal Revenue Code;

- your investment is not made in accordance with the documents and instruments governing your plan or IRA, including your plans investment policy;

- your investment does not satisfy the prudence and diversification requirements of Section 40 (a) (1)(B) and 404 (A) (1)(C) of ERISA;

- your investment impairs the liquidity of the plan;

- your investment produces "unrelated business taxable income" for the plan or IRA;

- you will not be able to value the assets of the plan annually in accordance with ERISA requirements; or

*ACTIVE 47915850v1*

- your investment creates a prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code.

***Our assets may be Plan Assets for ERISA purposes, which could subject us to additional restrictions on our ability to operate our business.***

ERISA and the Internal Revenue Code may apply what is known as the look-through rule to this investment. Under the look-through rule, the assets of an entity in which a qualified plan or IRA has made an Loan may constitute assets of the qualified plan or IRA. A fiduciary of a qualified plan or IRA should consult with its advisors and carefully consider the effect of that treatment if that were to occur. We may only accept less than 25% of the gross proceeds of the Offering from Qualified Plans and IRAs.

*ACTIVE 47915850v1*

04-06-2021 @ 11:48:09 AM EST

**EXHIBIT D**
**DEFINITION OF ACCREDITED INVESTOR**

Accredited investor means any person who comes within any of the following categories:

(1)     Either (a) a bank as defined in Section 3(a)(2) of the Securities Act of 1933, as amended (the "**Act**"), or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; (b) any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended; (c) an insurance company as defined in Section 2(13) of the Act; (d) an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that act; (e) a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or 301(d) of the Small Business Investment Act of 1958; (f) an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which plan fiduciary is either a bank, savings and loan association, insurance company or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000 or if a self-directed plan, with investment decisions made solely by persons that are accredited investors; or (g) a plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if the plan has total assets in excess of $5,000,000;

(2)     A private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940;

(3)     Any organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, corporation, trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)     Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of the issuer;

(5)     A natural person whose individual net worth, or joint net worth with spouse, exceeds $1,000,000 at the time of purchase (exclusive of the investor's primary residence)[6];

(6)     A natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each

---

[6] The calculation of "net worth" for purposes of the determining accredited investor status was amended by the federal statute The Dodd–Frank Wall Street Reform and Consumer Protection Act and rules promulgated by the Securities and Exchange Commission thereunder.  The term "net worth" means the excess of total assets at fair market value, including cash, stock, securities, personal property and real estate (other than your primary residence), over total liabilities (other than a mortgage or other debt secured by your primary residence).  In the event that the amount of any mortgage or other indebtedness secured by your primary residence exceeds the fair market value of the residence, that excess liability should also be deducted from your net worth.  Any mortgage or indebtedness secured by your primary residence incurred within 60 days before the time of the sale of the securities offered hereunder, other than as a result of the acquisition of the primary residence, shall also be deducted from your net worth.

ACTIVE 47915850v1

04-06-2021 @ 11:48:09 AM EST

of those years and who reasonably expects reaching the same income level in the current year;[7]

(7)     Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506 (b)(2)(ii) under the Act; or

(8)     Any entity in which each of the equity owners of such entity certifies that he meets the qualifications set forth in either (1), (2), (3), (4), (5), (6) or (7) above.


[*Remainder of Page Intentionally Left Blank*]

---

[7] The term "income" means annual adjusted gross income, as reported for federal income tax purposes, plus (i) the amount of any tax-exempt interest income received; (ii) the amount of losses claimed as a limited partner in a limited partnership; (iii) any deduction claimed for depletion; (iv) amounts contributed to an IRA or Keogh retirement plan; (v) alimony paid; and (vi) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code of 1986, as amended.

ACTIVE 47915850v1

04-06-2021 @ 11:48:09 AM EST

## EXHIBIT E

### Definition of Bad Actor Disqualifying Event

**§ 230.506   Exemption for limited offers and sales without regard to dollar amount of offering.**

(d) *"Bad Actor" disqualification.* (1) No exemption under this section shall be available for a sale of securities if the issuer; any predecessor of the issuer; any affiliated issuer; any director, executive officer, other officer participating in the offering, general partner or managing member of the issuer; any beneficial owner of 20% or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power; any promoter connected with the issuer in any capacity at the time of such sale; any investment manager of an issuer that is a pooled investment fund; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of Purchasers in connection with such sale of securities; any general partner or managing member of any such investment manager or solicitor; or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor:

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of Purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of Purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

(*1*) Association with an entity regulated by such commission, authority, agency, or officer;

(*2*) Engaging in the business of securities, insurance or banking; or

(*3*) Engaging in savings association or credit union activities; or

(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(b) or 78*o*–4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–3(e) or (f)) that, at the time of such sale:

(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B) Places limitations on the activities, functions or operations of such person; or

(C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b–5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations

*ACTIVE 47915850v1*

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

## EXHIBIT F
## ACCREDITED INVESTOR QUESTIONNAIRE

Dear Investor:

The information contained in this questionnaire is being furnished to Justice Partners, LLP, a Delaware limited liability company (the "**Company**"), in order that the Company may determine whether acquisition of the Company's securities (the "**Securities**") may be made by you, as an investor, in light of the requirements of Regulation D promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"), and certain exemptions contained in state securities laws. You understand that the information is needed for the Company to determine whether it has reasonable grounds to believe that you are an "accredited investor" as that term is defined in Regulation D and that you have such knowledge and experience in financial, investment and business matters and that you are capable of evaluating the merits and risks of the proposed investment in the Securities. You understand that (a) the Company will rely on the information contained herein for purposes of such determination, (b) the Securities may not be registered under the Securities Act, (c) the Securities may not be registered under the securities laws of any state, and (d) this questionnaire is not an offer to acquire the Securities or any other securities in any case where such offer would not be legally permitted.

Information contained in this questionnaire will be kept confidential by the Company and its agents, employees and representatives. You understand, however, that the Company may have the need to present it to such parties as it deems advisable in order to establish the applicability under any federal or state securities laws of an exemption from registration.

In accordance with the foregoing, the following representations and information are hereby made and furnished by the investor:

Please answer all questions. If the answer is "none" or "not applicable," please so state.

INFORMATION REQUIRED OF EACH PROSPECTIVE INVESTOR:

1.  A.  **If Investor is an Individual:**

Name: Allan Teh                         Age: 56

Social Security Number: 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     No. of Dependents: 1

Marital Status: Divorced                Citizenship: USA

*If interests are to be jointly held:*

Name:_____                Age:_____

Social Security Number:_____         No. of Dependents:_____

Marital Status:_____         Citizenship:_____

B.  **If Investor is an Entity:**

Name_____                 State of Organization:_____

EIN: _____                 Date of Formation: _____

2.  A.  **If Investor is an Individual:**

Residence Address:_____50 S Pointe DR. PH#2  Miami Beach, Florida 33139_____

*ACTIVE 53688302v1*

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

Mailing Address (if different):

Telephone Number: __9174056164__

Facsimile Number: _____

Email Address: __Operations@kstreetcap.com__

**B.** **If Investor is an Entity:**

Business Address:

Mailing Address (if different):

Telephone Number: _____

Facsimile Number: _____

Email Address: _____

3. **A.** **If Investor is an Individual:**

State in which the investor:

is licensed to drive: _____

is registered to vote: _____

**B.** **If Investor is an Entity:**

State in which the investor:

files income tax returns: _____

has principal place of business: _____

4. **If Investor is an Individual**:

Please describe your current employment, including the name of the business and any entity by which you are employed and its principal business:

_____

_____

Please describe any college or graduate degrees held by you: _____

_____

_____

5. **If Investor is an Entity:**

Provide the total assets of the entity as of a recent date:*

Assets: $_____     Date: _____

*\* In the event the entity has less than $5,000,000 in assets, each shareholder, partner, member, or beneficiary (in the case of a trust), as applicable, must be an accredited investor and complete this questionnaire.*

*ACTIVE 53688302v1*

04-06-2021 @ 11:48:09 AM EST

**6.**   **If Investor is an Individual:**

Please initial on the line applicable to you under "Individual" and to you and your spouse under "Joint":

(a)   Gross Income During Last Two Years

| Individual | | Joint (with spouse) | | |
|---|---|---|---|---|
| 2020 | 2019 | 2020 | 2019 | |
| _____ | _____ | _____ | _____ | Less than $200,000 |
| _____ | _____ | _____ | _____ | $200,000 - 299,000 |
| _____ | _____ | _____ | _____ | $300,000 - 1,000,000 |
| _____ | _____ | _____ | _____ | More than $1,000,000 |

(b)   Anticipated Gross Income During 2021

| Individual | Joint (with spouse) | |
|---|---|---|
| _____ | _____ | Less than $200,000 |
| _____ | _____ | $200,000 - $299,000 |
| _____ | _____ | $300,000 - $1,000,000 |
| _____ | _____ | More than $1,000,000 |

(c)   Current "Net Worth" (Exclusive of Primary Residence)[8]

| | |
|---|---|
| _____ | Less than $1,000,000 |
| _____ | $1,000,000 - $5,000,000 |
| _____ | More than $5,000,000 |

**7.**   Is the investor involved in any litigation, which, if an adverse decision occurred, would materially affect the investor's financial condition?

Yes _____ No _____

If yes, please provide details: _____

_____

**8.**   The investor is an experienced and sophisticated investor or is advised by a qualified investment advisor, all as required under the securities laws and regulations.

Yes _____   No _____

**9.**   The investor understands the full nature and risk of an investment in the Securities and can afford the complete loss of the entire investment in the Securities.

Yes _____   No _____

---

[8] "Net Worth" means the excess of total assets at fair market value, including cash, stock, securities, personal property and real estate (*other than* your primary residence), over total liabilities (*other than* a mortgage or other debt secured by your primary residence). In the event that the amount of any mortgage or other indebtedness secured by your primary residence exceeds the fair market value of the residence, that excess liability must also be deducted from your net worth. Any mortgage or indebtedness secured by your primary residence incurred within 60 days before the time of the sale of the securities offered hereunder, other than as a result of the acquisition of the primary residence, shall also be deducted from your net worth.

ACTIVE 53688302v1

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

10. The investor is able to bear the economic risk of an investment in the securities for an indefinite period of time and understands that an investment in the Securities may be illiquid.

Yes ____   No ____

11. Does the investor have any other investments or contingent liabilities that the investor reasonably anticipates could cause the need for sudden cash requirements in excess of cash readily available to the investor?

Yes ____   No ____

If yes, please explain: _____

_____

12. Please describe the investor's experience as an investor (including amounts invested) in securities, particularly investments in non-marketable and tax incentive securities.

_____

_____

13. Has the investor participated in other private placements of securities?

Yes ____   No ____

If yes, please provide detail: _____

_____

14. In evaluating the merits and risks of this investment, does the investor intend to rely upon the advice of the investor's attorney, accountant or other advisor?

Yes ____   No ____

15. If the investor is an entity, was it formed for the specific purpose of acquiring the Securities offered?

Yes ____   No ____

16. Manner in which title to Securities is to be held: (circle one)

(a)   Individual Ownership
(b)   Community Property
(c)   Joint Tenant with Right of Survivorship (both parties must sign)
(d)   Partnership
(e)   Tenants in Common
(f)   Company
(g)   Trust
(h)   Other: _____

17. **Further Representations**.

The investor understands that the Company will be relying on the accuracy and completeness of the investor's responses to the foregoing questions and the investor represents and warrants to the Company as follows:

(i)   The answers to the above questions are complete and correct and may be relied upon by the Company whether or not the offering in which the investor proposes to participate is exempt from registration under the Securities Act and the securities laws of certain states;

*ACTIVE 53688302v1*

(ii)	The investor will notify t̄ e ~ompany ̄mme ̄ ̄ate ̄y o ̄any mater ̄a ̄ change in any statement made herein occurring prior to the closing of any purchase by the investor of the Securities; and

(iii)	The investor or its management, in case of an entity, has sufficient knowledge and experience in financial, investment and business matters to evaluate the merits and risks of the prospective investment; and the investor is able to bear the economic risk of the investment in the Securities and currently could afford a complete loss of such investment.

[*Signature Page Follows*]

ACTIVE 53688302v1

04-06-2021 @ 11:48:09 AM EST

**Justice Partners, LLC**

*ACCREDITED INVESTOR QUESTIONNAIRE SIGNATURE PAGE*

IN WITNESS WHEREOF, the undersigned has executed this Accredited Investor Questionnaire as of the date set forth below and declares under oath that it is truthful and correct to the best of the undersigned's knowledge.

*Signature of the Investor or Authorized Signatory of Investor*: _Allan Teh_____

Name of Investor:    Allan Teh_____

Name of Authorized Signatory: _____

Title of Authorized Signatory: _____

Date:   4/6/2021_____

**If jointly held:**

*Signature of the Investor or Authorized Signatory of Investor*: _____

Name of Investor: _____

Name of Authorized Signatory: _____

Title of Authorized Signatory: _____

Date: _____

*ACTIVE 53688302v1*

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Brent Steinberg
04-06-2021 @ 11:48:09 AM EST

**EXHIBIT G**
**BAD ACTOR QUESTIONNAIRE**
**Justice Partners, LLC (the "Issuer")**

**Bad Actor Questionnaire for Entities**

Legal Name of Entity: _____

Relationship to Issuer: _____

Please complete the following questions on behalf of the foregoing entity. Please feel free to contact the Issuer for clarification on any of the foregoing questions.

1. Please list each of the Executive Officers, Directors, Managers and Officers of the Entity named above participating in the offering of the Issuer's securities: _____

_____

_____

_____

_____

*If you are a General Partner, Managing Member, Investment Manager, Placement Agent or other entity receiving payment in connection with the Offering, please have each of the foregoing individuals complete a separate Bad Actor Questionnaire for Individuals in the form attached hereto. If you are a beneficial owner of more than 20% of the Issuer's securities, a separate Bad Actor Questionnaire for Individuals will not be required for each of the foregoing individuals.*

2. Have you been convicted, within the last 10 years, of a felony or misdemeanor: (A) in connection with the purchase or sale of any security; (B) involving the making of any false filing with the SEC; or (C) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

   ☐ Yes          ☐ No

3. Are you subject to any order, judgment or decree of any court of competent jurisdiction, entered within the last five years that currently restrains or enjoins you from engaging or continuing to engage in any conduct or practice: (A) in connection with the purchase or sale of any security; (B) involving the making of any false filing with the SEC; or (C) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

   ☐ Yes          ☐ No

4. Are you subject to a final order of a state securities commission (or an agency or office of a state performing similar functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that: (A) presently, bars you from: (1) association with an entity regulated by such commission, authority, agency, or officer; (2) engaging in the business of securities, insurance or banking; or (3) engaging in savings association or credit union activities; or (B) constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before the date hereof?

   ☐ Yes          ☐ No

5. Are you presently subject to an order of the SEC entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 or section 203(e) or (f) of the Investment Advisers Act of 1940 that: (A) suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser; (B) places limitations on your activities, functions or operations; or (C) bars you from being associated with any entity or from participating in the offering of any penny stock?

   ☐ Yes          ☐ No

*ACTIVE 53688302v1*

6.  Are you subject to any order of the SEC entered within five years before the date hereof that currently orders you to cease and desist from committing or causing a violation or future violation of: (A) any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933, section 10(b) of the Securities Exchange Act of 1934 and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 and section 206(1) of the Investment Advisers Act of 1940, or any other rule or regulation thereunder; or (B) Section 5 of the Securities Act of 1933?

    ☐ Yes            ☐ No

7.  Are you currently suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?

    ☐ Yes            ☐ No

8.  Have you filed (as a registrant or issuer), or been named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within the last five years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or are you currently the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued?

    ☐ Yes            ☐ No

9.  Are you subject to a United States Postal Service false representation order entered within the last five years, or are you subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations?

    ☐ Yes            ☐ No

If you answer "Yes" to any of questions 2-9 above, please describe the event(s), including the date of the event and, if applicable, the court or agency involved in such conviction, order, judgment or decree.  Please attach additional pages if necessary. _____

_____
_____
_____
_____
_____
_____
_____

The undersigned hereby certifies under penalty of perjury that (a) the undersigned is an officer of the above named entity, (b) the undersigned is duly authorized to complete this questionnaire on behalf of the above named entity, and (c) to the best of the undersigned's knowledge, after reasonable due inquiry, the foregoing information is true and correct in all respects.  The undersigned understands that this questionnaire will be used by the Issuer in order to comply with applicable securities laws and that the failure to disclose applicable information could restrict the Issuer's ability to conduct a private placement of securities in compliance with the Securities Act of 1933, as amended.  The undersigned further acknowledges that the Issuer may be required by Rule 506(e) of Regulation D promulgated under the Securities Act of 1933 to disclose the information contained in this questionnaire to potential purchasers of the Issuer's securities and hereby consents, on behalf of the above named entity, in the undersigned's capacity as an officer of the above named entity, to the disclosure of such information.  In the event that any of the information in the foregoing questionnaire becomes untrue at any time, the undersigned hereby agrees to promptly provide the Issuer with an update to this questionnaire and a description of such event(s) which make the answers to this questionnaire untrue.

Name of Entity: _____

Signature of Authorized Person: _____

Printed Name: _____

Title: _____

Date: _____

*ACTIVE 53688302v1*

04-06-2021 @ 11:48:09 AM EST

EXHIBIT G
Part 2 of 2

### Justice Partners, LLC (the "Issuer")
### Bad Actor Questionnaire for Individuals

Name: __Allan Teh__                                         Title: __Individual__

Relationship to Issuer: _____

Please complete the following questions.  Please feel free to contact the Issuer for clarification on any of the foregoing questions.

1.  Have you been convicted, within the last 10 years, of a felony or misdemeanor: (A) in connection with the purchase or sale of any security; (B) involving the making of any false filing with the SEC; or (C) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

    ☐ Yes            ☑ No

2.  Are you subject to any order, judgment or decree of any court of competent jurisdiction, entered within the last five years that currently restrains or enjoins you from engaging or continuing to engage in any conduct or practice: (A) in connection with the purchase or sale of any security; (B) involving the making of any false filing with the SEC; or (C) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

    ☐ Yes            ☑ No

3.  Are you subject to a final order of a state securities commission (or an agency or office of a state performing similar functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that: (A) presently, bars you from: (1) association with an entity regulated by such commission, authority, agency, or officer; (2) engaging in the business of securities, insurance or banking; or (3) engaging in savings association or credit union activities; or (B) constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before the date hereof?

    ☐ Yes            ☑ No

4.  Are you presently subject to an order of the SEC entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 or section 203(e) or (f) of the Investment Advisers Act of 1940 that: (A) suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser; (B) places limitations on your activities, functions or operations; or (C) bars you from being associated with any entity or from participating in the offering of any penny stock?

    ☐ Yes            ☑ No

5.  Are you subject to any order of the SEC entered within five years before the date hereof that currently orders you to cease and desist from committing or causing a violation or future violation of: (A) any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933, section 10(b) of the Securities Exchange Act of 1934 and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 and section 206(1) of the Investment Advisers Act of 1940, or any other rule or regulation thereunder; or (B) Section 5 of the Securities Act of 1933?

    ☐ Yes            ☑ No

*ACTIVE 53694223v2*

04-06-2021 @ 11:48:09 AM EST

6. Are you currently suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?

☐ Yes          ☑ No

7. Have you filed (as a registrant or issuer), or been named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within the last five years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or are you currently the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued?

☐ Yes          ☑ No

8. Are you subject to a United States Postal Service false representation order entered within the last five years, or are you subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations?

☐ Yes          ☑ No

If you answer "Yes" to any of the foregoing questions, please describe the event(s), including the date of the event and, if applicable, the court or agency involved in such conviction, order, judgment or decree.  Please attach additional pages                                                if                                                necessary.

_____
_____
_____
_____
_____
_____
_____
_____
_____

I hereby certify under penalty of perjury that the foregoing information is true and correct in all respects.  I understand that this questionnaire will be used by the Issuer in order to comply with applicable securities laws and that the failure to disclose applicable information could restrict the Issuer's ability to conduct a private placement of securities in compliance with the Securities Act of 1933, as amended.  I further acknowledge that the Issuer may be required by Rule 506(e) of Regulation D promulgated under the Securities Act of 1933 to disclose the information contained in this questionnaire to potential purchasers of the Issuer's securities and hereby consent to the disclosure of such information.  In the event that any of the information in the foregoing questionnaire becomes untrue at any time, I hereby agree to promptly provide the Issuer with an update to this questionnaire and a description of such event(s) which make the answers to this questionnaire untrue.

*Allan Teh*

Signature: _____

Printed Name:  Allan Teh_____

Date:  4/6/2021_____

*ACTIVE 53694223v2*



TRIBEXA

| Signer | Signature | Timestamp |
|---|---|---|
| Brent Steinberg<br>steinberg.brent@gmail.com | *Allan Teh*<br><br>Using IP Address 138.207.157.50 | Viewed: 04-06-2021 11:19:00 AM EST<br>Signed: 04-06-2021 11:48:09 AM EST |

Geo IP address location for 138.207.157.50

| Region/State | City | Zip/Postal Code | Country |
|---|---|---|---|
| Florida | Flagami | | United States |



# Exhibit 4



**Invest in the Power of Making Wrongs Right**

*Seed Capital for Mass Tort Actions*

JUSTICE PARTNERS

Confidential — Subject to Confidentiality Order

NOT AN OFFICIAL COPY - PUBLIC ACCESS COPY - NOT AN OFFICIAL COPY - PUBLIC ACCESS COPY - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# Disclaimer

» This presentation is the property of Justice Partners Investments LLC ("Justice Partners") and is strictly confidential. It contains information intended only for the person to whom it is transmitted. With receipt of this information, recipient acknowledges and agrees that: (i) this document which is not intended to be distributed, and if distributed inadvertently, will be returned to Justice Partners upon request as soon as possible; (ii) the recipient will not copy, fax, reproduce, divulge, or distribute this confidential information, in whole or in part, without the express written consent of Justice Partners ; (iii) all of the information herein will be treated as confidential material with no less care than that afforded to its own confidential material.

» This presentation is for informational purposes only and is not intended for any other use. This presentation is not an offering memorandum or prospectus and should not be treated as offering material of any sort. The information contained in this presentation shall not constitute an offer to sell or the solicitation of an offer to buy securities. This presentation is intended to be of general interest only and does not constitute or set forth professional opinions or advice. The information in this document is speculative and may or may not be accurate. Actual information and results may differ materially from those stated in this document.

» Justice Partners makes no representations or warranties which respect to the accuracy of the whole or any part of this Justice Partners presentation and disclaims all such representations and warranties. Neither Justice Partners nor its principals, employees, or agents shall be liable to any user of this document or to any other person or entity for the truthfulness or accuracy of information contained in this presentation or for any errors or omissions in its content, regardless of the cause of such inaccuracy, error, or omission. Furthermore, Justice Partners, its principals, employees, or agents accept no liability and disclaim all responsibility for the consequences of any user of this document or anyone else acting, or refraining to act, in reliance on the information contained in this document or for any decision based on it, or for any actual, consequential, special, incidental, or punitive damages to any person or entity for any matter relating to this document even if advised of the possibility of such damages. Any and all projections that may be contained this document have been estimated based on unknown variables which may or may not occur in the future.

» This presentation contains forward-looking statements within the meaning of the federal securities laws. Forward-looking statements express Justice Partners' expectations or predictions of future events or results. They are not guaranties and are subject to many risks and uncertainties. There are a number of factors beyond Justice Partners' control that could cause actual events or results to be significantly different from those described in the forward-looking statements. Any or all of the forward-looking statements in this document or in any other statements Justice Partners makes may turn out to be wrong. Except as required by applicable law, Justice Partners does not intend to publicly update or revise any forward-looking statements, whether as a result of new information, future developments or otherwise. In light of the significant uncertainties inherent in the forward-looking statements made in this document, the inclusion of this information should not be regarded as a representation by Justice Partners or any other person that its objectives, future results, levels of activity, performance or plans will be achieved.

» The financial information contained herein has not been audited or reviewed by our independent certified public accountants and accordingly they express no opinion or other form of assurance as to this financial information. No representation or warranty of any kind is or can be made with respect to the accuracy or completeness of, and no representation or warranty should be inferred from, Justice Partners 's financial information (the "Financials") or the assumptions underlying them. No representation or warranty can be made as to Justice Partners' future operations or the amount of any future income or loss. Some assumptions on which the Financials are based may inevitably not materialize, and unanticipated events and circumstances will occur. Further, the Financials are not prepared nor are they presented in accordance with generally accepted accounting principles. Therefore, the actual results achieved during the period presented may vary from the Financials, and the variations may be material. Prospective investors are cautioned not to rely on the Financials contained in the presentation. Justice Partners does not intend to update or otherwise revise the Financials to reflect circumstances existing after the date hereof or to reflect the occurrence of unanticipated events even if some or all of the underlying assumptions do not come to fruition.

## Confidential – Subject to Confidentiality Order

NOT AN OFFICIAL COPY - PUBLIC ACCESS · NOT AN OFFICIAL COPY - PUBLIC ACCESS · NOT AN OFFICIAL COPY - PUBLIC ACCESS

# JUSTICE PARTNERS

# Executive Summary

» Justice Partners

- **Justice Partners, LLC** ("**Justice Partners**" or the "**Fund**"), is a new Fund which is offering up to $30,000,000 of its Series A Preferred Units to invest in law firms in order to finance mass tort litigation expenses, thereby encouraging access to justice and increase operational efficiencies.

- The Justice Partners team consists of seasoned attorneys and investment professionals. It was founded by Lee Melchionni, an attorney with close to a decade of experience, primarily in Mass Torts, and Sylvia Benito, a CFA charter holder with over 20 years of experience and $1 billion AUA.

- The Firm has access to a multitude of law firms that have leadership positions in multiple ongoing mass tort litigations, with the ability to direct capital to those firms.

- The Firm's ability to co-counsel with the top mass tort litigation firms in leadership positions, increases the chances of successful outcomes, through access to information and standing of our co-counsel partners in positions of power.

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 572 of 978

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## ℙ JUSTICE PARTNERS

# Features and Benefits

» Access to direct investments in Mass Tort Litigations → Zero correlated asset class with high potential returns

» Agreements with steering committee attorneys → Visibility into case data for increased precision of investment decisions

» LLC structure, not a fund → Allows for option to defer taxation upon settlement, after consulting your tax specialist

» Cutting edge case acquisition → Ability to acquire up to 4x the number of claimants versus a traditional Mass Tort firm

» Seasoned team → Long term attorney relationships to provide opportunities to garner favorable results.

4

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 573 of 978

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

**JUSTICE PARTNERS**

STRATEGIES - HOW JUSTICE PARTNERS WORKS

# Realistic Opportunities Through Due Diligence and Case Selection

» Focus will be on litigations that have been ongoing for 12 to 24 months, allowing Justice Partners to better gauge the probability of success

» The Firm will seek cases that have already generated a recognized liability, often through bell weather case hearings, where a court rules on the claims of a small subset of claimants with the strongest cases

» Our attorneys will analyze case documents and outside research to evaluate the strength of a claim, evaluating evidence of harm, number of likely claimants, and our probability of success

» We will also perform financial analysis to determine likely settlement amounts, focusing on claims with the highest potential for monetary success

» We intend to focus on 3-5 high potential cases at a time. This allows us to devote the diligence necessary for success to each individual claim, without making the Firm reliant on the success or failure of one single litigation

» Investors can make additional direct co-investments, up to their original investment in Justice Partners, where additional capacity exists, for specific individual litigations

5

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB  Document 1-2  Entered on FLSD Docket 11/26/2025  Page 574 of 978

# JUSTICE PARTNERS

## Mass Tort Actions Are a Powerful Tool for Social Justice and an Extraordinary Investment Opportunity

| Tax Deferral | Positive Social Impact | Non-Correlation | Outsized Returns |
|---|---|---|---|
| Investors should check with their tax advisor to explore whether distributions to the investor may be deferred using a Qualified Settlement Fund, authorized by Section 468B of the Internal Revenue Code and Treasury Regulations | Justice Partners managers plan to dedicate a percentage of profits (per successful tort, after return of principal) to justice reform | Mass tort settlements have near zero correlation with returns on the stock and bond markets | We cannot guarantee any return, but if our model is successful, the aim for expected return multiples range from 2x-6x[1] of invested capital, with settlements occurring in 3 to 5 years |

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 575 of 978

THE OPPORTUNITY

# What is a Mass Tort?

» A mass tort is a suit in which many plaintiffs seek compensation for injuries caused by a single action of a defendant(s). One bad drug or faulty medical device can affect hundreds, even hundreds of thousands of claimants, all entitled to compensation if a claim is successfully tried or settled

» Over $300 billion in settlements have been awarded, including these well known, historically large claims

| Litigation Timeline | | Largest Mass Tort Settlements |
|---|---|---|
| 2 Years | Roundup | 10,000,000,000 |
| 2 Years | BP Oil spill | 7,800,000,000 |
| 3 Years | Fen-Fen | 3,750,000,000 |
| 3 Years | DePuy ASR | 2,500,000,000 |
| 4 Years | Actos | 2,400,000,000 |
| 3 Years | Stryker Hip | 2,100,000,000 |
| 5 Years | Xarelto | 750,000,000 |
| 4 Years | Testosterone Therapy | 600,000,000 |
| 3 Years | Dupont C8 | 350,000,000 |
| 3 Years | Benicar | 300,000,000 |
| 3 Years | Granuflu | 250,000,000 |

Confidential – Subject to Confidentiality Order

7

# What is a Mass Tort?

» Most claimants are low- to middle-income individuals who don't have the resources to pursue claims

» Without law firms financing client acquisition and legal services, these individuals would be unlikely to receive compensation for the damage done, frequently, years before

There's a business opportunity in facilitating these suits

The upfront investment in client recruiting, research, litigation costs and operation expenses can provide the Firm with the ability to benefit from operational efficiencies, increased client acquisition, thus potential increased client returns.

**JUSTICE PARTNERS**

8

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 576 of 978

DO NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## JUSTICE PARTNERS

HOW JUSTICE PARTNERS WORKS

# Financing the Legal Process

Law firms—and their equity partner investors—are compensated for mass torts through contingency fees only after a successful settlement.

As a result, they must finance all the activities leading up to that settlement.

As an investor in Justice Partners, you will provide the Firm with the capital to finance essential elements of the mass tort process, including:

» Acquisition of clients: The more clients that are uncovered and participate, the higher the eventual settlement. The capital raised by Justice Partners is allocated to client acquisition, working capital, Firm operational expenses, and other litigation costs. We anticipate spending more than other firms on client acquisition

- Most law firms only spend about 25% on this expense
- We believe Justice Partners will be able to acquire, on average, **4x more new cases** than a traditional mass tort law firm

» Research and third-party experts: We pay upfront for the information and expert witness testimony that can prove our case

» Legal services: We anticipate entering co-counsel arrangements for legal services with mass tort firms

Confidential – Subject to Confidentiality Order

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**JUSTICE PARTNERS**

HOW JUSTICE PARTNERS WORKS

# Distribution and Tax Implications

**DISTRIBUTIONS**

» Justice Partners will give its Preferred Equity Investors the ability to receive distributions upon settlement of a case, net of any Firm and Fund expenses

**TAX DEFERRAL**

» Investors should check with their tax advisor to explore whether distributions to the Investors may be deferred using a Qualified Settlement Fund, authorized by Section 468B of the Internal Revenue Code and Treasury Regulations. While deferred, the funds can be managed by their financial advisor, borrowed against, or invested in any legitimate business

» A tax opinion and IRS Private Letter Ruling can be provided upon request

Confidential – Subject to Confidentiality Order

HOW JUSTICE PARTNERS WORKS

# How profits are distributed

A $1 billion hypothetical settlement is reached with a defendant, which includes all client funds and attorney fees, for all parties involved in the litigation

$1 billion from settlement flows into the Master QSF → **Master Qualified Settlement Fund**

Attorney Fees designated to JP Law Group flows into a second QSF → **Justice Law Group's Qualified Settlement Fund**

Profits are distributed from Justice Law Group's QSF to investors → **Investors**

Confidential – Subject to Confidentiality Order

DO NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 580 of 978

**JUSTICE PARTNERS**

# Social Impact

Justice Partners works for positive social change both through its business model and through an active commitment to justice reform

These are the main ways we deliver social impact:

| | | | |
|---|---|---|---|
| Through our focus on client acquisition, we empower individuals to sue large corporations who have caused them injury | We avoid frivolous cases, focusing our energies on instances where individuals have experienced real and significant injuries | We are dedicated to strengthening the justice system and making it fairer for everyone | Justice Partners managers plan to dedicate a percentage of profits (per successful tort, after return of principal) to justice reform |

Confidential – Subject to Confidentiality Order

JUSTICE PARTNERS

MASS TORT JUSTICE IN ACTION: CASE STUDIES ON RECENT LEGISLATION

# Actos Diabetes Medicine Causes Bladder Cancer

### THE INJURY

» In 2011, the FDA issued a warning informing the public that use of Actos, a type 2 diabetes drug, may be associated with an increased risk of bladder cancer

» Individuals started filing claims in state and federal court, alleging that Actos was defectively designed and defendants, Takeda and Eli Lilly, failed to warn patients about the risk of bladder cancer associated with the use of the medication

### RESOLUTION

» The first federal trial resulted in a plaintiffs' verdict of $1.48 million in compensatory damages and $9 billion in punitive damages in 2014

» Nine cases went to trial before an Actos Resolution Program was established in April of 2015 to resolve all Actos bladder cancer claims, estimated to be approximately 9,000, pursuant to the Master Settlement Agreement ("MSA") for $2.4 billion, averaging $250,000/claim

» The Court awarded 8.6% of the gross award for common benefit fees to Lead Counsel

Confidential – Subject to Confidentiality Order

NDC 64764-301-15

actos®
(pioglitazone HCl) Tablets
30 mg 90 Tablets

Rx Only

NOT AN OFFICIAL COPY PUBLIC ACCESS - NOT AN OFFICIAL COPY PUBLIC ACCESS

## JUSTICE PARTNERS

MASS TORT JUSTICE IN ACTION: CASE STUDIES ON RECENT LEGISLATION

# Actos Diabetes Medicine Causes Bladder Cancer

**INVESTMENT RETURNS**

| | | | |
|---|---|---|---|
| Amount Invested | $5,000,000 | Total Claimants | 1,250 |
| Cost/Claimant | $4,000 | Viable Claimants | 1,000 |
| Viable Claimants | 80% | Gross Settlement to Victims | $200,000,000 |
| Average Settlement | $200,000 | Attorneys' Fees | $80,000,000 |
| Attorney Fees | 40% | Common Benefit Fees | $17,200,000 |
| Common Benefit | 8.6% | Attorneys' Fees for Distribution | $62,800,000 |
| | | **Net Distribution to LP's** | **$25,120,000** |

*Case study assumes that $5 million was used to acquire 1.250 Actos cases, at $4,000/case, with 1,000 of those claimants being viable[1]*

Confidential – Subject to Confidentiality Order

14

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 583 of 978

## MASS TORT JUSTICE IN ACTION: CASE STUDIES ON RECENT LEGISLATION

# DePuy ASR's Hip Replacement Devices Failed in 40% of Cases

### THE INJURY

» In 2010, DuPuy, a subsidiary of Johnson & Johnson, voluntarily recalled over 90,000 of its metal-on-metal ASR hip implants because one out of every eight devices failed within the first 5 years, later estimated to be 40% of all implants, as a result of component loosening, component malalignment, dislocation, and/or fractures. Consequently, a substantial number of patients required complicated, expensive, and painful revision surgery with a prolonged recovery time

» Individuals filed claims in state and federal court alleging that the metal-on-metal ASR hip implant was defectively designed and/or manufactured, and that DuPuy failed to provide adequate warnings concerning the medical devices

### RESOLUTION

» In 2013, Johnson & Johnson announced a settlement for $2.475 billion for all claimants who were required to undergo revision surgery to replace their ASR XL Acetabular Hip System or ASR Hip Resurfacing System before August 31, 2013. A second settlement was reached for $490 million in 2015, which resolved revisionary surgery claims between August 31, 2013 and January 31, 2015

» In 2017, the parties modified and amended certain provisions of the 2015 settlement to compensate those who had surgery to replace their device through February 2015, 2017

» Under the settlements, all eligible claimants received maximum awards of $250,000, subject to reduction for things such as smoking, prior hip replacement surgery, or a body mass index

Confidential – Subject to Confidentiality Order

15

**JUSTICE PARTNERS**

MASS TORT JUSTICE IN ACTION: CASE STUDIES ON RECENT LEGISLATION

# DePuy ASR's Hip Replacement Devices Failed in 40% of Cases

## INVESTMENT RETURNS

| | | | |
|---|---|---|---|
| Amount Invested | $10,000,000 | Total Claimants | 3,333 |
| Cost/Claimant | $3,000 | Viable Claimants | 2,000 |
| Viable Claimants | 60% | Gross Settlement to Victims | $450,000,000 |
| Average Settlement | $225,000 | Attorneys' Fees | $180,000,000 |
| Attorney Fees | 40% | Common Benefit Fees | $27,000,000 |
| Common Benefit | 6% | Attorneys' Fees for Distribution | $153,000,000 |
| | | **Net Distribution to LP's** | **$61,200,000** |

*Case study assumes that $10 million was used to acquire 3,333 DePuy cases, at $3,000/case, with 2,000 of those claimants being viable[1]*

16

Confidential – Subject to Confidentiality Order

MASS TORT JUSTICE IN ACTION: CASE STUDIES ON RECENT LEGISLATION

# Zantac: A Popular Heartburn Medicine Causes Cancer

## THE INJURY

» Zantac, a popular heartburn medicine, was found to contain a carcinogenic contaminant known as N-nitroso dimethylamine (NDMA). NDMA is also a potent hepatotoxin that causes liver damage even after short-term exposure and can increase the risk of liver, kidney, and lung tumors. Despite scientific research that demonstrated a clear link between ranitidine, the active ingredient in Zantac, and NDMA, drug makers chose not to disclose this risk to the government or consumers

## RESOLUTION

» The Zantac mass tort has yet to be resolved



Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 585 of 978

# JUSTICE PARTNERS

MASS TORT JUSTICE IN ACTION: CASE STUDIES ON RECENT LEGISLATION

## Zantac: A Popular Heartburn Medicine Causes Cancer

**POTENTIAL INVESTMENT RETURNS[1]**

| Marketing Analysis |
|---|
| » Cost per Qualified Lead (QL): $600 |
| » Average 40% Conversion |
| » Average Packet Cost (600/.4) = $1,500.00 |
| » $150.00 Per Client Work Up Cost |
| » $1,650.00 Average Cost of a Client |

| Case Analysis |
|---|
| » Average Gross Case Value: $200,000 |
| » Average Attorney Fee: 33% – We will subtract 7% for common benefit fees and other miscellaneous fees |
| » $66,666.67 Attorney Fees per case |
| » Settlement Date: Conservative timeline of 4 yrs |

Confidential – Subject to Confidentiality Order

DO NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

DO NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS - PUBLIC ACCES

# JUSTICE PARTNERS

## Four Ways to Incorporate Justice Partners Into Wealth Management

### 1 IMPACT INVESTING

Justice Partners generates positive social impact through its main activities—enabling low-income claimants to receive compensation for injury and discouraging corporate malfeasance.

### 2 DIVERSIFICATION

The Justice Partner's performance is uncorrelated with any other investment. Investors receive returns when a claim is settled. As a result, an investment in Justice Partners can provide significant diversification benefits

### 3 TAX PLANNING

The Justice Partner's unique structure enables investors to defer gains indefinitely, enabling them to carefully plan when and how they will report income. Gains can be deferred, for instance, until the investor has lower income in retirement or until after the calendar year in which a significant liquidity event occurs

### 4 ESTATE PLANNING

Investors should check with their tax advisor, but the Investor may explore avenues to defer gains to a subsequent generation, for example through an irrevocable trust established before any distributions are made.

Confidential – Subject to Confidentiality Order

# Sylvia Benito, CFA

## Chief Executive Officer at Justice Partners

Sylvia Benito is portfolio manager with 20 years of experience in managing family office investments. She began her career as an entrepreneur, co-founding a start-up in South America, The Oasis Institute, which she successfully exited before becoming a professional investor. She has worked in various capacities in wealth management, from hedge fund analyst to investment strategist for ultra-high-net-worth individuals, managing over $1B in assets.

Sylvia worked with Lee at Integrated Financial, developing and bringing to market an attorney deferred compensation program, a role in which she gained expertise and understanding of the mass tort world. With Justice Partners, she ties together her financial investment expertise to a deep belief that mass tort cases enhance corporate governance and ultimately, serve our country's economy.

Sylvia holds her CFA charter and is trained in family governance and systems.

Confidential – Subject to Confidentiality Order

is not applicable.

# Lee Melchionni, Esq.

## Chief Operating Officer at Justice Partners

Lee Melchionni is the COO at Justice Partners. Lee has worked closely for several years with attorneys and their clients, to develop customized financial solutions focused on financial security. Lee has provided solutions that allow attorneys to receive tax-deferred periodic payments over any period of their choosing. Lee is an expert in settlement annuities, market-based structured settlements, qualified settlements funds, financial planning and trust solutions. Lee has especially strong ties to the mass tort community, with excellent relationships with client acquisition specialists and trial lawyers tied into leadership roles with ongoing mass tort litigations.

Lee was a four-year letterman with Duke University's Men's Basketball Team from 2003-2006, a tenure that included four ACC Basketball Championships, and a Final Four appearance. Selected as a Senior Captain by his peers and Coach Mike Krzyzewski, Lee has long understood that hard work and collaboration are critical to success. Prior to forming Justice Partners, Lee was a Private Client Advisor at U.S. Trust, where he worked closely with high-net-worth individuals and families, to help them grow, preserve, and transfer wealth effectively. Previously, Lee was a Certified NBA and NFL Player Agent at Wasserman, where he represented clients in contract and endorsement negotiations. Lee also played professional basketball in Novara, Italy.

Lee earned his B.A. from Duke University and his J.D. from Loyola Law School in Los Angeles. He is a member of the Bar of the Commonwealth of Pennsylvania, as well as the District of Columbia.

Originally from Lancaster, PA, Lee continues to be active in the in the Duke University Alumni Community, as well as Big Brother Big Sister of America.

Confidential – Subject to Confidentiality Order

DO NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**JUSTICE PARTNERS**

## Key Advisors and Resources

» Legal: Greenberg Traurig, LLP PA

» Ethics: Jack Marshall, ProEthics, LTD.

» Fund Administration: Industry Fintech

» CPA/Audit: EisnerAmper

22

Confidential – Subject to Confidentiality Order

JUSTICE PARTNERS

# Essential Information About Justice Partners

**TERMS**

| | |
|---|---|
| Target Fund Size | $30MM |
| Fund Length | 3-5 years with option to extend to 6 |
| Investment Period | 6-12 months |
| Minimum Investment | $500,000 |
| Expected Return | 2x-6x in 3-5 years |
| Preferred Return | 15% preferred return |
| Management Fee | 0% |
| Incentive Fee | 15% (once 300% of capital contribution is returned, 20% catch up) |
| Exit Strategy | Return Funds disbursed upon settlement of each case |

23

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 591 of 978

## Contact Us for More Information

**Sylvia Benito, CEO**

Sylvia@capital4justice.com

C+502.298.4792

**Lee Melchionni, COO**

lee@capital4justice.com

C+717.380.7709

24

Confidential – Subject to Confidentiality Order

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# JUSTICE PARTNERS

# Justice Partners ESG Policy

Our purpose is to change the lives of others, one case at a time. Each litigation is carefully chosen, as we identify as many factors as possible to circumvent cases that do not emphasize our promise and intention. At our core, we believe it is a necessity and an opportunity for our stakeholders, the justice system, individuals we service, our fund's performance, and our overall global footprint, to ensure ESG is an integral part of our investment process. However, we are also aware that many ESG policies are merely words, and not ultimately meaningful. As a group, we seek to fulfill the spirit of this policy by challenging ourselves to choose what is in the highest benefit of both our shareholders and our stakeholders. Our ESG Policy is regularly referenced and evolves as updates occur so that it fulfills our own philosophy, as well as current industry demands and best practices and regulations.

**Our Leading Principles**

» At Justice Partners, we evaluate our decision-making through a precise economic, societal, and environmental lens to ensure that meaningful and favorable litigations ensue. We understand and foresee the importance of helping corporations become more responsible to their customers, community, operations, and the living environment.

» We interpret the scope of ESG to include the principles in the United-Nations supported Principles for Responsible Investment (PRI) report, with a direct emphasis on Principles 1 and 2:

1.     We will incorporate ESG issues into investment analysis and decision-making processes.
   A.   The work of all Justice Partners employees will be consistent with the highest standards of professional conduct
   B.   Justice Partners will consider applicable ESG issues in all cases
   C.   Appointing an advisor who has ESG expertise
   D.   Full disclosure of ESG factors in our investor reports
   E.   Providing commentary on ESG factors in each case
   F.   Working constructively with our investors who express an interest in ESG matters through direct engagement
   G.   Hiring of appropriate PR to disclose and amplify the impact of our cases to the media
2.     We will be active owners and incorporate ESG issues into our ownership policies and practices
   A.   Hiring practices must reflect the creation of a diverse and inclusive team
   B.   Team members are encouraged to actively learn about the ESG metrics that each case addresses

**Our Priorities**

» It is our priority to consciously pursue new litigation opportunities by considering multiple key themes: attentive management and monitoring; risk management beliefs and parameters; inclusive and sustainable economic conditions; reduction of inequality; lowering levels of poverty; development of strong communities; formation of high quality job positions and other professional and/or self-improvement endeavors; cybersecurity and data privacy procedures; smart institutional energy management; and healthy environmental practices.

» We incorporate these themes into our case selections, investments, and due process, because we believe they carry weight toward judicial successes.

**Accountability**

» Justice Partners is committed to actively supporting the issue of justice reform, in partnership with the Innocence Project. Upon successful settlement of each litigation, the managers will donate a portion of their profits into the Justice Partners Foundation to support ongoing justice reform initiatives. We believe that our fund's performance is intrinsically tied to choosing cases that have tangible and meaningful impact—avoiding frivolous or nuisance cases, and staying in alignment with our moral compass. We will seek, where possible, to engage defendants to make meaningful changes on ESG metrics that have impact according to the nature of the case.

**Our Promise to Investors**

» We commit to an engagement focused on the health of stakeholder interests, advancing market and media impact potentials, and the continuation of education and exploration of sustainable litigation practice.

Confidential – Subject to Confidentiality Order

# Additional Disclaimers

1. Targeted or projected IRR or similar projections or yields of any kind (whether gross or net) is provided as an indicator as to how the Manager intends to manage the Partnership and are not intended to be viewed as indicators of likely performance returns to investors. There can be no assurance that any such targeted IRR set forth herein will be attained, and actual results may be significantly different from the targeted IRR. General economic factors, political changes, legal and regulatory requirements, changes in the markets or real estate risks, competition, and consumer preferences, all of which are not predictable, can have a material effect on the reliability of targeted IRR. Furthermore, for future actual results to be consistent with any targeted IRR (and regardless there can be no guarantee), several factors and assumptions must prove correct.

The projected returns contained herein are based on data obtained third parties or developed by the Manager. See the legends and disclaimers at the beginning this Presentation regarding any data, projections, forward looking statements or other information or views discussed in this Presentation, including in this section. Limited Partners should make their own evaluation of likely future results. The Manager strongly recommends you consider the inherent limitations of projected performance.

All figures are only projections. There can be no guarantee of similar results or distributions at the same rate. Future performance may materially differ from the information presented.

Confidential – Subject to Confidentiality Order

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 594 of 978

# Exhibit 5

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2022-022470-CA-01

ALLAN TEH,
an individual,

    Plaintiff,

vs.

JUSTICE PARTNERS, LLC,
a limited liability company,

    Defendants.

_____/

**ORIGINAL**

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF LEE MELCHIONNI

TAKEN ON BEHALF OF THE PLAINTIFF

AUGUST 22, 2023
11:31 A.M. TO 1:11 P.M.

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23

REPORTED BY:
BRIEL MADDALENA, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

APPEARANCES OF COUNSEL

ON BEHALF OF THE PLAINTIFF:

     MATTHEW JONES, ESQUIRE
     JONES & ADAMS, P.A.
     999 PONCE DE LEON BOULEVARD, SUITE 925
     CORAL GABLES, FLORIDA 33134
     305-270-8858
     MATTHEW@JONES-ADAMS.COM
     (REMOTELY VIA ZOOM)

     CHEYENNE MOGHADAM, ESQUIRE
     JONES & ADAMS, P.A.
     999 PONCE DE LEON BOULEVARD, SUITE 925
     CORAL GABLES, FLORIDA 33134
     305-270-8858
     C.MOGHADAM@JONES-ADAMS.COM
     (REMOTELY VIA ZOOM)

ON BEHALF OF THE DEFENDANT:

     KENNETH BRESSLER, ESQUIRE
     BLANK ROME
     1271 AVENUE OF THE AMERICAS
     NEW YORK, NEW YORK 10020
     212-885-5203
     KEN.BRESSLER@BLANKROME.COM
     (REMOTELY VIA ZOOM)

ALSO PRESENT:

SYLVIA BENITO
     (REMOTELY VIA ZOOM)



INDEX OF EXAMINATION

WITNESS:  LEE MELCHIONNI

                                                    PAGE
DIRECT EXAMINATION
     BY MATTHEW JONES, ESQUIRE                        5



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                    Page 4

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Plaintiff's | | |
| EXHIBIT 1 | NOTICE OF TAKING DEPOSITION | 7 |
| EXHIBIT 2 | NOVEMBER 5, 2022 LETTER | 14 |
| EXHIBIT 3 | NOVEMBER 16, 2022 LETTER | 21 |
| EXHIBIT 4 | FEBRUARY 16 LETTER | 31 |
| EXHIBIT 5 | JUSTICE PARTNERS LLC OPERATING AGREEMENT | 34 |
| EXHIBIT 6 | PROMISSORY NOTE | 38 |
| EXHIBIT 7 | INVOICES | 45 |
| EXHIBIT 8 | JUSTICE PARTNERS, LLC FINANCIAL STATEMENT | 53 |
| EXHIBIT 9 | JUSTICE PARTNERS, LLC FINANCIAL STATEMENTS | 56 |



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

VIDEOTAPED DEPOSITION OF LEE MELCHIONNI

AUGUST 22, 2023

THE COURT REPORTER:  We are now on the record. Today's date is August 22nd, 2023.  The time is approximately 11:31 a.m.

We are here in the matter of Case Number 2022-022470-CA -01.

Pursuant to Florida Supreme Court Order AOSC20-23, all parties are appearing remotely.

The Court Reporter is Briel Maddalena with Universal Court Reporting.  Would Counsels please introduce themselves for the record?

MR. JONES:  Matthew Jones and Cheyenne Moghandam on behalf of the Plaintiff.

MR. BRESSLER:  Ken Bressler for Defendant.

MR. JONES:  And I believe we have Ms. Benito is also present in the depo, right, Ken?

MR. BRESSLER:  Yes, Ms. Benito is present.

THE COURT REPORTER:  Okay.

Thereupon:

LEE MELCHIONNI,

Was called as a witness, and after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. JONES:



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023          Page 6

Q     Please state your full legal name.

A     Lee Matthew Melchionni.

Q     And where are you currently located?

A     Atlanta, Georgia.

Q     Is that your place of residence or is that where you live?

A     Correct.

Q     Okay.  And what's your current address?

MR. BRESSLER:  Please give your business address.  If there's any issue, Mr. Jones with serving, we will deal with that with you.

A     I don't recall our business address off the top of my head.

BY MR. JONES:

Q     We just want to know if you have an address where you can be located.

MR. BRESSLER:  We will accept service for Mr. Melchionni.

MR. JONES:  So, to be clear, are you instructing the witness not to tell us where he is located?

MR. BRESSLER:  Well, I'm telling him not to give you his personal residence.

BY MR. JONES:

Q     Very good.  What's -- actually, let's back up,



we're going to mark as Exhibit Number 1, Notice of

Taking Videotaped Deposition Duces Tecum.

          (Thereupon, Plaintiff's Exhibit 1 was entered

          into the record.)

BY MR. JONES:

     Q    We have a couple of options on this.  We'll

start off with just putting it on share screen and

Cheyenne can share the folder.

          But Ken and Lee, you let us know if it's an

inconvenient method in terms of the documents that you

want to review and look at.

          MR. BRESSLER:     I don't see any option to

     you,     if you have other ones, let us know and

     we can --

          MR. JONES:    Well, let's go off the record

     just briefly just so we can talk about logistics.

          (Thereupon, a short discussion was held off

          record.)

          (Deposition resumed.)

BY MR. JONES:

     Q    So, Mr. Melchionni, on share screen and marked

as Exhibit Number 1 is the Notice of Taking Videotaped

Deposition Duces Tecum.  You see that?

     A    I do.

     Q    And you're here today pursuant to that Notice?



A    I am.

Q    Thank you.  Did you bring any documents with you today to the deposition?

A    No.

Q    Okay.  And why is that?

A    That's advice of Counsel.  As you know, we objected to the request for documents to be produced.

Q    Okay.  Other than advice of Counsel, certainly don't want to know what you communicated with Mr. Bressler.  Other than that, is there any other reason you didn't bring any documents?

A    No.

Q    Okay.  Do you currently hold a specific position or title at Justice Partners LLC?

A    I do.

Q    And what is that position or title?

A    Chief Operating Officer.

Q    Chief Operating Officer, correct?

A    Correct.

Q    Any other titles or positions?

A    No.

Q    Are you able to give us a brief job description of what Chief Operating Officer means in the context of Justice Partners LLC?

A    My role was to develop relationships with co-



counsels, identify litigations that Justice Partners would participate in.

Q    Right.

MR. BRESSLER:  Cheyenne, if you're done with this Exhibit, can you take it down?

MR. JONES:  Absolutely.

BY MR. JONES:

Q    You used the past tense was or are you still in that role at Justice Partners?

A    I am.

Q    Okay.  Do you have a contract of employment or for services as COO for Justice Partners LLC?

A    I don't believe so, no.

Q    Okay.  Do you also have a position or title at Justice Partners Law Group?

MR. BRESSLER:  Objection, don't answer.  It's irrelevant.  Your notice request -- this deposition is concerning what documents exist between or at the Defendant here pursuant to your request for books and records.  Any other entity is irrelevant here.

MR. JONES:  So, you're instructing the witness not to answer?

MR. BRESSLER:  Correct.

MR. JONES:  Very good.



BY MR. JONES:

Q    Prior to the deposition today, did you have a chance to -- and I don't want to know what you communicated with your lawyer, I don't want to know any attorney-client privilege communication.

So, other than that, and prior to your deposition today, did you have a chance to review documents ahead of this deposition and in preparation for this deposition?

A    I did.

Q    Okay.  So, let's just take it generally logistically with regard to that preparation in your review of those documents.  Were you viewing those documents on a particular device?

A    A computer.

Q    Right, was it a laptop?

A    Yes.

Q    Okay.  Where is that laptop located?

A    In my home.

Q    Okay.  And what is this laptop in your home that you reviewed these documents on?  I take it that it's within your possession, custody and control as of today's date, correct?

A    Correct.

Q    Okay.  Is this the device that you are



currently logged onto for purposes of this deposition?

A    Correct.

Q    Okay.  Now, the documents that you reviewed on this laptop, are they locally on this laptop or were you viewing them through some sort of cloud service or something similar to that?

A    Something similar to that.

Q    Okay.  So, what is the cloud service that you utilize to view these documents that you just mentioned on your laptop?

A    I believe they were shared with me via e-mail attachment.

Q    Okay.  So, somebody provided those documents for your review that you saw on your laptop via e-mail.  Is that your testimony?

A    Correct.

Q    Who sent you those documents to review?

A    Industry FinTech and our Counsel.

Q    Okay.  So, I definitely do not want to know what you discussed or communicated with your Attorney.  Other than that, just by way of example, your comments regarding Industry FinTech, who specifically sent those documents to you from FinTech?

A    Arthur Weissman.

Q    Okay.  Anybody else?



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

A    We do interact with, I can't remember Sandy's last name, but other employees of Industry FinTech.

Q    Okay.  And again, not with regard to documents your lawyer sent you but with regard to the other non-privileged documents, describe as best you can, the nature of these documents.  Was it agreements, e-mails, was it all kinds of different things?

MR. BRESSLER:  For clarifying, I want to make sure that it's understood because you're asking the witness for documents sent to him specifically to prepare for his deposition by Industry FinTech.

MR. JONES:  So far, yes, that's the pending question.

A    I believe it was documents that you requested, Mr. Jones.

BY MR. JONES:

Q    Yes, but since I only get to ask you now the nature of the documents you've looked at to prepare for this deposition, that's why I'm asking that.  We're familiar with the documents we requested.

I just want to know what was sent to you by Industry FinTech.  So, what did they send you via e-mail?

A    Documents.

Q    I'm sorry, it cut off, did you just say --



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

A    Documents --

Q    Okay.

A    I'm not sure what you're getting at here.

Q    Right.  And that included -- just by way of example, that would've been included and we'll cover it shortly, but would that have included the executed promissory note between LLC and Law Group?

A    You're asking me if they sent an executed promissory note to me.

Q    Yes, I was just giving you that as an example, I'm trying to find out the nature of the documents that you reviewed ahead of this deposition.  And I'm asking you just by way of example, did you get the executed document between Justice Partners LLC and Justice Partners Law Group?

A    I don't believe I got that particular document.

Q    Okay.  So, I'll just keep asking until I figure out what it is.  Did Mr. Weissman or this e-mail from Industry FinTech include prior e-mail communications?

A    No, I don't believe so.

Q    Okay.  Did this e-mail attaching documents or documents that were sent to you by Industry FinTech, did it include things like balance sheets or PNLs, things



like that?

A    Yes.

Q    Okay.  Did it include bank statements?

A    I believe so.

Q    Okay.  The documents that Mr. Weissman sent from Industry FinTech, did it include things like general ledgers?

A    I believe so.

Q    Okay.  We're going to cover that shortly.  So, the next Exhibit we're going to mark is Exhibit 2.

(Thereupon, Plaintiff's Exhibit 2 was entered into the record.)

BY MR. JONES:

Q    We can share screen it and certainly, Mr. Bressler will you let us know if it becomes distracting, we'll take it down but we're going to ask a few questions about this.

This is a November 5th, 2022 letter from my firm to Justice Partners LLC.  Do you recall receiving this letter at any point in time?

A    I do.

Q    Okay.  Can we agree that you received this letter on or shortly after November 5th, 2022?

A    Yes.

Q    Okay.  When you got this letter, and again I



don't want to know what you communicated with your attorneys but when you got this letter, did there come a point in time when you started assembling documents responsive to this letter?

A    Yes.

Q    Okay.  And we're not going to go through every single one of them because obviously we'd like to finish this deposition today, but let's just go through what we can.

I take it that when you got this request for documents on November 5th, you found the time to look for the various income tax returns and reports associated with those returns, right?

A    Correct.

Q    Okay.  Let's look at Number 2, when you got this request, did you attempt to locate the financial statements of the company including profit and loss statements, balance sheets and cash flow statements?

A    Correct.

Q    Okay.  So, you were involved in looking for those documents, correct?

A    We have a fund administrator, Industry FinTech who has all of those documents.

Q    Okay.

A    So, depends on how you want to define



involved.

Q    Well, you're the Chief Operating Officer, so are you able to tell us what role the Chief Operating Officer has with regard to looking for documents when they get a request like this?

MR. BRESSLER:  Objection. Form.

BY MR. JONES:

Q    You agree that you were involved in looking for these documents, correct?

A    Correct.

Q    Okay.  So, you said that there's a fund administrator involved Industry FinTech?

A    Correct.

Q    Okay.  Is Justice Partners LLC to your knowledge as the CEO, a fund?

MR. BRESSLER:  Objection --

A    I'm not the CEO.

BY MR. JONES:

Q    I said COO, in your knowledge as a COO is it your testimony that Justice Partners LLC is a fund?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    You can go ahead and answer.

A    I don't know the legal definition of fund, no.

Q    Okay.  Without regard to the legal definition



of fund, with regard to your role as the CEO, do you know what a fund is?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    You can go ahead and answer.

A    I don't understand the question.

Q    Well, you used the term fund administrator, how about I ask it this way?  When you said the word fund administrator, do you know what the word fund means when you provided that testimony?

A    Vehicle where you pick investor capital and use those funds to invest in various investments.

Q    Okay.  Is it your testimony and again, not a legal definition, but is it your testimony as the COO that Justice Partners LLC is a fund as you just described?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    Go ahead and answer.

A    I believe so.

Q    Okay.  Number 3, copies of all documents evidencing, distributions and disbursements.  So, I take it that you were involved with regard to looking for those documents?

A    Correct.



Q    So, with regard to trying to determine whether there was a distribution or disbursement and again in the context of you being the COO of this company, where would you look for those documents if you were trying to locate them?

A    Bank statements and general ledger.

Q    Okay.  Anything else?

A    Not to my knowledge.  Industry FinTech may have a different answer.

Q    Okay.  Would Industry FinTech be in a position to better answer that question?  Is that your testimony?

A    I don't think so, I think you would see them in the bank statements and general ledger.

Q    I'm sorry, did you say you think so?

A    I don't think so.  I believe you would see them in the bank statements and general ledger.

Q    Okay.  So, to make that point, who is the person at Justice Partners LLC that looked at the documents, general ledger, bank statements to find out if there were any distributions or disbursements when they received this November 5th letter?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    You can go ahead and answer.

A    We reviewed it, Sylvia Benito and myself,



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

reviewed with our Counsel.

Q    Okay.  Well, I certainly don't want to know about communications with your Counsel, but you and Sylvia Benito reviewed what, with regard to figuring out what were the disbursements, if any, and what were the distributions, if any, of Justice Partners LLC?

A    Bank statements and general ledger.

Q    Okay.  And that's all you reviewed with respect to Number 3, correct?

A    I believe so.

Q    Okay.  And did there come a point in time following the receipt of this November 5th letter where you in particular Number 3 and we can agree that -- actually, strike that, we'll get to that as a separate exhibit.

Let's go to Number 4, which states all documents related in Mr. Teh's equity interest in the company.  And this request includes but is not limited to marketing, subscription, operational, accounting and audit records of the company.  Were you involved in looking for those records?

A    Correct.

Q    Was Ms. Benito involved in looking for those records?

A    I don't recall.



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                          Page 20

Q    Okay.  You said a moment ago with regard to Number 3 that Ms. Benito was involved but with regard to Number 4, you do not recall?

A    I don't -- she may have been.

Q    Okay.  So, if you recall, could you tell us what you -- where you specifically looked with regard to the marketing records involving Mr. Teh's equity interest in the company?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    You can answer.

A    Marketing records, the Justice Partners materials provided to Mr. Teh and his employees.

Q    Right.  And I asked you where you were looking for those records.  Like, were you looking on a server, were you looking on a laptop?  Was it in a file room, a cabinet?

Where did you go to determine if there were any marketing records relating to Mr. Teh's equity interest in the company?

A    I believe there is a -- Industry FinTech maintains a deal room.

Q    And when you say deal room, you mean electronically I take it?

A    Correct.



877-291-3376
www.ucrinc.com

Q    All right.  And so, there came a point in time after you got this November 5th letter where you somehow accessed this Industry FinTech deal room and you were looking for these marketing records?

A    Correct.

Q    Okay.  Did you locate any?

A    I believe what was provided.

Q    Okay.  So, let's put a pin in that and let's go to Exhibit Number 3 Which will be the November 16th, 2022 letter from Mr. Bressler's office and we'll share screen that and let's go to Number 4 of that letter.

(Thereupon, Plaintiff's Exhibit 3 was entered into the record.)

MR. JONES:  Cheyenne, you may have to zoom in a little bit for the witness.

BY MR. JONES:

Q    Where in response to our request Number 4, which was all documents relating to Mr. Teh's equity interest in the company, this request includes but is not limited to marketing, subscription, operational accounting and audit records of the company.

The response given to us by Justice Partners for Number 4 was, and I'm quoting "The following documents, evidencing Mr. Teh's interest in Justice Partners: and offering circular of Series A preferred

units to offering Allan Teh dated December 15th, 2020."
Did I read that correctly?

A    I believe so.

Q    Okay.  So, is it your testimony that with
regard to our request Number 4, the singular document,
the offering circular, that's the scope of the documents
that you were able to locate?

A    Correct.

Q    Okay.  So, other than the offering circular,
you did not locate any, just by way of example,
operational accounting and audit records of the company?

MR. BRESSLER:  Objection to form.

A    I believe Number 4 states what was provided to
you.

BY MR. JONES:

Q    Okay.  So, let's go back to Exhibit Number 2,
Item Number 4, where the request was marketing
subscription, operational accounting and audit records
of the company.

And your testimony is the offering circular,
dated December 15th, 2020, that's all you found or could
locate.  That's your testimony?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    Go ahead and answer.


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

MR. BRESSLER:  My objection just so you know as to the timing.

A    I believe what was provided to you, we provided to you advice of Counsel, what was requested.

BY MR. JONES:

Q    Okay.  Well, I certainly don't want to know about the communication you had with your Counsel, but what I'm getting at, and it should be fairly obvious, is in November 5th, 2022, we asked for, in addition to other things, operational accounting and audit records of the company.

And your response was this singular document, this offering circular dated December 15th, 2020.  And I want to know if when you got the November 5th letter, did you actually look for operational accounting and audit records of the company?

A    We did.

Q    Okay.  And is it your testimony that you were not able to locate any?

A    No, we can locate them.  We did locate them.

Q    Okay.  Do you know why they weren't provided in response to our request Number 4?

MR. BRESSLER:  Objection, they were provided.

MR. JONES:  Well, I didn't know that you were under oath today, Mr. Bressler and so your offering



of testimony is interesting to say the least.

MR. BRESSLER:  And you're misstating in your question trying to trick him.

MR. JONES:  I trust you've read the local rules regarding speaking objections and you'll tailor your objections accordingly.

MR. BRESSLER:  You do what you have to do, Mr. Jones, but I would trust that you would also not try to trick him when you know you've received other documents.

MR. JONES:  Now, the witness knows how you want him to testify, which is how the local rules are configured to take into account exactly what you just tried to do.

MR. BRESSLER:  So, in other words, you're saying you'd like to trick him by telling him that's all that was produced.

MR. JONES:  You have to explain that to the Judge.  That's fine.

MR. BRESSLER:  I'm happy to.

BY MR. JONES:

Q    So, you're going to go ahead and answer my question, right, Mr. Melchionni?

A    What was your question?

Q    Would you like the Court Reporter to read it



back?

A      That would be great.

(Thereupon, the question was read back.)

A      I do not.

BY MR. JONES:

Q      Okay.  And I want to be clear because we really will get the chance to talk to the Court about this at some point.

Is it your testimony, Mr. Melchionni, that you provided audit records in response to our November 5th letter?

A      It appears that these documents have been provided to you --

Q      Okay --

A      -- and you're trying to trick me around the date that they were provided to you, Mr. Jones.

Q      Okay.  And you said I was trying to trick you around the date, right?  That's what you just said?

A      Well, these documents have been provided to you.

Q      Okay.  So, I want to be --

A      You continue to ask me around the date.

Q      Right, okay.

A      If you --

Q      I want to make sure that we're clear in the



record.  Is it your testimony, that prior to Mr. Teh suing Justice Partners that Justice Partners and/or you provided operational accounting and audit records to him in response to this request for records?

A    The documents requested in Number 4 were provided to your client.

Q    Okay.  So, do you know when they were provided, pre or post filing of the lawsuit?

A    I don't know.

Q    Let's go to request Number 5 on Exhibit 2, we asked for the general ledger of the company and I just have a few quick questions in that regard.  Did you personally look for that document with regard to that request?

MR. BRESSLER:  Objection, form.

A    Industry FinTech maintains that document.

BY MR. JONES:

Q    Okay.  But that wasn't my question, so I'll ask my question again.  Did you personally look for that document when you got this request?

A    Yes.

MR. BRESSLER:  Object to form.

BY MR. JONES:

Q    Okay.  And so, yes, you did look for this document.  Where did you look for this document?  In the



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

same data room that you just described earlier?

A    I believe.

Q    Okay.

A    Industry FinTech was notified of these requests and helped us maintain or obtain the requested document.

Q    Okay.  So, at the point in time you got this request and this is in the context of you being the COO of the company, back in November of 2022, when you got this request, did you reach out to any accountants that Justice Partners LLC utilized at the time?

A    Not at that time.

Q    Okay.  As you sit here -- actually, strike that.  As of November of 2022, do you have any personal knowledge as to whether or not Justice Partners LLC utilized the services of an accounting or CPA firm during that timeframe?

A    Yes.

Q    And what was the name of that accounting or CPA firm?

A    I don't recall.

Q    Okay.  And I want to make sure I understood your answer and I apologize if it's repetitive.  Did you say you did recall or did not recall whether or not you reached out to that accounting firm when you got these

requests back in November?

A    I did not reach out to the accounting firm.

Q    Okay.  Do you know if Ms. Benito reached out to that accounting firm?

A    I do not.

Q    Okay.  Do you know if Industry FinTech or anybody on their behalf reached out to that accounting firm?

A    I do not.

Q    Okay.  With regard to the relationship between Justice Partners LLC and the use of services that are provided by Industry FinTech, are you the point person with regard to that arrangement?

A    Correct.

Q    Okay.  So, you understand that there's a written agreement between Justice Partners LLC and Industry FinTech, correct?

A    Correct.

Q    Do you understand that the scope of the services offered by Industry FinTech, do they include items, bookkeeping items, like the maintenance of general ledgers?

A    Correct.

Q    Okay.  So, as you sit here today, you're testifying that they do provide that service for Justice



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

Partners LLC, correct?

A     Correct.

Q     Okay.  Number 6 of our request has for all loan documents for loans held by or in the name of the company.

And we see that the response as we've already, if you want us to put it up in front of you to Exhibit 3 that's already marked, is the loan and security agreement between Justice Partners LLC and Justice Partners Law Group.

Is that is due -- to the extent -- nope, strike that.  Can you and I agree that that's the only loan agreement or facility that currently exists between Justice Partners LLC and Justice Partners Law Group?

A     Correct.

Q     Okay.  And we'll get to that in a little bit, I just wanted to make sure there was no other loan agreement that you had any knowledge of.

Now, Number 9 of our requests, you'll see that we ask for all communications regarding the equity entrance to Mr. Teh and the company, but if you bring up Exhibit 3, you'll see that there's no response to Number 9.  Do you have any explanation in that regard?

A     My understanding that Delaware law is that e-mails are not responsive to a books and records claim.



Q    Okay.  And that's your understanding of why there wasn't even an acknowledged response to that number?

A    Correct.

Q    Okay.  And the reason I ask is because if you click between Exhibit 2 and Exhibit 3, there's a misnumbering that occurs because our Number 10 asks for "All contracts entered into by the company" and there is no Number 10 on your response.

So, now we're going to talk about our Number 10, your response Number 9, okay?  Does that make sense?

A    It does.

Q    Okay.  So, as of November 16th, 2022, your response was, to our request, you just wrote, all contracts entered into by Justice Partners, and I'll be clear that's what Mr. Bressler wrote.

I know you didn't write that, but I'm asking you as the COO, what is your understanding as of November 16th, 2022, what contracts had been entered into by Justice Partners?

A    A loan agreement and a promissory note and then an agreement with the Lake Law Firm.

Q    Okay.  So, your sworn testimony is that of -- as of for November --

A    I believe if you're part of our contract with

IFT, which is a back office contract unrelated to business.

Q    Got you.  So, I believe your sworn testimony is that as of November 16th, 2022, Justice Partners had three agreements in place, three contracts in place, one with IFT that you just mentioned, one with Lake Law Firm and then the loan agreement you just mentioned.  Did I get that right?

A    I believe so.

Q    Okay.  All right.  So, let's talk about what we're going to mark as Exhibit 4, this is the February 16th letter from Ms. Young, who was in Mr. Bressler's office.

(Thereupon, Plaintiff's Exhibit 4 was entered into the record.)

BY MR. JONES:

Q    And again, I know you didn't write this letter and so, my questions will center upon the efforts and work done with regard to securing these documents for referenced in the letter, so.

And just a couple of generalities, do you have a recollection as you sit here today regarding the efforts that you made or may have made regarding securing these documents that were produced by Ms. Young that are Bates Numbered 1 through 373?



A    I do.

Q    Okay.  So, again, these are just broader logistical things.  With regard to this tranche of records that were produced in February -- actually, February 16th, 2023, just tell us what efforts you made to track down these documents and locate them.

A    All of these documents are held by Industry FinTech.

Q    Okay.

A    Ms. Young worked with Industry FinTech to obtain these documents.

Q    Okay.  So, that's all I'm getting at this point in time at least, is the documents that are Bates Numbered Justice Partners The 1 through 373, your testimony is that all of these documents came from this data room that Industry FinTech maintained.  Is that correct?

A    Industry FinTech maintained those documents.

Q    Got you.  So, with regard to documents that may have been located in another location other than Fin -- Industry FinTech, did you look in any other locations in that regard?

A    There is no other location.

Q    So, that's what you've anticipated my follow-up question.  Is it your sworn testimony that all of the



documents relating to Justice Partners LLC, meaning all of their corporate documentation, all of that which is required either by law or by contract, that Justice Partners have.

That all of those documents are held by and maintained by Industry FinTech?

A    To my knowledge, yes.

Q    Okay.  Because -- and again, I don't want to beat a dead horse here but I think that you understand the concept that in a corporation, a third party or non-party may hold some documents but also the corporation itself may have a location where documents are located, right?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    Does that make sense?

A    Sure.

Q    Okay.  And all I'm trying to get at is your sworn testimony is you have looked and there is no other location in which Justice Partners has its corporate documentation, accounting documentation and operational documentation, correct?

A    Your statement is correct.

Q    No, okay.  All right.  So, let's bring up the Justice Partners LLC operating agreement and mark it as



the next Exhibit, I think we're on Number 5.

          (Thereupon, Plaintiff's Exhibit 5 was entered

          into the record.)

          MR. JONES:  Cheyenne, you can -- Mr. Bressler,

I think you already have that but we're certainly

happy to e-mail it to you so you can send it to the

witness, whatever your pleasure.

          MR. BRESSLER:  Put it on the screen -- why

don't you e-mail it to me and put it on the screen.

          MR. JONES:  Very good.  One moment while I e-

mail it to Mr. --

          MR. BRESSLER:  You can start your

questioning.

          MR. JONES:  Okay.  Is that okay?  You'll have

to listen to this loud car behind me.  Sorry,

about the --

          MR. BRESSLER:  Fine with me.  Why don't you

start?

BY MR. JONES:

     Q    Very good.  So, let's go to Page 27 of the
operating agreement and you'll have to blow it up a
little bit and we're at Section 10.1, Page 27 of the
operating agreement.

          And specifically, Mr. Melchionni, we're
talking about Section 10.1, lowercase a, books and



records?

A    Okay.

Q    Okay.  And it says -- and I'll make sure that -- I don't want to talk too fast, but it says "The company will maintain true, complete and correct books of account of the company, all in accordance with generally accepted accounting principles applied on a consistent basis and shall keep minutes of the proceedings of or maintained written consents executed by the members and the manager."  So, do you know if that was done?

A    I believe so.

Q    Okay.  And what was your undergraduate degree in?

A    History.

Q    Okay.  Did you get any graduate degree in finance or accounting?

A    No.

Q    Did you ever hold a series seven or other license issued by the SEC or FINRA?

A    I did.

Q    Okay.  So, you have a reasonable familiarity with the concept of generally accepted accounting principles?

A    It has been a while.



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                    Page 36

Q    All right.  But do you understand what that term generally means?

A    I do.

Q    Okay.  So, let's go to the next sentence.  It says, "The books of account shall contain particulars of all monies, goods or effects, belonging to or owing to or by the company or paid, received, sold or purchased in the course of the business.

And all such other transactions matters and things relating to the business of the company as are usually entered in books of accounts kept by persons engaged in the business of a like kind and character.

In addition, the company shall keep all records required to be kept pursuant to the Act."  Do you know if that was done?

MR. BRESSLER:  Objection, form.  This deposition is about whether there are documents that you asked for that exist and that you don't have.

This is going beyond, I'll allow you to ask it but I will keep it in check.  And if you go too far off of the purpose of this deposition, I will block it.

BY MR. JONES:

Q    You can go ahead and answer the question.



A     I believe so.

Q     Okay.  And further to Mr. Bressler's commentary just a moment ago, the last sentence of that paragraph says, "The company will provide an unaudited financial at the end of each fiscal year to its members."  Do you know if that was done?

A     I believe so.

Q     So, you have an understanding that there was an unaudited financial at the end of 2021 that was provided to all the members?

A     I don't recall.  I know we provided an audited financial statement end of 2022.

Q     Right, what about 2021?

A     I don't recall.

Q     Who's responsible for preparing that statement?

A     Industry FinTech, I believe.

Q     Okay.  Do the officers and principals of Justice Partners LLC play any role with regard to preparing and providing those statements?

        MR. BRESSLER:  Objection, form.

A     No.

BY MR. JONES:

Q     So, is it your understanding as COO with regard to providing these statements and that we've been



referencing these last two questions, that Industry FinTech is solely responsible for providing those statements?

A     Yes.

MR. JONES:  That was Number 5, Cheyenne, I think.

MR. MOGHANDAM:  Yes.

MR. JONES:  All right.  So, now we're going to go to Exhibit Number 6 and you can e-mail this to Mr. Bressler.

(Thereupon, Plaintiff's Exhibit 6 was entered into the record.)

MR. BRESSLER:  So, far, Mr. Jones, I've not received any Exhibits from Cheyenne.

MR. MOGHANDAM:  Unfortunately, I can't share screen and e-mail at the same time.  So, if you'd like me to e-mail prior to going into the Exhibits, whatever works best for you guys.

MR. JONES:  We've been at this for 45 minutes. You want to take a two or three minute break and e-mail a tranche of things to you, Ken?

MR. BRESSLER:  Sure.

MR. JONES:  Okay.  Whatever just --

MR. BRESSLER:  Just send me all the -- send me all the exhibits, I won't open them and share them



with the client and --

MR. JONES:  You can open them all you want.
Yeah, send a big chunk of things to Ken, it's no
big deal me.  All right.  So, we're going to take a
quick break, you're going to get a tranche of
documents that way we can push them out.

(Thereupon, a short discussion was held off
record.)

(Deposition resumed.)

BY MR. JONES:

Q    All right.  So, the next Exhibit is the senior
secured promissory note and while I'm asking my
questions, Cheyenne will continue to e-mail the other
items, it should be a tranche of multiple e-mails.

MR. JONES:  And Cheyenne, you just keep
working on sending those e-mails to Mr. Bressler.

BY MR. JONES:

Q    And actually before I start talking about the
senior secure promissory note, it was -- I forgot to
tell you at the beginning of the deposition, Mr.
Melchionni, you're not getting e-mails or texts while
you're rendering your testimony here, are you?

A    No.

Q    Okay.  Because there's been a couple of recent
cases where that's an issue and I hope that's not the

case because that would be improper.  So, I appreciate that.

So, now let's talk about the senior secured promissory note.  You can see that -- is this the one you were talking about earlier where we were talking about the note?

A    Correct.

Q    Okay.  And you can see that it says commitment amount 45 million, original issue date April 14th, 2021, correct?

A    Correct.

Q    Okay.  Now, if you go to the end of the document though, you'll see that's your signature, correct?

A    Correct.

Q    And this is a nine-page document and it says there, date signed June 23rd, 2023, effective date April 14th, 2021.  Did I read that correct?

A    You did.

Q    So, why was this $45 million senior secured promissory note signed more than two years after the effective date?

A    Oversight.

Q    Okay.  Whose oversight?

A    Mine.



Q     Okay.  Is that something you forgot to do or what do you mean by that?

A     It should have been signed at the effective date.  It was not and we remedied the issue.

Q     Okay.  So, who's the lender in this document? Justice Partners LLC, right?

MR. BRESSLER:  Objection, document speaks for itself.

A     The document speaks for itself.

BY MR. JONES:

Q     I'm sure it does, now that Mr. Bressler gave you that speaking objection, who's the lender that you can tell?  You are a COO, so you can just read there and the lender is Justice Partners LLC, right?

A     As you said.

Q     Am I correct?

A     I believe so.

Q     Right --

A     I --

Q     So, Justice Partners LLC is agreeing to loan up to $45 million to Justice Partners Law Group, correct?

A     Correct.

Q     Now, at the time that you signed this document in June of 2023, you were also the COO of Justice



Partners LLC, correct?

A    Correct.

Q    And what's your title at Justice Partners Law Group?

A    I believe Managing Partner.

Q    Okay.  Now, do you have a recollection that at some point in time before this document was produced to us that we received the unexecuted version of that document?

A    I do.

Q    Okay.  Do you know why we were sent the unexecuted version of that document?

A    It had not been executed when it was sent to you.

Q    Okay.  In Paragraph 2 of this document, on the first page it says that the lender Justice Partners, LLC, which you testified earlier, shall maintain an account on its books, which shall evidence the outstanding principle balance of all advances interest due and owing thereon and any fees and expenses due from time to time under this note.  You see that?

A    I do.

Q    Has that been done?

MR. BRESSLER:  Objection, goes beyond the scope.  You can answer.



A    I believe so, by Industry FinTech.

BY MR. JONES:

Q    Okay.  So, your testimony is that with regard to the person or entity that would have knowledge in that regard that would be Industry FinTech?

MR. BRESSLER:  Objection, form.

A    I believe so.

BY MR. JONES:

Q    That's all I'm getting at, sir, is that I just want to know with regard to books and records that relate to outstanding principle balance of advances, interest due and fees and expenses.

Either you're the person I ask that question to or you're going to tell me that Industry FinTech is to whom I have to direct that and I just want to know who's maintaining those books and records.  Is it you or Industry FinTech?

A    I believe Industry FinTech.

Q    Okay.  With respect to the appropriate -- if you look at the next sentence, with respect to the appropriate entries debited to the loan account and the amount of each advance hereunder, is that similarly something that I have to direct my inquiries regarding those books and records to Industry FinTech or do you have knowledge in that regard?



A    Industry FinTech would have a record of that.

Q    Okay.  I get that.  Now, but the follow-up is, do you have a record of it as well or is it only Industry FinTech?

A    Only Industry FinTech.

Q    Okay.  And I trust that that's the balance -- that your testimony is the similar with regard to the balance of that paragraph.

For example, the credits to the loan account repayments of advances and payments of interest, fees and expenses made by the borrower, that would also be directed to Industry FinTech, correct?

A    Correct.

Q    All right.  Now --

MR. JONES:  Cheyenne, did you have a chance to e-mail those to Mr. Bressler?

MR. MOGHANDAM:  I have them.

MR. JONES:  Very good.  Now have they been sent as a group, Cheyenne, as a zipped up group or are they separate?

MR. MOGHANDAM:  A group.

MR. JONES:  They were sent together, but each PDF is separate as --

MR. MOGHANDAM:  Okay.

MR. JONES:  So, just share screen how that



looks because I want to make sure we have efficient marking of exhibits here.  We can mark them as Composite Exhibit A.  Ken, is that okay with you?

MR. BRESSLER:  All the rest -- all these exhibits?  All these are invoices?

MR. JONES:  Yes, they're all -- I think it's a tranche of nothing but invoices, which is why I offered to mark them as a Composite of just invoices.

MR. BRESSLER:  You should do whatever you think is appropriate.  It also includes the executed secured promissory note, but you can do whatever you like.

MR. JONES:  All right.  So, what we're going to do is we're going to mark, Madam Court Reporter, the invoices and Cheyenne will clear this up at the conclusion of the depo, but the invoices will all be marked as Composite Exhibit Number 7.

(Thereupon, Plaintiff's Composite Exhibit 7 was entered into the record.)

MR. BRESSLER:  And I'm sending them to Lee and to Sylvia.

MR. JONES:  Very good.  And Cheyenne, whenever you can, we're going to walk through these invoices pretty quickly and I would only ask Cheyenne, is

that you ensure everything you can do -- I understand it may be difficult, but ensure that they're chronologically arranged.  So, I see on this invoice Number 1, 05/18/2021, let's just make sure we stay in chronological order until I say otherwise, all right?

MR. MOGHANDAM:  Would you like me -- do you mind if I take 10 seconds just to verify the order before we move forward or do you want to --

MR. JONES:  Let's do it.  Let's do it, 10 seconds.

MR. MOGHANDAM:  Good to go.

MR. JONES:  All right.

BY MR. JONES:

Q    So, Mr. Melchionni, you see as part of our Composite Exhibit Number 7, an invoice dated 05/18/2021?

A    I do.

Q    You do, all right.  And you see that's a monthly salary draw.  Is that a salary draw payable to you?

A    Correct.

Q    Okay.  And let's click to the next one again, chronological order.  I'm just trying to arrange my screen here.  Here we have one June 10th, 2021 payable to you, $10,000, correct?



A    Correct.

Q    All right.  What's the next one?  I think that's July --

A    We can stipulate if you represent so that there's one every month.

Q    Right.  All right.  So, let me just count them up.  We can stipulate that starting in May of '21 going through certainly for the balance of 2021 you were receiving a monthly draw salary of $10,000 a month, correct?

A    Correct.

Q    Okay.  And that continued on into 2022 until, I believe, it may or may not be your testimony, that it stopped in August of 2022.  Is that a correct statement?

A    I believe so.

Q    Okay.  And so, these invoices are in as Composite 7.  So, what I would like to know is, first of all, are these invoices -- just give us the logistics of how they're generated, like, are they printed out, like in a QuickBooks form or do you know anything about that?

A    I believe I just created a PDF invoice and submitted it through Industry FinTech.

Q    Okay.  And you did that contemporaneous with the dates that are indicated on the invoice.  Is that your testimony?

A     Correct.

Q     Okay.  So, back in, just by way of example to be clear, June 10th, 2021, you would've generated an invoice and submitted it to Industry FinTech, correct?

A     Correct.

Q     And then you would be paid shortly thereafter, it says terms net seven, but your testimony is that you would receive payment corresponding with that invoice a few days later.  Is that your testimony?

A     Correct.

Q     Okay.  And is there -- well, strike that.  Are you able to explain why these disbursements to you were not disclosed in the responses that you initially gave when we were asking for these records back in November 5th, 2022?

MR. BRESSLER:  Objection.  You can answer.

BY MR. JONES:

Q     You can answer.

A     I believe they were covered in the bank statements and general ledger.

Q     Okay.  So, your testimony is that these invoices that we are looking at and have been marked as Composite Exhibit 7 would all be set out in the bank statements and general ledger that were previously referenced?

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                          Page 49

A    I believe they were reflected in the bank statements and general ledger.

Q    Okay.  And that's your testimony with regard to why they were not included when we asked for them?

MR. BRESSLER:  Objection.

BY MR. JONES:

Q    Did I get that right?

A    I believe they were covered in the bank statements and general ledger.

Q    Okay.  Do you know how these disbursements showed up in the bank statements or general ledger, how they were described or set forth?

A    I do not.

Q    Okay.  Who is responsible, if you know who is responsible, for inputting the information that ends up on this general ledger to which you've made reference?

A    I believe Industry FinTech maintains the general ledger.

Q    Okay.  But how does Industry FinTech come into possession of the data that they use to put in that general ledger, they get an invoice from you, right?

A    No, I'm not clear what you're asking.

Q    Sure.  I'll ask it a different way.  So, let's be specific so it's not -- on the screen --

MR. JONES:  Cheyenne, go to the July 2021

invoice for Mr. Melchionni.  July 2021.

BY MR. JONES:

Q    Just by way of example, you're saying Industry FinTech would be the one inputting that data into the general ledger, and I was asking where they got that data, and I'm just asking you, did they get that data because you e-mailed them an invoice back on July 17th, 2021 that's it?

A    Correct.

Q    Okay.  So, if you sent this invoice to Industry FinTech back in July of '21, there's an e-mail from you to Industry FinTech attaching this invoice back in July of 2021, correct?

A    At some point, I don't recall, they used a system called bill.com and I would submit the invoices through that and that's how invoices would be submitted and other various invoices approved.

Q    Okay.  So, you're saying, is it your testimony that you generated an invoice on your computer and submitted it to the bill.com service and that would somehow get to Industry FinTech?

A    Correct.  For some of these, I don't remember when Industry FinTech started using that system.

Q    Okay.  So, how would you transmit or upload the information to bill.com?



A    I go to bill.com then we have a Justice Partners account, they're uploaded there.

Q    So, Justice Partners LLC had an account at bill.com back in July of 2021?

A    It may have been Industry FinTech's account, but that's how invoices were submitted.

Q    And when you say how invoices were submitted, did you fill out a form that bill.com utilized, like and it would populate into a bill.com or did you literally generate an invoice the one that we're looking at right now, the July --

A    PDF was uploaded.

Q    Right.  So, you would generate a PDF on your computer, presumably a laptop, correct?

0A    Correct.

Q    And then you would take that PDF and you would somehow transmit it to bill.com, correct?

A    Correct.

Q    You would upload it or e-mail it, do you recall?

A    Upload.

Q    Okay.  So, you'd log on to bill.com and you'd find one portal or one option or one tab and you would upload the PDF that you generated on your laptop, correct?



A    Correct.

Q    I take it that you've maintained all of those original PDFs that you -- in that regard?

A    I believe so.

Q    So, on your laptop we will find a PDF dated July 17th, 2021 that was created on that date?

A    Correct.

Q    And that would be your similar sworn testimony with regard to the other PDFs that are marked as Composite Exhibit Number 7?

A    Correct.

Q    We'll find a corresponding PDF created on that particular date on your laptop.  That's your testimony?

A    Correct.

MR. BRESSLER:  By the way, now that you're not asking a question, I neglected to tell the Reporter that this should be marked -- this whole transcript should be marked -- let me see what our highest -- I think it's highly confidential.

MR. JONES:  All right.  That -- I am just going to take your representation, I can't remember the classifications of confidential, but we'll mark it however the order says, but --

MR. BRESSLER:  And I  can immediately now and we'll check and see and --

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                         Page 53

MR. JONES:  Yeah, yeah, yeah, we'll figure it out.  All right.  Okay.  You can take that PDF down, Cheyenne and let's see.  All right.

Cheyenne, if you can go to the, what I'm calling at the top of it, it says Justice Partners LLC, financial statements December 31st, 2021 that'll be our next Exhibit it'll be Number 8 and you can e-mail that to Mr. Bressler.

(Thereupon, Plaintiff's Exhibit 8 was entered into the record.)

MR. JONES:  And you can share screen it when you're done with that.

MR. MOGHANDAM:  Can you give me the date one more time, sir, that you're referring to?

MR. JONES:  So the Justice Partners LLC Financial statements, December 31st, 2021.  I believe we received this document from Mr. Bressler's office around July 26th.

BY MR. JONES:

Q    All right.  So, I'm just going to ask you a few questions regarding this.  But first of all, have you ever seen this cash flow statement for 2021?

A    I believe so.

Q    Do you know when it was generated?

A    I do not.

UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Q    Do you know who created it?

A    I believe Industry FinTech.

Q    Okay.  Do you know anybody at Justice Partners LLC that was involved in assembling, gathering or marshaling the data that was used to generate this cash flow statement?

A    No.

Q    So, you and I can agree that Industry FinTech is a distinct company from Justice Partners LLC, correct?

A    Correct.

Q    Okay.  Are there offices in the same location?

A    We use that as a business address, Justice Partners really does not have a physical location.

Q    Okay.  Does Justice Partners own any tangible assets, you know, like file room cabinets, computers things like that?

A    No.

Q    No?

A    No.

Q    Okay.  So, I guess the question still stands as you sit here today, do you know of any person who holds any title or capacity or position at Justice Partners LLC that was involved in assembling and gathering the information that was used to generate this

cash flow statement?

            MR. BRESSLER:  Objection, form.

    A     Industry FinTech was the third party provider that handled that for us.

BY MR. JONES:

    Q     Correct.  And is that another way of saying that as you sit here today, you don't have any knowledge of anybody who holds a position at Justice Partners LLC, who is involved in gathering and assembling and compiling this information, correct?

    A     Correct.

            MR. BRESSLER:  Objection, form.

BY MR. JONES:

    Q     Correct?

    A     Correct.

    Q     Very good.

            MR. JONES:  All right.  So, you can take that share screen down, Cheyenne.  The next one -- now, Cheyenne, did you upload and did you get to Mr. Bressler the financial statement of December 31st, 2021?

            MR. MOGHANDAM:  I have not e-mailed that to him yet just because I was sharing screen.

            MR. JONES:  Yeah, go ahead.

            MR. BRESSLER:  Share screen, it's fine.



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023          Page 56

MR. JONES:  Go ahead and share screen at first.  Thank you.

MR. MOGHANDAM:  I apologize.  Are you referring to the second Exhibit or are you referring to the previous one or are we moving to a different one?

MR. JONES:  Yeah, well, first of all, Madam Court Reporter or Cheyenne, I'm doing my own tabulation.  Exhibit Number 8 is the one we just had, right?

MR. MOGHANDAM:  Correct.

MR. JONES:  And what was the title of it?  I want to make sure that I title it correctly.

MR. MOGHANDAM:  The Justice Partners LLC cash flow Statement 2021.

MR. JONES:  Correct and that's a one Page document, correct?

MR. MOGHANDAM:  Correct.

MR. JONES:  All right.  So, the next document, which will be Number 9, is the Justice Partners LLC Financial Statements.  December 31st, 2021.

(Thereupon, Plaintiff's Exhibit 9 was entered into the record.)

MR. JONES:  It is from what I can tell a nine-page document.

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                    Page 57

MR. MOGHANDAM:  I apologize.  Sir, can you tell me the title of that document one more time?

MR. JONES:  Justice Partners, LLC Financial Statements, December 31st, 2021.

Actually, I'm just going to go ahead and ask a few questions on it while you look for that because it has some names on it that I have to ask Mr. Melchionni.

BY MR. JONES:

Q    So, when we get that document loaded, Mr. Melchionni, you'll see on it that there's a firm called JVA Accountants and Advisors.  Does that name ring a bell?

A    It does.

Q    Okay.  And on the document that we will be sending to you shortly, it's the person that signed it. It doesn't give a human that signed it, but there's three people on this JVA letterhead, Joseph Velocci, Anthony Velocci, and Nancy Colucco or Colucco.

Did any of those names ring a bell with regard to your role at Justice Partners, LLC?

A    They do.

Q    Okay.  All three of them or one in particular or a group of them?

A    Joe Velocci.

Q    Joe Velocci.  Okay.  So, is Joe Velocci the accountant and/or CPA for Justice Partners LLC?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    You can go ahead and answer.

A    He was the accountant we used to do the -- these particular statements.

Q    Right.  And so, we have it up on share screen. And first of all, do you recall reviewing this document before your deposition today?

MR. BRESSLER:  Objection form.

A    Briefly.

BY MR. JONES:

Q    Okay.  Well, let's go to the first substantive page.  We have this blank page is Number 1 and there's a table of contents.  And then the third Page is the report of Independent Certified Public Accountants.  You see that?

A    I do.

Q    And it says -- well, first of all, are you able to point to us, let's go to the next page just because I'm going to ask about dates.  If you go to the next page where it says Palm Beach Gardens Florida, April 7th, 2023.  You see that?

A    I do.



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Q    So, tell us what knowledge you have as to why the members of Justice Partners LLC ostensibly are receiving this report of Independent Certified Public Accountants for 2021 in April of 2023.

A    I don't know.

Q    So, as the COO of Justice Partners, you don't have any testimony or knowledge in that regard, correct?

MR. BRESSLER:  Objection, form, objection beyond the scope.

MR. JONES:  Just trying to find out about these particular books and records referenced in this report, but you don't have any knowledge.

MR. BRESSLER:  The question you're asking has nothing to do with other books or records exist. You can answer -- he already has answered, but you can answer again if you want to.

A    No.

BY MR. JONES:

Q    Okay.  So, with regard to the provision of the books and records in response to the request of a particular member, do you see on the first page of this report of Independent Certified Public Accounts where it says "To the members of Justice Partners LLC", you see that?  It's the very first line.

A    Um-hum.



Q     You see that?

A     Um-hum.

Q     Is that a yes?

A     I see it, yes.

Q     Do you know if that actually took place?

A     What took place?

Q     Did the members of Justice Partners LLC get this report in April of 2023?

A     I don't recall.

Q     Who's responsible at Justice Partners LLC for making sure that the members get the appropriate set of documents and reports?

MR. BRESSLER:  Objection, form objection beyond the scope and I'm going to cut it off now. This deposition is about what documents exist. Whether it was sent to the members of Justice Partners LLC in 2023 is irrelevant.  The deposition is about your demand in November 2022.  Move on.

MR. JONES:  Well, you're either going to instruct the witness or not --

MR. BRESSLER:  I can, I instruct him not to answer --

MR. JONES:  Okay.

MR. BRESSLER:  -- move on.

MR. JONES:  Second of all -- second of all



just to be clear the deposition is what documents existed and who has them?  You can't leave that part out of the statute or the case law.

MR. BRESSLER:  Okay.  Move on.  I instruct him not to answer.

MR. JONES:  And lastly, just to make the point real clear, I'm not taking instructions from you today, Mr. Bressler, we're going to proceed and then you'll terminate the deposition as you see fit.

MR. BRESSLER:  I'm instructing the witness not to answer.

MR. JONES:  Okay.  I got it.  So, and to be clear, are you instructing this witness not to answer any more questions relating to this report of Independent Certified Public Accountants?

MR. BRESSLER:  We'll go question by question.

MR. JONES:  Very good.

BY MR. JONES:

Q    All right.  So, regarding this report, sir, if you page through this report and Cheyenne will page down on Page 3, Page 4, you'll see various figures and data regarding Justice Partners LLC.

What I would like to know is, were you involved in the review of any documents that were



utilized in coming up with any of these figures and if so, where are those documents located?

A    All documents were maintained by Industry FinTech.

Q    And with respect to the part of my question about where they're located, your answer would be similar to what you said earlier today about this data room that Industry FinTech maintains?

A    Correct.

Q    Okay.  With regard to your understanding about what documents exist and where they're located, if you go to Page 6 of the report that we're talking about, you'll see cash flows from financing activities $11,950,000 where it states net cash provided used in financing activities.

Again, with regard to the documents that speak to those particular figures, is it your testimony that all of those documents are in the possession, custody and control of Industry FinTech?

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    I'm sorry, what was your answer?

A    Correct.

Q    All right.  And then I'm almost done with this document.  Just underneath that, same question with



regard to cash and cash equivalence, with regard to the existence of any documents and who's got control of them, possession, custody or control of them, the cash and cash equivalence as of December 31st, 2021, is that something that Industry FinTech would have?

MR. BRESSLER:  Objection, form.

A     Correct.

BY MR. JONES:

Q     All right.  Now, going back to Exhibit 8, that was the cash flow statement for the year 2021, I believe.

MR. JONES:  Cheyenne, if you could put that on, that was the single page Exhibit we had.  It was just the previous Exhibit, Cheyenne.  There you go.

BY MR. JONES:

Q     And now if you look at this cash flow statement for the year in 2021 and you compare it with our request that's set out in Exhibit Number 2, which you previously testified to where we asked for the cash flow statements back in November of '22.

Do you have any explanation or testimony to offer that would explain why we didn't get this document response?

MR. BRESSLER:  Objection, form.



A      Each member of Justice Partners has access to the data room and I believe this document is uploaded in there that they can view 24/7 365.

BY MR. JONES:

Q      So, your testimony is that each member of Justice Partners LLC has independent access to the FinTech data room that allows them to view things like this cash flow statement for the year end of 2021. That's your testimony?

A      I could be incorrect, but I believe that each individual Justice Partners investor has access to a place where these documents are held at Industry FinTech.

Q      Do you know, as COO of Justice Partners LLC, do you know if in fact this cash flow statement for the year end 2021 actually existed in the Industry FinTech data room back in 2021?

A      In the Industry FinTech data room?

Q      Um-hum.

A      I can't say with certainty whether it existed, I believe so.

Q      Okay.  But you agree with regard to this particular document and whether it existed at that time that you just referenced, it would be Industry FinTech who could answer that question?



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

A    Correct.

Q    Okay.  All right.  So, if I were to ask you why and when it comes to the documents that we received in July 26th of this year, why those documents were not produced pursuant to our original request for documents, your answer would be that the members of Justice Partners LLC all have access to the Industry FinTech data room, correct?

MR. BRESSLER:  Objection, form.

A    What are you asking me?

BY MR. JONES:

Q    So, we've already heard your testimony with regard to the, just by way of example, the invoices that we covered and how those documents were not provided in response to our original request for documents.

Your testimony was that that information was contained in bank statements and general ledgers, we'll see about that.

But your explanation appears to be that these documents were somehow available to the members where they could have logged on to Industry FinTech through some portal at any point in time.  I just want to know if that's your testimony.

MR. BRESSLER:  Objection, form.

A    I'm not sure if you're trying to trick me or



not.  I believe these documents were provided to you.

BY MR. JONES:

Q    Okay.  I don't think there's any dispute, sir that the invoices that we've now marked in this case as Composite Exhibit Number 7, I believe those specific invoices were not provided in response --

A    Are you talking about the invoices or are you talking about the cash flow statement on the screen? I'm confused.

Q    I was talk -- nope, now, I'm just talking about to make sure we're clear on the documents. Exhibit -- Composite Exhibit Number 7 was a series of invoices from you regarding ostensibly some disbursements and moneys that you received.

And correct me if I'm wrong, but you made it clear that those invoices were provided not in response to our original request for production, but we received those on July 26th of this year.  Do you have an understanding of that?

A    Okay.

Q    You agree with that, right?

A    Agree.

Q    All right.  And all I'm getting at, sir, is because obviously I want to finish the deposition as much as you do, I'm trying to figure out if, when I ask



you about the documents that we did not get in response to our original request for records.

For example, the cash flow statement that we just referenced, I just want to know if it's your testimony that those documents were all available to the members of Justice Partners LLC.

If they would've just logged on to the Industry FinTech portal, they would've been there for the members to view. I just want to know if that's your testimony.

A    As I stated previously, I can't say it --

Q    Say that again.

A    As I stated previously, I cannot say with certainty, but I believe they were in that portal.

Q    Okay. And can then -- the appropriate follow-up is then with regard to that level of certainty that you just mentioned, you agree that it would be Industry FinTech people who would best be able to answer that question, correct?

A    Correct.

Q    All right. All right.

MR. JONES: Cheyenne, if you can share screen, Mr. Bressler's August 17th e-mail, August 17th, 2023 regarding some additional production. Let me know if you need any time.



BY MR. JONES:

Q    I am just showing you this e-mail quickly. We're now going to talk about some recent document production we got, Mr. Melchionni, now.

MR. JONES:  Cheyenne, I'm not going to ask you if you saw Mr. Bressler's e-mail, but I just wanted to contextualize the documents we're talking about now.

Now, in response to Mr. Bressler's or not in response, attached to Mr. Bressler's e-mail is a series of documents that I'll try to cover quickly, but it was the -- you can share screen the loan and security agreement, Cheyenne.  And just so you know, it's Bates 384 through 400.

BY MR. JONES:

Q    All right.  Do you recall seeing that agreement, Mr. Melchionni?

A    No.

MR. BRESSLER:  Objection, form.

BY MR. JONES:

Q    And this is similar to my earlier questions. I just want to know if you have any testimony to offer as to why this loan and security agreement was not turned over pursuant to our original request for documents back in November of 2018.



MR. BRESSLER:  Objection.

BY MR. JONES:

Q    2022.

MR. BRESSLER:  Objection, form.

A    I'm not sure whether you're trying to trick me, I believe --

BY MR. JONES:

Q    I'm not --

A    -- you have the document in possession I'm not sure what you're asking.

Q    Yeah, I'm not trying to trick anybody I want to know --

A    You want to know why the document has been produced --

Q    Yeah, it's a straightforward question.  Here let's go to the top of this document.  It's a loan and security agreement and from what I can tell, it's between Justice Partners LLC and Justice Partners Law Group, right?

A    Okay.

Q    It's a contract between those two companies, right?

A    Correct.

Q    When we asked for this document back in November 5th, 2022 and we got the original response with



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023                    Page 70

a set of documents, this document was not included in your response and I just want to know, what's the explanation why we didn't -- why didn't we get this document as part of that original response?

MR. BRESSLER:  Objection to form and misstatement of fact.

BY MR. JONES:

Q    You can go ahead and answer.

A    I don't know.

Q    Okay.  So, let's go to the bottom of this document.  From what I can tell you signed this document as General Partner of Justice Partners LLC.  Is that what it says?

A    That's what it says.

Q    Does Justice Partners LLC have a General Partner?

A    We are the manager, I believe Sylvia and myself are the managing general partner, GP.

Q    You and Sylvia are the managing general partners of Justice Partners LLC, that's your testimony?

A    Yes.

Q    Okay.  And you also signed this agreement on behalf of Justice Partners Law Group as a managing partner, correct?

A    Correct.

Q    Did you inform the members of Justice Partners LLC whether you signed this document?

A    No.

Q    Why not?

MR. BRESSLER:  Objection form.  Don't answer, got nothing to do with the deposition.

MR. JONES:  Just want to make it clear you're instructing the witness not to answer.

MR. BRESSLER:  That is clear.

MR. JONES:  All right.  All right.  You can take that document off screen, Cheyenne.

BY MR. JONES:

Q    Now, with regard to any people that, or entities that have knowledge regarding the location and possession of the books and records of Justice Partners LLC, do you have any understanding whatsoever that Ed Lake or the Lake Law Firm would have possession, custody, or control of any Justice Partners LLC records?

A    No.

Q    Meaning you don't know either way or you know for a fact they don't have any records?

A    They don't have any records.

Q    Okay.  So, your testimony is that the Lake Law Firm doesn't have any records relating to Justice Partners LLC.  Is that your testimony?



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023          Page 72

A    Records being defined as you have a contract with them, do you consider that a record?

Q    Well, it's actually what you consider a record.  You're the COO of Justice Partners, LLC.  And what I would like to know is do you have any knowledge as to whether or not this other law firm called the Lake Law Firm, do you know whether they have Justice Partners records -- Justice Partners LLC records in their possession, custody or control?

MR. BRESSLER:  Objection form.

A    They do not.

BY MR. JONES:

Q    You don't know either way, correct?

A    They do not.

Q    Okay.  You know for a fact that they do not -- I'm sorry.  So, that's your testimony, correct?

A    Correct.

Q    All right.  Do you know if the Lake Law Firm has any records that pertain to the loan and security agreement between Justice Partners and Justice Partners Law Group?

MR. BRESSLER:  Objection, form.

A    They do not.

BY MR. JONES:

Q    Okay.

MR. JONES:  All right.  I don't have a lot of questions left.  Do you want to -- I take it you want to push through and not take a lunch break, right, Ken?

MR. BRESSLER:  Yes.

MR. JONES:  Okay.  Then let me just take five minutes as a quick comfort break and then we will wrap this up quickly.

(Thereupon, a short discussion was held off record.)

(Deposition resumed.)

MR. JONES:  So, Cheyenne, you're going to put up on share screen our request for production and you're going to go to Number 19.  And then I think the last couple of things will just be these last two documents.

And this relates to, Mr. Melchionni, the documents that do exist as they relate to specific entities.  So, if you can put that up on the share screen when you get a chance.

All right.  Go to Page 6, Request Number 19.  All right.  So, zoom in a little bit just so Mr. Melchionni can read that.

BY MR. JONES:

Q    We asked for copies of all contracts or



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

agreements entered into by Justice Partners LLC, and then I don't think you have it on --

MR. JONES:  I mean, unless you can get it quick up there, Cheyenne, their response.

BY MR. JONES:

Q   But on the June 12th, 2023 at 05:38 p.m. we received a response that says here it is -- zoom in a little bit.

The response to our request says that Justice Partners objects it as duplicative, but the production produced all contracts entered into Justice Partners, and then it specifically mentions Bates Numbers 351 through 353.  You see that?

A   I do.

MR. JONES:  Okay.  So, Cheyenne will now put on the share screen those Bates Numbers you talked about that Justice Partners LLC, contracts, that's what Request Number 19 asked for.

BY MR. JONES:

Q   All right.  So, here is the April 15th, 2021 invoice, the 351 Bates Number, and you can see it's from the Lake Law Firm, but it says it's billed to Justice Partners Law Group.

And so, what we're trying to find out is why are you saying that that's a Justice Partners LLC



contract when it says it's a bill to Justice Partners Law Group?

A    I don't know.

Q    Okay.  Same question as to Bates Number 353. There's 353 and then you see it's from the Lake Law Firm to Justice Partners Law Group.  Is your answer the same as to the previous answer?

A    It obviously pertains to Justice Partner Business, but yes.

Q    And why does it obviously pertain to Justice Partners Business?

A    Justice Partners Law Group is involved in the -- involved in litigation, which would then -- the funds produced from that would flow through to Justice Partners LLC.

Q    Right.  And with regard to who has the existence of certain documents and who has possession of these documents and whether or not the response of the request for production is accurate, I just want to know, you and I can agree that Bates Numbers 351 and 353, those are not contracts between Justice Partners, LLC and anybody.  These are invoices directed to Justice Partners Law Group, correct?

A    Correct.

Q    Right.



MR. JONES:  Obviously we're reserving our rights with respect to the questions that received an instruction not to answer, but I don't have anything else to ask this witness at this time.

MR. BRESSLER:  Okay.  Why don't we go off the record and talk about what time you want to start Sylvia's?

MR. JONES:  I only need 15 minutes.

(Deposition concluded at 01:11 p.m.)

(Reading and signing of the deposition by the witness has been reserved.)



CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF POLK


     I, BRIEL MADDALENA, Court Reporter and Notary

Public for the State of Florida, do hereby certify that

I was authorized to and did digitally report and

transcribe the foregoing proceedings, and that the

transcript is a true and complete record of my notes.


     I further certify that I am not a relative,

employee, attorney or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorneys or counsel connected with the action, nor am

I financially interested in the action.


Witness my hand this 25th day of August, 2023.



_____
BRIEL MADDALENA, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA

UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF POLK


     I, BRIEL MADDALENA, the undersigned authority,

certify that LEE MELCHIONNI, appeared before me remotely

pursuant to Florida Supreme Court Order AOSC20-23 and

was duly sworn on the 22nd day of August, 2023.


Witness my hand this 25th day of August, 2023.



_____
BRIEL MADDALENA, COURT REPORTER
Notary Public, State of Florida
Commission No.:  HH095918
Commission Expiration:  02/22/2025

DATE:      AUGUST 25, 2023
TO:        LEE MELCHIONNI
C/O        KENNETH BRESSLER, ESQUIRE
           BLANK ROME
           1271 AVENUE OF THE AMERICAS
           NEW YORK, NEW YORK 10020

IN RE:     ALLAN TEH VS. JUSTICE PARTNERS, LCC

CASE NO:   2022-022470-CA-01

Dear MR. MELCHIONNI,

Please take notice that on AUGUST 22, 2023, you gave your deposition in the above-referenced matter.  At that time, you did not waive signature.  It is now necessary that you sign your deposition.  You may do so by contacting your own attorney or the attorney who took your deposition and make an appointment to do so at their office.  You may also contact our office at the below number, Monday - Friday, 9:00 AM - 5:00 PM, for further information and assistance.

If you do not read and sign your deposition within thirty (30) days, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court.

If you wish to waive your signature, sign your name in the blank at the bottom of this letter and promptly return it to us.

Very truly yours,

BRIEL MADDALENA, Court Reporter
Universal Court Reporting
(954)712-2600

I do hereby waive my signature.


_____
LEE MELCHIONNI
Cc: via transcript:              MATTHEW JONES, ESQUIRE



Errata Sheet

NAME OF CASE: Allan Teh vs Justice Partner, LLC

DATE OF DEPOSITION: 08/22/2023

NAME OF WITNESS: Lee Melchionni

Reason Codes:

      1. To clarify the record.

      2. To conform to the facts.

      3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason_____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

                     _____


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**$**

**$10,000**
46:25 47:9

**$11,950,000**
62:14

**$45**
40:20 41:21

**-**

**-01**
5:7

**0**

**01:11**
76:9

**022470-CA**
5:7

**05/18/2021**
46:4,16

**05:38**
74:6

**0A**
51:15

**1**

**1**
7:1,3,22 31:25
32:14 46:4 58:15

**10**
30:7,9,11 46:8,10

**10.1**
34:22,25

**10th**
46:24 48:3

**11:31**
5:5

**12th**
74:6

**14th**
40:9,18

**15**
76:8

**15th**
22:1,21 23:13
74:20

**16th**
21:9 30:13,19
31:4,12 32:5

**17th**
50:7 52:6 67:23

**19**
73:14,21 74:18

**2**

**2**
14:10,11 15:15
22:16 26:10 30:6
42:15 63:19

**2018**
68:25

**2020**
22:1,21 23:13

**2021**
37:9,13 40:9,18
46:24 47:8 48:3
49:25 50:1,8,13
51:4 52:6 53:6,16,
22 55:21 56:15,21
57:4 59:4 63:4,10,
18 64:8,16,17
74:20

**2022**
14:18,23 21:10

23:9 27:9,14
30:13,19 31:4
37:12 47:12,14
48:15 60:18 69:3,
25

**2022-**
5:6

**2023**
5:2,4 32:5 40:17
41:25 58:24 59:4
60:8,17 67:24 74:6

**21**
47:7 50:11

**22**
5:2 63:21

**22nd**
5:4

**23rd**
40:17

**24/7**
64:3

**26th**
53:18 65:4 66:18

**27**
34:20,22

**3**

**3**
17:21 19:9,13 20:2
21:9,12 29:7,22
30:6 61:22

**31st**
53:6,16 55:20
56:21 57:4 63:4

**351**
74:12,21 75:20

**353**
74:13 75:4,5,20

**365**
64:3

**373**
31:25 32:14

**384**
68:14

**4**

**4**
19:16 20:3 21:11,
17,23 22:5,13,17
23:22 26:5 31:11,
14 61:22

**400**
68:14

**45**
38:19 40:9

**5**

**5**
26:10 34:1,2 38:5

**5th**
14:18,23 15:11
18:21 19:12 21:2
23:9,14 25:10
48:15 69:25

**6**

**6**
29:3 38:9,11 62:12
73:21

**7**

**7**
45:18,19 46:16
47:17 48:23 52:10
66:5,12



877-291-3376

www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**7th**
58:24

**8**

**8**
53:7,9 56:9 63:9

**9**

**9**
29:19,23 30:11
56:20,22

**A**

**a.m.**
5:5

**able**
8:22 16:3 22:7
23:19 48:12 58:21
67:18

**about**
7:16 14:17 17:8
19:3 23:7 25:7
30:10 31:10 34:16,
25 36:17 37:13
39:18 40:3,5,6
47:20 58:22 59:10
60:15,18 62:6,7,
10,12 65:18 66:7,
8,11 67:1 68:3,7
74:17 76:6

**Absolutely**
9:6

**accept**
6:17

**accepted**
35:7,23

**access**
64:1,6,11 65:7

**accessed**
21:3

**accordance**
35:6

**accordingly**
24:6

**account**
24:13 35:6 36:5
42:18 43:21 44:9
51:2,3,5

**accountant**
58:2,6

**accountants**
27:10 57:12 58:17
59:4 61:16

**accounting**
19:19 21:21 22:11,
18 23:10,15 26:3
27:16,19,25 28:2,
4,7 33:21 35:7,17,
23

**accounts**
36:11 59:22

**accurate**
75:19

**acknowledged**
30:2

**Act**
36:14

**activities**
62:13,15

**actually**
6:25 19:14 23:15
27:13 32:4 39:18
57:5 60:5 64:16
72:3

**addition**
23:9 36:13

**additional**
67:24

**address**
6:8,10,12,15 54:13

**administrator**
15:22 16:12 17:7,9

**advance**
43:22

**advances**
42:19 43:11 44:10

**advice**
8:6,8 23:4

**Advisors**
57:12

**after**
5:22 14:23 21:2
40:21

**again**
12:3 14:25 17:13
18:2 26:19 31:17
32:2 33:8 46:22
59:16 62:16 67:12

**ago**
20:1 37:3

**agree**
14:22 16:8 19:13
29:12 54:8 64:22
66:21,22 67:17
75:20

**agreeing**
41:20

**agreement**
28:16 29:9,13,18
30:21,22 31:7
33:25 34:21,23
68:13,17,23 69:17
70:22 72:20

**agreements**
12:6 31:5 74:1

**ahead**
10:8 13:12 16:23
17:5,19 18:24

22:25 24:22 36:25
55:24 56:1 57:5
58:5 70:8

**all**
5:9 12:7 15:23
17:21 19:8,16
21:1,18 22:21
24:17 29:3,20
30:8,14 31:10
32:7,12,15,25
33:1,2,5,18,24
35:6 36:1,6,9,13
37:10 38:8,24,25
39:2,4,11 42:19
43:9 44:14 45:4,5,
6,14,17 46:6,13,18
47:2,6,18 48:23
52:2,20 53:2,3,20,
21 55:17 56:7,19
57:23 58:9,20
60:25 61:20 62:3,
18,24 63:9 65:2,7
66:23 67:5,21
68:16 71:10 72:18
73:1,21,22,25
74:11,20

**Allan**
22:1

**allow**
36:20

**allows**
64:7

**almost**
62:24

**already**
29:6,8 34:5 59:15
65:12

**also**
5:17 9:14 24:8
33:11 41:25 44:11
45:11 70:22

**am**



877-291-3376

www.ucrinc.com

8:1 9:10 41:16
52:20 68:2

**amount**
40:9 43:22

**and/or**
26:2 58:2

**another**
32:20 55:6

**answer**
9:16,23 16:23
17:5,19 18:9,11,24
20:11 22:25 24:22
27:23 36:25 42:25
48:16,18 58:5
59:15,16 60:22
61:5,12,15 62:6,22
64:25 65:6 67:18
70:8 71:5,8 75:6,7
76:3

**answered**
59:15

**Anthony**
57:19

**anticipated**
32:24

**any**
6:10 7:12 8:2,10,
11,20 9:20 10:4
14:20 18:20 19:5,6
20:19 21:6 22:10
23:19 27:10,14
29:18,23 32:21
35:16 37:19 38:14
42:20 54:15,22,23
55:7 57:20 59:7,12
61:15,25 62:1
63:2,22 65:22 66:3
67:25 68:22 71:13,
16,18,21,22,24
72:5,19

**anybody**
11:25 28:7 54:3

55:8 69:11 75:22

**anything**
18:7 47:20 76:4

**AOSC20-23**
5:9

**apologize**
27:23 56:3 57:1

**appearing**
5:9

**appears**
25:12 65:19

**applied**
35:7

**appreciate**
40:1

**appropriate**
43:19,21 45:11
60:11 67:15

**approved**
50:17

**approximately**
5:5

**April**
40:9,17 58:24 59:4
60:8 74:20

**around**
25:15,18,22 53:18

**arrange**
46:23

**arranged**
46:3

**arrangement**
28:13

**Arthur**
11:24

**ask**
12:17 14:16 17:8
25:22 26:19 29:20

30:5 36:20 43:13
45:25 49:23 53:20
57:5,7 58:22 65:2
66:25 68:5 76:4

**asked**
20:14 23:9 26:11
36:18 49:4 63:20
69:24 73:25 74:18

**asking**
12:9,19 13:8,12,18
30:17 39:12 48:14
49:22 50:5,6 52:16
59:13 65:10 69:10

**asks**
30:7

**assembling**
15:3 54:4,24 55:9

**assets**
54:16

**associated**
15:13

**Atlanta**
6:4

**attached**
68:10

**attaching**
13:23 50:12

**attachment**
11:12

**attempt**
15:16

**Attorney**
11:20

**attorney-client**
10:5

**attorneys**
15:2

**audit**
19:20 21:21 22:11,

18 23:10,16 25:10
26:3

**audited**
37:11

**August**
5:2,4 47:14 67:23

**available**
65:20 67:5

---

**B**

**back**
6:25 22:16 25:1,3
27:9 28:1 31:1
48:2,14 50:7,11,12
51:4 63:9,21 64:17
68:25 69:24

**balance**
13:25 15:18 42:19
43:11 44:6,8 47:8

**bank**
14:3 18:6,13,16,19
19:7 48:19,23
49:1,8,11 65:17

**basis**
35:8

**Bates**
31:25 32:13 68:14
74:12,16,21 75:4,
20

**Beach**
58:23

**beat**
33:9

**because**
12:9 15:7 25:6
30:5,7 33:8 39:24
40:1 45:1 50:7
55:23 57:6 58:22
66:24



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

**becomes**
14:15

**before**
39:18 42:7 46:9
58:10

**beginning**
39:20

**behalf**
5:14 28:7 70:23

**behind**
34:15

**believe**
5:16 9:13 11:11
12:14 13:16,22
14:4,8 17:20 18:15
19:10 20:21 21:7
22:3,13 23:3 27:2
30:25 31:3,9 35:12
37:1,7,17 41:17
42:5 43:1,7,18
47:13,15,21 48:19
49:1,8,17 52:4
53:17,23 54:2
63:11 64:2,10,21
66:1,5 67:14 69:6
70:17

**bell**
57:13,20

**belonging**
36:6

**Benito**
5:16,18 18:25
19:4,23 20:2 28:3

**best**
12:5 38:18 67:18

**better**
18:11

**between**
9:18 13:7,14
28:10,16 29:9,13
30:6 69:18,21

**beyond**
72:20 75:21

**beyond**
36:20 42:24 59:9
60:14

**big**
39:3,4

**bill**
75:1

**bill.com**
50:15,20,25 51:1,
4,8,9,17,22

**billed**
74:22

**bit**
21:15 29:16 34:22
73:22 74:8

**blank**
58:15

**block**
36:22

**blow**
34:21

**bookkeeping**
28:21

**books**
9:20 29:25 34:25
35:5 36:5,11 42:18
43:10,16,24 59:11,
14,20 71:15

**borrower**
44:11

**bottom**
70:10

**break**
38:20 39:5 73:3,7

**Bressler**
5:15,18 6:9,17,22
7:12 8:10 9:4,16,
24 12:8 14:15

16:6,16,21 17:3,17
18:22 20:9 22:12,
23 23:1,23,25
24:2,7,15,20
26:15,22 30:16
33:14 34:4,8,12,17
36:16 37:21 38:10,
13,22,24 39:16
41:7,11 42:24 43:6
44:16 45:4,10,21
48:16 49:5 52:15,
24 53:8 55:2,12,
20,25 58:3,11
59:8,13 60:13,21,
24 61:4,8,11,17
62:20 63:6,25
65:9,24 68:19
69:1,4 70:5 71:5,9
72:10,22 73:5 76:5

**Bressler's**
21:10 31:12 37:2
53:18 67:23 68:6,
9,10

**brief**
8:22

**briefly**
7:16 58:12

**Briel**
5:10

**bring**
8:2,11 29:21 33:24

**broader**
32:2

**business**
6:9,12 31:2 36:8,
10,12 54:13 75:9,
11

---

**C**

---

**cabinet**
20:17

**cabinets**
54:16

**called**
5:22 50:15 57:11
72:6

**calling**
53:5

**came**
21:1 32:15

**can**
6:16 7:8,14,16 9:5
12:5 14:14,22 15:9
16:23 17:5 18:24
19:13 20:11 23:20
29:12 34:4,6,12
36:25 38:9 39:2,6
40:4,8 41:13 42:25
45:2,12,24 46:1
47:4,7 48:16,18
52:24 53:2,4,8,11,
13 54:8 55:17
56:24 57:1 58:5
59:15,16 60:21
64:3 67:15,22
68:12 69:17 70:8,
11 71:10 73:19,23
74:3,21 75:20

**can't**
12:1 38:15 52:21
61:2 64:20 67:11

**cannot**
67:13

**capacity**
54:23

**capital**
17:11

**car**
34:15

**case**
5:6 40:1 61:3 66:4



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**cases**
39:25

**cash**
15:18 53:22 54:5
55:1 56:14 62:13,
14 63:1,3,4,10,17,
20 64:8,15 66:8
67:3

**center**
31:18

**CEO**
16:15,17 17:1

**certain**
75:17

**certainly**
8:8 14:14 19:2
23:6 34:5 47:8

**certainty**
64:20 67:14,16

**Certified**
58:17 59:3,22
61:16

**chance**
10:3,7 25:7 44:15
73:20

**character**
36:12

**check**
36:21 52:25

**Cheyenne**
5:13 7:8 9:4 21:14
34:4 38:5,14
39:13,15 44:15,19
45:16,23,25 49:25
53:3,4 55:18,19
56:8 61:21 63:12,
14 67:22 68:5,13
71:11 73:12 74:4,
15

**Chief**
8:17,18,23 16:2,3

**chronological**
46:5,23

**chronologically**
46:3

**chunk**
39:3

**circular**
21:25 22:6,9,20
23:13

**claim**
29:25

**clarifying**
12:8

**classifications**
52:22

**clear**
6:19 25:6,25 30:16
45:16 48:3 49:22
61:1,7,14 66:11,16
71:7,9

**click**
30:6 46:22

**client**
26:6 39:1

**cloud**
11:5,8

**co-**
8:25

**Colucco**
57:19

**come**
15:2 19:11 49:19

**comes**
65:3

**comfort**
73:7

**coming**
62:1

**commentary**
37:3

**comments**
11:21

**commitment**
40:8

**communicated**
8:9 10:4 11:20
15:1

**communication**
10:5 23:7

**communications**
13:21 19:3 29:20

**companies**
69:21

**company**
15:17 18:3 19:18,
20 20:8,20 21:19,
21 22:11,19 23:11,
16 26:11 27:9
29:5,21 30:8 35:5,
6 36:7,10,13 37:4
54:9

**compare**
63:18

**compiling**
55:10

**complete**
35:5

**Composite**
45:3,8,18,19 46:16
47:17 48:23 52:10
66:5,12

**computer**
10:15 50:19 51:14

**computers**
54:16

**concept**
33:10 35:23

**concerning**
9:18

**concluded**
76:9

**conclusion**
45:17

**confidential**
52:19,22

**configured**
24:13

**confused**
66:9

**consents**
35:9

**consider**
72:2,3

**consistent**
35:8

**contain**
36:5

**contained**
65:17

**contemporaneou
s**
47:23

**contents**
58:16

**context**
8:24 18:3 27:8

**contextualize**
68:7

**continue**
25:22 39:13

**continued**
47:12

**contract**
9:11 30:25 31:1
33:3 69:21 72:1



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

75:1

**contracts**
30:8,15,19 31:5
73:25 74:11,17
75:21

**control**
10:22 62:19 63:2,3
71:18 72:9

**COO**
9:12 16:19 17:14
18:3 27:8 30:18
37:24 41:13,25
59:6 64:14 72:4

**copies**
17:21 73:25

**corporate**
33:2,20

**corporation**
33:10,11

**correct**
6:7 8:18,19 9:24
10:23,24 11:2,16
15:14,19,21 16:9,
10,13 17:25 19:9,
22 20:25 21:5 22:8
28:14,17,18,23
29:1,2,15 30:4
32:17 33:22,23
35:5 40:7,10,11,
14,15,18 41:16,22,
23 42:1,2 44:12,13
46:21,25 47:1,10,
11,14 48:1,4,5,10
50:9,13,22 51:14,
15,17,18,25 52:1,
7,11,14 54:10,11
55:6,10,11,14,15
56:11,16,17,18
59:7 62:9,23 63:7
65:1,8 66:15
67:19,20 69:23
70:24,25 72:13,16,
17 75:23,24

**correctly**
22:2 56:13

**corresponding**
48:8 52:12

**could**
20:5 22:21 63:12
64:10,25 65:21

**Counsel**
8:6,8 11:18 19:1,3
23:4,7

**counsels**
5:11 9:1

**count**
47:6

**couple**
7:6 31:21 39:24
73:15

**course**
36:8

**Court**
5:3,8,10,11,19
24:25 25:7 45:15
56:8

**cover**
13:5 14:9 68:11

**covered**
48:19 49:8 65:14

**CPA**
27:16,20 58:2

**created**
47:21 52:6,12 54:1

**credits**
44:9

**current**
6:8

**currently**
6:3 8:13 11:1
29:13

**custody**
10:22 62:18 63:3
71:18 72:9

**cut**
12:25 60:14

---

**D**

**data**
27:1 32:16 49:20
50:4,6 54:5 61:22
62:7 64:2,7,17,18
65:8

**date**
5:4 10:23 25:16,
18,22 40:9,17,22
41:4 52:6,13 53:13

**dated**
22:1,21 23:13
46:16 52:5

**dates**
47:24 58:22

**days**
48:9

**dead**
33:9

**deal**
6:11 20:22,23 21:3
39:4

**debited**
43:21

**December**
22:1,21 23:13
53:6,16 55:20
56:21 57:4 63:4

**Defendant**
5:15 9:19

**define**
15:25

**defined**
72:1

**definitely**
11:19

**definition**
16:24,25 17:14

**degree**
35:13,16

**Delaware**
29:24

**demand**
60:18

**depends**
15:25

**depo**
5:17 45:17

**deposition**
5:1 7:2,19,23 8:3
9:17 10:2,7,8,9
11:1 12:11,19
13:12 15:8 36:17,
22 39:9,20 58:10
60:15,17 61:1,9
66:24 71:6 73:11
76:9,10

**describe**
12:5

**described**
17:16 27:1 49:12

**description**
8:23

**determine**
18:1 20:18

**develop**
8:25

**device**
10:14,25

**didn't**
8:11 23:24 30:17



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

31:17 63:23 70:3

**different**
12:7 18:9 49:23
56:6

**difficult**
46:2

**direct**
5:24 43:15,23

**directed**
44:12 75:22

**disbursement**
18:2

**disbursements**
17:22 18:20 19:5
48:12 49:10 66:14

**disclosed**
48:13

**discussed**
11:20

**discussion**
7:17 39:7 73:9

**dispute**
66:3

**distinct**
54:9

**distracting**
14:15

**distribution**
18:2

**distributions**
17:22 18:20 19:6

**document**
13:14,17 22:5
23:12 26:13,16,20,
25 27:6 40:13,16
41:5,7,9,24 42:7,9,
12,15 53:17 56:17,
19,25 57:2,10,15
58:9 62:25 63:23

64:2,23 68:3 69:9,
13,16,24 70:1,4,11
71:2,11

**documentation**
33:2,21,22

**documents**
7:10 8:2,7,11 9:18
10:8,13,14,21
11:3,9,13,17,23
12:3,5,6,10,14,18,
20,24 13:1,11,23,
24 14:5 15:3,11,
21,23 16:4,9
17:21,24 18:4,19
19:17 21:18,24
22:6 24:10 25:12,
19 26:5 29:4
31:19,24 32:6,7,
11,13,15,18,19
33:1,5,11,12 36:17
39:6 60:12,15
61:1,25 62:2,3,11,
16,18 63:2 64:12
65:3,4,5,14,15,20
66:1,11 67:1,5
68:7,11,25 70:1
73:16,18 75:17,18

**doesn't**
57:17 71:24

**don't**
6:12 7:12 8:9 9:13,
16 10:3,4 13:16,22
15:1 16:24 17:6
18:12,15 19:2,25
20:4 23:6 26:9
27:21 33:8 34:9,17
35:4 36:18 37:11,
14 50:14,22 55:7
59:5,6,12 60:9
66:3 70:9 71:5,20,
21,22 72:13 73:1
74:2 75:3 76:3,5

**done**
9:4 31:19 35:11

36:15 37:6 42:23
53:12 62:24

**down**
9:5 14:16 32:6
53:3 55:18 61:21

**draw**
46:19 47:9

**Duces**
7:2,23

**due**
29:11 42:20 43:12

**duly**
5:23

**duplicative**
74:10

**during**
27:17

---

**E**

**e-**
12:22 29:24 34:10
38:20

**e-mail**
11:11,14 13:19,20,
23 34:6,9 38:9,16,
17 39:13 44:16
50:11 51:19 53:8
67:23 68:2,6,10

**e-mailed**
50:7 55:22

**e-mails**
12:6 39:14,16,21

**each**
37:5 43:22 44:22
64:1,5,10

**earlier**
27:1 40:5 42:17
62:7 68:21

**Ed**
71:16

**effective**
40:17,22 41:3

**effects**
36:6

**efficient**
45:1

**efforts**
31:18,23 32:5

**either**
33:3 43:13 60:19
71:20 72:13

**electronically**
20:24

**else**
11:25 18:7 76:4

**employees**
12:2 20:13

**employment**
9:11

**end**
37:5,9,12 40:12
64:8,16

**ends**
49:15

**engaged**
36:12

**ensure**
46:1,2

**entered**
7:3 14:11 21:12
30:8,15,19 31:14
34:2 36:11 38:11
45:20 53:9 56:22
74:1,11

**entities**
71:14 73:19



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**entity**
9:20 43:4

**entrance**
29:21

**entries**
43:21

**equity**
19:17 20:7,19
21:18 29:20

**equivalence**
63:1,4

**every**
15:6 47:5

**everything**
46:1

**evidence**
42:18

**evidencing**
17:22 21:24

**exactly**
24:13

**EXAMINATION**
5:24

**example**
11:21 13:5,10,13
22:10 44:9 48:2
50:3 65:13 67:3

**executed**
13:6,8,13 35:9
42:13 45:12

**exhibit**
7:1,3,22 9:5 14:10,
11 19:15 21:9,12
22:16 26:10 29:7,
22 30:6 31:11,14
34:1,2 38:9,11
39:11 45:3,18,19
46:16 48:23 52:10
53:7,9 56:4,9,22
63:9,13,14,19

66:5,12

**exhibits**
38:14,17,25 45:2,5

**exist**
9:18 36:18 59:14
60:15 62:11 73:18

**existed**
61:2 64:16,20,23

**existence**
63:2 75:17

**exists**
29:13

**expenses**
42:20 43:12 44:11

**explain**
24:18 48:12 63:23

**explanation**
29:23 63:22 65:19
70:3

**extent**
29:11

---

**F**

**facility**
29:13

**fact**
64:15 70:6 71:21
72:15

**fairly**
23:8

**familiar**
12:20

**familiarity**
35:22

**far**
12:12 36:21 38:13

**fast**
35:4

**February**
31:11 32:4,5

**fees**
42:20 43:12 44:10

**few**
14:16 26:12 48:9
53:21 57:6

**figure**
13:19 53:1 66:25

**figures**
61:22 62:1,17

**figuring**
19:4

**file**
20:16 54:16

**filing**
26:8

**fill**
51:8

**Fin**
32:20

**finance**
35:17

**financial**
15:16 37:5,9,12
53:6,16 55:20
56:21 57:3

**financing**
62:13,15

**find**
13:11 18:19 51:23
52:5,12 59:10
74:24

**fine**
24:19 34:17 55:25

**finish**
15:7 66:24

**FINRA**
35:20

**Fintech**
11:18,22,23 12:2,
11,22 13:20,24
14:6 15:22 16:12
18:8,10 20:21 21:3
26:16 27:4 28:6,
12,17,20 32:8,10,
16,18,21 33:6
37:17 38:2 43:1,5,
14,17,18,24 44:1,
4,5,12 47:22 48:4
49:17,19 50:4,11,
12,21,23 54:2,8
55:3 62:4,8,19
63:5 64:7,13,16,
18,24 65:7,21
67:8,18

**Fintech's**
51:5

**firm**
14:19 27:16,20,25
28:2,4,8 30:22
31:6 57:11 71:17,
24 72:6,7,18 74:22
75:5

**first**
5:22 42:16 47:17
53:21 56:2,7 58:9,
14,20 59:21,24

**fiscal**
37:5

**fit**
61:10

**five**
73:6

**Florida**
5:8 58:23

**flow**
15:18 53:22 54:6
55:1 56:15 63:10,
17,21 64:8,15 66:8
67:3 75:14



**UNIVERSAL**
**COURT REPORTING**
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**flows**
62:13

**folder**
7:8

**follow-**
32:24 67:15

**follow-up**
44:2

**following**
19:12 21:23

**follows**
5:23

**forgot**
39:19 41:1

**form**
16:6,21 17:3,17 18:22 20:9 22:12, 23 26:15,22 33:14 36:16 37:21 43:6 47:20 51:8 55:2,12 58:3,11 59:8 60:13 62:20 63:6,25 65:9,24 68:19 69:4 70:5 71:5 72:10,22

**forth**
49:12

**forward**
46:9

**found**
15:11 22:21

**from**
11:23 13:20 14:6, 18 21:10 31:12 32:15 38:14 42:20 49:21 50:12 53:17 54:9 56:24 61:7 62:13 66:13 69:17 70:11 74:21 75:5, 14

**front**
29:7

**full**
6:1

**fund**
15:22 16:11,15,20, 24 17:1,2,7,9,15

**funds**
17:12 75:13

**further**
37:2

_____

**G**

**Gardens**
58:23

**gathering**
54:4,25 55:9

**gave**
41:11 48:13

**general**
14:7 18:6,13,16,19 19:7 26:11 28:22 48:20,24 49:2,9, 11,16,18,21 50:5 65:17 70:12,15,18, 19

**generalities**
31:21

**generally**
10:11 35:7,23 36:2

**generate**
51:10,13 54:5,25

**generated**
47:19 48:3 50:19 51:24 53:24

**Georgia**
6:4

**get**
12:17 13:13 16:5 19:14 25:7 29:16 31:8 33:18 35:16

39:5 44:2 49:7,21 50:6,21 55:19 57:10 60:7,11 63:23 67:1 70:3 73:20 74:3

**getting**
13:3 23:8 32:12 39:21 43:9 66:23

**give**
6:9,23 8:22 47:18 53:13 57:17

**given**
21:22

**giving**
13:10

**go**
7:15 15:6,8 16:23 17:5,19 18:24 19:16 20:18 21:9, 11 22:16,25 24:22 26:10 34:20 36:4, 21,25 38:9 40:12 46:12 49:25 51:1 53:4 55:24 56:1 57:5 58:5,14,21,22 61:17 62:12 63:15 69:16 70:8,10 73:14,21 76:5

**goes**
42:24

**going**
7:1 14:9,10,16 15:6 24:22 30:10 31:11 36:20 38:8, 17 39:4,5 43:14 45:14,15,24 47:7 52:21 53:20 57:5 58:22 60:14,19 61:8 63:9 68:3,5 73:12,14

**good**
6:25 9:25 34:10,20

44:18 45:23 46:12 55:16 61:18

**goods**
36:6

**GP**
70:18

**graduate**
35:16

**great**
25:2

**group**
9:15 13:7,15 29:10,14 41:21 42:4 44:19,21 57:24 69:19 70:23 72:21 74:23 75:2, 6,12,23

**guess**
54:21

**guys**
38:18

_____

**H**

**had**
23:7 29:18 30:19 31:4 42:13 51:3 56:10 63:13

**handled**
55:4

**happy**
24:20 34:6

**has**
15:23 16:4 29:3 33:20 35:25 42:23 57:7 59:13,15 61:2 64:1,6,11 69:13 72:19 75:16,17 76:11

**have**



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

5:16 6:15 7:6,13
9:11,14 10:2,7
13:6 15:22 18:9
20:4 21:14 24:7,18
25:12,19 26:12
27:14 29:23 31:21,
23 32:20 33:4,12,
19 34:5,14,21
35:22 36:19 37:8
41:3 42:6 43:4,15,
23,25 44:1,3,15,
17,18 45:1 46:24
48:22 51:1,5 53:21
54:14 55:7,22 57:7
58:8,15 59:1,7,12
63:5,22 65:7,21
66:18 68:22 69:9
70:15 71:14,16,17,
21,22,24 72:1,5,7
73:1 74:2 76:3

**having**
5:22

**he**
6:20 58:6 59:15

**head**
6:13

**heard**
65:12

**held**
7:17 29:4 32:7
33:5 39:7 64:12
73:9

**helped**
27:5

**here**
5:6 7:25 9:19,21
13:3 27:13 28:24
31:22 33:9 39:22
45:2 46:24 54:22
55:7 69:15 74:7,20

**hereunder**
43:22

**highest**
52:18

**highly**
52:19

**him**
6:22 12:10 24:3,9,
12,16 26:3 55:23
60:21 61:4

**his**
6:23 12:11 20:13

**History**
35:15

**hold**
8:13 33:11 35:19

**holds**
54:23 55:8

**home**
10:19,20

**hope**
39:25

**horse**
33:9

**human**
57:17

---

**I**

---

**I'LL**
13:18 26:18 30:15
35:3 36:20 49:23
68:11

**I'M**
6:22 12:19,25
13:3,11,12 16:17
18:14 21:23 23:8
24:20 30:17 32:12
33:18 39:12 41:11
43:9 45:21 46:23
49:22 50:6 53:4,20
56:8 57:5 58:22

60:14 61:7,11
62:22,24 65:25
66:8,10,15,23,25
68:5 69:5,8,9,11
72:16

**I'VE**
38:13

**identify**
9:1

**IFT**
31:1,6

**immediately**
52:24

**improper**
40:1

**in**
5:6,17 7:10 8:23
9:2,9 10:8,12,19,
20 14:20 15:3,20
16:8,19 17:12
18:2,10,13,16
19:11,13,17,20,23
20:8,16,20 21:1,8,
14,17,19,24 23:9,
22 24:2,15 25:10,
25 26:4,5,12,25
27:7,8,9 28:1 29:4,
7,16,23 31:5,12,20
32:4,13,20,21,22
33:10,20 35:6,14,
16 36:8,11,12,13,
21 41:5,25 42:7,15
43:4,25 46:5 47:7,
14,16,20 48:2,13,
14,19,23 49:1,8,
11,20 50:11,13
51:4 52:3 54:4,12,
24 55:9 57:23
59:4,7,11,20 60:8,
17,18 61:25 62:1,
14,18 63:18,19,21
64:2,15,16,17,18
65:4,14,17,22

66:4,6,16 67:1,14
68:9,25 69:9,24
70:1 72:8 73:22
74:7 75:12,13

**include**
13:20,25 14:3,6
28:20

**included**
13:4,5,6 49:4 70:1

**includes**
19:18 21:19 45:11

**including**
15:17

**income**
15:12

**inconvenient**
7:10

**incorrect**
64:10

**independent**
58:17 59:3,22
61:16 64:6

**indicated**
47:24

**individual**
64:11

**Industry**
11:18,22 12:2,11,
22 13:20,24 14:6
15:22 16:12 18:8,
10 20:21 21:3
26:16 27:4 28:6,
12,17,20 32:7,10,
16,18,21 33:6
37:17 38:1 43:1,5,
14,17,18,24 44:1,
4,5,12 47:22 48:4
49:17,19 50:3,11,
12,21,23 51:5
54:2,8 55:3 62:3,8,
19 63:5 64:12,16,


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

18,24 65:7,21
67:8,17

**inform**
71:1

**information**
49:15 50:25 54:25
55:10 65:16

**initially**
48:13

**inputting**
49:15 50:4

**inquiries**
43:23

**instruct**
60:20,21 61:4

**instructing**
6:20 9:22 61:11,14
71:8

**instruction**
76:3

**instructions**
61:7

**interact**
12:1

**interest**
19:17 20:8,20
21:19,24 42:19
43:12 44:10

**interesting**
24:1

**into**
7:4 14:12 21:13
24:13 30:8,15,20
31:15 34:3 38:12,
17 45:20 47:12
49:19 50:4 51:9
53:10 56:23 74:1,
11

**introduce**
5:12

**invest**
17:12

**investments**
17:12

**investor**
17:11 64:11

**invoice**
46:4,16 47:21,24
48:4,8 49:21 50:1,
7,10,12,19 51:10
74:21

**invoices**
45:5,7,9,16,17,24
47:16,18 48:22
50:15,16,17 51:6,7
65:13 66:4,6,7,13,
16 75:22

**involved**
15:20 16:1,8,12
17:23 19:20,23
20:2 54:4,24 55:9
61:25 75:12,13

**involving**
20:7

**irrelevant**
9:17,20 60:17

**issue**
6:10 39:25 40:9
41:4

**issued**
35:20

**it'll**
53:7

**it's**
7:9 9:16 10:22
12:9 27:23 39:3
45:6 49:24 52:19
55:25 57:16 59:24
67:4 68:14 69:15,
16,17,21 72:3
74:21,22 75:1,5

**Item**
22:17

**items**
28:21 39:14

**its**
33:20 37:5 42:18

**itself**
33:12 41:8,9

---

**J**

**job**
8:22

**Joe**
57:25 58:1

**Jones**
5:13,16,25 6:10,
14,19,24 7:5,15,20
9:6,7,22,25 10:1
12:12,15,16 14:13
16:7,18,22 17:4,18
18:23 20:10 21:14,
16 22:15,24 23:5,
24 24:4,8,11,18,21
25:5,16 26:17,23
31:16 33:15 34:4,
10,14,19 36:24
37:23 38:5,8,13,
19,23 39:2,10,15,
17 41:10 43:2,8
44:15,18,22,25
45:6,14,23 46:10,
13,14 48:17 49:6,
25 50:2 52:20
53:1,11,15,19
55:5,13,17,24
56:1,7,12,16,19,24
57:3,9 58:4,13
59:10,18 60:19,23,
25 61:6,13,18,19
62:21 63:8,12,16
64:4 65:11 66:2
67:22 68:1,5,15,20

69:2,7 70:7 71:7,
10,12 72:12,24
73:1,6,12,24 74:3,
5,15,19 76:1,8

**Joseph**
57:18

**Judge**
24:19

**July**
47:3 49:25 50:1,7,
11,13 51:4,11 52:6
53:18 65:4 66:18

**June**
40:17 41:25 46:24
48:3 74:6

**just**
6:15 7:7,16 10:11
11:9,21 12:21,25
13:4,10,13,18 15:8
17:15 22:10 23:1
24:14 25:18 26:11
27:1 29:17 30:14
31:6,7,21 32:2,5
37:3 38:23,24
39:15 41:13 43:9,
15 44:25 45:8
46:4,8,23 47:6,18,
21 48:2 50:3,6
52:20 53:20 55:23
56:9 57:5 58:21
59:10 61:1,6 62:25
63:14 64:24 65:13,
22 66:10 67:4,7,9,
17 68:2,6,13,22
70:2 71:7 73:6,15,
22 75:19

**Justice**
8:14,24 9:1,9,12,
15 13:14 14:19
16:14,20 17:15
18:18 19:6 20:12
21:22,24 26:2
27:11,15 28:11,16,



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

25 29:9,14 30:15,
20 31:4 32:14
33:1,3,20,25 37:19
41:6,14,20,21,25
42:3,16 51:1,3
53:5,15 54:3,9,13,
15,23 55:8 56:14,
20 57:3,21 58:2
59:2,6,23 60:7,10,
16 61:23 64:1,6,
11,14 65:6 67:6
69:18 70:12,15,20,
23 71:1,15,18,24
72:4,7,8,20 74:1,9,
11,17,22,25 75:1,
6,8,10,12,14,21,22

**JVA**
57:12,18

## K

**keep**
13:18 35:8 36:13,
21 39:15

**Ken**
5:15,17 7:9 38:21
39:3 45:3 73:4

**kept**
36:11,14

**kind**
36:12

**kinds**
12:7

**know**
6:15 7:9,13 8:6,9
10:3,4 11:19 12:21
14:15 15:1 16:24
17:2,9 19:2 23:1,6,
14,21,24 24:9
26:7,9 28:3,6
30:17 31:17 35:10
36:15 37:6,11
42:11 43:10,15

47:17,20 49:10,14
53:24 54:1,3,16,22
59:5 60:5 61:24
64:14,15 65:22
67:4,9,25 68:14,22
69:12,13 70:2,9
71:20 72:5,7,13,
15,18 75:3,19

**knowledge**
16:15,19 18:8
27:15 29:18 33:7
43:4,25 55:7 59:1,
7,12 71:14 72:5

**knows**
24:11

## L

**Lake**
30:22 31:6 71:17,
23 72:6,18 74:22
75:5

**laptop**
10:16,18,20 11:4,
10,14 20:16 51:14,
24 52:5,13

**last**
12:2 37:3 38:1
73:15

**lastly**
61:6

**later**
48:9

**law**
9:15 13:7,15
29:10,14,24 30:22
31:6 33:3 41:21
42:3 61:3 69:18
70:23 71:17,23
72:6,7,18,21
74:22,23 75:2,5,6,
12,23

**lawsuit**
26:8

**lawyer**
10:4 12:4

**least**
24:1 32:13

**leave**
61:2

**ledger**
18:6,13,16,19 19:7
26:11 48:20,24
49:2,9,11,16,18,21
50:5

**ledgers**
14:7 28:22 65:17

**Lee**
5:1,21 6:2 7:9
45:21

**left**
73:2

**legal**
6:1 16:24,25 17:14

**lender**
41:5,12,14 42:16

**let's**
6:25 7:15 10:11
15:8,15 19:16
21:8,11 22:16
26:10 31:10 33:24
34:20 36:4 40:3
46:4,10,22 49:23
53:3 58:14,21
69:16 70:10

**letter**
14:18,20,23,25
15:2,4 18:21 19:12
21:2,10,11 23:14
25:11 31:12,17,20

**letterhead**
57:18

**level**
67:16

**license**
35:20

**limited**
19:18 21:20

**line**
59:24

**listen**
34:15

**literally**
51:9

**litigation**
75:13

**litigations**
9:1

**little**
21:15 29:16 34:22
73:22 74:8

**live**
6:6

**LLC**
8:14,24 9:12 13:7,
14 14:19 16:14,20
17:15 18:18 19:6
27:11,15 28:11,16
29:1,9,14 33:1,25
37:19 41:6,14,20
42:1,17 51:3 53:6,
15 54:4,9,24 55:8
56:14,20 57:3,21
58:2 59:2,23 60:7,
10,17 61:23 64:6,
14 65:7 67:6 69:18
70:12,15,20 71:2,
16,18,25 72:4,8
74:1,17,25 75:15,
21

**loaded**
57:10



877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**loan**
29:4,8,13,17 30:21
31:7 41:20 43:21
44:9 68:12,23
69:16 72:19

**loans**
29:4

**local**
24:4,12

**locally**
11:4

**locate**
15:16 18:5 21:6
22:7,10,22 23:19,
20 32:6

**located**
6:3,16,21 10:18
32:20 33:12 62:2,
6,11

**location**
32:20,23 33:12,20
54:12,14 71:14

**locations**
32:21

**log**
51:22

**logged**
11:1 65:21 67:7

**logistical**
32:3

**logistically**
10:12

**logistics**
7:16 47:18

**look**
7:11 15:11,15 18:4
23:15 26:13,19,24,
25 32:21 43:20
57:6 63:17

**looked**
12:18 18:18 20:6
33:19

**looking**
15:20 16:4,8 17:23
19:21,23 20:14,15,
16 21:4 48:22
51:10

**looks**
45:1

**loss**
15:17

**lot**
73:1

**loud**
34:15

**lowercase**
34:25

**lunch**
73:3

---

**M**

**Madam**
45:15 56:7

**Maddalena**
5:10

**made**
31:23 32:5 44:11
49:16 66:15

**mail**
12:23 34:11 38:21

**mails**
29:25

**maintain**
27:5 35:5 42:17

**maintained**
32:16,18 33:6 35:9
52:2 62:3

**maintaining**
43:16

**maintains**
20:22 26:16 49:17
62:8

**maintenance**
28:21

**make**
12:8 18:17 25:25
27:22 29:17 30:11
33:16 35:3 45:1
46:4 56:13 61:6
66:11 71:7

**making**
60:11

**manager**
35:10 70:17

**managing**
42:5 70:18,19,23

**mark**
7:1 14:10 31:11
33:25 45:2,8,15
52:22

**marked**
7:21 29:8 45:18
48:22 52:9,17,18
66:4

**marketing**
19:19 20:7,12,19
21:4,20 22:17

**marking**
45:2

**marshaling**
54:5

**materials**
20:13

**matter**
5:6

**matters**
36:9

**Matthew**
5:13 6:2

**may**
18:8 20:4 21:14
31:23 32:20 33:11,
12 46:2 47:7,13
51:5

**me**
11:11 13:8,9
25:15,22 34:9,15,
17 38:17,24 39:4
43:14 46:7 47:6
52:18 53:13 57:2
65:10,25 66:15
67:24 69:6 73:6

**mean**
20:23 41:2 74:3

**meaning**
33:1 71:20

**means**
8:23 17:9 36:2

**Melchionni**
5:1,21 6:2,18 7:21
24:23 25:9 34:24
39:21 46:15 50:1
57:8,11 68:4,17
73:17,23

**member**
59:21 64:1,5

**members**
35:10 37:6,10
59:2,23 60:7,11,16
65:6,20 67:6,9
71:1

**mentioned**
11:9 31:6,7 67:17

**mentions**
74:12

**method**
7:10


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**million**
40:9,20 41:21

**mind**
46:8

**Mine**
40:25

**minute**
38:20

**minutes**
35:8 38:19 73:7
76:8

**misnumbering**
30:7

**misstatement**
70:6

**misstating**
24:2

**Moghandam**
5:14 38:7,15
44:17,21,24 46:7,
12 53:13 55:22
56:3,11,14,18 57:1

**moment**
20:1 34:10 37:3

**moneys**
66:14

**monies**
36:6

**month**
47:5,9

**monthly**
46:19 47:9

**more**
40:21 53:14 57:2
61:15

**move**
46:9 60:18,24 61:4

**moving**
56:5

**much**
66:25

**multiple**
39:14

**my**
6:13 8:25 10:19
14:18 18:8 23:1
24:22 26:18,19
29:24 31:18 32:24
33:7 39:12 43:23
46:23 56:8 62:5
68:21

**myself**
18:25 70:18

---

**N**

---

**name**
6:1 12:2 27:19
29:4 57:12

**names**
57:7,20

**Nancy**
57:19

**nature**
12:6,18 13:11

**need**
67:25 76:8

**neglected**
52:16

**net**
48:7 62:14

**next**
14:10 34:1 36:4
39:11 43:20 46:22
47:2 53:7 55:18
56:19 58:21,23

**nine-**
56:24

**nine-page**
40:16

**no**
8:4,12,21 9:13
13:22 16:24 23:20
29:17,22 30:9
32:23 33:19,24
35:18 37:22 39:3,
23 49:22 54:7,18,
19,20 59:17 68:18
71:3,19

**non-**
12:4 33:10

**nope**
29:11 66:10

**not**
6:20,22 9:23 11:19
12:3 13:3 15:6
16:17 17:13 18:8
19:18 20:3 21:20
22:10 23:19 24:8
25:4 27:12,15,24
28:2,5,9 29:25
38:13 39:21,25
41:4 42:13 47:13
48:13 49:4,13,22,
24 52:15 53:25
54:14 55:22 60:20,
21 61:5,7,11,14
65:4,14,25 66:1,6,
16 67:1 68:5,9,23
69:5,8,9,11 70:1
71:4,8 72:6,11,14,
15,23 73:3 75:18,
21 76:3

**note**
13:7,9 30:21
39:12,19 40:4,6,21
42:21 45:12

**nothing**
45:7 59:14 71:6

**notice**
7:1,22,25 9:17

**notified**
27:4

**November**
14:18,23 15:11
18:21 19:12 21:2,9
23:9,14 25:10
27:9,14 28:1
30:13,19,24 31:4
48:14 60:18 63:21
68:25 69:25

**now**
5:3 11:3 12:17
24:11 29:19 30:10
38:8 40:3,12
41:11,24 42:6
44:2,14,18 51:11
52:15,24 55:18
60:14 63:9,17
66:4,10 68:3,4,8,9
71:13 74:15

**number**
5:6 7:1,22 15:15
17:21 19:9,13,16
20:2,3 21:9,11,17,
23 22:5,13,16,17
23:22 26:5,10
29:3,19,22 30:3,7,
9,10,11 34:1 38:5,
9 45:18 46:4,16
52:10 53:7 56:9,20
58:15 63:19 66:5,
12 73:14,21 74:18,
21 75:4

**Numbered**
31:25 32:14

**Numbers**
74:12,16 75:20

---

**O**

---

**oath**
23:25



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**Object**
26:22

**objected**
8:7

**objection**
9:16 16:6,16,21
17:3,17 18:22 20:9
22:12,23 23:1,23
26:15 33:14 36:16
37:21 41:7,12
42:24 43:6 48:16
49:5 55:2,12 58:3,
11 59:8 60:13
62:20 63:6,25
65:9,24 68:19
69:1,4 70:5 71:5
72:10,22

**objections**
24:5,6

**objects**
74:10

**obtain**
27:5 32:11

**obvious**
23:8

**obviously**
15:7 66:24 75:8,10
76:1

**occurs**
30:7

**off**
6:12 7:7,15,17
12:25 36:22 39:7
60:14 71:11 73:9
76:5

**offer**
63:23 68:22

**offered**
28:20 45:8

**offering**
21:25 22:1,6,9,20

23:13,25

**office**
21:10 31:1,13
53:18

**Officer**
8:17,18,23 16:2,4

**officers**
37:18

**offices**
54:12

**okay**
5:19 6:8 8:5,8,13
9:11,14 10:11,18,
20,25 11:3,8,13,
19,25 12:3 13:2,
18,23 14:3,5,9,22,
25 15:6,15,20,24
16:11,14,25 17:13,
21 18:7,10,17
19:2,8,11 20:1,5
21:6,8 22:4,9,16
23:6,18,21 25:6,
14,17,21,23 26:7,
18,24 27:3,7,13,22
28:3,6,10,15,24
29:3,16 30:1,5,11,
13,23 31:10 32:2,
9,12 33:8,18,24
34:14 35:2,3,13,
16,22 36:4 37:2,18
38:23 39:24 40:8,
12,24 41:1,5 42:6,
11,15 43:3,19
44:2,6,24 45:3
46:22 47:12,16,23
48:2,11,21 49:3,
10,14,19 50:10,18,
24 51:22 53:2
54:3,12,15,21
57:15,23 58:1,14
59:19 60:23 61:4,
13 62:10 64:22
65:2 66:3,20 67:15
69:20 70:10,22

71:23 72:15,25
73:6 74:15 75:4
76:5

**on**
5:3,14 7:6,7,21
10:14,21 11:3,4,
10,14 14:23 15:11,
25 20:15,16 26:10
28:7 30:9 34:1,8,9
35:7 39:16 42:15,
18 46:3 47:12,24
49:16,24 50:7,19
51:13,22,24 52:5,
6,12,13 57:6,7,11,
15,18 58:8 59:21
60:18,24 61:4,22
63:13 65:21 66:8,
11,18 67:7 70:22
73:13,19 74:2,6,16

**one**
15:7 31:5,6 34:10
40:4 46:22,24
47:2,5 50:4 51:10,
23 53:13 55:18
56:5,6,9,16 57:2,
23

**ones**
7:13

**only**
12:17 29:12 44:3,5
45:25 76:8

**onto**
11:1

**open**
38:25 39:2

**operating**
8:17,18,23 16:2,3
33:25 34:21,23

**operational**
19:19 21:20 22:11,
18 23:10,15 26:3
33:21

**option**
7:12 51:23

**options**
7:6

**order**
5:8 46:5,8,23
52:23

**original**
40:9 52:3 65:5,15
66:17 67:2 68:24
69:25 70:4

**ostensibly**
59:2 66:13

**other**
7:13 8:8,10,20
9:20 10:6 11:21
12:2,4 22:9 23:10
24:10,15 29:17
32:20,21,23 33:19
35:19 36:9 39:13
50:17 52:9 59:14
72:6

**otherwise**
46:6

**our**
6:12 11:18 19:1
21:17 22:5 23:22
25:10 29:3,19
30:7,10,14,25
46:15 52:18 53:7
63:19 65:5,15
66:17 67:2 68:24
73:13 74:9 76:1

**out**
13:11,19 18:19
19:4 27:10,25
28:2,3,7 39:6
47:19 48:23 51:8
53:2 59:10 61:3
63:19 66:25 74:24

**outstanding**
42:19 43:11



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**over**
68:24

**oversight**
40:23,24

**owing**
36:6 42:20

**own**
54:15 56:8

---

**P**

**p.m.**
74:6 76:9

**page**
34:20,22 42:16
56:16,25 58:15,16,
21,23 59:21 61:21,
22 62:12 63:13
73:21

**paid**
36:7 48:6

**Palm**
58:23

**paragraph**
37:4 42:15 44:8

**part**
30:25 46:15 61:3
62:5 70:4

**participate**
9:2

**particular**
10:14 13:16 19:13
52:13 57:23 58:7
59:11,21 62:17
64:23

**particulars**
36:5

**parties**
5:9

**partner**
42:5 70:12,16,18,
24 75:8

**partners**
8:14,24 9:1,9,12,
15 13:14,15 14:19
16:14,20 17:15
18:18 19:6 20:12
21:22,25 26:2
27:11,15 28:11,16
29:1,9,10,14
30:15,20 31:4
32:14 33:1,4,20,25
37:19 41:6,14,20,
21 42:1,3,16 51:2,
3 53:5,15 54:3,9,
14,15,24 55:8
56:14,20 57:3,21
58:2 59:2,6,23
60:7,10,17 61:23
64:1,6,11,14 65:7
67:6 69:18 70:12,
15,20,23 71:1,15,
18,25 72:4,7,8,20
74:1,10,11,17,23,
25 75:1,6,11,12,
15,21,23

**party**
33:10,11 55:3

**past**
9:8

**payable**
46:19,24

**payment**
48:8

**payments**
44:10

**PDF**
44:23 47:21 51:12,
13,16,24 52:5,12
53:2

**PDFS**

52:3,9

**pending**
12:12

**people**
57:18 67:18 71:13

**person**
18:18 28:12 43:4,
13 54:22 57:16

**personal**
6:23 27:14

**personally**
26:13,19

**persons**
36:11

**pertain**
72:19 75:10

**pertains**
75:8

**physical**
54:14

**pick**
17:11

**pin**
21:8

**place**
6:5 31:5 60:5,6
64:12

**Plaintiff**
5:14

**Plaintiff's**
7:3 14:11 21:12
31:14 34:2 38:11
45:19 53:9 56:22

**play**
37:19

**please**
5:11 6:1,9

**pleasure**

34:7

**PNLS**
13:25

**point**
14:20 15:3 18:17
19:11 21:1 25:8
27:7 28:12 32:13
42:7 50:14 58:21
61:6 65:22

**populate**
51:9

**portal**
51:23 65:22 67:8,
14

**position**
8:14,16 9:14 18:10
54:23 55:8

**positions**
8:20

**possession**
10:22 49:20 62:18
63:3 69:9 71:15,17
72:9 75:17

**post**
26:8

**pre**
26:8

**preferred**
21:25

**preparation**
10:8,12

**prepare**
12:11,18

**preparing**
37:15,20

**present**
5:17,18

**presumably**
51:14


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**pretty**
45:25

**previous**
56:5 63:14 75:7

**previously**
48:24 63:20 67:11,
13

**principals**
37:18

**principle**
42:19 43:11

**principles**
35:7,24

**printed**
47:19

**prior**
10:2,6 13:20 26:1
38:17

**privilege**
10:5

**privileged**
12:5

**proceed**
61:8

**proceedings**
35:9

**produced**
8:7 24:17 31:24
32:4 42:7 65:5
69:14 74:11 75:14

**production**
66:17 67:24 68:4
73:13 74:10 75:19

**profit**
15:17

**promissory**
13:7,9 30:21
39:12,19 40:4,21
45:12

**provide**
28:25 37:4

**provided**
11:13 17:10 20:13
21:7 22:13 23:3,4,
21,23 25:10,13,16,
19 26:3,6,8 28:12
37:10,11 62:14
65:14 66:1,6,16

**provider**
55:3

**providing**
37:20,25 38:2

**provision**
59:19

**Public**
58:17 59:3,22
61:16

**purchased**
36:7

**purpose**
36:22

**purposes**
11:1

**pursuant**
5:8 7:25 9:19
36:14 65:5 68:24

**push**
39:6 73:3

**put**
21:8 29:7 34:8,9
49:20 63:12 73:12,
19 74:15

**putting**
7:7

**Q**

**question**
12:13 17:6 18:11

24:3,23,24 25:3
26:18,19 32:25
36:25 43:13 52:16
54:21 59:13 61:17
62:5,25 64:25
67:19 69:15 75:4

**questioning**
34:13

**questions**
14:17 26:12 31:18
38:1 39:13 53:21
57:6 61:15 68:21
73:2 76:2

**quick**
26:12 39:5 73:7
74:4

**Quickbooks**
47:20

**quickly**
45:25 68:2,11 73:8

**quoting**
21:23

**R**

**reach**
27:10 28:2

**reached**
27:25 28:3,7

**read**
22:2 24:4,25 25:3
40:18 41:13 73:23

**reading**
76:10

**real**
61:7

**really**
25:7 54:14

**reason**
8:10 30:5

**reasonable**
35:22

**recall**
6:12 14:19 19:25
20:3,5 27:21,24
37:11,14 50:14
51:20 58:9 60:9
68:16

**receipt**
19:12

**receive**
48:8

**received**
14:22 18:21 24:9
36:7 38:14 42:8
53:17 65:3 66:14,
17 74:7 76:2

**receiving**
14:19 47:9 59:3

**recent**
39:24 68:3

**recollection**
31:22 42:6

**record**
5:3,12 7:4,15,18
14:12 21:13 26:1
31:15 34:3 38:12
39:8 44:1,3 45:20
53:10 56:23 72:2,4
73:10 76:6

**records**
9:20 19:20,21,24
20:7,12,15,19
21:4,21 22:11,18
23:10,16 25:10
26:3,4 29:25 32:4
35:1 36:14 43:10,
16,24 48:14 59:11,
14,20 67:2 71:15,
18,21,22,24 72:1,
8,19



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**reference**
49:16

**referenced**
31:20 48:25 59:11
64:24 67:4

**referencing**
38:1

**referring**
53:14 56:4,5

**reflected**
49:1

**regard**
10:12 12:3,4 16:4,
25 17:1,23 18:1
19:4 20:1,2,6 22:5
26:12,13 28:10,13
29:23 31:19 32:3,
19,22 37:19,25
43:3,5,10,25 44:7
49:3 52:3,9 57:20
59:7,19 62:10,16
63:1 64:22 65:13
67:16 71:13 75:16

**regarding**
11:22 24:5 29:20
31:22,23 43:23
53:21 61:20,23
66:13 67:24 71:14

**relate**
43:11 73:18

**related**
19:17

**relates**
73:17

**relating**
20:19 21:18 33:1
36:10 61:15 71:24

**relationship**
28:10

**relationships**
8:25

**remedied**
41:4

**remember**
12:1 50:22 52:21

**remotely**
5:9

**rendering**
39:22

**repayments**
44:10

**repetitive**
27:23

**report**
58:17 59:3,12,22
60:8 61:15,20,21
62:12

**Reporter**
5:3,10,19 24:25
45:15 52:16 56:8

**Reporting**
5:11

**reports**
15:12 60:12

**represent**
47:4

**representation**
52:21

**request**
8:7 9:17,19 15:10,
16 16:5 19:18
21:17,19 22:5,17
23:22 26:4,10,14,
20 27:8,10 29:3
30:14 59:20 63:19
65:5,15 66:17 67:2
68:24 73:13,21
74:9,18 75:19

**requested**
12:14,20 23:4 26:5
27:5

**requests**
27:5 28:1 29:19

**required**
33:3 36:14

**reserved**
76:11

**reserving**
76:1

**residence**
6:5,23

**respect**
19:9 43:19,20 62:5
76:2

**response**
21:17,22 23:12,22
25:10 26:4 29:6,22
30:2,9,11,14 59:20
63:24 65:15 66:6,
16 67:1 68:9,10
69:25 70:2,4 74:4,
7,9 75:18

**responses**
48:13

**responsible**
37:15 38:2 49:14,
15 60:10

**responsive**
15:4 29:25

**rest**
45:4

**resumed**
7:19 39:9 73:11

**returns**
15:12,13

**review**
7:11 10:7,13
11:14,17 61:25

**reviewed**
10:21 11:3 13:12
18:25 19:1,4,8

**reviewing**
58:9

**right**
5:17 9:3 10:16
13:4 15:13 20:14
21:1 24:23 25:18,
23 31:8,10 33:13,
24 36:1 37:13 38:8
39:4,11 41:6,14,18
44:14 45:14 46:6,
13,18 47:2,6 49:7,
21 51:10,13 52:20
53:2,3,20 55:17
56:10,19 58:8
61:20 62:24 63:9
65:2 66:21,23
67:21 68:16 69:19,
22 71:10 72:18
73:1,4,21,22 74:20
75:16,25

**rights**
76:2

**ring**
57:12,20

**role**
8:25 9:9 16:3 17:1
37:19 57:21

**room**
20:16,22,23 21:3
27:1 32:16 54:16
62:8 64:2,7,17,18
65:8

**rules**
24:5,12

**S**

**said**
16:11,19 17:8 20:1
25:17,18 41:15
62:7

**salary**


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

46:19 47:9

**same**
27:1 38:16 54:12
62:25 75:4,6

**Sandy's**
12:1

**saw**
11:14 68:6

**say**
12:25 18:14 20:23
24:1 27:24 46:5
51:7 64:20 67:11,
12,13

**saying**
24:16 50:3,18 55:6
74:25

**says**
35:3,4 36:5 37:4
40:8,16 42:16 48:7
52:23 53:5 58:20,
23 59:23 70:13,14
74:7,9,22 75:1

**scope**
22:6 28:19 42:25
59:9 60:14

**screen**
7:7,21 14:14 21:11
34:8,9 38:16 44:25
46:24 49:24 53:11
55:18,23,25 56:1
58:8 66:8 67:22
68:12 71:11 73:13,
20 74:16

**SEC**
35:20

**second**
56:4 60:25

**seconds**
46:8,11

**Section**
34:22,25

**secure**
39:19

**secured**
39:12 40:3,20
45:12

**securing**
31:19,24

**security**
29:8 68:13,23
69:17 72:19

**see**
7:12,23 18:12,15
29:6,19,22 40:4,8,
13 42:21 46:3,15,
18 52:18,25 53:3
57:11 58:18,24
59:21,23 60:1,4
61:9,22 62:13
65:18 74:13,21
75:5

**seeing**
68:16

**seen**
53:22

**send**
12:22 34:6 38:24
39:3

**sending**
39:16 45:21 57:16

**senior**
39:11,19 40:3,20

**sense**
30:11 33:16

**sent**
11:17,22 12:4,10,
21 13:8,24 14:5
42:11,13 44:19,22
50:10 60:16

**sentence**
36:4 37:3 43:20

**separate**
19:14 44:20,23

**series**
21:25 35:19 66:12
68:11

**server**
20:15

**service**
6:17 11:5,8 28:25
50:20

**services**
9:12 27:16 28:11,
20

**serving**
6:11

**set**
48:23 49:12 60:11
63:19 70:1

**seven**
35:19 48:7

**shall**
35:8 36:5,13
42:17,18

**share**
7:7,8,21 14:14
21:10 38:15,25
44:25 53:11 55:18,
25 56:1 58:8 67:22
68:12 73:13,19
74:16

**shared**
11:11

**sharing**
55:23

**she**
20:4

**sheets**
13:25 15:18

**short**
7:17 39:7 73:9

**shortly**
13:6 14:9,23 48:6
57:16

**should**
23:8 39:14 41:3
45:10 52:17,18

**showed**
49:11

**showing**
68:2

**signature**
40:13

**signed**
40:17,21 41:3,24
57:16,17 70:11,22
71:2

**signing**
76:10

**similar**
11:6,7 44:7 52:8
62:7 68:21

**similarly**
43:22

**since**
12:17

**single**
15:7 63:13

**singular**
22:5 23:12

**sir**
43:9 53:14 57:1
61:20 66:3,23

**sit**
27:13 28:24 31:22
54:22 55:7

**sold**
36:7

**solely**
38:2





Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**some**
11:5 25:8 33:11
42:7 50:14,22 57:7
65:22 66:13 67:24
68:3

**somebody**
11:13

**somehow**
21:2 50:21 51:17
65:20

**something**
11:6,7 41:1 43:23
63:5

**sorry**
12:25 18:14 34:15
62:22 72:16

**sort**
11:5

**speak**
62:16

**speaking**
24:5 41:12

**speaks**
41:7,9

**specific**
8:13 49:24 66:5
73:18

**specifically**
11:22 12:10 20:6
34:24 74:12

**stands**
54:21

**start**
7:7 34:12,18 39:18
76:6

**started**
15:3 50:23

**starting**
47:7

**state**
6:1

**stated**
67:11,13

**statement**
33:23 37:12,16
47:14 53:22 54:6
55:1,20 56:15
63:10,18 64:8,15
66:8 67:3

**statements**
14:3 15:17,18
18:6,13,16,19 19:7
37:20,25 38:3
48:20,24 49:2,9,11
53:6,16 56:21 57:4
58:7 63:21 65:17

**states**
19:16 22:13 62:14

**statute**
61:3

**stay**
46:5

**still**
9:8 54:21

**stipulate**
47:4,7

**stopped**
47:14

**straightforward**
69:15

**strike**
19:14 27:13 29:12
48:11

**submit**
50:15

**submitted**
47:22 48:4 50:16,
20 51:6,7

**subscription**
19:19 21:20 22:18

**substantive**
58:14

**suing**
26:2

**Supreme**
5:8

**sure**
12:9 13:3 25:25
27:22 29:17 33:17
35:3 38:22 41:11
45:1 46:5 49:23
56:13 60:11 65:25
66:11 69:5,10

**sworn**
5:23 30:23 31:3
32:25 33:19 52:8

**Sylvia**
18:25 19:4 45:22
70:17,19

**Sylvia's**
76:7

**system**
50:15,23

———————

**T**

———————

**tab**
51:23

**table**
58:16

**tabulation**
56:9

**tailor**
24:6

**take**
9:5 10:11,21 14:16
15:10 17:22 20:24
24:13 38:20 39:4

46:8 51:16 52:2,21
53:2 55:17 71:11
73:2,3,6

**taking**
7:2,22 61:7

**talk**
7:16 25:7 30:10
31:10 35:4 40:3
66:10 68:3 76:6

**talked**
74:16

**talking**
34:25 39:18 40:5
62:12 66:7,8,10
68:7

**tangible**
54:15

**tax**
15:12

**Tecum**
7:2,23

**Teh**
20:13 22:1 26:1
29:21

**Teh's**
19:17 20:7,19
21:18,24

**tell**
6:20 16:3 20:5
32:5 39:20 41:13
43:14 52:16 56:24
57:2 59:1 69:17
70:11

**telling**
6:22 24:16

**tense**
9:8

**term**
17:7 36:2



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**terminate**
61:9

**terms**
7:10 48:7

**testified**
5:23 42:17 63:20

**testify**
24:12

**testifying**
28:25

**testimony**
11:15 16:20 17:10,
13,14 18:11 22:4,
20,22 23:18 24:1
25:9 26:1 30:23
31:3 32:15,25
33:19 39:22 43:3
44:7 47:13,25
48:7,9,21 49:3
50:18 52:8,13 59:7
62:17 63:22 64:5,9
65:12,16,23 67:5,
10 68:22 70:20
71:23,25 72:16

**texts**
39:21

**than**
8:8,10 10:6 11:21
22:9 32:20 40:21

**Thank**
8:2 56:2

**that**
6:5,11 7:10,23,25
8:5,10,16 9:1,9
10:6,12,18,21,25
11:3,6,7,8,9,14,15,
21 12:9,14,19
13:4,5,6,10,11,16,
24 14:1,5,9,22
15:10 16:8,11,20
17:10,15,23 18:11,
17,18 19:13,14

20:2 21:8,11 22:2,
4,7 23:18,24 24:8,
17,18 25:2,9,12,
16,25 26:1,2,12,
13,16,18,19 27:1,
10,12,14,17,19,25
28:4,7,11,13,15,
19,25 29:6,11,12,
13,16,18,19,22,23,
24 30:2,7,11,17,23
31:4,6,8,23,24,25
32:4,13,15,16,19,
22,25 33:2,3,5,9,
10,16 34:5,14
35:3,11 36:1,15,18
37:3,6,8,9,15,25
38:1,5 39:6 40:1,2,
4,8,18 41:1,2,11,
12,24 42:6,8,12,
16,21,23 43:3,4,5,
9,10,13,14,15,22,
23,25 44:1,2,6,7,8,
11,25 45:3 46:1,2,
19 47:4,7,12,13,
14,20,23,24 48:7,
8,9,11,13,21,22,24
49:7,15,20 50:4,5,
6,16,19,20,23
51:8,10,16,24
52:2,3,6,8,9,12,15,
17,20 53:2,8,12,14
54:4,5,8,13,17,24,
25 55:4,6,7,17,22
56:13 57:2,6,7,10,
11,12,15,16,17
58:18,24 59:7,24
60:1,3,5,11 61:2,
25 62:8,12,16,17,
25 63:4,5,9,12,13,
23 64:3,5,7,10,23,
24,25 65:3,6,13,
16,18,19 66:4,14,
16,19,21 67:1,3,5,
12,14,16,17,18
68:11,16 70:4,12
71:9,11,13,14,16,

23,25 72:2,15,19
73:18,19,23 74:7,
9,13,17,25 75:14,
20 76:2

**that'll**
53:7

**that's**
8:6 12:12,19 19:8
22:6,21,22 24:17,
19 25:18 29:8,12
30:1,16 32:12,24
39:25 40:13 43:9
44:6 46:18 47:3
49:3 50:8,16 51:6
52:13 56:16 63:19
64:9 65:23 67:9
70:14,20 72:16
74:17,25

**their**
28:7 33:2 72:8
74:4

**them**
11:5 15:7 18:5,12,
16 23:20 32:6
38:25 39:2,6 44:17
45:2,8,21 47:6
49:4 50:7 57:23,24
61:2 63:3 64:7
72:2

**themselves**
5:12

**then**
30:22 31:7 48:6
51:1,16 58:16 61:9
62:24 67:15,16
73:6,7,14 74:2,12
75:5,13

**there**
8:10 15:2 18:2,20
19:11 20:18,21
21:1 29:17 30:2,8
32:23 33:19 36:17
37:8 40:17 41:13

48:11 51:2 54:12
63:14 64:3 67:8
74:4

**there's**
6:10 16:11 28:15
29:22 30:6 39:24
47:5 50:11 57:11,
17 58:15 66:3 75:5

**thereafter**
48:6

**thereon**
42:20

**thereupon**
5:20 7:3,17 14:11
21:12 25:3 31:14
34:2 38:11 39:7
45:19 53:9 56:22
73:9

**these**
10:21 11:9 12:6
16:9 21:4 25:12,19
27:4,25 31:19,24
32:2,6,7,11,15
37:25 38:1 45:4,5,
24 47:16,18 48:12,
14,21 49:10 50:22
58:7 59:11 62:1
64:12 65:19 66:1
73:15 75:18,22

**they**
11:4,11 12:22 13:8
16:5 18:21 23:21,
23 25:16 26:7
28:20,25 44:18,20,
22 47:19 48:19
49:1,4,8,12,20,21
50:5,6,14 57:22
64:3 65:21 67:7,8,
14 71:21,22 72:7,
11,14,15,23 73:18

**they're**
45:6 46:3 47:19
51:2 62:6,11



UNIVERSAL COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

**things**
12:7 13:25 14:6
23:10 32:3 36:10
38:21 39:3 54:17
64:7 73:15

**think**
18:12,14,15 33:9
34:1,5 38:6 45:6,
11 47:2 52:19 66:3
73:14 74:2

**third**
33:10 55:3 58:16

**this**
7:6 9:5,17 10:8,9,
20,25 11:1,4 12:19
13:12,19,23 14:17,
18,20,22,25 15:2,
4,8,10,16 16:5
17:8 18:3,21
19:12,18 21:2,3,19
23:12,13 25:8
26:4,20,24,25
27:7,8,10 31:11,17
32:3,12,15 34:15
36:16,20,22 38:9,
19 40:4,16,20
41:5,24 42:7,15,21
45:16 46:4 49:16
50:10,12 52:17
53:17,21,22 54:5,
25 55:10 57:18
58:9,15 59:3,12,21
60:8,15 61:14,15,
20,21 62:7,24
63:17,23 64:2,8,
15,22 65:4 66:4,18
68:2,21,23 69:16,
24 70:1,3,10,11,22
71:2 72:6 73:8,17
76:4

**those**
10:13 11:13,17,22
15:13,21,23 17:12,
24 18:4 19:21,23

20:15 32:18 33:5
37:20 38:2 39:16
43:16,24 44:16
52:2 57:20 62:2,
17,18 65:4,14
66:5,16,18 67:5
69:21 74:16 75:21

**though**
40:13

**three**
31:5 38:20 57:18,
23

**through**
11:5 15:6,8 31:25
32:14 45:24 47:8,
22 50:16 61:21
65:21 68:14 73:3
74:13 75:14

**time**
5:4 14:20 15:3,11
19:11 21:1 27:7,
11,12 32:13 38:16
41:24 42:7,21
53:14 57:2 64:23
65:22 67:25 76:4,6

**timeframe**
27:17

**timing**
23:2

**title**
8:14,16 9:14 42:3
54:23 56:12,13
57:2

**titles**
8:20

**today**
7:25 8:3 10:2,7
15:8 23:25 28:24
31:22 54:22 55:7
58:10 61:8 62:7

**today's**

5:4 10:23

**together**
44:22

**took**
60:5,6

**top**
6:13 53:5 69:16

**track**
32:6

**tranche**
32:3 38:21 39:5,14
45:7

**transactions**
36:9

**transcript**
52:17

**transmit**
50:24 51:17

**trick**
24:3,9,16 25:15,17
65:25 69:5,11

**tried**
24:14

**true**
35:5

**trust**
24:4,8 44:6

**try**
24:9 68:11

**trying**
13:11 18:1,4 24:3
25:15,17 33:18
46:23 59:10 65:25
66:25 69:5,11
74:24

**turned**
68:24

**two**
38:1,20 40:21

69:21 73:16

---

**U**

---

**Um-hum**
59:25 60:2 64:19

**unaudited**
37:4,9

**under**
23:25 42:21

**undergraduate**
35:13

**underneath**
62:25

**understand**
17:6 28:15,19 33:9
36:1 46:2

**understanding**
29:24 30:1,18
37:8,24 62:10
66:19 71:16

**understood**
12:9 27:22

**unexecuted**
42:8,12

**Unfortunately**
38:15

**units**
22:1

**Universal**
5:11

**unless**
74:3

**unrelated**
31:1

**until**
13:18 46:5 47:12

**up**
6:25 29:7,21 32:25



Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

33:24 34:21 41:21
44:19 45:16 47:7
49:11,15 58:8 62:1
67:16 73:8,13,19
74:4

**upload**
50:24 51:19,21,24
55:19

**uploaded**
51:2,12 64:2

**upon**
31:18

**us**
6:20 7:9,13 8:22
14:15 16:3 20:5
21:22 27:5 29:7
32:5 42:8 47:18
55:4 58:21 59:1

**use**
17:12 28:11 49:20
54:13

**used**
9:8 17:7 50:14
54:5,25 58:6 62:14

**using**
50:23

**usually**
36:11

**utilize**
11:9

**utilized**
27:11,16 51:8 62:1

---

**V**

**various**
15:12 17:12 50:17
61:22

**Vehicle**
17:11

**Velocci**
57:18,19,25 58:1

**verify**
46:8

**version**
42:8,12

**via**
11:11,14 12:22

**Videotaped**
5:1 7:2,22

**view**
11:9 64:3,7 67:9

**viewing**
10:13 11:5

---

**W**

**walk**
45:24

**want**
6:15 7:11 8:9 10:3,
4 11:19 12:8,21
15:1,25 19:2 23:6,
14 24:12 25:6,21,
25 27:22 29:7 33:8
35:4 38:20 39:2
43:10,15 45:1 46:9
56:13 59:16 65:22
66:24 67:4,9 68:22
69:11,13 70:2 71:7
73:2,3 75:19 76:6

**wanted**
29:17 68:6

**wasn't**
26:18 30:2

**way**
11:21 13:4,13 17:8
22:10 39:6 48:2
49:23 50:3 52:15
55:6 65:13 71:20
72:13

**we**
5:3,6,16 6:11,15,
17 7:6,14,16 8:6
12:1,20 14:14,22
15:8,22 18:25
19:13 23:3,9,17,20
25:6 26:10 29:6,20
37:11 39:6 40:5
41:4 42:8,11 45:1,
2 46:5,9,24 47:4,7
48:14,22 49:4 51:1
52:5 53:17 54:13
56:5,9 57:10,15
58:6,8,15 63:13,
20,23 65:3,14
66:17 67:1,3 68:4
69:24,25 70:3,17
73:7,25 74:6 76:5

**we'd**
15:7

**we'll**
7:6 13:5 14:16
19:14 21:10 29:16
52:12,22,25 53:1
61:17 65:17

**we're**
7:1 12:19 14:9,10,
16 15:6 25:25
30:10 31:11 34:1,
5,22,24 38:8 39:4
45:14,15,24 51:10
61:8 62:12 66:11
68:3,7 74:24 76:1

**we've**
29:6 37:25 38:19
65:12 66:4

**Weissman**
11:24 13:19 14:5

**were**
10:13 11:4,11
13:24 15:20 16:8
17:23 18:4,20
19:5,20 20:14,15,

16,18 21:3 22:7
23:18,23,24 25:16
26:5,7 31:24 32:4
40:5 41:25 42:11
44:22 47:8 48:12,
14,19,24 49:1,4,8,
12 51:6,7 61:24,25
62:3 65:2,4,14,20
66:1,6,16 67:5,14

**weren't**
23:21

**what**
8:9,16,23 9:18
10:3,20 11:8,20
12:21,22 13:3,19
15:1,8 16:3 17:2,9
19:4,5 20:6 21:7
22:13 23:3,4,8
24:7,13,24 25:18
27:19 30:16,18,19
31:10 32:5,24
35:13 36:1 37:13
41:2 45:14 47:17
49:22 52:18 53:4
56:12,24 59:1
60:6,15 61:1,24
62:7,11,22 65:10
69:10,17 70:11,13,
14 72:3,5 74:18,24
76:6

**what's**
6:8,25 42:3 47:2
70:2

**whatever**
34:7 38:18,23
45:10,13

**whatsoever**
71:16

**when**
14:25 15:2,3,10,15
16:4 17:8,10 18:20
20:23 23:14 24:9
26:7,20 27:9,25



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376

www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

42:13 48:14 49:4
50:23 51:7 53:11,
24 57:10 65:3
66:25 69:24 73:20
75:1

**whenever**
45:23

**where**
6:3,6,16,20 10:18
17:11 18:3 19:12
20:6,14,18 21:2,17
22:17 26:25 33:12
39:25 40:5 50:5
58:23 59:22 62:2,
6,11,14 63:20
64:12 65:20

**whether**
18:1 27:15,24
36:17 60:16 64:20,
23 69:5 71:2 72:6,
7 75:18

**which**
19:16 21:9,18
24:12 31:1 33:2,20
42:17,18 45:7
49:16 56:20 63:19
75:13

**while**
34:10 35:25 39:12,
21 57:6

**who**
11:17,22 15:23
18:17 31:12 49:14
54:1,22 55:8,9
61:2 64:25 67:18
75:16,17

**who's**
37:15 41:5,12
43:16 60:10 63:2

**whole**
52:17

**whom**
43:15

**Whose**
40:24

**why**
8:5 12:19 23:21
30:1 34:8,17 40:20
42:11 45:7 48:12
49:4 59:1 63:23
65:3,4 68:23 69:13
70:3 71:4 74:24
75:10 76:5

**will**
6:11,17 14:15 21:9
25:7 31:18 35:5
36:21,22 37:4
39:13 45:16,17
52:5 56:20 57:15
61:21 73:7,15
74:15

**with**
5:10 6:10,11 7:7
8:2,9,25 9:4 10:4,
12 11:11,20 12:1,
3,4,20 15:1,13
16:4 17:1,23 18:1
19:1,3,4,8 20:1,2,6
22:4 23:7 26:13
28:10,13 30:22,25
31:6,19 32:3,10,19
34:17 35:6,23
37:19,24 39:1
43:3,10,19,20 44:7
45:3 47:23 48:8
49:3 52:9 53:12
57:20 59:14,19
62:1,5,10,16,24,25
63:1,18 64:20,22
65:12 66:21 67:13,
16 69:25 71:6,13
72:2 75:16 76:2

**within**
10:22

**Without**
16:25

**witness**
5:22 6:20 9:22
12:10 21:15 24:11
34:7 60:20 61:11,
14 71:8 76:4,11

**won't**
38:25

**word**
17:8,9

**words**
24:15

**work**
31:19

**worked**
32:10

**working**
39:16

**works**
38:18

**would**
5:11 9:2 13:6 18:4,
10,12,15 24:8,25
25:2 40:1 43:4,5
44:1,11 45:25 46:7
47:17 48:6,8,23
50:4,15,16,20,24
51:9,13,16,19,23
52:8 61:24 62:6
63:5,23 64:24 65:6
67:17,18 71:17
72:5 75:13,14

**would've**
13:5 48:3 67:7,8

**wrap**
73:8

**write**
30:17 31:17

**written**

28:16 35:9

**wrong**
66:15

**wrote**
30:14,16

---

Y

**yeah**
39:3 53:1 55:24
56:7 69:11,15

**year**
37:5 63:10,18
64:8,16 65:4 66:18

**years**
40:21

**yes**
5:18 10:17 12:12,
17 13:10 14:2,24
15:5 26:21,24
27:18 33:7 38:4,7
45:6 60:3,4 70:21
73:5 75:9

**yet**
55:23

**you**
6:3,6,11,15,16,19,
23 7:9,10,13,23
8:2,3,6,9,11,13,22
9:5,8,11,14 10:2,3,
7,13,21,25 11:3,4,
8,9,14,17,20,23
12:4,5,14,17,21,
22,25 13:10,12,13,
24 14:15,19,22,25
15:1,2,3,10,11,15,
16,20,25 16:3,8,
11,23 17:1,5,7,8,9,
10,11,15,23 18:3,
4,12,14,15,24
19:3,8,13,20 20:1,
3,5,6,11,14,15,16,



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

Allan Teh vs Justice Partner, LLC
Melchionni, Lee on 08/22/2023

18,23 21:2,3,6,14 22:7,10,14,21 23:1,3,4,7,14,15, 18,21,24 24:7,8,9, 11,14,18,25 25:9, 13,16,17,18,20,22, 24 26:2,7,12,19, 20,24,25 27:1,7,8, 9,10,13,14,23,24, 25 28:3,6,12,15, 19,24 29:7,12,18, 21,23 30:5,14,17, 18 31:3,6,7,17,21, 22,23 32:5,19,21 33:9,19 34:4,5,6,9, 12,17 35:10,16,19, 22 36:1,15,18,20, 21,25 37:6,8 38:9, 18,20,21 39:2,15, 20,22 40:4,5,8,12, 19 41:1,2,12,13, 15,24,25 42:6,11, 14,17,21,25 43:16, 20,24 44:3,15 45:3,10,12,13,24 46:1,7,9,15,18,20, 25 47:4,8,20,23 48:3,6,7,12,13,16, 18 49:10,14,21 50:6,7,10,12,19,24 51:7,8,9,13,16,19, 23,24 52:3 53:2,4, 8,11,13,20,22,24 54:1,3,8,16,22 55:7,17,19 56:2,3, 4 57:1,6,16 58:5,9, 17,20,22,24 59:1, 6,12,15,16,21,23 60:1,5 61:2,7,9,14, 21,24 62:7,11 63:12,14,17,18,20, 22 64:14,15,22,24 65:2,10 66:1,7,13, 14,15,18,21,25 67:1,17,22,25 68:2,5,6,12,13,16,

22 69:9,13 70:8, 11,19,22 71:1,2, 10,16,20 72:1,2,3, 5,7,13,15,18 73:2, 19,20 74:2,3,13, 16,21,25 75:5,20 76:6

**you'd**
24:16 38:16 51:22

**you'll**
24:5 29:19,22 34:14,21 40:13 57:11 61:9,22 62:13

**you're**
7:25 9:4,22 12:9 13:3,8 16:2 24:2, 15,22 25:15 28:24 30:25 39:5,21,22 43:13,14 49:22 50:3,18 52:15 53:12,14 59:13 60:19 65:25 69:5, 10 71:7 72:4 73:12,14

**you've**
12:18 24:4,9 32:24 49:16 52:2

**Young**
31:12,24 32:10

**your**
6:1,5,8,9 9:17,19 10:4,6,12,20,22 11:10,14,15,20,21 12:4 15:1 16:14, 19,20 17:1,13,14 18:11 19:3 22:4, 20,22 23:7,12,18, 25 24:2,6,24 25:9 26:1,6 27:23 30:1, 9,11,13,18,23 31:3 32:14,25 33:18,23 34:7,12 35:13

37:24 39:22 40:13 42:3 43:3 44:7 47:13,25 48:7,9,21 49:3 50:18,19 51:13,24 52:5,8, 13,21 57:21 58:10 60:18 62:6,10,17, 22 64:5,9 65:6,12, 16,19,23 67:4,9 70:2,20 71:23,25 72:16 75:6

---

**Z**

---

**zipped**
44:19

**zoom**
21:14 73:22 74:7

UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

# Composite Exhibit 7

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT dated as of the date executed below between **Justice Partners, LLC** (the "**Lender**") a Delaware limited liability company with an address located at 20900 NE 30ᵗʰ Ave., Suite 510, Miami, Florida 33180, and **Justice Partners Law Group, LP** a District of Columbia limited partnership (the "**Borrower**") located at 1100 H Street NW, Suite 840, Washington, D.C., 20005.  In order to induce the Lender to advance money or grant other financial accommodations on one or more occasions to the undersigned Borrower, the undersigned Borrower represents, warrants, covenants to and agrees with the Lender as follows:

1.      **Definitions.**  For purposes of this Agreement, unless the context clearly requires otherwise, in addition to the terms defined elsewhere herein, the following terms shall have the meanings set forth below:

*Advances* means the Borrower's Advances with the Lender referred to in Section 2.1 infra.

*Affiliate* means any person and/or entity, which directly or indirectly controls, or is controlled by, or is under common control, with the Borrower.

*Agreement* means this Loan and Security Agreement.

*Collateral* means the Collateral described in Section 3, infra.

*Collateral Account* means the account of Borrower with the Lender established under Section 8.2 (c) infra.

*Control* shall be deemed to exist if any person, entity or corporation, or combination thereof, shall have possession, directly and/or indirectly, of the power to direct the management and/or policies of the Borrower or any person, entity, or corporation deemed to be an Affiliate of the Borrower, and shall be deemed to include any holder of 50% or more of any stock or other interest in the Borrower or in any person, entity or corporation deemed to be an Affiliate of the Borrower, whether such holding is direct or indirect.

*Deposit* means any deposits, credits, securities, interests, participations, shares, collateral or property of the Borrower at any time now or thereafter in the possession, custody, safekeeping or control of or in transit to the Bank, or any other holder for the purpose of securing Inventory financing of Borrower, and the proceeds thereof.

*Deposit Accounts* means all deposit accounts maintained by the Borrower with the Bank for the purpose of financing renovation, expansion, furniture and fixtures of Borrower, and the proceeds thereof.

*Events of Default* shall have the meaning given such term in Section 8 of this Agreement infra

*Indebtedness* means the total of all obligations of the Borrower to the Lender, whether current or long-term, including without limitation, guaranties, endorsements, or other arrangements whereby responsibility is assumed for the obligations of others.

*Inventory* means all inventory, including, without limitation, all inventory in the possession of others or in transit, all goods held for sale or lease or to be furnished under contracts for service or which have been so furnished, and completed and unshipped merchandise, and all products and proceeds (including insurance and condemnation proceeds) of the foregoing, as defined by the Uniform Commercial Code of the State of Delaware, whether presently owned or hereafter acquired.

*Legal Requirements* means all applicable present and future statutes, laws, ordinances, rules and/or regulations of any governmental authority, all orders, writs, injunctions, decrees and judicial decisions and all covenants which bind or materially affect the Borrower or any part of its assets.

*Loan Account* means the accounting as to the Loans issued by the Lender pursuant to Section 2.2 infra.

*Loan Documents* means the following documents collectively: (i) This Agreement; (ii) Each Promissory Note of the Borrower to the Lender, including the Note (collectively the "Notes") evidencing the indebtedness for the Loan; (iii) a UCC-1 Financing Statement; (iv) all other documents and instruments heretofore or hereafter executed by the Borrower in favor of the Lender relating to the Loans, including any guaranty, pledge, security and/or subordination agreement and related Uniform Commercial Code financing statements; and (v) in each case, the term "Loan Documents" and any reference herein to any particular Loan Document shall mean and include all amendments, modifications, replacements, renewals or extensions of any and all such documents, whenever executed.

*Loans* means: (i) Advances evidenced by the Note; and (ii) Any other loans made by the Lender to the Borrower after the date of this Agreement.

*Maturity Date* means the fifth anniversary of the date of the first Advance, as may be extended. The Borrower shall have the option to extend the Maturity Date for two successive 12-month extensions, as applicable (the "**Final Maturity Date**"). Subject to the conditions set forth below, Borrower may extend the Initial Maturity Date for two separate 12-month periods (each, an "**Extension Period**"). Each Extension Period shall be subject to satisfaction of the following conditions: (i) notice is delivered to the Lender at least 90 days but not more than 120 days prior to the expiration of the Initial Maturity Date, or if extended, the expiration of the first Extension Period; (ii) no default or event of default exists on the date that the notice described in clause "(i)" is provided by the Borrower, or on the first day of the applicable Extension Period; and (iii) certain other conditions set forth in the Loan Agreement have been satisfied.

*Note* means the Borrower's Senior Secured Promissory Note evidencing indebtedness for Advances of even date herewith.

*Obligations* means all liabilities, duties and/or obligations now or hereafter owing from the Borrower to the Lender of whatever kind or nature, whether or not currently contemplated at the time of this Agreement, whether such obligations be direct or indirect, absolute or contingent or due or to become due, including all obligations of the Borrower, actual or contingent, in respect to the letters of credit or Lender's acceptances issued by the Lender for the account of, or guaranteed

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group

</div>

2

BOC 37448230v3

by, the Borrower, including, without limitation all obligations of any partnership or joint venture as to which the Borrower is or may become, liable, which term shall include all accrued interest and/or all costs and expenses, including reasonable attorneys' fees, costs and expenses relating to the appraisal and/or valuation of assets and all reasonable costs and expenses incurred or paid by the Lender in exercising, preserving, defending, collecting, enforcing or protecting any of its rights under the Obligations or in any litigation arising out of the transactions evidenced by the Obligations.

*Required Permits* means all permits, licenses, approvals, consents and waivers necessary pursuant to any Legal Requirement to be obtained from, or made by, any governmental authority for the ownership by the Borrower of its assets or for the conduct of its business.

*Term* shall mean the date of execution through repayment of the Loan.

*Termination Date* shall mean the Maturity Date, at the end of the Term, subject to any extensions.

2.      **Loans.**

2.1     **Advances.**

(a)     Pursuant to this Agreement, and upon satisfaction of the conditions precedent in Section 5 hereof, during the period from the date hereof until the fifth anniversary of the date of the last Advance hereunder (as such date may be extended from time to time), the Lender may make Advances and the Borrower may borrow under this Agreement.

(b)     All Advances under this Agreement shall be evidenced by the Note, shall bear interest, and shall be due and payable in full on the Termination Date.

2.2     **Loan Account.**

(a)     The Lender shall maintain an accounting (the "Loan Account") on its books to record: (i) all Loans; (ii) all payments made by the Borrower; and (iii) all other appropriate debits and credits as provided in this Agreement with respect to the Obligations.  All entries in the Loan Account shall be made in accordance with the Lender's customary accounting practices as in effect from time to time.  Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Lender from or on behalf of Borrower, and the Borrower hereby irrevocably agrees that the Lender shall have the continuing exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default against the Obligations in such manner as the Lender may deem advisable.

(b)     The balance in the Loan Account, as set forth on the Lender's most recent printout or other written statement, shall be presumptive evidence of the amounts due and owing to the Lender by Borrower; provided, however, that any failure to so record or any error in so recording shall not affect the payment of the Obligations.  Any periodic statement prepared by the Lender setting forth the principal balance of the Loan Account and the calculation of interest due thereon shall be subject to subsequent adjustment by the Lender but shall, absent manifest errors or

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group

3
</div>

BOC 37448230v3

omissions, be presumed final, conclusive and binding upon the Borrower, and shall constitute an account stated unless within thirty (30) days after receipt of such statement, the Borrower shall deliver to the Lender its written objection thereto specifying the error or errors, if any, contained in such statement. In the absence of a written objection delivered to the Lender as set forth above, the Lender's statement of the Loan Account shall be presumptive evidence against the Borrower of the amount of the Obligations and the burden of proof to show manifest errors or omissions shall be on the Borrower.

3.    **Grant of Security Interest; Obligations Secured.** The Borrower hereby grants to the Lender a senior security interest in all of the Borrower's present and future right, title and interest in all of its assets, including but not limited to its interest in any Qualified Settlement Fund, and all distributions, cash and other property or proceeds from time to time received in respect thereof, furniture and fixtures, inventory, deposit accounts and reserve bank accounts, lease reserve accounts, and secured accounts receivable wherever located and whether now existing or hereafter created or arising, collectively called the "**Collateral.**" The security interest in the Collateral granted herein is to secure the payment and performance of the Obligations. Lender is hereby authorized by Borrower to file any and all documents with the appropriate authorities as necessary to authenticate and/or perfect the security interests granted herein.

4.    **Representations and Warranties.** The Borrower hereby represents and warrants to the Lender (which representations and warranties will survive the delivery of this Agreement and the making of any advances of any Loan and shall be deemed to be continuing until all Loans are fully paid and this Agreement is terminated) that:

(a)    (i) The Borrower is, and will continue to be, duly organized and validly existing; the Borrower is in good standing under the laws of the State of incorporation thereof; (ii) the Borrower is qualified and in good standing to do business in all other jurisdictions in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary; (iii) the Borrower has the power to execute and deliver this Agreement and each Loan Document and to borrow hereunder; and (iv) the Borrower has all Required Permits, without unusual restrictions or limitations, to own, operate and lease its properties and to conduct the business in which it is presently engaged, all of which are in full force and effect.

(b)    The making and performance by the Borrower of this Agreement and the Loan Documents have been authorized by all necessary corporate action by its Board of Directors. The execution and delivery of this Agreement and the other Loan Documents, the consummation of the transactions herein and therein contemplated, the fulfillment of or compliance with the terms and provisions hereof and thereof, (i) are within its powers, (ii) will not violate any provision of law or of its organizational documents, or (iii) will not result in the breach of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of the Borrower pursuant to any indenture or Lender loan or credit agreement (other than pursuant to this Agreement and the other Loan Documents) or other agreement or instrument to which the Borrower is a party. To the Borrower's knowledge, no approval, authorization, consent or other order or registration or filing with any governmental body is required in connection with the making and performance of this Agreement.

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                                    4

CONFIDENTIAL                                                   Justice-Partners-Teh-000115

(c)      Subject to any limitations stated therein or in connection therewith, all information furnished, or to be furnished, by the Borrower pursuant to the terms hereof is, or will be at the time the same is furnished, accurate and complete in all material respects necessary to make the information furnished, in the light of the circumstances under which such information is furnished, not misleading.

(d)      The Borrower is in material compliance with all Legal Requirements applicable to it, its property or the conduct of its business, including, without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment.

(e)      No proceedings by or before any private, public or governmental body, agency or authority and no litigation is pending, or, so far as is known to the Borrower, its officers or directors, or threatened against the Borrower, except such as are disclosed in any addendums attached hereto.

(f)      No Event of Default has occurred and no event has occurred, or is continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice specified therein, would constitute such an Event of Default.

(g)      The Borrower agrees that the proceeds of Loan shall only be used in connection for general working capital purposes and to fund mass tort litigation expenses.  It is understood that no portion of the Loan shall be used to pay an interest due or payable under this Agreement.

(h)      This Agreement and all other Loan Documents, upon the execution and delivery thereof, will be legal, valid, binding and enforceable obligations of the Borrower as the case may be, in accordance with the terms of each; provided, however, that the Borrower's representation as to enforceability is qualified to the extent that enforcement of the rights and remedies created by this Agreement and the Loan Documents may be subject to applicable bankruptcy, insolvency, reorganization or similar laws affecting the rights of creditors and secured parties generally, and does not apply with respect to the availability of the remedy of specific performance, injunctive relief or any other equitable remedy.

(i)      The Borrower has good and marketable title to its properties and assets, including all of the Collateral, subject to no mortgage, pledge, lien, security interest, encumbrance or other charge which is not set forth in any addendums attached hereto.

(j)      The Borrower has filed all tax returns and reports required to be filed by it with all federal, state or local authorities and has paid in full, or made adequate provision for the payment of, all taxes, interest, penalties, assessments or deficiencies shown to be due or claimed to be due on or in respect of such tax returns and reports.

(k)      The Borrower conducts its business solely in its own name without the use of a trade name or the intervention of, or through, any other entity of any kind, other than as disclosed on any addendums attached hereto.  All books and records relating to the assets of the Borrower are located at the Borrower's chief executive office and its other places and locations where its assets are located.

BOC 37448230v3

CONFIDENTIAL

Justice-Partners-Teh-000116

(l)     The Borrower and any of the Borrower's tenants have not given, nor have they received, any notice that: (i) there has been a release, or there is a threat of release, of toxic substances, oil or hazardous wastes on or from any real property owned or operated by the Borrower; (ii) the Borrower or any tenants may be, or is, liable for the costs of cleaning up or responding to a release of any toxic substances, oil or hazardous wastes; or (iii) any of such real property is subject to a lien for any liability arising from costs incurred in response to a release of toxic substances, oil or hazardous wastes.

**5.     Conditions Precedent.**

**5.1     Conditions to Initial Advance.**  In addition to any other conditions contained in this Agreement, the initial advance shall be subject to the following conditions precedent:

(a)     *Proof of Action*.  The Lender shall have received such documents evidencing the Borrower's power to execute and deliver this Agreement and the other Loan Documents as the Lender or its counsel shall request.

(b)     *The Notes and Loan Documents*.  The Borrower shall have delivered to the Lender the Notes, this Agreement, and the other Loan Documents and such other documents as the Lender may request.

(c)     *Liens to be Discharged*.  The Lender shall be satisfied with arrangements made to pay, discharge and terminate debt owed, and security interests granted by, the Borrower to non-permitted debt and security interest holders.

**5.2     Conditions to Every Advance.**  In addition to all other conditions contained in this Agreement, every advance shall be subject to the following conditions precedent that:

(a)     *No Event of Default*.  No Event of Default has occurred and no event shall have occurred, or be continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice as specified therein, would constitute an Event of Default.

(b)     *No Material Adverse Change*.  There shall have been no material adverse change (as determined by the Lender in its sole discretion) in the assets, liabilities, financial condition or business of the Borrower since the date of any financial statements delivered to the Lender before or after the date of this Agreement.

(c)     *Representations and Warranties*.  That the representations and warranties contained in Section 4 hereof and in each other Loan Document shall be true and correct in all material respects.  Any request for a borrowing shall be deemed a certification by the Borrower as to the truth and accuracy in all material respects of the representations and warranties contained in Section 4 infra and in each other Loan Document as of the date of such request.

**6.     Affirmative Covenants.**  The Borrower covenants and agrees that from the date hereof until payment in full of all Loans and the performance of all Borrower's obligations hereunder, and under all other Loan Documents, is complete and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall:

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                                                    6

</div>

BOC 37448230v3

CONFIDENTIAL                                                Justice-Partners-Teh-000117

(a)     Comply with all terms and conditions of this Agreement and the other Loan Documents and pay all material debts of the Borrower before the same shall become delinquent.

(b)     The Borrower shall deliver to the Lender: (i) within 30 days after the close of each fiscal year, a balance sheet of the Borrower as of the close of each fiscal year and statements of income and retained earnings for that portion of the fiscal year-to-date then ended, prepared in conformity with GAAP; (ii)(1) within 90 days after the close of each fiscal year of the Borrower, in accountant-prepared draft form, and (2) within 30 days of completion, in final, unaudited accountant reviewed form, financial statements ("Financial Statements"), including, a balance sheet as of the close of such year and statements of income and retained earnings and cash flows for the year then ended, prepared in conformity with GAAP, applied on a basis consistent with that of the preceding year or containing disclosure of the effect on financial position or results of operations of any change in the application of accounting principles during the year; (iii) the other financial reports, if any, delivered to the owners of the Borrower, and upon request, such other information about the financial condition, business and operations of the Borrower, as the Lender may from time to time, reasonably request; and (iv) promptly upon becoming aware of any Event of Default, or any event which with the giving of notice or the passage of time would constitute an Event of Default, notice thereof, in writing.  The Lender may modify or waive the performance of this section (b) in its sole discretion.

(c)     (i) Keep its properties insured against fire and other hazards (so called "All Risk" coverage) in amounts and with companies satisfactory to the Lender to the same extent and covering such risks as is customary in the same or a similar business, but in no event in an amount less than the full insurable value thereof, which policies shall name the Lender as additional insured as its interest may appear, (ii) maintain public liability coverage against claims for personal injuries or death, and (iii) maintain all worker's compensation, employment or similar insurance as may be required by applicable law.  Such All Risk property insurance coverage shall provide for a minimum of 30 days' written notice to the Lender of cancellation or modification.  The Borrower agrees to deliver copies of all of the aforesaid insurance policies to the Lender.  In the event of any loss or damage to any of its assets, including any collateral securing any Loan, the Borrower shall give prompt written notice to the Lender and to Borrower's insurers of such loss or damage and shall promptly file proofs of loss with said insurers.

(d)     Comply with all Legal Requirements, including without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment.  The Borrower shall pay all taxes, assessments, governmental charges or levies, or claims for labor, supplies, rent and other obligations made against the Borrower or any of its properties which, if unpaid, might become a lien or charge against it or any of its properties, except liabilities being contested in good faith with the prior written consent of the Lender and against which, if requested by the Lender, the Borrower shall maintain reserves in amount and in form (book, cash, bond or otherwise) satisfactory to the Lender.

(e)     Maintain its chief executive office, principal places of business and locations of assets at the locations set forth in this Agreement.  The Borrower shall promptly give the Lender written notice of any change in any of such addresses.  All business records of the Borrower,

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group
</div>

7

BOC 37448230v3

CONFIDENTIAL

including those pertaining to all Collateral, shall be kept at the said chief executive office of the Borrower, unless prior written consent of the Lender is obtained to a change of location.

(f)     Allow the Lender, by or through any of its officers, agents, attorneys, or accountants designated by it, for the purpose of ascertaining whether or not each and every provision hereof and of any other Loan Document is being performed and for the purpose of examining and appraising the assets of the Borrower and the records relating thereto, to enter the offices of the Borrower to examine or inspect any of the properties, books and records or extracts therefrom and to make copies thereof and to discuss the affairs, finances and accounts thereof with the Borrower and its accountants, at such reasonable times with advance notice to Borrower and as often as the Lender may reasonably determine The Borrower will reimburse the Lender for all costs associated with its examination, appraisals and audits.

(g)     Promptly advise the Lender of the commencement, or threat of litigation, including arbitration proceedings and any proceedings before any governmental agency, which might have a material adverse effect upon the assets, liabilities, financial condition or business of the Borrower.

(h)     Promptly notify the Lender in writing of (i) any enforcement, cleanup, removal or other action instituted or threatened against the Borrower by any federal, state, county or municipal authority or agency pursuant to any public health, safety or environmental laws, rules, ordinances and regulations, (ii) any and all claims made or threatened by any third party against the Borrower or any real property owned or operated by any of them relating to the existence of, or damage, loss or injury from any toxic substances, oil or hazardous wastes or any other conditions constituting actual or potential violations of such laws, rules, ordinances or regulations and (iii) any enforcement or compliance action, instituted or threatened or claim made or threatened by any federal or state authority relating to the employment of labor or employee benefits.

(i)     Continue to conduct the business of the Borrower as presently conducted, maintain its existence and maintain its properties in good repair, working order and operating condition. The Borrower shall promptly notify the Lender of any event causing material loss or unusual depreciation in the value of the business assets of the Borrower and the amount of same.

(j)     The Borrower will notify the Lender promptly upon Borrower's entry into any transaction with any federal, state or local governmental entity which would give rise to an account receivable which would be subject to the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement (herein a "Government Account") and the Borrower will execute all such instruments and take all such action as may be reasonably requested by the Lender so that all moneys due, or to become due, thereunder will be effectively assigned to the Lender and notice thereof given to such account debtor in accordance with the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement.

(k)     (i) The Borrower will keep the Collateral in good order and repair, will not waste or destroy the Collateral or any part thereof and will not knowingly use the Collateral in violation of any applicable Legal Requirement or any policy of insurance thereon. The Borrower will notify the Lender in writing promptly upon its learning of any event, condition, loss, damage, litigation,

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group

8

CONFIDENTIAL

administrative proceeding or other circumstance which may materially and adversely affect the assets, liabilities, financial condition or business of the Borrower or the Lender's security interest in the Collateral. In the event that the Lender shall reasonably determine that there has been any loss, damage or material diminution in the value of the Collateral, the Borrower will, whenever the Lender requests, pay to the Lender such amount as the Lender shall have reasonably determined represents such loss, damage or material diminution in value (any such payment not to affect the Lender's security interest in such Collateral). (ii) Without limiting the generality of the foregoing, the Borrower shall notify the Lender promptly of any claim or dispute that may materially affect the value of the Borrower's Accounts.

(l)     The Borrower will, at such intervals as the Lender may request, notify the Lender, in a form satisfactory to the Lender, of all Collateral which has come into existence since the date hereof or the date of the last such notification, whichever is later.

(m)     At its option, but without obligation to do so, the Lender may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral; may place and pay for insurance on the Collateral; may order and pay for the repair, maintenance and preservation of the Collateral; and may pay any fees for filing or recording such instruments or documents as may be necessary or desirable to perfect the security interest granted herein. The Borrower agrees to reimburse the Lender on demand for any payment made, or any expense incurred, by the Lender pursuant to the foregoing authorization, and all such payments and expenses shall constitute part of the principal amount of Obligations hereby secured and shall bear interest at the highest rate payable on the Obligations of the Borrower to the Lender.

**7.     Negative Covenants.** The Borrower covenants and agrees that until payment is made in full on all Loans, the performance of all Borrower's obligations hereunder and under all other Loan Documents is complete, and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall not directly or indirectly:

(a)     Incur or permit to exist any lien, mortgage, security interest, pledge, charge or other encumbrance against any of the Collateral, whether now owned or hereafter acquired, except: (i) liens in favor of the Lender required by this Agreement and/or any other Loan Document; (ii) tax liens which are being contested in good faith; (iii) liens, mortgages, security interests, pledges, charges or other encumbrances in favor of the Lender or specifically permitted, in writing, by the Lender; and (iv) liens and mortgages already disclosed herein.

(b)     Sell, lease, pledge, transfer or otherwise dispose of all or any of its assets (other than the disposition of inventory in the ordinary course of its business as presently conducted, or the sale of obsolete equipment or equipment no longer usable in the conduct of the Borrower's business), whether now owned or hereafter acquired except for liens or encumbrances required or permitted hereby or by any Loan Document.

(c)     Make or consent to a material change in the ownership or capital structure of the Borrower, or make a material change in the nature of the business or the management of the Borrower or in the manner in which the business of the Borrower is conducted.

BOC 37448230v3

CONFIDENTIAL

(d)      Impair the Collateral as determined in the sole discretion of the Lender.

(e)      Enter into or effect any merger, other corporate reorganization, change of control of the Borrower, sale of the Borrower, or any other transaction in which all or substantially all of the assets of the Borrower are sold, transferred, licensed or otherwise disposed of.

(f)      Revocation/lapse of licensure of any of the principals of Borrower.

(g)      Any Event of Default under and as defined in any of the Loan Documents.

(h)      Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any capital stock or equity of any party to any Loan Document, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any party to any Loan Document (a "Restricted Payment"), unless after payment such Restricted Payment, the aggregate fair market value of the Collateral shall exceed 100% of the value of the outstanding principal balance of the Loan plus all accrued unpaid interest thereon.

**8.      Events of Default; Remedies.**

**8.1      Events of Default.**  The occurrence of any of the following events, for any reason whatsoever, shall constitute an "Event of Default" hereunder:

(a)      (i) Failure to make due payment of principal and/or interest on any Loan provided such failure continues for a period of five (5) business days or (ii) failure by the Borrower, or any Affiliate, to make due payment of any other liability or obligation owing by the Borrower, or any Affiliate, to the Lender, now existing or hereafter incurred, whether direct or contingent (herein, "Other Lender Debt"), provided such failure continues for a period of five (5) business days; or

(b)      Failure by the Borrower to observe or perform any covenant contained in (i) this Agreement, or any of their respective obligations under any other Loan Document or (ii) any document or instrument evidencing, securing or otherwise relating to any Other Lender Debt provided that if said failure is curable, it continues for a period of ten (10) days; or

(c)      Any representation or warranty made by the Borrower to the Lender or any statement, certificate or other data furnished by any of them in connection herewith or with any other Loan Document proves at any time to be incorrect in any material respect; or

(d)      A judgment or judgments for the payment of money shall be rendered against the Borrower, which shall remain unsatisfied and in effect for a period of sixty (60) days without a stay of execution; or

(e)      Any levy, seizure, attachment, execution or similar process shall be issued or levied on any of the Borrower's property, which process could have a material adverse effect on the business of the Borrower in the Lender's reasonable judgment; or

BOC 37448230v3

CONFIDENTIAL

Justice-Partners-Teh-000121

(f)     The Borrower shall (i) apply for or consent to the appointment of a receiver, conservator, trustee or liquidator of all or a substantial part of any of its assets; (ii) be unable, or admit in writing its inability, to pay its debts as they mature; (iii) file or permit the filing of any petition, case, arrangement, reorganization, or the like under any insolvency or Bankruptcy law, or the adjudication of it as Bankrupt, or the making of an assignment for the benefit of creditors or the consenting to any form of arrangement for the satisfaction, settlement or delay of debt or the appointment of a receiver for all or any part of its properties; or (iv) take any action for the purpose of effecting any of the foregoing; or

(g)     An order, judgment or decree shall be entered, or a case shall be commenced, against the Borrower, without the application, approval or consent of the Borrower by, or in, any court of competent jurisdiction, approving a petition or permitting the commencement of a case seeking reorganization or liquidation of the Borrower or appointing a receiver, trustee, conservator or liquidator of the Borrower, or of all or a substantial part of its assets and the Borrower, by any act, indicates its approval thereof, consent thereto, or acquiescence therein, or, in any event, such order, judgment, decree or case shall continue unstayed, or undismissed, and in effect for any period of ninety (90) consecutive days; or

(h)     The Borrower shall dissolve or liquidate, or be dissolved or liquidated, or cease to exist legally, or merge or consolidate with, or be merged or consolidated with or into any other entity; or

(i)     Failure by the Borrower to pay or perform any other Obligation, whether contingent or otherwise, or if any such other Obligation shall be accelerated, or if there exists any event of default under any instrument, document or agreement governing, evidencing or securing such other Obligation; or

(j)     The Lender reasonably believes that any material adverse change in the assets, liabilities, financial condition or business of the Borrower has occurred since the date before or after the date of this Agreement; or

(k)     The Borrower sells, liquidates, transfers or otherwise disposes of an asset not in strict accordance with the terms of this Loan Agreement; or

(l)     If at any time the Lender reasonably believes in good faith that the prospect of payment of any Obligation or the performance of any agreement of the Borrower is materially impaired, or that there is such a change in the assets, liabilities, financial condition or business of the Borrower as the Lender believes in good faith materially impairs the Lender's security or increases its risk of non-collection; or the Borrower fails to create the required number of direct or indirect jobs (as specified in the Economic Analysis of the Project) to cover any Advance.

## 8.2    Remedies.

(a)     Upon the occurrence of any Event of Default, and at any time thereafter, the availability of advances hereunder shall, at the option of the Lender, be deemed to be automatically terminated and the Lender, at its option, may declare one or more, or all, of the Loans outstanding hereunder, together with accrued interest thereon and all applicable late charges and surcharges

CONFIDENTIAL                                                                  Justice-Partners-Teb-000122

and all other liabilities and obligations of the Borrower to the Lender, to be forthwith due and payable, whereupon the same shall become forthwith due and payable; all of the foregoing without presentment or demand for payment, notice of non-payment, protest or any other notice or demand of any kind, all of which are expressly waived by the Borrower.

(b) The Lender shall have the following additional rights and remedies:

(i) All of the rights and remedies of a secured party under the Uniform Commercial Code or any other applicable law or at equity, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by law, in addition to any other rights and remedies contained in this Agreement, any other Loan Document or in any document, instrument or agreement evidencing, governing or securing the Obligations.

(ii) The right to (1) take possession of the Collateral, without resort to legal process and without prior notice to Borrower, and for that purpose Borrower hereby irrevocably appoints the Lender its attorney-in-fact to enter upon any premises on which the Collateral or any part thereof may be situated and remove the Collateral therefrom, or (2) require the Borrower to assemble the Collateral and make it available to the Lender in a place to be designated by the Lender, in its sole discretion, or (3) instruct the Bank, without further consent of Borrower, to transfer the balance of all deposit accounts of Borrower to Lender and to thereafter treat Lender as the owner of such deposit accounts and the Bank's customer with respect to such deposit account. The Borrower shall make available to the Lender all premises, locations and facilities necessary for the Lender's taking possession of the Collateral or for removing or putting the Collateral in saleable form.

(iii) The right to sell or otherwise dispose of all or any part of the Collateral by one or more public or private sales. The Lender will give the Borrower at least five (5) business days' prior written notice of the time and place of any public sale thereof, or of the time after which any private sale or any other intended disposition (which may include, without limitation, a public sale or lease of all or part of the Collateral) is to be made. The Borrower agrees that five (5) business days is a reasonable time for any such notice. The Lender, its employees, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is subject to widely distributed standard price quotations. Any public or private sale shall be free from any right of redemption, which the Borrower hereby waives and releases. If there is a deficiency after such sale and the application of the net proceeds from such sale, the Borrower shall be responsible for the same, with interest.

(iv) The right, after an Event of Default shall have occurred (and Borrower irrevocably appoints the Lender as attorney-in-fact for the Borrower for this purpose, such appointment being coupled with an interest), upon notice to Borrower and without resort to legal process, to notify the persons liable for payment of all accounts (as defined in the Uniform Commercial Code) at any time and direct such persons to make payments directly to the Lender, and to perform all acts the Borrower could take to collect on such accounts,

including, without limitation, the right to notify postal authorities to change the address for delivery, open mail, endorse checks, bring collection suits, and realize upon Collateral securing such accounts.  At the Lender's request, all bills and statements sent by the Borrower to the persons liable for payments of such accounts shall state that they have been assigned to, and are solely payable to, the Lender, and Borrower shall direct persons liable for the payment of such accounts to pay directly to the Lender any sums due or to become due on account thereof.

(v)      The right from and after an Event of Default, from time to time without demand or notice, and without being required to look first to any other Collateral to apply and set off any or all of the Deposits against any and all Obligations even though such Obligations are unmatured.

(c)      Collateral Account.  Upon an Event of Default:

(i)      The Borrower shall direct each of its creditors and/or customers that all payments or other distributions of whatever kind made to the Borrower shall be made to a post office box designated by the Lender (the "**Lock Box**").  The Lender shall have sole access to the Lock Box, and is hereby authorized by the Borrower to open all mail addressed to the Lock Box, and to apply all proceeds received therein, as herein provided.  If Borrower should receive itself any such payments, the Borrower shall hold all such collections in trust for the Lender without commingling the same with other funds of the Borrower and will promptly, on the day of receipt thereof, transmit such collections to the Lender in the identical form in which they were received by the Borrower, with such endorsements as may be appropriate, accompanied by a report, in a form approved by the Lender, showing the amount of such collections and such other information as the Lender may require.

(ii)      All collections in the form of cash, checks or other demand remittances so received by, or transmitted to, the Lender shall upon receipt by the Lender be credited to the Collateral Account established hereunder.  Each such credit shall be conditional upon final payment to the Lender of all items giving rise to such credit, and, if any item is not so paid, the credit for such item shall be reversed whether or not the item has been returned and the amount thereof, in the Lender's discretion may be charged to any operating account of Borrower with the Lender.  All collections in the form of notes, drafts, acceptances or other instruments not payable on demand shall be delivered by the Borrower to the Lender.  When such items are collected, the amount thereof shall be credited by the Lender to the Collateral Account, with appropriate notice to the Borrower.  Until such items are collected, the Borrower will not, without the consent of the Lender, make any entry on its books or records indicating that the same were received in payment of the receivable giving rise thereto.

(iii)      At such intervals as the Lender may deem appropriate, the Lender shall charge and apply the full amount then on deposit in the Collateral Account in reduction or payment of Borrower's Loan Account, such application to be subject to the final payment in cash of all items theretofore credited to such Collateral Account.

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                                        13

BOC 37448230v3

CONFIDENTIAL

**9.     Lien and Set Off.** The Borrower hereby gives the Lender a lien and right of set off for all of Borrower's liabilities and obligations to the Lender upon and against all Collateral now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to it.

**10.     Audit Rights.** At any time during the term of the Loan, the Lender shall have the right to audit the books and records of the Borrower upon prior written notice to the Borrower in accordance with procedures to be set forth in the Loan Documents.

**11.     Non-Recourse.** No recourse shall be had to Borrower for payment of principal and interest under the Loan Documents, and Lender shall look solely to the Collateral as security for payment of principal and interest due under the Note and other Loan Documents. In no event shall Borrower be held personally liable for any payment of principal or interest under the Note and other Loan Documents or for any Event of Default.

**12.     Miscellaneous.**

**12.1     Certain Waivers.** Borrower hereby waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of dishonor, and hereby agrees to any extension or delay in the time for payment or enforcement, to renewal of any Loan and to any substitution or release of any Collateral, all without notice and without any effect on their liabilities. Any delay on the part of the Lender in exercising any right hereunder, or under any other Loan Document which may secure any Loan, shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of a subsequent default. The Lender may revoke any permission or waiver previously granted to Borrower, such revocation to be effective prospectively when given, whether given orally or in writing. The rights and remedies of the Lender shall be cumulative and not in the alternative, and shall include all rights and remedies granted herein, in any other Loan Document and under all applicable laws.

LENDER AND BORROWER IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER OR BORROWER IN RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER LOAN DOCUMENT.

BORROWER (i) ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION AND (ii) TO THE EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVES ANY RIGHT TO PRIOR NOTICE OF, AND A HEARING ON, THE RIGHT OF ANY HOLDER OF THE NOTES, TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OF ANY OF THEIR PROPERTY, AT ANY TIME, PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS AGREEMENT.

**12.2     Notices.** All notices, requests or demands to or upon a party to this Agreement shall be given or made by the other party hereto in writing, in person or by depositing in the mail, postage prepaid, return receipt requested, addressed to the addressee at the address set forth herein as the

BOC 37448230v3

CONFIDENTIAL

Justice-Partners-Teh-000125

Borrower's chief executive office or to such other addresses as such addressee may have designated in writing to the other party hereto.

**12.3   Expenses; Additional Documents.**   The Borrower will pay all taxes levied or assessed upon the principal sum of the advances made against the Lender, all fees of the Lender for its Lock-Box services and all other fees provided herein, and all expenses arising out of the preparation, amendment, waiver, modification, protection, collection and/or other enforcement of this Agreement, or any other Loan Document, or of any Collateral or security interest now or hereafter granted to secure the Loans or mortgage, security interest or lien, granted hereunder or under any other Loan Document (including, without limitation, attorneys' fees).   The Borrower will, from time to time, at its sole expense, execute and deliver to the Lender all such other and further instruments and documents, and take or cause to be taken all such other and further action as the Lender shall request in order to effect and confirm or vest more securely all rights contemplated by this Agreement or any other Loan Document.

**12.4   Addendums.**   Any Addendums that are attached hereto are and shall constitute a part of this Agreement.

**12.5   Governing Law; Consent to Jurisdiction.**   This Agreement, the other Loan Documents and the rights and obligations of the parties hereunder, and thereunder, shall be construed and interpreted in accordance with the laws of the State of Delaware, USA.   The Borrower agrees that the execution of this Agreement and the other Loan Documents, and the performance of the Borrower's obligations hereunder, and thereunder, shall be deemed to have a Delaware situs and the Borrower shall be subject to the personal jurisdiction of the courts of Delaware with respect to any action the Lender or its successors or assigns may commence hereunder or thereunder. Accordingly, the Borrower hereby specifically and irrevocably consents to the jurisdiction of the courts of Delaware with respect to all matters concerning this Agreement, the other Loan Documents, the Notes or the enforcement of any of the foregoing.

**12.6   Survival of Representations.**   All representations, warranties, covenants and agreements herein contained or made in writing in connection with this Agreement shall survive the execution and delivery of the Loan Documents and shall continue in full force and effect until all amounts payable on account of all Loans, the Loan Documents and this Agreement shall have been paid in full and this Agreement has been terminated.

**12.7   Integration; Severability; Successors.**   This Agreement is the final, complete and exclusive statement of the terms governing this Agreement.   If any provision of this Agreement shall to any extent be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Agreement shall not be affected.   The provisions of this Agreement shall bind the heirs, executors, administrators, assigns and successors of the Borrower and shall inure to the benefit of the Lender, its successors and assigns.

**12.8   Determinations as to Compliance.**   All documents and assurances of any type related to the fulfillment of any condition or compliance with any provision hereof or of any other Loan Document and all other matters related to the Loans are subject to the prior approval and satisfaction of the Lender, its counsel and other consultants.

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                    15

</div>

*BOC 37448230v3*

**12.9   Termination of this Agreement.**   This Agreement shall terminate upon the written agreement of the parties hereto to the termination of any privilege of the Borrower to take advances and/or full and final payment of all amounts with respect to all Loans or amounts otherwise due hereunder and under the other Loan Documents.

**12.10   Attorney's Fees.**   Lender shall be entitled to recover all reasonable attorney's fees and expenses incurred by it in connection with enforcement of this Loan Agreement, including costs of collection.

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                                                    16

BOC 37448230v3

IN WITNESS WHEREOF, the undersigned executes this Agreement as an instrument under seal as of the date first set forth above.

BORROWER:   **Justice Partners Law Group, LP, a District of Columbia limited partnership**

By: _____    Date: _____

_____         _____
Printed Name                             Title

LENDER:        **Justice Partners, LLC, a Delaware limited liability company**

By: _____    Date: _____

_____         _____
Printed Name                             Title

BOC 37448230v3

CONFIDENTIAL                                      Justice-Partners-Teh-000128

THIS NOTE HAS NOT BEEN THE SUBJECT OF REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE AND THE SAME HAS BEEN ISSUED IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THIS NOTE MAY NOT BE SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT AS PERMITTED UNDER SUCH SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

## SENIOR SECURED PROMISSORY NOTE

Commitment Amount: up to $45,000,000

_____, 2021
Original Issue Date

FOR VALUE RECEIVED, the undersigned, Justice Partners Law Group, a District of Columbia limited partnership with an address located at 1100 H Street NW, Suite 840, Washington, D.C., 20005 ( the "Borrower"), hereby promises to pay to the order of JUSTICE PARTNERS, LLC, a Delaware limited liability company with an address located at 20900 NE 30th Ave., Suite 510, Miami, Florida 33180 (the "Lender"), or at such other place as the Lender may from time to time designate in writing, in lawful currency of the United States of America, the principal sum of up to Forty-Five Million Dollars and 00/100 ($45,000,000.00) (the "**Principal Amount**"), in accordance with the provisions of this secured promissory note (this "**Note**").

    1.    Background. This Note is being issued on _____, 2021 (the "**Original Issue Date**") in connection with the execution of that certain Senior Secured Loan Agreement with the Borrower, dated as of the Original Issue Date, by and between the Borrower and the Lender (the "**Loan Agreement**").

    2.    Advances. This Note shall may be funded in one or more tranches from time to time in accordance with the terms and conditions contained in this Note, such that the Borrower shall be entitled to borrow from the Lender a principal amount or multiple principal amounts (each an "**Advance**" and collectively, the "**Advances**") to the extent that the sum of all unpaid Advances does not, at any time, exceed the Commitment Amount. The initial Advance shall be Two Hundred and Fifty Thousand U.S. Dollars (US$ 250,000.00). The Lender shall maintain an account on its books which shall evidence the outstanding principal balance of all Advances, Interest due and owing thereon and any fees and expenses due from time to time under this Note (the "**Loan Account**"). The Lender shall by appropriate entries debit to the Loan Account the amount of each Advance hereunder, together with all accrued Interest and any fees and expenses due hereunder, and credit to the Loan Account repayments of Advances and payments of Interest, fees and expenses made by the Borrower.

    3.    Security and Ranking. The obligations of the Borrower under this Note, including all fees, principal and interest payments due or becoming due under this Note, shall be secured

1

ACTIVE 54090108v2

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

obligations of the Borrower, to be secured by a first priority, perfected security interest in all of its assets of Borrower, including its interest in any Qualified Settlement Fund, and all distributions, cash and other property or proceeds from time to time received in respect thereof (the "**Collateral**") pursuant to the terms of security agreement (together with all documents evidencing, securing and/or otherwise executed and/or delivered in connection with the Loan (the "**Security Agreement**"). Reference is made to the Security Agreement for a description of the Collateral (as defined therein) and the rights and remedies of the Lender (or another holder) in respect thereof. This Note, the Security Agreement and any UCC financing statements and other documents, instruments and agreements evidencing, guaranteeing or securing this Note, and all written amendments, replacements or supplements to any of them, are collectively referred to as the "**Loan Documents**".   The Loan shall rank senior to all other indebtedness of the Borrower issued hereafter in both liquidation and distributions and the Borrower shall not be permitted to enter into any other secured debt obligations without the prior written consent of the Lender, in its sole and absolute discretion

4.     Maturity Date; Term.  This Note shall mature, and be due and payable on a date that is equal to the five-year anniversary from the date of the First Advance (the "**Maturity Date**") and shall be for a term commencing on the date hereof and ending on the Maturity Date (the "**Term**"), subject to two successive 12-month extensions, as applicable (the "**Final Maturity Date**"). Subject to the conditions set forth below, Borrower may extend the Initial Maturity Date for two separate 12-month periods (each, an "**Extension Period**"). Each Extension Period shall be subject to satisfaction of the following conditions: (i) notice is delivered to the Lender at least 90 days but not more than 120 days prior to the expiration of the Initial Maturity Date, or if extended, the expiration of the first Extension Period; (ii) no default or event of default exists on the date that the notice described in clause "(i)" is provided by the Borrower, or on the first day of the applicable Extension Period; and (iii) certain other conditions set forth in the Loan Agreement have been satisfied.

5.     Interest Rate.  Interest shall accrue on the unpaid principal balance of this Note at a rate equal to 18.0% per annum and payable on the Maturity Date.  Following the occurrence of an Event of Default, interest on the Loan shall be increased twenty-four percent (24%) (the "**Default Rate**").

6.     Payments of Principal Amount and Interest.  Any payments made pursuant to this Note shall be applied first toward any fees, expenses and costs due and then toward the Interest and finally toward the Principal Amount.  All payments of accrued but unpaid Interest and the Principal Amount are due, without notice on the Maturity Date.

7.     Prepayment.  The Loan may be pre-paid, in whole or in part, at any time by the Company.  Borrower shall pay all expenses of Lender in connection with any such prepayment.

8.     Procedures for Advances.

(a)     Subject to the terms and conditions of this Note, the Lender shall make Advances to the Borrower from time to time during the period from the Original Issuance Date to the day that is thirty (30) days prior to the Maturity Date up to an aggregate amount not to exceed at any time the Commitment Amount.  As long as the sum of all of the unpaid principal

2

amounts of the outstanding Advances does not exceed the Commitment Amount, the Borrower may borrow, repay and re-borrow principal amounts under this Note.

(b)  Whenever the Borrower desires the Lender to make an Advance hereunder, the Borrower shall deliver to the Lender a written notice requesting an Advance no later than 9:00 a.m. EST at least seven (7) days before the date on which the Borrower is requesting the Lender to make the Advance (such date, the "**Funding Date**").  Each such notice shall be duly executed by a duly authorized officer of the Borrower and shall specify the proposed Funding Date and the amount of the Advance requested.

(c)  In addition to the foregoing, the obligation of the Lender to make Advances hereunder shall be subject to fulfillment of the following conditions precedent on the date of such Advance:

(i)  There shall be no Event of Default (defined below) and no event which, with the passing of time or the giving of notice, would become an Event of Default; and

(ii)  The Lender shall have received such approvals, opinions or documents as the Lender may reasonably request.

9.  <u>Repayments and Prepayments.</u>

(a)  <u>Order.</u>  Any payments made pursuant to this Note shall be applied first toward any fees, expenses and costs due and then toward Interest due and finally toward the outstanding principal balance of the Advances.

(b)  <u>Optional Prepayment.</u>  The outstanding principal balance of any Advance may be prepaid in whole or in part at any time, without penalty or premium and without any prior written notice to the Lender before the Maturity Date; *provided*, that all accrued and unpaid Interest and any other charges accrued as of the date of prepayment are also paid in full.  Any prepayments shall not result in deferment or delay of the due date of any subsequent payment(s).

10.  <u>Success Fee.</u>  In addition to any other amounts payable pursuant to this Note, at the Maturity Date, the Borrower, in its sole discretion based upon its available funds, shall pay the Lender an amount equal to no less than fifty percent (50%) and up to one hundred percent (100%) of the amount of the funds in any Qualified Settlement Fund for the benefit of the Borrower (the "**Success Fee**").  Any payments due under this Note with respect to the Default Rate, shall be excluded from the calculation of the Success Fee.

11.  <u>Events of Default.</u>

(a)  <u>General.</u>  The occurrence of any one or more of the following events shall constitute an event of default (each, an "**Event of Default**") under this Note:

(i)  <u>Failure to Pay Principal Amount.</u>  The Borrower fails to pay the Principal Amount, Interest or other sum due under this Note when due; or

3

Justice-Partners-Teh-000131

(ii)     Breach of Covenant.   The Borrower breaches any covenant or other term or condition of this Note or any of the other Loan Documents in any respect and such breach, if subject to cure, continues for a period of ten (10) business days after written notice to the Borrower from the Lender.

(iii)    Representations and Warranties.   Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower in any of the Loan Documents shall be incorrect or misleading in any material respect when made or deemed made;

(iv)     Encumbrance Defects.   Any encumbrance of any kind created by any of the Loan Documents shall at any time fail to constitute a valid encumbrance on all of the Collateral purported to be subject thereto, securing the obligations purported to be secured thereby, or the Borrower shall so assert in writing, other than any such failure arising or resulting from any action or inaction on the part of the Lender;

(v)     Legal Action.   The Borrower or any Member of the Borrower (other than the Lender) shall file any claim or action against the Lender or any of its affiliates;

(vi)     Receiver or Trustee.   The Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee, or such a receiver or trustee shall otherwise be appointed;

(vii)    Judgments.   Any money judgment, writ or similar final process shall be entered or filed against the Borrower or any of its property or other assets for more than Fifty Thousand and 00/100 Dollars ($50,000.00), and shall remain unvacated, unbonded or unstayed for a period of forty-five (45) days; or

(viii)   Bankruptcy.   Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law or any law, or the issuance of any notice in relation to such event, for the relief of debtors shall be instituted by or against the Borrower, and if instituted against the Borrower, are not dismissed within forty-five (45) days of initiation.

(b)     Waiver of Events of Default.   The Lender may waive any Event of Default hereunder. Such waiver shall be evidenced by written notice or other document specifying the Event or Events of Default being waived.

12.    Remedies.

(a)     General.   In addition to all rights and remedies legally or equitably available to the Lender, including under the Security Agreement, upon the occurrence of any Event of Default, the Lender shall have the option, in its sole and absolute discretion, to declare all amounts due under this Note immediately due and payable in full, all without additional notice, presentment or right to cure the Event of Default, all of which hereby are expressly waived.

4

CONFIDENTIAL

with or without substitution, and to the release of any person or entity liable for the payment hereof; and

(i)    Additional Borrowers, Etc. Consent to the addition of any and all other makers, endorsers, guarantors, and other obligors for the payment hereof, and to the acceptance of any and all other security for the payment hereof, and agree that the addition of any such makers, endorsers, guarantors or other obligors, or security shall not affect the liability of the Borrower, any guarantor and all others now liable for all or any part of the obligations evidenced hereby

13.    Notices.    All notices, demands, requests, consents, approvals and other communications that may or are required to be given by either party to the other party hereunder shall be deemed to be sufficient if in writing and (i) delivered in person, (ii) delivered and received by facsimile, if a confirmatory mailing in accordance herewith is also made, (iii) duly sent by registered mail return receipt requested and postage prepaid, or (iv) duly sent by overnight delivery service, addressed to such party at the address set forth in the first paragraph of this Note. All notices, demands, requests, consents, approvals and other communications shall be deemed to have been received (i) at the same time it was personally delivered, (ii) on the receipt of delivery by facsimile if accompanied by a confirmatory mailing, (iii) five (5) days after mailing via registered mail return receipt requested whether signed for or not, to the foregoing persons at the addresses set forth above or (iv) the next day when sent by overnight delivery service.  The above shall constitute service despite rejection or other refusal to accept or inability to deliver because of changed address for which no notice has been received.

14.    Attorney Fees. If there is an Event of Default and an action is brought with respect to this Note, or in the event that this Note is collected in whole or in part by suit or through probate or bankruptcy proceedings, or other legal proceedings of any kind, the Borrower promises and agrees to pay, in addition to all the sums payable hereunder, the Lender's reasonable expenses and costs of collection, including without limitation reasonable attorneys' fees and disbursements, whether or not suit is brought and through all appeals.

15.    Lender Records Conclusive. The principal balance, Interest and other fees and expenses, each as noted on the Loan Account maintained by the Lender, shall be presumptive evidence of such outstanding principal balance, Interest and fees and expenses due under this Note. No failure by the Lender to make, and no error by the Lender in making, any annotation on the Loan Account shall affect the Borrower's obligation to pay the outstanding principal balance and Interest or any other obligation of the Borrower to the Lender pursuant to this Note.

16.    Legends.  It is understood that this Note (and any replacement thereof) shall bear the legend (in addition to any legends which may be required in the opinion of the Borrower's counsel by the securities laws of the state where the Lender is located) substantially as set forth on the first page of this Note.

17.    Invalidity of any Part. If any provision or part of any provision of this Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Note and this Note shall be construed as if such invalid, illegal or unenforceable provision or party hereof had never been contained herein, but only to the extent of if its invalidity, illegality or unenforceability.

6

CONFIDENTIAL

(b)     No Waiver. Failure to exercise the rights and remedies under Section 9(a) hereof in respect of any Event of Default shall not constitute a waiver of the right to exercise same with respect to such Event of Default or with respect to any subsequent Event of Default. No holder hereof shall, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by the holder hereof, and then only to the extent specifically set forth therein.

(c)     Cumulative.  The rights, remedies and powers of the holder hereof, as provided in this Note are cumulative and concurrent, and may be pursued singly, successively or together against the Borrower at the sole discretion of the holder hereof.

13.     Covenants and Waivers.  As a material inducement for the Lender to make Advances to the Borrower, the Borrower and all others who now or may at any time become liable for all or any part of the obligations evidenced hereby, expressly agree hereby to be jointly and severally bound, and jointly and severally:

(a)     No Distributions.  Agree not to make any distributions to its Members for as long as there remain any outstanding amounts, whether principal, Interest or other fees and expenses, under this Note;

(b)     No Amendments.  Agree not to amend, modify, alter or supplement the Operating Agreement or waive or consent to the waiver of any material provision of the Operating Agreement, without the prior written consent of the Borrower, which may be granted or withheld in the Borrower's sole discretion;

(c)     Certain Rights.  Waive and renounce any and all homestead, redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness evidenced by this Note or the Collateral or by any extension or renewal hereof;

(d)     Presentment.  Waive presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor, and notice of protest;

(e)     Notices.  Except as expressly provided herein, waive any and all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default, or enforcement of the payment hereof or hereunder;

(f)     Diligence or Delays.  Waive any and all lack of diligence and delays in the enforcement of the payment hereof;

(g)     Unconditional Obligation.  Agree that the liability of the Borrower, any guarantor, endorser or obligor shall be unconditional and without regard to the liability of any other person or entity for the payment hereof, and shall not in any manner be affected by any indulgence or forbearance granted or consented to by the Lender to any of them with respect hereto;

(h)     Extensions. Consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by the Lender with respect to the payment or other provisions hereof, and to the release of any security at any time given for the payment hereof, or any part thereof,

5

18.     Survival.  All agreements, representations and warranties made in this Note and in all the Other Agreements to be executed and delivered pursuant hereto shall survive the execution and delivery to the Lender of this Note and all other documents delivered hereunder or contemplated hereby, and shall continue in full force and effect so long as this Note remains outstanding, unperformed or unpaid.

19.     Construction; Governing Law.   All issues and questions concerning the construction, validity and interpretation of this Note and all matters pertaining hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

20.     **Consent to Jurisdiction.**  TO INDUCE THE LENDER TO ACCEPT THIS NOTE, THE BORROWER IRREVOCABLY AGREES THAT, SUBJECT TO THE LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS NOTE WILL BE LITIGATED IN COURTS HAVING SITUS IN WILMINGTON, DELAWARE.  THE BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN WILMINGTON, DELAWARE, WAIVES PERSONAL SERVICE OF PROCESS UPON THE BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE BORROWER AT THE ADDRESS STATED IN THE PREAMBLE  AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

21.     **Waiver of Jury Trial.**  THE BORROWER AND THE LENDER (BY ACCEPTANCE OF THIS NOTE), HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT OR INSTITUTED BY THE LENDER, THE BORROWER OR ANY SUCCESSOR OR ASSIGN OF THE LENDER OR THE BORROWER (a) UNDER THIS NOTE OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS NOTE OR (b) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.   THE BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

22.     Assignment.  This Note is not assignable or transferable by the Borrower except that Lender may assign this Note, the Security Agreement and all of the Loan Documents at any time.

<div align="center">7</div>

CONFIDENTIAL

Justice-Partners-Teh-000135

23. <u>Severability.</u>  In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

24. <u>Titles and Subtitles.</u>  The titles of the Sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

[*Signature Page Follows*]

8

CONFIDENTIAL

## SECURED PROMISSORY NOTE SIGNATURE PAGE

IN WITNESS WHEREOF, the Borrower has executed this secured promissory note as of the date first above written.

Justice Partners Law Group, LP
a District of Columbia limited partnership

By:_____ ____

*ACTIVE 54090108v2*

CONFIDENTIAL

Justice-Partners-Teh-000137

# Composite Exhibit 8

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT dated as of the date executed below between **Justice Partners, LLC** (the "**Lender**") a Delaware limited liability company with an address located at 20900 NE 30th Ave., Suite 510, Miami, Florida 33180, and **Justice Partners Law Group, LP** a District of Columbia limited partnership (the "**Borrowe**r") located at 1100 H Street NW, Suite 840, Washington, D.C., 20005.  In order to induce the Lender to advance money or grant other financial accommodations on one or more occasions to the undersigned Borrower, the undersigned Borrower represents, warrants, covenants to and agrees with the Lender as follows:

**1.     Definitions.**  For purposes of this Agreement, unless the context clearly requires otherwise, in addition to the terms defined elsewhere herein, the following terms shall have the meanings set forth below:

*Advances* means the Borrower's Advances with the Lender referred to in Section 2.1 infra.

*Affiliate* means any person and/or entity, which directly or indirectly controls, or is controlled by, or is under common control, with the Borrower.

*Agreement* means this Loan and Security Agreement.

*Collateral* means the Collateral described in Section 3, infra.

*Collateral Account* means the account of Borrower with the Lender established under Section 8.2 (c) infra.

*Control* shall be deemed to exist if any person, entity or corporation, or combination thereof, shall have possession, directly and/or indirectly, of the power to direct the management and/or policies of the Borrower or any person, entity, or corporation deemed to be an Affiliate of the Borrower, and shall be deemed to include any holder of 50% or more of any stock or other interest in the Borrower or in any person, entity or corporation deemed to be an Affiliate of the Borrower, whether such holding is direct or indirect.

*Deposit* means any deposits, credits, securities, interests, participations, shares, collateral or property of the Borrower at any time now or thereafter in the possession, custody, safekeeping or control of or in transit to the Bank, or any other holder for the purpose of securing Inventory financing of Borrower, and the proceeds thereof.

*Deposit Accounts* means all deposit accounts maintained by the Borrower with the Bank for the purpose of financing renovation, expansion, furniture and fixtures of Borrower, and the proceeds thereof.

*Events of Default* shall have the meaning given such term in Section 8 of this Agreement infra

*Indebtedness* means the total of all obligations of the Borrower to the Lender, whether current or long-term, including without limitation, guaranties, endorsements, or other arrangements whereby responsibility is assumed for the obligations of others.

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group
</div>

1

*BOC 37448230v3*

*Inventory* means all inventory, including, without limitation, all inventory in the possession of others or in transit, all goods held for sale or lease or to be furnished under contracts for service or which have been so furnished, and completed and unshipped merchandise, and all products and proceeds (including insurance and condemnation proceeds) of the foregoing, as defined by the Uniform Commercial Code of the State of Delaware, whether presently owned or hereafter acquired.

*Legal Requirements* means all applicable present and future statutes, laws, ordinances, rules and/or regulations of any governmental authority, all orders, writs, injunctions, decrees and judicial decisions and all covenants which bind or materially affect the Borrower or any part of its assets.

*Loan Account* means the accounting as to the Loans issued by the Lender pursuant to Section 2.2 infra.

*Loan Documents* means the following documents collectively: (i) This Agreement; (ii) Each Promissory Note of the Borrower to the Lender, including the Note (collectively the "Notes") evidencing the indebtedness for the Loan; (iii) a UCC-1 Financing Statement; (iv) all other documents and instruments heretofore or hereafter executed by the Borrower in favor of the Lender relating to the Loans, including any guaranty, pledge, security and/or subordination agreement and related Uniform Commercial Code financing statements; and (v) in each case, the term "Loan Documents" and any reference herein to any particular Loan Document shall mean and include all amendments, modifications, replacements, renewals or extensions of any and all such documents, whenever executed.

*Loans* means: (i) Advances evidenced by the Note; and (ii) Any other loans made by the Lender to the Borrower after the date of this Agreement.

*Maturity Date* means the fifth anniversary of the date of the first Advance, as may be extended. The Borrower shall have the option to extend the Maturity Date for two successive 12-month extensions, as applicable (the "**Final Maturity Date**").  Subject to the conditions set forth below, Borrower may extend the Initial Maturity Date for two separate 12-month periods (each, an "**Extension Period**").  Each Extension Period shall be subject to satisfaction of the following conditions:  (i) notice is delivered to the Lender at least 90 days but not more than 120 days prior to the expiration of the Initial Maturity Date, or if extended, the expiration of the first Extension Period; (ii) no default or event of default exists on the date that the notice described in clause "(i)" is provided by the Borrower, or on the first day of the applicable Extension Period; and (iii) certain other conditions set forth in the Loan Agreement have been satisfied.

*Note* means the Borrower's Senior Secured Promissory Note evidencing indebtedness for Advances of even date herewith.

*Obligations* means all liabilities, duties and/or obligations now or hereafter owing from the Borrower to the Lender of whatever kind or nature, whether or not currently contemplated at the time of this Agreement, whether such obligations be direct or indirect, absolute or contingent or due or to become due, including all obligations of the Borrower, actual or contingent, in respect to the letters of credit or Lender's acceptances issued by the Lender for the account of, or guaranteed

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group
</div>

2

BOC 37448230v3

by, the Borrower, including, without limitation all obligations of any partnership or joint venture as to which the Borrower is or may become, liable, which term shall include all accrued interest and/or all costs and expenses, including reasonable attorneys' fees, costs and expenses relating to the appraisal and/or valuation of assets and all reasonable costs and expenses incurred or paid by the Lender in exercising, preserving, defending, collecting, enforcing or protecting any of its rights under the Obligations or in any litigation arising out of the transactions evidenced by the Obligations.

*Required Permits* means all permits, licenses, approvals, consents and waivers necessary pursuant to any Legal Requirement to be obtained from, or made by, any governmental authority for the ownership by the Borrower of its assets or for the conduct of its business.

*Term* shall mean the date of execution through repayment of the Loan.

*Termination Date* shall mean the Maturity Date, at the end of the Term, subject to any extensions.

## 2.    Loans.

### 2.1    Advances.

(a)    Pursuant to this Agreement, and upon satisfaction of the conditions precedent in Section 5 hereof, during the period from the date hereof until the fifth anniversary of the date of the last Advance hereunder (as such date may be extended from time to time), the Lender may make Advances and the Borrower may borrow under this Agreement.

(b)    All Advances under this Agreement shall be evidenced by the Note, shall bear interest, and shall be due and payable in full on the Termination Date.

### 2.2    Loan Account.

(a)    The Lender shall maintain an accounting (the "Loan Account") on its books to record: (i) all Loans; (ii) all payments made by the Borrower; and (iii) all other appropriate debits and credits as provided in this Agreement with respect to the Obligations.  All entries in the Loan Account shall be made in accordance with the Lender's customary accounting practices as in effect from time to time.  Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Lender from or on behalf of Borrower, and the Borrower hereby irrevocably agrees that the Lender shall have the continuing exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default against the Obligations in such manner as the Lender may deem advisable.

(b)    The balance in the Loan Account, as set forth on the Lender's most recent printout or other written statement, shall be presumptive evidence of the amounts due and owing to the Lender by Borrower; provided, however, that any failure to so record or any error in so recording shall not affect the payment of the Obligations.  Any periodic statement prepared by the Lender setting forth the principal balance of the Loan Account and the calculation of interest due thereon shall be subject to subsequent adjustment by the Lender but shall, absent manifest errors or

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group                    3

</div>

*BOC 37448230v3*

omissions, be presumed final, conclusive and binding upon the Borrower, and shall constitute an account stated unless within thirty (30) days after receipt of such statement, the Borrower shall deliver to the Lender its written objection thereto specifying the error or errors, if any, contained in such statement.  In the absence of a written objection delivered to the Lender as set forth above, the Lender's statement of the Loan Account shall be presumptive evidence against the Borrower of the amount of the Obligations and the burden of proof to show manifest errors or omissions shall be on the Borrower.

**3.     Grant of Security Interest; Obligations Secured.**  The Borrower hereby grants to the Lender a senior security interest in all of the Borrower's present and future right, title and interest in all of its assets, including but not limited to its interest in any Qualified Settlement Fund, and all distributions, cash and other property or proceeds from time to time received in respect thereof, furniture and fixtures, inventory, deposit accounts and reserve bank accounts, lease reserve accounts, and secured accounts receivable wherever located and whether now existing or hereafter created or arising, collectively called the "**Collateral**."  The security interest in the Collateral granted herein is to secure the payment and performance of the Obligations.  Lender is hereby authorized by Borrower to file any and all documents with the appropriate authorities as necessary to authenticate and/or perfect the security interests granted herein.

**4.     Representations and Warranties.**  The Borrower hereby represents and warrants to the Lender (which representations and warranties will survive the delivery of this Agreement and the making of any advances of any Loan and shall be deemed to be continuing until all Loans are fully paid and this Agreement is terminated) that:

(a)     (i) The Borrower is, and will continue to be, duly organized and validly existing; the Borrower is in good standing under the laws of the State of incorporation thereof; (ii) the Borrower is qualified and in good standing to do business in all other jurisdictions in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary; (iii) the Borrower has the power to execute and deliver this Agreement and each Loan Document and to borrow hereunder; and (iv) the Borrower has all Required Permits, without unusual restrictions or limitations, to own, operate and lease its properties and to conduct the business in which it is presently engaged, all of which are in full force and effect.

(b)     The making and performance by the Borrower of this Agreement and the Loan Documents have been authorized by all necessary corporate action by its Board of Directors.  The execution and delivery of this Agreement and the other Loan Documents, the consummation of the transactions herein and therein contemplated, the fulfillment of or compliance with the terms and provisions hereof and thereof, (i) are within its powers, (ii) will not violate any provision of law or of its organizational documents, or (iii) will not result in the breach of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of the Borrower pursuant to any indenture or Lender loan or credit agreement (other than pursuant to this Agreement and the other Loan Documents) or other agreement or instrument to which the Borrower is a party.  To the Borrower's knowledge, no approval, authorization, consent or other order or registration or filing with any governmental body is required in connection with the making and performance of this Agreement.

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                                    4

*BOC 37448230v3*

(c)      Subject to any limitations stated therein or in connection therewith, all information furnished, or to be furnished, by the Borrower pursuant to the terms hereof is, or will be at the time the same is furnished, accurate and complete in all material respects necessary to make the information furnished, in the light of the circumstances under which such information is furnished, not misleading.

(d)      The Borrower is in material compliance with all Legal Requirements applicable to it, its property or the conduct of its business, including, without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment.

(e)      No proceedings by or before any private, public or governmental body, agency or authority and no litigation is pending, or, so far as is known to the Borrower, its officers or directors, or threatened against the Borrower, except such as are disclosed in any addendums attached hereto.

(f)      No Event of Default has occurred and no event has occurred, or is continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice specified therein, would constitute such an Event of Default.

(g)      The Borrower agrees that the proceeds of Loan shall only be used in connection for general working capital purposes and to fund mass tort litigation expenses.  It is understood that no portion of the Loan shall be used to pay an interest due or payable under this Agreement.

(h)      This Agreement and all other Loan Documents, upon the execution and delivery thereof, will be legal, valid, binding and enforceable obligations of the Borrower as the case may be, in accordance with the terms of each; provided, however, that the Borrower's representation as to enforceability is qualified to the extent that enforcement of the rights and remedies created by this Agreement and the Loan Documents may be subject to applicable bankruptcy, insolvency, reorganization or similar laws affecting the rights of creditors and secured parties generally, and does not apply with respect to the availability of the remedy of specific performance, injunctive relief or any other equitable remedy.

(i)      The Borrower has good and marketable title to its properties and assets, including all of the Collateral, subject to no mortgage, pledge, lien, security interest, encumbrance or other charge which is not set forth in any addendums attached hereto.

(j)      The Borrower has filed all tax returns and reports required to be filed by it with all federal, state or local authorities and has paid in full, or made adequate provision for the payment of, all taxes, interest, penalties, assessments or deficiencies shown to be due or claimed to be due on or in respect of such tax returns and reports.

(k)      The Borrower conducts its business solely in its own name without the use of a trade name or the intervention of, or through, any other entity of any kind, other than as disclosed on any addendums attached hereto.  All books and records relating to the assets of the Borrower are located at the Borrower's chief executive office and its other places and locations where its assets are located.

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                    5

BOC 37448230v3

CONFIDENTIAL                                                        Justice-Partners-Teh000388

(l)     The Borrower and any of the Borrower's tenants have not given, nor have they received, any notice that: (i) there has been a release, or there is a threat of release, of toxic substances, oil or hazardous wastes on or from any real property owned or operated by the Borrower; (ii) the Borrower or any tenants may be, or is, liable for the costs of cleaning up or responding to a release of any toxic substances, oil or hazardous wastes; or (iii) any of such real property is subject to a lien for any liability arising from costs incurred in response to a release of toxic substances, oil or hazardous wastes.

**5.     Conditions Precedent.**

**5.1     Conditions to Initial Advance.**  In addition to any other conditions contained in this Agreement, the initial advance shall be subject to the following conditions precedent:

(a)     *Proof of Action*.  The Lender shall have received such documents evidencing the Borrower's power to execute and deliver this Agreement and the other Loan Documents as the Lender or its counsel shall request.

(b)     *The Notes and Loan Documents*.  The Borrower shall have delivered to the Lender the Notes, this Agreement, and the other Loan Documents and such other documents as the Lender may request.

(c)     *Liens to be Discharged*.  The Lender shall be satisfied with arrangements made to pay, discharge and terminate debt owed, and security interests granted by, the Borrower to non-permitted debt and security interest holders.

**5.2     Conditions to Every Advance.**  In addition to all other conditions contained in this Agreement, every advance shall be subject to the following conditions precedent that:

(a)     *No Event of Default*.  No Event of Default has occurred and no event shall have occurred, or be continuing, which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice as specified therein, would constitute an Event of Default.

(b)     *No Material Adverse Change*.  There shall have been no material adverse change (as determined by the Lender in its sole discretion) in the assets, liabilities, financial condition or business of the Borrower since the date of any financial statements delivered to the Lender before or after the date of this Agreement.

(c)     *Representations and Warranties*.  That the representations and warranties contained in Section 4 hereof and in each other Loan Document shall be true and correct in all material respects.  Any request for a borrowing shall be deemed a certification by the Borrower as to the truth and accuracy in all material respects of the representations and warranties contained in Section 4 infra and in each other Loan Document as of the date of such request.

**6.     Affirmative Covenants.**  The Borrower covenants and agrees that from the date hereof until payment in full of all Loans and the performance of all Borrower's obligations hereunder, and under all other Loan Documents, is complete and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall:

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group                6

</div>

BOC 37448230v3

(a)     Comply with all terms and conditions of this Agreement and the other Loan Documents and pay all material debts of the Borrower before the same shall become delinquent.

(b)     The Borrower shall deliver to the Lender: (i) within 30 days after the close of each fiscal year, a balance sheet of the Borrower as of the close of each fiscal year and statements of income and retained earnings for that portion of the fiscal year-to-date then ended, prepared in conformity with GAAP; (ii)(1) within 90 days after the close of each fiscal year of the Borrower, in accountant-prepared draft form, and (2) within 30 days of completion, in final, unaudited accountant reviewed form, financial statements ("Financial Statements"), including, a balance sheet as of the close of such year and statements of income and retained earnings and cash flows for the year then ended, prepared in conformity with GAAP, applied on a basis consistent with that of the preceding year or containing disclosure of the effect on financial position or results of operations of any change in the application of accounting principles during the year; (iii) the other financial reports, if any, delivered to the owners of the Borrower, and upon request, such other information about the financial condition, business and operations of the Borrower, as the Lender may from time to time, reasonably request; and (iv) promptly upon becoming aware of any Event of Default, or any event which with the giving of notice or the passage of time would constitute an Event of Default, notice thereof, in writing.  The Lender may modify or waive the performance of this section (b) in its sole discretion.

(c)     (i) Keep its properties insured against fire and other hazards (so called "All Risk" coverage) in amounts and with companies satisfactory to the Lender to the same extent and covering such risks as is customary in the same or a similar business, but in no event in an amount less than the full insurable value thereof, which policies shall name the Lender as additional insured as its interest may appear, (ii) maintain public liability coverage against claims for personal injuries or death, and (iii) maintain all worker's compensation, employment or similar insurance as may be required by applicable law.  Such All Risk property insurance coverage shall provide for a minimum of 30 days' written notice to the Lender of cancellation or modification.  The Borrower agrees to deliver copies of all of the aforesaid insurance policies to the Lender.  In the event of any loss or damage to any of its assets, including any collateral securing any Loan, the Borrower shall give prompt written notice to the Lender and to Borrower's insurers of such loss or damage and shall promptly file proofs of loss with said insurers.

(d)     Comply with all Legal Requirements, including without limitation, those pertaining to or concerning the employment of labor, employee benefits, public health, safety and the environment.  The Borrower shall pay all taxes, assessments, governmental charges or levies, or claims for labor, supplies, rent and other obligations made against the Borrower or any of its properties which, if unpaid, might become a lien or charge against it or any of its properties, except liabilities being contested in good faith with the prior written consent of the Lender and against which, if requested by the Lender, the Borrower shall maintain reserves in amount and in form (book, cash, bond or otherwise) satisfactory to the Lender.

(e)     Maintain its chief executive office, principal places of business and locations of assets at the locations set forth in this Agreement.  The Borrower shall promptly give the Lender written notice of any change in any of such addresses.  All business records of the Borrower,

CONFIDENTIAL                                                                 Justice-Partners-Teh000390

including those pertaining to all Collateral, shall be kept at the said chief executive office of the Borrower, unless prior written consent of the Lender is obtained to a change of location.

(f)     Allow the Lender, by or through any of its officers, agents, attorneys, or accountants designated by it, for the purpose of ascertaining whether or not each and every provision hereof and of any other Loan Document is being performed and for the purpose of examining and appraising the assets of the Borrower and the records relating thereto, to enter the offices of the Borrower to examine or inspect any of the properties, books and records or extracts therefrom and to make copies thereof and to discuss the affairs, finances and accounts thereof with the Borrower and its accountants, at such reasonable times with advance notice to Borrower and as often as the Lender may reasonably determine The Borrower will reimburse the Lender for all costs associated with its examination, appraisals and audits.

(g)     Promptly advise the Lender of the commencement, or threat of litigation, including arbitration proceedings and any proceedings before any governmental agency, which might have a material adverse effect upon the assets, liabilities, financial condition or business of the Borrower.

(h)     Promptly notify the Lender in writing of (i) any enforcement, cleanup, removal or other action instituted or threatened against the Borrower by any federal, state, county or municipal authority or agency pursuant to any public health, safety or environmental laws, rules, ordinances and regulations, (ii) any and all claims made or threatened by any third party against the Borrower or any real property owned or operated by any of them relating to the existence of, or damage, loss or injury from any toxic substances, oil or hazardous wastes or any other conditions constituting actual or potential violations of such laws, rules, ordinances or regulations and (iii) any enforcement or compliance action, instituted or threatened or claim made or threatened by any federal or state authority relating to the employment of labor or employee benefits.

(i)     Continue to conduct the business of the Borrower as presently conducted, maintain its existence and maintain its properties in good repair, working order and operating condition. The Borrower shall promptly notify the Lender of any event causing material loss or unusual depreciation in the value of the business assets of the Borrower and the amount of same.

(j)     The Borrower will notify the Lender promptly upon Borrower's entry into any transaction with any federal, state or local governmental entity which would give rise to an account receivable which would be subject to the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement (herein a "Government Account") and the Borrower will execute all such instruments and take all such action as may be reasonably requested by the Lender so that all moneys due, or to become due, thereunder will be effectively assigned to the Lender and notice thereof given to such account debtor in accordance with the Federal Assignment of Claims Act, or any other comparable federal, state or local legal requirement.

(k)     (i) The Borrower will keep the Collateral in good order and repair, will not waste or destroy the Collateral or any part thereof and will not knowingly use the Collateral in violation of any applicable Legal Requirement or any policy of insurance thereon.  The Borrower will notify the Lender in writing promptly upon its learning of any event, condition, loss, damage, litigation,

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group                                    8

</div>

BOC 37448230v3

CONFIDENTIAL                                                           Justice-Partners-Teh000391

administrative proceeding or other circumstance which may materially and adversely affect the assets, liabilities, financial condition or business of the Borrower or the Lender's security interest in the Collateral.  In the event that the Lender shall reasonably determine that there has been any loss, damage or material diminution in the value of the Collateral, the Borrower will, whenever the Lender requests, pay to the Lender such amount as the Lender shall have reasonably determined represents such loss, damage or material diminution in value (any such payment not to affect the Lender's security interest in such Collateral).  (ii) Without limiting the generality of the foregoing, the Borrower shall notify the Lender promptly of any claim or dispute that may materially affect the value of the Borrower's Accounts.

(l)     The Borrower will, at such intervals as the Lender may request, notify the Lender, in a form satisfactory to the Lender, of all Collateral which has come into existence since the date hereof or the date of the last such notification, whichever is later.

(m)     At its option, but without obligation to do so, the Lender may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral; may place and pay for insurance on the Collateral; may order and pay for the repair, maintenance and preservation of the Collateral; and may pay any fees for filing or recording such instruments or documents as may be necessary or desirable to perfect the security interest granted herein.  The Borrower agrees to reimburse the Lender on demand for any payment made, or any expense incurred, by the Lender pursuant to the foregoing authorization, and all such payments and expenses shall constitute part of the principal amount of Obligations hereby secured and shall bear interest at the highest rate payable on the Obligations of the Borrower to the Lender.

**7.     Negative Covenants.**  The Borrower covenants and agrees that until payment is made in full on all Loans, the performance of all Borrower's obligations hereunder and under all other Loan Documents is complete, and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall not directly or indirectly:

(a)     Incur or permit to exist any lien, mortgage, security interest, pledge, charge or other encumbrance against any of the Collateral, whether now owned or hereafter acquired, except: (i) liens in favor of the Lender required by this Agreement and/or any other Loan Document; (ii) tax liens which are being contested in good faith; (iii) liens, mortgages, security interests, pledges, charges or other encumbrances in favor of the Lender or specifically permitted, in writing, by the Lender; and (iv) liens and mortgages already disclosed herein.

(b)     Sell, lease, pledge, transfer or otherwise dispose of all or any of its assets (other than the disposition of inventory in the ordinary course of its business as presently conducted, or the sale of obsolete equipment or equipment no longer usable in the conduct of the Borrower's business), whether now owned or hereafter acquired except for liens or encumbrances required or permitted hereby or by any Loan Document.

(c)     Make or consent to a material change in the ownership or capital structure of the Borrower, or make a material change in the nature of the business or the management of the Borrower or in the manner in which the business of the Borrower is conducted.

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group                    9
</div>

*BOC 37448230v3*

CONFIDENTIAL                                                    Justice-Partners-Teh000392

(d)     Impair the Collateral as determined in the sole discretion of the Lender.

(e)     Enter into or effect any merger, other corporate reorganization, change of control of the Borrower, sale of the Borrower, or any other transaction in which all or substantially all of the assets of the Borrower are sold, transferred, licensed or otherwise disposed of.

(f)     Revocation/lapse of licensure of any of the principals of Borrower.

(g)     Any Event of Default under and as defined in any of the Loan Documents.

(h)     Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any capital stock or equity of any party to any Loan Document, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any party to any Loan Document (a "Restricted Payment"), unless after payment such Restricted Payment, the aggregate fair market value of the Collateral shall exceed 100% of the value of the outstanding principal balance of the Loan plus all accrued unpaid interest thereon.

## 8.     Events of Default; Remedies.

**8.1     Events of Default.**  The occurrence of any of the following events, for any reason whatsoever, shall constitute an "Event of Default" hereunder:

(a)     (i) Failure to make due payment of principal and/or interest on any Loan provided such failure continues for a period of five (5) business days or (ii) failure by the Borrower, or any Affiliate, to make due payment of any other liability or obligation owing by the Borrower, or any Affiliate, to the Lender, now existing or hereafter incurred, whether direct or contingent (herein, "Other Lender Debt"), provided such failure continues for a period of five (5) business days; or

(b)     Failure by the Borrower to observe or perform any covenant contained in (i) this Agreement, or any of their respective obligations under any other Loan Document or (ii) any document or instrument evidencing, securing or otherwise relating to any Other Lender Debt provided that if said failure is curable, it continues for a period of ten (10) days; or

(c)     Any representation or warranty made by the Borrower to the Lender or any statement, certificate or other data furnished by any of them in connection herewith or with any other Loan Document proves at any time to be incorrect in any material respect; or

(d)     A judgment or judgments for the payment of money shall be rendered against the Borrower, which shall remain unsatisfied and in effect for a period of sixty (60) days without a stay of execution; or

(e)     Any levy, seizure, attachment, execution or similar process shall be issued or levied on any of the Borrower's property, which process could have a material adverse effect on the business of the Borrower in the Lender's reasonable judgment; or

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group                    10

</div>

CONFIDENTIAL                                        Justice-Partners-Teh000393

(f)    The Borrower shall (i) apply for or consent to the appointment of a receiver, conservator, trustee or liquidator of all or a substantial part of any of its assets; (ii) be unable, or admit in writing its inability, to pay its debts as they mature; (iii) file or permit the filing of any petition, case, arrangement, reorganization, or the like under any insolvency or Bankruptcy law, or the adjudication of it as Bankrupt, or the making of an assignment for the benefit of creditors or the consenting to any form of arrangement for the satisfaction, settlement or delay of debt or the appointment of a receiver for all or any part of its properties; or (iv) take any action for the purpose of effecting any of the foregoing; or

(g)    An order, judgment or decree shall be entered, or a case shall be commenced, against the Borrower, without the application, approval or consent of the Borrower by, or in, any court of competent jurisdiction, approving a petition or permitting the commencement of a case seeking reorganization or liquidation of the Borrower or appointing a receiver, trustee, conservator or liquidator of the Borrower, or of all or a substantial part of its assets and the Borrower, by any act, indicates its approval thereof, consent thereto, or acquiescence therein, or, in any event, such order, judgment, decree or case shall continue unstayed, or undismissed, and in effect for any period of ninety (90) consecutive days; or

(h)    The Borrower shall dissolve or liquidate, or be dissolved or liquidated, or cease to exist legally, or merge or consolidate with, or be merged or consolidated with or into any other entity; or

(i)    Failure by the Borrower to pay or perform any other Obligation, whether contingent or otherwise, or if any such other Obligation shall be accelerated, or if there exists any event of default under any instrument, document or agreement governing, evidencing or securing such other Obligation; or

(j)    The Lender reasonably believes that any material adverse change in the assets, liabilities, financial condition or business of the Borrower has occurred since the date before or after the date of this Agreement; or

(k)    The Borrower sells, liquidates, transfers or otherwise disposes of an asset not in strict accordance with the terms of this Loan Agreement; or

(l)    If at any time the Lender reasonably believes in good faith that the prospect of payment of any Obligation or the performance of any agreement of the Borrower is materially impaired, or that there is such a change in the assets, liabilities, financial condition or business of the Borrower as the Lender believes in good faith materially impairs the Lender's security or increases its risk of non-collection; or the Borrower fails to create the required number of direct or indirect jobs (as specified in the Economic Analysis of the Project) to cover any Advance.

## 8.2    Remedies.

(a)    Upon the occurrence of any Event of Default, and at any time thereafter, the availability of advances hereunder shall, at the option of the Lender, be deemed to be automatically terminated and the Lender, at its option, may declare one or more, or all, of the Loans outstanding hereunder, together with accrued interest thereon and all applicable late charges and surcharges

*BOC 37448230v3*

CONFIDENTIAL                                                      Justice-Partners-Teh000394

and all other liabilities and obligations of the Borrower to the Lender, to be forthwith due and payable, whereupon the same shall become forthwith due and payable; all of the foregoing without presentment or demand for payment, notice of non-payment, protest or any other notice or demand of any kind, all of which are expressly waived by the Borrower.

(b)     The Lender shall have the following additional rights and remedies:

(i)     All of the rights and remedies of a secured party under the Uniform Commercial Code or any other applicable law or at equity, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by law, in addition to any other rights and remedies contained in this Agreement, any other Loan Document or in any document, instrument or agreement evidencing, governing or securing the Obligations.

(ii)     The right to (1) take possession of the Collateral, without resort to legal process and without prior notice to Borrower, and for that purpose Borrower hereby irrevocably appoints the Lender its attorney-in-fact to enter upon any premises on which the Collateral or any part thereof may be situated and remove the Collateral therefrom, or (2) require the Borrower to assemble the Collateral and make it available to the Lender in a place to be designated by the Lender, in its sole discretion, or (3) instruct the Bank, without further consent of Borrower, to transfer the balance of all deposit accounts of Borrower to Lender and to thereafter treat Lender as the owner of such deposit accounts and the Bank's customer with respect to such deposit account.  The Borrower shall make available to the Lender all premises, locations and facilities necessary for the Lender's taking possession of the Collateral or for removing or putting the Collateral in saleable form.

(iii)     The right to sell or otherwise dispose of all or any part of the Collateral by one or more public or private sales.  The Lender will give the Borrower at least five (5) business days' prior written notice of the time and place of any public sale thereof, or of the time after which any private sale or any other intended disposition (which may include, without limitation, a public sale or lease of all or part of the Collateral) is to be made.  The Borrower agrees that five (5) business days is a reasonable time for any such notice.  The Lender, its employees, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is subject to widely distributed standard price quotations.  Any public or private sale shall be free from any right of redemption, which the Borrower hereby waives and releases.  If there is a deficiency after such sale and the application of the net proceeds from such sale, the Borrower shall be responsible for the same, with interest.

(iv)     The right, after an Event of Default shall have occurred (and Borrower irrevocably appoints the Lender as attorney-in-fact for the Borrower for this purpose, such appointment being coupled with an interest), upon notice to Borrower and without resort to legal process, to notify the persons liable for payment of all accounts (as defined in the Uniform Commercial Code) at any time and direct such persons to make payments directly to the Lender, and to perform all acts the Borrower could take to collect on such accounts,

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                    12

BOC 37448230v3

including, without limitation, the right to notify postal authorities to change the address for delivery, open mail, endorse checks, bring collection suits, and realize upon Collateral securing such accounts.  At the Lender's request, all bills and statements sent by the Borrower to the persons liable for payments of such accounts shall state that they have been assigned to, and are solely payable to, the Lender, and Borrower shall direct persons liable for the payment of such accounts to pay directly to the Lender any sums due or to become due on account thereof.

(v)     The right from and after an Event of Default, from time to time without demand or notice, and without being required to look first to any other Collateral to apply and set off any or all of the Deposits against any and all Obligations even though such Obligations are unmatured.

(c)     Collateral Account.  Upon an Event of Default:

(i)     The Borrower shall direct each of its creditors and/or customers that all payments or other distributions of whatever kind made to the Borrower shall be made to a post office box designated by the Lender (the "**Lock Box**").  The Lender shall have sole access to the Lock Box, and is hereby authorized by the Borrower to open all mail addressed to the Lock Box, and to apply all proceeds received therein, as herein provided. If Borrower should receive itself any such payments, the Borrower shall hold all such collections in trust for the Lender without commingling the same with other funds of the Borrower and will promptly, on the day of receipt thereof, transmit such collections to the Lender in the identical form in which they were received by the Borrower, with such endorsements as may be appropriate, accompanied by a report, in a form approved by the Lender, showing the amount of such collections and such other information as the Lender may require.

(ii)     All collections in the form of cash, checks or other demand remittances so received by, or transmitted to, the Lender shall upon receipt by the Lender be credited to the Collateral Account established hereunder.  Each such credit shall be conditional upon final payment to the Lender of all items giving rise to such credit, and, if any item is not so paid, the credit for such item shall be reversed whether or not the item has been returned and the amount thereof, in the Lender's discretion may be charged to any operating account of Borrower with the Lender.  All collections in the form of notes, drafts, acceptances or other instruments not payable on demand shall be delivered by the Borrower to the Lender. When such items are collected, the amount thereof shall be credited by the Lender to the Collateral Account, with appropriate notice to the Borrower.  Until such items are collected, the Borrower will not, without the consent of the Lender, make any entry on its books or records indicating that the same were received in payment of the receivable giving rise thereto.

(iii)     At such intervals as the Lender may deem appropriate, the Lender shall charge and apply the full amount then on deposit in the Collateral Account in reduction or payment of Borrower's Loan Account, such application to be subject to the final payment in cash of all items theretofore credited to such Collateral Account.

<div align="center">

LOAN AND SECURITY AGREEMENT
Justice Partners Law Group                    13

</div>

BOC 37448230v3

CONFIDENTIAL                                                      Justice-Partners-Teh000396

**9.      Lien and Set Off.**  The Borrower hereby gives the Lender a lien and right of set off for all of Borrower's liabilities and obligations to the Lender upon and against all Collateral now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to it.

**10.     Audit Rights.** At any time during the term of the Loan, the Lender shall have the right to audit the books and records of the Borrower upon prior written notice to the Borrower in accordance with procedures to be set forth in the Loan Documents.

**11.     Non-Recourse.**  No recourse shall be had to Borrower for payment of principal and interest under the Loan Documents, and Lender shall look solely to the Collateral as security for payment of principal and interest due under the Note and other Loan Documents.  In no event shall Borrower be held personally liable for any payment of principal or interest under the Note and other Loan Documents or for any Event of Default.

**12.     Miscellaneous.**

**12.1    Certain Waivers.**  Borrower hereby waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of dishonor, and hereby agrees to any extension or delay in the time for payment or enforcement, to renewal of any Loan and to any substitution or release of any Collateral, all without notice and without any effect on their liabilities.  Any delay on the part of the Lender in exercising any right hereunder, or under any other Loan Document which may secure any Loan, shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of a subsequent default.  The Lender may revoke any permission or waiver previously granted to Borrower, such revocation to be effective prospectively when given, whether given orally or in writing.  The rights and remedies of the Lender shall be cumulative and not in the alternative, and shall include all rights and remedies granted herein, in any other Loan Document and under all applicable laws.

LENDER AND BORROWER IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER OR BORROWER IN RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER LOAN DOCUMENT.

BORROWER (i) ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION AND (ii) TO THE EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVES ANY RIGHT TO PRIOR NOTICE OF, AND A HEARING ON, THE RIGHT OF ANY HOLDER OF THE NOTES, TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OF ANY OF THEIR PROPERTY, AT ANY TIME PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS AGREEMENT.

**12.2    Notices.**  All notices, requests or demands to or upon a party to this Agreement shall be given or made by the other party hereto in writing, in person or by depositing in the mail, postage prepaid, return receipt requested, addressed to the addressee at the address set forth herein as the

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group                    14

</div>

*BOC 37448230v3*

Borrower's chief executive office or to such other addresses as such addressee may have designated in writing to the other party hereto.

**12.3     Expenses; Additional Documents.**   The Borrower will pay all taxes levied or assessed upon the principal sum of the advances made against the Lender, all fees of the Lender for its Lock-Box services and all other fees provided herein, and all expenses arising out of the preparation, amendment, waiver, modification, protection, collection and/or other enforcement of this Agreement, or any other Loan Document, or of any Collateral or security interest now or hereafter granted to secure the Loans or mortgage, security interest or lien, granted hereunder or under any other Loan Document (including, without limitation, attorneys' fees).  The Borrower will, from time to time, at its sole expense, execute and deliver to the Lender all such other and further instruments and documents, and take or cause to be taken all such other and further action as the Lender shall request in order to effect and confirm or vest more securely all rights contemplated by this Agreement or any other Loan Document.

**12.4     Addendums.**  Any Addendums that are attached hereto are and shall constitute a part of this Agreement.

**12.5     Governing Law; Consent to Jurisdiction.**  This Agreement, the other Loan Documents and the rights and obligations of the parties hereunder, and thereunder, shall be construed and interpreted in accordance with the laws of the State of Delaware, USA.  The Borrower agrees that the execution of this Agreement and the other Loan Documents, and the performance of the Borrower's obligations hereunder, and thereunder, shall be deemed to have a Delaware situs and the Borrower shall be subject to the personal jurisdiction of the courts of Delaware with respect to any action the Lender or its successors or assigns may commence hereunder or thereunder. Accordingly, the Borrower hereby specifically and irrevocably consents to the jurisdiction of the courts of Delaware with respect to all matters concerning this Agreement, the other Loan Documents, the Notes or the enforcement of any of the foregoing.

**12.6     Survival of Representations.**  All representations, warranties, covenants and agreements herein contained or made in writing in connection with this Agreement shall survive the execution and delivery of the Loan Documents and shall continue in full force and effect until all amounts payable on account of all Loans, the Loan Documents and this Agreement shall have been paid in full and this Agreement has been terminated.

**12.7     Integration; Severability; Successors.**   This Agreement is the final, complete and exclusive statement of the terms governing this Agreement.  If any provision of this Agreement shall to any extent be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Agreement shall not be affected.  The provisions of this Agreement shall bind the heirs, executors, administrators, assigns and successors of the Borrower and shall inure to the benefit of the Lender, its successors and assigns.

**12.8     Determinations as to Compliance.**  All documents and assurances of any type related to the fulfillment of any condition or compliance with any provision hereof or of any other Loan Document and all other matters related to the Loans are subject to the prior approval and satisfaction of the Lender, its counsel and other consultants.

<div align="center">

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group                                  15

</div>

BOC 37448230v3

CONFIDENTIAL                                                  Justice-Partners-Teh000398

**12.9     Termination of this Agreement.**  This Agreement shall terminate upon the written agreement of the parties hereto to the termination of any privilege of the Borrower to take advances and/or full and final payment of all amounts with respect to all Loans or amounts otherwise due hereunder and under the other Loan Documents.

**12.10   Attorney's Fees.**  Lender shall be entitled to recover all reasonable attorney's fees and expenses incurred by it in connection with enforcement of this Loan Agreement, including costs of collection.

LOAN AND SECURITY AGREEMENT

Justice Partners Law Group

16

BOC 37448230v3

IN WITNESS WHEREOF, the undersigned executes this Agreement as an instrument under seal as of the date first set forth above.

BORROWER:   **Justice Partners Law Group, LP, a District of Columbia limited partnership**

By: _____

Printed Name

Date: _____

Title

LENDER:   **Justice Partners, LLC, a Delaware limited liability company**

By: _____

Printed Name

Date: _____

Title

*BOC 37448230v3*

CONFIDENTIAL

Justice-Partners-Teh000400

**THIS NOTE HAS NOT BEEN THE SUBJECT OF REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE AND THE SAME HAS BEEN ISSUED IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THIS NOTE MAY NOT BE SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT AS PERMITTED UNDER SUCH SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.**

## SENIOR SECURED PROMISSORY NOTE

Commitment Amount:  up to $45,000,000 \_\_\_\_\_, 2021
Original Issue Date

**FOR VALUE RECEIVED**, the undersigned, Justice Partners Law Group, a District of Columbia limited partnership with an address located at 1100 H Street NW, Suite 840, Washington, D.C., 20005 ( the "Borrower"), hereby promises to pay to the order of JUSTICE PARTNERS, LLC, a Delaware limited liability company with an address located at 20900 NE 30th Ave., Suite 510, Miami, Florida 33180 (the "**Lender**"), or at such other place as the Lender may from time to time designate in writing, in lawful currency of the United States of America, the principal sum of up to Forty-Five Million Dollars and 00/100 ($45,000,000.00) (the "**Principal Amount**"), in accordance with the provisions of this secured promissory note (this "**Note**").

1.      Background.  This Note is being issued on _____, 2021 (the "**Original Issue Date**") in connection with the execution of that certain Senior Secured Loan Agreement with the Borrower, dated as of the Original Issue Date, by and between the Borrower and the Lender (the "**Loan Agreement**").

2.      Advances.  This Note shall may be funded in one or more tranches from time to time in accordance with the terms and conditions contained in this Note, such that the Borrower shall be entitled to borrow from the Lender a principal amount or multiple principal amounts (each an "**Advance**" and collectively, the "**Advances**") to the extent that the sum of all unpaid Advances does not, at any time, exceed the Commitment Amount.  The initial Advance shall be Two Hundred and Fifty Thousand U.S. Dollars (US$ 250,000.00).  The Lender shall maintain an account on its books which shall evidence the outstanding principal balance of all Advances, Interest due and owing thereon and any fees and expenses due from time to time under this Note (the "**Loan Account**").  The Lender shall by appropriate entries debit to the Loan Account the amount of each Advance hereunder, together with all accrued Interest and any fees and expenses due hereunder, and credit to the Loan Account repayments of Advances and payments of Interest, fees and expenses made by the Borrower.

3.      Security and Ranking. The obligations of the Borrower under this Note, including all fees, principal and interest payments due or becoming due under this Note, shall be secured

1

*ACTIVE 54090108v2*

obligations of the Borrower, to be secured by a first priority, perfected security interest in all of its assets of Borrower, including its interest in any Qualified Settlement Fund, and all distributions, cash and other property or proceeds from time to time received in respect thereof (the "**Collateral**") pursuant to the terms of security agreement (together with all documents evidencing, securing and/or otherwise executed and/or delivered in connection with the Loan (the "**Security Agreement**"). Reference is made to the Security Agreement for a description of the Collateral (as defined therein) and the rights and remedies of the Lender (or another holder) in respect thereof. This Note, the Security Agreement and any UCC financing statements and other documents, instruments and agreements evidencing, guaranteeing or securing this Note, and all written amendments, replacements or supplements to any of them, are collectively referred to as the "**Loan Documents**".   The Loan shall rank senior to all other indebtedness of the Borrower issued hereafter in both liquidation and distributions and the Borrower shall not be permitted to enter into any other secured debt obligations without the prior written consent of the Lender, in its sole and absolute discretion

4.      Maturity Date; Term.  This Note shall mature, and be due and payable on a date that is equal to the five-year anniversary from the date of the First Advance (the "**Maturity Date**") and shall be for a term commencing on the date hereof and ending on the Maturity Date (the "**Term**"), subject to two successive 12-month extensions, as applicable (the "**Final Maturity Date**").  Subject to the conditions set forth below, Borrower may extend the Initial Maturity Date for two separate 12-month periods (each, an "**Extension Period**").  Each Extension Period shall be subject to satisfaction of the following conditions:  (i) notice is delivered to the Lender at least 90 days but not more than 120 days prior to the expiration of the Initial Maturity Date, or if extended, the expiration of the first Extension Period; (ii) no default or event of default exists on the date that the notice described in clause "(i)" is provided by the Borrower, or on the first day of the applicable Extension Period; and (iii) certain other conditions set forth in the Loan Agreement have been satisfied.

5.      Interest Rate.  Interest shall accrue on the unpaid principal balance of this Note at a rate equal to 18.0% per annum and payable on the Maturity Date.  Following the occurrence of an Event of Default, interest on the Loan shall be increased twenty-four percent (24%) (the "**Default Rate**").

6.      Payments of Principal Amount and Interest.  Any payments made pursuant to this Note shall be applied first toward any fees, expenses and costs due and then toward the Interest and finally toward the Principal Amount.  All payments of accrued but unpaid Interest and the Principal Amount are due, without notice on the Maturity Date.

7.      Prepayment.  The Loan may be pre-paid, in whole or in part, at any time by the Company.  Borrower shall pay all expenses of Lender in connection with any such prepayment.

8**.**      Procedures for Advances.

(a)      Subject to the terms and conditions of this Note, the Lender shall make Advances to the Borrower from time to time during the period from the Original Issuance Date to the day that is thirty (30) days prior to the Maturity Date up to an aggregate amount not to exceed at any time the Commitment Amount.  As long as the sum of all of the unpaid principal

2

amounts of the outstanding Advances does not exceed the Commitment Amount, the Borrower may borrow, repay and re-borrow principal amounts under this Note.

(b)     Whenever the Borrower desires the Lender to make an Advance hereunder, the Borrower shall deliver to the Lender a written notice requesting an Advance no later than 9:00 a.m. EST at least seven (7) days before the date on which the Borrower is requesting the Lender to make the Advance (such date, the "**Funding Date**").  Each such notice shall be duly executed by a duly authorized officer of the Borrower and shall specify the proposed Funding Date and the amount of the Advance requested.

(c)     In addition to the foregoing, the obligation of the Lender to make Advances hereunder shall be subject to fulfillment of the following conditions precedent on the date of such Advance:

(i)     There shall be no Event of Default (defined below) and no event which, with the passing of time or the giving of notice, would become an Event of Default; and

(ii)     The Lender shall have received such approvals, opinions or documents as the Lender may reasonably request.

9.     Repayments and Prepayments.

(a)     Order.  Any payments made pursuant to this Note shall be applied first toward any fees, expenses and costs due and then toward Interest due and finally toward the outstanding principal balance of the Advances.

(b)     Optional Prepayment.  The outstanding principal balance of any Advance may be prepaid in whole or in part at any time, without penalty or premium and without any prior written notice to the Lender before the Maturity Date; *provided*, that all accrued and unpaid Interest and any other charges accrued as of the date of prepayment are also paid in full.  Any prepayments shall not result in deferment or delay of the due date of any subsequent payment(s).

10.     Success Fee.  In addition to any other amounts payable pursuant to this Note, at the Maturity Date, the Borrower, in its sole discretion based upon its available funds, shall pay the Lender an amount equal to no less than fifty percent (50%) and up to one hundred percent (100%) of the amount of the funds in any Qualified Settlement Fund for the benefit of the Borrower (the "**Success Fee**").  Any payments due under this Note with respect to the Default Rate, shall be excluded from the calculation of the Success Fee.

11.     Events of Default.

(a)     General. The occurrence of any one or more of the following events shall constitute an event of default (each, an "**Event of Default**") under this Note:

(i)     Failure to Pay Principal Amount.  The Borrower fails to pay the Principal Amount, Interest or other sum due under this Note when due; or

3

(ii)   <u>Breach of Covenant</u>.   The Borrower breaches any covenant or other term or condition of this Note or any of the other Loan Documents in any respect and such breach, if subject to cure, continues for a period of ten (10) business days after written notice to the Borrower from the Lender.

(iii)   <u>Representations and Warranties</u>.   Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower in any of the Loan Documents shall be incorrect or misleading in any material respect when made or deemed made;

(iv)   <u>Encumbrance Defects</u>.   Any encumbrance of any kind created by any of the Loan Documents shall at any time fail to constitute a valid encumbrance on all of the Collateral purported to be subject thereto, securing the obligations purported to be secured thereby, or the Borrower shall so assert in writing, other than any such failure arising or resulting from any action or inaction on the part of the Lender;

(v)   <u>Legal Action</u>.   The Borrower or any Member of the Borrower (other than the Lender) shall file any claim or action against the Lender or any of its affiliates;

(vi)   <u>Receiver or Trustee</u>.   The Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee, or such a receiver or trustee shall otherwise be appointed;

(vii)   <u>Judgments</u>.   Any money judgment, writ or similar final process shall be entered or filed against the Borrower or any of its property or other assets for more than Fifty Thousand and 00/100 Dollars ($50,000.00), and shall remain unvacated, unbonded or unstayed for a period of forty-five (45) days; or

(viii)   <u>Bankruptcy</u>.   Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law or any law, or the issuance of any notice in relation to such event, for the relief of debtors shall be instituted by or against the Borrower, and if instituted against the Borrower, are not dismissed within forty-five (45) days of initiation.

(b)   <u>Waiver of Events of Default</u>. The Lender may waive any Event of Default hereunder. Such waiver shall be evidenced by written notice or other document specifying the Event or Events of Default being waived.

12.   <u>Remedies.</u>

(a)   <u>General</u>.   In addition to all rights and remedies legally or equitably available to the Lender, including under the Security Agreement, upon the occurrence of any Event of Default, the Lender shall have the option, in its sole and absolute discretion, to declare all amounts due under this Note immediately due and payable in full, all without additional notice, presentment or right to cure the Event of Default, all of which hereby are expressly waived.

4

(b)    No Waiver.  Failure to exercise the rights and remedies under Section 9(a) hereof in respect of any Event of Default shall not constitute a waiver of the right to exercise same with respect to such Event of Default or with respect to any subsequent Event of Default. No holder hereof shall, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by the holder hereof, and then only to the extent specifically set forth therein.

(c)    Cumulative.  The rights, remedies and powers of the holder hereof, as provided in this Note are cumulative and concurrent, and may be pursued singly, successively or together against the Borrower at the sole discretion of the holder hereof.

13.    Covenants and Waivers.  As a material inducement for the Lender to make Advances to the Borrower, the Borrower and all others who now or may at any time become liable for all or any part of the obligations evidenced hereby, expressly agree hereby to be jointly and severally bound, and jointly and severally:

(a)    No Distributions.  Agree not to make any distributions to its Members for as long as there remain any outstanding amounts, whether principal, Interest or other fees and expenses, under this Note;

(b)    No Amendments.  Agree not to amend, modify, alter or supplement the Operating Agreement or waive or consent to the waiver of any material provision of the Operating Agreement, without the prior written consent of the Borrower, which may be granted or withheld in the Borrower's sole discretion;

(c)    Certain Rights.  Waive and renounce any and all homestead, redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness evidenced by this Note or the Collateral or by any extension or renewal hereof;

(d)    Presentment.  Waive presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor, and notice of protest;

(e)    Notices.  Except as expressly provided herein, waive any and all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default, or enforcement of the payment hereof or hereunder;

(f)    Diligence or Delays.  Waive any and all lack of diligence and delays in the enforcement of the payment hereof;

(g)    Unconditional Obligation.  Agree that the liability of the Borrower, any guarantor, endorser or obligor shall be unconditional and without regard to the liability of any other person or entity for the payment hereof, and shall not in any manner be affected by any indulgence or forbearance granted or consented to by the Lender to any of them with respect hereto;

(h)    Extensions.  Consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by the Lender with respect to the payment or other provisions hereof, and to the release of any security at any time given for the payment hereof, or

5

Justice-Partners-Teh000379

any part thereof, with or without substitution, and to the release of any person or entity liable for the payment hereof; and

(i)      Additional Borrowers, Etc. Consent to the addition of any and all other makers, endorsers, guarantors, and other obligors for the payment hereof, and to the acceptance of any and all other security for the payment hereof, and agree that the addition of any such makers, endorsers, guarantors or other obligors, or security shall not affect the liability of the Borrower, any guarantor and all others now liable for all or any part of the obligations evidenced hereby

13.      Notices.    All notices, demands, requests, consents, approvals and other communications that may or are required to be given by either party to the other party hereunder shall be deemed to be sufficient if in writing and (i) delivered in person, (ii) delivered and received by facsimile, if a confirmatory mailing in accordance herewith is also made, (iii) duly sent by registered mail return receipt requested and postage prepaid, or (iv) duly sent by overnight delivery service, addressed to such party at the address set forth in the first paragraph of this Note.  All notices, demands, requests, consents, approvals and other communications shall be deemed to have been received (i) at the same time it was personally delivered, (ii) on the receipt of delivery by facsimile if accompanied by a confirmatory mailing, (iii) five (5) days after mailing via registered mail return receipt requested whether signed for or not, to the foregoing persons at the addresses set forth above or (iv) the next day when sent by overnight delivery service.  The above shall constitute service despite rejection or other refusal to accept or inability to deliver because of changed address for which no notice has been received.

14.      Attorney Fees. If there is an Event of Default and an action is brought with respect to this Note, or in the event that this Note is collected in whole or in part by suit or through probate or bankruptcy proceedings, or other legal proceedings of any kind, the Borrower promises and agrees to pay, in addition to all the sums payable hereunder, the Lender's reasonable expenses and costs of collection, including without limitation reasonable attorneys' fees and disbursements, whether or not suit is brought and through all appeals.

15.      Lender Records Conclusive.  The principal balance, Interest and other fees and expenses, each as noted on the Loan Account maintained by the Lender, shall be presumptive evidence of such outstanding principal balance, Interest and fees and expenses due under this Note. No failure by the Lender to make, and no error by the Lender in making, any annotation on the Loan Account shall affect the Borrower's obligation to pay the outstanding principal balance and Interest or any other obligation of the Borrower to the Lender pursuant to this Note.

16.      Legends.  It is understood that this Note (and any replacement thereof) shall bear the legend (in addition to any legends which may be required in the opinion of the Borrower's counsel by the securities laws of the state where the Lender is located) substantially as set forth on the first page of this Note.

17.      Invalidity of any Part. If any provision or part of any provision of this Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Note and this Note shall be

6

Justice-Partners-Teh000380

construed as if such invalid, illegal or unenforceable provision or party hereof had never been contained herein, but only to the extent of if its invalidity, illegality or unenforceability.

18.      Survival.  All agreements, representations and warranties made in this Note and in all the Other Agreements to be executed and delivered pursuant hereto shall survive the execution and delivery to the Lender of this Note and all other documents delivered hereunder or contemplated hereby. and shall continue in full force and effect so long as this Note remains outstanding, unperformed or unpaid.

19.      Construction; Governing Law.   All issues and questions concerning the construction, validity and interpretation of this Note and all matters pertaining hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

20.      **Consent to Jurisdiction.  TO INDUCE THE LENDER TO ACCEPT THIS NOTE, THE BORROWER IRREVOCABLY AGREES THAT, SUBJECT TO THE LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS NOTE WILL BE LITIGATED IN COURTS HAVING SITUS IN WILMINGTON, DELAWARE.  THE BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN WILMINGTON, DELAWARE, WAIVES PERSONAL SERVICE OF PROCESS UPON THE BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE BORROWER AT THE ADDRESS STATED IN THE PREAMBLE  AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.**

21.      **Waiver of Jury Trial.  THE BORROWER AND THE LENDER (BY ACCEPTANCE OF THIS NOTE), HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT OR INSTITUTED BY THE LENDER, THE BORROWER OR ANY SUCCESSOR OR ASSIGN OF THE LENDER OR THE BORROWER (a) UNDER THIS NOTE OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS NOTE OR (b) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.   THE BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.**

22.      Assignment.  This Note is not assignable or transferable by the Borrower except that Lender may assign this Note, the Security Agreement and all of the Loan Documents at any time.

7

23.     <u>Severability</u>.  In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

24.     <u>Titles and Subtitles</u>.   The titles of the Sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

[*Signature Page Follows*]

8

CONFIDENTIAL

Justice-Partners-Teh000382

## SECURED PROMISSORY NOTE SIGNATURE PAGE

IN WITNESS WHEREOF, the Borrower has executed this secured promissory note as of the date first above written.

<div style="text-align:right">

Justice Partners Law Group, LP
a District of Columbia limited partnership


By:_____ ____

</div>

9

*ACTIVE 54090108v2*

CONFIDENTIAL                                                                                    Justice-Partners-Teh000383

Subject: Re: Data request / update



**Lee Melchionni** <lee@capital4justice.com>                        Wed, Oct 20, 2021, 2:33 PM
to Sohail Shahrasebi, Sylvia Benito, ALLAN TEH

# Exhibit 9

Sohail,

For Allan's independent law firm, KS Law Group, we spent $3,880,080.00 to acquire 155 RoundUp cases, 200 Talc Cases, 212 Hernia Mesh Cases, and 212 3M cases. We are entitled to 60% of the attorney fee.

For Justice Partners, we have spent $11,250,000.00 to acquire 200 Firefighter Foam Cases, 208 Talc Cases, 380 Hernia Mesh Cases, 350 3M Cases, 150 RoundUp Cases, and 200 Zantac Cases. We are entitled to 72% of the attorney fee.

In addition, we purchased 12% of the attorney fee for 1128 Talc Cases, 1220 Hernia Mesh Cases, 302 3M Cases, and 300 RoundUp Cases. All of these cases were mature, meaning the clients had already been acquired and cases worked up to a certain point, mitigating case acquisition, drop off, and timing of settlement risk.

Best,
Lee

On Tue, Oct 19, 2021 at 9:52 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

> Lee thanks for this. When you get a chance, as a follow-up can you please send me the $ invested per case type? Thank you.
>
> **From:** Lee Melchionni <lee@capital4justice.com>
> **Sent:** Monday, October 18, 2021 5:37 PM
> **To:** Sohail Shahrasebi <Sohail@kstreetcap.com>
> **Cc:** Sylvia Benito <sylvia@capital4justice.com>
> **Subject:** Re: Data request / update
>
> Sohail,
>
> We have answered your questions in blue below. Do not hesitate to reach out with follow up questions.
> - Could we be given the following
>   - A final copy of the legal documents supporting the supporting the Denovo US law firm?
>     - We have attached an opinion from our ethics counsel, Jack Marshall, on non-lawyer partners.
>   - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
>     - We have invested all of the $8mln committed. I have broken down the number of cases and case type, for Justice Partners and then KS Law Group below.

- Justice Partners
  - 200 Firefighter Foam
  - 208 Talc
  - 380 Hernia Mesh
  - 350 3M
  - 150 RoundUp
  - 200 Zantac

    - KS Law Group
    - 155 RoundUp
    - 200 Talc
    - 212 Hernia Mesh
    - 212 3M

- Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.

  - The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost.

- Update on the status of the various cases in the US and timing on each case

  - Hernia Mesh - We continue to march towards settlement with multiple manufacturers.  We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022.
  - Talc - We will send a separate, longer update, given the bankruptcy news. We are in the process of gathering information.
  - 3M - There have been four trials with mostly positive results. The first trial resulted in a $7.1M verdict for three plaintiffs in April, while the second ended in a victory for 3M in May. This was not a surprise, given that it was a 3M pick for trial. The third trial found 3M 62% liable for the $1.7M in damages a veteran sustained. A jury in the fourth trial awarded a U.S. Army veteran $8.2M after finding that 3M's Combat Arms Earplugs Version 2 caused him to suffer hearing loss and tinnitus. There are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months.
  - RoundUp - in 2020, a global settlement agreement was proposed, where $10 billion was allocated to resolve existing claims and a controversial scientific panel was created to decide the fate of future claims. In March 2021 the RoundUp MDL Judge rejected Bayer's motion for approval of the proposed settlement for all future RoundUp claims. In August 2021 Bayer announced that it had set aside $4.5B for future RoundUp claims and that it had pulled glyphosate-based RoundUp from the U.S. consumer market.
  - Firefighter Foam - There is no substantive update since our last investor communication.
  - Zantac - There is no substantive update since our last investor communication.

- On the Diesel stuff

- Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

  - Yes, our attorneys are currently preparing documents.

On Fri, Oct 15, 2021 at 9:34 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

Hey Guys –

I spoke with Allan and he is asking for a bunch of stuff related to both the US cases we've invested in and Europe cases we intend to invest in.

- Could we be given the following

    - A final copy of the legal documents supporting the supporting the Denovo US law firm?
    - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
    - Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
    - Update on the status of the various cases in the US and timing on each case

- On the Diesel stuff

    - Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

Sorry again for the request. Just fulfilling Allan's demands.

Best Regards,
Sohail Shahrasebi


Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139
O: 786-484-0771
M: 646-707-4484

# Exhibit 10



**JUSTICE PARTNERS**

Dear Justice Partners Investors,

In the portal you will find our latest update, including the status report on each individual docket. We are also including a new spreadsheet modeling overall expected returns. This spreadsheet will now be updated on a quarterly basis or as often as changes in the litigation occur such as expected settlement amounts or timelines.

As always, please reach out to us with any questions. We are available for calls at your convenience.


Thank You,

Sylvia and Lee

# 3M Earplugs

## April 2023

### Case Details

There is a pending motion to dismiss Aero's bankruptcy but there has not been a ruling yet. A bankruptcy court in the Southern District of Indiana denied Aero's initial attempt to get into bankruptcy. The MDL is located in the Northern District of Florida. The Judge in the MDL granted plaintiff summary judgment for 3M's full and independent liability. 3M is appealing the motion for summary judgment to the 11th circuit. New cases are still being filed and there are roughly 220,000 cases in the MDL.

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 216 | 60 | 141 |

## Leads by Status



- Filed
- Pending
- Retained- Sent to Firm
- Attempting to Contact
- Closed - Dual Rep Rev Sh...
- Filed - Dual Rep Rev Share
- Unable to Reach/ Unresp...
- Ready for Law Firm
- Ready for Skip Tracing

48.15%
2.78%
17.13%
27.78%

## Pending Leads by Reason

| Reason | Leads |
|---|---:|
| Atty Review | 3 |
| Med Recs - Client | 4 |
| Med Recs - Client; Med Recs - Vendor | 1 |
| Med Recs - Vendor | 41 |
| Nurse Review | 7 |
| Nurse Review; PPF/PFS/Census | 1 |
| PPF/PFS/Census | 1 |
| Proof of Usage | 2 |

# Camp Lejeune

## April 2023

### Case Details

In speaking to several attorneys involved in the litigation, they agree that they are encouraged by Judge Devers' approach to handling the cases. Judge Devers asked the Department of Justice in the most recent hearing how many offers were made on the claims forms that were submitted by plaintiffs. The response by the DOJ was zero. Judge Devers proceeded to ask why this was the case and stated that Congress did not pass the bill so that the Eastern District of North Carolina Court could litigate every single Camp Lejeune claim. There has been talk of setting up a potential settlement grid for a certain number of injuries and a potential belief that a leadership group of attorneys will be appointed. Camp Lejeune continues to potentially take shape like an MDL.

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 21 | 20 | 0 |



Leads by Status

- Pending
- Ready to Submit

4.76%
95.24%

## Pending Leads by Reason

| Reason | Leads |
|---|---:|
| Med Recs – Client | 1 |
| Med Recs – Vendor | 15 |
| Med Recs – Vendor; Nurse Review | 1 |
| Nurse Review | 3 |

# Fire Foam

## April 2023

### Case Details

The MDL is in the Federal Court in the District of South Carolina. There are currently 4,000 cases filed right now. The cases being consolidated in front of a single judge is a positive step. There is a bellwether trial set for May in Stuart, FL. The Stuart city water authority is claiming that the city water supply was contaminated by carcinogenic firefighting foam. We will continue to monitor the litigation.

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 149 | 33 | 114 |

## Leads by Status



- Retained- Sent to Firm
- Pending
- Attempting to Contact
- Unable to Reach/ Unresp...

0.67%
22.15%
76.51%

## Pending Leads by Reason

| Reason | Leads |
|---|---:|
| Med Recs - Client | 1 |
| Med Recs - Vendor | 15 |
| Med Recs - Vendor; PPF/PFS/Census | 1 |
| Nurse Review | 3 |
| PPF/PFS/Census | 13 |

# Hernia Mesh

## April 2023

### Case Details

There is no material news to report. In our discussions with co-counsel, they have said that Bard's approach has been to approach individual law firms with significant dockets and start settlement talks. To date, no settlements have occurred. There is a bellwether trial scheduled in October for Bard.

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 195 | 138 | 49 |

## Leads by Status



- Pending
- Retained- Sent to Firm
- Filed
- Ready to Submit
- Attempting to Contact
- Unable to Reach/ Unresp...

70.77%
16.92%
8.21%
1.54%

## Pending Leads by Reason

| Reason | Leads |
|---|---:|
| Atty Review; Med Recs - Vendor | 1 |
| Case WorkUp; Med Recs - Vendor | 1 |
| Med Recs - Client | 7 |
| Med Recs - Client; Med Recs - Vendor | 1 |
| Med Recs - Vendor | 120 |
| Med Recs - Vendor; Other (see Notes) | 1 |
| Med Recs - Vendor; Retainer | 1 |
| Nurse Review | 3 |
| Other (see Notes) | 2 |

# Talcum Powder

## April 2023

### Case Details

Johnson and Johnson ("J&J") recently announced a proposed $8.9 billion package to cover its liability from its talcum powder product. Multiple law firms with significant talcum powder dockets have spoken out against the settlement, including Levin Papantonio Rafferty, Beasley Allen, and Arnold & Itkin. Under the proposal, a J&J subsidiary would re-file for Chapter 11 bankruptcy protection and seek court approval for the plan. In order for J&J's subsidiary to get approval of the settlement, 75% of the victims would have to vote in favor of the bankruptcy plan. In our conversations with multiple co-counsels, no one is sure of the path forward. Law Firms in favor of the settlement believe this plan gets money into the victims' hands sooner, with a potential settlement value ranging from high five figures to the low six figures. However, those who oppose the settlement believe that if J&J is allowed to transfer their talcum powder liabilities into Chapter 11 bankruptcy, then this tactic could potentially transform mass torts forever, paving the way for copycat tactics across all mass tort litigations. We will continue to speak with our co-counsels to get new information as it becomes available.

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 30 | 14 | 16 |

## Leads by Status



- Retained- Sent to Firm
- Pending

46.67%   53.33%

## Pending Leads by Reason

| Reason | Leads |
|---|---|
| Med Recs - Vendor | 8 |
| Med Recs; Med Recs - Vendor | 3 |
| PPF/PFS/Census | 3 |

# Zantac

## April 2023

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 29 | 14 | 15 |

## Leads by Status



- Retained- Sent to Firm
- Pending

48.28% — 51.72%

## Pending Leads by Reason

| Reason | Leads |
|---|---:|
| Med Recs - Vendor | 7 |
| Med Recs - Vendor; PPF/PFS/Census; Proof of Usage | 1 |
| Nurse Review; PPF/PFS/Census | 1 |
| PPF/PFS/Census | 3 |
| Retainer | 2 |

# B2B - ERC

## April 2023

| Total Leads | Pending Leads | Filed/Retained Leads |
|:---:|:---:|:---:|
| 73 | 0 | 0 |

### Leads by Status



- Sent to Phillips
- Disqualified

49.32%     50.68%

### Pending Leads by Reason

| Reason | Leads |
|---|---|
| | |

**Justice Partners**
3/31/23

| Litigation | Investment | Investment Date | Cost/case | Target | Current | Contracted Replacement | Contracted Replacement % | Replacements Due | Settlement Date | Average Settlement | Attorney % | Investor% | Estimated Return/Case |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | 4/15/21 | $ 5,000 | 380 | 210 | 266 | 70% | 56 | 2/1/24 | $ 70,000 | 40% | 60% | $ 16,800 |
| Talc | $ 1,185,600 | 4/15/21 | $ 5,700 | 208 | 34 | 156 | 75% | 122 | 1/1/24 | $ 100,000 | 40% | 60% | $ 24,000 |
| Firefighter Foam | $ 1,089,400 | 4/15/21 | $ 5,447 | 200 | 150 | 150 | 75% | - | 1/1/25 | $ 90,000 | 40% | 60% | $ 21,600 |
| Camp Lejeune (CL) | $ 750,000 | 4/15/21 | $ 5,000 | 150 | 24 | 113 | 75% | 89 | 1/1/25 | $ 125,000 | 33% | 60% | $ 24,750 |
| 3M | $ 700,000 | 4/15/21 | $ 2,000 | 350 | 225 | 263 | 75% | 38 | 11/1/23 | $ 25,000 | 40% | 60% | $ 6,000 |
| Zantac | $ 500,000 | 4/15/21 | $ 2,500 | 200 | 29 | 0 | 0% | - | 1/1/25 | $ 80,000 | 40% | 60% | $ 19,200 |
| Back End Portfolio | $ 5,125,000 | 10/11/21 | | | | | | | | | | | |
| JP Hernia Mesh | | | $ 1,000 | 380 | 210 | 266 | 70% | 56 | 2/1/24 | $ 70,000 | 40% | 12% | $ 3,360 |
| JP Talc | | | $ 1,140 | 208 | 34 | 156 | 75% | 122 | 1/1/24 | $ 100,000 | 40% | 12% | $ 4,800 |
| JP Firefighter Foam | | | $ 1,089 | 200 | 150 | 150 | 75% | - | 1/1/25 | $ 90,000 | 40% | 12% | $ 4,320 |
| JP CL | | | $ 1,000 | 150 | 24 | 113 | 75% | 89 | 1/1/25 | $ 125,000 | 33% | 12% | $ 4,950 |
| JP 3M | | | $ 400 | 350 | 225 | 263 | 75% | 38 | 11/1/23 | $ 25,000 | 40% | 12% | $ 1,200 |
| Zantac | | | $ 500 | 200 | 29 | 0 | 0% | - | 1/1/25 | $ 80,000 | 40% | 12% | $ 3,840 |
| Other Talc | | | $ 1,140 | 1,026 | 110 | 770 | 75% | 660 | 1/1/24 | $ 100,000 | 40% | 12% | $ 4,800 |
| Other Hernia Mesh | | | $ 1,000 | 1,153 | 593 | 807 | 70% | 214 | 2/1/24 | $ 70,000 | 40% | 12% | $ 3,360 |
| Other 3M | | | $ 400 | 320 | 178 | 240 | 75% | 62 | 11/1/23 | $ 25,000 | 40% | 12% | $ 1,200 |
| Other Roundup | | | $ 860 | 205 | 110 | 154 | 75% | 44 | 3/1/24 | $ 75,000 | 40% | 12% | $ 3,600 |

**SCENARIOS***

| Contracted Replacement | Investment | Return on Current Cases | Replacement Value | Potential Return | Gross** Multiple |
|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | $ 3,528,000 | $ 940,800 | $ 4,468,800 | 2.4 |
| Talc | $ 1,185,600 | $ 816,000 | $ 2,928,000 | $ 3,744,000 | 3.2 |
| Firefighter Foam | $ 1,089,400 | $ 3,240,000 | $ - | $ 3,240,000 | 3.0 |
| Camp Lejeune (CL) | $ 750,000 | $ 594,000 | $ 2,190,375 | $ 2,784,375 | 3.7 |
| 3M | $ 700,000 | $ 1,350,000 | $ 225,000 | $ 1,575,000 | 2.3 |
| Zantac | $ 500,000 | $ 556,800 | $ - | $ 556,800 | 1.1 |
| Back End Portfolio | $ 5,125,000 | $ 5,147,040 | $ 5,373,711 | $ 10,520,751 | 2.1 |
| JP Hernia Mesh | | $ 705,600 | $ 188,160 | $ 893,760 | |
| JP Talc | | $ 163,200 | $ 585,600 | $ 748,800 | |
| JP Firefighter Foam | | $ 648,000 | $ - | $ 648,000 | |
| JP CL | | $ 118,800 | $ 438,075 | $ 556,875 | |
| JP 3M | | $ 270,000 | $ 45,000 | $ 315,000 | |
| Zantac | | $ 111,360 | $ - | $ 111,360 | |
| Other Talc | | $ 528,000 | $ 3,165,600 | $ 3,693,600 | |
| Other Hernia Mesh | | $ 1,992,480 | $ 719,376 | $ 2,711,856 | |
| Other 3M | | $ 213,600 | $ 74,400 | $ 288,000 | |
| Other Roundup | | $ 396,000 | $ 157,500 | $ 553,500 | |
| | $ 11,250,000 | $ 15,231,840 | $ 11,657,886 | $ 26,889,726 | 2.4 |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

| Case Cost+Interest*** | Investment | Return on Current Cases | Case Cost+INT | Potential Return | Gross** Multiple | Time (yrs) from Invest |
|---|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | $ 3,528,000 | $ 398,720 | $ 3,926,720 | 2.1 | 2.8 |
| Talc | $ 1,185,600 | $ 816,000 | $ 985,525 | $ 1,801,525 | 1.5 | 2.7 |
| Firefighter Foam | $ 1,089,400 | $ 3,240,000 | $ - | $ 3,240,000 | 3.0 | 3.7 |
| Camp Lejeune (CL) | $ 750,000 | $ 594,000 | $ 662,610 | $ 1,256,610 | 1.7 | 3.7 |
| 3M | $ 700,000 | $ 1,350,000 | $ 105,288 | $ 1,455,288 | 2.1 | 2.5 |
| Zantac | $ 500,000 | $ 556,800 | $ - | $ 556,800 | 1.1 | 3.7 |
| Back End Portfolio | $ 5,125,000 | $ 5,147,040 | $ 1,571,990 | $ 6,719,030 | 1.3 | |
| JP Hernia Mesh | | $ 705,600 | $ 66,347 | $ 771,947 | | 2.3 |
| JP Talc | | $ 163,200 | $ 163,832 | $ 327,032 | | 2.2 |
| JP Firefighter Foam | | $ 648,000 | $ - | $ 648,000 | | 3.2 |
| JP CL | | $ 118,800 | $ 111,350 | $ 230,150 | | 3.2 |
| JP 3M | | $ 270,000 | $ 17,469 | $ 287,469 | | 2.1 |
| Zantac | | $ 111,360 | $ - | $ 111,360 | | 3.2 |
| Other Talc | | $ 528,000 | $ 885,635 | $ 1,413,635 | | 2.2 |
| Other Hernia Mesh | | $ 1,992,480 | $ 253,659 | $ 2,246,139 | | 2.3 |
| Other 3M | | $ 213,600 | $ 28,882 | $ 242,482 | | 2.1 |
| Other Roundup | | $ 396,000 | $ 44,816 | $ 440,816 | | 2.4 |
| | $ 11,250,000 | $ 15,231,840 | $ 3,724,133 | $ 18,955,973 | 1.7 | |

| Partial Substitution**** | Investment | Return on Current Cases | Replacement & Substitution | Potential Return | Gross** Multiple | ERC% | ERC per Case | Expected Return/ERC | Camp Lejeune % | CL per Case | Expected Return/CL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | $ 3,528,000 | $ 940,800 | $ 4,468,800 | 2.4 | | | | | | |
| Talc | $ 1,185,600 | $ 816,000 | $ 2,684,000 | $ 3,500,000 | 3.0 | 50% | 7 | $ 2,750 | 50% | 1 | $ 24,750 |
| Firefighter Foam | $ 1,089,400 | $ 3,240,000 | $ - | $ 3,240,000 | 3.0 | | | | | | |
| Camp Lejeune (CL) | $ 750,000 | $ 594,000 | $ 2,190,375 | $ 2,784,375 | 3.7 | | | | | | |
| 3M | $ 700,000 | $ 1,350,000 | $ 309,375 | $ 1,659,375 | 2.4 | 100% | 3 | $ 2,750 | | | |
| Zantac | $ 500,000 | $ 556,800 | $ - | $ 556,800 | 1.1 | | | | | | |
| Back End Portfolio | $ 5,125,000 | $ 5,147,040 | $ 4,735,124 | $ 9,882,164 | 1.9 | | | | | | |
| JP Hernia Mesh | | $ 705,600 | $ 188,160 | $ 893,760 | | | | | | | |
| JP Talc | | $ 163,200 | $ 469,700 | $ 632,900 | | 50% | 1 | $ 2,750 | 50% | 0.2 | $ 24,750 |
| JP Firefighter Foam | | $ 648,000 | $ - | $ 648,000 | | | | | | | |
| JP CL | | $ 118,800 | $ 438,075 | $ 556,875 | | | | | | | |
| JP 3M | | $ 270,000 | $ 61,875 | $ 331,875 | | 100% | 0.6 | $ 2,750 | | | |
| Zantac | | $ 111,360 | $ - | $ 111,360 | | | | | | | |
| Other Talc | | $ 528,000 | $ 2,539,075 | $ 3,067,075 | | 50% | 1 | $ 2,750 | 50% | 0.2 | $ 24,750 |
| Other Hernia Mesh | | $ 1,992,480 | $ 719,376 | $ 2,711,856 | | | | | | | |
| Other 3M | | $ 213,600 | $ 102,300 | $ 315,900 | | 100% | 0.6 | $ 2,750 | | | |
| Other Roundup | | $ 396,000 | $ 216,563 | $ 612,563 | | | | | 100% | 0.2 | $ 24,750 |
| | $ 11,250,000 | $ 15,231,840 | $ 10,859,674 | $ 26,091,514 | 2.3 | | | | | | |

*Hypotehtical returns under various scenarios

** Gross return before carry, fees, and expenses (JP's LPs recieves a 15% simple preferred return per year until the original principal is returned before any carry is paid to the GP)

***Case cost plus 20% plus 8% per year (simple interest...not compounded) calculated from investment date to settlment date for JP cases. Case cost plus 8% per year for Back End

****Assumes Talc, 3M, & Round Up are partially substuted by ERC and/or Camp Lejeune, while the other cases are replaced as contracted

# Disclosures

Justice Partners LPs receive a 15% preferred return before any carry is paid to the GP.

If cases cannot be replaced, our case cost plus 20% plus 8% simple annual interest (not compounding) is returned to investors until order is filled.

The replacement contract provides for replacement up to 70-75% (depending on the case) for any loss due to lack of medical records.

Camp Le Jeune attorney fee is currently modeled at 33% not the historical 40% due to possible fee reductions from Congress.

Replacements as currently contracted:


3M attrition is replaced with 4 employees in Employee Retention Tax Credit Claims
Roundup is replaced 1:1 with Camp Le Jeune
Talc is replaced with a 1:1 Camp LeJeune or 7 employees in the Employee Retention Tax Credit

Range of settlement dates is based on an average of estimates from our co-counsel and are subject to revision.

Management Fee is no longer being charged to conserve the cash balance. Expenses include legal fees which may or may not be reimbursed.

The GP of Justice Partners will update and revise this spreadsheet on a 1/4ly basis with any changes in timeline or settlement estimates.

# Exhibit 11



## THE LAKE LAW FIRM.

Edward J. Lake, Esq.*
Michael J. Blom, Esq.*
Shelby Morales, Esq.°

Trial Counsel
Milberg Coleman
Bryson Phillips Grossman

July 6, 2023

**TO.**

**KS Law Group
JPLG**

RE: KS LAW GROUP AND JPLG CASES

My name is Edward Lake, and I am the founding partner of The Lake Law Firm (LLF) and am 100% owner in both LLF and Persist Communications. Attached hereto is exhibit (A) showing fee splits between LLF and our co-counsel, exhibit (B) showing all cases presently open and assigned to KS Law Group, and exhibit (C) showing all cases presently open and assigned to JPLG.

Affirmed by Edward Lake, Esq. on July 6th, 2023.

*Edward Lake*

📞 888-LAKE-LAW

🔗 www.thelakelawfirm.com

📍 One Rockefeller Plaza | 510 Broad Hollow Rd.
11th Floor | Suite 306
New York, NY 10020 | Melville, NY 11747

Licensed in NY* | Licensed in IL°

Exhibit C

All cases presently open and assigned to JPLG Law Group

| Full Name | Case Type |
|---|---|
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |
| | Hernia Mesh |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh

Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh

Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Hernia Mesh
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
Talcum Powder
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs

3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs

3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs

3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs

3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs

3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
3M Earplugs
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Camp Lejeune
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam

Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam

Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam

Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
III     Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Fire Foam
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac

Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
Zantac
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC



B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC
B2B - ERC

**signNow**

## Document History

SignNow E-Signature Audit Log

All dates expressed in MM/DD/YYYY (US)

| | |
|---|---|
| **Document name:** | KS-JPLG letter 7.6.23 |
| **Document created:** | 07/06/2023 18:45:54 |
| **Document pages:** | 1 |
| **Document ID:** | a7334d670440406f8d26e0d527d6f9a9160a961f |
| **Document Sent:** | 07/06/2023 18:50:19 UTC |
| **Document Status:** | Signed |
| | 07/06/2023 18:52:53UTC |

| | |
|---|---|
| **Sender:** | mblom@thelakelawfirm.com |
| **Signers:** | elake@forpersist.com, mblom@thelakelawfirm.com |
| **CC:** | |

| Client | Event | By | Server Time | Client Time | IP Address |
|---|---|---|---|---|---|
| SignNow Web Application | Uploaded the Document | mblom@thelakelawfirm.com | 07/06/2023 18:45:54 pm UTC | 07/06/2023 18:45:53 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | mblom@thelakelawfirm.com | 07/06/2023 18:46:10 pm UTC | 07/06/2023 18:46:10 pm UTC | 72.76.179.198 |
| SignNow Web Application | Document Saved | mblom@thelakelawfirm.com | 07/06/2023 18:49:18 pm UTC | 07/06/2023 18:49:17 pm UTC | 72.76.179.198 |
| SignNow Web Application | Invite Sent to: elake@forpersist.com, mblom@thelakelawfirm.com | mblom@thelakelawfirm.com | 07/06/2023 18:50:21 pm UTC | 07/06/2023 18:50:18 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Signed the Document | elake@forpersist.com | 07/06/2023 18:52:53 pm UTC | 07/06/2023 18:52:52 pm UTC | 12.151.95.4 |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**signNow**

## Document History

SignNow E-Signature Audit Log

All dates expressed in MM/DD/YYYY (US)

| | |
|---|---|
| **Document name:** | Exhibit A |
| **Document created:** | 07/06/2023 18:45:54 |
| **Document pages:** | 17 |
| **Document ID:** | afd741c9820f4d069e0d7ccad881a204c5da5b85 |
| **Document Sent:** | 07/06/2023 18:50:19 UTC |
| **Document Status:** | Signed |
| | 07/06/2023 18:50:19UTC |

| | |
|---|---|
| **Sender:** | mblom@thelakelawfirm.com |
| **Signers:** | elake@forpersist.com, mblom@thelakelawfirm.com |
| **CC:** | |

| Client | Event | By | Server Time | Client Time | IP Address |
|---|---|---|---|---|---|
| SignNow Web Application | Uploaded the Document | mblom@thelakelawfirm.com | 07/06/2023 18:45:55 pm UTC | 07/06/2023 18:45:53 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | mblom@thelakelawfirm.com | 07/06/2023 18:46:10 pm UTC | 07/06/2023 18:46:10 pm UTC | 72.76.179.198 |
| SignNow Web Application | Document Saved | mblom@thelakelawfirm.com | 07/06/2023 18:49:18 pm UTC | 07/06/2023 18:49:17 pm UTC | 72.76.179.198 |
| SignNow Web Application | Invite Sent to: elake@forpersist.com, mblom@thelakelawfirm.com | mblom@thelakelawfirm.com | 07/06/2023 18:50:21 pm UTC | 07/06/2023 18:50:18 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Document Saved | elake@forpersist.com | 07/06/2023 18:52:54 pm UTC | 07/06/2023 18:52:54 pm UTC | 12.151.95.4 |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**signNow**

## Document History

SignNow E-Signature Audit Log

All dates expressed in MM/DD/YYYY (US)

| | |
|---|---|
| **Document name:** | Exhibit B |
| **Document created:** | 07/06/2023 18:45:54 |
| **Document pages:** | 11 |
| **Document ID:** | 0e85822abc1a4677a99b6c09875056c1bfe26fb7 |
| **Document Sent:** | 07/06/2023 18:50:19 UTC |
| **Document Status:** | Signed |
| | 07/06/2023 18:50:19UTC |

| | |
|---|---|
| **Sender:** | mblom@thelakelawfirm.com |
| **Signers:** | elake@forpersist.com, mblom@thelakelawfirm.com |
| **CC:** | |

| Client | Event | By | Server Time | Client Time | IP Address |
|---|---|---|---|---|---|
| SignNow Web Application | Uploaded the Document | mblom@thelakelawfirm.com | 07/06/2023 18:45:54 pm UTC | 07/06/2023 18:45:53 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | mblom@thelakelawfirm.com | 07/06/2023 18:46:10 pm UTC | 07/06/2023 18:46:10 pm UTC | 72.76.179.198 |
| SignNow Web Application | Document Saved | mblom@thelakelawfirm.com | 07/06/2023 18:49:18 pm UTC | 07/06/2023 18:49:17 pm UTC | 72.76.179.198 |
| SignNow Web Application | Invite Sent to: elake@forpersist.com, mblom@thelakelawfirm.com | mblom@thelakelawfirm.com | 07/06/2023 18:50:21 pm UTC | 07/06/2023 18:50:18 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Document Saved | elake@forpersist.com | 07/06/2023 18:52:55 pm UTC | 07/06/2023 18:52:54 pm UTC | 12.151.95.4 |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**signNow**

## Document History

SignNow E-Signature Audit Log

All dates expressed in MM/DD/YYYY (US)

| | |
|---|---|
| **Document name:** | Exhibit C-2 |
| **Document created:** | 07/06/2023 18:45:54 |
| **Document pages:** | 15 |
| **Document ID:** | 8b2fdbb21ad14148a5879189cd95172318427c3d |
| **Document Sent:** | 07/06/2023 18:50:19 UTC |
| **Document Status:** | Signed |
| | 07/06/2023 18:50:19UTC |

| | |
|---|---|
| **Sender:** | mblom@thelakelawfirm.com |
| **Signers:** | elake@forpersist.com, mblom@thelakelawfirm.com |
| **CC:** | |

| Client | Event | By | Server Time | Client Time | IP Address |
|---|---|---|---|---|---|
| SignNow Web Application | Uploaded the Document | mblom@thelakelawfirm.com | 07/06/2023 18:45:54 pm UTC | 07/06/2023 18:45:53 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | mblom@thelakelawfirm.com | 07/06/2023 18:46:10 pm UTC | 07/06/2023 18:46:10 pm UTC | 72.76.179.198 |
| SignNow Web Application | Document Saved | mblom@thelakelawfirm.com | 07/06/2023 18:49:18 pm UTC | 07/06/2023 18:49:17 pm UTC | 72.76.179.198 |
| SignNow Web Application | Invite Sent to: elake@forpersist.com, mblom@thelakelawfirm.com | mblom@thelakelawfirm.com | 07/06/2023 18:50:21 pm UTC | 07/06/2023 18:50:18 pm UTC | 72.76.179.198 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Viewed the Document | elake@forpersist.com | 07/06/2023 18:52:32 pm UTC | 07/06/2023 18:52:32 pm UTC | 12.151.95.4 |
| SignNow Web Application | Document Saved | elake@forpersist.com | 07/06/2023 18:52:56 pm UTC | 07/06/2023 18:52:55 pm UTC | 12.151.95.4 |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS



# Exhibit 12

Dear Justice Partners LPs,

We hope you are doing well. Below please find an updated spreadsheet with our projected returns. If you have any questions, please do not hesitate to reach out to us.

Of note, last quarter 3M reached a global settlement which is positive news for JP.

We would also like to inform you that Lee has taken an additional role as Senior Partner at Milberg, one of the largest mass tort firms in the world, where his focus will be on their global funding deals. This position will not affect his role at Justice Partners and give the fund increased information on the progress of several of our cases.

We appreciate your continued support,

Sylvia and Lee

Lee Melchionni, Esq.

Sylvia Benito, CFA

**Justice Partners**
9/30/23

| Litigation | Investment | Investment Date | Cost/case | Target | Current | Contracted Replacement | Contracted Replacement % | Replacements Due | Estimated Settlement Date | Average Settlement | Attorney % | Investor% | Estimated Return/Case |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | 4/15/21 | $ 5,000 | 380 | 137 | 266 | 70% | 129 | 2/1/24 | $ 70,000 | 40% | 60% | $ 16,800 |
| Talc | $ 1,185,600 | 4/15/21 | $ 5,700 | 208 | 24 | 156 | 75% | 132 | 1/1/24 | $ 100,000 | 40% | 60% | $ 24,000 |
| Firefighter Foam | $ 1,089,400 | 4/15/21 | $ 5,447 | 200 | 152 | 150 | 75% | (2) | 1/1/25 | $ 90,000 | 40% | 60% | $ 21,600 |
| Camp Lejeune (CL) | $ 750,000 | 4/15/21 | $ 4,491 | 167 | 16 | 167 | 100% | 151 | 1/1/25 | $ 125,000 | 33% | 60% | $ 24,750 |
| 3M | $ 700,000 | 4/15/21 | $ 2,000 | 350 | 163 | 263 | 75% | 100 | 11/1/23 | $ 25,000 | 40% | 60% | $ 6,000 |
| Zantac | $ 500,000 | 4/15/21 | $ 2,500 | 200 | 13 | 0 | 0% | - | 1/1/25 | $ 80,000 | 40% | 60% | $ 19,200 |
| Back End Portfolio | $ 5,125,000 | 10/11/21 | | | | | | | | | | | |
| JP Hernia Mesh | | | $ 1,000 | 380 | 137 | 266 | 70% | 129 | 2/1/24 | $ 70,000 | 40% | 12% | $ 3,360 |
| JP Talc | | | $ 1,140 | 208 | 24 | 156 | 75% | 132 | 1/1/24 | $ 100,000 | 40% | 12% | $ 4,800 |
| JP Firefighter Foam | | | $ 1,089 | 200 | 152 | 150 | 75% | (2) | 1/1/25 | $ 90,000 | 40% | 12% | $ 4,320 |
| JP CL | | | $ 898 | 167 | 16 | 167 | 100% | 151 | 1/1/25 | $ 125,000 | 33% | 12% | $ 4,950 |
| JP 3M | | | $ 400 | 350 | 163 | 263 | 75% | 100 | 11/1/23 | $ 25,000 | 40% | 12% | $ 1,200 |
| Zantac | | | $ 500 | 200 | 13 | 0 | 0% | - | 1/1/25 | $ 80,000 | 40% | 12% | $ 3,840 |
| | | | | | | | | | | | | | |
| Other Talc | | | $ 1,140 | 1,026 | 100 | 770 | 75% | 670 | 1/1/24 | $ 100,000 | 40% | 12% | $ 4,800 |
| Other Hernia Mesh | | | $ 1,000 | 1,153 | 411 | 807 | 70% | 396 | 2/1/24 | $ 70,000 | 40% | 12% | $ 3,360 |
| Other 3M | | | $ 400 | 320 | 145 | 240 | 75% | 95 | 11/1/23 | $ 25,000 | 40% | 12% | $ 1,200 |
| Other Roundup | | | $ 860 | 205 | 88 | 154 | 75% | 66 | 3/1/24 | $ 75,000 | 40% | 12% | $ 3,600 |

**SCENARIOS***

| Contracted Replacement | Investment | Return on Current Cases | Replacement Value | Potential Return | Gross** Multiple |
|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | $ 2,301,600 | $ 2,167,200 | $ 4,468,800 | 2.4 |
| Talc | $ 1,185,600 | $ 576,000 | $ 3,168,000 | $ 3,744,000 | 3.2 |
| Firefighter Foam | $ 1,089,400 | $ 3,283,200 | $ (43,200) | $ 3,240,000 | 3.0 |
| Camp Lejeune (CL) | $ 750,000 | $ 396,000 | $ 3,737,250 | $ 4,133,250 | 5.5 |
| 3M | $ 700,000 | $ 978,000 | $ 597,000 | $ 1,575,000 | 2.3 |
| Zantac | $ 500,000 | $ 249,600 | $ - | $ 249,600 | 0.5 |
| Back End Portfolio | $ 5,125,000 | $ 3,908,640 | $ 6,820,446 | $ 10,729,086 | 2.1 |
| JP Hernia Mesh | | $ 460,320 | $ 433,440 | $ 893,760 | |
| JP Talc | | $ 115,200 | $ 633,600 | $ 748,800 | |
| JP Firefighter Foam | | $ 656,640 | $ (8,640) | $ 648,000 | |
| JP CL | | $ 79,200 | $ 747,450 | $ 826,650 | |
| JP 3M | | $ 195,600 | $ 119,400 | $ 315,000 | |
| Zantac | | $ 49,920 | $ - | $ 49,920 | |
| Other Talc | | $ 480,000 | $ 3,213,600 | $ 3,693,600 | |
| Other Hernia Mesh | | $ 1,380,960 | $ 1,330,896 | $ 2,711,856 | |
| Other 3M | | $ 174,000 | $ 114,000 | $ 288,000 | |
| Other Roundup | | $ 316,800 | $ 236,700 | $ 553,500 | |
| | $ 11,250,000 | $ 11,693,040 | $ 16,446,696 | $ 28,139,736 | 2.5 |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

| Case Cost+Interest*** | Investment | Return on Current Cases | Case Cost+INT | Potential Return | Gross** Multiple | Time (yrs) from Invest |
|---|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | $ 2,301,600 | $ 918,480 | $ 3,220,080 | 1.7 | 2.8 |
| Talc | $ 1,185,600 | $ 576,000 | $ 1,066,305 | $ 1,642,305 | 1.4 | 2.7 |
| Firefighter Foam | $ 1,089,400 | $ 3,283,200 | $ (16,313) | $ 3,266,887 | 3.0 | 3.7 |
| Camp Lejeune (CL) | $ 750,000 | $ 396,000 | $ 1,015,469 | $ 1,411,469 | 1.9 | 3.7 |
| 3M | $ 700,000 | $ 978,000 | $ 279,363 | $ 1,257,363 | 1.8 | 2.5 |
| Zantac | $ 500,000 | $ 249,600 | $ - | $ 249,600 | 0.5 | 3.7 |
| Back End Portfolio | $ 5,125,000 | $ 3,908,640 | $ 2,024,310 | $ 5,932,950 | 1.2 | |
| JP Hernia Mesh | | $ 460,320 | $ 152,835 | $ 613,155 | | 2.3 |
| JP Talc | | $ 115,200 | $ 177,261 | $ 292,461 | | 2.2 |
| JP Firefighter Foam | | $ 656,640 | $ (2,741) | $ 653,899 | | 3.2 |
| JP CL | | $ 79,200 | $ 170,647 | $ 249,847 | | 3.2 |
| JP 3M | | $ 195,600 | $ 46,351 | $ 241,951 | | 2.1 |
| Zantac | | $ 49,920 | $ - | $ 49,920 | | 3.2 |
| Other Talc | | $ 480,000 | $ 899,064 | $ 1,379,064 | | 2.2 |
| Other Hernia Mesh | | $ 1,380,960 | $ 469,286 | $ 1,850,246 | | 2.3 |
| Other 3M | | $ 174,000 | $ 44,255 | $ 218,255 | | 2.1 |
| Other Roundup | | $ 316,800 | $ 67,352 | $ 384,152 | | 2.4 |
| | $ 11,250,000 | $ 11,693,040 | $ 5,287,615 | $ 16,980,655 | 1.5 | |

| Partial Substitution**** | Investment | Return on Current Cases | Replacement & Substitution | Potential Return | Gross** Multiple | ERC% | ERC per Case | Expected Return/ERC | Camp Lejeune % | CL per Case | Expected Return/CL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hernia Mesh | $ 1,900,000 | $ 2,301,600 | $ 2,167,200 | $ 4,468,800 | 2.4 | | | | | | |
| Talc | $ 1,185,600 | $ 576,000 | $ 2,904,000 | $ 3,480,000 | 2.9 | 50% | 7 | $ 2,750 | 50% | 1 | $ 24,750 |
| Firefighter Foam | $ 1,089,400 | $ 3,283,200 | $ (43,200) | $ 3,240,000 | 3.0 | | | | | | |
| Camp Lejeune (CL) | $ 750,000 | $ 396,000 | $ 3,737,250 | $ 4,133,250 | 5.5 | | | | | | |
| 3M | $ 700,000 | $ 978,000 | $ 820,875 | $ 1,798,875 | 2.6 | 100% | 3 | $ 2,750 | | | |
| Zantac | $ 500,000 | $ 249,600 | $ - | $ 249,600 | 0.5 | | | | | | |
| Back End Portfolio | $ 5,125,000 | $ 3,908,640 | $ 6,235,309 | $ 10,143,949 | 2.0 | | | | | | |
| JP Hernia Mesh | | $ 460,320 | $ 433,440 | $ 893,760 | | | | | | | |
| JP Talc | | $ 115,200 | $ 508,200 | $ 623,400 | | 50% | 1 | $ 2,750 | 50% | 0.2 | $ 24,750 |
| JP Firefighter Foam | | $ 656,640 | $ (8,640) | $ 648,000 | | | | | | | |
| JP CL | | $ 79,200 | $ 747,450 | $ 826,650 | | | | | | | |
| JP 3M | | $ 195,600 | $ 164,175 | $ 359,775 | | 100% | 0.6 | $ 2,750 | | | |
| Zantac | | $ 49,920 | $ - | $ 49,920 | | | | | | | |
| Other Talc | | $ 480,000 | $ 2,577,575 | $ 3,057,575 | | 50% | 1 | $ 2,750 | 50% | 0.2 | $ 24,750 |
| Other Hernia Mesh | | $ 1,380,960 | $ 1,330,896 | $ 2,711,856 | | | | | | | |
| Other 3M | | $ 174,000 | $ 156,750 | $ 330,750 | | 100% | 0.6 | $ 2,750 | | | |
| Other Roundup | | $ 316,800 | $ 325,463 | $ 642,263 | | | | | 100% | 0.2 | $ 24,750 |
| | $ 11,250,000 | $ 11,693,040 | $ 15,821,434 | $ 27,514,474 | 2.4 | | | | | | |

*Hypotehtical returns under various scenarios
** Gross return before carry, fees, and expenses (JP's LPs recieves a 15% simple preferred return per year until the original principal is returned before any carry is paid to the GP)
***Case cost plus 20% plus 8% per year (simple interest...not compounded) calculated from investment date to settlment date for JP cases. Case cost plus 8% per year for Back End
****Assumes Talc, 3M, & Round Up are partially substuted by ERC and/or Camp Lejeune, while the other cases are replaced as contracted



NOT AN OFFICIAL COPY - PUBLIC ACCESS · NOT AN OFFICIAL COPY - PUBLIC ACCESS

# Exhibit 13

JUSTICE PARTNERS

Dear Justice Partners Investor:

In an effort to shore up and protect our investments in cases being handled by the Lake Law Firm ("LLF"), on January 17, 2024, Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term Funding and Security Agreement (the "Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF. The purpose of the loan is to allow LLF to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business. We are informed that LLF is currently in discussions with two potential longer-term lenders. The loan accrues interest at the rate of five percent per annum and matures April 1, 2024.

Under the Agreement, LLF granted a first priority security interest in its unencumbered assets and a second priority security interest in assets subject to a pre-existing security interest. The assets comprise LLF's mass tort and personal injury case portfolio, including co-counsel agreements and all fees, income, revenue, and other proceeds of the cases. Ms. Benito and Mr. Melchionni hold these security interests for the benefit of our investors.

In addition, under the Agreement, LLF assigned to Ms. Benito and Mr. Melchionni one hundred cases based on improvised explosive devices ("IED Cases"). The Agreement provides that if, and only if, LLF repays all amounts owed to our investors on or before January 10, 2025, Ms. Benito and Mr. Melchionni will transfer the IED Cases back to LLF. If all amounts owed to our investors are not fully repaid by such date, Ms. Benito and Mr. Melchionni will use the proceeds of the IED Cases (either through sale, recovery, or both) to repay principal and interest in full to our investors. Any excess proceeds will be paid over to LLF.

We believe that this has added significantly more security to your positions in the portfolio. In addition, this means that a full buyout of the portfolio has been negotiated within a one-year timeline. If that buyout does not occur, we have the collateral to liquidate and return to investors within a reasonable timeline thereafter.

As always, please reach out to us with any questions.

Best Regards,

_Lee Melchionni_

_____
Lee Melchionni, ESQ

_Sylvia Benito_

_____
Sylvia Benito, CFA

# Exhibit 14

---

From: **Noonan, Amanda** <Amanda.Noonan@blankrome.com>
Date: Fri, Feb 9, 2024 at 3:24 PM
Subject: February KS Law Update
To: matthew@jones-adams.com <matthew@jones-adams.com>, Cheyenne Moghadam <c.moghadam@jones-adams.com>
CC: Bressler, Ken <ken.bressler@blankrome.com>

Please see attached and below the investor update for KS Law.

I hope you are well. Attached is KS Law's case list update. I have broken down the litigations below and included a status definition.

In an effort to shore up and protect our investments in cases being handled by the Lake Law Firm ("LLF"), on January 17, 2024, Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term Funding and Security Agreement (the "Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF. The purpose of the loan is to allow LLF to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business. We are informed that LLF is currently in discussions with two potential longer-term lenders. The loan accrues interest at the rate of five percent per annum and matures April 1, 2024.

Under the Agreement, LLF granted a first priority security interest in its unencumbered assets and a second priority security interest in assets subject to a pre-existing security interest. The assets comprise LLF's mass tort and personal injury case portfolio, including co-counsel agreements and all fees, income, revenue, and other proceeds of the cases. Ms. Benito and Mr. Melchionni hold these security interests for the benefit of our investors.

In addition, under the Agreement, LLF assigned to Ms. Benito and Mr. Melchionni one hundred cases based on improvised explosive devices ("IED Cases"). The Agreement provides that if, and only if, LLF repays all amounts owed to our investors on or before January 10, 2025, Ms. Benito and Mr. Melchionni will transfer the IED Cases back to LLF. If all amounts owed to our investors are not fully repaid by such date, Ms. Benito and Mr. Melchionni will use the proceeds of the IED Cases (either through sale, recovery, or both) to repay principal and interest in full to our investors. Any excess proceeds will be paid over to LLF.

We believe that this has added significantly more security to your position in the portfolio. In addition, this means that a full buyout of the portfolio has been negotiated within a one-year timeline. If that buyout does not occur, we have the collateral to liquidate and return to investors within a reasonable timeline thereafter. As always, please reach out to us with any questions.

### 3M Earplugs

- 1 3M survey that has been completed
- 1 case that is closed with a dual representation revenue share
- 83 cases have been filed
- 1 cases that have been filed with a dual representation revenue share
- 15 cases have been retained - sent to firm

### Employee Retention Tax Credit Program

- KS Law Group has 41 companies with 636 employees

### Hernia Mesh

- 34 cases have been filed
- 20 cases are pending
- 19 cases have been sent to firm
- 6 cases that are unable to reach/unresponsive

### Round Up

- 1 case is attempting to contact
- 16 cases have been filed
- 23 cases are pending
- 21 cases have been retained and sent to firm
- 2 cases that have a health status follow up
- 6 cases have skip tracking completed
- 4 cases have been unable to reach/unresponsive

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**<u>Talcum Powder</u>**

- 4 cases have been filed

- 2 cases have been retained and to the firm

- <u>Attempting to Contact</u> - The client has signed the retainer and our co-counsel is reaching out to confirm all of the information on the intake form is accurate.

- <u>Skip Tracing Completed</u> - A case was unresponsive and the private investigator has provided to co-counsel any information that they could find about the client.

- <u>Unable to Reach/Unresponsive</u> - A client has become unable to reach.

- <u>Pending</u> - This is the stage before we send it to the filing firm. The reason the case is pending is listed on the spreadsheet.

- <u>Ready for PPF</u> - Medical records are in, the case looks good, only the required discovery document is needed before being sent to the filing firm for filing.

- <u>Ready to Submit</u> - The case is going through a last quality control check before being sent to the filing firm for filing.

- <u>Retained Sent to Firm</u> - Co-counsel has completed all required work up and the case has been sent to the filing firm for filing.

- <u>Closed Dual Rep Rev Share</u> - Fee split negotiated but Dual Rep co-counsel has not filed the case yet.

- <u>Filed Dual Rep Rev Share</u> - Fee split negotiated and case has been filed.

- <u>Filed</u> - The case has been filed by the filing firm.

**Amanda M Noonan** | BLANKROME
444 West Lake Street | Suite 1650 | Chicago, IL 60606
O: 312.776.2537 | F: 312.896.9181 | amanda.noonan@blankrome.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Exhibit 15**

### The New York Times

# Johnson & Johnson Reaches Deal for $8.9 Billion Talc Settlement

The company faces a flood of lawsuits claiming its talc products caused cancer. The proposed settlement requires approval by a bankruptcy court, but has the backing of plaintiffs' lawyers.





The talc in Johnson & Johnson's baby powder may have been contaminated with asbestos, plaintiffs claim.   Lucas Jackson/Reuters



By **Tiffany Hsu**
Tiffany Hsu has followed the Johnson & Johnson talc litigation closely for more than five years.

April 4, 2023

Johnson & Johnson said on Tuesday that it had agreed to pay $8.9 billion to tens of thousands of people who claimed the company's talcum powder products caused cancer, a proposal that lawyers for the plaintiffs called a "significant victory" in a legal fight that has

**Special offer:** Subscribe for ~~$4.25~~ $1 a week for the first year.                    EXPAND

Filing # 234267379 E-Filed 10/22/2025 07:34:07 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH, on a derivative basis as a member of Justice Partners,

     Plaintiff(s),

vs.

LEE MELCHIONNI, SYLVIA BENITO, JUSTICE PARTNERS MANAGEMENT, JUSTICE PARTNERS LAW GROUP, PERSIST COMMUNICATIONS, INC., a Florida Corporation, THE LAKE LAW FIRM, and EDWARD LAKE.,

     Defendant(s).

_____/

## MEDIATION DISPOSITION REPORT

A Mediation conference was conducted on October 21, 2025. The conference resulted in the following:

The following attorneys, parties, corporate representatives, and/or claims professionals attended and participated in the mediation conference:

    [X] All Plaintiffs and their respective trial counsel.
    [X] All Defendants and/or their fully authorized claims representative, and their respective trial counsel.

The following individuals, parties, corporate representatives and/or claims professionals failed to appear and/or participate as ordered:

_____

_____

___ AGREEMENT
A partial/final agreement was reduced to writing and signed by the participating parties. Counsel for the parties shall report the partial/final agreement to the Court, and /or file the appropriate stipulation for Dismissal.

[X] NO AGREEMENT
The parties did not reach an agreement.

___ ADJOURNMENT
These proceedings have been adjourned, and the mediation hearing shall be resumed on

_____.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on 10|22 , 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

Respectfully submitted,

Joseph R. Dawson, Mediator
Mediator # 41188 R
Upchurch Watson White & Max
Phone: (954) 423-8856
Fax:   (954) 334-2838
jdawson@uww-adr.com

Filing # 234563642 E-Filed 10/27/2025 11:24:27 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

     Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation, THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,

     Defendants.

_____/

Defendant Sylvia Benito hereby submits this Answer, Affirmative Defenses, and Counterclaim to Plaintiff Allan Teh's First Amended Complaint (Dkt. # 36), and states as follows.

## ANSWER

## PARTIES, JURISDICTION AND VENUE

1.     This direct action is for damages, declaratory relief and equitable relief in excess of the minimum jurisdictional limits of this Court.

**Answer**: Benito admits that Teh is seeking damages, declaratory relief, and equitable relief, but denies that Teh is entitled to any damages.

2.     The Plaintiff, Allan Teh, is a citizen and resident of the State of Florida.

**Answer**: Admitted.

1

3.      Defendant, Melchionni, is the Chief Operating Officer of Justice Partners and is a citizen and resident of the State of Florida.  His current residential address is located in Miami-Dade County Florida.

**Answer**: Benito lacks knowledge as to the allegations in this Paragraph and, as such, denies these allegations.

4.      Defendant, Benito, is the Chief Executive Officer of Justice Partners and is a citizen and resident of the State of Florida. Her current residential address is located in Miami-Dade County Florida. Her apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

**Answer**: Benito admits that she has at times described herself as the CEO of Justice Partners, LLC, she denies that she had the responsibilities that a CEO typically has.  Benito further admits that her current residential address is in Dade County, Florida. Benito further admits that per Justice Partners LLC's Operating Agreement, the address to which notices are to be sent is 20900 NE 30th Ave., Miami, FL 33180.

5.      Defendant, Management, is the Manager of LLC and is a Delaware Limited Liability Company doing business in Miami-Dade County, Florida.

**Answer**: Admitted.

6.      Defendant, Law Group, is a District of Columbia Limited Partnership doing business in Miami-Dade County, Florida.

**Answer**: Benito admits that Justice Partners Law Group, LP is a District of Columbia Limited Partnership.  Understanding "doing business" to mean "practicing law," Benito denies that Justice Partners Law Group, LLP practices law in Florida.

7.      Defendant Persist is a Florida Corporation formed in the State of Florida and doing business in the state of Florida.  Persist's current office and the place of operation is located in

2

Broward County, Florida - specifically, 1815 Cordova Road, Fort Lauderdale, FL 33316.

**Answer**: Benito lacks knowledge as to the allegations in this Paragraph and, as such, denies these allegations.

8.      Persist's President and Registered Agent is Edward Lake ("Mr. Lake").  Mr. Lake's address as President and Registered Agent of Persist is the same principal address as Persist and The Lake Law Firm - 1815 Cordova Road, Fort Lauderdale, FL 33316.  *See attached Persist Annual Report filed on January 20, 2023 as **Exhibit 1** and Lake Law invoices dated 4/15/2021 and 10/11/2021 as **Composite Exhibit 2.***

**Answer**: Benito lacks knowledge as to the allegations in this Paragraph and, as such, denies these allegations.

9.      Upon information and belief, Defendant, Edward Lake, is the sole owner, member, and officer of Persist Communications.  Edward Lake is in primary control of all alleged business operations and activities of Persist.

**Answer**: Benito lacks knowledge as to the allegations in this Paragraph and, as such, denies these allegations.

10.      Upon information and belief, Edward Lake exerts dominion and control over Persist as the controlling director, member and/or officer whose control and dominion render Persist a mere business conduit or alter ego used for Edward Lake's personal benefit and financial gain.  Edward Lake is using Persist for an improper purpose to the detriment of the Plaintiff.

**Answer**: Benito lacks knowledge as to the allegations in this Paragraph and, as such, denies these allegations.

11.      Lake Law, upon information and belief, is a New York law firm with operations in the State of Florida.  Lake Law Firm has an office located in Broward County Florida and issues

3

invoices regarding alleged services offered and rendered in the State of Florida and utilizes the 1815 Cordova Road, Fort Lauderdale, FL 33316 office address on its invoices. *See Composite Exhibit 2*.

**Answer**: Benito lacks knowledge as to the allegations in this Paragraph and, as such, denies these allegations.

12.     Upon information and belief, Defendant, Edward Lake, is the sole owner, member, and officer of The Lake Law Firm.  Edward Lake is in primary control of all alleged business operations and activities of The Lake Law Firm.

**Answer**: Admitted.

13.     Upon information and belief, Edward Lake exerts dominion and control over The Lake Law Firm as the controlling director, member and/or officer whose control and dominion render Lake Law a mere business conduit or alter ego used for Edward Lake's personal benefit and financial gain. Edward Lake is using Lake Law for an improper purpose to the detriment of the Plaintiff.

**Answer**: Benito lacks knowledge as to the allegations in this Paragraph and, as such, denies these allegations.

14.     As more fully set forth herein, Lake Law has purposefully availed itself of the privilege of conducting activities within Florida and is therefore under the jurisdiction of this Court. As set out herein and pursuant to Fla. Stat. §48.193 et seq., Lake Law is subject to specific personal jurisdiction because Lake Law committed multiple acts and breaches enumerated in Fla. Stat. §48.193(1) including, but not limited to: operating, conducting, engaging in, and carrying on a business or business venture in Florida, Lake Law has an office in Florida, has committed various and multiple tortious acts within the State of Florida and has breached and is continuing to breach

4

agreements in Florida by failing to perform acts required by the agreements to be performed in Florida.

**Answer**: Benito lacks knowledge as to the allegations in this Paragraph and, as such, denies these allegations.

15.     This venue and forum are appropriate based upon Fla. Stat. § 47.011 and Fla. Stat. § 47.051, and also because virtually every act, breach and transaction set out in this Derivative Complaint occurred in Miami-Dade County, Florida. To the extent other acts, breaches and transactions are stated within this complaint, those occurred in Broward County, Florida. Moreover, the overwhelming majority of fact witnesses are located in Miami-Dade County, Florida.

**Answer**: Benito admits that venue is proper in this Court.  Benito denies the balance of the allegations in this Paragraph.

16.     Defendant, Edward Lake is a citizen and resident of the State of Florida.

**Answer**: Admitted.

17.     Pursuant to Section 9.3 of the Offering Circular attached hereto as **Exhibit 3** the parties to the Agreement irrevocably agree that all actions or proceedings arising out of or related to the Subscription Agreement will be litigated solely in the venue and jurisdiction of any court located within the State of Florida.

**Answer**: Benito states that Section 9.3 of the Subscription Agreement speaks for itself, and on that basis, neither admits nor denies the allegations in this Paragraph.  To the extent that this Paragraph contains legal conclusions, no response is required.

18.     Pursuant to Section 13.8 of the LLC's Operating Agreement, this action can only be brought in courts located in Florida, "County of Dade" [sic].

5

**Answer**: Benito states that Section 13.8 of the Justice Partners LLC Operating Agreement speaks for itself, and on that basis, neither admits nor denies the allegations in this Paragraph.  To the extent that this Paragraph contains legal conclusions, no response is required

**GENERAL ALLEGATIONS**

19.    The Manager of LLC is Defendant, Justice Partners Management, LLC, ("Management") a Delaware Limited Liability Company formed on February 15th, 2021.

**Answer**: Admitted.

20.    Pursuant to the Offering Circular, Melchionni is an "Authorized Member" of JP Management. *See Pg. 67 of Offering Circular attached as* ***Exhibit 3.***

**Answer**: Benito states that Offering Circular speaks for itself, and on that basis, neither admits nor denies the allegations in this Paragraph.  To the extent that this Paragraph contains legal conclusions, no response is required.

21.    On April 6, 2021, Plaintiff acquired a sizable equity interest in Justice Partners through the purchase of 4,000 Units of Series A Preferred Units, at a purchase price of $4,000,000. *See Offering Circular attached as* ***Exhibit 3.***

**Answer**: Benito admits that Teh purchased 4,000 Series A Preferred Units of Justice Partners LLC for $4 million.  Benito denies the remaining allegations of Paragraph 21.

22.    As more fully set out herein, the Plaintiff's acquisition of this equity interest was the result of a variety of misrepresentations by the Defendants herein.

**Answer**: Denied.

23.    Defendants, Melchionni, Benito, Management, jointly and individually, fraudulently induced multiple individuals and entities, including the Plaintiff, to invest a total of $11,725,000 in the LLC.

6

**Answer**: Denied.

24.    The represented purpose of the formation of LLC as stated in the marketing documents and Offering Circular provided by the Defendants was to take the entirety of the invested proceeds and provide those funds as a "Loan" to Defendant, Law Group. *See Page 3 of Marketing Deck attached as **Exhibit 4.***

**Answer**: Benito states that the documents speak for themselves, and on that basis, neither admits nor denies the allegations in this Paragraph.

25.    The LLC Operating Agreement and incorporated documents and agreements – presented to the Plaintiff prior to his investment and as a specific inducement to undertake such investment, used the terms "Loan" and "Investment" interchangeably, defining "Investment" as "investments and loans made, directly, or indirectly, by the Company [LLC] in accordance with this Agreement to Justice Partners Law Group, LP." *See Pg. 28 of Offering Circular attached as **Exhibit 3.***

**Answer**: Benito states that the documents speak for themselves, and on that basis, neither admits nor denies the allegations in this Paragraph.  Benito denies that the Justice Partners LLC Operating Agreement and incorporated documents were presented to Teh "prior to his investment and as a specific inducement to undertake such investment."  To the extent that this Paragraph contains legal conclusions, no response is required.

26.    The Defendants, Melchionni and Benito both collectively and individually, represented that the "Loan" was to be utilized by the Law Group "as to facilitate the financing of mass tort litigation expenses, which include, but are not limited to: research, client acquisition; marketing; expert fees; general working capital purposes for the Firm [Law Group], and any other businesses ancillary or complementary thereto."

7

**Answer**: Benito states that to the extent that Teh is quoting documents, the documents speak for themselves, and on that basis, neither admits nor denies the allegations in this Paragraph.

27.    As discovery has revealed in other related litigation, the only method or basis that could result in the return of the Plaintiff's or other investors' principal investment, and possible profits, is: (1) Law Group's acquisition of mass tort litigation cases; (2) the settlement or successful trial of those mass tort litigation cases; (3) via legitimate retainer agreements, contingency fee agreements, and/or referral/co-counsel agreements, that would ultimately yield attorneys' fees revenue which would then result in funds that would then flow up to the LLC for purposes of distribution and/or repayment to the investors and members of the LLC.

**Answer**: Because this is not a factual allegation but rather an attempt to characterize evidence in another lawsuit, no response is required.  Further, Benito states that the evidence speaks for itself, and on that basis, neither admits nor denies this allegation.  To the extent a response is required, Benito denies this allegation.

28.    Defendant Melchionni, the COO of the LLC, the Managing Partner of Defendant Law Group, as well as an "Authorized Member" of Management, admitted under oath in a separate legal proceeding that the Law Group is inextricably linked with Justice Partners.

**Answer**: Because this is not a factual allegation but rather an attempt to characterize evidence in another lawsuit, no response is required.  Further, Benito states that Melchionni's testimony speaks for itself, and on that basis, neither admits nor denies this allegation.  To the extent a response is required, Benito denies this allegation.

29.    Specifically, Melchionni confirmed these allegations by testifying: "Justice Partners Law Group is involved in the . . . litigation, which would then – the funds produced from

that would flow through to Justice Partners LLC." *See Pg. 75 Lns. 12-15*

*of Deposition Transcript of Melchionni attached as* **Exhibit 5***.*

**Answer**: Because this is not a factual allegation but rather an attempt to characterize evidence in another lawsuit, no response is required.  Further, Benito states that Melchionni's testimony speaks for itself, and on that basis, neither admits nor denies this allegation.  To the extent a response is required, Benito denies this allegation.

30.     As set out more fully below, the "Loan" of $11,725,000 to Law Group **was never effectuated**, and **JP Law Group has not acquired any mass tort litigation cases or clients**.

**Answer**: Denied.

31.     Instead, Defendants Melchionni, Benito, Management, and Law Group, jointly and individually, conspired with Defendants, Lake Law Persist, and Edward Lake jointly and individually, to defraud the LLC's investors and members.

**Answer**: Denied.

32.     Prior to Mr. Teh's investment and after that investment, Melchionni, Benito, and Management, jointly and individually, misrepresented the nature of the LLC's members' investment and loan to Law Group, and instead effectuated the fraudulently transfer of $11,250,000 to Defendants, Lake Law and Persist. *See Lake Law Invoices attached as* **Exhibit 2***.*

**Answer**: Denied.

33.     In furtherance of that scheme, Melchionni, Benito, Management, and Law Group, jointly and individually, misrepresented the capacity, authority, ability and status of the Law Group's acquisition of mass tort litigation cases. These misrepresentations were made before and after the Plaintiff's investment.

**Answer**: Denied.

9

34. Upon information and belief prior to Plaintiff's April 6, 2021, investment in Justice Partners Defendants, Melchionni, Benito, Management, Lake Law, Persist, and Edward Lake entered into a common plan and agreement to induce Plaintiff to invest $4,000,000 into Justice Partners through false representations that the funds would be loaned to Justice Partners Law Group for acquisition of mass tort cases.

**Answer**: Denied.

35. Upon information and belief, in furtherance of the conspiracy, and as more fully set forth herein, the Defendants agreed that Lake Law, Persist, and Edward Lake would generate false and backdated invoices and documentation purporting to show case acquisitions and co-counsel relationships that did not exist.

**Answer**: Denied.

36. Upon information and belief Lake Law, Persist, and Edward Lake in agreement with, and at the direction and knowledge of Melchionni and Benito, created invoices backdated to coincide with the purported "loan" and falsely represented that 11,250,000 dollars had been used to acquire thousands of mass tort cases.

**Answer**: Denied.

37. These coordinated acts were undertaken to mislead Plaintiff into believing his investment was supported by legitimate mass tort assets and that the funds were properly loaned to JP Law Group.

**Answer**: Denied.

38. As set forth in detail herein, Plaintiff justifiably relied on these representations and suffered damages exceeding $4,000,000 as a direct and proximate result of the conspiracy."

**Answer**: Denied.

10

39. Following Plaintiff's April 6th, 2021, acquisition of 4,000 Units of Series A Preferred Units of the LLC, at a purchase price of $4,000,000 he did not receive any substantive correspondence, information or documentation to allow him to assess the value, status, and quality of $4,000,000 equity interest.

**Answer**: Denied.

40. In response, and following the LLC's failure to comply with Plaintiff's November 5th, 2022, Demand for Books and Records, Plaintiff, on November 25th, 2022, initiated a Books and Records Action in the Circuit Court for the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, *Teh v. Justice Partners, LLC, et al*., Case No. 2022-022470-CA-1 (the "Books and Records Action.")

**Answer**: Benito admits that Teh commenced a books and records action so styled. Benito denies the balance of the allegations in this Paragraph.

41. During those legal proceedings the LLC at the direction of Melchionni, Benito, and Management, turned over a small set of documents, albeit insufficient, that directly revealed: 1) Melchionni's, Benito's, and Management's obvious breach and disregard as to the terms of Justice Partners Operating Agreement; 2) the lack of evidence to support that any "Loan" was ever provided to Law Group; and 3) the fraudulent and unauthorized transfer of $11,250,000 to Defendant's Lake Law and Persist.

**Answer**: Denied.

42. Section 10.1 of the Justice Partners Operating Agreement provides:

The Company will maintain true, **complete and correct books of account of the Company, all in accordance with generally accepted accounting principles** applied on a consistent basis and shall keep minutes of the proceedings of, or

11

maintain written consents executed by, the Members and the Manager.  The books of account **shall contain particulars of all monies, goods or effects belonging to or owing to or by the Company**, or paid, received, sold or purchased in the course of the business, and all such other transactions, **matters and things relating to the business of the Company as are usually entered in books of accounts kept by Persons engaged in a business of a like kind and character**. In addition, the Company shall keep all records required to be kept pursuant to the Act.  Any Member shall, upon prior written notice and during normal business hours, have access to the information described in the Act, for the purpose of inspecting or, at the expense of such Member, copying the same.  Any Member reviewing the books and records of the Company pursuant to the preceding sentence shall do so in a manner which does not unduly interfere with the conduct of the business of the Company. The Company will provide an unaudited financial at the end of each fiscal year to its Members.

*Section 10.1(a): Books and Records*

**Answer**: Benito states that the Justice Partners LLC Operating Agreement speaks for itself, and on that basis, neither admits nor denies this allegation.

43.     Section 10.1 of the Justice Partners Operating Agreement provides:

The Manager **may not commingle the Company's funds with the funds of any** Member, Director, officer or other Person.

*Section 10.3: Company Funds*

**Answer**: Benito states that the Justice Partners LLC Operating Agreement speaks for itself, and on that basis, neither admits nor denies this allegation.

12

44. The term "Person" is identified in the LLC Operating Agreement as "a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity."

**Answer**: Benito states that the Justice Partners LLC Operating Agreement speaks for itself, and on that basis, neither admits nor denies this allegation

45. Prior to the plaintiff's investment, the Defendants specifically stated that the plaintiff's invested funds would be segregated and safeguarded into a discrete operating account for the subject operating LLC. This representation was material and essential regarding the Plaintiff's decision to undertake this investment.

**Answer**: Benito denies making the alleged representation to Teh. Benito lacks knowledge as to what went into The's decision making and, as such, denies the allegation regarding his decision making.

46. However, the Defendants, Melchionni and Benito, have admitted on multiple occasions that, in direct breach of Section 10.3, Justice Partners funds have been extensively commingled with other entities via their unauthorized and undisclosed use of a "third-party fund administrator" Industry Fintech Inc.

**Answer**: Denied.

47. As evidence of these misrepresentations, and in direct breach of Section 10.1(a) of the Operating Agreement, and despite being the COO of Justice Partners, Melchionni has repeatedly contended that it is Industry Fintech, not the LLC that generates and handles the financial records of LLC.

**Answer**: Denied. Further, Benito states that Melchionni's testimony in this regard speaks

for itself, and on that basis, neither admits nor denies this allegation.

48.     Melchionni went as far as to represent under oath that *only* Industry Fintech maintains and has custody of documents [*sic*] which would evidence and outline the status of the "Loan" to Law Group. *See Pg. 43-4 Lns. 19-13 of Deposition Transcript of Melchionni attached as* **Exhibit 5**.

**Answer**: Benito states the Melchionni's testimony speaks for itself, and on that basis, neither admits nor denies this allegation.

49.     No such documents or records in that regard have ever been produced to the Plaintiff.

**Answer**: Benito cannot admit or deny this allegation because it is too vague.

50.     The LLC's funds were so extensively commingled that the heavily redacted bank statements provided during the Books and Records Action were unusable to forensically determine the flow of the subject funds.

**Answer**: Benito has no knowledge as to whether Teh could conduct a forensic analysis of the referenced bank records, and on that basis, denies the allegation.

51.     As additional evidence of these misrepresentations, during the Books and Records Action, Melchionni and Benito produced two "Invoices" generated by Defendants, Lake Law and Persist. *See Invoices attached as Composite* **Exhibit 2.**

**Answer**: Denied.

52.     The first "Invoice" was apparently generated by Lake Law and Persist on April 15th, 2021, **only two days** following Plaintiff's initial transfer of $2 million into Justice Partners' bank account, and states that **$6,125,000** was transferred into Persist's TD Bank Account ending in #2721.

14

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

53.     The second "Invoice" was generated by Lake Law and Persist on October 11th, 2021, and states that an additional **$5,125,000** was transferred into Persist's TD Bank Account ending in #2721.

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

54.     The second "Invoice" was generated by Lake Law and Persist on October 11th, 2021, and states that an additional **$5,125,000** was transferred into Persist's TD Bank Account ending in #2721.

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

55.     However, Justice Partners (2021-2022) General Ledger, provided by Melchionni and Benito, establishes that it was in fact the LLC, **not the** Law Group, which transferred the funds to Persist and Lake Law. *See General Ledger as **Exhibit 6** which will be filed Under Seal.*

**Answer**: Benito states that the referenced General Ledger speaks for itself, and on that basis, neither admits nor denies this allegation.

56.     The misrepresentations and fraudulent payments and transfers referenced above, totaling **$11,250,000**, were effectuated and undertaken at the direction of Melchionni, Benito, Management, Lake Law, Lake and Persist, jointly and individually.  Such transfers were made and effectuated without any cognizable consideration, contract or agreement in place.

**Answer**: Denied.

57.     The fact that the funds transferred to Lake Law and Persist came from the LLC and

15

not JP Law's bank accounts is and express admission and concession that the misrepresented "Loan" to Law Group was never actually made or realized.

**Answer**: Denied.

58.     However, such well documented fraudulent misrepresentations and acts did not get in the way of the Defendants attempting a ham-handed cover up regarding such a breaches. Specifically, on February 16th, 2022, 103 days following Plaintiff's original records request, Melchionni and Benito, ostensibly on behalf of the LLC, provided Plaintiff with an unexecuted "Senior Secured Promissory Note" supposedly evidencing the memorialization of the "Loan" from the LLC to JP Law Group. See Unexecuted Loan Agreements attached as Composite Exhibit 7.

**Answer**: Denied.

59.     Interestingly, and according to the terms of the unexecuted "Senior Security Instrument", the LLC "shall maintain an account on its books and records which shall evidence the outstanding principal balance of all Advances, Interest due and owing thereon and any fees and expenses due from time to time under this Note." *See **Exhibit 7.***

**Answer**: Denied.

60.     Only after this Court entered a verdict against the LLC in a separate action did the Defendants bother to generate and then send to the Plaintiff a quanta of these documents. Even that production is grossly deficient

**Answer**: Denied.

61.     More interestingly, on August 18th, 2023, counsel for Justice Partners in the Books and Records Action produced an **executed version** of the "Senior Security Instrument." *See Executed Loan Agreements attached as **Exhibit 8.***

**Answer**: Denied.

16

62.     On August 22nd, 2023, when Melchionni, under oath, was asked why the executed version of the "Senior Security Instrument" was not originally provided back in February 16th, 2023 in response to the records requests, he simply answered "[i]t had not been executed when it was sent to you." *See Page 42, Lns. 11-14 of Melchionni Deposition Transcript attached as Exhibit 5.*

**Answer**: Benito states that Melchionni's testimony speaks for itself, and on that basis, neither admits nor denies this allegation.

63.     The Senior Security Instrument was executed **by Melchionni**, on behalf of Law Group, on **June 23rd, 2023**, **808 days following Plaintiff's acquisition of his $4,000,000 equity interest**. *See Exhibit 8.*

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

64.     However, although the Instrument was apparently executed on June 23rd, 2023, Melchionni, on behalf of both the LLC and the Law Group, simply announced that the "effective date" of the agreement would be **April 14th, 2021**.

**Answer**: Benito states that Melchionni's testimony speaks for itself, and on that basis, neither admits nor denies this allegation.

65.     Coincidentally, the "effective date" of April 14th, 2021, is **a day before the first "Invoice" was generated by Lake Law and Persist on April 15th, 2021**.

**Answer**: Benito states that the referenced documents speak for themselves, and on that basis, neither admits nor denies this allegation.

66.     Rather than following through on the representations made to the Plaintiff regarding the actual use of the invested funds or adhering to the LLC's Operating Agreement and

properly providing a "Loan" to the Law Group, Defendants, Melchionni, Benito, and Management instead fraudulently paid and transferred essentially the entirety of the LLC's cash, assets and invested funds directly to Defendants, Lake Law, Lake and Persist.

**Answer**: Denied.

67.     The Defendants made these misrepresentations and conducted this fraudulent scheme in order to obtain and then retain complete control over the use of the LLC's cash, assets, and investors' funds as well as siphon "good cases" away from the LLC's members and investors for Defendants' own pecuniary gain.

**Answer**: Denied.

68.     Specifically, Defendants Melchionni and Benito have significant material interests and positions in other similarly configured law firms. As a result of those Defendants' inter-firm relationships, those Defendants are able to assign, re-assign or otherwise designate "good cases" to one or more firms ("cherry-picking") but also assign or re-assign "bad cases" to other firms at which those Defendants have significant interests and positions.

**Answer**: Benito admits that she is a non-lawyer partner in certain District of Columbia law firms other than Justice Partners Law Group, LLP.  Benito denies the remaining allegations in this Paragraph.

69.     The Defendants, Melchionni and Benito, conspicuously failed to advise the Plaintiff of these positions and relationships before he [*sic*] his investment.

**Answer**: To the extent that Teh suggests that Benito had an obligation to "advise [him] of these positions and relationships," Benito denies this allegation.  Benito further lacks knowledge regarding the averments in Paragraph 69, as such, denies them.

70.     An example of this conduct comes in the form of the various nonsensical "updates"

provided by the Defendants to the LLC's members and investors regarding the status of these supposed mass tort litigation cases "acquired" by the Law Group.

**Answer**: Denied.

71.     One such "update" (i.e., a "representation") occurred on October 20, 2021, when Melchionni and Benito emailed Plaintiff explicitly stating that the LLC had "spent $11,250,000 to **acquire** 200 Firefighter Foam Cases, 208 Talc Cases, 380 Hernia Mesh Cases, 350 3M Cases, 150 RoundUp Cases, and 200 Zantac Cases." *See October 20th, 2021 Email attached **as Exhibit 9.***

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

72.     Melchionni and Benito stated in that same October 20, 2021 email that Justice Partners would be "entitled to 72% of the attorney fee" obtained through these mass tort litigations.

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

73.     Melchionni assured Plaintiff on several occasions that there would be no case drop-off in the cases acquired by Justice Partners stating "I prenegotiate exactly what we are paying for cases so I do not have to worry about drop off or price increases mid campaign." *See Email attached as **Exhibit 9.***

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

74.     However, those representations made are incongruent, and hold no relationship with the cases "acquired" by the Law Group, as set forth in the two "Invoices" generated by Lake Law and Persist.

**Answer**: Benito states that the referenced documents speak for itself, and on that basis,

neither admits nor denies this allegation.

75.     Specifically, the April 15th, 2022, and October 11th, 2021, "Invoices" state that for the same $11,250,000 figure, the Law Group "acquired":

> a. 1,200 3M Mass Tort Cases;
>
> b. 200 Fire Foam Mass Tort Cases;
>
> c. 1,986 Hernia Mesh Mass Tort Cases;
>
> d. 250 Round Up Mass Tort Cases;
>
> e. 1,544 Talcum Powder Mass Tort Cases; and
>
> f. 200 Zantac Mass Tort Cases.

*See attached **Exhibit 2.***

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

76.     As is crystal clear, those "Invoices" bear no relationship to the other representations or verifiable reality.

**Answer**: Denied.

77.     Not only do the Invoices illustrate Lake Law and Persist's failures to satisfy any of their represented obligations, but also establish Edward Lake's failure to satisfy or comply with the obligations he is individually liable for.

**Answer**: Denied.

78.     Each invoice states that "Edward J. Lake, Esq. (EL) agrees to the following: 1) Market, intake, and sign-up potential clients; 2) Gather medical records, a medical summary, a plaintiff fact sheet and/or court complaint, as necessary; 3) EL will act liaison between the undersigned trial firms; 4) The Lake Law Offices will handle any client inquiries; 5) Any out-of-

20

pocket expenses paid as result of the above will be a lien on clients' portion of any recovery; 6) Joint venture fee splits will be as follows: 20% The Lake Law Offices; 60% Client firm; 20% Trial firm." *See Composite* **Exhibit 2.**

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

79.     The inclusion of the language "Edward J. Lake, Esq. agrees" followed by an explicit listing of his duties represents Lake's clear intention to be individually liable for obligations and representations set forth in the two Invoices.

**Answer**: Admitted.

80.     The Defendants' misrepresentations and nonsensical "updates" continued.

**Answer**: Benito admits that she provided certain updates to Justice Partners LLC members, but denies that they contained misrepresentations or were nonsensical.

81.     Specifically, Melchionni, Benito, and Management provided "investor report" in April of 2023. *See April 2023 Investor Report attached as* **Exhibit 10.**

**Answer**: Admitted.

82.     In that "report", the mass tort "cases" previously represented to be "acquired" by the Law Group and by Agreement the LLC as a lender/investor of the Law Group, those case were now referred to as mere "leads," while maintaining the same acquisition cost of "$11,250,000."

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

83.     Specifically, the April 2023 Report now states that the LLC and the Law Group have:

        a. 216 Total "Leads" of 3M Ear Plug Mass Tort Cases with 60 pending leads

21

and 141 filed/retained leads;

b. 21 Total "Leads" of Camp Lejune Mass Tort Cases with 20 pending leads and 0 filed/retained leads;

c. 149 Total Leads of Fire Foam Mass Tort Cases with 33 pending leads and 114 filed/retained leads;

d. 195 Total Leads of Hernia Mesh Mass Tort Cases with 138 pending leads and 49 filed/retained leads;

e. 30 Total Leads of Talcum Powder Mass Tort Cases with 14 pending leads and 16 filed/retained leads;

f. 29 Total Leads of Zantac Mass Tort Cases with 14 pending leads and 16 filed/retained leads; and

g. 73 Total Leads of B2B/ERC Mass Tort Cases with 0 pending leads and 0 filed/retained leads. *See Exhibit 10.*

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

84.    Not only do the represented values not make logical sense, but now other undisclosed categories of cases are referenced and the phrase "Leads" was never disclosed to the Plaintiff prior to his investment.

**Answer**: Denied.

85.    The Defendants' misrepresentations continued.

**Answer**: Denied.

86.    On July 11th, 2023, Plaintiff received a document labeled "All cases presently open and assigned to JPLG Law Group [Law Group]" *See List of cases attached as Exhibit 11.*

22

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

87.    This list of "cases presently open and assigned to JPLG Law Group" was not provided, or generated by the LLC Melchionni, Benito, or Management, but rather Defendant Edward J. Lake, the 100% owner of both Lake Law and Persist.

**Answer**: Benito lacks information regarding the averments in this Paragraph and, on that basis, denies them.

88.    This previously undisclosed list now provides a wholly new set of values for the mass tort cases supposedly "acquired" by the Law Group, and now provides that the Law Group has:

a. 152 Hernia Mesh Mass Tort Cases;

b. 30 Talcum Powder Mass Tort Cases;

c. 200 3M Earplug Mass Tort Cases;

d. 18 Camp Lejune Mass Tort Cases;

e. 150 Fire Foam Mass Tort Cases;

f. 28 Zantac Mass Tort Cases; and

g. 52 B2B/ERC Mass Tort Cases.

See attached Exhibit 11.

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

89.    Not content with the misrepresentations thus far, they continued.

**Answer**: Denied.

90.    On December 1st, 2023, Plaintiff received a purported LLC September 2023

23

"Investor Report" generated by Melchionni, Benito, and Management, containing once again a wholly new data set representing the cases "acquired" by JP Law Group. *See September Investor Report attached as* **Exhibit 12.**

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

91.     In that "report" the Defendants now claim that the cases "acquired" by the Law Group and by Agreement, the LLC, include:

a. 137 Hernia Mesh Mass Tort Cases;

b. 24 Talcum Powder Mass Tort Cases;

c. 152 Fire Foam Mass Tort Cases;

d. 16 Camp Lejune Mass Tort Cases;

e. 163 3M Earplug Mass Tort Cases; and

f. 13 Zantac Mass Tort Cases. *See* **Exhibit 13.**

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation

92.     Not only are the number of "acquired" cases materially different than prior representations but the September 2023 Investor Report is wholly devoid of any reference to the 52 B2B/ERC Mass Tort Cases represented in Edward J. Lake's prior

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

93.     Defendants' misrepresentations reached new heights of absurdity when on January 25th, 2024, Plaintiff received the LLC's January 2024 "Investor Update" ("January Report"). *See January 2024 Investor Update attached as* **Exhibit 13.**

24

**Answer**: Denied

94.     The opening paragraph of the January Report states:

In an effort to shore up and protect our investments in cases being handled

by the Lake Law Firm ("LLF"), **on January 17, 2024, Sylvia Benito and**

**Lee Melchionni, acting in their individual capacities, entered into a**

**Short-Term Funding and Security Agreement (the "Agreement") with**

**LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned**

**an aggregate amount of $400,000.00 to LLF.** The purpose of the loan is

to allow LLF to pay ongoing operating expenses of the firm including

payroll while it seeks longer-term financing solutions for its business. We

are informed that LLF is currently in discussions with two potential longer-

term lenders. The loan accrues interest at the rate of five percent per annum

and matures April 1, 2024.

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

95.     The January Report sets forth that Melchionni and Benito in their individual capacity provided Defendant Lake Law with an additional **$400,000**.

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation.

96.     Melchionni and Benito went as far to state that the funds will be used by Lake Law "to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business."

**Answer**: Benito states that the referenced document speaks for itself, and on that basis,

neither admits nor denies this allegation.

97. The absurdity and obvious nature of Melchionni and Benito's misrepresentations continued on February 29th, 2024, when Plaintiff received and update **for an entirely separate and distinct investment** he entered into with Melchionni and Benito, **which was identical to the LLC's January Report**. *See February 29th ,2024 KS Law Update attached as **Exhibit 14.***

**Answer**: Denied.

98. The investment involves a District of Columbia law firm, KS Law Group, LLP ("KS Law"), which was formed by Melchionni, Benito, and the Plaintiff, on August 24th, 2021.

**Answer**: Benito admits that she, Melchionni, and Teh are partners in a District of Columbia Law Firm called KS Law Group, LLP.

99. KS Law was to operate in the same capacity as the Justice Partners Law Group but with the Plaintiff being the sole investor/capital partner

**Answer**: Benito admits that Teh was the only source of capital for KS Law Group, LLP, which had a purpose of ultimately investing in mass torts litigation.

100. Plaintiff has initiated several different lawsuits and arbitration proceedings in regard to the KS Law investment.

**Answer**: Admitted.

101. As evidence of the fraudulent conduct set out herein, the February 29th, 2024, KS Law update was **verbatim** to the January Justice Partners LLC Report.

**Answer**: Denied.

102. The first paragraph of the KS Law update read as follow [*sic*]:

In an effort to shore up and protect our investments in cases being handled by the Lake Law Firm ("LLF"), **on January 17, 2024, Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term**

26

**Funding and Security Agreement (the "Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF.** The purpose of the loan is to allow LLF to pay ongoing operating expenses of the firm including payroll while it seeks longer-term financing solutions for its business. We are informed that LLF is currently in discussions with two potential longer-term lenders. The loan accrues interest at the rate of five percent per annum and matures April 1, 2024.

**Answer**: Benito states that the referenced document speaks for itself, and on that basis, neither admits nor denies this allegation

103.    For Melchionni and Benito to represent identical "updates" in two entirely separate and distinct entities and investments strains the limits of credibility and further demonstrates their disregard for their legal obligations as well as any semblance of transparency or integrity.

**Answer**: Denied.

104.    To this day, the Plaintiff still has not been able to accurately assess the value, status, and quality of his investment.

**Answer**: Benito lacks knowledge as to the allegations in this Paragraph and, as such, denies these allegations.

105.    As if to highlight to serious nature of these claims, the misrepresentations made to the Plaintiff regarding Talcum Powder Cases are especially troubling in light of Johnson & Johnson's April 13th, 2023, press release announcing an **8.9 Billion Dollar** settlement offer to claimants in Talcum Powder cases. *See Press Release attached as **Exhibit 15.***

**Answer**: Denied.

106.    Additionally, it is important to note that the Justice Partners Law Group is **law firm** formed in the District of Columbia and is required to comply with the D.C. Rules of Professional Conduct.

**Answer**: Benito admits that Justice Partners Law Group LLP is a District of Columbia Law

27

firm subject to the District of Columbia Rules of Professional Conduct.

107.    As Rules 1.5(c) and 1.5(e) of the D.C. Rules of Professional Conduct explicitly state:

1.5(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. **A contingent fee agreement shall be in writing** and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation, other expenses to be deducted from the recovery, whether such expenses are to be deducted before or after the contingent fee is calculated, and whether the client will be liable for expenses regardless of the outcome of the matter. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and if there is a recovery, showing the remittance to the client and the method of its determination.

1.5(e) A division of a fee between lawyers who are not in the same firm may be made only if:

(1) The division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.

(2) **The client is advised, in writing**, of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged;

(3) The client gives informed consent to the arrangement; and

(4) The total fee is reasonable

**Answer**: Benito states that the cited Rules speak for themselves, and on that basis, neither admits nor denies this allegation

108.    As previously stated, and upon information and belief, Law Group is apparently not a party to any known fee agreement and no "client" has ever been informed of Law Group's involvement in their case.

**Answer**: Denied.

28

109.    Defendants Melchionni, Benito, and JP Management, acting in concert with Defendants, the Law Group, Lake Law, Lake and Persist as described herein, have defrauded the Plaintiff and caused substantial damage in that regard. These damages are separate and distinct from any damages incurred by Justice Partners LLC.

**Answer**: Denied.

## COUNT 1
## DIRECT CLAIM FOR CIVIL CONSPIRACY TO COMMIT FRAUD
### (AS TO ALL DEFENDANTS)

110.    Benito incorporates by reference her responses to the previous allegations in their entirety.

111.    Prior to Plaintiff's April 6, 2021, $4,000,000 investment in Justice Partners, Defendants Lee Melchionni, Sylvia Benito, Justice Partners Management, LLC, Justice Partners Law Group, LP, The Lake Law Firm, LLC, Persist Communications, Inc., and Edward Lake, acting jointly and in concert, entered into a common plan and agreement to induce Plaintiff to invest through false representations concerning the use and purpose of his funds.

**Answer**: Denied.

112.    The purpose and objective of the conspiracy were to mislead Plaintiff into believing that his investment would be "loaned" to Justice Partners Law Group for the legitimate acquisition of thousands of mass-tort cases, when, in fact, Defendants had already agreed that the funds would be diverted to accounts owned and controlled by Defendants Lake, Lake Law, and Persist for the own pecuniary gain of the Defendants.

**Answer**: Denied.

113.    In furtherance of this plan, and prior to Plaintiff's investment, Defendants agreed that Lake Law, Persist, and Edward Lake would generate false and backdated invoices and

documents purporting to evidence mass-tort case acquisitions and cocounsel relationships that did not exist. This included fabricating invoices backdated to April 15, 2021, and October 11, 2021, that collectively claimed $11,250,000 in "case acquisitions" despite no such assets ever being acquired.

**Answer**: Denied.

114.    To lend legitimacy to the fraudulent transfers, Defendants also agreed to create a "Senior Security Instrument" purporting to document a loan from Justice Partners, LLC to the Law Group.  The instrument was executed more than two years after Plaintiff's investment (June 23, 2023) but falsely backdated to April 14, 2021, the day before the first backdated invoice to create the illusion of a contemporaneous, authorized transaction.

**Answer**: Denied.

115.    Acting in concert:

a. Melchionni and Benito directed the transfer of investor funds from Justice Partners' account to Persist's TD Bank account ending in 2721, even though Persist had no contractual entitlement or role in the venture.

b. Lake Law and Persist issued matching invoices and received the funds while representing that Edward J. Lake, Esq. agrees to market, intake, and sign-up clients; gather medical records; act as liaison between trial firms; and handle client inquiries.

c. Lake personally approved and transmitted these invoices and directed the receipt and disbursement of investor funds under his control

d. All Defendants then collaborated to circulate a series of false "Investor Updates" (October 20, 2021; April 2023; September 2023; January 2024) repeating

knowingly fabricated case counts and asset values to conceal the misappropriation.

**Answer**: Denied.

116.   Even after Plaintiff's investment, Defendants continued to act in concert to conceal the scheme. When Plaintiff demanded records in November 2022, Defendants responded with incomplete and misleading documents, and ultimately fabricated an executed version of the "Senior security Instrument" to give the appearance that the transfers had been legitimate. Each Defendant benefitted from the fraudulent diversion of funds.

**Answer**: Denied.

117.   The overt acts undertaken by Defendants in furtherance of this conspiracy include, but are not limited to:

a. generating and backdating false invoices totaling $11,250,000;

b. issuing knowingly false "Investor Reports" purporting to show nonexistent case portfolios

c. transferring and commingling investor funds into accounts owned by Lake and his entities

d. fabricating and circulating inconsistent "case acquisition" data across multiple updates and entities (Justice Partners and KS Law).

**Answer**: Denied.

118.   As a direct and proximate result of Defendants' unlawful agreement, coordinated actions, and concealment, Plaintiff was fraudulently induced to invest $4,000,000, lost the entirety of his investment, and has been denied truthful and reliable information necessary to assess his ownership interest or recover his funds.

**Answer**: Denied

31

**WHEREFORE**, Plaintiff, requests this Honorable Court enter judgment against all Defendants for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

**Answer**: Benito admits that Teh seeks relief but denies that such relief is proper.

## COUNT 2
## DIRECT CLAIM FOR FRAUD
### (AS TO LEE MELCHIONNI)

119.    Benito incorporates by reference her responses to the previous allegations in their entirety.

120.    The allegations in Paragraphs 120 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

121.    The allegations in Paragraphs 121 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

122.    The allegations in Paragraphs 122 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

123.    The allegations in Paragraphs 123 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

124.    The allegations in Paragraphs 124 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

32

125.    The allegations in Paragraphs 125 are not directed at Benito. Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

**ANSWER:**  Because Teh does not direct this Count at Benito, he is not entitled to any relief from her.

## COUNT 3
## DIRECT CLAIM FOR FRAUD
### (AS TO SYLVIA BENITO)

126.    Benito incorporates by reference her responses to the previous allegations in their entirety.

127.    At all times material hereto, there has been a relationship of trust and confidence between this Defendant on one hand and the Plaintiff. The genesis of this trust and confidence is consequent to this Defendant's solicitation and multiple representations to the Plaintiff in an effort to induce him to make the investment set out herein.

**ANSWER:** Denied.

128.    As alleged above and herein, Benito has committed fraud by, among other things, participating in self-dealing and fraudulent transactions whereby transferring essentially all of Plaintiff's funds to Defendants, Persist and Lake Law, without any known consideration or agreement in place.

**ANSWER:** Denied.

33

129.    Further, Benito, has commingled the plaintiff's funds in an effort to utilize said funds for her own pecuniary gain.

**ANSWER:** Denied.

130.    By virtue of Benito's fiduciary relationship, Benito had the continuing duty of care, honesty, and loyalty to the plaintiff which she has blatantly ignored and breached.

**ANSWER:** Denied.

131.    Benito knew or should have known that his conduct and inaction would necessarily damage the plaintiff.

**ANSWER:** Denied.

132.    Benito's material breaches of her duties have proximately caused serious damage to the plaintiff. All such damages proximately result from Benito's breaches of her duties.

**ANSWER:** Denied.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

**Answer**: Benito admits that Teh seeks relief but denies that such relief is proper.

**COUNT 4**
**DIRECT CLAIM BREACH OF FIDUCIARY DUTY**
**(AS TO LEE MELCHIONNI)**

133.    Benito incorporates by reference her responses to the previous allegations in their entirety.

134.    The allegations in Paragraphs 134 are not directed at Benito. Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

34

135.     The allegations in Paragraphs 135 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

136.     The allegations in Paragraphs 136 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

137.     The allegations in Paragraphs 137 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

138.     The allegations in Paragraphs 138 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

139.     The allegations in Paragraphs 139 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

**ANSWER:**   Because Teh does not direct this Count at Benito, he is not entitled to any relief from her on the Count.

<div align="center">

**COUNT 6[1]**
**DIRECT CLAIM BREACH OF FIDUCIARY DUTY**

</div>

---

[1]     This Count is misnumbered; it should be Count 5.  Consequently, all subsequent numbering is off by one.

**(AS TO SYLVIA BENITO)**

140.     Benito incorporates by reference her responses to the previous allegations in their entirety.

141.     At all times material hereto, there has been a relationship of trust and confidence between this Defendant on one hand and the Plaintiff. The genesis of this trust and confidence is consequent to this Defendant's solicitation and multiple representations to the Plaintiff in an effort to induce him to make the investment set out herein.

**ANSWER:** Denied.

142.     As alleged herein Benito has committed fraud and breached her fiduciary duties by misdirecting and misappropriating the Plaintiff's funds, wasting assets, and fraudulently concealing and failing to disclose the same, for his own personal pecuniary gain and to the detriment of the Plaintiff.

**ANSWER:** Denied.

143.     For example, Plaintiff has discovered that Benito without any safeguards, benchmarks, or monitoring agreements in place, fraudulently transferred and participated in a scheme to transfer essentially all of the Plaintiff's funds to Defendants, Persist and Lake Law.

**ANSWER:** Denied.

144.     Benito has also failed to properly account for Plaintiff's funds by improperly co-mingling those funds with several other entities under her power and control for her own pecuniary gain.

**ANSWER:** Denied.

145.     As further evidence of her breaches in this regard, Benito has failed to maintain proper bookkeeping in regard to any "loans" paid or provided to Justice Partners Law Group.

36

**ANSWER:** Denied

146.    The misconduct of Benito has materially harmed the plaintiff. has also failed to properly account for Plaintiff's funds by improperly co-mingling those funds with several other entities under her power and control for her own pecuniary gain.

**ANSWER:** Denied.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

**Answer**: Benito admits that Teh seeks relief but denies that such relief is proper.

**COUNT 7**
**CLAIM FOR AIDING AND ABETTING FRAUD BREACH OF FIDUCIARY DUTY**
**(AS TO THE LAKE LAW FIRM, LLC)**

147.    Benito incorporates by reference her responses to the previous allegations in their entirety.

148.    The allegations in Paragraphs 148 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

149.    The allegations in Paragraphs 149 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

150.    The allegations in Paragraphs 150 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

151.    The allegations in Paragraphs 151 are not directed at Benito.  Accordingly, although

37

her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

152. The allegations in Paragraphs 152 are not directed at Benito. Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

153. The allegations in Paragraphs 153 are not directed at Benito. Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

154. The allegations in Paragraphs 154 are not directed at Benito. Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

155. The allegations in Paragraphs 155 are not directed at Benito. Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

**ANSWER:** Because Teh does not direct this Count at Benito, he is not entitled to any relief from her on the Count.

## COUNT 8
## CLAIM FOR AIDING AND ABETTING FRAUD BREACH OF FIDUCIARY DUTY
### (AS TO PERSIST COMMUNICATIONS, INC.)

156. Benito incorporates by reference her responses to the previous allegations in their entirety.

38

157.     The allegations in Paragraphs 157 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

158.     The allegations in Paragraphs 158 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

159.     The allegations in Paragraphs 159 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

160.     The allegations in Paragraphs 160 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

161.     The allegations in Paragraphs 161 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

162.     The allegations in Paragraphs 162 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

163.     The allegations in Paragraphs 163 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and

any such further relief this Court finds just and proper.

**ANSWER:** Because Teh does not direct this Count at Benito, he is not entitled to any relief from her on the Count.

## COUNT 9
## CLAIM FOR AIDING AND ABETTING FRAUD BREACH OF FIDUCIARY DUTY
### (AS TO EDWARD LAKE)

164. Benito incorporates by reference her responses to the previous allegations in their entirety.

165. The allegations in Paragraphs 165 are not directed at Benito. Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

166. The allegations in Paragraphs 166 are not directed at Benito. Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

167. The allegations in Paragraphs 167 are not directed at Benito. Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

168. The allegations in Paragraphs 168 are not directed at Benito. Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

169. The allegations in Paragraphs 169 are not directed at Benito. Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

170. The allegations in Paragraphs 170 are not directed at Benito. Accordingly, although

40

her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

171.    The allegations in Paragraphs 171 are not directed at Benito.  Accordingly, although her response is not required, Benito will deny the allegations in this Paragraph on the basis that they are not directed at her.

**WHEREFORE,** Plaintiff, requests this Honorable Court enter judgment against this Defendant for all damages, plus interest, costs, and attorneys' fees, appropriate equitable relief and any such further relief this Court finds just and proper.

**ANSWER:**   Because Teh does not direct this Count at Benito, he is not entitled to any relief from her on the Count.

<div align="center">

**EXHIBITS**

</div>

The Exhibits to the First Amended Complaint are documents that speak for themselves. To the extent that Teh alleges that a document say something they do not, Benito denies the allegation.

<div align="center">

**AFFIRMATIVE DEFENSES**

</div>

Benito asserts the following affirmative or other defenses without assuming any burden of proof that does not otherwise exist.  Benito expressly reserves the right to add affirmative defenses.

<div align="center">

**FIRST AFFIRMATIVE DEFENSE**

</div>

Teh's claims fail to state a claim upon which relief can be granted.

<div align="center">

**SECOND AFFIRMATIVE DEFENSE**

</div>

Teh's claims are barred, in whole or in part, by the rule against claim splitting.

<div align="center">

**THIRD AFFIRMATIVE DEFENSE**

</div>

Teh's claim for breach of fiduciary duty (Count 6) is barred by the Justice Partners LLC

<div align="center">

41

</div>

Operating Agreement, including by Section 8.2, and other related transactional documents.

## FOURTH AFFIRMATIVE DEFENSE

Teh's claims are barred, in whole or in part, by the doctrine of laches.

## FIFTH AFFIRMATIVE DEFENSE

Teh's claims are barred by the doctrine of *res judicata*.

## SIXTH AFFIRMATIVE DEFENSE

Teh's claims are barred by the doctrine of collateral estoppel.

## SEVENTH AFFIRMATIVE DEFENSE

Teh's claims are barred by the doctrine of unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE

Teh's claims are premature in that he has not incurred, and cannot have incurred, any damages at this time.

## NINTH AFFIRMATIVE DEFENSE

Teh's claims are barred by the doctrine of assumption of risk.

## TENTH AFFIRMATIVE DEFENSE

Teh's claims are barred by the actions of others that constitute an independent, intervening and/or superseding causes of any damages that Teh claims.

## ELEVENTH AFFIRMATIVE DEFENSE

Any damages allegedly suffered by Teh were caused by the acts or omissions of third parties over whom this Defendant had no control, or by Plaintiff's own acts or omissions.

## TWELFTH AFFIRMATIVE DEFENSE

Teh is barred from recovering any loss or damage, if any, to the extent he has failed to make reasonable efforts to mitigate such loss or damage, which would have prevented any such loss or damage.

## THIRTEENTH AFFIRMATIVE DEFENSE

Teh's claims are barred under the doctrines of ratification, waiver and estoppel, including, without limitation, by assenting to the terms of the Justice Partners LLC Subscription Agreement and related documents, as well as voluntarily making payments with full knowledge of the facts pertaining thereto.

## DEFENDANT SYLVIA BENITO'S COUNTERCLAIM AGAINST PLAINTIFF ALLAN TEH

Pursuant to Florida Rule of Civil Procedure Rule 1.170(a), Defendant/Counter-Plaintiff Sylvia Benito hereby brings a counterclaim for defamation against Plaintiff/Counter-Defendant Allan Teh, on personal knowledge as to herself and on information and belief as to all other facts as follows.

## INTRODUCTION

This is a case of a sophisticated investor trying to walk back an investment. When Benito met Teh in late 2020, Benito was raising capital for an investment opportunity involving mass torts litigation called Justice Partners. Because Teh was an experienced investor, Benito presented the opportunity to Teh.

As with all potential investors, Benito provided Teh with extensive information about Justice Partners—including risk factors associated with the investment. One of the disclosed risks was that the investment depended entirely on the ability to "engage clients and successfully litigate/settle . . . claims" through co-counsel firms.

43

After months of deliberation, Teh invested $4 million in Justice Partners. Approximately a year and a half later, it became clear that The Lake Law Firm (one of the Defendants)—which was responsible for signing up mass torts cases for Justice Partners—was falling far short of delivering the cases that it promised. In other words, one of the identified risks was coming to pass.

With his other investments losing money and perhaps desiring liquidity, Teh spotted an exit out of Justice Partners. Claiming that he "lost the entirety of his investment"—even though distributions had not become due yet—Teh began a defamation campaign against Benito. He told many people, both in conversations and via text messages, that Justice Partners was a scam, Benito's conduct was criminal, and Benito had purchased her engagement ring and thrown yacht parties with investor money. He also incessantly harassed Benito by doing things like showing up unannounced at her business dinners and making crude sexual remarks about her. Teh's idea was to put maximum pressure on Benito to get his money back as soon as possible.

Benito now seeks redress for Teh's misconduct.

## PARTIES

1.      Defendant/Counter-Plaintiff Sylvia Benito is a resident of Dade County, Florida.

2.       Plaintiff/Counter-Defendant Allan Teh is a resident of Dade County, Florida.

## JURISDICTION & VENUE

3.      This Court has jurisdiction over Teh because he is a Florida resident, and therefore, "at home" in Florida; submitted to the jurisdiction of this Court when he filed the action that includes Benito's counterclaim; and the acts giving rise to Benito's counterclaim occurred largely, if not entirely, in Florida.

44

4.      Venue is proper in this Court under Florida Statutes § 47.011 because Teh resides in Dade County.

## GENERAL ALLEGATIONS

### A.      The Justice Partners Investment

5.      In March 2020, Benito and an attorney named Lee Melchionni launched Justice Partners, a mass torts litigation fund.

6.      While she was raising money for Justice Partners, Benito met Teh.

7.      Because Teh was a sophisticated investor who managed his considerable personal wealth through his family office, Benito thought that it would be appropriate to present the Justice Partners opportunity to Teh.

8.      Like all investors, she supplied Teh with Justice Partners investor materials, including the Offering Circular.  (1st Am. Compl. Ex. 3.)  The Offering Circular provides extensive information regarding the Justice Partners investment—including risk factors associated with the investment.  (1st Am. Compl. Ex. 3.)

9.      One of the risk factors was that the investment's success was "entirely dependent" on the ability to "engage clients and successfully litigate/settle . . . claims" through independent co-counsel firms.  (1st Am. Compl. Ex. 3.)

10.      The investor materials also made it clear that as part of the investment structure, investor funds would be loaned to a related District of Columbia law firm called Justice Partners Law Group, LP, and there would be no distributions to investors until that loan was repaid.  (1st Am. Compl. Ex. 3.)  The earliest maturity date of the loan is five years.  (1st Am. Compl. Ex. 7.)  The loan has not become due yet, so there is nothing due to investors at the moment.  (1st Am. Compl. Ex. 7.)

### B.        Teh Starts A Defamation Campaign Against Benito

11.        By summer 2022, it became clear that Lake Law was not delivering the cases that it had promised to Justice Partners.  Specifically, Lake Law was short 208 talcum powder cases, 380 hernia mesh cases, 150 Roundup cases, 350 3M cases, and 200 firefighter foam cases.

12.        When Teh found out that Lake Law had fallen short of delivering the cases that it promised Justice Partners, he saw an opportunity to exit the investment and get his money back. Indeed, Teh's other investments were not doing well and the promise of immediate liquidity likely was a big motivating factor for Teh.  To achieve his goal, Teh started putting maximum pressure on Benito through defamation and harassment.

13.        Although Teh knew that the case shortfall was because Lake Law failed to deliver on its promises (a disclosed risk) and not because of any malfeasance on Benito's part, Teh nevertheless started a defamation campaign against Benito.

14.        Specifically, Teh sent false text messages to numerous people in the industry stating that Benito's conduct relating to the Justice Partners was criminal.

15.        Teh also falsely told industry professionals at a conference that Benito: (1) committed crimes in connection with the Justice Partners investment; (2) purchased her engagement ring with Justice Partners investor money; and (3) threw yacht parties with Justice Partners investor money.

16.        In addition, Teh approached a family for whom Benito served as the Chief Investment Officer and falsely told them that Benito committed wrongdoing in connection with the Justice Partners investment.

17.        What is most maddening about Teh's defamation campaign is that Benito was working tirelessly to mitigate the harm to her investors while Teh was falsely and recklessly

46

accusing her of ripping them off.  For instance, in the face of threats by Ed Lake to shut down Lake Law, she personally loaned the firm $1.05 million to keep it operational, so that the investors' investments would not go to zero.  Benito has yet to be repaid by Lake Law.

## FIRST CAUSE OF ACTION FOR DEFAMATION

18.     The elements of a defamation claim are: (1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff.  Further, a plaintiff need not show special damages if the defamatory statements accuse the defendant of criminal conduct.

19.     Here, Teh made both written and oral false statements about Benito to numerous third parties, which by any reasonable measure are defamatory because they involve misconduct by Benito while discharging her professional duties, and these statements harmed Benito by depriving her of various investment opportunities.

20.     Moreover, Teh's conduct constitutes defamation *per se* because he claimed both orally and in writing that Benito's conduct *vis-à-vis* the Justice Partners venture constituted criminal conduct.

## PRAYER FOR RELIEF

1.     Compensatory and consequential damages in an amount to be proven at trial.

2.     Pre-judgment and post-judgment interest as permitted by law.

3.     Attorney's fees and costs as permitted by law.

4.     Such other and further relief as the Court deems just and proper.

Dated: October 27, 2025                    Respectfully submitted,

                                           **BREWER ATTORNEYS AND COUNSELORS**

                                           By: /s/ *Jim Montalvo*

47

Jim Montalvo, Esq.
Florida Bar No. 887056
Local Counsel
hjm@brewerattorneys.com
1717 Main Street, Suite 5900
Dallas, TX 75201
Telephone: (214) 653-4000
Fax: (214) 653-1015

Nafiz Cekirge (*Pro Hac Vice*)
New York Bar No. 3068442
nnc@brewerattorneys.com
750 Lexington Ave, 14th Floor
New York, NY 10022
Telephone: (212) 489-1400

*Counsel for Defendant Sylvia Benito*

Filing # 234662329 E-Filed 10/28/2025 09:39:39 PM

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN
AND FOR MIAMI-DADE COUNTY,
FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.: 2024-020751-CA-01

ALLAN TEH,
     Plaintiff,

vs.

LEE MELCHIONI, individually; SYLVIA BENITO,
individually; JUSTICE PARTNERS
MANAGEMENT, a Delaware Limited Liability
Company; JUSTICE PARTNERS LAW GROUP, a
District of Colombia Limited Partnership; PERSIST
COMMUNICATIONS, INC., a Florida Corporation;
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,
     Defendants.

_____/

**DEFENDANTS', PERSIST COMMUNICATIONS, INC., THE LAKE LAW FIRM, AND EDWARD LAKE'S, MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT [DE #36] WITH PREJUDICE**

Defendants, PERSIST COMMUNICATIONS, INC., THE LAKE LAW FIRM, and

EDWARD LAKE, (hereinafter "the Lake Defendants"), by and through their undersigned counsel,

and pursuant to Florida Rule of Civil Procedure 1.140, hereby files Defendants' Motion to Dismiss

Plaintiff's First Amended Complaint [DE #36] with Prejudice, and as grounds states as follows:

**INTRODUCTION**

This is now the **fifth** lawsuit brought by Allan Teh involving investments he made in

companies run and managed by Lee Melchionni and Sylvia Benito, whether on a derivative basis,

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, FL 33431 · Phone: 954-320-0100 · Fax: 754-217-5960

individually, or otherwise. Plaintiff's First Amended Complaint (hereinafter "Complaint") raises counts for Civil Conspiracy to Commit Fraud (Count 1) and Aiding and Abetting Fraud (Counts 7, 8, and 9) against the Lake Defendants.

In the present case, Plaintiff alleges that he invested $4 million in exchange for a member interest in Justice Partners, an LLC that has loaned money to its law firm affiliate, Justice Partners Law Group ("Law Group"), as well as a portion of an $11,725,000 investment that, in turn, invested in a venture with The Lake Law Firm ("LLF") to represent clients in mass tort litigations involving Roundup, Talcum Powder, 3M Earplugs, Hernia Mesh, Fire Foam, Zantac, and other defective products. Justice Partners, run by Melchionni and Benito through a management company they own, essentially funded Law Group's venture with LLF in handling hundreds/thousands of these cases in exchange for a percentage fee interest in each of them. Persist Communications ("Persist") is the marketing arm of LLF, both of which are solely owned by Edward J. Lake, Esq. The **two invoices** attached to the Complaint (**Composite Exhibit 2**) lay out the arrangement and fee structure between Law Group and LLF.

Throughout these different lawsuits, Plaintiff has flip flopped between individual actions in his own name and derivative actions on behalf of the LLC in which he is a member. This Court is familiar with them as it conducted a trial on one, dismissed one individual action as to these Defendants (sending the portion against Melchionni and Benito to arbitration) and sent another derivative action to arbitration as to all the parties[1].

---

[1] The others are *Allan Teh v. Justice Partners, LLC*, Case No. 2022-022470 (Final Judgment entered September 18, 2024, and a Notice of Appeal filed October 15, 2024); *Allan Teh v. Melchionni, Benito, Persist Comm. and Lake Law Firm*, Case No. 2023-004474 (individual action dismissed as to Persist and Lake Law and sent to arbitration as to Melchionni and Benito); *Allan Teh v. KS Law Group, LLP, Melchionni, Benito, Persist Comm. and Lake Law Firm*, Case No. 2023-015702 (derivative action sent to arbitration); and *Allan Teh v. Lee Melchionni, Sylvia Benito, Persist Communications, Inc., and the Lake Law Firm*, American Arbitration Association case number 01-25-0003-6283.

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, FL 33431 · Phone: 954-320-0100 · Fax: 754-217-5960

Here, Persist, LLF, and Edward Lake ("EL") are being sued individually by Allan Teh, an individual whom none of these Defendants have had any direct dealings with, nor had any arms' length dealings with, for civil conspiracy to commit fraud and aiding and abetting the alleged fraud of Melchionni and Benito. In fact, it is undisputed that Allan Teh did not even know who the Lake Defendants were – and conversely, the Lake Defendants did not know who Allan Teh was – at the time Plaintiff made this investment.

Justice Partners merely supplied a loan to its affiliate, Law Group, to fund the latter's venture with Lake Law. Moreover, the underlying contract is still in its executory stage, because LLF's performance to transform the investment by Law Group is still ongoing.

In short, the Complaint fails to state a cause of action and should be dismissed with prejudice because (1) there was no conspiracy to commit fraud by Persist, LLF, nor EL; (2) there is no fraud, so Persist, LLF, and EL could not have aided and abetted fraud; and (3) Edward lake has no basis to be included in this lawsuit as the Plaintiff has not properly pierced the corporate veil. For the reasons stated below, all such counts should be dismissed with prejudice, and the Lake Defendants should be awarded reasonable attorney's fees and costs in having to defend these meritless allegations.

## ANALYSIS

### A. The Plaintiff Failed to Demonstrate How the Lake Defendants Conspired to Commit Fraud

Count 1 of Plaintiff's First Amended Complaint alleges that all Defendants engaged in a Civil Conspiracy to Commit Fraud; however, this Motion to Dismiss simply addresses the allegations raised against the Lake Defendants. Plaintiff alleges that "[p]rior to Plaintiff's April 6,

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, FL 33431 · Phone: 954-320-0100 · Fax: 754-217-5960

2021 $4,000,000.00 investment in Justice Partners, [all Defendants], acting jointly and in concert, entered into a common plan and agreement to induce Plaintiff to invest through false representations concerning the use and purpose of his funds". *See First Amended Complaint at ¶111*. Plaintiff's Complaint continues to describe the "purpose and objective" of the conspiracy, but fails to provide any specific details, evidence, or factual support to tie the Lake Defendants to the purported conduct or any overt acts that ultimately resulted in Plaintiff investing this money with Justice Partners.

In fact, taking all factual allegations in Plaintiff's Complaint as true, Plaintiff even admits that the acts took place "more than two years after Plaintiff's investment". *See* <u>Id.</u> at *¶114.* The only way Plaintiff's allegations in Count 1 of its Complaint survive a Motion to Dismiss against the Lake Defendants is to specifically allege that the Lake Defendants took part in over acts or agreements with multiple parties to commit fraud. However, considering Plaintiff's investment was made on April 6, 2021, Plaintiff fails to meet his burden against the Lake Defendants. Paragraph 113 of Plaintiff's Complaint references allegations of "fabricating invoices backdated to April 15, 2021 and October 11, 2021" – both such dates after the investment was made. Paragraph 115 of Plaintiff's Complaint references allegations that "[a]ll Defendants then collaborated to circulate a series of false 'Investor Updates' (October 20, 2021; April 2023; September 2023; January 2024) repeating knowingly fabricated case counts and asset values to conceal the misappropriation". Again – all of these actions and timeframes are well after Plaintiff was purportedly conspired against to invest his monies.

"Civil conspiracy is the combination of two or more persons or entities for an unlawful purpose or for the accomplishment of a lawful purpose by unlawful means, resulting in damage". *Friedman v. Zahid Aslam, Bibee, LLC* 2015WL966111 at *19. "Civil conspiracy is not an

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, FL 33431 · Phone: 954-320-0100 · Fax: 754-217-5960

independent cause of action in Delaware. To be actionable, a civil conspiracy must embody an underlying wrong which would be actionable in the absence of the conspiracy". Id at *20, 21. In Plaintiff's Complaint, there are no allegations that the Lake Defendants engaged in an unlawful purpose or for the accomplishment of a lawful purpose by unlawful means, considering the timeline of allegations raised against the Lake Defendants compared to the actual investment by Plaintiff.

This Court previously advised Plaintiff's Counsel during the September 17, 2025 hearing on the Lake Defendant's Motion to Dismiss the Complaint that Plaintiff needed to properly plead how the Lake Defendants were involved with conspiring against Allan Teh to induce him to invest in the $4,000,000.00 Justice Partners operation; however, despite this Court's clear directive, Plaintiff once again falls short. Even taking all material allegations of the complaint as true, Plaintiff has not, and is unable to, allege that the Lake Defendants had any involvement whatsoever in conspiring to induce Allan Teh to invest his money. Accordingly, Count 1 of Plaintiff's Complaint against the Lake Defendants should be dismissed with prejudice, and the Lake Defendants should be awarded reasonable attorney's fees and costs in having to defend this action.

**B. The Complaint Fails to State a Cause of Action for Fraud Such That the Aiding and Abetting Claims Also Fail.**

Fraud must also be plead with particularity. The minimum pleading requirements to satisfy the elements of fraud is insufficient. Accordingly, Plaintiff's lawsuit must be dismissed with prejudice. The elements of fraud are (1) a false representation; (2) the maker of such representation's knowledge or belief in its falsity or reckless indifference to its truth; (3) an intention to induce action based on the representation; (4) reasonable reliance by the recipient of the representation; and (5) damages. *Trifecta Multimedia Holdings, Inc. v. WCG Clinical Servs.*

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, FL 33431 · Phone: 954-320-0100 · Fax: 754-217-5960

*LLC*, No. 2023-0699-JTL, 2024 WL 2890980 (Del. Ch. June 10, 2024).

Since Plaintiff alleged that Melchionni and Benito ran and run Justice Partners, the elements of the cause of action become absurd. The false statement must be made to another person – not themselves. One cannot defraud himself any more than he can conspire with himself. As noted above, Melchionni and Benito are alleged to be both the maker and recipient of these alleged statements.

Seeing that the claim for fraud against Melchionni and Benito fail, so too must the claims for aiding and abetting fraud against LLF, Persist, and EL. Even if the underlying claim was properly pled, the allegations are woefully deficient as to what these Defendants did to aid and abet. Legal conclusions are not sufficient, especially in the context of fraud.

Nevertheless, the Lake Defendants will address the allegations raised in Counts 7, 8, and 9, which all allege aiding and abetting fraud against each of the three Lake Defendants separately. However, as stated, *supra*, Plaintiff's allegations for each of these three counts fall short to suggest that the Lake Defendants aided and abetted anything.

### i.  Aiding and Abetting Fraud – Lake Law Firm (Count 7)

The allegations for aiding and abetting fraud raised against the Lake Law Firm once again reference purported acts to knowingly and substantially assist co-Defendants in inducing Plaintiff to invest $4,000,000.00 in Justice Partners. *See Plaintiff's Complaint at ¶149.* Despite the following paragraph's loose reference to a purported "agreement" to backdate or fabricate invoices prior to April 6, 2021, this is not supported by any other allegations in the Complaint, nor exhibits attached to said Complaint. There was always an agreement to provide mass tort leads in exchange for the investment money the Lake Defendants received, it was just not memorialized until much later. Not to mention, the invoices were not "knowingly false and designed to conceal that no such

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, FL 33431 · Phone: 954-320-0100 · Fax: 754-217-5960

cases existed", as the cases very clearly exist, and can all be found in the Zoho case management software. *See* Id. at *¶151*.

In paragraph 152 of Plaintiff's Complaint, they allege that LLF "knowingly represented on its invoices that Edward J. Lake, Esq. agrees to market, intake and sign-up clients; gather medical records; act as liaison between trial firms; and handle client inquires," and "were included to lend legitimacy to the fraudulent transfer of investor funds to Lake Law and Persist Communications". Not only is this allegation completely unfounded, in that the Lake Defendants have performed these duties in all of the mass tort campaigns they have been involved in over the last two decades, but, even assuming this statement were true, this does not help prove any aiding and abetting fraud, as Plaintiff is alleging that it was the false statements on these purportedly backdated invoices that allowed for the investing of funds to proceed. This makes no sense, as the investments had already been transferred many months prior. Ultimately, Plaintiff has failed to demonstrate how the Lake Law Firm aided and abetted fraud, such that Count 7 of Plaintiff's Complaint must be dismissed with prejudice, and the Lake Law Firm should be awarded reasonable attorney's fees and costs.

### ii.      Aiding and Abetting Fraud – Persist (Count 8)

Once again, Plaintiff relies upon conduct and actions taken *after* his investment was made to support his allegation that Persist aiding and abetted fraud which ultimately coerced Plaintiff to invest in this operation. *See Plaintiff's Complaint at ¶¶157, 158.* Plaintiff's allegations in Count 8 are unfounded, and so vague that they fail to properly state a cause of action. Persist was the marketing arm of the Lake Law Firm. It operated a state-of-the-art call center which was able to market, intake, and acquire leads to convert to clients. It also engaged with other mass tort advertising companies to help fulfill additional leads for the benefit of the Lake Law Firm and its co-counsel investors, such as Justice Partners. Plaintiff's Complaint makes barebones allegations

– this count being just seven paragraphs not including the lead-in – and suggests that Persist has aided and abetted fraud. The allegations in Count 8 make no reference to any false representations, no intention to induce action based on these false representations, and no reasonable reliance by any recipients of these false representations. Therefore, Plaintiff's count for aiding and abetting fraud against Persist Communications must be dismissed with prejudice, and Persist Communications should be awarded reasonable attorney's fees and costs for having to defend this action.

### iii.    Aiding and Abetting Fraud – Edward Lake (Count 9)

Once again, Plaintiff's allegations raised in Count 9 fall short of proving the basic elements of aiding and abetting fraud under Delaware law. Plaintiff also attempts to pierce the corporate veil and attach personal liability by Edward Lake against the Lake Law Firm and Persist Communications; however, that will be addressed in the following paragraph.

Plaintiff alleges that "no mass-tort clients had been retained, no case files existed, and no co-counsel or referral agreements were in place" (*see Plaintiff's Complaint at ¶168)*, when he knows very well that the Zoho case management software contains every single case that makes its way through the Lake Defendant's inventory, whether they are converted leads, disqualified, or attempting to be contacted. Throughout the three years of litigating countless actions based on the same exact conduct, Plaintiff and his Counsel, as well as their experts, have employed the tactic of "see no evil, hear no evil", because they know that acknowledging the capabilities and data contained in Zoho would completely derail their case. Once the Zoho platform was examined in detail by the arbitrator in the KS Law arbitration, it was clear that many cases belonged to KS Law, much the same way that examining the Zoho platform would reveal the inventory of Justice Partners here. But, acknowledging this would be fatal to Plaintiff's case, so he continues to pretend

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, FL 33431 · Phone: 954-320-0100 · Fax: 754-217-5960

it does not exist. Nevertheless, all of the allegations raised in Count 9 of Plaintiff's Complaint are baseless, not supported by facts or any evidence or exhibits attached to the Complaint, and fall short of proving the basic elements of aiding and abetting fraud. As such, Count 9 of Plaintiff's Complaint should be dismissed with prejudice, and Edward Lake should be awarded reasonable attorney's fees and costs for defending this action.

**C. The Allegations Against Edward Lake Must Be Dismissed As Plaintiff Has Failed to Pierce the Corporate Veil**

Specifically pertaining to the allegations made against EL, this lawsuit must be dismissed. Even assuming, *arguendo*, that Plaintiff's unfounded allegations were true, they do not amount to any causes of action against EL personally. Plaintiff cannot cite to any authority that EL himself took part in any of this conduct, not to mention that the Plaintiff has failed to demonstrate how he can pierce the corporate veil and attack EL personally. "Generally, a plaintiff seeking to pierce the corporate veil must show that (1) the owners exercised complete dominion of the corporation in respect to the transaction attacked; and (2) that such dominion was used to commit fraud or wrong against the plaintiff which resulted in plaintiff's injury". *Conason v. Megan Holding, LLC*, 25 N.Y.3d 1, 18 (2015) (internal quotation marks omitted; *TNS Holdings*, 92 N.Y.2d at 339 (1998). As alluded to *supra*, the investments that form the basis of this lawsuit involve an investment by Law Group to LLF and Persist to procure mass torts leads. There was no contract entered into with Plaintiff, Allan Teh and the Lake Defendants. Nor were any of these contracts with Edward Lake, personally. Plaintiff fails to meet his burden to indicate that EL has any responsibility to Teh personally for any of these fallacious allegations. Further, Plaintiff and the Lake Defendants had never met, had any direct communication, nor knew the other existed when Plaintiff wired monies for this investment. Accordingly, the lawsuit against EL should be dismissed with prejudice.

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, FL 33431 · Phone: 954-320-0100 · Fax: 754-217-5960

**WHEREFORE,** Persist Communications, Inc., The Lake Law Firm, and Edward Lake move to dismiss the First Amended Complaint with prejudice, award reasonable attorney's fees and costs, and grant all other relief that the Court deems just and proper.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was provided via Florida Courts e-filing Portal on this October 29, 2025, to: Matthew Jones, Esq. at JONES & ADAMS, P.A., Coral Gables Centre 999 Ponce de Leon Blvd., Suite 925 Coral Gables, FL 33134 (matthew@jones-adams.com); Amiad Kushner, Esq. at SEIDEN LAW, LLP 322 8th Avenue Suite 1200 New York, NY 10001 (akushner@seidenlaw.com).

**GELBER LAW GROUP, P.A.**
2385 NW Executive Center Drive
Suite 100
Boca Raton, Florida 33431
Phone: (954) 320-0100
Fax: (754) 217-5960
Primary email:     matt@gelberlawgroup.com
Secondary email:  victoria@gelberlawgroup.com
Service email:      eservice@gelberlawgroup.com
(For Pleadings Only)

By: __/s/ Matt Gelber__
MATT GELBER, Esquire
Fla. Bar. No.: 115465

Page 10 of 10

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, FL 33431 · Phone: 954-320-0100 · Fax: 754-217-5960

Filing # 234742075 E-Filed 10/29/2025 04:12:59 PM

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

     Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,

     Defendants
_____/

## **ANSWER TO THE FIRST AMENDED COMPLAINT**

Defendants Justice Partners Management ("JP Management") and Justice Partners Law

Group LLP ("JP Law Group"), by their undersigned counsel, hereby file their Answer and

Affirmative Defenses to Plaintiff, Allan Teh's ("Teh" or "Plaintiff") First Amended Complaint,

filed October 17, 2025 (DE #36), and state as follows:

### **PARTIES, JURISDICTION AND VENUE**

1. Admit that Plaintiff is attempting to seek damages, declaratory relief, and equitable

relief in excess of the minimum jurisdictional limits of this Court but deny the remaining

allegations contained in Paragraph 1.

2. Deny knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 2.

1

3.      Admit that Defendant Melchionni is the Chief Operating Officer of Justice Partners, LLC ("Justice Partners") but deny the remaining allegations contained in Paragraph 3.

4.      Defendants lack knowledge as to the allegations in Paragraph 4 and, as such, deny these allegations.

5.      Admit the allegations contained in Paragraph 5.

6.      Admit the allegations contained in Paragraph 6.

7.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7.

8.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8.

9.      Admit that Edward Lake has controlled Persist Communications. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9.

10.     Admit that Edward Lake has controlled Persist Communications.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10.

11.     Admit that Lake Law is a New York law firm. The referenced invoices speak for themselves, and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11.

12.     Admit that Edward Lake has controlled The Lake Law Firm. Otherwise Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12.

13.     Admit that Edward Lake has controlled The Lake Law Firm. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13.

14.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14.

15.     Paragraph 15 asserts legal conclusions to which no response is required.  The JP Defendants otherwise deny the allegations in paragraph 15.

16.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16.

17.     Aver that Section 9.3 of the Series A Preferred Units of Justice Partners, LLC's Offering Circular (the "Offering Circular") speaks for itself, and on that basis, neither admit nor deny the allegations in this Paragraph. To the extent that this Paragraph contains legal conclusions, no response is required.

18.     Aver that that Section 13.8 of the Justice Partners LLC Operating Agreement speaks for itself, and on that basis, neither admit nor deny the allegations in this Paragraph. To the extent that this Paragraph contains legal conclusions, no response is required.

### GENERAL ALLEGATIONS

19.     Admit the allegations contained in Paragraph 19.

20.     Admit the allegations contained in Paragraph 20.

21.     Admit that Plaintiff purchased 4,000 Units of Series A Preferred Units in Justice Partners for $4,000,000 but deny the remaining allegations in Paragraph 21.

22.     Deny the allegations contained in Paragraph 22.

23.     Deny the allegations contained in Paragraph 23.

3

24.     Aver that the "marketing materials" and Offering Circular speak for themselves, but otherwise deny the allegations contained in Paragraph 24..

25.     Aver that the Offering Circular speaks for itself, but otherwise deny the allegations contained in Paragraph 25.

26.     Aver that the Offering Circular speaks for itself, but otherwise deny the allegations contained in Paragraph 26.

27.     Deny the allegations contained in Paragraph 27.

28.     Admit that Defendant Melchionni is the COO of Justice Partners, a Managing Partner and the Legal Managing Partner of Justice Partner Law Group, and an "Authorized Member" of Justice Partners Management, but deny the remaining allegations contained in Paragraph 28.

29.     Melchionni's testimony speaks for itself, and otherwise deny the allegations contained in Paragraph 29.

30.     Deny the allegations contained in Paragraph 30.

31.     Deny the allegations contained in Paragraph 31.

32.     Deny the allegations contained in Paragraph 32.

33.     Deny the allegations contained in Paragraph 33.

34.     Deny the allegations contained in Paragraph 34.

35.     Deny the allegations contained in Paragraph 35.

36.     Deny the allegations contained in Paragraph 36.

37.     Deny the allegations contained in Paragraph 37.

38.     Deny the allegations contained in Paragraph 38.

39.     Deny the allegations contained in Paragraph 39.

40.     Admit that Plaintiff made a Demand for Books and Records on Justice Partners on November 5, 2022 and initiated the Books and Records Action on November 25, 2022 but deny the remaining allegations in Paragraph 40.

41.     Deny the allegations contained in Paragraph 41.

42.     Aver that the Section 10.1 of Justice Partners' Operating Agreement (the "Operating Agreement") speaks for itself.

43.     Aver that Section 10.3 of the Operating Agreement speaks for itself.

44.     Aver that the Operating Agreement speaks for itself.

45.     Deny the allegations contained in Paragraph 45.

46.     Deny the allegations in Paragraph 46.

47.     Melchionni's testimony speaks for itself. Otherwise deny the allegations in Paragraph 47.

48.     Melchionni's testimony speaks for itself. Otherwise deny the allegations contained in Paragraph 48.

49.     Deny the allegations contained in Paragraph 49.

50.     Deny the allegations contained in Paragraph 50.

51.     Deny the allegations in Paragraph 51.

52.     The invoice speaks for itself.

53.     Admit that the invoice is dated October 11, 2021. Otherwise the invoice speaks for itself.

54.     Admit that the invoice is dated October 11, 2021. Otherwise the invoice speaks for itself.

55.     Aver that Justice Partners' 2021-2022 General Ledger speaks for itself.

56.     Deny the allegations contained in Paragraph 56.

57.     Deny the allegations contained in Paragraph 57.

58.     Deny the allegations contained in Paragraph 58.

59.     Aver that the Senior Secured Promissory Note speaks for itself but otherwise deny the allegations in Paragraph 59.

60.     Deny the allegations in Paragraph 60.

61.     Admit that the executed Senior Secured Promissory Note was produced on August 18, 2023 in the Books and Records Action but deny the remaining allegations contained in Paragraph 61.

62.     Aver that the deposition transcript speaks for itself but otherwise deny the allegations in Paragraph 62.

63.     Admit the allegations contained in Paragraph 63.

64.     Admit that the effective date of the Senior Secured Promissory Note is April 14, 2021, but deny the remaining allegations contained in Paragraph 64.

65.     Admit that the effective date of the Senior Secured Promissory Note is a day prior to the date of the first of the Lake Law Invoices, April 15th, 2021, but deny the remaining allegations contained in Paragraph 65.

66.     Deny the allegations contained in Paragraph 66.

67.     Deny the allegations contained in Paragraph 67.

68.     Deny the allegations contained in Paragraph 68.

69.     Deny the allegations contained in Paragraph 69.

70.     Deny the allegations contained in Paragraph 70.

71.     Aver that the October 20, 2021 email attached as Exhibit 9 speaks for itself but otherwise deny the allegations contained in Paragraph 71.

72.     Aver that the October 20, 2021 email attached as Exhibit 9 speaks for itself, but otherwise deny the allegations contained in Paragraph 72.

73.     Deny the allegations contained in Paragraph 73.

74.     Deny the allegations contained in Paragraph 74.

75.     Deny the allegations contained in Paragraph 75.

76.     Deny the allegations contained in Paragraph 76.

77.     Deny the allegations contained in Paragraph 77.

78.     Aver that the invoices speak for themselves, but otherwise deny the allegations contained in Paragraph 78.

79.     Aver that the invoices speak for themselves.  To the extent this Paragraph asserts a legal conclusion, no response is required.

80.     Deny the allegations contained in Paragraph 80.

81.     Admit that Melchionni and Benito, and Justice Partners Management provided an investor report to Plaintiff in April 2023 ("April 2023 Investor Report").

82.     Deny the allegations contained in Paragraph 82.

83.     Aver that the April 2023 Investor Report speaks for itself but otherwise deny the allegations contained in Paragraph 83.

84.     Deny the allegations contained in Paragraph 84.

85.     Deny the allegations contained in Paragraph 85.

86.     Admit that Plaintiff received a document labelled "All cases presently open and assigned to JPLG Law Group."  Defendants further state that the referenced document speaks for

7

itself, and on that basis, neither admit nor deny this allegation.  Defendants deny the remaining allegations contained in Paragraph 86.

87.     Admit that the Lake Law Firm generated an exhibit described as "All cases presently open and assigned to JPLG Law Group" that was provided to Plaintiff.  Defendants further state that the referenced document speaks for itself, and on that basis, neither admit nor deny this allegation.  Defendants further state that they lack sufficient regarding the remaining allegations in this Paragraph, and on that basis, deny them.

88.     Aver that the document speaks for itself. Otherwise deny the allegations contained in Paragraph 88.

89.     Deny the allegations contained in Paragraph 89.

90.     Aver that the September 2023 investor report ("September 2023 Investor Report") speaks for itself and deny the remaining allegations contained in Paragraph 90.

91.     Aver that the September 2023 Investor Report speaks for itself and deny the remaining allegations contained in Paragraph 91.

92.     Deny the allegations contained in Paragraph 92.

93.     Deny the allegations contained in Paragraph 93.

94.     Aver that the January 2024 investor report ("January 2024 Investor Report") speaks for itself and deny the remaining allegations contained in Paragraph 94.

95.     Aver that the January 2024 Investor Report states that "Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term Funding and Security Agreement (the "Short-Term Funding Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF" and deny the remaining allegations contained in Paragraph 95.

96.     Aver that the January 2024 Investor Report speaks for itself and deny the remaining allegations contained in Paragraph 96.

97.     Deny the allegations contained in Paragraph 97.

98.     Aver that Melchionni, Benito and Plaintiff executed a Limited Liability Partnership Agreement on August 24, 2021, creating a District of Columbia law firm, KS Law Group, LLP, but deny the remaining allegations contained in Paragraph 98.

99.     Deny the allegations contained in Paragraph 99.

100.     Admit the allegations contained in Paragraph 100.

101.     Deny the allegations contained in Paragraph 101.

102.     Aver that the February 9, 2024 KS Law update speaks for itself, but deny the remaining allegations in Paragraph 102.

103.     Deny the allegations contained in Paragraph 103.

104.     Deny the allegations contained in Paragraph 104.

105.     Deny the allegations contained in Paragraph 105.

106.     Deny the allegations contained in Paragraph 106.

107.     The D.C. Rules of Professional Conduct speak for themselves.

108.     Deny the allegations contained in Paragraph 108.

109.     Deny the allegations contained in Paragraph 109.

### AS AND FOR A DEFENSE TO COUNT I
### DIRECT CLAIM FOR CIVIL CONSPIRACY TO COMMIT FRAUD
### (AS TO ALL DEFENDANTS)

110.     Restate and reallege responses to paragraphs 1 through 109 as though fully set forth herein.

111.     Deny the allegations contained in Paragraph 111.

9

112.  Deny the allegations contained in Paragraph 112.

113.  Deny the allegations contained in Paragraph 113.

114.  Deny the allegations contained in Paragraph 114.

115.  Deny the allegations contained in Paragraph 115.

116.  Deny the allegations contained in Paragraph 116.

117.  Deny the allegations contained in Paragraph 117.

118.  Deny the allegations contained in Paragraph 118.

**AS AND FOR A DEFENSE TO COUNT II**
**DIRECT CLAIM FOR FRAUD**
**(AS TO LEE MELCHIONNI)**

119.  Restate and reallege responses to paragraphs 1 through 118 as though fully set forth herein.

120.  The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

121.  The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

122.  The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

123.  The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

124.  The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

125.  The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

10

**AS AND FOR A DEFENSE TO COUNT III**
**DIRECT CLAIM FOR FRAUD**
**(AS TO SYLVIA BENITO)**

126.    Restate and reallege responses to paragraphs 1 through 125 as though fully set forth herein.

127.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required

128.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

129.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

130.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

131.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

132.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

**AS AND FOR A DEFENSE TO COUNT IV**
**DIRECT CLAIM BREACH OF FIDUCIARY DUTY**
**(AS TO LEE MELCHIONNI)**

133.    Restates and realleges its response to paragraphs 1 through 132 as though fully set forth herein.

134.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

11

135.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

136.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

137.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

138.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

139.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

**AS AND FOR A DEFENSE TO COUNT VI[1]**
**DIRECT CLAIM BREACH OF FIDUCIARY DUTY**
**(AS TO SYLVIA BENITO)**

140.    Restate and reallege responses to paragraphs 1 through 139 as though fully set forth herein.

141.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

142.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

143.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

144.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

---

[1] Plaintiff has incorrectly designated this as "Count VI"; it is properly numbered "Count V".

12

145.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

146.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

**AS FOR A DEFENSE TO COUNT VII**
**CLAIM FOR AIDING AND ABETTING FRAUD**
**(AS TO THE LAKE LAW FIRM, LLC)**

147.     Restate and reallege responses to paragraphs 1 through 146 as though fully set forth herein.

148.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

149.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

13

150.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

151.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

152.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

153.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

154.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

155.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

### AS FOR A DEFENSE TO COUNT VIII
### CLAIM FOR AIDING AND ABETTING FRAUD
### (AS TO PERSIST COMMUNICATIONS INC.)

156.     Restate and reallege responses to paragraphs 1 through 155 as though fully set forth herein.

157.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

158.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

159.     The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

14

160.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

161.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

162.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

163.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

## AS FOR A DEFENSE TO COUNT IX
## CLAIM FOR AIDING AND ABETTING FRAUD
### (AS TO EDWARD LAKE)

164.    Restate and reallege responses to paragraphs 1 through 163 as though fully set forth herein.

165.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

166.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

167.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

168.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

169.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

170.    The allegations in this Paragraph are not directed towards JP Management nor JP Law Group, therefore, no response by JP Management nor JP Law Group is required.

## AFFIRMATIVE DEFENSES

JP Management and JP Law Group reserve their right to defend this matter on the basis of the following listed defenses. By doing so, JP Management and JP Law Group do not assume the burden of proof on any issue for which the burden legally rests on Plaintiff. For their affirmative defenses, JP Management and JP Law Group incorporate their responses above, and further state as follows:

## FIRST AFFIRMATIVE DEFENSE

1.    Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to plead the essential elements necessary to establish his claims.

## SECOND AFFIRMATIVE DEFENSE

2.    Plaintiff's fraud-based claims are barred, in whole or in part, by his failure to plead such claims with the requisite particularity.

## FOURTH AFFIRMATIVE DEFENSE

3.    Plaintiff's Complaint fails to state a valid claim for relief against JP Management and JP Law Group

## FIFTH AFFIRMATIVE DEFENSE

4.    Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

16

## SIXTH AFFIRMATIVE DEFENSE

5.     Plaintiff's fraud and breach of fiduciary duty-based claims against JP Management and JP Law Group seek duplicative damages for the same alleged injury.

## SEVENTH AFFIRMATIVE DEFENSE

6.     Plaintiff's claims are barred, in whole or in part, by the doctrine of assumption of risk. Plaintiff knowingly and voluntarily assumed the risks associated with his investment in Justice Partners under the terms of the Operating Agreement, as contained within the Offering Circular. The alleged injuries and damages, if any, were caused by and arose out of risks of which Plaintiff or his agents had full knowledge of, and which Plaintiff assumed.

## EIGHTH AFFIRMATIVE DEFENSE

7.     Any damages sustained by Plaintiff in this action were the result of the acts or omissions of third parties over whom JP Management and JP Law Group had no control.

## NINTH AFFIRMATIVE DEFENSE

8.     The Complaint does not describe the claims made against JP Management and JP Law Group with sufficient particularity to enable Melchionni to determine all defenses he has. Accordingly, JP Management and JP Law Group reserve the right to assert additional defenses that may be pertinent to the First Amended Complaint once the precise nature of each claim is ascertained.

## TENTH AFFIRMATIVE DEFENSE

9.     Plaintiff's claims are barred, in whole or in part, by the Operating Agreement, including, but not necessarily limited to, Article VI: Section 6.12 and Article VIII: Section 8.2.

17

## ELEVENTH AFFIRMATIVE DEFENSE

10.     Plaintiff's claims are barred, in whole or in part, by the doctrine of *res judicata* and/or the doctrine of claim-splitting, including, without limitation, because Plaintiff's claims are improperly split from those filed in this Court on March 15, 2023 in *Teh v. Melchionni, et al.* (Case No. 2023-004474-CA-01).

## TWELFTH AFFIRMATIVE DEFENSE

11.     The actions of persons or entities other than JP Management and JP Law Group constitute an independent, intervening and/or superseding cause and the claims against Melchionni are barred or otherwise proportionately reduced.

Dated: October 29, 2025                              Respectfully submitted,

                                                    */s/ Daniel S.Bitran*
                                                    DANIEL S. BITRAN
                                                    Florida Bar No. 124041
                                                    dbitran@mitrani.com
                                                    miamidocketing@mitrani.com
                                                    **MITRANI, RYNOR, ADAMSKY &
                                                    TOLAND, P.A**.

18

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on October 29, 2025, the foregoing document was filed via the

Florida Courts e-Filing Portal which will serve a true and correct copy to counsel for all parties.

<div style="text-align: right;">

*/s/ Daniel S.Bitran*
DANIEL S. BITRAN
Florida Bar No. 124041
dbitran@mitrani.com
miamidocketing@mitrani.com
**MITRANI, RYNOR, ADAMSKY &
TOLAND, P.A**.

</div>

Filing # 234742855 E-Filed 10/29/2025 04:16:55 PM

IN THE CIRCUIT COURT OF THE 11ᵀᴴ
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

     Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,

     Defendants

_____/

### ANSWER TO THE FIRST AMENDED COMPLAINT

Defendant Lee Melchionni ("Melchionni"), by his undersigned counsel, hereby files his Answer and Affirmative Defenses to Plaintiff, Allan Teh's ("Teh" or "Plaintiff") First Amended Complaint, filed October 17, 2025 (DE #36), and state as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Admit that Plaintiff is attempting to seek damages, declaratory relief, and equitable relief in excess of the minimum jurisdictional limits of this Court but deny the remaining allegations contained in Paragraph 1.

2.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2.

1

3. Admit that Defendant Melchionni is the Chief Operating Officer of Justice Partners, LLC ("Justice Partners") but deny the remaining allegations contained in Paragraph 3.

4. Admit the allegations contained in Paragraph 4.

5. Admit the allegations contained in Paragraph 5.

6. Admit the allegations contained in Paragraph 6.

7. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7.

8. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8.

9. Admit that Edward Lake has controlled Persist Communications. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9.

10. Admit that Edward Lake has controlled Persist Communications.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10.

11. Admit that Lake Law is a New York law firm. The referenced invoices speak for themselves, and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11.

12. Admit that Edward Lake has controlled The Lake Law Firm. Otherwise Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12.

13. Admit that Edward Lake has controlled The Lake Law Firm. Otherwise Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13.

14. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14.

15. Paragraph 15 asserts legal conclusions to which no response is required.  The JP Defendants otherwise deny the allegations in paragraph 15.

16. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16.

17. Aver that Section 9.3 of the Series A Preferred Units of Justice Partners, LLC's Offering Circular (the "Offering Circular") speaks for itself, and on that basis, neither admit nor deny the allegations in this Paragraph. To the extent that this Paragraph contains legal conclusions, no response is required.

18. Aver that that Section 13.8 of the Justice Partners LLC Operating Agreement speaks for itself, and on that basis, neither admit nor deny the allegations in this Paragraph. To the extent that this Paragraph contains legal conclusions, no response is required.

**GENERAL ALLEGATIONS**

19. Admit the allegations contained in Paragraph 19.

20. Admit the allegations contained in Paragraph 20.

21. Admit that Plaintiff purchased 4,000 Units of Series A Preferred Units in Justice Partners for $4,000,000 but deny the remaining allegations in Paragraph 21.

22. Deny the allegations contained in Paragraph 22.

23. Deny the allegations contained in Paragraph 23.

24.     Deny the allegations contained in Paragraph 24.

25.     Aver that the Offering Circular speaks for itself, but otherwise deny the allegations contained in Paragraph 25.

26.     Aver that the Offering Circular speaks for itself, but otherwise deny the allegations contained in Paragraph 26.

27.     Deny the allegations contained in Paragraph 27.

28.     Admit that Defendant Melchionni is the COO of Justice Partners, a Managing Partner and the Legal Managing Partner of Justice Partner Law Group, and an "Authorized Member" of Justice Partners Management, but deny the remaining allegations contained in Paragraph 28.

29.     Melchionni's testimony speaks for itself, and otherwise deny the allegations contained in Paragraph 29.

30.     Deny the allegations contained in Paragraph 30.

31.     Deny the allegations contained in Paragraph 31.

32.     Deny the allegations contained in Paragraph 32.

33.     Deny the allegations contained in Paragraph 33.

34.     Deny the allegations contained in Paragraph 34.

35.     Deny the allegations contained in Paragraph 35.

36.     Deny the allegations contained in Paragraph 36.

37.     Deny the allegations contained in Paragraph 37.

38.     Deny the allegations contained in Paragraph 38.

39.     Deny the allegations contained in Paragraph 39.

40.    Admit that Plaintiff made a Demand for Books and Records on Justice Partners on November 5, 2022 and initiated the Books and Records Action on November 25, 2022 but deny the remaining allegations in Paragraph 40.

41.    Deny the allegations contained in Paragraph 41.

42.    Aver that the Section 10.1 of Justice Partners' Operating Agreement (the "Operating Agreement") speaks for itself.

43.    Aver that Section 10.1 of the Operating Agreement speaks for itself.

44.    Aver that the Operating Agreement speaks for itself.

45.    Deny the allegations contained in Paragraph 45.

46.    Deny the allegations in Paragraph 46.

47.    Melchionni's testimony speaks for itself. Otherwise deny the allegations in Paragraph 47.

48.    Melchionni's testimony speaks for itself. Otherwise deny the allegations contained in Paragraph 48.

49.    Deny the allegations contained in Paragraph 49.

50.    Deny the allegations contained in Paragraph 50.

51.    Deny the allegations in Paragraph 51.

52.    The invoice speaks for itself.

53.    Admit that the invoice is dated October 11, 2021. Otherwise the invoice speaks for itself.

54.    Admit that the invoice is dated October 11, 2021. Otherwise the invoice speaks for itself.

55.    Aver that Justice Partners' 2021-2022 General Ledger speaks for itself.

5

56.     Deny the allegations contained in Paragraph 56.

57.     Deny the allegations contained in Paragraph 57.

58.     Deny the allegations contained in Paragraph 58.

59.     Aver that the Senior Secured Promissory Note speaks for itself but otherwise deny the allegations in Paragraph 59.

60.     Deny the allegations in Paragraph 60.

61.     Admit that the executed Senior Secured Promissory Note was produced on August 18, 2023 in the Books and Records Action but deny the remaining allegations contained in Paragraph 61.

62.     Aver that the deposition transcript speaks for itself but otherwise deny the allegations in Paragraph 62.

63.     Admit the allegations contained in Paragraph 63.

64.     Admit that the effective date of the Senior Secured Promissory Note is April 14, 2021, but deny the remaining allegations contained in Paragraph 64.

65.     Admit that the effective date of the Senior Secured Promissory Note is a day prior to the date of the first of the Lake Law Invoices, April 15th, 2021, but deny the remaining allegations contained in Paragraph 65.

66.     Deny the allegations contained in Paragraph 66.

67.     Deny the allegations contained in Paragraph 67.

68.     Admit that Melchionni and Benito have interests in other law firms, and otherwise deny the allegations contained in Paragraph 68.

69.     Deny the allegations contained in Paragraph 69.

70.     Deny the allegations contained in Paragraph 70.

6

71.     Aver that the October 20, 2021 email attached as Exhibit 9 speaks for itself but otherwise deny the allegations contained in Paragraph 71.

72.     Aver that the October 20, 2021 email attached as Exhibit 9 speaks for itself, but otherwise deny the allegations contained in Paragraph 72.

73.     Deny the allegations contained in Paragraph 73.

74.     Deny the allegations contained in Paragraph 74.

75.     Deny the allegations contained in Paragraph 75.

76.     Deny the allegations contained in Paragraph 76.

77.     Deny the allegations contained in Paragraph 77.

78.     Aver that the invoices speak for themselves, but otherwise deny the allegations contained in Paragraph 78.

79.     Aver that the invoices speak for themselves.  To the extent this Paragraph asserts a legal conclusion, no response is required.

80.     Deny the allegations contained in Paragraph 80.

81.     Admit that Melchionni and Benito, and Justice Partners Management provided an investor report to Plaintiff in April 2023 ("April 2023 Investor Report").

82.     Deny the allegations contained in Paragraph 82.

83.     Aver that the April 2023 Investor Report speaks for itself but otherwise deny the allegations contained in Paragraph 83.

84.     Deny the allegations contained in Paragraph 84.

85.     Deny the allegations contained in Paragraph 85.

86.     Admit that Plaintiff received a document labelled "All cases presently open and assigned to JPLG Law Group" but deny the remaining allegations contained in Paragraph 86.

7

87.     Admit that the Lake Law Firm generated an exhibit described as "All cases presently open and assigned to JPLG Law Group" that was provided to Plaintiff.  Otherwise but deny knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph.

88.     The document speaks for itself. Otherwise deny the allegations contained in Paragraph 88.

89.     Deny the allegations contained in Paragraph 89.

90.     Aver that the September 2023 investor report ("September 2023 Investor Report") speaks for itself and deny the remaining allegations contained in Paragraph 90.

91.     Aver that the September 2023 Investor Report speaks for itself and deny the remaining allegations contained in Paragraph 91.

92.     Deny the allegations contained in Paragraph 92.

93.     Deny the allegations contained in Paragraph 93.

94.     Aver that the January 2024 investor report ("January 2024 Investor Report") speaks for itself and deny the remaining allegations contained in Paragraph 94.

95.     Aver that the January 2024 Investor Report states that "Sylvia Benito and Lee Melchionni, acting in their individual capacities, entered into a Short-Term Funding and Security Agreement (the "Short-Term Funding Agreement") with LLF pursuant to which Ms. Benito and Mr. Melchionni jointly loaned an aggregate amount of $400,000.00 to LLF" and deny the remaining allegations contained in Paragraph 95.

96.     Aver that the January 2024 Investor Report speaks for itself and deny the remaining allegations contained in Paragraph 96.

97.     Deny the allegations contained in Paragraph 97.

8

98.     Aver that Melchionni, Benito and Plaintiff executed a Limited Liability Partnership Agreement on August 24, 2021, creating a District of Columbia law firm, KS Law Group, LLP, but deny the remaining allegations contained in Paragraph 98.

99.     Deny the allegations contained in Paragraph 99.

100.     Admit the allegations contained in Paragraph 100.

101.     Deny the allegations contained in Paragraph 101.

102.     Aver that the February 9, 2024 KS Law update speaks for itself, but deny the remaining allegations in Paragraph 102.

103.     Deny the allegations contained in Paragraph 103.

104.     Deny the allegations contained in Paragraph 104.

105.     Deny the allegations contained in Paragraph 105.

106.     Deny the allegations contained in Paragraph 106.

107.     The D.C. Rules of Professional Conduct speak for themselves.

108.     Deny the allegations contained in Paragraph 108.

109.     Deny the allegations contained in Paragraph 109.

<div align="center">

**AS AND FOR A DEFENSE TO COUNT I**
**DIRECT CLAIM FOR CIVIL CONSPIRACY TO COMMIT FRAUD**
**(AS TO ALL DEFENDANTS)**

</div>

110.     Restate and reallege responses to paragraphs 1 through 109 as though fully set forth herein.

111.     Deny the allegations contained in Paragraph 111.

112.     Deny the allegations contained in Paragraph 112.

113.     Deny the allegations contained in Paragraph 113.

114.     Deny the allegations contained in Paragraph 114.

115. Deny the allegations contained in Paragraph 115.

116. Deny the allegations contained in Paragraph 116.

117. Deny the allegations contained in Paragraph 117.

118. Deny the allegations contained in Paragraph 118.

**AS AND FOR A DEFENSE TO COUNT II**
**DIRECT CLAIM FOR FRAUD**
**(AS TO LEE MELCHIONNI)**

119. Restate and reallege responses to paragraphs 1 through 118 as though fully set forth herein.

120. Deny the allegations contained in Paragraph 120.

121. Deny the allegations contained in Paragraph 121.

122. Deny the allegations contained in Paragraph 122.

123. Deny the allegations contained in Paragraph 123.

124. Deny the allegations contained in Paragraph 124.

125. Deny the allegations contained in Paragraph 125

**AS AND FOR A DEFENSE TO COUNT III**
**DIRECT CLAIM FOR FRAUD**
**(AS TO SYLVIA BENITO)**

126. Restate and reallege responses to paragraphs 1 through 125 as though fully set forth herein.

127. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

128. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

10

129.     The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

130.     The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

131.     The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

132.     The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

**AS AND FOR A DEFENSE TO COUNT IV**
**DIRECT CLAIM BREACH OF FIDUCIARY DUTY**
**(AS TO LEE MELCHIONNI)**

133.     Restates and realleges its response to paragraphs 1 through 132 as though fully set forth herein.

134.     Deny the allegations contained in Paragraph 134.

135.     Deny the allegations contained in Paragraph 135.

136.     Deny the allegations contained in Paragraph 136.

137.     Deny the allegations contained in Paragraph 137.

138.     Deny the allegations contained in Paragraph 138.

139.     Deny the allegations contained in Paragraph 139.

**AS AND FOR A DEFENSE TO COUNT VI[1]**
**DIRECT CLAIM BREACH OF FIDUCIARY DUTY**
**(AS TO SYLVIA BENITO)**

140.     Restate and reallege responses to paragraphs 1 through 139 as though fully set forth herein.

---

[1] Plaintiff has incorrectly designated this as "Count VI"; it is properly numbered "Count V".

11

141.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

142.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

143.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

144.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

145.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

146.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

**AS FOR A DEFENSE TO COUNT VII**
**CLAIM FOR AIDING AND ABETTING FRAUD**
**(AS TO THE LAKE LAW FIRM, LLC)**

147.    Restate and reallege responses to paragraphs 1 through 146 as though fully set forth herein.

148.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

149.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

12

150. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

151. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

152. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

153. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

154. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

155. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

**AS FOR A DEFENSE TO COUNT VIII**
**CLAIM FOR AIDING AND ABETTING FRAUD**
**(AS TO PERSIST COMMUNICATIONS INC.)**

156. Restate and reallege responses to paragraphs 1 through 155 as though fully set forth herein.

157. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

158. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

159. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

13

160.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

161.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

162.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

163.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

**AS FOR A DEFENSE TO COUNT IX**
**CLAIM FOR AIDING AND ABETTING FRAUD**
**(AS TO EDWARD LAKE)**

164.    Restate and reallege responses to paragraphs 1 through 163 as though fully set forth herein.

165.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

166.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

167.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

168.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

169.    The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

14

170. The allegations in this Paragraph are not directed towards Melchionni and, therefore, no response by Melchionni is required.

## AFFIRMATIVE DEFENSES

Melchionni reserves their right to defend this matter on the basis of the following listed defenses. By doing so, Melchionni does not assume the burden of proof on any issue for which the burden legally rests on Plaintiff. For his affirmative defenses, Melchionni incorporates his responses above, and further state as follows:

### FIRST AFFIRMATIVE DEFENSE

1. Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to plead the essential elements necessary to establish his claims.

### SECOND AFFIRMATIVE DEFENSE

2. Plaintiff's fraud-based claims are barred, in whole or in part, by his failure to plead such claims with the requisite particularity.

### THIRD AFFIRMATIVE DEFENSE

3. Plaintiff's claims are barred, in whole or in part, because there was no confidential or fiduciary relationship between Plaintiff and Melchionni.

### FOURTH AFFIRMATIVE DEFENSE

4. Plaintiff's Complaint fails to state a valid claim for relief against Melchionni.

### FIFTH AFFIRMATIVE DEFENSE

5. Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

## SIXTH AFFIRMATIVE DEFENSE

6.     Plaintiff's fraud and breach of fiduciary duty-based claims against Melchionni seek duplicative damages for the same alleged injury.

## SEVENTH AFFIRMATIVE DEFENSE

7.     Plaintiff's claims are barred, in whole or in part, by the doctrine of assumption of risk. Plaintiff knowingly and voluntarily assumed the risks associated with his investment in Justice Partners under the terms of the Operating Agreement, as contained within the Offering Circular. The alleged injuries and damages, if any, were caused by and arose out of risks of which Plaintiff or his agents had full knowledge of, and which Plaintiff assumed.

## EIGHTH AFFIRMATIVE DEFENSE

8.     Any damages sustained by Plaintiff in this action were the result of the acts or omissions of third parties over whom Melchionni had no control.

## NINTH AFFIRMATIVE DEFENSE

9.     The Complaint does not describe the claims made against Melchionni with sufficient particularity to enable Melchionni to determine all defenses he has. Accordingly, Melchionni reserves the right to assert additional defenses that may be pertinent to the First Amended Complaint once the precise nature of each claim is ascertained.

## TENTH AFFIRMATIVE DEFENSE

10.     Plaintiff's claims are barred, in whole or in part, by the Operating Agreement, including, but not necessarily limited to, Article VI: Section 6.12 and Article VIII: Section 8.2.

## ELEVENTH AFFIRMATIVE DEFENSE

11.     Plaintiff's claims are barred, in whole or in part, by the doctrine of *res judicata* and/or the doctrine of claim-splitting, including, without limitation, because Plaintiff's

16

claims are improperly split from those filed in this Court on March 15, 2023 in *Teh v. Melchionni, et al.* (Case No. 2023-004474-CA-01).

## TWELFTH AFFIRMATIVE DEFENSE

12.     The actions of persons or entities other than Melchionni constitute an independent, intervening and/or superseding cause and the claims against Melchionni are barred or otherwise proportionately reduced.

Dated: October 29, 2025                                      Respectfully submitted,

                                                            */s/ Daniel S.Bitran*
                                                            DANIEL S. BITRAN
                                                            Florida Bar No. 124041
                                                            dbitran@mitrani.com
                                                            miamidocketing@mitrani.com
                                                            **MITRANI, RYNOR, ADAMSKY &
                                                            TOLAND, P.A**.

                                                            *Counsel for Defendant Lee Melchionni,*

17

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 29, 2025, the foregoing document was filed via the

Florida Courts e-Filing Portal which will serve a true and correct copy to counsel for all parties.

<u>*/s/ Daniel S.Bitran*</u>
DANIEL S. BITRAN
Florida Bar No. 124041
dbitran@mitrani.com
miamidocketing@mitrani.com
**MITRANI, RYNOR, ADAMSKY &**
**TOLAND, P.A**.

18

Filing # 235403160 E-Filed 11/07/2025 03:54:19 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

     Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,


Defendants

_____/

### RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT [DE #44]

Plaintiff, Allan Teh, by and through undersigned counsel hereby files this Response in

Opposition to Defendants, The Lake Law Firm, LLC ("Lake Law") and Persist Communications'

("Persist), Edward J. Lake ("Mr. Lake") (collectively the "Defendants") Motion to Dismiss

Plaintiff's Amended Complaint, and in support states as follows:

### INTRODUCTION

The Defendants' renewed Motion to Dismiss is a reassertion of the arguments set forth in

their prior motion to dismiss. However, Defendants' Motion ignores the several amendments to

Plaintiff's Complaint that account for the exact directives and concerns outlined by this Court at

the September 17th, 2025, hearing on Defendants' original Motion to Dismiss. Additionally,

1

Defendants go far outside the four corners analysis making conclusory unsubstantiated and procedurally improper statements such as "he [the Plaintiff] knows very well . . ." turning a motion to dismiss into a summary judgment motion with no factual support.

This Court gave clear guidance at the September 17 hearing. The Court granted leave to amend and identified three issues that required clarification: conspiracy timing, particularized facts regarding the allegations directed to Defendants' substantial assistance, and additional allegations regarding Edward Lake's personal liability warranting individual liability. The First Amended Complaint accounts for all concerns raised by this Court.

First, as to conspiracy timing, the Court asked whether the pleadings tied the Lake Defendants to the agreement and fraudulent scheme that induced Plaintiff's investment, not merely to later acts. The Amended Complaint now pleads explicit a pre-investment agreement and purpose. It alleges that, prior to the April 6, 2021 investment, all defendants, including the Lake Defendants, "entered into a common plan and agreement to induce Plaintiff to invest through false representations concerning the use and purpose of his funds," and that the "purpose and objective" was to mislead Plaintiff into believing the money would fund mass-tort case acquisitions when defendants had already agreed the funds would be diverted to Lake-controlled accounts for Defendants' own pecuniary gain. FAC ¶¶ 111-112.  These amendments directly answer the Court's timing concern.

The existence, purpose, and objective of this plan is further supported by competing lawsuits filed by Defendants Benito against Edward Lake and Edward Lake against Defendants Melchionni, Benito, and various others. These lawsuits, which have been filed with the Court [DE #47] substantiate and corroborate the exact theories Plaintiff's Amended Complaint rest upon. However, now the relationship between the co-conspirators has deteriorated to such a point that a

2

race has begun to impose liability on one another when in fact it was their agreement to conduct these fraudulent acts, and the Plaintiff is the true party harmed by their actions.

Second, on the aiding and abetting fraud claims, the Court required specific acts constituting substantial assistance, not general conclusions. The Amended Complaint now identifies concrete conduct by the Lake Defendants, including the generation and circulation of invoices and "investor updates" that falsely represented mass-tort case acquisitions and value, and the coordination of reporting designed to conceal the diversion of funds. FAC ¶¶ 66-77, 80-84.

Third, as to Edward Lake's individual role and liability, the Court asked for additional allegations of what he personally did and represented to establish personal liability and a piercing of the corporate veil. The Amended Complaint now pleads that each invoice states "Edward J. Lake, Esq. agrees to" market and intake clients, gather medical records, act as liaison with trial firms, and handle client inquiries, among other duties., and pleads that the inclusion of "Edward J. Lake, Esq. agrees" evidences his personal undertaking of obligations. FAC ¶ 78 ¶ 79.

The other defendants have elected to answer the Amended Complaint. The Lake Defendants alone continue to seek dismissal, by repeating arguments this Court has already considered, while ignoring the new allegations pled at the Court's direction. The renewed Motion should be denied.

**STANDARD OF REVIEW**

A motion to dismiss tests "whether the plaintiff has stated a cause of action, not whether the plaintiff will prevail at trial." *Lonestar Alternative Sol., Inc. v. Leview-Boymelgreen Soleil Developers, LLC.*, 10 So. 3d 1169, 1171 (Fla. 3d DCA 2009). The trial court is bound by the four corners of the complaint and attachments, and all ambiguities and inferences drawn from "the recitals in the complaint, together with the exhibits attached," must be construed in the light most

3

favorable to the plaintiff. *Id.* (*quoting Vienneau v. Metro. Life Ins. Co.*, 548 So.2d 856, 858 (Fla. 4th DCA 1989)). The material allegations of the complaint must be taken as true. *See Davidson v. Iona-McGregor Fire Protection and Rescue District,* 674 So. 2d 858, 859 (Fla. 2d DCA 1996). A motion to dismiss a complaint "must be decided on questions of law and questions of law only." *Connolly v. Sebeco, Inc.*, 89 So. 2d 482, 484 (Fla. 1956). It is error for the trial court to rely "upon matters raised in the motion, but not contained within the four corners of the complaint." *Chatham Mfg., Corp. v. Cates*, 969 So.2d 515, 516 (Fla. 1st DCA 2007). A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that Plaintiff cannot prove a set of facts that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Bracewell v. Nicholson Air Servs., Inc.* 680 F.2d 103, 104 (11th Cir. 1982). "If a complaint does not state a cause of action, the opportunity to amend a complaint should be liberally given, unless it is apparent the pleading cannot be amended to state a cause of action." *Samuels v. King Motor Co.*, 782 So. 2d 489, 495 (Fla. 4th DCA 2001).

The Supreme Court of Delaware, utilizing a notice pleading standard, echoes Plaintiff's position that Defendant is attempting to bypass discovery and make premature and unqualified factual conclusions. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003). Delaware law clearly states that a plaintiff need not plead evidence but rather, "the plaintiff need only allege the facts that, if true, state a claim upon which relief can be granted. *Id.* A complaint that provides fair notice of the causes of action therein shifts the burden to the defendant "to determine the details of the cause of action by way of *discovery* for the purpose of raising legal defenses." *Id.*

## ARGUMENT

**A.  Plaintiff has properly pled Civil Conspiracy.**

4

Defendants' arguments against Plaintiff's Civil Conspiracy Count fall flat. To properly plead a claim for civil conspiracy, a plaintiff must allege: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds...relating to the object or...course of action; (4) one or more unlawful acts; and (5) damages as a proximate result thereof." *In re Bracket Holding Corp. Litig.*, 2017 WL 3283169 at *12 (Del. Super. Ct. July 31, 2017). Conspiracy is distinct from aiding and abetting in that Conspiracy involves "concerted action by agreement," whereas aiding and abetting concerns "concerted action by substantial assistance." *Id.*

Defendants' Motion goes out of its way to point out the several explicit allegations in Plaintiff's Amended Complaint which speak to the Lake Defendants' affirmative actions following the Defendants' agreement to effectuate their fraudulent scheme in a misguided attempt to argue that an agreement prior to Plaintiff's investment did not occur. Defendants attempt to make this argument in the face of the explicit amendments to Plaintiff's Complaint that speak directly to that initial element of civil conspiracy.

At the hearing, this Court asked whether the pleadings alleged that the Lake Defendants were part of the agreement that induced Plaintiff's investment, rather than participants in later acts, which also would speak to Plaintiff's Aiding and Abetting Fraud Counts. **The Amended Complaint now pleads that, before the April 6, 2021, investment, all defendants including the Lake Defendants "entered into a common plan and agreement to induce Plaintiff to invest through false representations concerning the use and purpose of his funds."** FAC ¶ 111. It then pleads the purpose and immediate diversion to Lake-controlled accounts as the pre-existing objective of that agreement. FAC ¶ 112.

The Amended Complaint also alleges that defendants agreed in advance that Lake Law, Persist, and Edward Lake would generate backdated invoices and documents to fabricate mass-

5

tort acquisitions that did not exist, timed to make the fraudulent diversion of Plaintiff's fund appear authorized and appropriate. FAC ¶ 113. These allegations address the Court's concern that conspiracy is the agreement itself and must be tied to the inducement.

Defendants' renewed Motion claims Plaintiff "admits" post-investment conduct by pointing to paragraph 114 and the later-dated examples. **But the conspiracy allegations are not limited to post-investment events. The amended pleading explicitly alleges the pre-investment agreement and purpose and explains the later acts as the planned execution and concealment of that pre-existing agreement.** FAC ¶¶ 111-115. Defendants' arguments ignore the case law that is clear in that "[s]ince a conspiracy may be proved by circumstantial evidence as well as by direct evidence, reasonable latitude may be permitted in establishing facts from which the conspiracy may be inferred." *Connolly v. Labowitz,* 519 A.2d 138, 144 (Del. Super. Ct. 1986). Defendants wish this Court to impose an evidentiary standard at the pleading stage while the Plaintiff has clearly set forth clear allegations outlining the civil conspiracy and agreement of the Defendants.

**B. Plaintiff's Amended Complaint pleads knowing and substantial assistance with particularity and therefore has properly pled the Aiding and Abetting Fraud Causes of Action.**

Defendants' arguments regarding Plaintiff's Aiding and Abetting Fraud counts are nonsensical. First, the thrust of the Lake Defendants' argument is that the Plaintiff failed to plead fraud with particularity as to the other Defendants, therefore the Aiding and Abetting Fraud counts also fails. This argument fails to acknowledge that Defendants, Melchionni and Benito, have already elected to Answer rather than move to dismiss the Fraud claims against them. Implicit in their Answers is the sufficiency of the allegations directed to the underlying Fraud. These are the exact arguments Defendants set forth in their first Motion to Dismiss which also fail to account for the additional allegations in the Amended Complaint.

Second, the Lake Defendants' arguments rest on a completely absurd misrepresentation of the allegations and controlling case law. Defendants argue that Melchionni and Benito control both sides of the transaction and can't defraud themselves. The arguments are odd in the context of a direct action where the Plaintiff is explicitly alleging he, not Benito or Melchionni, is the victim of the fraud and misrepresentations. The only explanation of such a departure from Plaintiff's allegations appears to be that Defendants copy and pasted their arguments from a motion to dismiss filed in a related derivative action. Further to the point, Defendants' arguments are directly at odds with the Defendants' lawsuits against each other. The Lake Defendants cannot contend that the agreements in this case are still in their "executory phase" while simultaneously alleging that Melchionni and Benito "knowingly and falsely represented themselves as legitimate law firm owners under laws of the District of Columbia and as individuals authorized to serve as co-counsel in mass tort litigation." *See [DE #47]*. Additionally, Lake Law, pursuant to another recent lawsuit filed against them is currently under the supervision and authority of a Receiver and has no authority to disburse any funds. *See [DE #47].*

Nevertheless, Delaware Law clearly states that fraud does not merely consist of overt misrepresentations but "may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak." *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). Thus, one is equally culpable of fraud, who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading. *See Lock v. Schreppler,* Del.Super., 426 A.2d 856, 860–61 (1981) (concealment of material facts); *Leech v. Husbands,* Del.Super., 152 A. 729, 731–32 (1930) (same).

**Despite Defendants not including a single case regarding the elements of aiding and abetting fraud, Plaintiff includes it here**. A claim for aiding and abetting fraud must establish

7

the following elements: "(i) underlying tortious conduct[;] (ii) knowledge[;] and (iii) substantial assistance." *AmeriMark Interactive, LLC v. AmeriMark Holdings, LLC*, 2022 WL 16642020 at *11 (Del. Super. Ct. Nov. 3, 2022) Like the pleading requirements for fraud, the knowledge element of an aiding and abetting claim under Delaware law can be averred generally. *Id.* It requires that the plaintiff plead facts from which it reasonably can be inferred that the defendants knew or were in a position to know of the underlying tortious conduct. *Id.* To show substantial assistance, "the secondary actor must have provided 'assistance ... or participation' in aid of the primary actor's allegedly unlawful acts." *Id.*

All required elements of aiding and abetting fraud are present in Plaintiff's Amended Complaint. The Lake Defendants created and circulated the invoices that formed the financial backbone of the deception. These invoices did not merely record transactions. They constructed the fiction that the Law Group had used Plaintiff's funds to acquire thousands of mass-tort cases, in precise quantities and categories, tied to a supposed mass tort portfolio strategy. FAC ¶¶ 75–77. The invoices list specific case counts (e.g., "1,200 3M Cases," "1,986 Hernia Mesh Cases," etc.), giving the appearance of actual, verifiable case inventory. But as the Amended Complaint alleges, the Law Group never acquired these cases and never held retainer agreements entitling it to litigation proceeds. FAC ¶¶ 27, 31, 66–67.

The Lake Defendants also generated and transmitted "updates" to Plaintiff that reinforced this illusion. These updates did not simply imply the existence of mass-tort case portfolios  they explicitly represented that Justice Partners "had spent $11,250,000 to acquire" listed litigation assets in specific numerical quantities. FAC ¶¶ 70–73. These communications were sent to Plaintiff directly, and they were sent after the funds had already been diverted, for the express purpose of preventing Plaintiff from discovering the diversion. The Lake Defendants also

participated in the shifting narrative regarding what had been acquired. When Plaintiff began to question the legitimacy of the represented case assets, the Lake Defendants (along with the co-conspirators) reframed the "case acquisitions" as mere "leads", while inexplicably maintaining the same $11,250,000 valuation. FAC ¶¶ 80–84. This shift is critical. It demonstrates not only substantial assistance, but knowledge of falsity.

This Court noted at the hearing that substantial assistance requires allegations showing how the Lake Defendants helped "perpetuate" or "advance" the fraud. The Amended Complaint builds, clarifies, and adds to Plaintiff's prior allegations. **The Lake Defendants' renewed argument that they simply "received payments" ignores that the Amended Complaint alleges they manufactured the documents and messages necessary to justify those payments and conceal the fraud**. That is not passive receipt it is active participation in the execution of the scheme.

At the pleading stage, these factual allegations must be accepted as true, and they more than satisfy the standard for aiding and abetting under Delaware law, as already briefed in Plaintiff's prior response. The Lake Defendants' attempt to characterize these allegations as "conclusory" is not consistent with the Amended Complaint as written. The allegations are detailed, chronological, and tied directly to the fraudulent scheme pled and Defendants' substantial assistance.

### C. Plaintiff has sufficiently pled aiding and abetting fraud as to Defendant, Edward J. Lake, individually.

The Defendants once again argue that Plaintiff has not sufficiently pled aiding and abetting as to Defendant, Edward J. Lake, adequate to pierce the corporate veil. Defendants are incorrect. Not only does the Amended Complaint sufficiently plead allegations necessary to pierce the corporate veil, but it is not necessary because Edward Lake has already made himself individually liable for specific duties he failed to perform.

9

This Court noted at the September 17 hearing that the prior complaint needed to clearly state what Edward Lake himself did, in his individual capacity, to assist and further the fraud. The Court emphasized that allegations of ownership or status alone are insufficient, and that the pleading should instead identify the personal conduct giving rise to liability. The Amended Complaint does exactly that.

**The invoices central to the fraudulent scheme were not signed merely in the name of The Lake Law Firm or Persist Communications but expressly state that "Edward J. Lake, Esq. agrees to . . ." and sets forth his explicit individual duties.** See FAC ¶¶ 75–79. This is not mere ownership. This is not passive oversight. This is a written, individual commitment to perform explicit duties that include liaising with trial and co-counsel firms, coordinating client intake and communications, managing litigation processes, and overseeing record-gathering functions. FAC ¶¶ 75–78. Edward Lake had direct knowledge that he failed to and never intended to perform those functions. The concealment of those failures satisfies the substantial assistance in the other Defendants' fraud upon the Plaintiff.

Additionally, to pierce the corporate veil three factors must be present: (1) "the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant." *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008). All elements to pierce the corporate veil are explicitly present in Plaintiff's Amended Complaint and as they must be taken as true in the present procedural posture adequately defeat Defendants' arguments as to the personal liability of Edward Lake. FAC ¶ 9, ¶ 10, ¶ 12.

10

**CONCLUSION**

The Amended Complaint addresses the issues identified by this Court and pleads detailed facts establishing pre-investment conspiracy, particularized substantial assistance, and Edward Lake's personal role. The renewed Motion to Dismiss merely reasserts Defendants' prior arguments with no regard to the additional allegations in the Amended Complaint. The allegations set forth in Defendants' own complaints [DE #47] establish the baseless nature of the Lake Defendants' arguments and directly conflict with the representations made in their Motion to Dismiss. The Motion was filed purely for the purpose delaying these proceedings and should be **denied** and the Lake Defendants be required to **answer**.

**WHEREFORE,** Plaintiff, Allan Teh, respectfully requests that Defendants' Motion to Dismiss [DE #44] be denied and for such further relief this Court deems just and proper.

**CERTIFICATE OF SERVICE**

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 7th day of November, 2025.

<div align="right">

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
 Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:    _/s/ Matthew L. Jones, Esq._
       Matthew L. Jones, Esq.
       Florida Bar No. 909335

</div>

12

Filing # 235395835 E-Filed 11/07/2025 03:12:16 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2024-020751-CA-01

ALLAN TEH,

      Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
JUSTICE PARTNERS MANAGEMENT, a
Delaware Limited Liability Company,
JUSTICE PARTNERS LAW GROUP, a District
of Columbia Limited Partnership,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company, and EDWARD LAKE,

Defendants

_____/

## NOTICE OF FILING

      Plaintiff, Allan Teh, by and through undersigned counsel, hereby files this Notice of

Filing:

- Complaint: *Benito v. Lake et. al.*, Index No: 628021/2025, Supreme Court of the State of

  New York County of Suffolk

- Complaint: *Law Office of Edward J. Lake v. Melchionni, Benito, Solit, et. al*, Supreme

  Court of the State of New York County of Suffolk

- Complaint*: Blakemore Investments, LLC v. Law Offices of Edward J. Lake, P.C. d/b/a

  The Lake Law Firm and Edward J. Lake*, Index No. 629003/2025, Supreme Court of the

  State of New York County of Suffolk

- Stipulation and Order Resolving Motion and Appointing Temporary Receiver in *Blakemore Investments, LLC v. Law Offices of Edward J. Lake, P.C. d/b/a The Lake Law Firm and Edward J. Lake*, Index No. 629003/2025, Supreme Court of the State of New York County of Suffolk

**<u>CERTIFICATE OF SERVICE</u>**

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 7th day of October, 2025.

> **JONES & ADAMS, P.A.**
> Coral Gables Centre
> 999 Ponce de Leon Blvd., Ste 925
> Coral Gables, Florida 33134
> Telephone: (305) 270-8858
> Facsimile: (305) 270-6778
> Email: matthew@jones-adams.com
>
> By:   _/s/ Matthew L. Jones, Esq._
> Matthew L. Jones, Esq.
> Florida Bar No. 909335

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 905 of 978

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

---

SYLVIA BENITO,

                Plaintiff,

        v.

EDWARD J. LAKE and LAW OFFICE OF EDWARD
J. LAKE d/b/a THE LAKE LAW FIRM

                Defendants.

Index No.

---

**COMPLAINT**

Plaintiff Sylvia Benito files this Complaint against Defendants Edward J. Lake ("Ed Lake") and the Law Office of Edward J. Lake, P.C. d/b/a The Lake Law Firm ("Lake Law") on personal knowledge as to herself and on information and belief as to all other facts as follows:

**I.**
**PRELIMINARY STATEMENT**

This case arises out of the failure of Lake Law and the numerous schemes orchestrated by its founder, Ed Lake. For many years, Ed Lake has aggressively marketed his law firm as a highly successful participant in the mass torts litigation finance space—touting Lake Law's unique offerings such as a medical records review and guarantee.

Around 2017, Benito, an experienced investor relations professional, became interested in mass torts litigation as an investment class. While pursuing that interest, she developed relationships with attorneys who presented themselves as possessing expertise in the field. Among those she came to know was Ed Lake, who held himself out as a trusted expert and industry leader. In due course, Benito, like many others, was induced by Ed Lake's representations about his firm's "unblemished" record of success to place confidence, and ultimately capital, in him and his firm.

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 906 of 978

In total, Benito recommended that investors entrust over $15 million to Lake Law in connection with the purchase of a docket of mass torts cases. Unfortunately, neither Lake Law nor Ed Lake ever came close to delivering on their promises. Instead, fully aware of Benito's strong desire to protect her investors, Defendants induced Benito to make personal loans to Lake Law as "rescue funding" under false pretenses—loans that Defendants never intended to repay.

Defendants' misconduct extended to defrauding Benito into making personal investments in Employee Retention Tax Credits ("ERC") claims, a federal tax-credit program under the CARES Act.[1] Benito transmitted $1.5 million to Defendants to purchase ERC claims for her benefit. Rather than honoring their agreement, Ed Lake used the funds for his own benefit, later recharacterizing her investment as a "loan" to himself and appropriating for his own gain the opportunity that belonged to her.

Benito now seeks redress for Defendants' malfeasance, recovery of funds owed, and protection for others who might otherwise fall victim to similar conduct.

## II.
## JURISDICTION & VENUE

1.      The Court has general personal jurisdiction over Lake Law pursuant to CPLR 301 because Lake Law is incorporated in and has its principal place of business in Suffolk County, New York.

2.      The Court has long-arm jurisdiction pursuant to CPLR 302, consistent with federal

---

[1]      ERC was introduced under the CARES Act during the COVID-19 pandemic and is a refundable tax credit program for eligible employers who retained their employees during the pandemic. Under Lake Law's ERC investment model, the investor is assigned a specific taxpayer who has an ERC tax refund claim. The investor's money pays that taxpayer's legal fees and other costs associated with guiding the taxpayer through the refund application process. Once the taxpayer obtains his refund, the investor gets a portion of it as a return on investment. In this program, the investor does not fund litigation against the IRS.

2

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 907 of 978

constitutional requirements, over Ed Lake because he: (1) has and continues to transact business in New York; (2) has and continues to commit tortious acts in New York; and (3) owns, uses, or possesses real property situated in New York.

3. Venue is proper in this Court under CPLR 501 and 502 because Lake Law is located in Suffolk County and many of the acts and omissions alleged in the Complaint occurred there.

### III.
### PARTIES

4. Plaintiff Benito is a resident and citizen of Florida.

5. Defendant Ed Lake is a New York licensed attorney who is the founder and sole owner of Lake Law. Ed Lake currently resides in and is a citizen of Florida.

6. Defendant Lake Law is a law firm duly organized and operating under the laws of the State of New York with its principal place of business at 270 West Main Street, Suite 3, Sayville, New York 11782.

7. Ed Lake completely controls and dominates Lake Law, such that Lake Law is Ed Lake's alter ego, and does not have a meaningful separate existence from Ed Lake.

### IV.
### STATEMENT OF RELEVANT FACTS

8. This lawsuit concerns Defendants' misconduct in connection with a mass torts litigation finance program involving Benito and investors she introduced to Defendants, and Benito's personal investment in ERC claims.

**A.    The Players: Benito, Melchionni, and Ed Lake**

**1.    Benito & Melchionni**

9. Benito is an accomplished investment professional with over 20 years of experience in the financial industry, including roles at structured settlement companies, a hedge fund, and

3

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 908 of 978

family offices. Benito is particularly gifted in the areas of business development, capital raises, and investor relations. It is this expertise that led her to the field of mass torts litigation funding.

10. In 2016, Benito joined Structures, a structured settlement company, where she developed investment opportunities with mass tort attorneys. Shortly thereafter, Structures hired Melchionni, an attorney, for the same position.

11. In 2017, Benito, seeking a more manageable travel schedule as a single mother, left Structures to join a multi-family office called GenSpring. While there, Melchionni introduced Benito to mass torts litigation as an investable asset class that provided consistent returns at moderate risk.

12. Although Benito did not immediately invest, she found the concept appealing both financially and as a way to assist victims of mass torts.

13. By 2020, while working for another family office called ASK, Benito structured her first mass tort investment with Melchionni in connection with claims of sexual abuse against the Boy Scouts. This investment turned out to be a "home run" for the investors and continues to yield returns.

14. Benito and Melchionni's next investment was not as successful. In that investment, Benito's friend invested $300,000, which Benito and Melchionni used to fund talcum powder personal injury cases. This investment highlighted one of the risks of mass tort litigation funding: case drop-off. Specifically, when a litigation funder invests in a portfolio of mass torts litigation, the return on the investment is determined by the number of high-quality cases. While some case attrition in every portfolio is normal, if too many cases "drop off" because they are not viable, then the investment will not be profitable. Here, every talcum powder case in the portfolio was disqualified, so the investment went to zero. Nevertheless, Benito and Melchionni, without any

4

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 909 of 978

obligation to do so, personally covered the investor's entire loss.

### 2. Enter Ed Lake

15. In 2020, Melchionni met Ed Lake at an industry conference. Ed Lake touted himself as a leading attorney with almost 30 years' experience in personal injury and mass torts litigation. He claimed that his law firm "solved" the "case drop-off problem" through a medical records review and guarantee. That is, he claimed that any person that Lake Law signed up provided their medical records, so that the viability of his claim could quickly be assessed. If a case dropped off, then Lake Law's could replace the case.

16. He further claimed that, once a case was approved, he maximized recovery by acting as co-counsel with top trial firms.

### B. Justice Partners And KS Law Group

17. Ed Lake's representations induced Benito to work with Lake and his law firm as a potential investment source in mass tort litigation.

18. In late 2020, Melchionni and Benito launched Justice Partners with the intent to offer investors a diversified portfolio of mass torts cases. In the venture, Benito's role was to raise capital and handle investor relations while Melchionni, as the attorney, was responsible for managing the litigation docket.

19. Eventually, Justice Partners raised $11.25 million for investment. In addition, one of the Justice Partners investors made a $4 million "sidecar" investment in a venture called KS Law Group.

20. Once the funds closed, on April 15, 2021, Melchionni and Benito sent the

5

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 910 of 978

investment funds, in amount of $6.125 million, to Defendants to obtain the following cases:[2]

| Quantity | Description | Unit Price | Total Price |
|---|---|---|---|
| 380 | Hernia Mesh | $5,000 | $1.9 million |
| 208 | Talc | $5,700 | $1.185 million |
| 150 | Round Up | $5,000 | $750K |
| 350 | 3M | $2,000 | $700K |
| 200 | Fire Foam | $5447 | $1.0894 million |
| 200 | Zantac | $2,500 | $500K |

21.     On or about October 20, 2021, Justice Partners sent Defendants another $5.125 million to purchase an additional 12% of any recovered attorney's fees as follows:

| Quantity | Description |
|---|---|
| 1,606 | Hernia Mesh |
| 1,336 | Talc |
| 100 | Round Up |
| 850 | 3M |

---

[2]     The funds were transmitted to Defendants via a marketing firm owned and operated by Ed Lake called Persist Communications, Inc. ("Persist"), which Lake repeatedly claimed was his "engine room." According to Lake, the company ran the campaigns to locate and sign up the mass torts plaintiffs in whose cases the investors are investing.

6

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 911 of 978

22.     On September 1, 2021, KS Law sent $3.88 million to Defendants to obtain the following cases:

| Quantity | Description | Unit Price | Total Price |
|----------|-------------|------------|-------------|
| 220 | Hernia Mesh | $5,600 | $1.232 million |
| 200 | Talc | $6,000 | $1.2 million |
| 1155 | Round Up | $5,048.39 | $782.5K |
| 220 | 3M | $3.025 | $665K |

23.     In making the above-described investment decisions, Benito relied on Defendants' representation regarding the success of the fund, Ed Lake's representations regarding his firm's medical records review process and guarantees.

**C.     Benito Invests Her Own Money With Defendants**

24.     In addition to the Justice Partners and KS Law investments, on April 26, 2022, Benito invested $1.5 million of her own money with Lake Law to purchase ERC claims for her own account based on Ed Lake's representation that Lake Law had secured access to a pipeline of lucrative ERC claims.

25.     Unbeknownst to Benito, Ed Lake thereafter diverted those funds for his personal benefit rather than using them to acquire ERC claims for Benito, later recharacterizing her investment as a "loan" to himself.

26.     Benito was therefore deprived of the benefits of the investment, including ownership interests and potential profits as promised.

7

**D.**     **Trouble In Paradise**

27.     By summer 2022, the relationship among Benito, Melchionni, and Defendants began to deteriorate.  Lake Law had fallen far short of the promised case counts.  For Justice Partners, Lake Law was short 208 talc cases, 380 hernia mesh cases, 150 Roundup cases, 350 3M cases, and 200 firefighter foam cases.  For KS Law, the shortfall was 200 talc cases, 220 hernia mesh cases, 155 Roundup cases, and 220 3M cases.

28.     It also became apparent that Lake Law did not have sufficient "inventory" to cover Justice Partners' additional investment in 12% of attorney's fees. This, of course, was contrary to Ed Lake's specific representations.

29.     Relying on Ed Lake's medical records guarantee, Melchionni, acting on behalf of Justice Partners and KS Law, negotiated and entered into Case Replacement Agreements with Lake Law on December 1, 2022.  These agreements formalized Ed Lake's promises to substitute qualifying cases.  But by July 2023, Ed Lake repudiated these Agreements, proposing new terms that were materially adverse to investors and inconsistent with prior guarantees.

30.     Matters worsened when settlements began to materialize. After the resolution of 3M cases, Lake Law failed to distribute investor proceeds as required.

31.     By late 2023, Ed Lake began threatening to close Lake Law unless he received operational funding for Lake Law.  Specifically, he sought $400,000 in "rescue funding" from Benito and Melchionni on the false representation that the Lake Law would be getting significant financing within 90 days from Arena Investors LP and American Law Firm Capital LLC.

32.     In reliance on Ed Lake's representation about the forthcoming financing and to protect their investors, in January 2024, Benito and Melchionni each loaned Lake Law $200,000 via a "Short-Term Funding and Security Agreement."  Although the loan matured on April 1, 2024,

and despite repeated demands for repayment, the loan remains outstanding. Benito now knows that Ed Lake never intended to repay the debt.

33.     As if that was not enough, Ed Lake requested more purported "rescue funding"—again based on the misrepresentation that he was about to secure large long-term financing.

34.     Again, to protect their investors, Benito and Melchionni each loaned Lake Law $850,000 between March 2024 and March 2025. Benito now knows that Ed Lake never had any intention of repaying that debt either. Indeed, he never did so.

35.     Ed Lake's malfeasance carried over into Benito's personal ERC investment as well. In a sleight of hand, Ed Lake used Benito's $1.5 million investment in ERC claims to build an ERC docket for himself and then claim that Benito's money was "merely" a loan.

36.     Indeed, as time went on, it became clear that Ed Lake was effectively running a Ponzi scheme. As he failed to keep adequate reserves for his investment vehicles, he paid prior investors with new investors' funds. He also pledged the same attorneys' fees to multiple parties without their knowledge. The misconduct goes on and on.

37.     Benito now seeks redress for Ed Lake's misconduct.

## V.
## <u>FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT</u>
### (Against Ed Lake & Lake Law)

38.     Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

39.     The elements of a cause of action for breach of contract in New York are: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages.

40.     Here, Benito entered into the "Short-Term Funding and Security Agreement" with

Lake Law in or about January 2024; Benito lent Lake Law $200K under that agreement; Lake Law breached its obligations under that agreement by failing to repay the loan by the maturity date; and Benito was damaged as a result of the Lake Law's breach.

## VI.
## SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT
### (Against Ed Lake & Lake Law)

41. Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

42. The elements of a cause of action for breach of contract in New York are: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages.

43. Here, Benito entered into loan agreements with Lake Law between March 2024 and March 2025; Benito performed her obligation and loaned Lake Law $850,000 under those agreements; Lake Law breached its obligations under those agreements by failing to repay the loans by their maturity dates; and Benito was damaged as a result of the Lake Law's breaches.

## VII.
## THIRD CAUSE OF ACTION FOR BREACH OF CONTRACT
### (Against Ed Lake & Lake Law)

44. Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

45. The elements of a cause of action for breach of contract in New York are: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages.

46. Here, Benito entered into a contract with Lake Law in April 2022 to purchase ERC cases; Benito performed her obligation to pay the purchase price of $1.5 million for these cases;

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 915 of 978

Lake Law breached its obligations under that agreement by failing to deliver any ERC cases to Benito; and Benito was damaged as a result of the Lake Law's breach by losing out on an opportunity for a return on her investment.

## VIII.
## FOURTH CAUSE OF ACTION FOR FRAUDULENT INDUCEMENT
### (Against Ed Lake & Lake Law)

47.     Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

48.     The elements of a cause of action for fraudulent inducement in New York are: (1) a false representation of material fact; (2) known by the utterer to be untrue; (3) made with the intention of inducing reliance and forbearance from further inquiry; (4) that is justifiably relied upon; and (5) results in damages.

49.     Here, Ed Lake misrepresented that he would receive funding for his operations from Arena Investors LP and American Law Firm Capital LLC to induce Benito to loan Lake Law $200K; Benito justifiably relied on these representations and loaned Lake Law $200K; and Benito was damaged when Lake Law failed to repay the loan.

## IX.
## FIFTH CAUSE OF ACTION FOR FRAUDULENT INDUCEMENT
### (Against Ed Lake & Lake Law)

50.     Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

51.     The elements of a cause of action for fraudulent inducement in New York are: (1) a false representation of material fact; (2) known by the utterer to be untrue; (3) made with the intention of inducing reliance and forbearance from further inquiry; (4) that is justifiably relied upon; and (5) results in damages.

11

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 916 of 978

52.     Here, Ed Lake misrepresented that he would receive funding for his operations from Arena Investors LP and American Law Firm Capital LLC to induce Benito to loan Lake Law $850K; Benito justifiably relied on these representations and loaned Lake Law $850K in a series of transactions; and Benito was damaged when Lake Law failed to repay the loans.

## X.
## SIXTH CAUSE OF ACTION FOR FRAUDULENT INDUCEMENT
### (Against Ed Lake & Lake Law)

53.     Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

54.     The elements of a cause of action for fraudulent inducement in New York are: (1) a false representation of material fact; (2) known by the utterer to be untrue; (3) made with the intention of inducing reliance and forbearance from further inquiry; (4) that is justifiably relied upon; and (5) results in damages.

55.     Here, Ed Lake misrepresented in April 2022 that he would provide ERC claims to Benito in exchange for $1.5 million to induce Benito to send him that cash; Benito justifiably relied on Ed Lake's misrepresentation and sent Lake Law $1.5 million; and Benito was damaged when Ed Lake failed to deliver these cases because she lost out on an opportunity for a return on her investment.

## XI.
## SEVENTH CAUSE OF ACTION FOR AN ACCOUNTING
### (Against Ed Lake & Lake Law)

56.     Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

57.     At all relevant times, a fiduciary and confidential relationship existed between Benito and Defendants. Defendants solicited and received funds from Benito and the investors

12

she represented under the pretense that such funds would be used to acquire and manage portfolios of mass torts cases and related litigation assets for the investors' benefit. Defendants also received and controlled Benito's personal investment funds in connection with the ERC venture.

58.     As a result, Defendants owed Benito a duty to act with good faith, to account accurately for all funds received and disbursed, and to maintain transparent records reflecting the use and disposition of investment proceeds, case recoveries, and operational expenditures.

59.     Defendants commingled investor funds, diverted monies to unauthorized purposes, paid existing obligations with new investor capital, and double-pledged participation rights in attorney's fees and recoveries.

60.     Because the relevant financial information lies solely within Defendants' possession and control, Benito lacks an adequate remedy at law to ascertain the true extent of her losses and the disposition of investor assets.

61.     Accordingly, Benito is entitled to a full accounting of all monies and assets received, held, invested, disbursed, pledged, or otherwise managed by Defendants in connection with all the foregoing investments alleged.

## XII.
## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Benito prays for relief against Defendants as follows:

1.     Compensatory and consequential damages in an amount to be proven at trial, but not less than $2.55 million.

2.     A constructive trust, a constructive trust over Ed Lake and Lake Law's assets in the amount of at least $8.55 million.

3.     Equitable relief including the turnover of all collateral in which Plaintiff has a security.

<p style="text-align:center">13</p>

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 918 of 978

4.      Disgorgement of any profits on ERC cases that rightfully belong to Benito because of her $1.5 million investment.

5.      Exemplary and punitive damages under New York law for fraud.  Benito specifically alleges that Ed Lake's actions rise to felony-level misconduct in inducing Benito to send at least $2.55 million to Lake Law under false pretenses.

6.      Pre-judgment and post-judgment interest as permitted by law.

7.      Attorney's fees and costs as permitted by law.

8.      Such other and further relief that the Court deems just and proper.

## XIII.
## JURY DEMAND

Benito demands a trial by jury on all issues so triable.

Dated: October 20, 2025                    Respectfully submitted,
New York, New York

                                           /s/ William A. Brewer III
                                           William A. Brewer III
                                           **BREWER, ATTORNEYS & COUNSELORS**
                                           750 Lexington Avenue, 14th Floor
                                           New York, New York 10022
                                           Tel: (212) 489-1400
                                           wab@brewerattorneys.com

                                           **COUNSEL FOR PLAINTIFF SYLVIA BENITO**

14

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

LAW OFFICE OF EDWARD J. LAKE D/B/A
THE LAKE LAW FIRM AND EDWARD J. LAKE
     *Plaintiffs*,

v.

LEE MELCHIONNI, RICHARD SOLIT,
SYLVIA BENITO, ACI LAW GROUP LLP,
ACI TALC LAW GROUP LLP, ASK LAW
GROUP LLP, BHI LAW GROUP LLP,
BLUE CHIP LAW GROUP LLP, ERC LAW
GROUP LLP, ERC PARTNERS LLC, JUSTICE
PARTNERS GROUP LLP, KS LAW GROUP LLP,
LRS LAW GROUP, LLP, TC LAW GROUP LLP,
TITAN LAW GROUP LLP, and JANE/JOHN DOES
1-12
     *Defendants*.

Index No.:

## ORIGINAL COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION

Come Now Plaintiffs, LAW OFFICE OF EDWARD J. LAKE, PC, d/b/a THE LAKE LAW FIRM and EDWARD J. LAKE, by and through their undersigned counsel, and file this Complaint and Motion for Preliminary Injunction against Defendants, LEE MELCHIONNI, RICHARD SOLIT, SYLVIA BENITO, ACI LAW GROUP LLP, ACI TALC LAW GROUP LLP, ASK LAW GROUP LLP, BHI LAW GROUP LLP, BLUE CHIP LAW GROUP LLP, ERC LAW GROUP LLP, ERC PARTNERS LLC, JUSTICE PARTNERS GROUP LLP, KS LAW GROUP LLP, LRS LAW GROUP, LLP, TC LAW GROUP LLP, TITAN LAW GROUP, LLP, and JANE/JOHN DOES 1-12, and allege the following:

## I. **INTRODUCTION AND PRELIMINARY STATEMENT**

1.      This action arises from a hostile takeover of the LAW OFFICE OF EDWARD J. LAKE d/b/a THE LAKE LAW FIRM ("LAKE LAW FIRM" or "FIRM") orchestrated by Defendants, LEE MELCHIONNI, SYLVIA BENITO, AND RICK SOLIT ("INDIVIDUAL DEFENDANTS") who, as persons not qualified or authorized to practice law in the State of New York, engaged in a broad pattern of willful, malicious, and unlawful conduct aimed to take over LAKE LAW FIRM, dismantle the firm without regard for its clients or staff, and to strip it of its future earnings. INDIVIDUAL DEFENDANTS, along with JANE/JOHN DOES 1-12,  knowingly and falsely represented themselves as owners of legitimate District of Columbia law firms, including ACI LAW GROUP LLP, ACI TALC LAW GROUP LLP, ASK LAW GROUP LLP, BHI LAW GROUP LLP, BLUE CHIP LAW GROUP LLP, ERC LAW GROUP LLP, ERC PARTNERS LLC, JUSTICE PARTNERS GROUP LLP, KS LAW GROUP LLP, LRS LAW GROUP, LLP, TC LAW GROUP LLP, and TITAN LAW GROUP, LLP, ("D.C. FIRMS") and unlawfully assumed control over LAKE LAW FIRM business operations, client relationships, and financial resources. Their conduct included misrepresentation, breach of fiduciary duty, conspiracy, racketeering under the Civil RICO statute, conversion of firm assets, coercion, tortious interference, breach of the duty of good faith and fair dealing, fraud, and the unauthorized practice of law, among other actionable wrongs. As a direct result, Plaintiffs suffered the conversion of $7 million in assets, the destruction of an $18 million financing opportunity, severe reputational harm, emotional distress, and the collapse of a $20 million revenue firm. Plaintiffs seek compensatory, punitive, and treble damages, costs, interest, and all other relief the Court deems just and proper.

## II. JURISDICTION AND VENUE

2.      Jurisdiction is proper in this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302, as the claims arise from acts and omissions occurring within the State of New York, and Defendants transacted business and committed tortious acts within the state.

3.      Venue is proper in this Court pursuant to CPLR § 503, as the principal place of business of LAKE LAW FIRM is located in Suffolk County, New York, and the acts and omissions alleged herein occurred in substantial part within this County.

## III. PARTIES

4.      Plaintiff LAW OFFICE OF EDWARD J. LAKE, P.C. d/b/a THE LAKE LAW FIRM is a law firm duly organized and operating under the laws of the State of New York, with its principal place of business at 270 West Main Street, Suite 3, Sayville, New York  11782.

5.      Plaintiff EDWARD J. LAKE ("LAKE") is an individual residing at 7701 Glendevon Lane, Unit 1903, Del Ray Beach, Florida 33446 and is the founder and sole owner of LAKE LAW FIRM. LAKE is licensed to practice in the State of New York and has over 25 years of legal experience.

6.      Defendant LEE MELCHIONNI ("MELCHIONNI") an individual residing at 1537 Tryon Rd NE, Brookhaven, Georgia 30319, and may be served with process at this address. At all relevant times, MELCHIONNI has transacted business, engaged in commercial activities, and/or maintained sufficient contacts within the State of New York so as to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules §§ 301 and 302.

7.      Defendant RICHARD SOLIT ("SOLIT") is an individual residing at 9350 NE 12th Ave, Miami Shores, Florida 33138 and may be served with process at this address. At all

relevant times, SOLIT has transacted business, engaged in commercial activities, and/or maintained sufficient contacts within the State of New York so as to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules §§ 301 and 302.

8.      Defendant SYLVIA BENITO ("BENITO") is an individual whose address is 9350 NE 12th Ave, Miami Shores, Florida 33138 and may be served with process at this address. At all relevant times, BENITO has transacted business, engaged in commercial activities, and/or maintained sufficient contacts within the State of New York so as to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules §§ 301 and 302.

9.      Defendant ACI LAW GROUP LLP is a law firm existing under the laws of the District of Columbia whose principal address is 4062 Peachtree Rd NE, Unit A, Box 1667, Brookhaven, GA 30319. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant ACI LAW GROUP LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with the LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant ACI LAW GROUP LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant ACI LAW GROUP LLP by any other means authorized by law or order of the Court.

10.     Defendant ACI TALC LAW GROUP LLP is a law firm existing under the laws of the District of Columbia whose principal address is 20900 NE 30th Ave, Suite 510, Miami, FL 33180. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant ACI TALC LAW GROUP LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant ACI TALC LAW GROUP LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant ACI TALC LAW GROUP LLP by any other means authorized by law or order of the Court.

11.     Defendant ASK LAW GROUP LLP is a law firm existing under the laws of the District of Columbia whose principal address is 20900 NE 30th Ave, Suite 510, Miami, FL 33180. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant ASK LAW GROUP LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the

jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant ASK LAW GROUP LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant ASK LAW GROUP LLP by any other means authorized by law or order of the Court.

12.     Defendant BHI LAW GROUP LLP is a law firm existing under the laws of the District of Columbia whose principal address is 4062 Peachtree Rd NE, Unit A, Box 1667, Brookhaven, GA 30319. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant BHI LAW GROUP LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant BHI LAW GROUP LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant BHI LAW GROUP LLP by any other means authorized by law or order of the Court.

13.     Defendant BLUE CHIP LAW GROUP LLP, is a law firm existing under the laws of the District of Columbia whose principal address is 1100 H St NW, Suite 840, Washington, DC 20005. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant BLUE CHIP LAW GROUP LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant BLUE CHIP LAW GROUP LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant BLUE CHIP LAW GROUP LLP by any other means authorized by law or order of the Court.

14.     Defendant ERC LAW GROUP is a law firm existing under the laws of the District of Columbia whose principal address is 1537 Tryon Rd NE, Brookhaven, GA 30319. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant ERC LAW GROUP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of

this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant ERC LAW GROUP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant ERC LAW GROUP by any other means authorized by law or order of the Court.

15.     Defendant ERC PARTNERS LLC is a law firm existing under the laws of the District of Columbia whose principal address is 20900 NE 30th Ave, Suite 510, Miami, FL 33180. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant ERC PARTNERS LLC has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant ERC PARTNERS LLC, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant ERC PARTNERS LLC by any other means authorized by law or order of the Court.

16. Defendant LRS LAW GROUP, LLP is a law firm existing under the laws of the District of Columbia whose principal address is 20900 NE 30th Ave, Suite 510, Miami, FL 33180. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant LRS LAW GROUP, LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant LRS LAW GROUP, LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant LRS LAW GROUP, LLP by any other means authorized by law or order of the Court.

17. Defendant JUSTICE PARTNERS GROUP, LLP is a law firm existing under the laws of the District of Columbia whose principal address is 1100 H St NW, Suite 840, Washington, DC 20005. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant JUSTICE PARTNERS GROUP, LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be

subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant JUSTICE PARTNERS GROUP, LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant JUSTICE PARTNERS GROUP, LLP by any other means authorized by law or order of the Court.

18. Defendant KS LAW GROUP is a law firm existing under the laws of the District of Columbia whose principal address is 20900 NE 30th Ave, Ste 510, Miami, FL 33180. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant KS LAW GROUP, LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant KS LAW GROUP, LLP as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant KS LAW GROUP, LLP by any other means authorized by law or order of the Court.

19.     Defendant TC LAW GROUP, LLP is a law firm existing under the laws of the District of Columbia whose principal address is 1100 H St NW, Suite 840, Washington, DC 20005. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant TC LAW GROUP, LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant TC LAW GROUP, LLP as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant TC LAW GROUP, LLP by any other means authorized by law or order of the Court.

20.     Defendant TITAN LAW GROUP, LLP is a law firm existing under the laws of the District of Columbia whose principal address is 4062 Peachtree Rd NE, Unit A, Box 1667, Brookhaven, GA 30319. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant TITAN LAW GROUP, LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state

to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant TITAN LAW GROUP, LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant TITAN LAW GROUP, LLP by any other means authorized by law or order of the Court.

21.     Plaintiffs reserve the right to name additional parties as JANE/JOHN DOES 1-12 based on discovery of individuals who knowingly participated in, facilitated, or concealed the fraudulent conduct described in this complaint. These may include administrators, financial agents, attorneys, or others affiliated with MELCHIONNI'S network of law firms and funding arrangements. Such defendants will be held jointly and severally liable to the extent their conduct contributed to the injuries suffered by Plaintiffs.

IV.  Background and Factual Allegations

22.     Plaintiff Edward J. Lake is the principal of Lake Law Firm, a reputable legal practice based in Sayville, New York, with a long-standing record of serving clients in mass tort litigation and maintaining significant contractual and fiduciary relationships with clients, staff, and co-counsel. At all relevant times, Lake Law Firm operated as a legitimate law firm, generating annual revenues in excess of $20 million.

23.     Defendants Lee Melchionni, Sylvia Benito, and Rick Solit, acting in concert and with a common purpose, knowingly and falsely represented themselves as legitimate law firm owners under the laws of the District of Columbia and as individuals authorized to serve as co-

counsel in mass tort litigation. Relying on Defendants' representations, Plaintiffs entered into a series of agreements with the Defendants.

24. Unbeknownst to Plaintiffs, the purported law firms formed by Individual Defendants were, in violation of Rule 5.4 of the D.C. Rules of Professional Conduct and analogous New York rules.

25. In a subsequent arbitration proceeding held in Washington D.C., the arbitrator determined that KS Law GROUP, one of the legal entities created by the Individual Defendants and managed by Melchionni, was not a proper law firm under D.C. Rule of Professional Conduct 5.4, and that the Individual Defendants' involvement constitutes an improper arrangement in violation of professional conduct rules. It can be reasoned that the twelve law firms mentioned by the arbitrator that were similarly formed by Melchionni are equally improper.

26. Throughout their involvement, Defendants made material false statements to Plaintiffs and others, including but not limited to representations that their law firm was legitimate, properly constituted, and compliant with all applicable laws and ethical rules. Relying on Defendants' false statements and representations, Plaintiffs permitted Defendants to access confidential business information, client relationships, and financial accounts. Defendants exploited this access to seize control of the firm's operations, including management of payroll, communications with staff and co-counsel, and interactions with funders. Defendants made repeated threats regarding payroll and employment, coercing staff and Plaintiff LAKE, and subjecting them to duress in order to force compliance with Defendants' demands.

27. On or about March 11, 2024, Defendants interfered with a secured $18 million financing opportunity, which would have covered firm overhead and expenses for thousands of mass tort cases pending with the firm. Defendants' false communications, threats, and

misrepresentations caused funders to withdraw their commitment, resulting in the loss of critical financing and the collapse of the firm's revenue stream.

28.     On or about March 11, 2024, Defendants used Plaintiffs' loss of funding as an opportunity to seize control of LAKE LAW FIRM, despite their lack of qualifications or experience in running a law firm or handling litigation. Defendants engaged in coercive and extortionate conduct by making economic threats against Plaintiffs, including threats to withhold necessary funding for payroll and operations at a time when Defendants knew Plaintiffs would have difficulty making payroll the following day. Defendants bragged about their unfair bargaining position to third parties, claiming "We own Ed Lake." Defendants also threatened to use their financial expertise to "find something" in the firm accounts, claiming they are "always able to find something." Defendants intentionally timed their actions to exploit Plaintiffs' financial vulnerability and forced LAKE to sign an unconscionable financial agreement divesting his interest in LAKE LAW FIRM under duress. As part of this scheme, Defendants made a wrongful demand for $39 million from Plaintiffs, without legal or factual basis, further compounding the coercion and duress inflicted upon Plaintiffs.

29.     Defendants lacked the requisite credentials, licensure, and professional standing, and were not admitted to the New York bar. However, through their fraudulent misrepresentations, Defendants induced Plaintiffs and third parties—including clients, staff, and co-counsel—to believe Defendants were entitled to control and direct the operations of Lake Law Firm.

30.     After seizing control of the Lake Law Firm, Defendants' exercised control of LAKE LAW FIRM as follows:

   a. Directed staff to send e-mails to vendors and co-counsel, falsely stating that Plaintiff was no longer involved in firm operations, without LAKE's review or approval.

b.  Threatened to withhold LAKE's salary unless he removed his ability to sign on the firm's bank account.

c.  Conditioned continued funding of the firm on LAKE's execution of unconscionable agreements, timed just days before payroll deadlines.

d.  Took unilateral control of payroll, expenses, and financial decision-making for the firm.

e.  Exerted direct control over staff, including firing a large majority of employees, causing overwork and disruption of client services.

f.  Prevented LAKE from communicating freely with staff, clients, co-counsel or vendors by issuing directives that all communications flow through Defendants.

g.  Blocked or interfered with pending financing opportunities, including an $18 million loan, in order to maintain leverage over Plaintiff.

h.  Failed to pay firm obligations (e.g., American Express), resulting in the referral of obligations to collections and causing damage to LAKE's credit rating.

i.  Used threats and leverage to strip LAKE of effective authority in his own firm while continuing to benefit financially.

31.  Despite their fiduciary duty to clients, the sole concern of the Defendants was their fee interest in the cases. Because of their lack of legal experience, Defendants operated under the assumption that filed cases could be simply maintained until settlement with little to no firm staffing or resources. Defendants then terminated almost all staff with no notice or severance pay.

32.  Defendants, as investors and purported business partners, entered into contractual and fiduciary relationships with Plaintiffs, undertaking duties of loyalty, care, and good faith. Defendants breached these duties by acting in their own interests, misappropriating firm assets, and undermining the integrity and stability of the firm.

33.  Defendants engaged in a pattern of racketeering activity, including but not limited to wire and mail fraud, conversion of firm assets, extortionate threats, and repeated acts of fraud

and misrepresentation. These predicate acts were part of a scheme to unlawfully seize control of Lake Law Firm and its financial resources.

34.     Defendants wrongfully exercised dominion and control over at least $7 million in firm assets, converting these funds for their own benefit and contrary to Plaintiffs' rights and interests.

35.     Throughout their course of conduct, Defendants made defamatory statements attacking Plaintiff LAKE's professional competence and reputation, both internally to staff and externally to funders and co-counsel. These statements were false, malicious, and damaged LAKE's professional standing.

36.     Defendants' actions included interference with staff, funders, and clients, resulting in the loss of business opportunities, goodwill, and the destruction of LAKE LAW FIRM as an ongoing concern. Plaintiffs were subjected to coercion, duress, and emotional distress as a direct result of Defendants' threats, intimidation, and unlawful conduct.

37.     All acts described herein were willful, malicious, and undertaken with intent to harm Plaintiffs. As a direct and proximate result of Defendants' misconduct, including fraud, breach of fiduciary duty, racketeering, conversion, coercion, duress, breach of the duty of good faith and fair dealing, and the unauthorized practice of law, Plaintiffs have suffered substantial damages, including but not limited to the conversion of $7 million in assets, loss of an $18 million financing opportunity, reputational harm, emotional distress, and the destruction of a successful law firm.

38.     Plaintiffs reserve the right to supplement these allegations as additional facts become known through discovery and further investigation.

## V. <u>COUNT 1 - MISREPRESENTATION</u>

39.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

40.     Defendants made material false statements to Plaintiffs and others, including representations that the entities they formed were legitimate law firms, properly constituted and compliant with all applicable laws and ethical rules. As such, they had authority to operate LAKE LAW FIRM.

41.     Defendants knew or should have known that these statements were false, as they were not licensed to practice law in New York and their entities were not authorized to operate as law firms under New York law or Rule 5.4 of the D.C. and New York Rules of Professional Conduct.

42.     Defendants intended Plaintiff to rely on these misrepresentations in entering into agreements and permitting Defendants to participate in the management and control of LAKE LAW FIRM.

43.     Plaintiff reasonably relied on Defendants' representations to his detriment, resulting in financial loss, loss of control over his firm, and reputational harm.

44.     As a direct and proximate result of Defendants' misrepresentations, Plaintiffs have suffered damages in an amount to be determined at trial.

## VI. <u>COUNT 2 - TORTIOUS INTERFERENCE WITH CONTRACT</u>

45.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

46.     Defendants interfered with a pending financing deal that would have provided necessary capital to the firm, intentionally sabotaging the transaction in order to force Plaintiffs into a position of financial distress and facilitate the Defendants' takeover of the firm.

47.     Defendants' interference was intentional, without justification, and caused Plaintiffs to lose the benefit of the $18 million contract.

## VII.   COUNT 3 - TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

48.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

49.     Defendants, acting individually and in concert with the other Defendants, contacted co-counsel and vendors, falsely stating that LAKE had mishandled the firm and was no longer in charge.

50.     These actions were intended to, and did, interfere with Plaintiff's business relationships, resulting in loss of business opportunities and damage to the firm's reputation.

51.     Defendants instructed firm employees not to accept calls from LAKE, thereby undermining Plaintiff's ability to manage the firm and maintain relationships with staff.

52.     Defendants' conduct was intentional and without justification, causing harm to Plaintiff's business operations.

## VIII.   COUNT 4- COERCION / ECONOMIC DURESS

65.      Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

66.     Defendants intentionally placed Plaintiff under unlawful pressure and coercion by interfering in a financial opportunity and then threatening to withhold salary, halt payroll, and block firm funding unless Plaintiff signed agreements surrendering control of his firm.

67.     Defendants timed their actions to exploit Plaintiffs' financial vulnerability and forced Plaintiffs to sign a financial agreement divesting his interest in LAKE LAW FIRM under duress.

68.     Defendant also threatened to "look at [LAKE's] books and "find something" unless LAKE signed agreements surrendering control of his firm.

69.     Such conduct constituted duress and was designed to force Plaintiff LAKE into executing documents and concessions he would not have otherwise agreed to.

70.     Plaintiff LAKE executed certain agreements under this coercion, immediately prior to payroll deadlines, when the firm and its staff would otherwise have been unable to operate.

71.     Defendants' conduct deprived Plaintiff of his free will, caused severe financial harm, and directly contributed to the loss of his law firm.

72.     Defendants' conduct constitutes coercion and economic duress under New York law, rendering the agreement voidable and entitling Plaintiff to damages and equitable relief.

73.     As a result of this coercion, Plaintiff sustained damages including destruction of a firm generating $20 million over two years, loss of an $18 million funding commitment, and reputational harm.

## IX. COUNT 5 - BREACH OF FIDUCIARY DUTY

74.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

75.     Defendants assumed positions of trust and control within the Lake Law Firm, creating fiduciary duties to Plaintiffs.

76.     Defendants owed duties of loyalty, good faith, honesty, and care to Plaintiffs.

77.     Defendants breached their fiduciary duties by failing to disclose material facts regarding the true nature of their entity, their lack of licensure, and their intentions to take control of the firm for their own benefit. Defendants breached these duties by diverting firm funds,

sabotaging client and lender relationships, interfering with payroll, and misrepresenting the solvency of the firm.

78. Defendants acted in self-interest, to the detriment of Plaintiffs and their clients, resulting in substantial harm.

79. As a result, Plaintiffs suffered damages including conversion of $7 million, collapse of client relationships, and destruction of goodwill.

80. Defendants acted in bad faith and with malice, justifying punitive damages.

## X. COUNT 6 - CONVERSION

81. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

82. Defendants, without authorization or legal right, exercised control over and converted firm funds and assets for their own use, including withdrawing or redirecting monies from firm accounts.

83. Plaintiff was deprived of the use and possession of firm property, resulting in financial loss.

## XI. COUNT 7 - CIVIL RICO / RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

84. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

85. Defendants constituted an enterprise within the meaning of 18 U.S.C. § 1961(4), and their conduct was part of a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).

86. Defendants engaged in a pattern of racketeering activity, including but not limited to wire fraud, mail fraud, and other predicate acts, in furtherance of their scheme to take over Lake Law Firm and deprive Plaintiff of his ownership and control.

87. From approximately March 2024 through July 2025 Defendants entered into an explicit and tacit agreement to form and operate an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), for the express purpose of unlawfully seizing control of LAKE LAW FIRM, misappropriating its assets, and depriving Plaintiffs of their business and property.

88. The enterprise was structured and operated through coordinated actions and the use of shell entities, including JUSTICE PARTNERS and TITAN, which served as instrumentalities for the movement and concealment of funds and to shield Individual Defendants from liability.

89. Each Defendant played a specific and essential role in furtherance of the conspiracy and racketeering scheme:

   a. LEE MELCHIONNI orchestrated and directed communications, threats, and extortionate demands, including the timing of payroll threats and the wrongful demand for $39 million;

   b. SYLVIA BENITO and RICK SOLIT participated in and authorized financial transactions, asset transfers, the diversion of firm funds, and extortionate demands, including the timing of payroll threats and the wrongful demand for $39 million.

   c. ACI LAW GROUP LLP, ACI TALC LAW GROUP LLP, ASK LAW GROUP LLP, BHI LAW GROUP LLP, BLUE CHIP LAW GROUP LLP, ERC LAW GROUP LLP, ERC PARTNERS LLC, JUSTICE PARTNERS GROUP LLP, KS LAW GROUP LLP, LRS LAW GROUP, LLP, TC LAW GROUP LLP, TITAN LAW GROUP, LLP, functioned as shell entities to facilitate the movement, concealment, and conversion of assets, and to provide a façade of legitimacy to the enterprise;

90. Defendants, acting in concert, committed numerous predicate acts in furtherance of the enterprise and conspiracy, including but not limited to:

   a. Wire Fraud: Transmitting false statements, fraudulent documents, and extortionate demands via email, telephone, and/or electronic transfers to Plaintiffs, staff, funders, and third parties, particularly in connection with firm control and funding;

   b. Mail Fraud: Sending written correspondence and documents containing false statements and misrepresentations to Plaintiffs and third parties, including funders and co-counsel, to induce reliance and facilitate the unlawful takeover;

c. Extortion: Making threats to withhold payroll funding and demanding $39 million from Plaintiffs under duress, exploiting Plaintiffs' financial vulnerability and intentionally timing these threats to coincide with critical payroll deadlines;

d. Conversion: Wrongfully exercising dominion and control over at least $7 million in firm assets through misrepresentation, fraud, and coercion;

e. Misrepresentation: Disseminating false statements regarding their own credentials and position to LAKE and staff, in furtherance of their scheme to wrongfully take over the FIRM.

f. Interference with Contractual Relations: Sabotaging a pending $18 million financing opportunity through fraudulent communications and interference with funders, co-counsel, and staff.

91. These acts occurred on multiple occasions from at least March 2024, and were not isolated incidents but part of a continuous, coordinated pattern of racketeering activity and civil conspiracy designed to further the enterprise's unlawful objectives.

92. Defendants' coordinated conduct constitutes both a civil conspiracy under New York law and a pattern of racketeering activity under 18 U.S.C. § 1962(c) and (d). As a direct and proximate result of these violations, Plaintiffs have suffered substantial and direct injury to their business and property, including the loss and conversion of firm assets, destruction of financing opportunities, severe reputational harm, emotional distress, and the collapse of The Lake Law Firm.

93. Plaintiff has been injured in his business and property by reason of Defendants' violations of 18 U.S.C. § 1962.

### XII. COUNT 8 - NEGLIGENCE

94. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

95. Defendants, acting individually and in concert with the other Defendants, fired essential staff, refused to accept new cases from clients calling in, and refused to terminate an employee who was reported to have sexually harassed another employee.

96. These actions constituted gross mismanagement and caused substantial harm to the firm's operations and reputation.

## XIII. COUNT 9 - FRAUD

97. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

98. Defendants made material misrepresentations regarding their qualifications to operate and manage a law firm, including false claims of licensure and experience. Defendants falsely and knowingly held themselves out as a legitimate law firm and/or authorized providers of legal services in New York, despite not being admitted to practice law nor properly organized to provide legal services.

99. Defendants made such false representations with the intent to induce Plaintiff to rely upon their purported legitimacy in order to gain access to Plaintiffs' law firm, clients, staff, financial accounts, and business opportunities.

100. Plaintiffs reasonably relied upon Defendants' misrepresentations to their detriment.

101. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs suffered damages including conversion of $7 million, loss of an $18 million financing commitment, reputational harm, and destruction of a law firm generating $20 million over two years.

102. Defendants acted willfully, wantonly, and maliciously, warranting punitive damages.

## XIV. COUNT 10 - CONSPIRACY

103.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

104.     Defendants conspired together to commit the above-described acts, agreeing to engage in a coordinated scheme to take control of LAKE LAW FIRM, deprive Plaintiff of his ownership interest, and commit multiple torts and violations of law.

105.     Each Defendant committed overt acts in furtherance of the conspiracy, resulting in harm to Plaintiffs.

## XV. COUNT 11- BREACH OF DUTY OF CARE / BAD FAITH

106.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

107.     Defendants, by virtue of their control over the firm, owed a duty of care and were required to act in good faith in the management and operation of LAKE LAW FIRM.

108.     Defendants breached this duty by running the firm into the ground, firing essential staff, refusing to accept new cases, and failing to address serious misconduct by employees, including harassment.

109.     Defendants' actions were grossly negligent, reckless, and in bad faith, resulting in substantial harm to LAKE and the FIRM.

## XVI. COUNT 12 - UNAUTHORIZED PRACTICE OF LAW

114.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

115.     Defendants, not licensed attorneys in New York, engaged in the unauthorized practice of law by holding themselves out as attorneys and/or by exerting control over the management, client relations, and financial operations of a New York law firm.

116.     Such conduct violated New York Judiciary Law §§ 478 and 484.

117. Defendants' misrepresentations to clients, funders, and employees that they were legally authorized to control a law practice constituted fraud and deception.

118. As a direct and proximate result of Defendants' unauthorized practice, Plaintiff suffered damages including reputational harm, loss of client relationships, and destruction of firm goodwill.

119. Defendants acted knowingly and maliciously, warranting punitive damages.

## XVII. COUNT 13 – STATUTORY FRAUD

120. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

121. At all relevant times, Defendants JUSTICE PARTNERS, TITAN, LEE MELCHIONNI, SYLVIA BENITO, RICK SOLIT, and JANE/JOHN DOES 1–12, acting individually and in concert, engaged in deceptive, fraudulent, and unlawful acts and practices in violation of New York General Business Law § 349 and § 350, and other applicable statutes.

122. Defendants, in connection with their takeover and operation of LAKE LAW FIRM, made and disseminated materially false and misleading representations to Plaintiffs, clients, staff, funders, and the public, including but not limited to:

   a. Falsely representing themselves as a legitimate law firm authorized to practice law in the District of Columbia and New York;

   b. Falsely claiming to possess the requisite licensure, credentials, and professional standing to own, operate, and manage a law firm in New York;

   c. Misrepresenting the nature, terms, and legality of their investment agreements and financial arrangements with Plaintiffs;

   d. Concealing material facts regarding their lack of authority, licensure, and professional qualifications;

   e. Disseminating false and misleading statements regarding Plaintiff Edward J. Lake's professional competence, alleged criminal conduct, and the status of The Lake Law Firm.

123. Defendants' deceptive acts and practices were consumer-oriented, affected the public interest, and were likely to mislead reasonable persons, including Plaintiffs, clients, staff, and funders, causing substantial injury.

124. Plaintiffs and other affected parties reasonably relied on Defendants' false and misleading representations, resulting in the conversion of $7 million in firm assets, destruction of an $18 million financing opportunity, collapse of a $20 million revenue firm, severe reputational harm, emotional distress, and other damages.

125. Defendants' conduct constitutes statutory fraud under New York law, including violations of General Business Law § 349 (prohibiting deceptive acts and practices in the conduct of any business, trade, or commerce) and § 350 (prohibiting false advertising), and any other applicable statutes.

126. As a direct and proximate result of Defendants' statutory violations, Plaintiffs have suffered actual damages, including financial loss, reputational injury, and emotional distress. Defendants' conduct was willful, malicious, and undertaken with conscious disregard for Plaintiffs' rights and the requirements of New York law.

127. WHEREFORE, Plaintiffs seek judgment against Defendants for all damages resulting from Defendants' statutory fraud, including actual, statutory, and treble damages, costs, interest, attorneys' fees, and such other relief as the Court deems just and proper.

## XVIII. COUNT 14 - USURY

128. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

129. At all relevant times, DEFENDANTS JUSTICE PARTNERS, TITAN, LEE MELCHIONNI, SYLVIA BENITO, RICK SOLIT, and JANE/JOHN DOES 1–12, acting

individually and in concert, entered into financial arrangements, investment agreements, and/or loan transactions with Plaintiffs and subsequent demands for payment.

130.    Defendants, in connection with these transactions, imposed, charged, or demanded interest rates, fees, or other charges in excess of the maximum permitted by New York General Obligations Law §§ 5-501 et seq. and New York Penal Law §§ 190.40 et seq., which prohibit the charging of interest on loans or forbearances of money at a rate exceeding 16% per annum (civil usury) and 25% per annum (criminal usury).

131.    Defendants' conduct included, but was not limited to:

a.  Demanding excessive payments and interest in connection with the wrongful $39 million demand and other financial arrangements;

b.  Structuring transactions as loans, advances, or forbearances of money, disguised as investments or capital infusions, but in substance constituting usurious loans;

c.  Imposing terms and conditions that required Plaintiffs to pay interest, fees, or other charges in excess of the legal limits, under threat of economic harm, coercion, and duress.

132.    Plaintiffs did not knowingly consent to any usurious terms, and any such consent, if alleged, was obtained under duress, coercion, and without full disclosure of the true nature of the transactions.

133.    Defendants' actions constitute civil and/or criminal usury under New York law. As a result, any agreements or obligations arising from such usurious transactions are void and unenforceable, and Plaintiffs are entitled to recover all amounts paid in excess of the legal rate, together with damages, costs, interest, and such other relief as the Court deems just and proper.

134.    WHEREFORE, Plaintiffs seek judgment against Defendants:

a.  Declaring any usurious agreements void and unenforceable;

b.  Awarding restitution of all amounts paid in excess of the legal rate;

c. Awarding compensatory and punitive damages, costs, interest, and such other relief as the Court deems just and proper.

## XIX. COUNT 15 - BREACH OF FIDUCIARY DUTY

135. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

136. At all relevant times, Defendants, by virtue of their contractual, investment, and business relationships with Plaintiffs, owed Plaintiffs fiduciary duties, including duties of loyalty, care, candor, and good faith. These duties arose from Defendants' positions as investors, business partners, and persons exercising control over the operations, finances, and management of LAKE LAW FIRM.

137. Defendants breached their fiduciary duties to Plaintiffs by, among other acts and omissions:

a. Failing to disclose material facts regarding their lack of licensure, professional standing, and authority to operate or control a law firm in New York;

b. Concealing their true intentions to unlawfully seize control of LAKE LAW FIRM for their own benefit;

c. Misappropriating and converting firm assets, including at least $7 million in funds;

d. Acting in self-interest and to the detriment of Plaintiffs, including making a wrongful demand for $39 million and sabotaging a pending $18 million financing opportunity;

e. Engaging in conduct that undermined the integrity, stability, and reputation of LAKE LAW FIRM, including the dissemination of false and defamatory statements about Plaintiff LAKE;

f. Failing to act in good faith and with due care in the management and operation of the firm, including gross mismanagement, firing essential staff, and refusing to address serious misconduct within the firm.

138. Defendants' breaches of fiduciary duty were willful, malicious, and undertaken with intent to harm Plaintiffs and to benefit themselves at Plaintiffs' expense.

139.     As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiffs have suffered substantial damages, including but not limited to the conversion of $7 million in assets, loss of business opportunities, destruction of an $18 million financing opportunity, reputational injury, emotional distress, and the collapse of a $20 million revenue firm.

140.     WHEREFORE, Plaintiffs seek judgment against Defendants for all damages resulting from Defendants' breach of fiduciary duty, including compensatory, punitive, and treble damages, costs, interest, and such other relief as the Court deems just and proper.

## XX.     COUNT 16 - UNJUST ENRICHMENT

141.     Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

142.     At all relevant times, Defendants, acting individually and in concert, received and retained substantial benefits, including but not limited to the control, use, and enjoyment of LAKE LAW FIRM'S assets, including the wrongful transfer of approximately $7 million.

143.     Defendants' receipt and retention of these benefits was without legal right, and was obtained through wrongful conduct, including misrepresentation, fraud, conversion, and other unlawful acts as set forth in this Complaint.

144.     Plaintiffs conferred these benefits upon Defendants either directly or indirectly, in reliance on Defendants' false representations, threats, and misuse of their positions of control. Defendants' retention of such benefits is unjust and inequitable, as Plaintiffs have suffered substantial financial loss, reputational harm, and the destruction of their business, while Defendants have been enriched at Plaintiffs' expense.

145.     Defendants have not compensated Plaintiffs for the value of the benefits received, nor do they have any lawful entitlement to retain such benefits.

146. As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have suffered damages including, but not limited to, the loss and conversion of at least $7 million in firm assets.

147. WHEREFORE, Plaintiffs seek judgment against Defendants for restitution and disgorgement of all benefits unjustly received and retained, together with compensatory and punitive damages, costs, interest, and such other relief as the Court deems just and proper.

## XXI. COUNT 17 - PIERCING THE CORPORATE VEIL

148. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

149. Upon information and belief, Defendants ACI LAW GROUP LLP, ACI TALC LAW GROUP LLP, ASK LAW GROUP LLP, BHI LAW GROUP LLP, BLUE CHIP LAW GROUP LLP, ERC LAW GROUP LLP, ERC PARTNERS LLC, JUSTICE PARTNERS GROUP LLP, KS LAW GROUP LLP, LRS LAW GROUP, LLP, TC LAW GROUP LLP, and TITAN LAW GROUP, LLP, ("D.C. FIRMS") are entities formed, owned, and controlled by Defendants LEE MELCHIONNI, SYLVIA BENITO, RICK SOLIT, and others, for the sole purpose of facilitating the wrongful acts described in this Complaint.

150. At all relevant times, the D.C. FIRMS failed to observe corporate formalities, were inadequately capitalized, and commingled funds and assets with those of the individual Defendants. The D.C. FIRMS lacked independent business operations, assets, or decision-making authority, and functioned exclusively as instrumentalities and alter egos of the Individual Defendants.

151. The Individual Defendants dominated and controlled the D.C. FIRMS to such an extent that the entities had no separate will, existence, or interests of their own, and were used as mere conduits for the personal benefit of MELCHIONNI, BENITO, SOLIT, and their associates.

152.    The D.C. FIRMS were used to perpetrate fraud, commit wrongful acts, and evade legal obligations, including but not limited to: (a) misrepresenting their status as a legitimate law firm; (b) unlawfully seizing control of LAKE LAW FIRM; (c) converting firm assets; (d) interfering with contracts and business relationships; and (e) shielding the Individual Defendants from personal liability for their misconduct.

153.    The misuse of the corporate form by the Individual Defendants resulted in injustice and inequity to Plaintiffs, including the loss of $7 million in firm assets, the destruction of an $18 million financing opportunity, reputational harm, and the collapse of a $20 million revenue firm.

154.    Under New York law, where the owners of a corporation so dominate and control the entity that it becomes a mere instrumentality for their personal business, and such control is used to commit a fraud or other wrong resulting in injury to a third party, the corporate veil may be pierced and the individuals held personally liable for the corporation's acts.

155.    Plaintiffs therefore request that the Court disregard the separate legal existence of ACI LAW GROUP LLP, ACI TALC LAW GROUP LLP, ASK LAW GROUP LLP, BHI LAW GROUP LLP, BLUE CHIP LAW GROUP LLP, ERC LAW GROUP LLP, ERC PARTNERS LLC, JUSTICE PARTNERS GROUP LLP, KS LAW GROUP LLP, LRS LAW GROUP, LLP, TC LAW GROUP LLP, and TITAN LAW GROUP, LLP,, and hold Defendants MELCHIONNI, BENITO, SOLIT, and any other individuals found to have exercised such domination and control, jointly and severally liable for all damages and relief awarded in this action.

## XXII. EXEMPLARY / PUNITIVE DAMAGES

156.    Plaintiffs repeat and reallege all prior factual allegations as if fully set forth herein.

157.    Defendants' conduct, as described throughout this Complaint, including fraud, conversion of firm assets, tortious interference with contracts and prospective business advantage,

coercion, and racketeering, was egregious, willful, malicious, and undertaken with conscious disregard for Plaintiffs' rights. The cumulative and repeated nature of Defendants' misconduct demonstrates a pattern of intentional harm and bad faith, warranting the imposition of exemplary and punitive damages to punish Defendants and deter similar future misconduct.

## XXIII. <u>DAMAGES</u>

158. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs suffered substantial damages, including but not limited to:

  a. Loss and conversion of at least $7 million in firm assets;

  b. Destruction of an $18 million financing commitment due to funders withdrawing support based on Defendants' misrepresentations and interference;

  c. Severe reputational harm within the legal and business communities;

  d. Collapse of a $20 million revenue firm, resulting in loss of business opportunities, goodwill, and emotional distress.

  e. Defendants' actions were willful, malicious, and undertaken with intent to harm Plaintiffs.

159. WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with costs, interest, and such other relief as the Court deems just and proper.

## XXIV. <u>PRELIMINARY INJUNCTION</u>

160. Plaintiffs seek preliminary injunctive relief to prohibit Defendants from withholding funding pursuant to the June 2025 letter of intent and agreement, preserving the status quo and compelling the Defendants to continue paying expenses as required under the contractual agreement during the pendency of this litigation. Immediate relief is necessary to prevent irreparable harm to Plaintiffs and to ensure that the contractual obligations are honored while the underlying dispute is adjudicated.

161. Despite the unequivocal terms of the contract, Defendants have indicated their intent to refuse to continue making the required payments. This conduct constitutes a material breach or anticipatory breach of the agreement. Plaintiffs have made multiple demands for compliance, all of which have been ignored or rejected by Defendants. The refusal to honor the agreement is not based on any bona fide dispute as to the existence or enforceability of the obligation, but rather an attempt to gain leverage in the ongoing dispute and to exert further control over the LAKE LAW FIRM.

162. Plaintiffs will suffer immediate and irreparable harm if Defendants are not compelled to continue paying expenses as contractually required. The ongoing viability of LAKE LAW FIRM depends on the timely payment of these expenses. Without such payments, Plaintiffs face the risk of operational shutdown, inability to meet payroll, default on third-party obligations, and loss of goodwill and business opportunities. These harms are not readily quantifiable and cannot be adequately remedied by monetary damages after the fact. New York courts recognize that the loss of an ongoing concern, business reputation, or unique business opportunities constitutes irreparable harm warranting injunctive relief.

163. The relief sought merely preserves the status quo by requiring Defendants to continue performing their existing contractual obligations pending resolution of the underlying dispute. Granting the injunction does not impose any new or additional burden on Defendants; it simply enforces the bargain they voluntarily entered. The balance of equities thus tips decidedly in Plaintiffs' favor, as Defendants will suffer no cognizable harm from compliance, while Plaintiff faces severe and irreparable injury if relief is denied.

164. Granting the requested injunction serves the public interest by upholding the sanctity of contracts, promoting commercial stability, and preventing the disruption of ongoing

business operations, which would result in harm to thousands of clients. It also discourages parties from using the pendency of litigation as a pretext to evade clear contractual duties, thereby fostering confidence in the enforceability of agreements and the integrity of the judicial process.

165.    Plaintiffs have no adequate remedy at law because the damages resulting from Defendants' refusal to pay their contractual obligations are not fully ascertainable and may include loss of business, reputation, and opportunities that cannot be restored by a monetary award. Only injunctive relief can prevent the imminent and irreparable harm threatened by Defendants' conduct.

166.    For these reasons, Plaintiffs respectfully submit that all elements required for a preliminary injunction under New York law are satisfied, and that the requested relief is both necessary and appropriate to preserve the status quo and protect Plaintiffs' rights during the pendency of this litigation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs EDWARD J. LAKE and LAW OFFICE OF EDWARD J. LAKE, PC d/b/a THE LAKE LAW FIRM respectfully request that the Court enter judgment in their favor and against Defendants LEE MELCHIONNI, SYLVIA BENITO, RICK SOLIT, TITAN LAW GROUP, LLP, LRS LAW GROUP, LLP, ERC LAW GROUP, LLP, ERC PARTNERS, LLC, and JUSTICE PARTNERS GROUP, LLP, and any additional parties named as JANE/JOHN DOES 1-12, and grant the following relief:

    a. Awarding compensatory damages in an amount to be determined at trial, including but not limited to $7 million in converted assets, damages for lost financing and business opportunities (including the destruction of an $18 million financing opportunity), and all other losses resulting from Defendants' conduct;

    b. Awarding punitive damages for Defendants' willful, malicious, and egregious conduct, including but not limited to fraud, breach of fiduciary duty, conversion, misrepresentation, coercion, duress, and the unauthorized practice of law;

c.  Awarding treble damages as permitted by law, including under the Civil RICO statute and any other applicable statutes;

d.  Awarding damages for breach of contract and breach of the duty of good faith and fair dealing;

e.  Awarding pre- and post-judgment interest as permitted by law;

f.  Awarding costs of suit, including reasonable attorneys' fees;

g.  Imposing equitable relief, including but not limited to accounting, constructive trust, disgorgement, and restitution, as the Court deems just and proper;

h.  Issuing a preliminary injunction and/or protective order requiring Defendants to continue funding LAKE LAW FIRM through pursuant to the June 2025 investment agreement;

i.  Issuing a temporary restraining order and preliminary injunction prohibiting Defendants from directly or indirectly communicating with firm employees, vendors, co-counsel, or clients regarding the management, operations, or status of LAKE LAW FIRM, except as expressly authorized by the Court;

j.  Ordering Defendants to refrain from any further interference with Plaintiffs' business relations, contracts, employees, vendors, co-counsel, or clients, and to reinstate LAKE'S signing authority on firm financial accounts.

k.  Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

**EDWARD LAKE, ESQ.**
270 West Main Street, Suite 3
Sayville, NY 11782
Phone: 888-525-3529
Fax: 917-893-4392
Email: info@lakelawfirm.com
Email: edlakelaw@yahoo.com

By: /s/ *Edward J. Lake*
Edward J. Lake, Esquire
Reg. No.: 2522555

**VERIFICATION**

I, Edward J. Lake, am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and know the contents thereof. The same is true to my knowledge, except as to matters stated to be alleged on information and belief, and as to those matters, I believe them to be true.

_____
Edward J. Lake

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 955 of 978

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

BLAKEMORE INVESTMENTS LLC,

                     Plaintiff,

     -against-

LAW OFFICES OF EDWARD J. LAKE, P.C. d/b/a
THE LAKE LAW FIRM and EDWARD J. LAKE,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**SUMMONS**

Index No.

Date Index No. Purchased:

**TO THE ABOVE-NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED**, to answer the Complaint in this action and to serve a copy of your answer, or, if the Complaint is not served with this Summons, to serve a notice of appearance, on the Plaintiffs' attorney within twenty (20) days after service of this Summons, exclusive of the day of service (or within thirty (30) days after service is complete if this Summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

This action is brought in the County of Suffolk because: under C.P.L.R. § 302(a)(1), Defendants transacted business in New York in connection with the subject agreement pursuant to which, *inter alia*, funding was provided within New York; and based upon the Defendants' dealings with Plaintiff in connection therewith, which occurred within New York and within Suffolk County; and venue in Suffolk County is proper under C.P.L.R. §§ 503 and 509 as Defendants are residents of and/or have their primary place of business within Suffolk County.

4915-3863-5637v.1

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 956 of 978

Dated: Garden City, New York
  October 27, 2025

GARFUNKEL WILD, P.C.
*Attorneys for Plaintiff Blakemore Investments LLC*

By:   /s/ Kevin G. Donoghue
      Kevin G. Donoghue
      Burton S. Weston
900 Stewart Avenue
Garden City, New York 11530
(516) 393-2200

TO:   LAW OFFICES OF EDWARD J. LAKE, P.C.
      d/b/a THE LAKE LAW FIRM
      270 West Main Street, Suite 3
      Sayville, New York 11782

      EDWARD J. LAKE
      7701 Glendevon Lane, Unit 1903
      DelRay Beach, Florida 33446

4915-3863-5637v.1

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 957 of 978

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
-------------------------------------------------------------------------X
BLAKEMORE INVESTMENTS LLC,

                                        Plaintiff,

                      -against-

LAW OFFICES OF EDWARD J. LAKE, P.C. d/b/a THE
LAKE LAW FIRM and EDWARD J. LAKE,

                                        Defendants.
-------------------------------------------------------------------------X

Index No._____/2025

**COMPLAINT**

Plaintiff Blakemore Investments LLC ("Blakemore" or "Plaintiff"), by and through its undersigned attorneys, Togut, Segal & Segal, LLP and Garfunkel Wild, P.C., hereby makes this verified Complaint (the "Complaint") against defendants Law Offices of Edward J. Lake, P.C. d/b/a The Lake Law Firm (the "Firm") and Edward J. Lake ("Lake" and, together with the Firm, "Defendants"), and states and alleges as follows:

## NATURE OF THE ACTION

1.      This action arises from Defendants' mismanagement, incompetence, and misconduct which rendered the Firm insolvent and unable to meet its financial obligations, including those owed to Plaintiff, which provided funding to the Firm amounting to more than $15 million. Despite this funding provided by Plaintiff, and others as described below, Defendants have, through mismanagement, incompetence, and misconduct, brought the Firm on the precipice of a total collapse. Defendants have done so in recent vintage in blatant disregard of their contractual obligations.

2.      Plaintiff brings this action to recover substantial damages Plaintiff has suffered as a result of Defendants' egregious breaches of those contracts, as detailed below.

1

4919-9976-9461v.2

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 958 of 978

## PARTIES

3.    Plaintiff Blakemore Investments, LLC is a Delaware limited liability company with an address at 251 Little Falls Drive, Wilmington, DE 19808.

4.    Upon information and belief, defendant Law Offices of Edward J. Lake, P.C. d/b/a The Lake Law Firm is a New York professional company with an address at 270 West Main Street, Suite 3, Sayville, New York 11782, which focuses its law practice primarily on representing individual plaintiffs pursuing mass-tort and other plaintiff-based claims, including those under the Employee Retention Tax Credit (the "ERTC") program.

5.    Upon information and belief, defendant Edward J. Lake is an individual and resident of Florida with an address at 7701 Glendevon Lane, Unit 1903, Del Ray Beach, Florida 33446. Lake is a New York-licensed attorney and is the founder and sole owner of the Firm.

## JURISDICTION AND VENUE

6.    Jurisdiction is proper before this Court pursuant to C.P.L.R. § 302(a)(1) because: (1) Defendants transacted business in New York in connection with the subject Agreement (defined below) pursuant to which, *inter alia*, funding was provided within New York; and (2) based upon the Defendants' dealings with Plaintiff in connection therewith, which occurred within New York.

7.    Venue is proper before this Court pursuant to CPLR §§ 503 and 509 as Defendants are residents of or have their primary place of business in Suffolk County.

## FACTUAL BACKGROUND

**A.    The Parties' Relationship**

8.    On December 14, 2022, the Plaintiff and the Firm entered into a Capital Provision Agreement, later amended, (the "CPA"), pursuant to which the Plaintiff advanced funds to the Firm in exchange for future expected payments from tax refunds pursuant to the ERTC program,

2

4919-9976-9461v.2

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 959 of 978

which were claimed on payroll tax returns or amended tax returns filed with the Internal Revenue Service by the Firm on behalf of its client taxpayers. The Plaintiff advanced to the Firm $15 million (the "ERTC Principal").

9. The Firm's obligations under the CPA are secured by the Security Agreement, dated December 14, 2022 and later amended (the "Security Agreement"), pursuant to which the Firm granted to the Plaintiff a first-priority security interest in certain ERTC claims, the proceeds and any processing agreements related thereto, the Escrow Account (defined below), and all other assets or proceeds related to the foregoing (the "ERTC Collateral").

10. The Plaintiff perfected its security interest in the ERTC Collateral by filing a UCC-1 financing statement on December 16, 2022.

11. Under the CPA, Lake agreed to be jointly and severally liable to the Plaintiff for the Firm's performance and for the Firm's payment obligations under the CPA (the "Personal Guarantee").

12. In addition, the Plaintiff and the Firm executed an Escrow Agreement, dated January 17, 2023 and later amended (the "Escrow Agreement"), which required that the Firm deposit proceeds from the ERTC Collateral into an escrow account (the "Escrow Account").

13. The Firm failed to obtain the required ERTC claims due to the Plaintiff under the CPA.

14. As a result, on November 7, 2023, Plaintiff served on the Firm a Notice of Exercise of Rights under the CPA, which demanded that the Firm pay the penalty amount set forth in the CPA, which totaled $11,750,000 (the "Penalty Amount").

3

4919-9976-9461v.2

15. In mid-March 2024, the Plaintiff learned that the Firm entered into a Binding Term Sheet, dated March 11, 2024 (the "March 2024 Term Sheet"), with Titan Law Group and its affiliates (collectively, "Titan") to restructure the Firm.

16. The March 2024 Term Sheet, in Blakemore's view, violated the change-of-control provisions of the CPA as noted in the Default Notice.

17. The Plaintiff learned that prior to execution of the March 2024 Term Sheet, Titan advanced approximately $30 million, which was also exhausted by the Firm, on an unsecured basis to the Firm in exchange for future settlement proceeds from mass-tort claims.

18. The Plaintiff also learned that the Firm had failed to provide the mass-tort claims due to Titan and that the Firm was unable to pay its debts as they came due, including funding its day-to-day operations.

19. On March 25, 2024, the Plaintiff served on the Firm a Notice of Default under the CPA (the "Default Notice") as the Firm failed to pay the Penalty Amount.

20. The Default Notice also identified the occurrence of other "Remedy Events" (as defined in the CPA), including (1) the failure to obtain the required ERTC claims due to the Plaintiff and (2) a change of control of the Firm. That same date, the Plaintiff served on Lake a Notice of Joint and Several Liability, which confirmed that the Plaintiff did not waive its rights under the Personal Guarantee.

21. To date, the Defendants remain in default under the CPA and have not paid the Penalty Amount.

4

4919-9976-9461v.2

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 961 of 978

**B.      Plaintiff's Funding of the Firm and the Attempt to Stabilize the Firm's Operations**

22.     On information and belief, the Firm has earned virtually no fees to fund its operations over the last two years, and what fees have been generated are far short of the amounts needed to sustain its operations.

23.     In April 2024, the Plaintiff and Titan (together, the "Creditor Parties") began discussions to stabilize the Firm's operations and implement a workout to address the Firm's overwhelming liabilities.

24.     The Creditor Parties believe that they hold more than 90% of Lake Law's outstanding liabilities.

25.     The Creditor Parties agreed to fund the day-to-day operations of the Firm (the "Go-Forward Financing") until such time as the Firm generated enough unencumbered revenue to fund its operations.

26.     The Creditor Parties also sought to negotiate a restructuring support agreement, with the intent of ultimately obtaining the support of the Firm's other creditors.

27.     The appointment of an independent fiduciary to control the Firm's bank accounts was, and remains, an indispensable condition of the Creditor Parties' agreement to provide the Go-Forward Financing.

28.     Lake's mismanagement of the Firm demonstrated to the Plaintiff an inability of Lake to serve as a fiduciary for the creditors of the Firm in its insolvent state.

29.     On or around July 17, 2024, the Firm retained Getzler Henrich & Associates LLC ("Getzler") as its financial restructuring advisor.

30.     On August 15, 2024, Blakemore and the Firm executed an amended and restated Security Agreement (the "Amended Security Agreement"), which, among other things, granted

5

4919-9976-9461v.2

Blakemore a first-priority security interest in all assets of the Firm to secure Blakemore's share of the Go-Forward Financing. The Amended Security Agreement also provides that Blakemore's Go-Forward Financing is contingent upon the Firm's retention of Getzler to oversee the firm's operations and finances.

31.     That same day, the Plaintiff and the Firm amended the Escrow Agreement to add Mark Samson of Getzler as a company representative of the Firm.

32.     For several months thereafter, the Creditor Parties worked with Mr. Samson to stabilize the Firm's operations.

33.     Simultaneously, the Creditor Parties engaged in negotiations toward the Restructuring Support Agreement.

34.     Lake was updated on these negotiations through Mr. Samson and Lake's own counsel.

35.     On or about March 13, 2025, the Creditor Parties entered into a Term Sheet (the "Term Sheet"), governed by New York law, pursuant to which the terms of a comprehensive restructuring and recovery waterfall for all creditors of the Firm was agreed upon, and which allowed the Firm to continue to receive additional Go-Forward Financing.

36.     The Term Sheet memorialized the Go-Forward Financing, which remained crucial in keeping the Firm afloat and functioning since by that time the Firm was in grave financial straits.

37.     The Term Sheet provides that, on a go-forward basis, if the Firm did not have sufficient funds remaining after it paid certain fees (so-called "Lake Revenue") to pay necessary operational costs in the upcoming month pursuant to the 13-week budget provided by the Financial Advisor (to be updated regularly) and acceptable to the parties in their reasonable discretion (the "Budget"), the Creditor Parties would fund the Firm's necessary operational expenses

6

4919-9976-9461v.2

pursuant to the Budget on a month-by-month basis, with Titan providing two thirds of the funding and Blackmore providing the remaining third (*i.e.*, would fund Firm with the Go-Forward Financing).

38. The Term Sheet further provides that "[t]he Parties commit to provide the Go-Forward Financing until such time as the Firm receives and/or holds the Lake Revenue sufficient to satisfy the Firm's necessary operational expenses." *Id.* at p. 2.

39. But the Term Sheet also provides the Creditor Parties with a right to terminate the Go-Forward Financing: "[a]t the earlier of either Party (in its sole discretion) declaring a material adverse change (to be defined in the final agreement), or May 31, 2025, the Parties shall have the right to amend or revoke their respective commitments as to the Go-Forward Financing." *Id.*

40. With regard to distributions of recoveries received by the Firm, the Term Sheet determines the priority and waterfall distributions to be made from the Lake Revenue (the "Waterfall"). *Id.* pp. 4-6.

41. Thereafter, Lake and the Firm entered into an Addendum with Titan and Blakemore (the "Addendum" and, with the Term Sheet, the "Go-Forward Agreement"). Pursuant to the Addendum, Lake and the Firm agreed to the terms of the Addendum and also to the terms of the Term Sheet and agreed to be bound thereto.

42. The Addendum further provides for affirmative steps by Lake for the appointment of Mark Samson of the Financial Advisory firm as Chief Restructuring Officer of the Firm, and in that regard sets forth:

> Immediately following the execution of this Addendum, Lake shall take all actions and cooperate with any steps necessary to have Mark Samson, of Getzler Henrich & Associates LLC, the Firm's Financial Advisors, approved as the Chief Restructuring Officer of the Firm with sole authority and control over the Firm's receipts, disbursements and bank accounts.

7

4919-9976-9461v.2

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 964 of 978

43.     The Addendum even provides for the payment of a salary to Lake to be funded by the Creditor Parties, despite the fact that the Firm did not have any Lake Revenue from which to pay it, although the Creditor Parties reserved their rights to revoke their commitments to funding for that purpose. The Addendum provides:

> Commencing May 1, 2025, Lake shall receive a salary from [the Firm] of $30,000 per month, payable in the first payroll of each month for his services to the Firm for a period of one year following the execution of this Addendum (the "Lake Salary"). [Titan and Blakemore] shall have the right to revoke their respective commitment to fund the Lake Salary in the event either [Titan or Blakemore] (in its sole discretion) declares a material adverse change impacting operation of the Firm that cannot be cured within five (5) business days of notice being given by either [Titan or Blakemore].

44.     Consistent with the fact that the Firm required rescue financing, the Addendum provides that the Creditor Parties' consent is required before Defendants could agree to pay other creditors:

> Lake shall not personally, or cause the Firm, to enter into any agreement with any creditor of Lake or the Firm regarding the payment of amounts due to such creditor or authorize any disbursement to any creditor or himself without the written consent of Titan Law Group and Blakemore.

45.     The Addendum also requires that Lake cooperate with Titan and Blakemore in good faith:

> Lake shall cooperate with [Titan and Blakemore] in good faith. Upon reasonable request of [Plaintiff], Lake shall provide such information, execute and deliver such further documents, and take further actions as may be necessary or advisable to effectuate the provisions and intent of this Addendum and the Term Sheet.

46.     Finally, and importantly, the Addendum also provides that if Lake were to breach any term of the Term Sheet or Addendum, the Plaintiff or Titan could have a receiver appointed or institute bankruptcy proceedings, and that Lake would consent to such actions:

8

4919-9976-9461v.2

INDEX NO. 629003/2025
Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 965 of 978
RECEIVED NYSCEF: 10/27/2025

> In the event Lake breaches any terms of the Term Sheet or this Addendum, Titan Law Group and Blakemore, as the case may be, *are authorized to seek the appointment of a receiver or effectuate any insolvency or bankruptcy proceeding*, and Lake shall be deemed to have consented to such appointment or proceeding.

(emphasis added).

47. To date, the Plaintiff has advanced approximately $1,083,165.09 in Go-Forward Financing to the Firm to maintain the Firm's ability to operate.

48. With the Term Sheet and Addendum in place, all of the fundamental terms of a comprehensive rescue plan for the collection and liquidation of the Firm's mass-tort and ERTC Claim portfolio were agreed upon, and—as had been contemplated from the very beginning of the Creditor Parties' involvement with Defendants' rescue financing—the parties moved forward to document and implement a financial restructuring of the Firm pursuant to the terms of a restructuring support agreement that incorporated the terms of the Term Sheet and Addendum (the "Restructuring Support Agreement").

49. The Term Sheet and Addendum were and are binding on the parties even without a further Restructuring Support Agreement.

50. Lake was unquestionably aware of the terms of the Term Sheet and the Addendum as he is a party to them.

51. On or about September 26, 2025, an execution copy of the Restructuring Support Agreement was forwarded to Lake and the Firm.

52. However, Lake stalled and argued through his existing counsel that he needed *new* "restructuring counsel" to review the Restructuring Support Agreement.

9

4919-9976-9461v.2

53. Notably, the Creditor Parties had previously paid for the Firm to be represented by restructuring counsel, but for reasons unknown to the Creditor Parties, Lake either fired that attorney or the attorney terminated the engagement.

54. Throughout the Creditor Parties' involvement with Defendants' rescue financing, the Creditor Parties have provided the Firm with funding to pay the fees of the Firm's litigation counsel, which has been paid over time in accordance with the Budget.

55. As of the date of this Complaint, Lake refuses to finalize the Restructuring Support Agreement and, as a result, the Restructuring Support Agreement has never been executed.

56. Plaintiff fully performed under the Go-Forward Agreement by, *inter alia*, providing requisite funding to Defendants under the Go-Forward Agreement and notifying Defendants of their wrongful breaches and misconduct as further detailed below.

**C.  Defendants' Breaches And Other Misconduct Contributing To Firm's Insolvency**

57. By virtue of their general mismanagement, incompetence, oversight failures, and egregious breaches of the Go-Forward Agreement, Defendants have rendered the Firm insolvent and unable to maintain consistent and normal operations or meet its financial obligations, as further detailed below.

58. Defendants breached the Go-Forward Agreement by, *inter alia*: (1) wrongfully and secretly terminating Mr. Samson from the Firm; and (2) wrongfully and secretly demoting Ms. Grace Montealegre from her position as chief executive officer with the Firm.

59. On or about October 9, 2025, Lake, acting on his own and on behalf of the Firm, secretly terminated Mr. Samson as CRO, which was a material breach of the Go-Forward Agreement which provided "Immediately following the execution of this Addendum, Lake shall take all actions and cooperate with any steps necessary to have Mark Samson, of Getzler Henrich

10

4919-9976-9461v.2

& Associates LLC, the Firm's Financial Advisors, approved as the Chief Restructuring Officer of the Firm with sole authority and control over the Firm's receipts, disbursements and bank accounts" and which also provided "Lake shall cooperate with [Titan and Blakemore] in good faith . . . and take further actions as may be necessary or advisable to effectuate the provisions and intent of this Addendum and Term Sheet."

60. Upon information and belief, Lake wrongfully instructed Mr. Samson not to inform the Creditor Parties of his termination to further Defendants' scheme to hide that material breach of the Go-Forward Agreement from Plaintiff.

61. Defendants understood that the appointment of Mr. Samson as CRO was crucial to the Firm's operations and a necessary inducement for Plaintiff to enter into the Go-Forward Agreement and provide funding thereunder.

62. On October 12, 2025, in a joint letter from counsel to Titan and the Plaintiff, Defendants were given notice of their breach of the terms of the Go-Forward Agreement and were provided five (5) business days to cure the breaches (the "Notice").

63. In spite of the fact that the Go-Forward Agreement expressly requires that the CRO have "sole authority and control over the Firm's receipts, disbursements and bank accounts[,]" on or about October 15, 2025, Lake made unauthorized changes to the Firm's banking authorizations, making himself and/or his agent the signatory on accounts holding funds for the benefit of the Plaintiff and Titan.

64. On or about October 15, 2025, Defendants improperly threatened to sue Titan (and later, the Plaintiff), sending a draft complaint asserting a laundry list of frivolous claims (apparently drafted by Lake while his salary and the Firm's operations were funded by the Creditor Parties).

11

4919-9976-9461v.2

65. On October 16, 2025, counsel to the Plaintiff and Titan again sent a joint notice to Defendants reminding them that any disbursements made by anyone other than an independent fiduciary was a breach of the Go-Forward Agreement (the "Second Notice").

66. These most recent breaches of the Go-Forward Agreement are not the only evidence of Lake's mismanagement, incompetence, and malfeasance in connection with the Firm's management and reckless disregard for the interests of creditors like Plaintiff. Additional breaches and failures to comply with duties to creditors include the following:

a) Lake sought to pay the credit card bills of the wife of one of his employees totaling approximately $106,000.00, stating that the charges were for expenses of the Firm.

b) Lake had borrowed approximately $117,000.00 from an employee at the Firm.

c) Lake made payments on his personal credit card with funds advanced to the Firm by Titan and Blakemore, and the balance owed on that credit card exceeded $136,000.[1]

d) Lake sought to make payments to himself in excess of agreed-upon salary.

e) Lake appears to owe at least $671,469.60 to the Internal Revenue Service.

f) Lake appears to owe approximately $100,000 to New York State.

67. All the foregoing speak to Defendants' mismanagement, incompetence, and inability to responsibly manage Firm funds that has rendered the Firm insolvent, caused the Firm to need rescue financing, and necessitated the commencement of this action by Plaintiff.

68. Defendants never cured the aforementioned breaches of the Go-Forward Agreement, and none of these breaches have been excused.

69. As a consequence of Defendants' egregious breaches of the Go-Forward Agreement, Plaintiff has suffered damages, including, but not limited to, *inter alia*: (1) money damages in the amount of Plaintiff's funds that have been misappropriated, lost, or wasted in

---

[1] Ultimately, the Creditor Parties agreed to fund partial payments on this credit card as part of the Go-Forward Financing in an effort to insulate the Firm and maintain operations.

12

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 969 of 978

connection with Defendants' egregious and uncured breaches of the Go-Forward Agreement; (2) interest on those funds; and (3) attorneys' fees, costs, and expenses occasioned by Plaintiff's need to initiate this lawsuit.

70. Based upon Defendants' egregious breaches, oversight failures and general mismanagement, Plaintiff is also entitled to additional relief against Defendants, including the contractually-agreed-upon appointment of a receiver under C.P.L.R. § 6401, which will be sought by order to show cause once this case is docketed.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

71. Plaintiff repeats and reiterates the foregoing paragraphs of this Complaint as if fully set forth herein at length.

72. The subject the Go-Forward Agreement is valid and enforceable by Plaintiff against Defendants and Defendants are both bound by the terms thereof.

73. By virtue of the foregoing allegations, Defendants breached the Go-Forward Agreement and remain in breach thereunder.

74. Plaintiff fully performed under the Go-Forward Agreement by, *inter alia*, providing the Defendants with the funding contemplated under the Go-Forward Agreement, and duly notifying the Defendants of their wrongful breaches and misconduct before bringing suit.

75. By reason of Defendants' above-described breaches of the Go-Forward Agreement, Plaintiff has been harmed, and Defendants, jointly and severally, are liable to Plaintiff for damages, including, but not limited to, *inter alia*, (1) money damages in the amount of Plaintiff's funds that have been misappropriated, lost, or wasted in connection with Defendants' egregious and uncured

13

4919-9976-9461v.2

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 970 of 978

breaches of the Go-Forward Agreement; and (2) attorneys' fees, costs, and expenses occasioned by Plaintiff's need to initiate this lawsuit.

## SECOND CAUSE OF ACTION
### (For Attorneys' Fees, Costs, And Expenses)

76.     Plaintiff repeats and reiterates the foregoing paragraphs of this Complaint as if fully set forth herein at length.

77.     By reason of Defendants' above-described breaches of the Go-Forward Agreement and the CPA (and its related agreements), Plaintiff was compelled to hire the undersigned attorneys to commence and prosecute the causes of action in this Complaint, as well as the forthcoming motion to appoint a receiver, against Defendants.

78.     In the event that Plaintiff prevails on its causes of action against Defendants, Plaintiff is entitled to recover their reasonable attorneys' fees, costs, and expenses plus interest thereupon as permitted by applicable law.

*[Remainder of page left blank intentionally]*

14

4919-9976-9461v.2

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 971 of 978

**WHEREFORE**, Plaintiff Blakemore Investments LLC demands judgment of the Defendants as follows:

1. On its First Cause of Action for breaches of the Go-Forward Agreement against Defendants, jointly and severally, damages in an amount to be determined by the Court;

2. On their Second Cause of Action, for attorneys' fees, costs, and expenses against Defendants, jointly and severally, judgment awarding Plaintiff their reasonable attorneys' fees, costs and expenses plus interest thereupon as permitted by applicable law; and

3. For such other and further relief as this Court deems just and proper.

Dated: Garden City, New York
October 27, 2025

TOGUT, SEGAL & SEGAL, LLP

By:  /s/ Frank A. Oswald
Frank A. Oswald, Esq.
John N. McClain, III, Esq.
One Pennsylvania Plaza, Suite 3335
New York, New York 10019
(212) 594-5000

GARFUNKEL WILD, P.C.

By:  _____
Kevin Donoghue, Esq.
Burton S. Weston, Esq.
900 Stewart Avenue
Garden City, New York 11530
(516) 393-2200

*Attorneys for Plaintiff*

15

4919-9976-9461v.2

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 972 of 978

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

-------------------------------------------------------------------X

BLAKEMORE INVESTMENTS LLC,

                                       Plaintiff,

               -against-

LAW OFFICES OF EDWARD J. LAKE, P.C. d/b/a THE
LAKE LAW FIRM and EDWARD J. LAKE,

                                  Defendants.

-------------------------------------------------------------------X

Index No._____/2025

**VERIFICATION**

CRAIG BATCHELOR herby affirms the following:

I am an authorized representative of Plaintiff Blakemore Investments LLC. I have read the foregoing verified Complaint, and I affirm under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, to my own knowledge, except those matters therein that are stated to be alleged on information and belief, and as to those matters, I believe them to be true and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: October 27, 2025

_____

Craig Batchelor, *on behalf of Plaintiff,*
*Blakemore Investments LLC*

16

4919-9976-9461v.2

Case 1:25-cv-25583-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 973 of 978

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BLAKEMORE INVESTMENTS LLC,

                      Plaintiff,

  -against-

LAW OFFICES OF EDWARD J. LAKE d/b/a THE
LAKE LAW FIRM and EDWARD J. LAKE,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**STIPULATION AND
ORDER RESOLVING
MOTION AND APPOINTING
TEMPORARY RECEIVER**

Index No. 629003/2025

**WHEREAS,** on October 27, 2025, Blakemore Investments LLC (the "Plaintiff") commenced this action by the filing of a verified Complaint, dated October 27, 2025 (NYSCEF Doc. No. 1) (the "Complaint"), along with the October 27, 2025 filing of a motion by Order to Show Cause for Immediate Relief (NYSCEF Doc. No. 2) (the "Order to Show Cause"); the Emergency Affirmation of Frank A. Oswald, Esq. In Support of Plaintiff's Order to Show Cause for Immediate Relief, dated October 27, 2025 (NYSCEF Doc. No. 3) ("Oswald Affirmation"); the Affirmation of Craig Batchelor In Support of Plaintiff's Order to Show Cause for Immediate Relief, dated October 27, 2025 (NYSCEF Doc. No. 5) (the "Batchelor Affirmation") and all the exhibits attached thereto (NYSCEF Doc. Nos. 6-9); and the Plaintiff's Memorandum of Law in Support of Its Order to Show Cause seeking the Appointment of a Receiver, A Temporary Restraining Order and a Preliminary Injunction, dated October 27, 2025 (NYSCEF Doc. No. 10)

1

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 974 of 978

(the "MOL" and, together with the Order to Show Cause, Oswald Affirmation, and Batchelor Affirmation, the "Motion");[1]

**WHEREAS**, on October 27, 2025, consistent with the Uniform Rules, Plaintiff notified Defendants Law Offices of Edward J. Lake, P.C. d/b/a The Lake Law Firm (the "Firm") and Edward J. Lake ("Lake" and, together with the Firm, "Defendants"), through counsel, of this action and the immediate TRO relief to be sought by the Plaintiff pursuant to the Motion;

**WHEREAS,** among other things, the Motion requested (i) a temporary restraining order and preliminary injunction preventing Defendants from wasting, losing or misappropriating Plaintiff's property or destroying any documents, and (ii) the immediate appointment of a temporary receiver for the Firm to take control of, and to have sole authority over the Firm's bank accounts;

**WHEREAS,** the Defendants, through undersigned counsel, contacted the Plaintiff's undersigned counsel to discuss Defendants' consent to the entry of the preliminary injunction and appointment of a receiver for the Firm with sole authority over Plaintiff's collateral, other client property and the Firm's bank accounts;

**WHEREAS,** the Motion recommends that this Court appoint Salvatore LaMonica, Esq. as the receiver based upon the qualifications set forth in the Oswald Affirmation;

**WHEREAS,** the Defendants have consented to the Court's appointment of Mr. LaMonica as the receiver of the Firm with sole authority over the Firm's bank accounts and assets as hereinafter set forth; and

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Complaint or the Motion, as applicable.

2

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 975 of 978

**WHEREAS,** on October 28, 2025, the Court held a status conference regarding the Motion and wherein the Defendants consented to the entry of a temporary restraining order and expressed to the Court their consent to the entry of a preliminary injunction and appointment of a receiver for the Firm with sole authority over Plaintiff's collateral, other client property and the Firm's bank accounts.

**IN CONSIDERATION OF THE FOREGOING RECITALS, WHICH ARE INCORPORATED INTO THIS STIPULATION AND ORDER, IT IS HEREBY STIPULATED AND AGREED:**

1.      The requested TRO and the Motion are GRANTED to the extent set forth herein;

2.      Pursuant to C.P.L.R. § 6401, the appointment of a receiver for the Firm, who shall have sole authority to manage and control the Firm's bank accounts, collateral, property, receipts and disbursements until displaced by further order of this Court, is warranted;

3.      On the consent of the parties and subject to Court approval, the Court shall appoint Salvatore LaMonica, Esq. as the temporary receiver of the Firm pending a further order of this Court and Mr. LaMonica shall have sole authority to manage the Firm's receipts and disbursements and control the Firm's bank accounts until displaced by further order of this Court;

4.      The Defendants shall take all necessary steps to have Mr. LaMonica immediately approved as the sole person with authority and control over the Firm's receipts, disbursements, and bank accounts;

5.      The Defendants shall file a status update on the docket of this action when it has taken the foregoing steps and Mr. LaMonica has sole authority and control over the Firm's receipts, disbursements, and bank accounts;

3

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 976 of 978

6.    The Defendants are hereby restrained, prohibited, and directed to refrain from removing, losing, dissipating, or disbursing any funds from any and all of the Firm's bank accounts or any of Blakemore's collateral and other client property;

7.    The Defendants are restrained and prohibited from taking any action directing, transferring, or diverting the proceeds of any portion of the Plaintiff's collateral, or any proceeds of claims made pursuant to the Employee Retention Tax Credit program, into any accounts other than the Firm's Escrow Account at U.S. Bank N.A. without the Plaintiff's express written consent;

8.    The Defendants are hereby restrained, prohibited, and directed to refrain from secreting, destroying, modifying, altering, or deleting any documents, records, or communications relating to any and all of the Firm's bank accounts or any of Blakemore's collateral and other client property;

9.    Nothing herein shall be considered a waiver of any right of the Plaintiff to pursue additional or further action against either of the Defendants, including, but not limited to the causes of action set forth in the Complaint; and

10.    Defendants hereby confirm service of process of the Summons and Complaint and service of the Motion.

So Ordered

_____
David T. Reilly, J.S.C.

**this 31st day of October, 2025**

4

Case 1:25-cv-25583-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 977 of 978

Respectfully submitted this **30th** day of October 2025.

GELBER LAW GROUP, P.A.

By: _____

Matt Gelber, Esq.
2385 NW Executive Center Dr.,
Suite 100
Boca Raton, Florida 33431
(954) 320-0100

*Attorney for Defendants*

TOGUT, SEGAL & SEGAL, LLP

By: _____

Frank A. Oswald, Esq.
John N. McClain, III, Esq.
One Pennsylvania Plaza, Suite 3335
New York, New York 10019
(212) 594-5000

LAW OFFICES OF EDWARD J. LAKE, P.C.

By: _____

Edward J. Lake, Esq.

*In his capacity as sole member*

EDWARD J. LAKE

By: _____

Edward J. Lake, Esq.

*In his individual capacity*

GARFUNKEL WILD, P.C.

By: _____

Kevin G. Donoghue, Esq.
Burton S. Weston, Esq.
900 Stewart Avenue
Garden City, New York 11530
(516) 393-2200

*Attorneys for Plaintiff*

5

Case 1:25-cv-25583-BB  Document 1-2  Entered on FLSD Docket 11/26/2025  Page 978 of 978

authority to manage and control the Firm's bank accounts, collateral, property, receipts and disbursements until displaced by further order of this Court, is warranted;

3. On the consent of the parties and subject to Court approval, the Court shall appoint Salvatore LaMonica, Esq. as the temporary receiver of the Firm pending a further order of this Court and Mr. LaMonica shall have sole authority to manage the Firm's receipts and disbursements and control the Firm's bank accounts until displaced by further order of this Court;

4. The Defendants shall take all necessary steps to have Mr. LaMonica immediately approved as the sole person with authority and control over the Firm's receipts, disbursements, and bank accounts;

5. The Defendants shall file a status update on the docket of this action when it has taken the foregoing steps and Mr. LaMonica has sole authority and control over the Firm's receipts, disbursements, and bank accounts;

6. The Defendants are hereby restrained, prohibited, and directed to refrain from removing, losing, dissipating, or disbursing any funds from any and all of the Firm's bank accounts or any of Blakemore's collateral and other client property;

7. The Defendants are restrained and prohibited from taking any action directing, transferring, or diverting the proceeds of any portion of the Plaintiff's collateral, or any proceeds of claims made pursuant to the Employee Retention Tax Credit program, into any accounts other than the Firm's Escrow Account at U.S. Bank N.A. without the Plaintiff's express written consent;

**8. The Defendants are hereby restrained, prohibited, and directed to refrain from secreting, destroying, modifying, altering, or deleting any documents, records, or communications relating to any and all of the Firm's bank accounts or any of Blakemore's collateral and other client property;**

9. Nothing herein shall be considered a waiver of any right of the Plaintiff to pursue additional or further action against either of the Defendants, including, but not limited to, the causes of action set forth in the Complaint; and

10. Defendants hereby confirm service of process of the Summons and Complaint and service of the Motion.

*[Remainder of page left blank intentionally]*

Respectfully submitted this ___ day of October 2025.

GELBER LAW GROUP, P.A.                    TOGUT, SEGAL & SEGAL, LLP

By:                                       By:

    Matt Gelber, Esq.                         Frank A. Oswald, Esq.
    2385 NW Executive Center Dr.,             John N. McClain, III, Esq.
    Suite 100                                 One Pennsylvania Plaza, Suite 3335
    Boca Raton, Florida 33431                 New York, New York 10019
    (954) 320-0100                            (212) 594-5000

*Attorney for Defendants*

LAW OFFICES OF EDWARD J. LAKE, P.C.       GARFUNKEL WILD, P.C.
By: _____              By:

    Edward J. Lake, Esq.                      Kevin G. Donoghue, Esq.
                                          Burton S. Weston, Esq.
*In his capacity as sole member*          900 Stewart Avenue
                                          Garden City, New York 11530
EDWARD J. LAKE                            (516) 393-2200
By: _____
    Edward J. Lake, Esq.                  *Attorneys for Plaintiff*

*In his individual capacity*

**SO ORDERED**, this ___ day of October 2025

**E N T E R :**